**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

MIKE KLOPPEL and ADAM WILSON on behalf of themselves and all other similarly situated persons,

    Plaintiffs,

v.

HOMEDELIVERYLINK, INC.

    Defendant.

Case No. 6:17–cv–06296–FPG

**ORAL ARGUMENT REQUESTED
[L.R.Civ.P. 7(c)]**

**HOMEDELIVERYLINK, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO DECERTIFY CLASS ACTION**

Andrew J. Butcher (*Pro Hac Vice*)
Jared S. Kramer (*Pro Hac Vice*)
SCOPELITIS, GARVIN, LIGHT,
HANSON & FEARY
30 W. Monroe Street, Suite 1600
Chicago, IL 60603
(312) 255–7200

Emily A. Quillen
SCOPELITIS, GARVIN, LIGHT,
HANSON & FEARY
777 Main Street, Suite 3400
Fort Worth, TX 76102
(817) 869–1700

Andrew R. Brehm
SCOPELITIS, GARVIN, LIGHT,
HANSON & FEARY
330 E. Kilbourn Avenue, Suite 827
Milwaukee, WI 53202
(414) 219–8500

Rodney O. Personius, Esq.
PERSONIUS MELBER LLP
2100 Main Place Tower
Buffalo, NY  14202
(716) 855–1050 x101

*Attorneys for Defendant, HomeDeliveryLink, Inc.*

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    BACKGROUND .................................................................................................2

     A.    Plaintiffs' remaining claims under NYLL. .............................................2

     B.    Class definition and limited class discovery. ..........................................3

     C.    Plaintiffs' proposed new class definition. ...............................................4

III.   ARGUMENT & AUTHORITIES ......................................................................5

     A.    Decertification is required where class discovery reveals the case is not appropriate for class treatment under the Rule 23 standard....................................5

     B.    Classwide evidence does not exist to resolve the employment status of each class member........................................................................................7

     C.    Plaintiffs' generic references to "policies and procedures" fail as uniform proof of control by HDL. ...................................................................18

     D.    Application of the Fair Play Act exacerbates manageability concerns raised by a trial of independent contractor reclassification issues. ...................................21

     E.    Class members' testimony indicates common evidence of "wages" is not feasible. ......................................................................................25

     F.    Plaintiffs' proposed modification to the class definition does not ameliorate lack of classwide proof. .................................................................30

IV.   CONCLUSION.................................................................................................34

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Barnes v. Am. Tobacco Co.*,
  161 F.3d 127 (3d Cir. 1998) ...................................................................................6

*Boca Raton Comm. Hosp. v. Tenet Healthcare Corp.*,
  238 F.R.D. 679 (S.D. Fla. 2006) ..........................................................................31

*Boucher v. Syracuse Univ.*,
  164 F.3d 113 (2d Cir. 1999) ...................................................................................6

*Brockman v. Barton Brands, Ltd.*,
  2007 WL 4162920 (W.D. Ky. Nov. 21, 2007) .....................................................32

*Browning v. Ceva Freight, LLC*,
  885 F. Supp. 2d 590 (E.D.N.Y. 2012) ...................................................................8

*Byong v. Cipriani Group, Inc.*,
  1 N.Y.3d 193 (2003) *aff'd on other grounds*,
  854 F.3d 131 (2d Cir. 2017) ............................................................................7, 15

*Contrera v. Langer*,
  314 F. Supp. 3d 562 (S.D.N.Y. 2018) .................................................................26

*E.B. v. New York City Bd. of Educ.*,
  2005 WL 8156773 (E.D.N.Y. June 30, 2005) .....................................................31

*Edwards v. Publishers Circulation Fulfillment, Inc.*,
  268 F.R.D. 181 (S.D.N.Y. 2010) .........................................................................19

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ................................................................................................2

*Ferrari v. Keybank Nat'l Ass'n*,
  2009 WL 35330 (W.D.N.Y. Jan. 5, 2009) ..........................................................29

*Franze v. Bimbo Bakeries USA, Inc.*,
  826 Fed. Appx. 74 (2d Cir. 2020) ...................................................................8, 12

*Franze v. Bimbo Foods Bakeries Distrib., LLC*,
  2019 WL 2866168 (S.D.N.Y. July 2, 2019) ........................................................20

*Gbarabe v. Chevron Corp.*,
  2017 WL 956628 (N.D. Cal. Mar. 13, 2017) .......................................................32

*Holick v. Cellular Sales of New York, LLC*,
  2019 WL 1877176 (N.D.N.Y. Apr. 26, 2019) ................................................................. *passim*

*Jin v. Shanghai Original, Inc.*,
  990 F.3d 251 (2d Cir. 2021) ................................................................................................. 6

*Kamar v. Radio Shack Corp.*,
  375 Fed.Appx. 734 (9th Cir. 2010) ..................................................................................... 31

*Matter of Turek (Adelchi Inc.—Commissioner of Labor)*,
  184 A.D.3d 295 (2020) ........................................................................................................ 22

*Mazzei v. Money Store*,
  288 F.R.D. 45 (S.D.N.Y. 2012) ...................................................................................... 31, 33

*Mazzei v. Money Store*,
  829 F. 3d 260 (2d Cir. 2016) ................................................................................................ 6

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2d Cir. 2010) ............................................................................................... 22

*Pachter v. Bernard Hodes Group, Inc.*,
  10 N.Y.3d 609 (2008) ...................................................................................................... 3, 26

*Philip Morris USA v. Williams*,
  549 U.S. 346 (2007) ....................................................................................................... 22, 25

*Randleman v. Fidelity Nat'l Title Ins. Co.*,
  646 F.3d 347 (6th Cir. 2011) .............................................................................................. 31

*Reyes v. Sears Holdings Corp.*,
  2019 WL 3754197 (S.D.N.Y. Aug. 7, 2019) ....................................................................... 7

*Saleem v. Corporate Transp. Group, Ltd.*,
  2013 WL 6061340 (S.D.N.Y. Nov. 15, 2013) ........................................................... 18, 19, 20

*Saleem v. Corporate Transp. Group, Ltd.*,
  52 F. Supp. 3d 526 (S.D.N.Y. 2014) .................................................................................... 7

*Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) .............................................................................................................. 7

*Traver v. Lowe's Home Centers, LLC*,
  2016 WL 880169 (E.D.N.Y. Mar. 1, 2016) .................................................................... 21, 22

*Truelove v. NE Capital & Advisory, Inc.*,
  95 N.Y.2d 220 (2000) ...................................................................................................... 3, 26

*Vaccariello v. XM Satellite Radio,*
  295 F.R.D. 62 (S.D.N.Y. 2011) .................................................................................... 1

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) .......................................................................................... *passim*

## Statutes

28 U.S.C. § 2072 ....................................................................................................... 7, 25

N.Y. Lab. Law § 190 ...................................................................................................... 26

N.Y. Lab. Law § 193 ........................................................................................................ 2

N.Y. Lab. Law § 195 ........................................................................................................ 2

N.Y. Lab. Law § 198-b ..................................................................................................... 2

N.Y. Lab. Law § 861-c ................................................................................................... 21

N.Y. Lab. Law § 862-b .......................................................................................... *passim*

## Rules

Fed. R. Civ. P. 23 ..................................................................................................... *passim*

## Other Authorities

NY Bill Jacket, 2010 S.B. 5847, Ch. 418 ..................................................................... 21

NY Bill Jacket, 2013 A.B. 5867, Ch. 558 .................................................................... 21

# I.  INTRODUCTION

The Court certified New York Labor Law (NYLL) claims of a class of current and former drivers who have contracted with HDL to provide delivery services in New York, largely relying on Plaintiffs' representations that the claims arose from uniform policies that will allow the jury to answer liability questions by common proof. *See* ECF No. 121.

Now, with class discovery complete, Plaintiffs' portrayal of class members who "were all treated similarly" rings hollow. *Id*. at 18. Discovery has shown individualized questions, a lack of common proof, and manageability issues that make continued class treatment unworkable and inefficient. The written agreements and alleged policies relied on by Plaintiffs cannot provide uniform answers on the gateway issue of employment when class member testimony and tax records reveal inconsistent experiences on factors relevant to the two applicable misclassification tests. Moreover, class member testimony invalidates the notion that common proof of wages can be derived from records, as the Delivery Settlement Statements do not establish compensation paid for work personally performed by class members.

Proof of liability remains as indispensable in class actions as it is in individual actions. *Vaccariello v. XM Satellite Radio*, 295 F.R.D. 62, 74 (S.D.N.Y. 2011). Rule 23 neither reduces any class member's burden to prove each element of his individual claims nor deprives HDL of the right to present individualized defenses to those claims. Nor does it allow a liability finding unless actual violations of NYLL are proved. The evidence proffered on the employment classification element alone is not common to the class, and the disparate testimony for requisite proof of "wages" cannot establish liability under NYLL. These failures prohibit a finding of commonality, typicality, and adequacy, along with any finding of predominance. This case cannot

manageably be tried in accordance with the principles of due process. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011). Decertification must be granted as a result.

## II.  BACKGROUND

### A.  Plaintiffs' remaining claims under NYLL.

Plaintiffs filed this lawsuit on behalf of themselves and a class of contractors who have worked delivering merchandise for one of HDL's customers, Innovel Solutions, Inc. (Innovel), from locations in New York. *Plaintiffs' First Amended Complaint* (ECF No. 10) (Compl.) at 8. Innovel contracts with retailers such as Sears, Costco, e-Bay, and La-Z-Boy, to consolidate the retailers' products for delivery. *See Sierra Dep*. 43:10–24;[1] ECF No. 37-1 at 1.

The Court's dismissal of Plaintiffs' claims of unjust enrichment and illegal kickback of wages under NYLL Section 198-b [ECF Nos. 31, 87] left two remaining causes of action against HDL for alleged (1) illegal deductions under NYLL Section 193 and (2) record-keeping violations under NYLL Section 195. ECF No. 121 at 1. The consideration of whether Rule 23(b)(3) is satisfied "begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

The elements of a Section 193 claim are: (i) the existence of an employment relationship, (ii) the payment of "wages", and (iii) the existence of deductions taken from those wages for reasons other than those permitted by Section 193(1)(a)-(d). The elements of a Section 195 claim are: (i) the existence of an employment relationship and (ii) absence of a wage statement containing information specified in statute at time of payment.

---

[1] Cited portions of the depositions and other exhibits referenced throughout this memorandum are attached to the Declaration of Emily A. Quillen accompanying this filing. For ease of reference, HDL's exhibits are referenced as "Ex." throughout this Memorandum. Citations to deposition transcripts (Exhibits 17 to 29) are referenced as [Last name of deponent] Dep. [page number:line]. Exhibits 1, 2 and 16 contain redacted information, as they are tax records produced by class members; unredacted versions will be filed under seal pursuant to Local Rule 5.3.

Both Sections 193 and 195 require Plaintiffs to establish that HDL employed them. ECF No. 121 at 6. Employment may be established under both (1) the hybrid economic-realities 5-factor control test and (2) the 3-factor or 11-factor tests of the Commercial Goods Transportation Industry Fair Play Act (Fair Play Act) (NYLL §§ 862-b(1), (2)).

Plaintiffs also must demonstrate that they received a "wage" as defined under NYLL [ECF No. 121 at 6-7], including but not limited to (1) whether the class member received payment for services personally rendered by him/her and (2) whether the particular class member knew he/she had responsibility for covering operational expenses at the time of contracting and agreed to compensation terms factoring in reductions for those expenses. *See Truelove v. NE Capital & Advisory, Inc*., 95 N.Y.2d 220, 225 (2000); *Pachter v. Bernard Hodes Group, Inc*., 10 N.Y.3d 609, 617-18 (2008).

**B. Class definition and limited class discovery.**

On June 3, 2020, the Court granted class certification. *See* ECF No. 121. Based on Plaintiffs' proposed class definition, class members were defined as:

> All individuals designated as "contract carriers" by HDL, who performed truck driving delivery services out of specific facilities/warehouses located in Rochester, Syosset and Buffalo, New York, and delivered goods to customers located anywhere on the East Coast on behalf of HDL, at any time from May 8, 2011, through the date of final judgment in this action.

*Id*. at 19-20. Plaintiffs coordinated mailing of the class notice to the 122 individuals who, according to HDL's records, met the class definition. ECF No. 125. No one opted-out of the class.

Following the close of the notice period, the Court granted HDL leave to depose up to eight class members and serve up to ten class members with limited written discovery. ECF No. 126. As the parties attempted to schedule depositions, Plaintiffs' counsel reported at least fourteen class members who declined to participate in discovery or were non-responsive. After several informal

discovery conferences, stipulations, and discovery extensions [ECF Nos. 129, 131, 132, 135, 138-140], HDL finally was able to depose seven class members and received seven sets of responses to HDL's written discovery requests, which included documents produced by only three class members.

Of Plaintiffs and the seven class members who sat for depositions:

- five produced tax returns, including Schedule C to IRS Form 1040, Form 1120S, and Form 1065;

- three used their equipment to service non-HDL deliveries;

- nine had businesses that hired or contracted with drivers to complete deliveries;

- three purchased trucks specifically for delivering product for HDL;

- five continued to operate their businesses after their businesses terminated their contract with HDL; and

- five advertised their businesses on their trucks or apparel.

Testimony on the power to hire employees without HDL's approval, ability to decline work, as well as the freedom to schedule work days and negotiate rates varied widely, as did testimony on the supervision and training provided to drivers. *See Appendix A* (providing example testimony comparisons on these factual topics).

**C. Plaintiffs' proposed new class definition.**

In a discovery conference on February 22, 2021 [ECF No. 129], Plaintiffs deemed unworkable the class definition that they had proposed in their class certification motion, which the Court adopted in granting class certification. Counsel for Plaintiffs explained that, as defined, "[t]he class refers to people who provided delivery services whereas in similar cases like this, you know, it's included people who personally provide delivery services on a full-time basis." ECF No. 133 at 4:18-21. Plaintiffs' counsel opined that class members are not "employee[s] under New York law" who (i) do not personally provide delivery services on a "full-time basis", (ii) "arrange for trucks",

(iii) "arrange for people to get in those trucks and perform the deliveries", and (iv) "may even contract with multiple companies. . . not just HDL." *Id.* at 3:23-6:9 (Plaintiffs' counsel explaining need to revise current class definition). Thereafter, Plaintiffs agreed to provide a proposed "narrowed class definition by March 12." ECF No. 130 at ¶ 3(a).

On April 21, 2021, Plaintiffs reiterated their intent to propose a "narrowed definition" for the class, composed of "people who personally provided delivery services, not sat at home and, you know, organized other people to make deliveries." *See* ECF No. 137 at 13:12-14. Under Plaintiffs' theory, "you're only an employee if you actually drove a truck." *See* ECF No. 141 at 22:18-19.

On June 11, 2021, three months later than agreed, Plaintiffs proposed the following new class definition:

> All individuals who contracted with HDL to perform delivery services out of specific facilities/warehouses located in Rochester, Syosset and Buffalo, New York to customers located anywhere on the East Coast on behalf of HDL, who drove their vehicle for HDL for at least four consecutive weeks at any time from May 8, 2011, through the date of final judgment in this action, and including only periods where the individual personally performed deliveries on a full-time basis.

*Ex. 8*. On July 12, 2021, Plaintiffs provided the proposed new class list [*Ex. 10*], which added yet another criterion for inclusion in the proposed new class definition—the class member must have driven "3 days a week as the minimum number of days to qualify as having driven full time in a given week." *Ex. 9*. Plaintiffs claim that use of this "revised class list" would reduce the class size from 122 to 71 individuals, and that a class member may "qualif[y] under the class definition for some periods, but then does not qualify at other times" based on "full time" driving. *Id.*

### III.   ARGUMENT & AUTHORITIES

**A. Decertification is required where class discovery reveals the case is not appropriate for class treatment under the Rule 23 standard.**

A class certification order "may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). District courts must monitor class proceedings as the case develops to ensure all

Rule 23 requirements remain satisfied through final judgment. *Jin v. Shanghai Original, Inc*., 990 F.3d 251, 261 (2d Cir. 2021). Continued certification is appropriate only "if the trial court is satisfied, after a rigorous analysis," that all of the "prerequisites of Rule 23(a)" and one of the alternative requirements of Rule 23(b) have been met. *Dukes*, 564 U.S. at 350-51; *see Jin*, 990 F.3d at 261-62 (quoting *Boucher v. Syracuse Univ*., 164 F.3d 113, 118 (2d Cir. 1999)) (holding that "the district court need only find that a previously satisfied requirement of Rule 23 is now lacking" to warrant decertification).

Plaintiffs retain the burden to demonstrate by a preponderance of the evidence that all Rule 23 requirements are satisfied throughout the case. *See Mazzei v. Money Store*, 829 F. 3d 260, 270 (2d Cir. 2016) (recognizing that "[i]n opposing the decertification motion, [plaintiff] retained the burden to demonstrate that these requirements were satisfied"). Numerosity, commonality, typicality, and adequacy make up the Rule 23(a) requirements. The Rule 23(b)(3) requirements Plaintiffs must establish "through evidentiary proof" are that (1) questions of law or fact common to the members of the proposed class predominate over questions affecting individual class members alone, and (2) that a class action is superior to other available methods to resolve the controversy. ECF No. 121 at 11. Accordingly, if case developments call into question whether continued class treatment is appropriate, the Court should "reassess [its] class rulings" and decertify the case if the Rule 23 requirements are no longer satisfied. *Id*. at 267, n.7 (quoting *Barnes v. Am. Tobacco Co*., 161 F.3d 127, 140 (3d Cir. 1998)).

The evidence secured during class discovery dispels Plaintiffs' contention that classwide "common proof" exists on the elements of their NYLL claims. In order for the class to remain certified, Plaintiffs must demonstrate by a preponderance of the evidence that the four requirements of Rule 23(a) along with the Rule 23(b)(3) are met.

Decisions from the Supreme Court confirm that class actions do not relieve Plaintiffs' burden to establish the elements of each class member's individual NYLL claim or preclude HDL from defending against those individual claims. *Dukes*, 564 U.S. at 367 ("[T]he Rules Enabling Act [28 U.S.C. § 2072(b)] forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right.'"); *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co*., 559 U.S. 393, 408 (2010) (recognizing that class actions are a species of joinder, and the fact that "willing plaintiffs" choose to have their claims resolved in a class does not change their "separate entitlements to relief nor abridge defendants' rights.").

**B.  Classwide evidence does not exist to resolve the employment status of each class member.**

An employment relationship is the first element of the remaining  claims under Sections 193 and 195. *See Reyes v. Sears Holdings Corp*., 2019 WL 3754197, at *6-7 (S.D.N.Y. Aug. 7, 2019) (recognizing that employment relationship is an element of a wage and hour claim under the NYLL). The test for determining if an individual is an employee varies during the class period. Prior to enactment of the Fair Play Act, N.Y. Lab. Law § 862-b, the determination was resolved through a hybrid of the economic–realities test. ECF No. 121 at 13-14. Under both tests, the "degree of control" exercised by the putative employer remains the critical inquiry. *Saleem v. Corporate Transp. Group, Ltd*., 52 F. Supp. 3d 526, 536 (S.D.N.Y. 2014). Factors relevant to that inquiry are "whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Id*. (quoting *Byong v. Cipriani Group, Inc*., 1 N.Y.3d 193, 198 (2003)), *aff'd on other grounds*, 854 F.3d 131 (2d Cir. 2017)); ECF No. 121 at 13. Plaintiffs' class certification request asserted that class members' employment relationship can be determined through common proof [ECF No. 108 at 6-7], pointing to (1) the Home Delivery & Shuttle Carrier Agreements (HDSCAs) (2) the Independent Contractor Agreement (ICA) and (3) a document Plaintiffs refer

7

to generically as "HDL's Written Policies", which purportedly is a "job description for the HDL position of 'Account Executive.'" ECF No. 98-1, ¶ 6.

With class discovery now complete, "the record is replete with material discrepancies among the Plaintiffs and their relationships with Defendants, that are directly relevant to resolving this litigation." *Holick v. Cellular Sales of New York, LLC*, 2019 WL 1877176, at *11 (N.D.N.Y. Apr. 26, 2019). The lack of uniformity on these employment factors compels decertification here.

1. *Tax filings*: Tax reporting is a "significant consideration" in determining independent contractor status. *Franze v. Bimbo Bakeries USA, Inc.*, 826 Fed. Appx. 74, 79 (2d Cir. 2020); *Holick*, 2019 WL 1877176 at *5 (citing *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 605 (E.D.N.Y. 2012) (reasoning that plaintiffs' efforts to receive "significant tax benefits associated with their independent contractor [classification]" was a factor that "weigh[ed] heavily in favor of [the court finding] independent contractor status."). HDL requested ten class members' tax records, three of which produced business tax returns containing business expenses reported on either a Schedule C to IRS Form 1040, Form 1120S, or Form 1065. The remaining seven class members from whom HDL requested tax return information did not produce—and may not have filed—any business tax returns.

These tax records reflect income and expense numbers for the three class members' businesses, but their respective testimony alone provides context for the "substance of the business expense deductions" that are probative of independent-contractor status. *Holick*, 2019 WL 1877176 at *5. Those expenses included (i) over $1 million that Collins Home Delivery, Inc. (class member Michael Collins' company) paid to its employee drivers and helpers for tax years 2011 – 2018;[2] (ii) thousands of dollars in meal/entertainment expense Collins attributed to Buffalo Bills

---

[2] *Collins Dep.* 93:21-94:6; *Ex. 1* at MCOLLINS000001, 10, 19, 28, 38, 47, 56, 71.

tickets purchased as a goodwill gesture for his company's current and former employees;[3] and (iii) deductions ranging from $67 to $3,067 for uniforms, including shirts emblazoned with "Collins Home Delivery" that Collins handed out "to give [his] employees a little pride. They liked working for [him and] they liked the shirts."[4]

Class member Samora Minors's business-tax returns also reflect amounts for labor, meals and entertainment, as well as uniforms, but his testimony about those tax deductions diverges in substance from Collins. Instead of hiring employees to drive the four trucks that his business operated for HDL and two other companies, Minors retained contract labor to provide driver and helper services "purely [for] financial" reasons—"I couldn't afford an employee" said Minor, who testified to spending $207,560 for contract labor in 2014. *Minors Dep*. 84:7-18, 94:17-96:18, 134:9-11, 154:25-156:17; *Ex. 16* at SMINORS000478, 511, 513. He chose to pay for contract labor to avoid "the overhead" of hiring employees that would have caused his company to "shut down." *Minors Dep*. 134:6-20; *see Holick*, 2019 WL 1877176 at *6 ("hiring of other workers or subcontractors indicates independent contractor status" and therefore relevant to decertification).

So it goes with the tax deductions for uniforms. Minors testified that he was required to purchase specific shirts from HDL and could be subject to punishment if the wrong shirts were worn. *Minors Dep*. 100:7-101:24. And while there were no Buffalo Bills tickets among the meals and entertainment deductions (unsurprising, given Minors spent almost two years living in Florida while his business continued operating in New York), Minors did take deductions for the thousands of dollars spent on meals while "discussing company business or when I would take my guys out

---

[3] *Collins Dep*. 65:15-66:10; *Ex. 1* at MCOLLINS000024.
[4] *Collins Dep*. 17:11-18:3; *Ex. 1* at MCOLLINS0000005, 15, 24, 34, 43, 52; *but see* ECF No. 10 (Plaintiffs's Complaint alleges class members "wear[ ] a uniform required by [HDL]."

and pay for their food on the job." *Minors Dep*. 105:15-20, 160:7-17, 107:4-108:7; *Ex. 16* at SMINORS000480, 485, 503.

Tax reporting also reveals a difference of investment in class members' transportation operations. *Holick*, 2019 WL 1877176 at *5. Some Contract Carriers rented equipment on a week-by-week basis, others entered into long term leases. *See Traina Dep*. 114:23-115-:2; *Ex. 2* at TRAINA000007; *Appendix A*, § II(B). Still others purchased trucks, with cash or financing. *See Minors Dep*. 155:24-156:6 (deducting depreciation of four trucks); *Ex. 16* at SMINORS000478; *Appendix A*, § II(A). Tax filings also show class members expended funds on advertising aimed at business growth. *Minors Dep*. 168:11-169:14 (advertised with fliers to try to find moving work on the side); *Traina Dep*. 42:7-12 (advertised on Craigslist to find employees to hire for business); *Wilson Dep*. 35:9-36:12 (advertised with sponsorships of sports clubs or teams and advertised on trucks). Class members who did not advertise their business had no related deductions on their tax returns. *Collins Dep*. 66:11-13; *Ex. 1* at 1, 19, 28, 38, 47, 56, 66, 76; *Blattenberger Dep*. 86:12-21.

Class member tax documents also reveal (1) work for companies other than HDL with hundreds of thousands of dollars in gross receipts or sales compensation;[5] (2) capital contributions made to company operations;[6] (3) costs for payroll services for the businesses' employees, including payroll processed for work performed for other companies;[7] (4) expenses or depreciation

---

[5] *Compare Traina Dep*. 122:22-123:6, 127:8-13 (more than $400,000 reported compensation along with deductions of related expenses deducted for work performed for two other companies with which Traina Services LLC contracted), *with Ex*. 3 at 9 & *Ex*. 4 at 9 ("Plaintiff was not permitted to freely provide delivery services for companies other than HDL and Sears").

[6] *Minors Dep*. 163:7-22 (tax returns indicate partner's capital invested in excess of $49,000 in company)

[7] *Traina Dep*. 20:21-21:21, 120:4-19 (deducting expenses for payroll associated with trucking services Traina Delivery LLC performed for MFM in 2014, while contracted with HDL); *Ex*. 2 at TRAINA000012 ($1,040 expense deducted for "UGO/MFM Payroll Expense"; *Collins Dep*. 66:14-67:5 (never performed payroll processing for Collins Home Delivery LLC but engaged a payroll processing company to ensure accuracy for taxes); *Ex*. 1 at MCOLLINS000005 (reporting $16,742 in total deductions for "Payroll Processing Fees" for tax years 2011 – 2016, respectively); *but see Minors Dep*. 133:12-23 (class member personally wrote checks to contractors for Minors Contracting rather than use payroll processing company);

for equipment such as trucks, tools, and cell phones;[8] and (5) areas for potential impeachment since tax filings are made under penalty of perjury.[9] Some of these expenses were incurred independent of any work Contract Carriers completed for HDL. *See Minors Dep.* 171:14-24 (Minors Contracting LLC, which drove for multiple companies besides HDL, reimbursed its contract drivers' fuel expenses out of business account and reported expense of $25,600 for as deduction on 2017 Schedule C); *Traina Dep.* 18:23-19:20, 120:4-19; *Ex.* 2 at TRAINA000012, 14, 16, 18 (deducting payroll expenses related to delivery work Traina Service LLC performed for another company, MFM).

The purportedly common proof Plaintiffs proffered to resolve the employment element—the HDSCAs, ICA, and "HDL's Written Policies"—are silent on this salient evidence. Had HDL not received an opportunity to access these Contract Carriers' tax records and cross examine class members regarding their contents, HDL would not have discovered these facts that "are clearly relevant to the issues before the court, and weigh in favor of decertification." *Holick,* 2019 WL 1877176 at *5.

2. *Investment in the business*: Depositions also show variations in class members' investment in their business. *See Holick*, 2019 WL 1877176 at *3 (concluding that record showing differences in the extent of investment in equipment, supplies, and advertising warranted decertification);

---

*Blattenberger Dep.* 42:12-19 (Cells Contracting incurred no costs associated with payroll, as class member kept own accounting records on paper).

[8] *Collins Dep.* 67:6-68:18 (small tool and cell phone deduction taken on Form 1120S for Collins Home Delivery, Inc.); *Minors Dep.* 93:2-13 (did not deduct cell phone as business expenses), 155:24-156:17 (deducting depreciation for used trucks Minors Contracting purchased), 156:18-158:1 (describing tools, equipment, and supplies deducted in excess of $17,000 on 2014 Schedule C), 159:7-17 ($21,000 difference between truck expenses for 2014 and 2015 caused by more truck repairs and breakdowns), 164:3-20 (deducting $26,110 for truck rentals).

[9] *Traina Dep.* 120:4-19; *Ex.* 2 at TRAINA000012, 14, 16, 18; *Ex.* 5 at 2-3. Traina testified he may have contracted with a non-HDL company, MFM, two years earlier than what he disclosed in his interrogatory answers because deductions related to "MFM Payroll Expense" appeared on his taxes.

*Franze*, 826 Fed. Appx. at 77 (highlighting the plaintiff/appellants "made significant investments in, and had ample opportunity to profit from or lose money on, their business" as evidence of an independent contractor relationship).

Personal investments were dissimilar, with a class member testifying that he never personally paid for expenses associated with operating his business, while another class member invested $49,085 of personal capital into his partnership. *Collins Dep*. 67:15-18; *Minors Dep*. 163:7-13. Their businesses also took different levels of risk in investing in equipment, providing capital investments before or during their contracts with HDL. One class member's business owned equipment when it contracted with HDL. *Ramos Dep.* 46:22-47:17 (Bonilla Ramos Delivery Inc. had purchased truck for prior work for Niatco Trucking, before contracting with HDL). Other class members made the decision their companies would lease in the beginning, and then purchased trucks while contracted with HDL. *Minors Dep*. 63:23-65:15, 66:10-67:7, 118:16-24 (after turning in leased trucks, purchased four used box trucks that were more affordable and filled in with day rental if had truck breakdown); *Samuels Dep*. 103:11-104:14 (leased one truck beginning in 2013 and then purchased two trucks in 2015). And still others decided to lease trucks to save costs or simply as a matter of preference. *Traina Dep*. 33:6-25, 34:1-35:1; *Bharath Dep.* 49:9-50:18.

Class member testimony also diverged on the ability to add more trucks and drivers for Innovel routes. *Minors Dep.* 71:9-72:10 (added a backup driver to avoid losing a route); *Traina Dep.* 24:8-12 (added additional trucks and drivers when HDL asked him to do so); *Collins Dep.* 19:2-22, 22:22-23:22 (HDL told limit was two trucks as new contractor, although he had up to four more trucks available and increased up to five trucks with increased demand). And the payment of insurance premiums provides another example of the amount of investments class members made in their respective businesses. *Minors Dep.* 66:3-8 ("would shop around for rates"

for insurance, reporting $17,884 in insurance expenses on 2016 income statement for Minors Contracting LLC); *Traina Dep*. 103:8-104:2, 124:21-23 (after had experience, he searched for "best coverage" with expense of almost $70,000 reported on 2016 Schedule); *Bharath Dep.* 50:23-51:21 (chose State Farm insurance because of familiarity and past experience).

3. *Disparities in the hiring of other workers*: Plaintiffs claim that there is common proof on class members' ability to hire employees without HDL's approval. ECF No. 108 at 15. But class members provided varied testimony on their ability to hire drivers and helpers, as well as the business discretion they exercised in managing their labor force. *Holick*, 2019 WL 1877176 at *6 (finding factual discrepancies among plaintiffs regarding the hiring of workers and subcontractors an important aspect that weighed in favor of decertification). Minors testified that his decision regarding whether he would hire a worker was dependent on whether HDL "would tell me if he's good to work or not." *Minors Dep.* 43:15-22. In contrast, Bharath testified that he alone made the decision on whether his company, Lighthouse Trucking Inc., hired drivers or helpers. *Bharath Dep*. 94:9-15. And Samuels testified that whether his company hired someone without HDL's involvement depended on the worker:

> Q.  And how did you find Hugh Jackson?
>
> A.  He was my ex-wife's nephew.
>
> Q.  And <u>was it your decision to hire him</u>?
>
> A.  <u>Yes</u>, he came from Georgia. He was here and needed some work.
>
> . . .
>
> Q.  Then it appears that you also had a helper named Jerry Cesar, is that correct?
>
> A.  That's when the second truck came on. He was the helper for the second truck.
>
> Q.  Okay, and how did you find Jerry Cesar?
>
> A.  He was actually working with another guy that left the company, so he was looking for work.

Q. <u>Was it your decision to hire him</u>?

A. <u>Yes, but at the same time, it had to be cleared by HDL</u>, the other guy.

*Samuels Dep*. 36:14-37:7 (emphasis added).

4. *Discrepancies regarding ability to decline work:* Testimony on the ability to decline work reveals that Plaintiffs' allegation that all class members "worked subject to the same controls and supervision" (ECF No. 98-19 at 33) has conflicting support. *Holick*, 2019 WL 1877176 at *6 (finding factual differences in plaintiffs' "freedom to choose where to work" revealed lack of common proof and weighed in favor of decertification). Collins testified that he turned down work outside Rochester fifteen to twenty percent of the time because he could not find drivers willing to go out-of-town. *Collins Dep*. 53:7-16, 82:25-83:17. Another class member, Minors, stopped performing work out of Rochester because his company was not making a profit, but continued to perform work in Syosset. *Minors Dep*. 55:7-57:21. In contrast, Samuels testified that he refused work and then sat at home the next few days, which he supposed could have been a repercussion for turning down the work. *Samuels Dep*. 32:11-18.

5. *Different accounts of ability to determine and control work schedule*: Plaintiffs claim that they rely on "black-and-white polic[i]es" to establish control on a classwide basis. ECF No. 108 at 16. But class members had vastly different accounts of the amount of freedom they had to set their own work schedules. *Holick*, 2019 WL 1877176 at *6 (because "ability to choose how much and when to work are significant factors relevant to analyzing employment arrangement, "widely varied testimony . . . suggests that not all Plaintiffs were similarly situated in this key respect," which favors decertification). Some Contract Carriers hired additional drivers so that their owners could take time off. *Collins* 27:14-23; *Minors Dep.* 71:9-72:10. Minors testified to a very liberal schedule, describing that he took time off "however I felt like it." *Minors Dep.* 72:21-73:7. At one point, Minors lost his license and for a period of time worked only as a helper. *Id.* 127:14-128:4.

And from time to time, he did not make deliveries and focused on paperwork for his business instead. *Id.* 112:6-17, 184:5-15; *see also Holick*, 2019 WL 1877176 at *6 (finding evidence that at least two class members testified they could elect not to work suggests not all [p]laintiffs were similarly situated in this key respect") (citing *Saleem*, 854 F.3d at 146 ("The ability to choose how much to work also weighs in favor of independent contractor status.")). In contrast, other class members testified that they did not have the ability to take time off, and that "we couldn't say no" to work offered by HDL and "it was pretty much determined by HDL when you would work." *Ramos Dep.* 41:18-23; *Bharath Dep.* 88:6-18.

6. *Ability to negotiate*: Notable differences also exist with respect to class members' experiences in the ability to negotiate rates. *Holick*, 2019 WL 1877176 at *7 (considering different testimony regarding plaintiffs' ability to set prices and negotiate when granting decertification). Collins negotiated with HDL and received an additional $160 flat rate per week. *Collins Dep.* 86:19-89:16. When the negotiated rate was taken away, he threatened to terminate his contract and the higher rate was reinstated. *Collins Dep.* 89:9-15. But Samuels testified that he attempted on more than one occasion to negotiate a higher rate with HDL and was denied an increase. *Samuel Dep.* 32:5-10, 46:10-18.

Similar divergent experiences occurred in negotiations of delivery damage claims. While Plaintiffs allege that class members "do not contact [ ] customers" [*Compl.* at ¶ 28], one class member testified that he negotiated to resolve merchandise or in-home damage claims directly with customers. *Collins Dep.* 64:4-65:8. Insurance resolved some of the damage claims of one class member. *Minors Dep.* 140:23-141:10. But others testified that the claims were absorbed as business costs, as they were not able to determine which driver or helper was involved in the claim. *Blattenberger Dep.* 76:14-77:14; *Traina Dep.* 86:22-87:12.

7. *Supervision and training of workers:* There is no homogenous policy or practice regarding HDL's involvement in the supervision of day-to-day work by Contract Carriers, nor in the training of workers. *Holick*, 2019 WL 1877176 at \*7 (considering the diversity of experience among plaintiffs regarding "the level of supervision" when granting decertification).

HDL's involvement in the daily assignment of manifests to Contract Carriers' drivers varied across class members. Manifests contain the list of deliveries for a Contract Carrier's truck. Some drivers preferred certain manifests due to their geographic area, volume of deliveries, and the amount of revenue that could be earned by a driver. *Collins Dep*. 42:9-24. Minors lived in Florida while his New York teams operated without his labor. Accordingly, he testified that Sears "handed out [manifests] the day before" and "controlled everything on their end of the delivery spectrum." *Minors Dep*. 109:6-110:3. But Collins testified that for a period of time, he assigned the manifests to his company's employee drivers. *Collins Dep*. 43:6-44:9; *see also Kloppel Dep*. 100:25-101:9 (Kloppel had the final say in assigning work to Kloppel Deliveries' employees). Blattenberger described that "it was entirely up to HDL who got what" manifest, but later admitted that delivery teams or contractors picked their own routes at times. *Blattenberger Dep*. 48:8-49:15. This testimony does not match with Plaintiffs' claim that manifests were "handed to the drivers by HDL each morning" and "HDL Account Executives determine which contract carrier drivers will be working each day." ECF No. 98-19 at 17.

Class member testimony also diverged on the ability to add more trucks and drivers for Innovel routes. Some class members testified that they had discretion to add or remove trucks and drivers. *Ramos Dep*. 27:19-25 ("since there was not enough business I took the other truck out."); *Minors Dep.* 71:9-72:10 (added a backup driver to avoid losing a route); *Blattenberger Dep*. 38:17-39:4 (Cells Contracting "would get more guys" when it "needed more trucks."). But other class

members testified that HDL controlled the number of trucks they operated. *Traina Dep*. 24:8-12 (added additional trucks and drivers when HDL asked him to do so); *Collins Dep*. 19:2-22, 22:22-25:10 (HDL told him limit was two trucks as a new contractor, although he had up to four more trucks available and later added up to five trucks with increased demand).

Similar conflicting experiences occurred with driver training and daily contact with HDL. Plaintiffs contend that HDL trains drivers on "how to use equipment such as team straps, dollies or floor protection" [*Ex. 4* at 6] and "how they should load their trucks" [*Ex. 3* at 6]. Class member Bharath testified that HDL provided him a trainer as a helper for two weeks. *Bharath Dep*. 35:14-36:9. But Minors denied receiving training from HDL and Blattenberger testified that he trained his own drivers. *Minors Dep*. 48:23-25; *Blattenberger Dep*. 44:10-23. Collins testified that he had "a lot" of interactions on a daily basis with HDL employees, while Bharath stated he had no reason to contact HDL unless his teams encountered problems while making a delivery. *Collins Dep*. 35:18-36:12; *Bharath Dep*. 101:4-102:22.

Class members also provided differing testimony regarding the ability to advertise on their shirts. Samuels testified that his company had to purchase shirts from HDL and were not allowed to put names or logos on shirts. *Samuels Dep*. 94:24-95:8. Minors testified that he was not "able to enter the building without the [HDL] clothing." *Minors* at 100:11-18. On the other hand, Collins purchased his own shirts and put his company name on them. *Collins Dep*. 15:22-16:5, 17:11-18:4. This testimony conflicts with Plaintiffs' contention that they were "required to dress in specific clothing that gave customers the clear impression he was a Sears employee." *Ex. 3* at 9; *Ex. 4* at 9; *see also Compl*. at ¶ 16(f) (alleging class members "are required to wear" "navy shirt, black pants, and black boots").

In summary, discovery has highlighted that the employment element of both claims under Section 193 and 195 "cannot be resolved through generalized proof." *Saleem v. Corporate Transp. Group, Ltd*., 2013 WL 6061340, at *7 (S.D.N.Y. Nov. 15, 2013). As this Court has recognized, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." ECF No. 121 at 9-10 (quoting *Dukes*, 564 U.S. at 350). No common answer on any of the hybrid economic reality factors can be derived from the dissimilar testimony from even seven of the 122 class members who have received notice in this case.

### C.  Plaintiffs' generic references to "policies and procedures" fail as uniform proof of control by HDL.

The "policies and procedures" Plaintiffs pointed to when moving for class certification do not pave over evidentiary variances. As in *Holick*, "[t]he record belies the Plaintiffs' general assertion that Plaintiffs are all similarly situated simply because they were subject to an alleged 'uniform policy' of control." 2019 WL 1877176 at *7.

Plaintiffs claim that "the misclassification issue can be resolved on common proof" [ECF No. 108 at 6-7], pointing to (1) the HDSCAs, (2) the ICA, and (3) so-called "Written Policies" that purportedly is a "job description for the HDL position of 'Account Executive.'" ECF No. 98-1, ¶ 6. None of these documents contain policies that can resolve the employment element on a classwide basis. Nor does testimony from HDL employees Sierra, Rex, or Dunlop negate evidence from the class members themselves of the actual freedom each had to run their operations.

First, not every class member signed an ICA, whether on their own behalf or on behalf of their companies. HDL and the Contract Carriers used an ICA to memorialize the terms of their

arrangement until June 2017, when HDL began contracting with Contract Carriers under a Freight–Forwarder Carrier Agreement. ECF No. 109-5 at ¶ 10. At least 14 class members contracted with HDL after June 2017. *See* Ex. 10. Plaintiffs have presented no evidence that the terms of the newer agreement comport with the ICA that Plaintiffs signed.

But even if the ICA had been signed by all of the class members, since it is the <u>actual</u> control exerted over a contractor that matters in the classification determination—not the mere right to control identified in a contract—the parties' contractual agreement is of limited evidentiary value. *Saleem*, 2013 WL 6061340, at *5 (quoting *Edwards v. Publishers Circulation Fulfillment, Inc.*, 268 F.R.D. 181, 184 (S.D.N.Y. 2010)) (finding that even if all putative employees signed substantially identical franchise agreement, plaintiff "overlook[ed] that 'the critical determinant' of employment status under New York law is not the right of a purported employer to control a purported employee, but 'the degree to which the purported employer exercises control in fact over the results produced or the means used to obtain them.'").

Importantly, the ICA requires specific results, but reserves control over how those results are accomplished to the Contract Carrier. ECF No. 98-9 at ¶ 10 ("Contractor shall direct the operation of its equipment and employees in all respects and shall determine the means of performance"). It is because of this freedom of control that class members' deposition testimony reveals so many variances in their business decisions on matters like investment, hiring workers, scheduling, and negotiation. *See Appendix A*, §§ I - VII.

In the same way, the HDSCAs cannot serve as "common proof" that HDL had actual control over the class members' businesses. Principally, these documents are contracts between Innovel and HDL, so they do not on their face evidence control of class members. ECF No. 98-19 at 20; *Franze v. Bimbo Foods Bakeries Distrib., LLC*, 2019 WL 2866168 at *7 (S.D.N.Y. July 2, 2019)

(finding "Defendants' communications with chains and government institutions regarding pricing, store displays, and other matters" did not constitute control). And Plaintiffs do not connect the HDSCAs to any tangible uniform policy of control over class members. ECF No. 108 at 13 (referring only to the "litany of policies, practices and procedures" in the HDSCAs). Like the so-called Rulebooks considered in *Saleem*, the existence of the HDSCAs do not alter the class member testimony that supports a finding that HDL "wielded virtually no influence over other essential components of the business, including when, where, in what capacity, and with what frequency Plaintiffs would drive." *Saleem*, 854 F.3d at 14.

The relevance of the "Written Policies" remains unclear. Plaintiffs offered no evidentiary foundation for the document, leaving the Court to guess as to (i) when the document was used in New York (if ever), (ii) who the document was provided to, (iii) at what locations the document was in use, and (iv) how the document was utilized. ECF No. 98–1 at ¶ 6. Plaintiffs cite to descriptions of "Daily 'Stand Up' Meetings" and 'Ride Alongs.'" ECF No. 108 at 16, n.19 (citing ECF No. 98-2 at pp. 15-16). But Plaintiffs admitted that "Sears manager(s) and other Sears employees", not HDL employees, performed "'follow along[s]' (i.e. the Sears employees would shadow or ghost the drivers . . ." *Ex*. 4 at 6. And despite Plaintiffs' contention that meetings occurred "every day" and "failure to attend these daily meetings would lead to loss of work for the drivers," HDL Account Executives in Rochester and Syosset testified they have no "daily" meetings. *Rex Dep*. 56:20–24; *Coreas Dep*. 44:24–50:4. Class members also testified that they could choose to not attend meetings. *Minors Dep*. 150:20-151:3; *Collins Dep*. 38:8-14. The static "Written Policies" Plaintiffs have pointed to cannot eclipse the class members' contrasting experiences that compel decertification. *See Traver v. Lowe's Home Centers, LLC*, 2016 WL 880169, at *4 (E.D.N.Y. Mar. 1, 2016) (finding lack of predominance in context of New York

Construction Industry Fair Play Act (CIFPA) separate business entity test, NYLL § 861-c(2),[10] where plaintiff offered no evidence to suggest all installers followed Lowe's policies and evidence suggested at least some installers did not comply with contractual requirements).

Finally, the testimony of four HDL employees does not provide "common proof" of misclassification, as their knowledge of any policies and procedures was limited by the scope of their responsibilities, tenure, and physical location. Plaintiffs deposed two HDL Account Executives—one based in Rochester, the other in Syosset—who described differences in the Innovel operations at the respective locations for a narrow timeframe. *See, e.g., Rex. Dep.* 10:2-21; *Coreas Dep.* 10:20-11:24. Also deposed were HDL's Vice President of Operations who had very limited knowledge of the New York facilities' operations since 2014, and HDL Regional Director limited knowledge of New York facilities beginning in April 2017. *Sierra Dep*. 16:1-17:3; *Dunlop Dep*. 13:19-14:4. In contrast, the class members who were deposed had experiences that spanned the entire class period, including one class member who operated from 2011 until 2019. *Collins Dep.* 9:10-10:7, 11:12-25. As Plaintiffs never took a Rule 30(b)(6) deposition and none of the HDL witnesses have personal knowledge of HDL's policies or operations applicable to all Innovel facilities in New York for the entire class period, Plaintiffs cannot rely on blanket references to HDL testimony for "common proof" of misclassification. When class members' testimony is considered, it is evident that the predicate question of employment status cannot be answered on a classwide basis.

**D. Application of the Fair Play Act exacerbates manageability concerns raised by a trial of independent contractor reclassification issues.**

---

[10] The legislative history of the CIFPA and Transportation Industry Fair Play Act track similar purposes and justifications in amending the labor law and creating a rebuttable presumption of employment in specific industries. NY Bill Jacket, 2010 S.B. 5847, Ch. 418; NY Bill Jacket, 2013 A.B. 5867, Ch. 558.

For claims arising after April 10, 2014, the Fair Play Act creates a rebuttable presumption of employment. As a result, the putative employer has the burden of proof to establish independent contractor status under either an "ABC" test or 11–factor analysis. N.Y. Lab. Law § 862-b. Despite the burden-shifting framework, the analysis remains a fact-specific inquiry. *See, e.g., Matter of Turek (Adelchi Inc.—Commissioner of Labor)*, 184 A.D.3d 295, 298-99 (2020) (finding the first criterion in the separate business entity test of the CIFPA is "strikingly similar to the traditional rule" and "strongly suggests its intent to incorporate that standard" in a fact-specific inquiry where "the relevant indicia of control will necessarily vary depending on the nature of the work."). Moreover, in considering decertification, the burden-shifting framework does not change the relevance of ensuring that Rule 23's requirements are met. *See Myers v. Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010) ("While Hertz will ultimately bear the burden of proving the merits of its exemption argument, plaintiffs must at this stage show that more 'substantial' aspects of this litigation will be susceptible to generalize proof for all class members than individualized issues.") (internal citation omitted). Preventing HDL from exploring these fact-intensive inquiries on cross-examination with each class member under the guise of class action efficiencies deprives HDL of due process and strips it of the opportunity to overcome the presumption of employment. *See Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007) ("[T]he Due Process Clause prohibits a State from punishing an individual without first providing that individual with 'an opportunity to present every available defense.'"); *see also Traver*, 2016 WL 880169, at *4 (finding lack of predominance where Lowe's presented "countervailing evidence that will turn on the individual representations of personnel" and "individualized testimony" that would resolve factor of separate business entity test in CIFPA on an "installer-by-installer basis").

Testimony at trial is the only way to ensure HDL has an opportunity to establish each prong of the Fair Play Act, especially where Contract Carriers possess facts that can support certain elements for each class member, such as the following:

• *Freedom from direction or control over the means and manner of providing the service* (NYLL § 862-b(2)(a)). The absence of control in the ICA manifests itself in practice through Contract Carrier owners like Collins who hired at least six employees as drivers and helpers on up to five trucks, took time off within his discretion, provided his company's employees shirts bearing the Collins Home Delivery logo, assigned manifests to drivers, and negotiated rate increases with HDL. *Collins Dep*. 15:22-16:5, 17:11-18:4, 27:14-23, 43:6-44:9, 86:19-89:16; *Ex. 15* at 3, 4. The purported common evidence of direction and control that include Plaintiffs' allegations of required uniforms, ride-behinds, and route assignments is controverted with class member testimony indicating individualized assessments are needed on this factor. *See Appendix A*, § A; *see also* ECF No. 103 at 27-29.

• *Not subject to cancellation or destruction upon severance of the relationship* (NYLL § 862-b(2)(b)). The continuation of class members' businesses after termination of the contract with HDL is established by facts solely within the purview of individual class members. Several of the class members testified that after terminating their contracts with HDL, they continued transportation work through their business entities under the same motor carrier authority. *Traina Dep*. 17:15-19:5; *Bharath Dep*. 26:18-27:4; *Minors Dep*. 38:3-7, 186:9-187:16. One class member described that his business maintained its trucks and employees after terminating its contract with HDL, simply moving them to a new company to deliver products for Lowe's. *Samuels Dep*. 47:20-48:9, 103:20-104:23; *see also Appendix A*, § B.

● *Substantial investment of capital in the business, including but not limited to ordinary tools and equipment* (NYLL § 862-b(2)(c)). The extent of Contract Carriers' investments in trucks, home office space, tools, and entertainment and meal expenses is only evident upon cross-examination. *See Appendix A*, § C. Minors Contracting LLC purchased four trucks, advertised his business in order to hire workers, invested more than $49,000 of his personal capital into the operations, and took out at least one loan to help finance his venture. *Minors Dep*. 43:2-13, 63:23-65:15, 66:10-67:7, 92:2-18, 118:16-24, 163:7-16, 178:9-179:14. Class members also described additional investment in equipment to service multiple accounts. *Minors Dep*. 83:17-84:3, 87:1-89:12; *Traina Dep*. 135:19-136:23.

● *Owns or leases the capital goods, gains the profits, and bears the losses* (NYLL § 862-b(2)(d)). The profits and losses of Contract Carriers' ventures, including whether they owned or leased their trucks and other equipment necessary for the transportation services they agreed to provide under the ICA, are apparent from examining tax documents and deposing class members. *See Appendix A*, § D. This testimony destroys any suggestion of "common evidence" on this factor. *Compare Ex. 3* at 9 & *Ex. 4* at 9 (Plaintiffs allege they were "not entitled to the 'profits' derived from" deliveries), *with Minors Dep*. 55:7-57:21 (describing decision to stop operations in Rochester because "[w]e weren't making a profit" while continuing work in Syosset); *Collins Dep*. 44:16-24 (after deducting his personal federal taxes each week, "any other profit that was left would be mine"); *Traina D*ep. 113:13-16, 114:11-14, 126:5-22 (reporting profits for 2012, 2016); *Blattenberger Dep*. 36:3-22 (describing that his operation would "flex up" on short notice to meet a need for more trucks and increase profits); *Wilson Dep*. 76:18–22, 78:2–14 (took disbursements for personal use as needed and received a share of income from ECC Movers' annual profits, reported on a Schedule K-1).

• *May make its services available to the general public or others on a continuing basis* (NYLL § 862-b(2)(e)). Class members' work for third parties was only discoverable through depositions and written discovery, including analysis of tax returns, such as Minors Contracting LLC's work in both New York and Florida and delivery work for another company, XPO Last Mile, Inc. *Minors Dep*. 83:17-84:14, 104:23-105:10, 106:3-12, 107:4-108:7, 109:6-110:3, 119:9-16, 176:19-177:7; *see also Appendix A*, § E. These examples contrast with Plaintiffs' contention that they were "expected to exclusively provide delivery services to HDL and Sears." *Ex*. 3 at 9; *Ex. 4* at 9.

Class members' testimony for each of these elements demonstrates the need for cross-examination. *See Holick*, 2019 WL 1877176, at *8 ("Courts in this Circuit have acknowledged that the inquiry as to whether Plaintiffs were employees or independent contractors is difficult to establish with classwide proof because it generally requires an employee-specific analysis."). And the individualized testimony obtained from seven class member depositions implicates the impropriety of Rule 23 adjudication of HDL's defenses to the rebuttable presumption of employment under the Fair Play Act. *See Appendix A*, § E; *see Philip Morris USA*, 549 U.S. at 353; *In re Asacol Antitrust Litig.,* 907 F.3d 42, 53 (1st Cir. 2018) ("The fact that plaintiffs seek class certification provides no occasion for jettisoning the rules of evidence and procedure, the Seventh Amendment, or the dictate of the Rules Enabling Act, 28 U.S.C. § 2072(b).").

**E.  Class members' testimony indicates common evidence of "wages" is not feasible.**

Notwithstanding the individualized evidence attendant to the employment determination, additional discovery has demonstrated the impropriety of continuing to certify the remaining elements of a Section 193 or Section 195 claim. In order to prevail on their claim of unlawful deductions, Plaintiffs must establish (1) the existence of an employment relationship under the NYLL, and (2) that "wages were withheld in violation of one of the substantive provisions of the Labor Law." ECF No. 87 at 6 (citing *Contrera v. Langer*, 314 F. Supp. 3d 562, 568 (S.D.N.Y.

2018)). The record-keeping requirements of Section 195 likewise apply only when there is a payment of "wages." N.Y. Lab. Law § 195(3) (requiring employers to "furnish each employee with a statement with every payment of <u>wages</u>") (emphasis added).

"Wages" are defined by the NYLL as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission, or other basis. The term 'wages' also includes benefits or wage supplements as defined in [Section 198(c)] of this article, except for the purposes of [Sections 191 and 192] of this article." N.Y. Lab. Law § 190(l). Whether a payment is a "wage" requires Plaintiffs to show that (i) the class member received payment for services personally rendered by him/her and (ii) the particular class member did not know he/she had responsibility for covering operational expenses at the time of contracting and/or did not agree to compensation terms factoring in reductions for those expenses. *Id.*; *Truelove v. Northeast Capital & Advisory*, 95 N.Y.2d 220, 224 (2000); *Pachter v. Bernard Hodes Group, Inc*., 10 N.Y.3d 609, 617–18 (2008). Class member testimony on these elements reveal conflicting proof of wages.

In their summary judgment opposition brief, Plaintiffs assert that they seek "to recoup unlawful deductions from compensation paid to them for work they <u>personally performed</u>." ECF No. 121 at 7 (emphasis added). Plaintiffs allege that class members received "wages" only "[i]f they were receiving compensation for driving[.]" ECF No. 141 at 23:9-10. Plaintiffs purport to tender "common evidence" of those wages by referring to Delivery Settlement Statements provided to Contract Carriers. ECF No. 116 at 9; ECF No. 119 at 27. But those statements provide no such thing because (1) the Delivery Settlement Statements indicate gross compensation paid for the work of a delivery team, not just a driver; (2) as owners of the Contract Carrier, class members' compensation was not tied solely to their driving services; and (3) offsets shown on the

26

Delivery Settlement Statements often are unrelated to work personally performed by class members.

Delivery Settlement Statements show services provided by the Contract Carrier to transport Innovel merchandise. ECF No. 109-5, ¶ 15. A separate delivery settlement statement is issued for each driver that operates a Contract Carrier's truck in a given week. *Id.* at ¶ 20. Bi-weekly disbursements are provided to Contract Carriers, aggregating net compensation from all drivers as detailed on the corresponding delivery settlement statement. *See, e.g., Minors Dep.* 123:9-125:7; SMINORS000120-126. Because deliveries are completed with a delivery team—a driver and at least one helper—the Delivery Settlement Statements reflect work performed by more than the listed driver. *Bharath Dep.* 67:21-68:23, 74:6-22; *Minors Dep.* 128:16-24. At times, the Delivery Settlement Statements do not accurately reflect labor or services of the specific driver listed, but the statements reflect the work completed by and paid to the Contract Carrier. *See, e.g., Blattenberger Dep.* 59:6-60:4 ("for the most part [HDL] did not get [Delivery Settlement Statements] right" and there is no way to know how many days a week he actually drove a truck); *Traina Dep.* 92:17-93:1; *Ramos Dep.* 52:5-53:5, 54:21-56:3; *Wilson Dep.* 158:8-159:19.

Because the Delivery Settlement Statements do not reflect compensation actually paid to any individual, depositions were necessary to suss out how individual class members were compensated through their businesses. Class members received pay based on criteria that was different for each individual deposed, including whether their companies had partners that shared annual profits. *See Appendix A*, § D(7); *Wilson Dep.* 76:18-22, 78:2-22 (ECC Movers' profits were split among Plaintiff and three other co-owners); *but see Ex. 3* at 9 ("he was not entitled to the 'profits' derived from those deliveries"). None of the class members deposed were paid based solely on the "labor or services rendered" by that individual.

For instance, Collins paid himself $400 per week as an employee of Collins Home Delivery, regardless of the amount of work he performed. *Collin Dep*. 44:16-24; 58:13-20; 105:8-106:3. The only deductions taken from this payment were for social security, Medicaid, and other taxes based on the payroll information for Collins Home Delivery that were produced in discovery. *Id*. 44:22-45:6. After that payment and other expenses were paid for his operation with up to five trucks, he then would keep any profits from the company. Collins confirmed the compensation he received had no correlation with the work he personally performed in a given week. *Collins Dep*. 23:17-22, 44:10-45:6, 58:13-20, 92:14-25, 105:8-106:3.

Traina admitted there was no correlation between the work he personally performed and the amount he took out of his business account at the end of the week. Instead, he would pay weekly business expenses from his company account and "whatever was left" paid for his "personal expense, [for] living" including his personal vehicle or mortgage. *Traina Dep*. 37:11-39:11, 40:16-20. Blattenberger likewise did not take pay for the work he personally performed; rather, he took draws "to pay my bills". *Blattenberger Dep*. 56:9-57:11. And Minors did not take regular payments when he performed work, choosing instead to take draws when profits were available. *Minors Dep*. 114:6-116:20; 121:5-122:9. So it goes with Bharath, who paid himself a salary from his business account based on a lump sum that was available at the end of the year, after all business income and expenses were accounted, in an amount that varied annually. *Bharath Dep*. 58:23-60:5.

Evident from this testimony is the conclusion that no common proof exists to show the amount of funds each class member received for labor or services personally rendered. A payment untethered to "plaintiff's own personal productivity" does "not satisfy the statutory definition of earned wages under Article 6 of the Labor Law." *Ferrari v. Keybank Nat'l Ass'n*, 2009 WL 35330, at *13 (W.D.N.Y. Jan. 5, 2009). Here, each class member would need to be deposed in order to

determine the compensation that he retained for himself, whether from a fixed salary, profits, draws, or a combination of factors.

Additionally, off-sets that appear on Delivery Settlement Statements often are unrelated to work class members performed. Plaintiffs' position that they seek to recover each "deduction, charge, and/or expense" that "is deducted on a settlement statement . . . <u>no matter what category of deduction it is</u>" is untenable under Section 193. *Cf.* ECF No. 135 at ¶ 4(i). Class members confirmed that expenses and off-sets that appear on the Delivery Settlement Statements do not correlate to work they personally performed, nor any work from a specific week.

For example, some off-sets are not tethered to class members, nor traceable to any specific worker. Merchandise and in-home damage claims often related to damage caused by a Contract Carriers' delivery teams and not by class members themselves. *Blattenberger Dep*. 74:24-76:13 ("There's really no way to know how or where it got damaged"), 77:9-14 ("it could be narrowed down but to know exactly who how or when it happened, no. There's no way."); *Samuels Dep*. 78:20-81:3, 85:22-86:13; *Traina Dep*. 85:21-86:16, 90:25-91:13. Off-sets also relate to Contract Carriers' general business operations or equipment, not class members' labor or services. Repayment of a general business loan,[11] performance bonds,[12] truck repairs and liability insurance[13] bear no relation to labor provided by class members. And Contract Carriers may have utilized trucks for multiple accounts, such as class member Ivan Garrido, who declined to appear for a class member deposition but may have operated as many as twenty trucks for several delivery service contracts, including Bob's Furniture Delivery. *See Ex. 7* at ¶¶ 18-19.

---

[11] *Samuels Dep*. 91:10-92:6; *Traina Dep*. 63:3-19; *Minors Dep*. 178:22-180:8; SMINORS000084.
[12] ICA at ¶ 11; *Blattenberger Dep*. 73:14-74:19; *Samuels Dep*. 77:10-78:7; *Minors Dep*. 130:11-25; *Bharath Dep*. 84:4-86:5.
[13] *Blattenberger Dep*. 71:9-18; *Samuels Dep*. 82:19-83:9.

In summary, class members' testimony shows that Plaintiffs cannot resolve at trial whether the payments each personally received constituted a "wage" with uniform evidence. Details on compensation class members received in salary or draws from their company accounts were discerned only through their individual depositions. Therefore, HDL must have ability to cross-examine individuals about their respective arrangements for payment and whether alleged deductions were taken from amounts related to work they personally performed.

**F. Plaintiffs' proposed modification to the class definition does not ameliorate lack of classwide proof.**

Recognizing their inability to maintain certification of the class, Plaintiffs have proposed a "revised class definition" that limits the class to independent contractors who "drove their vehicle for HDL for at least four consecutive weeks at any time from May 8, 2011, through the date of final judgment in this action, and including only periods where the individual performed deliveries on a full-time basis." *See Ex.* 8. According to Plaintiffs, independent contractors would be deemed driving "full time" in any given week if they are listed as the driver in Delivery Settlement Statements for three or more days. *Ex. 9*. Plaintiffs' counsel represented the intent of revised class definition was to include only individuals who "actually drove a truck." *See* ECF No. 141 at 22:18-19. But the proposed definition includes arbitrary criteria that would exclude individuals who did, in fact, drive a truck but who worked less than three days a week as a matter of convenience or because they were servicing multiple companies through their businesses. *See* ECF No. 133 at 3:23-6:9 (describing intent to exclude any class member who "would not be an employee under New York Law" because they arrange for drivers to operate trucks and "contract with multiple companies"); *see also Compl.* at ¶ 30 (alleging class members "do not work for other entities making deliveries while they are working full-time for [HDL]").

Plaintiffs cannot unilaterally revise the class definition to avoid decertification. Rule 23 expressly provides that an order of the Court "must define the class." FED. R. CIV. P. 23(c)(1)(B). And while "[a]n order [certifying a class] may be altered or amended before final judgment", Plaintiffs have pointed to no authority allowing them to make such an alteration without a rigorous analysis regarding whether the newly proposed class meets Rule 23's requirements. FED. R. CIV. P. 23(c)(1)(C); *E.B. v. New York City Bd. of Educ.*, 2005 WL 8156773, at *3 (E.D.N.Y. June 30, 2005). Even so, Plaintiffs' proposed revised class definition would not pass muster under Rule 23, just like the presently certified class that Plaintiffs have admitted is unworkable. *See* ECF No. 133 at 3:23-6:9.

Plaintiffs now are faced with incontrovertible evidence of the varied experiences of class members while under contract with HDL that destroy the denoted "common proof." *See id*. at 5:20-6:3 (indicating desire to exclude class members who "arrange" for drivers to operate their trucks and contract with multiple companies who "would not be employees"). This justification for excluding class members appears as an attempt—albeit an unsuccessful one—to create a fail-safe class comprised of an arbitrary subset of class members who Plaintiffs deem best suited to fit their narrative of control.[14] Certification under such circumstances is inappropriate. *See Boca Raton Comm. Hosp. v. Tenet Healthcare Corp.,* 238 F.R.D. 679, 691 (S.D. Fla. 2006) (denying renewed motion for class certification, finding plaintiff's class "definition is not workable or

---

[14] "A fail-safe class is one whose definition 'shields the putative class members from receiving an adverse judgment'" and "should not be certified because it is unfair to defendants, it prevents an adverse judgment being entered against plaintiffs[.]" *Mazzei v. Money Store*, 288 F.R.D. 45, 55 (S.D.N.Y. 2012) (quoting *Randleman v. Fidelity Nat'l Title Ins. Co*., 646 F.3d 347, 352 (6th Cir. 2011), citing *Kamar v. Radio Shack Corp*., 375 Fed.Appx. 734, 736 (9th Cir. 2010)).

practicable because it is not grounded in fact or law and does not rationally separate" class members from non-class members).[15]

Plaintiffs cannot propose a revised class definition without a factual or legal reason to do so, and there is no justification to artificially create a class of drivers who operated three or more days per week for at least four consecutive weeks. First, HDL does not have a division of "full time" or "part time" drivers. Indeed, the ICA allows Contract Carriers the discretion to hire or contract with drivers to "furnish whatever labor is necessary to provide delivery services" for Innovel. ICA at ¶ 8. Second, while class certification is predicated on HDL's alleged "uniform policy of classifying contract carrier drivers as independent contractors" [ECF No. 121 at 13], Plaintiffs cannot point to any distinguishing policy, procedure, or practice that HDL applied to the proposed revised class members, which did not apply to the remainder of the current class members. Nor can they provide any uniform policy or procedure that applied because of the frequency of their work as a driver. Finally, making a distinction for "full time" drivers is unrelated to Plaintiffs' substantive claims that unlawful deductions were made or inaccurate wage statements were provided.

The *only* distinction separating those included in the revised class from those that are not is individual class members' decisions about when and where to work. Plaintiffs offer no evidence that a class member who drove 3 days a week was subject to greater control by HDL than an individual who drove 2 days a week or none at all. As such, driving "full time" is a distinction without a difference, demonstrated by Plaintiffs' contention that Wilson would remain in the class for his company's entire contract period, despite several periods of time when he drove less than

---

[15] *See also Gbarabe v. Chevron Corp.*, 2017 WL 956628, at *30 (N.D. Cal. Mar. 13, 2017) (finding "amended class definition is arbitrary and untethered to any evidence of harm"); *Brockman v. Barton Brands, Ltd.*, 2007 WL 4162920, at *3 (W.D. Ky. Nov. 21, 2007) (citing cases where courts decline to certify classes where the definition has no evidentiary connection with defendants' conduct).

3 days a week. *See, e.g., Ex*. 6. And other class members are disqualified in whole or in part for the same intermittent work. *Exs. 11 & 12* (Morgan and Garrido drift in and out of the proposed revised class, effectively excluding 16 and 49 weeks of Delivery Settlement Statements listing them as drivers in Syosset and Buffalo, respectively).

Class member testimony makes these points. Minors, for example, did not personally perform delivery services after he chose to move to Florida simply because he preferred the weather there, while his company continued to make deliveries in New York for approximately 22 months—from January of 2016 until he terminated his company's contract in November of 2017. *See Minors Dep*. 104:14-106:12, 113:4-9. Minors decided to operate his business from Florida, to work "back and forth" between states, and took time off "[h]owever [he] felt like it." *Id.* at 73:5-7, 107:17-22. These individual choices and the freedom afforded to Contract Carriers under the terms of the ICA cause his membership in the proposed revised class to terminate on April 19, 2014. *Ex. 10*. Nevertheless, Minors' name appears as a driver on 59 weeks of Delivery Settlement Statements in Rochester and Syosset from April 19, 2014 through November 11, 2017. *Ex. 14*.

Plaintiffs include another contractor, Traina, as a member of the revised class from December 10, 2011 to April 7, 2012, excluding weeks when his name appears as a driver on Delivery Settlement Statements in 2017 and 2018. *Ex. 10*; *Ex. 13*. Traina testified that he drove during this apparent gap in Delivery Settlement Statements, noting that deliveries he completed "could have [appeared] under a different driver's name possibility" as that occurred "a lot." *Traina Dep*. 92:17-93:1. And during 2016 and 2017, Traina contracted with two other companies to provide delivery services, while his company continued to operate delivery teams for HDL. *See Ex.* 5 at 2-3. After Traina's deposition, Plaintiffs' counsel crafted the proposed revised class definition in order to exclude Traina from the class, underscoring the arbitrary nature of Plaintiffs' criteria for

membership in the proposed revised class. *See* ECF No. 141 at 21:11-14 ("I think one, Mr. Traina, who they deposed, he did not drive much at all . . . we would want a class definition that excludes him").

In short, Plaintiffs' proposed revisions to the class definition are unconnected with policies or procedures HDL implemented, but rather, are predicated on decisions individual class members made within the context of their companies' operations. Certification under such circumstances is inappropriate. The Court should reject any attempt by Plaintiffs to avoid this logical conclusion by manufacturing a more homogeneous class delineated along such arbitrary lines. *See Dukes*, 564 U.S. at 365 ("What follows from this, however, is not that some arbitrary limitation on class membership should be imposed but that the backpay claims should not be certified under Rule 23(b)(2) at all."). The class should be decertified.

## IV.   CONCLUSION

To proceed through trial in a class action, Plaintiffs are obligated to proffer evidence that will resolve—up or down—each class member's respective claims. Plaintiffs have no such evidence that could alter the reality that each class members' testimony, providing details about their personal experience, matters to the resolution of their claims. The Court must decertify the class action.

Dated: September 7, 2021                              Respectfully submitted,

                                          */s/ Andrew J. Butcher*
                                          Andrew J. Butcher (*Pro Hac Vice*)
                                          Jared S. Kramer (*Pro Hac Vice*)
                                          SCOPELITIS, GARVIN, LIGHT,
                                          HANSON & FEARY
                                          30 W. Monroe Street, Suite 1600
                                          Chicago, IL 60603
                                          (312) 255–7200

                                          Emily A. Quillen
                                          SCOPELITIS, GARVIN, LIGHT,
                                          HANSON & FEARY
                                          777 Main Street, Suite 3400
                                          Fort Worth, TX 76102
                                          (817) 869–1700

                                          Andrew R. Brehm
                                          SCOPELITIS, GARVIN, LIGHT,
                                          HANSON & FEARY
                                          330 E. Kilbourn Avenue, Suite 827
                                          Milwaukee, WI 53202
                                          (414) 219–8500

                                          Rodney O. Personius
                                          PERSONIUS MELBER LLP
                                          2100 Main Place Tower
                                          Buffalo, NY  14202
                                          (716) 855–1050 x101

## CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2021, I served a copy of HomeDeliveryLink, Inc.'s

Memorandum in Support of its Motion to Decertify Class Action by electronic filing on all counsel

of record in this case.

                                          */s/ Emily A. Quillen*
                                          Emily A. Quillen

4825-7489-0996, v. 13