*Appendix A*

| Factors Considered in Common Law Misclassification Analysis[1] | Examples of Class Members' Differing Testimony |
|---|---|
| **I.      Tax Filings** | **A. <u>Some class members filed tax returns as independent contractors:</u>**<br><br>• Filed tax return as proprietor of a business in the service of trucking. *Traina Dep. 112:7-14.*<br><br>• Reported taxable income through S Corp which allowed for class member to receive compensation as employee of his own company. *Kloppel Dep*. 39:17-40:21; 160:17-161:16.<br><br>• Filed separate personal and business tax returns. *Collins Dep.* 54:13-25; *Samuels Dep*. 93:9-11.<br><br>• Tax preparation for company would guide decision on how much salary class member would take. *Bharath Dep*. 58:23-59:21.<br><br>**B. <u>Some class members' business expenses off-set income reported on tax returns:</u>**<br><br>• Company deducted business expenses including expenses for tools, $2,500 for uniforms, labor, meals and entertainments, and $2,000 for "Legal and professional services." *Wilson Dep.* 20:23-21:19, 43:9-17, 44:5-44:22, 56:15-21.<br><br>• Deducted for use of home office used to run the business. *Collins Dep.* 73:23-74:6; *Traina Dep.* 109:4-17.<br><br>• Elected to deduct the entire cost of depreciable equipment, which included 2 trucks, office expenses, and meal and entertainment expenses. *Kloppel Dep.* 59:20-60:18; 158:2-159:10<br><br>• Deducted depreciation (totaling $25,560 in 2014), truck expenses ($83,109 in 2014 and $104,306 in 2015) and rental expenses. *Minors Dep.*155:24-156:17; *Minors Dep.* 159:7-17; 164:3-20.<br><br>• Worker recruitment advertising expenses deducted on company taxes. *Minors Dep.* 154:18-155:13. In 2014, company deducted $207,560 in contract labor expenses for "[d]rivers and helpers and any contractor/laborer that" it utilized. *Minors Dep.* 155:14-18. |

---

[1] *Holick v. Cellular Sales of New York, LLC*, 2019 WL 1877176 (N.D.N.Y. Apr. 26, 2019).

Appendix A

|  | <ul><li>Invested in workers and team morale, deducting "meals and entertainment" expenses totaling $3,542 in 2014 for when Minors be "either sitting down discussing company business or when [he] would take [his] guys out and pay for their food on the job." *Minors Dep.* 160:7-17.</li><li>Deducted all business expenses from taxes such as "any property with the business, anything that [it had] rented for the business", and "[a]nything that [Minors] used for the business." *Minors Dep.* 156:18-157:6. These deductions included "a drill [] a socket set, hammer, your basic screwdriver sets [,]your hand truck [,] a measuring tape", a company computer and supplies like "miscellaneous things, extra straps, harnesses, gloves, paste, putty". *Minors Dep.* 92:12-18; 93:2-94:11; 157:20-158:2.</li><li>Deducted small tool expenses like "[d]elivery equipment, dollies, removing straps, small hand tools." *Collins Dep.* 67:6-14. It likewise deducted expenses associated with a cell phone used for business and fuel costs associated with operations. *Collins Dep.* 67:19-68:21. Wrote-off costs of auto expenses for when it "rented cars to guys, the guys back and forth to Virginia" as part of travel teams it employed for about a "total of six weeks". *Collins Dep.* 72:24-73:22.</li><li>Deducted business expenses for equipment, insurance, merchandise and in-home damages claims, truck rentals, and other operational costs from its taxes. *Bharath Dep.* 55:18-56:3, 15-22; 78:8-79:7. Its operational expenses included "fuel, diesel, tolls, uniforms, cell phone bills, blankets, handed trucks, [and] tools." *Bharath Dep.* 94:16-95:9.</li></ul>**C. Other class members may not have taken full advantage of tax treatment:**<ul><li>Did not deduct damage claims as business expenses on business taxes. *Samuels Dep.* 86:22-87:25.</li><li>Unsure if business expenses were deducted on tax returns. *Blattenberger Dep.* 79:19-23, 85:15-18; *Samuels Dep.* 93:17-19.</li></ul> |
|---|---|
| **II.      Investments** | **A. Some class members invested by purchasing trucks for company operations:**<ul><li>Purchased and leased trucks. *Kloppel Dep.* 46:17-47:25; 154:14-156:11. Company owned three trucks at termination of relationship with HDL and sold one for $8,000. *Kloppel Dep.* 58:13-59:9.</li><li>Initially, leased a 2011 Mitsubishi and a 2013 Hilo leased from a third-party vendor with lowest rates. *Minors Dep.* 61:6-10; 62:23-63:15. Later, company choose to purchase four trucks. *Id.* 66:9-67:7. This investment facilitated ongoing profit as it "would buy and sell trucks or if [he] bought a truck broke down [he] would part it out and sell it and buy another truck." *Id.* 67:2-5.</li></ul> |

Appendix A

<table>
<tr>
<td></td>
<td>

- Owned a truck prior to contracting with HDL and operated that truck when it first operated with HDL. *Ramos Dep.* 32:3-5. Purchased another truck, operating two trucks – a Hino and a GMC – to service HDL account. *Ramos Dep.* 31:12-32:9.

**B. Others invested in leased or rented trucks:**

- During contract with HDL, operated 5-7 leased trucks per day. *Wilson Dep.* 15:14-16:13, 81:4-81:8.

- Opted to lease trucks, peaking at four trucks, through Budget because it was "[j]ust easier to handle" and if something happened to the trucks you could "make a phone call, get it replaced or fixed." *Traina Dep.* 33:6-25.

- Initially, company operated one leased truck that it secured through HDL, but "quickly moved to two trucks" and "flexed up to four trucks a few times". *Blattenberger Dep.* 32:9-33:7.

- When first contracting with HDL, company operated one truck leased through Mendon Leasing. *Samuels Dep.* 27:18-28:8. It later invested in another truck, purchasing two trucks – a 2006 International and a 2008 International, both through private sellers. *Samuels Dep.* 28:12-21; 103:11-104:14.

- Initially, company had "three to four" rented trucks available for servicing the HDL account. *Collins Dep.* 19:17-20:4. Chose to add vehicles to "increase [its] revenue" and provide more jobs. *Collins Dep.* 22:22-23:22.

- Company operated two trucks rented through Penske and Ryder. *Bharath Dep.* 49:9-50:18. Maintained a company credit card to cover operational expenses, building rewards points. *Bharath Dep.* 80:16-81:7, 81:8-18.

**C. Some class members invested in items for company branding and talent recruitment:**

- Purchased shirts for delivery teams to wear that had "Collins Home Delivery" on them. *Collins Dep.* 15:22-16:5; 17:11-18:4. Obtained these company uniforms to "give [his] employees a little pride" because "[t]hey liked working for [Collins Home Delivery] they liked the shirts." *Collins Dep.* 17:23-18:4.

- Kloppel placed "Kloppel Deliveries" on his truck decals. *Kloppel Dep.* 106:15-22.

- Company placed "12 by 13 [or] 14 by 8" placards on its trucks that said "Traina Services." *Traina Dep.* 42:17-43:7.

- Minors Contracting placed decals on its trucks that stated company name. *Minors Dep.* 145:17-146:12.

</td>
</tr>
</table>

Appendix A

- Company found workers to hire through "word of mouth" or "ads on Craig's List", which it paid for. *Minors Dep.* 43:2-13.

- Company took out paid advertisements for employees on Craig's List. *Traina Dep.* 42:7-13; 44:15-18.

**D.  Class members invested in tools and necessary permits, with varying experiences:**

- Paid for permit and license fees, purchased own insurance, provided tools to employees, as well as credit cards for gas expenses employees incurred. *Kloppel Dep.* 16:22-17:15; 18:4-18:11, 60:13-18, 61:21-63:11.

- Investment in tools included "basic hand tools" like "a drill [] a socket set, hammer, your basic screwdriver sets and your hand truck and a measuring tape", a company computer, and "miscellaneous things, extra straps, harnesses, gloves, paste, putty". *Minors Dep.* 92:12-18; 93:2-94:8; 157:20-158:2.

- Purchased small tools for the job like "[d]elivery equipment, dollies, removing straps, small hand tools." *Collins Dep.* 67:6-14. Invested in a cell phone used for business and fuel costs associated with operations. *Id.* 67:19-68:21.

- Invested in tools to secure, cover, and protect merchandise being delivered, as well as straps for facilitating delivery. *Traina Dep.* 73:7-19, 105:24-106:16.

- Purchased "hand tools, dollies, blankets" from "Home Depot, Lowe's, [and] Harbor Freight". *Bharath Dep.* 54:19-55:13. Operational investments included "fuel, diesel, tolls, uniforms, cell phone bills, blankets, hand[] trucks, [and] tools". *Bharath Dep.* 94:16-95:9.

- Invested in equipment such as "dollies and moving equipment, moving straps, [and] rachet straps to secure the merchandise in truck". *Blattenberger Dep.* 37:10-18.

- Invested in "shoulder dollies [and] hand trucks". *Samuels Dep.* 54:3-8.

- Paid for expenses such as a cell phone, truck maintenance costs, fuel, and shirts that said "Sears" on them. *Ramos Dep.* 46:17-21; 47:5-48:9.

**E.  Class members opted for differing insurance investments:**

- Insured company operations initially through State Farm and later through Erie Insurance, including workers compensation insurance, based on its "price". *Collins Dep.* 22:8-21; 70:6-71:8.

- Obtained insurance by shopping for "best coverage" available. *Traina Dep.* 102:25-103:22.

Appendix A



|  | | • Had separate insurance to insure rented trucks through State Farm because had policy prior to contracting with HDL. *Bharath Dep.* 50:19-51:21.<br><br>• Secured insurance through State Farm at lower cost, but chose to obtain workers compensation insurance through an HDL facilitated account. *Samuels Dep.* 49:10-24, 51:8-12.<br><br>• Purchased workers compensation insurance directly through Erie Insurance. *Blattenberger Dep.* 37:3-9; 71:25-72:7.<br><br>• Insured trucks and purchased workers' compensation insurance. *Ramos Dep.* 46:8-16.<br><br>**F.  Class members placed funds in business bank accounts, sometimes with revenue paid by other accounts:**<br><br>• Maintained a business bank account where it would deposit revenue from HDL. *Collins Dep.* 54:13-19; *Ramos Dep.* 32:10-21; *Blattenberger Dep.* 31:20-23; 54:22-55:2; *Samuels Dep.* 55:4-14; *Minors Dep.* 79:10-23; *Kloppel Dep.* 18:7-11.<br><br>• Maintained a separate business bank account where revenue from HDL deposited, along with revenue from other accounts company serviced at same time under contract with HDL. *Traina Dep.* 35:15-36:5, 36:16-37:10.<br><br>• Company maintained a separate business bank account where it deposited payments from its customers, including HDL Lykes Cartage, Stocklin, and SMT. *Bharath Dep.* 56:4-11; 56:23-57:19. |
| **III.** | **Ability to Hire Workers** | **A.  Some class members testified that they had limited hiring authority:**<br><br>• Did not recruit or interview most of employees (with the exception of family members). *Wilson Dep.* 48:10-16, 52:12-53:24, 153:24-155:2. Wanted company to run more trucks for increased revenue, so accepted all referrals of potential employees from HDL. *Id.* 151:17-153:3.<br><br>• Did not have ultimate hiring authority, since "[HDL] pretty much hired them." *Traina Dep.* 25:11-16. Would interview prospective employees on the phone before hiring them. *Id.* 51:24-52:1.<br><br>**B.  Other class members hired employees or workers based on their own autonomous authority:**<br><br>• Class member would interview employee candidates and make the ultimate decision on whether to hire them. *Bharath Dep.* 31:7-23; 94:9-15. |

Appendix A

- Hired employees, including family members, and at peak, had "two or three or four" employees. *Ramos Dep.* 28:25-31:11.

- As President of Collins Home Delivery, had responsibility to "hire the people" subject only to Sears-required background check and drug testing provided by federal law. *Collins Dep.* 15:15-21, 93:11-17. "A lot of employees" of Collins Home Delivery "were [Collins'] friends". *Collins Dep.* 63:5-11

- Hired independent contractors, including brother and family friend. *Minors Dep.* 32:21-33:16; 60:4-12. HDL Account Executive recommended a worker to be hired, but class member decided he did not like him and terminated worker without issue. *Minors Dep.* 82:21-83:4.

- Company hired numerous employees, peaking at "12 to 15" at a given time. *Traina Dep.* 23:5-15; 24:8-12; 41:11-15; 48:5-51:8. Class member Blattenberger was an employee driver of Traina Services before starting his own company – Cells Contracting – and contracting with HDL. *Id.* 51:7-8; *Blattenberger Dep.* 18:11-19:23; 27:3-19.

- Hired one friend and another long-time acquaintance. *Blattenberger Dep.* 40:24-41:8; 41:18-42:2. It was his "decision to bring on these workers" and he was "responsible for making sure that they were paid". *Id.* 42:6-11.

- Made decision to hire workers, with exception of one driver who worked for another Contract Carrier that needed clearance from HDL. *Samuels Dep.* 35:6-15, 36:16-19; 37:5-7.

**C.  Some hired W2 employees as drivers and helpers:**

- Hired "employees as opposed to independent contractors" to lessen the tax burden on his workers: "I didn't think it was fair to pay them as contractors because their taxes by the time they were done they would be making no money." *Collins Dep.* 93:25-94:6. Collins did in fact hire drivers and helpers, including part time employees. *Collins Dep.* 25:3-28:11; 29:24-30:21.

- Hired employees. *Ramos Dep.* 28:6-29:7; *Traina Dep.* 41:11-15.

- Initially used 1099 workers but switched to W2 employees. *Kloppel Dep.* 13:13-14:13.

**D.  Other class members' companies utilized independent contractors as drivers and helpers:**

- Opted to use independent contractors instead of employee based on profit analysis because employees "cost[] 30 percent more on the back end" and, as such, having employee is "impossible". *Minors Dep.* 133:24-134:20.



|  | |
|---|---|
|  | • Company opted to contract with independent contractor drivers and helpers instead of employees, issuing only 1099s not W2s. *Samuels Dep.* 29:6-13. |
|  | • Cells Contracting utilized independent contractor drivers and helpers, up to "between six and eight" at a given time. *Blattenberger Dep.* 38:17-39:17. |
|  | **E.  Class members' companies implemented varying compensation structures for hired workers:** |
|  | • Would negotiate workers' rates. *Minors Dep.* 44:6-16; 45:25-46:7. Minors calculated rates for negotiation based on his "overhead" and insurance" to "determine what was feasible." *Minors Dep.* 134:21-135:15. |
|  | • Workers' rates varied "based upon experience and whatever rates were going for generally given at that point in time for the current position that they were applying for." *Bharath Dep.* 31:14-23; 36:10-37:11; 37:24-38:15. |
|  | • Generally paid workers on a per delivery basis because "it would motivate them to get the deliveries done and want to do more deliveries." *Collins Dep.* 31:11-23. Instead of negotiating rates upon hire, Collins Home Delivery "would start all the same" and give raises based on "performance" an "length of time" with the company. *Collins Dep.* 48:9-23. |
|  | • Paid its independent contractors a per day flat rate that did not vary. *Samuels Dep.* 35:15-36:13. |
|  | **F.  Class members' companies' hired workers to allow greater work flexibility for themselves:** |
|  | • Hired a third driver so that he could cover routes as needed. *Minors Dep.* 71:9-72:10. |
|  | • If HDL only needed one truck, he could decide to have his other driver operate the truck. *Ramos Dep.* 42:7-10. |
|  | • Hired a part-time driver to "work on Saturdays" so that he could "have off". *Collins Dep.* 27:14-23. |
| **IV.   Ability to Decline Work** | **A.   Some class members frequently rejected work offered to their companies:** |
|  | • Turned down work opportunities 15-20% of the time because could not find workers willing to travel out-of-town. *Collins Dep.* 53:7-16, 82:25-83:17. |
|  | • Began operating out of the Syosset location but later added operations out of Rochester because it "paid more per stop" and "[i]t was more of an incentive". *Minors Dep.* 50:24-51:20. When its Rochester operations "weren't making a profit" it stopped operating out of the Rochester location. *Minors Dep.* 55:7-56:2. |

Appendix A

| | |
|---|---|
| | **B. <u>Others testified that HDL dictated the extent to which the company would operate on a given day:</u>** |
| | • Samuels testified that he could not decide how many trucks to run because HDL would tell him "they need one or two trucks" and "how many trucks for the next day". *Samuels Dep.* 44:4-16. He couldn't say "'I want both my trucks running every day'" because "[i]t doesn't work like that, unfortunately." *Id.* |
| | • Samuels testified that he refused work once and sat at home for next few days. *Samuels Dep.* 32:11-18. He believed this could have be a repercussion for turning down the work. *Id.* |
| | • Traina testified that his company did not have opportunities to increase profitability on a weekly basis because "[i]t was what they gave me is what they gave me". *Traina Dep.* 132:6-13. And, he did not fuel his trucks based on costs because he "had no choice." *Traina Dep.* 132:20-133:7 |
| **V.   Ability to Determine and Control Work Schedule** | **A. <u>Some class members chose the frequency of their work days:</u>** |
| | • Took time off "periodically" for "three, four days" at time "however [he] felt like it". *Minors Dep.* 72:21-73:7. |
| | • While his company was under contract with HDL, would personally work servicing another contract with XPO in Connecticut for "about three to four weeks give or take some". *Minors Dep.* 83:17-84:9, 88:7-16. Also worked as a driver or helper in New Jersey servicing an account with Home Delivery America. *Minors Dep.* 95:18-96:18. |
| | • Did not perform work for HDL because he no longer lived in New York – he "was living in Florida, [] registered in Florida [and] in Florida for those times." *Minors Dep.* 107:4-13. Was not making deliveries but ran his company "in the back end running the paperwork and stuff like that." *Minors Dep.* 112:6-17. |
| | • From 2011 to 2016, personally drove six out of seven days per week. *Collins Dep.* 58:1-12. By 2018, this decreased to "about four days a week". *Id.* |
| | • Set aside vacation time while his company was under contract with HDL, taking "about three weeks a year off." *Collins Dep.* 100:18-101:5. |
| | • Took "a day off here or there" based on his own decision and his company's staffing situation. *Blattenberger Dep.* 45:18-46:7. |
| | • Chose to drive 4 days a week but also worked as a helper, but he sometimes worked as little as 1 to 2 days per week. *Kloppel Dep.* 45:6-19, 144:21-23, 146:17-19, 149:21-23. |

Appendix A

- Elected to drive one of ECC Movers' trucks 6 days a week for four years, until he decided to reduce his own work schedule. *Wilson Dep.* 120:18-121:21.

**B.  Other class members testified they could not choose when to take days off:**

- "No, we couldn't say" "[I don't] want to drive the next day" or "supervisors" would "tell us okay you don't have anymore work here then". *Ramos Dep.* 41:18-42:2.

- No instances of taking "days off or weeks off". *Bharath Dep.* 88:14-18.

**C.  Some class members provided services to other companies while under contract with HDL:**

- Serviced Appliance Associates beginning in 2014 and added an Orville Home Appliances account in 2016 while under contract with HDL. *Wilson Dep.* 40:9-14, 86:21-88:6. Work with these companies amounted to 75% of revenue in 2016. *Id.* 86:21-88:6.

- While under contract with HDL, serviced an account with XPO in Connecticut as well as an account with Home Delivery America, for which the company obtained interstate motor carrier authority. *Minors Dep.* 83:17-84:18, 94:17-95:17, 95:18-96:18.

- Registered company to do business in Florida while contracting with HDL in New York. *Minors Dep.* 119:9-16.

- Provided services to Spirit Delivery and MFM while under contract with HDL. *Traina Dep.* 19:6-20:7, 20:21-21:21. In 2016 alone, more than $400,000 of $649,466 in gross receipts came from contracts with companies other than HDL. *Traina Dep.* 122:6-123:6.

- While under contract with HDL, earned income from installing carpet. *Traina Dep.* 135:19-137:12.

- May have worked for another company delivering piping while his company was under contract with HDL. *Ramos Dep.* 33:2-7, 8-21.

**D.  Other class members did not work for other companies:**

- While contracting with HDL, did not provide delivery services to another company. *Bharath Dep.* 43:3-10.

- Attempted to solicit work from Home Depot and Lowe's but unable to obtain another account to service along with HDL. *Kloppel Dep.* 70:20-72:16

*Appendix A*

|  | • Did not service any other accounts or generate income from other companies while under contract with HDL. *Blattenberger Dep.* 53:9-15.<br><br>• Did not provide services or make deliveries for another company. *Samuels Dep.* 45:4-16.<br><br>**E.  Some class members operated on flexible, varying schedules:**<br><br>• Could change the order and timing of routing prepared by Innovel. *Kloppel Dep.* 123:22-124:19.<br><br>• "[D]idn't have set days" that he worked per week and "every week was different". *Ramos Dep.* 40:7-11. For its workers, there was a start time but no "end time". *Ramos Dep.* 40:12-15.<br><br>• "More or less" decided when to take days off, depending on "staffing needs." *Blattenberger Dep.* 46:2-7.<br><br>• During high volume periods, company delivered 7 days a week, resulting in "significant bonus money" that class member retained. *Collins Dep*. 55:12-24. Class member personally delivered 5 to 6 days per week, but later 4 to 5 days per week. *Id*. 58:2-12.<br><br>**F.  But some Contract Carriers operated on a regular schedule.**<br><br>• Worked on a 6-day schedule, although he decided which of his employees would work on a given day. *Wilson Dep*. 95:5-7, 125:17-25.<br><br>• Had expectation of work Monday through Saturday. *Traina Dep*. 87:21-88:15.<br><br>**G.  Class members scheduled their workers to best fit their companies' needs:**<br><br>• Determined which HDL terminal to work out of and how to allocate his company drivers and trucks to different HDL terminals based on the volume at the terminals. *Minors Dep.* 78:5-22.<br><br>• Would assign Buffalo routes to other employees because he personally "didn't want to drive in Buffalo." *Collins Dep.* 48:24-49:11.<br><br>• While living in Florida, "the people on the truck [in Rochester] were the ones that were performing the work." *Minors Dep.* 106:3-12. Would only come back to "check up with Rochester". *Id.* 107:4-13.<br><br>• If HDL only needed one truck, could decide to have other driver operate the truck. *Ramos Dep.* 42:7-10.<br><br>• Decreased weekly work days from six out of seven days per week to "about four days a week". *Collins Dep.* 58:1-12. |

Appendix A

| | | |
|---|---|---|
| | | • "[D]irect[ed] management of employees" by "coordinat[ing] when they needed to be to work, what days they would work." *Kloppel Dep.* 13:13-17. |
| **VI.** | **Ability to Negotiate** | **A. <u>Some class members successfully negotiated favorable compensation structures:</u>**<br><br>• Negotiated "compensation higher than other contractors" in the form of an additional flat rate of $160 per week. *Collins Dep.* 87:7-23; 88:21-89:15. Negotiations like this occurred frequently; especially after the contractor threatened ending employment. *Id.*<br><br>• Would request higher rates and would sometimes be given "an extra 40 bucks". *Kloppel Dep.* 27:12-28:6. Likewise permitted his employees to negotiate "straight to HDL" in "discussions with HDL to receive compensation for a particular circumstance such as arriving early, waiting for a late customer to arrive at their house, unusual circumstances at the door". *Kloppel Dep.* 41:3-21.<br><br>• Negotiated a different per delivery amount from HDL for a particular active delivery location. *Kloppel Dep.* 130:5-8. He also negotiated additional stops and specials, with additional stop pay being one "mechanism" for these negotiations. *Kloppel Dep.* 43:23-45:5; 130:9-12.<br><br>**B. <u>Other class members testified that they could not successfully negotiate rates with HDL:</u>**<br><br>• Did not negotiate delivery rates, additional stop pay, or additional specials pay with HDL. *Wilson Dep.* 127:14-130:9. Rather, he was "told what we were going to get" and "[t]here is no negotiation when it's not two sides, it's one side." *Wilson Dep.* 127:20-129:15.<br><br>• Attempted to negotiate higher rates in Rochester but was told "[t]here's not enough money" and "[t]his is what you're going to get". *Samuels Dep.* 31:22-32:10.<br><br>• Tried to "negotiate a higher per stop rate" "to no avail". *Blattenberger Dep.* 65:19-66:8. |
| **VII.** | **Supervision and Training** | **A. <u>Some class members managed their operations remotely:</u>**<br><br>• While his company was under contract with HDL, would personally work servicing another contract with XPO in Connecticut for "about three to four weeks give or take some". *Minors Dep.* 83:17-84:9, 88:7-16. Also worked as a driver or helper in New Jersey servicing an account with Home Delivery America. *Id.* 95:18-96:18.<br><br>• Did not perform work for HDL because he no longer lived in New York – he "was living in Florida, [] registered in Florida [and] in Florida for those times." *Minors Dep.* 107:4-13. While living in Florida, |

"the people on the truck [in Rochester] were the ones that were performing the work." *Id.* 106:3-12. Would only come back to "check up with Rochester". *Id.* 107:4-13.

- On the days he was off, he would run the company doing "paperwork usually" or training. *Blattenberger Dep.* 46:17-47:3.

- For "a long period of time" manifests were assigned to company's teams by HDL manager. But, when a new manager took over, Collins gained authority assign routes to his teams. *Collins Dep.* 43:6-22.

**B. <u>Some class members implemented their own manifest and route selection process:</u>**

- Contract Carriers with the highest performance score from Innovel's customer surveys could pick their routes from Buffalo. *Wilson Dep.* 33:17-24.

- Had final say over manifest assignments to Kloppel Deliveries' drivers. *Kloppel Dep.* 100:25-101:9.

- Would determine how to assign workers "based on their performance" which included considerations of "[g]reat customer service and the amount of property damage" related to Collins Home Delivery workers. *Collins Dep.* 32:8-16. Would personally select routes with fewer delivers. *Id.* 44:4-9.

- At some times would pick the routes his company would run but other times would also let his workers pick routes based on performance scores that were provided. *Blattenberger Dep.* 49:4-15.

**C. <u>Within selected manifests, some class members could rearrange stops and dictate routes:</u>**

- In Rochester, could change the order and timing of routing prepared by Innovel. *Kloppel Dep.* 123:22-124:19.

- Manifests did not have routing information like directions but listed an order of deliveries. *Blattenberger Dep.* 51:15-21. Teams could not change the order of deliveries on a manifest "without HDL's consent" but clarified teams would in fact change the order of deliveries after they made "pre-calls" and "people didn't answer or said they needed to reschedule." *Id.* 51:22-53:4.

**D. <u>But other class members could not change routes or delivery order:</u>**

- Did not believe that his teams were able to "take an order out of sequence" from what was indicated on the manifest. *Ramos Dep.* 43:3-6.

- Never rearranged deliveries from order listed in manifest. *Wilson Dep.* 193:18-23.

**E. <u>Communications with HDL differed:</u>**

*Appendix A*



|  | • ECC employees would call Wilson, Innovel's customer service line, or HDL if there was a problem with a delivery. *Wilson Dep.* 160:15-163:11, 164:13-6 |
|---|---|
|  | • If deliveries were going smoothly, there would be no communication with HDL. *Ramos Dep.* 43:25-44:3. Rather, would only call HDL, the retailer of the product, or the customer, if an issue arose while making deliveries. *Id.* 44:4-12. |
|  | **F. Class members testimony varied regarding training:** |
|  | • HDL provided him a trainer as a helper for two weeks. *Bharath Dep.* 35:14-36:9. |
|  | • Denied receiving training from HDL. *Minors Dep.* 48:23-25. |
|  | • Implemented his own system of training workers where he would join all new workers on their routes for "at least a few weeks". *Blattenberger Dep.* 44:10-45:5. This differed from the training he received as a driver for Traina Services. *Id.* |

| **Elements of Separate Business Entity Test under New York Fair Play Act** | **Examples of Class Members' Differing Testimony** |
|---|---|
| **A. Business entity is performing the service free from direction or control over the means and manner of providing the service, subject only to the right of the commercial goods transportation contractor for whom the service is provided to specify the desired result or federal rule or regulation;** | **1.** __Class members decided which days to personally work:__<br><br>• Generally chose to drive 4 days a week but also worked as a helper, but he sometimes worked as little as 1 to 2 days per week. *Kloppel Dep.* 45:6-19, 144:21-23, 146:17-19; 149:21-23.<br><br>• Elected to drive 6 days a week at first, until he decided to reduce his own work schedule. *Wilson Dep.* 120:18-121:21.<br><br>• Took "a day off here or there" based on his own decision and his company's staffing situation. *Blattenberger Dep.* 45:18-46:7.<br><br>**2.** __Class members implemented different systems for manifest selection:__<br><br>• Contract Carriers with the highest performance score from Innovel's customer surveys could pick their routes from Buffalo. *Wilson Dep.* 33:17-24. |

*Appendix A*

- Had final say over manifest assignments to Kloppel Deliveries' drivers. *Kloppel Dep.* 100:25-101:9.

- Would determine how to assign workers "based on their performance" which included considerations of "[g]reat customer service and the amount of property damage". *Collins Dep.* 32:8-16.

- At times, would pick the routes his company would run but at other times his workers pick routes based on performance scores that were provided. *Blattenberger Dep.* 49:4-15.

3. **Some class members could change routes and/or orders of deliveries:**

- In Rochester, could change the order and timing of routing prepared by Innovel. *Kloppel Dep.* 123:22-124:19.

- Had final say over manifest assignments to drivers. *Kloppel Dep.* 100:25-101:9. Could sometimes change the order of deliveries on a manifest. *Id.* 124:16-19.

- Teams could not change the order of deliveries on a manifest "without HDL's consent" but teams would in fact change the order of deliveries after they made "pre-calls" and "people didn't answer or said they needed to reschedule." *Blattenberger Dep.* 51:22-53:4.

4. **Other class members could not change routes or delivery order:**

- Did not believe that his teams were able to "take an order out of sequence" from what was indicated on the manifest. *Ramos Dep.* 43:3-6.

- Never changed the order of deliveries listed in manifest. *Wilson Dep.* 193:18-23.

5. **Communications with HDL varied:**

- Employees would call him, Innovel's customer service line, or HDL if there was a problem with a delivery. *Wilson Dep.* 160:15-163:11, 164:13-6.

- If deliveries were going smoothly, there would be no communication with HDL. *Ramos Dep.* 43:25-44:3. Rather, would only call HDL, the retailer of the product, or the customer, if an issue arose while making deliveries. *Id.* 44:4-12.

6. **Class members testimony varied regarding training:**

- HDL provided him a trainer as a helper for two weeks. *Bharath Dep.* 35:14-36:9.

- Did not receive training from HDL. *Minors Dep.* 48:23-25.

Appendix A

| | |
|---|---|
| | • Implemented own system of training workers where he would join all new workers on their routes for "at least a few weeks". *Blattenberger Dep.* 44:10-45:5. This differed from the training he received as a driver for Traina Services. *Id.* |
| **B. Business entity is not subject to cancellation or destruction upon severance of the relationship with the commercial goods transportation contractor;** | **1.  Some class members' companies continued to operate in the transportation industry following contact with HDL:**<br><br>• Terminated its contract with HDL and then the same equipment began work for another shipping company. *Wilson Dep.* 86:21-89:22, 104:5-24.<br><br>• Continues to operate in the transportation business today with the same DOT motor carrier authority it had while with HDL. *Traina Dep.* 17:15-25. Operates with five companies, including "XPO Logistics, Spiro Logistics, Estes Express, and R&L Carriers." *Traina Dep.* 18:1-18. Services these accounts with eight trucks and approximately eight drivers, one or two of which also serviced the HDL account. *Id.* 32:20-33:5; 52:6-12.<br><br>• Contracted with HDL out of a Pflugerville, Texas terminal. *Bharath Dep.* 48:5-49:2. Company maintains registration to do business in New York. *Bharath Dep.* 102:23-103:11. Following contract with HDL, company continues to operate two trucks for three separate accounts under the same authority. *Bharath Dep.* 26:18-27:4; 39:8-11; 104:25-105:7.<br><br>• Initially inactive after HDL, but the company became active and operational again and remains active providing delivery services with three trucks for FGO Delivery. *Minors Dep.* 26:12-27:8; 38:3-7; 186:9-16; 187:11-16, 188:11-25.<br><br>• Remained active and operational for nearly two years after its contract with HDL, provided "appliance deliveries for Home Depot" as part of a contract with XPO Logistics and "appliance delivery for Lowe's" under a contract with FGO Logistics. *Samuels Dep.* 23:16-24:3; 45:17-21*; 47:20-49:9. Uses the same trucks and workers for XPO Logistics as it did with HDL. *Id.*; 104:15-23.<br><br>**2.  Other class members' companies closed after terminating contract with HDL:**<br><br>• Shut down company after it terminated its contract with HDL. *Collins Dep.* 71:9-24.<br><br>• Closed company after it terminated its contract with HDL, closing the company bank account too. *Blattenberger Dep.* 55:2-7; 53:9-15. |

Appendix A

| | |
|---|---|
| | • Sold the trucks it had owned after its relationship with HDL ended and closed its business bank account. *Ramos Dep.* 31:12-23; 32:10-17. |
| **C. Business entity has a substantial investment of capital in the business entity, including but not limited to ordinary tools and equipment;** | 1. <u>**Some class members' companies invested in purchasing trucks for operations:**</u><br><br>• Purchased and leased trucks. *Kloppel Dep.* 46:17-47:25; 154:14-156:11. Owned three trucks at termination of relationship with HDL and sold one for $8,000. *Kloppel Dep.* 58:13-59:9.<br><br>• Initially, company leased a two trucks from a third-party vendor with lowest rates. *Minors Dep.* 61:6-10; 62:23-63:15. Later, company chose to purchase four trucks and gained profitability as it "would buy and sell trucks or if [he] bought a truck broke down [he] would part it out and sell it and buy another truck". *Id.* 66:9-67:7.<br><br>• Owned a truck prior to contracting with HDL and brought truck to HDL work. *Ramos Dep.* 32:3-5. Purchased another truck to increase operations. *Id.* 31:12-32:9.<br><br>2. <u>**Other class members' companies leased trucks:**</u><br><br>• Opted to lease up to four trucks through Budget because it was "[j]ust easier to handle" and if something happened to the trucks could "make a phone call, get it replaced or fixed." *Traina Dep.* 33:6-25.<br><br>• During contract with HDL, operated 5-7 leased trucks per day. *Wilson Dep.* 15:14-16:13, 81:4-81:8.<br><br>• Initially, company operated one leased truck that it secured through HDL, but "quickly moved to two trucks" and "flexed up to four trucks a few times". *Blattenberger Dep.* 32:9-33:7.<br><br>• When first contracting with HDL, company operated one leased truck. *Samuels Dep.* 27:18-28:8. Later invested in another truck, purchasing two trucks from private sellers. *Id.* 28:12-21, 103:11-104:14.<br><br>3. <u>**And, some class members' companies opted to rent trucks:**</u><br><br>• Initially, had "three to four" rented trucks available for servicing the HDL account. *Collins Dep.* 19:17-20:4. At its peak, operated with HDL, choosing to add vehicles to "increase [its] revenue" and provide more jobs. *Collins Dep.* 22:22-23:22.<br><br>• Operated two trucks that it chose to rent. *Bharath Dep.* 49:9-50:18. Maintained a company credit card to cover operational expenses, building rewards points. *Id.* 80:16-81:7, 81:8-18. |

Appendix A

> **4.** **Class members' companies invested in tools required for operations, including operational permits:**
>
> - Paid for permit and license fees, purchased own insurance, provided tools to employees, as well as credit cards for gas expenses they incurred while operating. *Kloppel Dep.* 16:22-17:15, 18:4-18:11, 60:13-18, 61:21-63:11.
>
> - Took tax deductions for equipment including two trucks and other equipment. *Kloppel Dep.* 59:20-60:18; 158:2-159:10.
>
> - Invested in tools, vehicles and equipment, and uniforms. *Wilson Dep.* 20:23-21:19, 43:9-17, 44:5-44:22, 56:15-21.
>
> - Investment in tools included "basic hand tools" like "a drill [] a socket set, hammer, your basic screwdriver sets and your hand truck and a measuring tape", a company computer, and "miscellaneous things, extra straps, harnesses, gloves, paste, putty". *Minors Dep.* 92:12-18; 93:2-94:8; 157:20-158:2.
>
> - Invested in small tool for the job like "[d]elivery equipment, dollies, removing straps, small hand tools." *Collins Dep.* 67:6-14. Invested in a cell phone used for business and fuel costs associated with operations. *Id.* 67:19-68:21.
>
> - Invested in pads and ties to "tie [product] down so it didn't get damaged" and cover the product with pads. *Traina Dep.* 73:7-19. It also invested in "carry straps". *Id.* 105:24-106:16.
>
> - Purchased in "hand tools, dollies, blankets" from "Home Depot, Lowe's, [and] Harbor Freight". *Bharath Dep.*54:19-55:13. Its operational investments included "fuel, diesel, tolls, uniforms, cell phone bills, blankets, handed trucks, [and] tools" *Id.* 94:16-95:9.
>
> - Invested in equipment such as "dollies and moving equipment, moving straps, [and] rachet straps to secure the merchandise in truck". *Blattenberger Dep.* 37:10-18. Purchased this equipment directly because he did not believe it was an option for HDL to advance the money and then deduct the investment from the company's settlement. *Id.* 38:4-11.
>
> - Invested in equipment for its operations like "shoulder dollies [and] hand trucks". *Samuels Dep.* 54:3-8.
>
> - Paid for expenses such as a cell phone, truck maintenance costs, fuel, and shirts that said "Sears" on them. *Ramos Dep.* 46:17-21; 47:5-48:9.
>
> **5.** **Class members' companies invested in insurance, with differing experiences:**

Appendix A

- Insured its operations, initially through State Farm and later through Erie Insurance based on its "price". *Collins Dep.* 22:8-21; 70:6-71:8.

- Invested in separate insurance, shopping for "best coverage" available. *Traina Dep.* 102:25-103:22.

- Invested in separate insurance to insure its rented trucks through State Farm because he had obtained "State Farm insurance prior to working for HDL". *Bharath Dep.* 50:19-51:21.

- Secured insurance for trucks directly through State Farm because HDL was "charging too much, and [they] got [their] insurance way cheaper", but chose to obtain workers compensation insurance through an HDL facilitated account. *Samuels Dep.* 49:10-24; 51:8-12.

- Invested in insurance, purchasing workers compensation insurance directly through Erie Insurance. *Blattenberger Dep.* 37:3-9; 71:25-72:7.

- Insured company operations. *Ramos Dep.* 46:8-16.

6. <u>Some class members' companies invested in labor and employee recruitment:</u>

- Found workers to hire through "word of mouth" or "ads on Craig's List", which it paid for. *Minors Dep.* 43:2-13. Deducted these advertising expenses from its taxes. *Id.* 154:18-155:13. In 2014, deducted $207,560 in contract labor expenses for "[d]rivers and helpers and any contractor/laborer that" it utilized. *Id.* 155:14-18.

- Advertised "for employees" on Craig's List, at some time paying for the advertisements. *Traina Dep.* 42:7-13; 44:15-18.

7. <u>Class members' companies invested funds in business bank accounts:</u>

- Maintained a business bank account where it would deposit revenue from HDL. *Collins Dep.* 54:13-19; *Ramos Dep.* 32:10-21; *Blattenberger Dep.* 31:20-23; 54:22-55:2; *Samuels Dep.* 55:4-14; *Minors Dep.* 79:10-23.

- Maintained a separate business bank account where it deposited revenue from its account with HDL and other accounts it was servicing while under contract with HDL. *Traina Dep.* 35:15-36:5, 36:16-37:10.

- Maintained a separate business bank account where it deposited payments from its customers, including HDL Lykes Cartage, Stocklin, and SMT. *Bharath Dep.* 56:4-11; 56:23-57:19.

8. <u>Other investments varied:</u>

Appendix A



|  | • Invested in placards with company names to put on trucks. *Traina Dep.* 42:17-43:7; *Minors Dep.* 145:17-146:12. |
|---|---|
|  | • Invested in home offices to manage operations. *Collins Dep.* 73:23-74:6; *Traina Dep.* 109:4-17. |
|  | • Invested in workers and team morale, deducting "meals and entertainment" expenses totaling $3,542 in 2014 for when Minors be "either sitting down discussing company business or when [he] would take [his] guys out and pay for their food on the job." *Minors Dep.* 160:7-17. |
|  | • Invested in truck storage expenses. *Minors Dep.* 172:14-173:2. |
|  | • Used a third-party company for payroll "to make sure [its] taxes were all in line." *Collins Dep.* 67:2-5. |
|  | • Invested in "rented cars to guys, the guys back and forth to Virginia" as part of travel teams it employed for about a "total of six weeks". *Collins Dep.* 72:24-73:22. |
|  | • Contract Carrier incurred business expenses including truck expenses, "wages", "state taxes, fees", "insurance", and workers compensation insurance. *Blattenberger Dep.* 31:14-19. Some of these expenses it paid directly; others it opted for HDL to deduct from its settlements. *Id.* 31:24-32:8. Considers deducted expenses to be "trucking expenses". *Id.* 31:24-32:8. |
| **D. Business entity owns or leases the capital goods and gains the profits and bears the losses of the business entity;** | **1.** <u>**Some class members' companies purchased trucks for operations:**</u><br><br>• Purchased and leased trucks . *Kloppel Dep.* 46:17-47:25; 154:14-156:11.<br><br>• Leased two trucks from a third-party vendor because "ultimately the rates were just lower for" than other lease options considered. *Minors Dep.* 61:6-10; 62:23-63:15. Later, purchased four trucks, facilitating ongoing profit as it "would buy and sell trucks or if [he] bought a truck broke down [he] would part it out and sell it and buy another truck." *Id.* 66:9-67:7.<br><br>• Started with one truck that was owned before coming to HDL. *Ramos Dep.* 32:3-5. Later, purchased another truck. *Id.* 31:12-32:9.<br><br>• After first leasing a truck, later purchased two trucks, both through private sellers. *Samuels Dep.* 27:18-28:8; 28:12-21; 103:11-104:14.<br><br>**2.** <u>**Other class members' companies leased or rented trucks for profitability reasons:**</u><br><br>• Always rented trucks while with HDL. *Wilson Dep.* 81:4-81:8. |

Appendix A

- Also opted to rent trucks, having "three to four" rented trucks available for servicing the HDL account and, at its peak, it operated five trucks on its HDL account for about two years. *Collins Dep*. 19:17-20:4; 22:22-23:22. Chose to rent trucks for profitability purposes because "it would be cheaper and easier" and the rental company would "fix the trucks". *Id.* 21:13-20.

- Rented multiple trucks, which incentivized more out-of-town work due to the lower operating costs and maintenance associated with leased trucks. *Kloppel Dep*. 68:10-69:1, 69:17-70:4, 80:9-82:2.

- Initially, leased truck that it secured through HDL, but "quickly moved to two trucks" and "flexed up to four trucks a few times". *Blattenberger Dep*. 32:9-33:7.

- Company eventually opted to lease trucks directly through Enterprise because the cost of doing so was less. *Blattenberger Dep*. 69:17-70:5.

- Leased trucks through Budget, leasing up to four trucks at given time. *Traina Dep*. 33:6-25.

- Operated two rented trucks, that it chose to rent through Penske and Ryder. *Bharath Dep*. 49:9-50:18.

**3.   Contract Carriers chose to operate out of given terminals based on profitability analysis:**

- Opted to decline work in Buffalo because of the higher costs he incurred from the wear and tear on truck that he owned. *Kloppel Dep*. 80:9-81:5.

- Began operating out of the Syosset location but later added operations out of Rochester because it "paid more per stop" and "[i]t was more of an incentive". *Minors Dep*. 50:24-51:20. When its Rochester operations "weren't making a profit" it stopped operating out of the Rochester location. *Id.* 55:7-56:2. The losses incurred as part of its Rochester operations included higher truck rental fees from Penske and merchandise damage claims. *Id.* 56:3-57:21

**4.   Class members' companies owned tools needed to operate:**

- Owned the necessary operational equipment, such as basic hand tools" like "a drill [] a socket set, hammer, your basic screwdriver sets and your hand truck and a measuring tape" as well as a company computer. *Minors Dep*. 92:12-18; 93:2-94:8.

- Owned equipment such as "shoulder dollies [and] hand trucks". *Samuels Dep*. 54:3-8.

- It owned its own equipment though, such as "hand tools, dollies, blankets". *Bharath Dep*. 54:19-55:13.

- Would select manifests based on potential profitability. *Collins Dep*. 42:2-24.

Appendix A

**5. <u>Some class members' companies changed operations to increase profitability</u>:**

- During a poor financial period, company entered into a contract with XPO to provide delivery services because "it looked like a decent opportunity that paid well". *Minors Dep.* 85:18-24.

- When moved to Florida, he scaled down his company's New York operations, "ran less trucks", and "sold trucks". *Minors Dep.* 112:18-113:2.

- Increased its number of trucks "to make more money" based on the volume of merchandise. *Blattenberger Dep.* 33:8-34:6. Likewise, it would flex up trucks "because there was an opportunity for more profit". *Id.* 36:3-16.

- Managed costs by securing "insurance way cheaper than they were charging." *Samuels Dep.* 51:8-12.

- Used a business credit card to pay for business expenses, including truck rentals. *Bharath Dep.* 80:16-81:18. Did this to "build up points and get rewards". *Id.*

- Managed company profitability by: (i) offering extra pay for travel teams (*Collins Dep.* 52:8-16); (ii) selecting manifests with more stops in a smaller geographic area (*Id.* 81:3-23); (iii) negotiating "compensation higher than other contractor" with an additional flat rate of $160 per week (*Id.* 87:7-23; 88:21-89:15); (iv) adding trucks to his fleet to "increase [his] revenue a little bit" (*Id.* 23:11-16).

**6. <u>Some class members' companies were restricted in profitability attempts</u>:**

- Sought increased profit by hiring more employees "when they asked for more trucks or more teams". *Traina Dep.* 24:8-25:10. But did not have opportunities to increase profitability on a weekly basis because "[i]t was what they gave me is what they gave me". *Traina Dep.* 132:6-13. Did not fuel trucks based on costs because they "had no choice." *Id.* 132:20-133:7.

- Managed profitability of the company and changed "business strategies" by adding "one more truck" than needed during peak times to have a spare truck available and "keep[ing] your one truck during slow times. *Samuels Dep.* 43:11-19. Could not decide how many trucks to run because HDL would tell them "they need one or two trucks" and "how many trucks for the next day". *Id.* 44:4-16. Couldn't say "'I want both my trucks running every day'" because "[i]t doesn't work like that, unfortunately." *Id.*

- Never attempted to negotiate higher rates from HDL in the form of specials. *Bharath Dep.* 77:24-78:3.

**7. <u>Class members' companies bore losses associated with financial performance</u>:**

- Incurred losses associated with property damage claims, HDL would not permit them to negotiate directly with the customer. *Collins Dep.* 63:16-64:15. Paid these claims through its business bank account. *Id.* 65:9-15.

- Bore losses associated with in-home damage claims caused by its workers, paying claims "out of pocket" "[e]very single time". *Minors Dep.* 139:4-22.

- Unlike other Contract Carriers, would pay damages claims but would not deduct such amounts as business expenses on its taxes. *Samuels Dep.* 86:22-87:25.

- Bore losses attributed to its employees, including one driver who "had several property damages and [] damages a couple of [Collins Home Delivery's] trucks." *Collins Dep.* 28:12-29:15. This was because the driver "was an employee" and it was Collins Home Delivery's "responsibility". *Id.*

- Sustained the losses associated with its operations with HDL to the extent that, when it terminated its contract and closed its bank account, the remaining funds "were mostly spent on paying" its workers. *Blattenberger Dep.* 54:22-55:11.

**8. Class members' compensation varied:**

- The financial performance of the company affected the amount of owner draws, since what he "earn[ed] was likely hidden by putting expenses on credit cards, honestly." *Kloppel Dep.* 39:10-20.

- Took disbursements when needed and as finances allowed, and received a share of company income at year's end. *Wilson Dep.* 76:18-22, 78:2-14.

- Did not pay himself but was paid "mostly off of tips" because financial constraints on the company. *Minors Dep.* 114:6-23. Amount he took was, "to an extent", dependent on the "financial success of the company". *Id.* 115:7-15. During more profitable times, would take a draw totaling the quarterly profit in the company after expenses. *Id.* 115:16-116:20.

- Did not take a salary but took a draw "as [he] needed to pay [his] bills". *Samuels Dep.* 55:15-57:12.

- Did not pay himself a salary, but opted to take weekly draws of all retained profit in the company after expenses. *Traina Dep.* 37:11-24. These draws depended on the financial success of company. *Id.* 40:21-41:2.

- Did not take a salary but would pay himself a draw, retaining enough company funds to "keep the business afloat" and paying himself enough to keep from "being homeless". *Blattenberger Dep.* 55:18-56:3. Generally this payment was "just enough to pay the bills" and did not take a higher draw if there was

Appendix A

<table>
<tr>
<td></td>
<td>

more money in the business bank account. *Id.* 56:4-24. Personal compensation "not really" dependent on the financial success of Cells Contracting. *Id.* 56:18-20.

- Paid himself a salary and did not take draws from the company. *Bharath Dep.* 57:20-58:2. This salary was taken as a lump sum at the end of the year "based on expenses and income." *Id.* 58:23-59:21. While salary varied year to year, claims that it was not dependent on the financial success of company. *Id.* 60:2-61:2. Instead, his salary was based on his accountant's advice regarding "future purchases". *Id.* 61:3-20.

- Paid himself a flat rate of $400 per week and "any other profit [of the company] that was left would be [his]." *Collins Dep.* 44:16-24; 58:13-20; 105:8-106:3. Company was more profitable due to increased volume from "2011 to 2015" where Collins personally could retain more income based on his salary "plus any other profit [the company] made." *Id.* 55:1-24.

</td>
</tr>
<tr>
<td>

**E. Business entity may make its services available to the general public or others not a party to the business entity's written contract referenced in paragraph (g) of this subdivision in the business community on a continuing basis;**

</td>
<td>

1. <u>**Some class members' companies serviced other accounts with HDL:**</u>

- Serviced Appliance Associates beginning in 2014 and added an Orville Home Appliances account in 2016 while under contract with HDL. *Wilson Dep.* 40:9-14; 86:21-88:6. Work with these companies amounted to 75% of revenue in 2016. *Id.* 86:21-88:6.

- Serviced an account with XPO in Connecticut as well as an account with Home Delivery America, for which the company obtained interstate motor carrier authority. *Minors Dep.* 83:17-84:18; 94:17-95:17; 95:18-96:18.

- Registered company to do business in Florida while contracting with HDL in New York. *Minors Dep.* 119:9-16.

- Provided services to Spirit Delivery and MFM while under contract with HDL and continued to service Spirit Delivery following termination of HDL contract. *Traina Dep.* 19:6-20:7, 20:21-21:21. In 2016 alone, more than $400,000 of $649,466 in gross receipts came from contracts with companies other than HDL. *Id.* 122:6-123:6.

- In 2012, while under contract with HDL, retained income from installing carpet. *Traina Dep.* 135:19-137:12.

- May have worked for another company delivering piping while his company was under contract with HDL. *Ramos Dep.* 33:2-7, 8-21.

2. <u>**Other class members' companies opted to only provide services to HDL:**</u>

</td>
</tr>
</table>

Appendix A

| | |
|---|---|
| | • Advertised for business and unsuccessfully attempted to solicit work from Home Depot and Lowe's. *Kloppel Dep.* 35:2-36:3; 70:20-72:16. |
| | • While contracting with HDL in Syosset, did not provide delivery services to any other company. *Bharath Dep.* 43:3-10. |
| | • Did not service any other accounts or generate income from other companies while under contract with HDL. *Blattenberger Dep.* 53:9-15. |
| | • Did not provide services or make deliveries for another company. *Samuels Dep.* 45:4-16. |
| **F. Business entity provides services reported on a Federal Income Tax form 1099, if required by law;** | 1. <u>**Class members received 1099 forms from HDL:**</u><br><br>• *Traina Dep.* 16:10-14. *Minors Dep.* 176:6-8. |
| **G. Business entity performs services for the commercial goods transportation contractor pursuant to a written contract, under the business entity's name, specifying their relationship to be as independent contractors or separate business entities;** | 1. <u>**Class members' companies operated under written agreements with HDL:**</u><br><br>• *Samuels Dep.* 24:7-10, 101:5-102:7; *Bharath Dep.* 31:24-32:7, 96:3-97:3; *Blattenberger Dep.* 29:7-30:6; *Minors Dep.* 142:9-18, 143:6-144:2; *Traina Dep.* 46:23-47:2; *Collins Dep.* 24:5-11. |
| **H. When the services being provided require a license or permit, the business entity pays for the license or permit in the business entity's name or, where permitted by law, pays for reasonable use of the commercial goods transportation contractor's license or permit;** | 1. <u>**Class members' companies paid for licenses and permits:**</u><br><br>• Coordinated and paid for their motor carrier authority issued by the U.S. Department of Transportation. *Kloppel Dep.* 60:16-18; 70:10-15; *Wilson Dep.* 86:10-20.<br><br>• Used its motor carrier authority issued before it contracted with HDL, to provide transportation services to other clients besides HDL. *Wilson Dep.* 86:10-20. Initially testified that company did pay for any fees and permits but then changed his answer claiming that there are not permits needed. *Id.* 176:6-25, 177:10-11. |

Appendix A

| | |
|---|---|
| | • Invested in and paid for necessary permits, including "annual fees" for its DOT number and MC number based on the number of trucks it was operating. *Collins Dep.* 96:17-97:4.<br><br>• Maintained operating authority granted by the Federal Motor Carrier Safety Administration. *Bharath Dep.* 39:8-11.<br><br>• Obtained motor carrier authority by the Federal Motor Carrier Safety Administration and displayed its DOT number on its trucks with HDL. *Blattenberger Dep.* 24:12-22; 86:22-87:5.<br><br>• Obtained DOT operating authority shortly before contracting with HDL and continued to maintain that authority. *Minors Dep.* 69:20-70:13. It displayed its DOT number on the trucks it operated. *Id.* 145:4-16.<br><br>• Maintained a DOT number and MC number along with operating authority from the Federal Motor Carrier Safety Administration. *Samuels Dep.* 25:6-10; 41:7-21.<br><br>• Applied for and was granted interstate operating authority by the Federal Motor Carrier Safety Administration. *Traina Dep.* 30:11-31:10. |
| **I. If necessary, the business entity hires its own employees without the commercial goods transportation contractor's approval, subject to applicable qualification requirements or federal or state laws, rules or regulations, and pays the employees without reimbursement from the commercial goods transportation contractor;** | **1. <u>Some class members' companies hired employees for delivery operations:</u>**<br><br>• Did not recruit or interview most of companies' employees, due to advertisements placed in the Buffalo newspaper and HDL's interview of prospective drivers and helpers. *Wilson Dep.* 48:10-16, 52:12-53:24, 153:24-155:2.<br><br>• Wanted company to run more trucks for increased revenue, he accepted all referrals of potential employees from HDL. *Wilson Dep.* 151:17-153:3.<br><br>• Company's employees were located through Craigslist ads or word of mouth, with interviews conducted by Kloppel. *Kloppel Dep.* 35:18-25, 36:10-18.<br><br>• Hired employees. *Ramos Dep.* 28:6-29:7. Besides one employee who was family member, found other employees "through acquaintances." *Ramos Dep.* 38:3-7.<br><br>• At peak, had "two or three or four" employees. *Ramos Dep.* 31:4-11.<br><br>• Hired drivers and helpers as employees. *Bharath Dep.* 27:5-28:20. As President, Bharath would interview employee candidates and make the ultimate decision on whether to hire them. *Id.* 31:7-23; 94:9-15. |

Appendix A

- One "job responsibilities" was to "hire the people". *Collins Dep.* 15:15-21. Hiring authority was subject only to HDL "background checks and the drug testing and all of that." *Collins Dep.* 93:11-17.

- Hired "employees as opposed to independent contractors" to lessen the tax burden on his workers: "I didn't think it was fair to pay them as contractors because their taxes by the time they were don they would be making no money." *Collins Dep.* 93:25-94:6.

- Did hire drivers and helpers, including part time employees. *Collins Dep.* 25:3-28:11; 29:24-30:21. "A lot of employees" of Collins Home Delivery "were [Collins'] friends". *Collins Dep.* 63:5-11.

- Company hired employee workers. *Traina Dep.* 23:5-15; 24:8-12; 41:11-15; 48:5-51:8.

2. **Other class members' companies used independent contractors as drivers and helpers:**

- Utilized independent contactors as drivers and helpers. *Minors Dep.* 38:21-25; 39:8-17; 40:11-21; 42:11-25; 80:25-81:19;133:24-134:20. Opted to use independent contractors instead of employees based on profit analysis because employees "cost[] 30 percent more on the back end" and, as such, having employee is "impossible". *Id.* 133:24-134:20.

- Opted to contract with independent contractor drivers and helpers instead of employees, issuing only 1099s not W2s. *Samuels Dep.* 29:6-30:5. Also would bring on independent contractors to "come in" "once in a while" if he "was a little bit tired" so that he "could shut [his] eyes for a few minutes". *Id.* 38:25-39:24.

- Used independent contractor drivers and helpers, up to "between six and eight" at a given time. *Blattenberger Dep.* 38:17-39:17.

3. **Class members' interview and hiring practices varied:**

- Would interview potential independent contractors and make the decision to bring them on, subject to HDL's background screening. *Minors Dep.* 43:14-22. Independent contractors included his brother and family friends. *Id.* 32:21-33:16; 60:4-12.

- HDL asked if a former principal of an HDL Contractor Carrier could work for company. *Minors Dep.* 82:21-83:4. He "said okay. And then [he] said 'I don't like what is happening' and Scott 'can't work for me any more'" and "that was it". *Id.*

- Hired numerous employees, peaking at "12 to 15" at a given time. *Traina Dep.* 23:5-15; 24:8-12; 41:11-15; 48:5-51:8.



Appendix A

<table>
<tr><td></td><td>

- Did not have ultimate hiring authority, rather he "located them, [HDL] pretty much hired them. They did every – they did all the work, they has a strict onboarding." *Traina Dep.* 25:11-16. Even so, would interview prospective employees on the phone before hiring them. *Id.* 51:24-52:1.

- One independent contractor of company was a "friend" who he "grew up with" and another he had known "for a lot of years." *Blattenberger Dep.* 40:24-41:8; 41:18-42:2. It was his "decision to bring on these workers" and he was "responsible for making sure that they were paid". *Id.* 42:6-11.

- Independent contractors of company included a longtime acquaintance and "ex-wife's nephew". *Samuels Dep.* 35:6-14; 36:3-15. It was his ultimate decision to bring on these independent contractors, subject to clearance by HDL. *Id.* 36:16-19; 37:5-7.

**4. Payment practices differed:**

- When contracting with these workers, he, as CEO, would negotiate rates. *Minors Dep.* 44:6-16; 45:25-46:7. Calculated rates for negotiation based on his "overhead" and insurance" to "determine what was feasible." *Id.* 134:21-135:15.

- Made the decision on pay rates for employees "based upon experience and whatever rates were going for generally given at that point in time for the current position that they were applying for." *Bharath Dep.* 31:14-23; 36:10-37:11; 37:24-38:15.

- Paid drivers and helpers on a per delivery basis because "it would motivate them to get the deliveries done and want to do more deliveries." *Collins Dep.* 31:11-23. Instead of negotiating rates upon hire, workers "would start all the same" and give raises based on "performance" an "length of time" with the company. *Id.* 48:9-23.

- Paid its independent contractors a per day flat rate that did not vary. *Samuels Dep.* 35:15-36:13.

</td></tr>
<tr><td>

**J. The commercial goods transportation contractor does not require that the business entity be represented as an employee of the commercial goods transportation contractor to its customers; and**

</td><td>

**1. Testimony regarding uniforms varied:**

- Was told that shirts worn by Buffalo-based Contract Carriers had to say "Sears or HDL authorized delivery logo" on them. *Wilson Dep.* 56:22-57:2.

- Teams were also required to wear shirt supplied by HDL with HDL's "name on it." *Traina Dep.* 43:19-44:2; 74:14-23. His company never had uniforms with his company logo on them. *Id.* 43:19-44:2.

- Paid for and was required to have its team wear uniforms that "were navy blue shirts that said HDL 'HomeDeliveryLink' on them. *Blattenberger Dep.* 79:24-22.

</td></tr>
</table>

Appendix A



| | |
|---|---|
| | • While first contracting with HDL, contracting workers were required to wear "blue pants" and "blue shirts" that said "HomeDeliveryLink on them". *Collins Dep.* 15:22-17:10. Then, purchased uniforms that had "Collins Home Delivery" on them. *Id.* 15:22-16:5; 17:11-18:4. Obtained these company uniforms to "give [his] employees a little pride" because "[t]hey liked working for [Collins Home Delivery] they liked the shirts." *Id.* 17:23-18:4.<br><br>• Required to purchase uniforms from HDL, rather than an "outside" vendor like "Walmart". *Minors Dep.* 100:7-102:4. The HDL uniform requirement dictated "blue shirt, blue pants, black boots" and precluded "hoodies and their shirts". *Id.* 101:18-24. "Every Friday" his team "had to take a group picture to make sure [they] had a uniform" and they would be "penalized" if they did not have the right shirt. *Id.* 101:11-101:17.<br><br>• Did not put company logos on their shirts, because "they would not allow [them] to put [their] name." *Ramos Dep.* 39:7-13. But the uniforms for his company did not say HDL, rather they "wore the shirt that they gave us at Sears a shirt that said 'Sears'. That is what the shirt said." *Id.* 39:16-22. Later, his company was paid for shirts that said "Home Delivery Experts". *Id.* 39:23-40:3.<br><br>• Tried to get his own uniforms for this company workers, but was told that "it wasn't good enough." *Samuels Dep.* 75:23-76:8. Instead, his company was required to purchase and wear uniforms through HDL that were marked "Authorized Carrier". *Id.* 75:11-18.<br><br>**2.   Testimony regarding company names or logos on trucks varied:**<br><br>• Not allowed to place any decals on his truck. *Wilson Dep.* 83:9-25.<br><br>• Placed "Kloppel Deliveries" on his truck decals. *Kloppel Dep.* 106:15-22.<br><br>• Placed "12 by 13 [or] 14 by 8" placards on its trucks that said "Traina Services." *Traina Dep.* 42:17-43:7.<br><br>• Affixed decals on its trucks that stated the company name. *Minors Dep.* 145:17-146:12. |
| **K. Business entity has the right to perform similar services for others on whatever basis and whenever it chooses.** | **1.   Some class members' companies provided services to others:**<br><br>• Consecutively serviced two other accounts that grew to the point that they assumed the majority of its revenue by 2016. *Wilson Dep.* 86:21-88:6. |

28

Appendix A

- While under contract with HDL, companies contracted with and provided services to other accounts. *Minors Dep.* 83:17-84:18.; 94:17-95:17; 95:18-96:18; *Traina Dep.* 19:6-20:7, 20:21-21:21; 122:6-123:6.

- In 2012, company also obtained income from installing carpet. *Traina Dep.* 135:19-137:12.

- While contracted to provide equipment and services to HDL in New York, registered company to conduct business in Florida. *Minors Dep.* 119:9-16.

- May have performed pipe delivery services for another a company while company was under contract with HDL. *Ramos Dep.* 33:2-7, 8-21.

- Companies did not service other accounts while under contract with HDL in New York. *Bharath Dep.* 43:3-10; *Samuels Dep.* 45:4-16; *Blattenberger Dep.* 53:9-15.

- Solicited but did not secure additional accounts. *Kloppel Dep.* 70:20-72:16.

2. <u>**Vacations and time off varied:**</u>

- Never took days or weeks off. *Bharath Dep.* 88:14-18.

- Could not decide whether to take a given day off, but could have another driver fill his role if his company was running only one truck. *Ramos Dep.* 41:18-42:2; 42:7-10.

- Moved to Florida and operated his company's work in New York from afar. *Minors Dep.* 107:4-13. During this time, "the people on the truck were the ones that were performing the work." *Id.* 106:3-12.

- Had the authority to allocate which terminals his team would work out of and which workers would work a given day. *Minors Dep.* 78:5-22. Took time off "periodically" for "three, four days" at time "however [he] felt like it". *Id.* 72:21-73:7. This included a vacation outside of the country. *Id.* 184:5-15. Hired drivers to cover work. *See Id.* 71:9-72:10.

- Initially worked six days a week, he scaled back his schedule to work "about four days a week." *Collins Dep.* 58:1-12. Hired a part time driver so that he could take Saturdays off. *Id.* 27:14-23. Would set aside "about three weeks a year off" for vacation. *Id.* 100:18-101:5.

- Would take "a day off here or there" based on his own decision and his company's staffing situation. *Blattenberger Dep.* 45:18-46:7. But, was not able to take vacations. *Id.* 46:15-16.