A. BLATTENBERGER

1

2     A.   There could've been. I don't 100%

3     recall.

4     Q.   We talked a little bit about the

5     manifest earlier. What exactly would be shown

6     on a manifest?

7     A.   There would've been the address of

8     where the product was going, what the product

9     is, contact information for the customer, our

10    timeframe, when we had to arrive, we had our

11    service time, the time that we were supposed

12    to complete the delivery and installation in,

13    and how long we were allowed to actually be

14    there.

15    Q.   Was there routing on the manifest?

16    A.   What do you mean by routing?

17    Q.   Directions on what routes to take

18    for the deliveries?

19    A.   I don't believe so.

20    Q.   Was there an order of deliveries?

21    A.   Yes.

22    Q.   Could you change the order of

23    deliveries around?

24    A.   Not without HDL's consent.

25    Q.   And did Cells Contracting ever

Veritext Legal Solutions
800-336-4000

```
 1                    A. BLATTENBERGER
 2      change the orders of deliveries around?
 3           A.  I'd like to say yes, but usually it
 4      was HDL's discretion if they decided, like
 5      say a customer called in and said they
 6      weren't going to be there for the delivery,
 7      they would call me and tell me to skip that
 8      delivery and move on to the next. I wasn't
 9      allowed to make those decisions myself,
10      though.
11           Q.  So, you would call someone at HDL if
12      that situation came up?
13           A.  Typically, they would call me. But
14      yes, there was times where I would also have
15      to call them if we got to a house and there
16      was nobody there for the delivery.
17           Q.  Did you ever rearrange stops in the
18      morning after looking at the manifest?
19           A.  Well, a few times. They would ask us
20      in the morning to do pre-calls to where we
21      called every stop on our route for that day.
22      And if people didn't answer or said they
23      needed to reschedule, we would try to get
24      that handled on the dock before we left the
25      building so we wouldn't have a whole
```

Page 52

```
 1                      A. BLATTENBERGER
 2      kitchen's worth of appliances on our truck
 3      that we couldn't deliver so it wouldn't block
 4      everything else in.
 5           Q.   And would you have your guys do the
 6      pre-calls?
 7           A.   Everybody did pre-calls. It depended
 8      on the day and who was doing what.
 9           Q.   While Cells Contracting was under
10      contract with HDL, did it ever service any
11      other accounts?
12           A.   No.
13           Q.   Did it ever obtain compensation from
14      someone other than HDL?
15           A.   No.
16           Q.   You said that you believe Cells
17      Contracting had a business bank account,
18      correct?
19           A.   Correct.
20           Q.   And were payments for the services
21      that Cells Contracting provided to its
22      customers deposit in that bank account?
23           A.   HDL would give me a check, and then,
24      yes, I would deposit that check into my
25      business banking account.
```

Page 53

```
 1                    A. BLATTENBERGER
 2        Q.  Was all income generated by Cells
 3   Contracting deposited into that bank account?
 4        A.  (No verbal response.)
 5                    MR. BREHM:  Let's go off the
 6              record here. I think we're
 7              having some technical issues.
 8                    THE VIDEOGRAPHER:  The time
 9              is 11:07. And we are going off
10              the record. This is the end of
11              media unit number one.
12                    (Whereupon, a short recess
13              was taken.)
14                    THE VIDEOGRAPHER:  The time
15              is 11:29 and we are back on the
16              record. This is the beginning of
17              media unit number 2.
18   BY MR. BREHM (continued):
19        Q.  Mr. Blattenberger you understand you
20   are still under oath, correct?
21        A.  Yes.
22        Q.  Before the break here we were
23   discussing Cel's Contracting business bank
24   account. Would Cel's Contracting deposit all
25   income it generated into that bank account?
```

Page 54

```
 1                    A. BLATTENBERGER

 2          A.  Yes.

 3          Q.  Is that bank account still open?

 4          A.  No.

 5          Q.  Was it closed when Cel's Contracting

 6     closed?

 7          A.  Yes.

 8          Q.  And what happened to the funds that

 9     were in the bank account?

10          A.  Well, they were mostly spent on

11     paying my guys.

12          Q.  Was there any leftover funds after

13     paying your guys?

14          A.  No, HDL Capped out on the last

15     settlement. Almost all of it as they said to

16     claim future claims so actually, they didn't

17     even have enough to pay my guys.

18          Q.  While you were contracted with HDL

19     did you take a salary from Cel's contracting?

20          A.  I wouldn't say a salary. Obviously,

21     I had to get by, but I didn't make very much

22     money.

23          Q.  How would you get paid then?

24          A.  How would I get paid? I mean it was

25     enough to keep the business afloat and me
```

Veritext Legal Solutions
800-336-4000

```
 1                    A. BLATTENBERGER
 2     from being homeless but after that there
 3     wasn't much left over.
 4          Q.  My apologies that was a poor
 5     question, but I guess what I was getting at
 6     was. Did you take distributions from Cel's
 7     contracting?
 8          A.  I don't know.
 9          Q.  Did you pay yourself a standard
10     rate?
11          A.  I wouldn't say I paid myself a
12     standard rate. I took just enough to pay my
13     bills. That?s about it.
14          Q.  So, you would withdraw money from
15     the Cel's Contracting account when needed to
16     pay bills; is that correct?
17          A.  Correct.
18          Q.  Would the amount you took out depend
19     on the financial success of Cel's?
20          A.  Not really.
21          Q.  So, if there was more money in the
22     bank account you wouldn't take out more
23     money?
24          A.  No.
25          Q.  How would you determine what amount
```

Page 56

```
 1                    A. BLATTENBERGER
 2    to distribute to yourself?
 3         A.  Like I previously stated I would
 4    take enough to pay bills.
 5         Q.  Is it fair to say that you did not
 6    pay yourself a rate for the labor and
 7    services you provided?
 8         A.  That would be correct. I didn't pay
 9    myself a daily or an hourly rate or anything
10    like that. I took the bare minimum needed
11    just to keep myself afloat.
12         Q.  Mr. Blattenberger I'm going to share
13    my screen with you again with an exhibit I'm
14    deeming marked as exhibit 2.
15                         (Whereupon, the witness was
16                          shown a document marked as
17                          Exhibit 2 for identification as
18                          of this date.)
19         Q.  This is an electronic copy of an
20    excel spreadsheet base labeled HDLK002069.
21    Specifically, we're looking at a worksheet on
22    the excel spreadsheet labeled CELCEL.
23              Mr. Blattenberger, can you see this
24         document.
25         A.  More or less.
```

Veritext Legal Solutions
800-336-4000

                          A. BLATTENBERGER

1
2        Q.   Okay, if you have any issues looking
3    at items that I point out please let me know.
4    I can zoom in or adjust. At the top of this
5    document, it says delivery settlement
6    statement. What is a delivery settlement
7    statement?
8        A.   Sorry, where are you on here?
9        Q.   At the very top here. Do you see my
10   cursor?
11       A.   Oh okay, yep, I see it.
12       Q.   What is a delivery settlement
13   statement?
14       A.   I believe that is my weekly or
15   possibly bi-weekly what HDL would pay me.
16       Q.   In the upper left corner here, it
17   says HDLID CELCEL.
18            Do you see that?
19       A.   Yes.
20       Q.   What does CEL mean?
21       A.   I would assume that is what HDL put
22   in their system for my payroll. For Cel's
23   Contracting.
24       Q.   Right below that it has a driver
25   column that says Anthony Blattenberger, do

                                              Page 58

```
 1                    A. BLATTENBERGER
 2    you see that?
 3         A.   Yeah.
 4         Q.   That is you, correct?
 5         A.   Yeah.
 6         Q.   Did you receive copies of these
 7    delivery settlement statements from HDL?
 8         A.   Yes.
 9         Q.   Were they provided as paper copies?
10         A.   Yes.
11         Q.   Did you receive them as the owner of
12    the company?
13         A.   Yes.
14         Q.   You said you thought these were
15    either weekly or bi-weekly; is that correct?
16         A.   Yes.
17         Q.   Would you have to input your name
18    somewhere to be listed as the driver on these
19    statements?
20         A.   No. I had nothing to do with the
21    sound of it. This was all HDL.
22         Q.   Do you know how they determined who
23    the driver listed was?
24         A.   A shot in the dark. I don't know.
25    For the most part they did not get those
```

Page 59

1                          A. BLATTENBERGER

2     right, so I don't know how they determined

3     that. I think they would mostly put me on

4     there as I was the Owner/Operator.

5          Q.   Looking at this document is there

6     any way of determining how many days of this

7     week you actually drove?

8          A.   No. Not to my knowledge. I wouldn't

9     create these. It's what HDL provided me. I

10    had very title input into these at all.

11         Q.   I would like to get an understanding

12    into what some of these columns mean, if

13    you're able to see them. In row 6 here there

14    is a section labeled completed stop CT.

15              Do you see that?

16         A.   Yes.

17         Q.   And it looks like on 3/12 Monday

18    3/12 there is 11 completed stops; is that

19    correct?

20         A.   Yes.

21         Q.   What consists of a completed stop?

22         A.   A stop that we went to where the

23    customer was home, and we were able to

24    complete the delivery.

25         Q.   Did completion of the delivery

                                        Page 60

1                    A. BLATTENBERGER

2      include installation, if necessary?

3          A.   Yes.

4          Q.   Anything else include completion of

5      the delivery?

6          A.   No.

7          Q.   Below that on row 9 there is a

8      section labeled CONFINCADDRCT, do you know

9      what that stands for?

10         A.   I would assume it stands for

11     confirmed incomplete.

12         Q.   What is a confirmed incomplete?

13         A.   A stop that we went to that we

14     weren't able to complete.

15         Q.   How would you communicate the

16     inability to complete the stop?

17         A.   There was a phone system that we

18     used. I don't recall the name of it or

19     anything like that. It was like an app that

20     all the workers had to have on their phone

21     and when we would pull up to an address we

22     had arrived and when we finished, we would

23     put complete or incomplete. That's how it was

24     conveyed back to HDL through that app.

25         Q.   Cel's contracting paid for confirmed

Veritext Legal Solutions
800-336-4000

```
 1                    A. BLATTENBERGER
 2     incomplete stops?
 3          A.   I think it was a smaller amount or
 4     none at all. Honestly, I don't recall how
 5     they did that.
 6          Q.   Okay, on row 11 here there's a
 7     section titled mileage and on the same date
 8     3/12 it says 157. Do you see that?
 9          A.   Sure.
10          Q.   What does this stand for?
11          A.   Mileage?
12          Q.   Yes.
13          A.   Mileage stands for how many miles we
14     drove in that day.
15          Q.   How would you determine the mileage
16     you drove on that day?
17          A.   An odometer.
18          Q.   Would you report that number to
19     someone?
20          A.   Yes. Kind of. HDL, when they hand
21     you the manifest in the morning it has the
22     mileage listed, like a rough estimate of what
23     they think it is and that is what is listed
24     on what you're showing me. My actual mileage
25     for that day is probably not exactly 157 it
```

Page 62

```
1                    A. BLATTENBERGER
2      could've been more or less depending on roads
3      taken.
4           Q.  If you were to drive extra mileage
5      in a given day would that be reflected on
6      this document?
7           A.  Maybe, this was HDL side of things.
8      I do recall having issues with them not
9      paying me the correct mileage. It was a
10     constant battle with them because more
11     mileage equals more gas money.
12          Q.  The next row down, row 12 is labeled
13     fuel. Do you see that?
14          A.  Sure.
15          Q.  It looks like on 3/12 there is 55
16     dollars and 59 cents listed; is that correct?
17          A.  Yes.
18          Q.  Is this the amount that HDL paid you
19     for fuel on that day?
20          A.  Yes.
21          Q.  And how is that amount determined?
22          A.  I couldn't tell you that was on HDL
23     side of things.
24          Q.  Do you recall if it was based on the
25     mileage figure above that?
```

Page 63

A. BLATTENBERGER

1

2      A.  Yes, it would've been based on the

3   mileage.

4      Q.  You mentioned you had some back and

5   forth with HDL on mileage, correct?

6      A.  Correct.

7      Q.  Explain those instances to me

8   please.

9      A.  Well their paperwork wasn't always

10  accurate and that's what they would mostly

11  list on the paperwork you're showing me here.

12  It's just their computer-generated amount but

13  if we had stops added or we had go backs or

14  we had any of a thousand different scenarios

15  I would usually end up with 50 more miles a

16  day and they didn't like paying that so they

17  would just try and stick to what was on their

18  computer-generated amount for that day.

19     Q.  So, for that situation where you

20  ended up with 50 miles more in a day would

21  you go to HDL and ask for additional mileage?

22     A.  Yes.

23     Q.  It sounds like sometimes you were

24  not paid for that additional mileage; is that

25  correct?

Page 64

```
 1                    A. BLATTENBERGER
 2        A.   Correct.
 3        Q.   Is there times where you were paid?
 4        A.   Yes.
 5        Q.   The next row down, we have a row
 6   titled completed and on that 3/12 date it
 7   looks like the number is 335 and 50 cents; is
 8   that correct?
 9        A.   Yes
10        Q.   Is that the amount that HDL paid
11   Cel's Contracting for completed stops on this
12   day?
13        A.   I believe so, yes.
14        Q.   Okay, and we discussed before that
15   there were 11 completed stops so that works
16   out to 30 dollars and 50 cents per completed
17   stop. Is that accurate?
18        A.   Sure.
19        Q.   Did Cel's ever negotiate a higher
20   per stop rate?
21        A.   Cel's contracting tried, to no
22   avail.
23        Q.   Tell me about that situation.
24        A.   30 dollars is just not feasible to
25   operate that business model so I showed them
```

Veritext Legal Solutions
800-336-4000

```
 1                         A. BLATTENBERGER
 2      my paperwork and my expenses and explained to
 3      them that if they wanted me to stick around
 4      and be successful that I would need x amount
 5      per stop, and they couldn't care less.
 6           Q.  So, the negotiation wasn't
 7      successful, is that fair?
 8           A.  Yes.
 9           Q.  During your time with HDL did the
10      amount paid per stop vary at all?
11           A.  I don't believe so.
12           Q.  Row 15 here it says CONFINADDR I
13      think we discussed before this is confirmed
14      incomplete stop; is that correct?
15           A.  Yes.
16           Q.  It looks like Cel's contracting was
17      paid 20 dollars for that one confirmed
18      incomplete stop; is that correct?
19           A.  Yes.
20           Q.  Was this a consistent rate that HDL
21      paid for confirmed incomplete stops?
22           A.  I believe it was.
23           Q.  Did Cel's ever negotiate a different
24      rate?
25           A.  No.
```

Veritext Legal Solutions
800-336-4000

```
 1                    A. BLATTENBERGER
 2         Q.  Did it ever attempt to?
 3         A.  Yes.
 4         Q.  The next row down, 16 says Specials.
 5    What's a special?
 6         A.  A special is how they would try and
 7    get me to go do extra stuff for them. Say
 8    somebody wasn't home the first time I went
 9    there and then I'm 60 miles away and they
10    call HDL and HDL would call me and say, ?hey
11    can you go back and I'd say for $20 it isn't
12    really worth it for me to go back so they'd
13    offer me specials on occasion to sweeten the
14    pot to get me to go back and do something
15    that they wanted me to do.?
16         Q.  In those situations, would you
17    negotiate the amount of the special?
18         A.  I would try.
19         Q.  Was that ever successful?
20         A.  Sometimes.
21         Q.  Two rows down row 18 says SDO. Do
22    you see that?
23         A.  Yeah.
24         Q.  On Monday 3/12 there is an amount
25    listed for 94.50; is that correct?
```

Veritext Legal Solutions
800-336-4000

1                    A. BLATTENBERGER

2          A.   Yes.

3          Q.   What is an SDO?

4          A.   To be honest I don't recall. I think

5     it was something to do with the zone I was

6     delivering in. If it was something like Erie

7     County or Chautauqua County. Something along

8     those lines but I'm not 100%.

9          Q.   This is an extra payment for

10    operating in that zone, is that your

11    recollection?

12         A.   I believe so, like I said I don't

13    recall.

14         Q.   Scrolling down to the bottom half of

15    this statement here there is a section titled

16    do home delivery link.

17              Do you see that?

18         A.   Yeah.

19         Q.   Okay, is this what you would refer

20    to your trucking expenses?

21         A.   The line under it where it says

22    Truck Rental, yes.

23         Q.   So, the line below it?

24         A.   Yes.

25         Q.   Okay, and all the lines below here

Page 68

```
 1                    A. BLATTENBERGER
 2     these are amounts that were deducted from
 3     Cel's settlement statement; is that correct?
 4          A.  It looks to be.
 5          Q.  So, the first category here truck
 6     rental, the amount listed is 575, correct?
 7          A.  Yes.
 8          Q.  And this is for the trucks that
 9     Cel's Contracting was renting potentially
10     from Enterprise?
11          A.  Well HDL was leasing them and then
12     charging me.
13          Q.  Sure, so it was HDL facilitated
14     rental program.
15          A.  Yes, and that would've been the fee
16     for one truck.
17          Q.  Cel's agreed to have that amount
18     deducted from its compensation; is that
19     correct?
20          A.  Not exactly. It's complicated. They
21     told me that they weren't charging me a fee.
22     That they would charge me the same amount
23     Enterprise would charge me if I went through
24     them through my own means and it turned out
25     that was not accurate and that they were
```

Page 69

```
 1                    A. BLATTENBERGER
 2    charging me money on top of what Enterprise
 3    was charging me. So, they were charging for
 4    the truck and as well whatever fee they were
 5    taking for themselves.
 6         Q.  How did you find out they were
 7    charging more money than what Enterprise
 8    would directly?
 9         A.  I spoke with Enterprise directly and
10    found that out and then spoke with the
11    manager at HDL and they confirmed that.
12         Q.  Who's the manager at HDL?
13         A.  There was a few. There was Scott,
14    there was a guy named Carl. A whole troop of
15    them coming and going so it's hard to
16    recollect any one name.
17         Q.  Do you recall which one you spoke to
18    about the fees for truck rentals?
19         A.  I don't recall.
20         Q.  After you learned about this did you
21    then become renting directly from Enterprise?
22         A.  I tried, yes.
23         Q.  What do you mean by you tried?
24         A.  Well, I did rent through Enterprise
25    on my own but for money issues getting
```

Page 70

```
1                        A. BLATTENBERGER
2    charged for the truck I wouldn't have enough
3    to go through Enterprise for all of my
4    trucks.
5         Q.  If you rented directly through
6    Enterprise you would pay for the rental
7    directly through Enterprise, correct?
8         A.  Yes.
9         Q.  And this 575 amount for your truck
10   rental was that the standard rental rate that
11   Cel's contracting paid?
12        A.  I believe so, yeah. That was per
13   truck, per week. That's how that would get
14   paid.
15        Q.  So, did that amount vary based on
16   the amount of work performed in a given week?
17        A.  No, that would've been just per
18   truck per week. The 575.
19        Q.  Scrolling down here a little bit.
20   Row 37, says work comp. Do you see that?
21        A.  Yeah.
22        Q.  There's no deduction listed here,
23   correct?
24        A.  Correct.
25        Q.  Did Cel's Contracting have a workers
```

Page 71

```
 1                    A. BLATTENBERGER
 2    compensation policy?
 3         A.   I believe I did.
 4         Q.   Is that something you obtained
 5    directly through an insurer?
 6         A.   Yeah, I had Erie Insurance as my
 7    insurance carrier.
 8         Q.   Do you recall how you found Erie
 9    Insurance?
10         A.   HDL refer them to me
11         Q.   Did Cel's contracting pay for that
12    insurance policy directly?
13         A.   I believe so, I don't recall.
14         Q.   Did that policy cover the workers
15    that we discussed earlier?
16         A.   I would assume so. I don't really
17    recall how all of this stuff works.
18         Q.   The next row down there is a
19    category Insurance and there is an amount
20    listed 235, do you see that?
21         A.   Yes.
22         Q.   What is this?
23         A.   That is for some insurance. I don't
24    recall.
25         Q.   Do you recall if it's insurance for
```

Page 72

```
 1                    A. BLATTENBERGER
 2      the trucks that Cel's contracting was
 3      running?
 4           A.   I don't recall.
 5           Q.   Was this a consistent deduction on
 6      the settlement statements?
 7           A.   I believe it was.
 8           Q.   Do you know if it varied week by
 9      week?
10           A.   I don't recall.
11           Q.   Do you know if it was dependent on
12      the amount of work performed in a given week?
13           A.   I don't recall.
14           Q.   The next row down 39 is performance
15      bond, do you see that?
16           A.   Yes.
17           Q.   There is 100 dollars listed.
18           A.   Yes.
19           Q.   What is a performance bond?
20           A.   That was a fee that HDL charged me
21      as kind of a deposit that they can hold
22      against me, so I believe they did something
23      like 2500 to 3000 dollars per truck that I
24      was running. They would take a performance
25      bond out and up until they got that limit of
```

Page 73

```
 1                      A. BLATTENBERGER
 2     3 grand or whichever their limit was. So, if
 3     my contract was terminated or something
 4     happened, and I wasn't able to work there
 5     anymore they'd take my performance bond and
 6     keep it. It was like a security deposit.
 7          Q.  Deduction from Cel's contracting
 8     settlement statement would be made until you
 9     reached that limit; is that correct?
10          A.  I believe so, yes.
11          Q.  Was it 100 dollars per statement?
12          A.  I don't entirely recall. I know they
13     did it differently. They would charge per
14     truck, per team that I had. So, I'm not sure
15     how they did it.
16          Q.  This amount deducted would not vary
17     based on the amount performed in a given
18     week, correct?
19          A.  Correct.
20          Q.  On row 42 here there is a section
21     here called merchandise claim. Do you see
22     that?
23          A.  Yeah.
24          Q.  There is an amount listed of r75
25     dollars and 35 cents. Correct?
```

Page 74

```
 1                    A. BLATTENBERGER
 2          A.   Yes.
 3          Q.   What is a merchandise claim?
 4          A.   The claim is something HDL would
 5     charge me with so if there was a fridge that
 6     we open up, take it out of the box at a
 7     customer?s house and there is a dent on it.
 8     On the door or on the side or something like
 9     that. They would say that because I didn't
10     open it up and check it in the warehouse that
11     morning, they were going to charge me for
12     that damage, so that's what that is. I
13     believe.
14          Q.   The amount listed here is a charge
15     for that damage; is that correct?
16          A.   I would assume so. Some form of
17     damage to an appliance.
18          Q.   Is there any way of knowing whether
19     the merchandise was damaged in this given
20     week?
21          A.   No, you wouldn't know if it was from
22     the warehouse guy clamping it too tight when
23     he was moving it in the warehouse or if it
24     happened when it was being shipped there.
25     There's really no way to know how or where it
```

Page 75

```
1                    A. BLATTENBERGER
2    got damaged, and they wanted us to open up
3    every single box that we had in the morning
4    to check for these things which it's just not
5    feasible on a full day with a thousand cubic
6    feet of merchandise and to open up every box
7    and inspect every single item would take
8    hours. It just wasn't a realistic thing, but
9    they would still take money every chance they
10   got.
11        Q.  Is there any way of knowing when the
12   damage to the merchandise occurred?
13        A.  No.
14        Q.  I take it that Cel's contracting had
15   merchandise claims deducted from its
16   settlement statements, correct?
17        A.  Yeah, I'm pretty sure that line
18   means right there. I'm taking 75 dollars.
19        Q.  Do you recall if they were usually
20   deducted in the week that the damage occurred
21   to the merchandise?
22        A.  Oh no. Their policy for claims is
23   ridiculous. It was basically, they could get
24   it claimed from a year prior. Just from
25   somebody calling and saying we found a ding
```

Page 76

```
 1                    A. BLATTENBERGER
 2    on our fridge and HDL would claim it and say
 3    basically there's no limit to the time that
 4    they could charge me for any claim. So, they
 5    would charge me. I'd get hit with claims for
 6    2000 dollars, 7 months after they supposedly
 7    happened. So, this was a constant and
 8    frequent problem that I dealt with HDL.
 9         Q.  So, there is no way of knowing which
10    driver, helper was involved in the delivery
11    of this merchandise?
12         A.  I mean it could be narrowed down but
13    to know exactly who how or when it happened,
14    no. There's no way.
15         Q.  When Cel's Contracting paid these
16    merchandise claims would it charge those back
17    to the drivers if they could find out who the
18    driver was?
19         A.  I tried my hardest not to do that.
20    These guys had families and stuff, so it was
21    really tough to charge them anything. That's
22    kind of how all the contractors operated
23    there but I tried my hardest not to charge
24    anybody. For the most part I would just eat
25    the damage claims.
```

Veritext Legal Solutions
800-336-4000

```
 1                    A. BLATTENBERGER
 2        Q.  Did Cel's contracting have an option
 3   to submit the damage claims to its insurance?
 4        A.  I don't recall.
 5        Q.  The next row down row 43 there's a
 6   section in-home damage claim. Do you see
 7   that?
 8        A.  Yeah.
 9        Q.  There's no in-home damage claim
10   deduction listed here, correct?
11        A.  Correct.
12        Q.  What is an in-home damage claim?
13        A.  That could be a customer saying we
14   scratched their floor or put a ding in their
15   floor or the appliance itself. Any list of
16   issues. Could say I put a crack in their
17   driveway with the weight of my truck. Could
18   be anything and everything.
19        Q.  Did Cel's Contracting have in-home
20   damage claims deducted from its settlement
21   statements?
22        A.  Oh yeah.
23        Q.  Would those deductions occurred in
24   the week that the damage occurred?
25        A.  No.  It could be months and months
```

Veritext Legal Solutions
800-336-4000

1                    A. BLATTENBERGER

2      later. It could be a customer calling in and

3      say Oh we noticed our floor is scratched and

4      HDL would say okay and then they would charge

5      me.

6          Q.   So, is it true that when those

7      deductions occurred it may or may not have

8      been related to the work performed in that

9      week?

10         A.   Yes.

11         Q.   For in-home damage claims would

12     Cel's Contracting have the option to submit

13     the claim to insurance?

14         A.   I don't recall.

15         Q.   Is this a similar situation where

16     you tried to not charge the delivery teams if

17     you could find them?

18         A.   Correct.

19         Q.   For the merchandise claims and in-

20     home damage claims did Cel's Contracting

21     deduct those as business expenses from its

22     taxes?

23         A.   I don't recall.

24         Q.   Row 45 here there's a section for

25     uniforms. Did Cel's Contracting have

                                        Page 79

1                    A. BLATTENBERGER

2      uniforms?

3           A.   Yes. It wasn't Cel's Contracting

4      uniforms. They were uniforms supplied by HDL.

5           Q.   What were those uniforms?

6           A.   They were navy blue shirts that said

7      HDL HomeDeliveryLink on them. They charged me

8      for that stock, but I don't remember how much

9      it was. We had to wear navy blue pants as

10     well that we had to buy at our own -- like

11     Dickies.

12          Q.   Did Cel's Contracting pay for those

13     uniforms directly?

14          A.   I do believe HDL charged me for

15     uniforms I just don't recall the amount or

16     the dates.

17          Q.   Do you recall if the amount was

18     deducted from the settlement statements?

19          A.   I believe it was.

20          Q.   You said the uniforms said HDL on

21     them; is that correct?

22          A.   Yes.

23          Q.   Row 48 here there is a section

24     called other and there is an amount listed

25     for 3 dollars and 76 cents. Do you see that?

Veritext Legal Solutions
800-336-4000

```
 1                      A. BLATTENBERGER
 2          A.  Yeah.
 3          Q.  What is that?
 4          A.  Well, all the way to the left of
 5     that it says a claim fee. I assume that's a
 6     fee they charge me to charge me.
 7          Q.  By that do you mean it's related to
 8     the merchandise claim?
 9          A.  I would assume it would be.
10          Q.  Is it fair that this amount is
11     unrelated to the work that was performed in
12     the week?
13          A.  I would say that it's related to the
14     claims. Aside from that I couldn't tell you.
15          Q.  The next row down, 49, admin
16     services. Do you see that?
17          A.  Yes.
18          Q.  What is this?
19          A.  That is just what HDL would take for
20     themselves out of my settlement.
21          Q.  Do you know how this amount was
22     calculated/
23          A.  No.
24          Q.  Is this charge related to the work
25     that was performed in a given week?
```

Page 81

A. BLATTENBERGER

1

2      A.   I don't believe so.

3      Q.   You mentioned that you received

4  paper copies of these settlement statements,

5  correct?

6      A.   Correct.

7      Q.   Do you still have those copies?

8      A.   I lost a lot of stuff in a flood

9  that I had but I think I still have a couple

10  things laying around.

11      Q.   I'm going to share my screen one

12  more time here mister Blattenberger. I'm

13  displaying what I'm deemed marked as exhibit

14  three.

15                    (Whereupon, the witness was

16                shown a document marked as

17                Exhibit 3 for identification as

18                of this date.)

19      Q.   This is an electronic copy of an

20  excel spreadsheet base labeled HDLK002178.

21  Once again, we're going to look at the

22  worksheet titled CELCEL.

23          Do you see this?

24      A.   Yes.

25      Q.   This is another delivery settlement

Page 82

```
 1                    A. BLATTENBERGER
 2     statement, correct?
 3          A.  Yes.
 4          Q.  This one for the week ending in 7/30
 5     2016, correct?
 6          A.  Okay, yes.
 7          Q.  Row 3, driver. Says Tony
 8     Blattenberger. Is that you?
 9          A.  Yes.
10          Q.  I'd like to turn to the bottom half
11     of the page here where we have the category
12     do home delivery link. Do you see that?
13          A.  Yes.
14          Q.  At row 48 there's a category called
15     other with an amount of 200 dollars listed.
16     Do you see that?
17          A.  Yeah.
18          Q.  Do you know what that is?
19          A.  I have no idea. I don't know.
20          Q.  Over on the same row in the left-
21     hand corner it says CBS and in parenthesis
22     204, do you see that?
23
24          A.  (No verbal response.)
25
```

Veritext Legal Solutions
800-336-4000

A. BLATTENBERGER

1

2

3

4

5        Q.  Does that refresh your recollection

6    of what this might be?

7        A.  They charged me for so many

8    different things it's really hard to recall

9    them all. That could've been a fee that they

10    charged me to actually start up the contract

11    with them. I do recall that there was a fee.

12    I don't remember the amount but there was a

13    fee for the startup paperwork that they

14    processed.

15        Q.  When you say start up paperwork do

16    you mean forming the entity?

17        A.  Correct.

18        Q.  Does that also include the motor

19    carrier authority we discussed earlier?

20        A.  I don't know.

21        Q.  Does this amount, the 200 dollars,

22    relate to the work that was performed in this

23    week?

24        A.  No.

25        Q.  Did you ever receive a W2 form for

Page 84

1                    A. BLATTENBERGER

2     Cel's Contracting?

3          A.   I don't recall.

4          Q.   Did Cel's Contracting file tax

5     returns each year it was operational?

6          A.   I don't recall.

7          Q.   Do you recall if you had an

8     accountant to assist with Cel's Contracting

9     taxes?

10         A.   I did not.

11         Q.   If you did file taxes would that

12    have been something that you would've done

13    yourself?

14         A.   I believe so.

15         Q.   Do you recall if Cel's Contracting

16    took tax deductions for its business

17    expenses?

18         A.   I don't recall.

19         Q.   Do you retain any tax records

20    related to Cel's Contracting?

21         A.   I might.

22         Q.   Have you looked for them at all?

23         A.   I have not.

24         Q.   Did Cel's Contracting ever advertise

25    for its services?

Veritext Legal Solutions
800-336-4000

1                    A. BLATTENBERGER

2          A.   As far as what? Like trying to do

3     business elsewhere? To deliver appliances for

4     another company? I'm not sure what your

5     question means.

6          Q.   Did Cel's Contracting ever try to

7     deliver for another company?

8          A.   No.

9          Q.   Do you need to take a short break

10    sir?

11         A.   No.

12         Q.   Did Cel's Contracting ever pay for

13    any type of advertising?

14         A.   No.

15         Q.   Did Cel's Contracting ever appear on

16    any of the trucks it operated?

17         A.   No. I was told that was not allowed.

18         Q.   Who told you that?

19         A.   HDL

20         Q.   Do you recall who at HDL?

21         A.   No.

22         Q.   Did the trucks that Cel's

23    Contracting operated have any logos or

24    placards on them?

25         A.   There was a DOT number that I had to

                                        Page 86

```
 1                        A. BLATTENBERGER
 2     have on the door.
 3          Q.  Was that Cel's Contracting DOT
 4     number?
 5          A.  Yes.
 6          Q.  We talked a little bit about the HDL
 7     manager that were at the buffalo warehouse.
 8     You said there was a Scott Macy; is that
 9     correct?
10          A.  I know there was a Scott. I think
11     his last name was something like that, but I
12     could be wrong.
13                        MR. BREHM:  Thank you.  I
14                   have nothing further.
15                        THE VIDEOGRAPHER:  We are
16                   off the record at 12:18 PM and
17                   this concludes today's testimony
18                   given by Anthony Blattenberger.
19                        The total number of media
20                   units used was two and will be
21                   retained by Veritext Texas.
22                        (Whereupon, the deposition
23                   of Anthony Blattenberger was
24                   concluded, at 12:18 p.m.)
25                        -o0o-
```

Page 87

A. BLATTENBERGER

C E R T I F I C A T E

STATE OF NEW YORK)

:ss

COUNTY OF QUEENS)

I, JUDEEN M. DENNISTON, a Shorthand
Reporter and Notary Public, within and for
the State of New York, do hereby certify:

That, the witness whose deposition
is herein before set forth, was duly sworn
by me and that such deposition is a true
record of the testimony given by such
witness.

I further certify that I am not
related to any of the parties to this action
by blood or marriage and that I am in no way
interested in the outcome of this matter.

IN WITNESS WHEREOF, I have
hereunto set my hand this 19th day of
July, 2021.

JUDEEN M. DENNISTON

Page 88

```
1                         A. BLATTENBERGER

2                          I N D E X

3     EXAMINATION BY                              PAGE

4     Mr. Brehm                                    8

5

6                       E X H I B I T S

7

8

9     EXHIBIT         DESCRIPTION                 PAGE

10    Exhibit 1     Independent Contractor

11                      Agreement                  29

12

13    Exhibit 2     Excel Spreadsheet

14                      (HDLK002069)               57

15

16    Exhibit 3     Excel Spreadsheet

17                      (HDLK002178)               82

18

19

20    REQUEST PRODUCTION   DESCRIPTION         PAGE

21    None

22

23    INSERTS              DESCRIPTION         PAGE

24    None

25                      *   *   *   *   *
```

Page 89

```
 1                    A. BLATTENBERGER

 2    A C K N O W L E D G E M E N T   O F   D E P O N E N T

 3

 4    STATE OF _____)

 5                    :ss

 6    COUNTY OF _____)

 7

 8          I, ANTHONY BLATTENBERGER, hereby certify

 9       that I have read the transcript of my testimony

10       taken under oath in my deposition of June 29 ,

11       2021; that the transcript is a true, complete

12       and correct record of what was asked, answered

13       and said during this deposition, and that the

14       answers on the record as given by me are true

15       and correct.

16

17                      _____

18                      ANTHONY BLATTENBERGER

19

20    SUBSCRIBED AND SWORN BEFORE ME

21    THIS_____ DAY OF _____, 2021.

22

23    _____

24    Notary Public

25    My Commission Expires:_____
```

Page 90

```
 1   Kloppel, Mike, Et Al. v. Homedeliverylink, Inc.

 2   Anthony Blattenberger Job No. 4677131

 3                 E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Anthony Blattenberger                        Date

25

                                          Page 91
```

**[& - amazon]**

| & | | |
|---|---|---|
| **&**   2:4,13 | | |

**0**

**06296**   1:8

**1**

**1**   29:5 89:10
**10**   13:21
**100**   51:2 68:8
  73:17 74:11
**10:02**   1:14 4:3
**10:09**   12:10
**10:11**   12:15
**11**   60:18 62:6
  65:15
**11:07**   54:9
**11:29**   54:15
**12**   63:12
**12:18**   87:16,24
**14001**   2:7
**14075**   7:24 12:23
**15**   13:21 66:12
**150**   20:8
**157**   62:8,25
**16**   67:4
**18**   67:21
**19th**   88:21

**2**

**2**   54:17 57:14,17
  89:13
**20**   66:17 67:11
**200**   83:15 84:21
**200,000**   28:7
**2000**   77:6
**2016**   8:18 14:12
  17:3 22:10 83:5
**2017**   8:18 17:3
  22:10
**2018**   14:14 17:11
  23:23 26:7

**2021**   1:13 4:4
  88:22 90:11,21
**204**   83:22
**220**   20:10
**235**   72:20
**240**   20:10
**2500**   73:23
**29**   1:13 4:4 89:11
  90:10

**3**

**3**   74:2 80:25 82:17
  83:7 89:16
**3/12**   60:17,18 62:8
  63:15 65:6 67:24
**30**   65:16,24
**3000**   73:23
**31**   2:6
**330**   2:14
**3305**   88:24
**335**   65:7
**35**   74:25
**37**   71:20
**39**   73:14

**4**

**42**   74:20
**43**   78:5
**45**   12:3 79:24
**4677131**   1:23 91:2
**48**   80:23 83:14
**49**   81:15

**5**

**50**   64:15,20 65:7
  65:16
**53202**   2:15
**55**   63:15
**5611**   4:22 7:23
  12:22
**57**   89:14
**575**   69:6 71:9,18

**59**   63:16

**6**

**6**   60:13
**60**   67:9
**6:17**   1:8
**6:17cv06296fpg...**
  5:7

**7**

**7**   77:6
**7/30**   83:4
**74**   2:5
**75**   76:18
**76**   80:25

**8**

**8**   89:4
**82**   89:17
**827**   2:14

**9**

**9**   61:7
**94.50**   67:25

**a**

**a.m.**   1:14
**able**   11:15 29:11
  46:15 48:17 60:13
  60:23 61:14 74:4
**absolutely**   6:14
**accident**   13:7
  35:24
**account**   31:21,23
  31:25 34:12 53:17
  53:22,25 54:3,24
  54:25 55:3,9
  56:15,22
**accountant**   85:8
**accounts**   53:11
**accurate**   16:16
  33:10 64:10 65:17
  69:25

**act**   39:24 41:7,25
  45:9,12
**acted**   40:22
**action**   5:14 88:17
**actual**   46:20 62:24
**added**   64:13
**additional**   64:21
  64:24
**additionally**   10:3
**address**   7:21
  14:10,11 51:7
  61:21
**adjust**   58:4
**admin**   81:15
**administer**   3:17
**administration**
  24:13,17 25:9
**advance**   38:8
**advertise**   85:24
**advertising**   86:13
**advice**   23:14
**affiliations**   5:18
**afloat**   55:25 57:11
**ago**   8:18 14:13
  29:25
**agree**   4:16 25:12
  33:12
**agreed**   3:4,10,15
  22:21 69:17
**agreement**   29:10
  29:23 89:11
**ahead**   16:21
**akron**   2:7
**al**   5:2 91:1
**alba**   2:8 6:4,4
  16:18 35:12
**allowed**   51:13
  52:9 86:17
**alter**   45:3
**amazon**   50:21,24

**[amount - books]**

**amount** 32:14 39:5 56:18,25 62:3 63:18,21 64:12,18 65:10 66:4,10 67:17,24 69:6,17,22 71:9,15 71:16 72:19 73:12 74:16,17,24 75:14 80:15,17,24 81:10 81:21 83:15 84:12 84:21

**amounts** 69:2

**andrew** 2:16 5:24 39:14,18

**andy** 8:6

**answer** 9:10,19 11:9 16:21 35:13 52:22

**answered** 90:12

**answering** 9:8

**answers** 9:16 90:14

**anthony** 1:16 4:21 7:18 58:25 87:18 87:23 90:8,18 91:2,24

**anybody** 77:24

**anymore** 74:5

**apologies** 56:4

**app** 61:19,24

**appear** 86:15

**appearance** 5:21

**appearances** 5:17

**appearing** 13:3

**appliance** 75:17 78:15

**appliances** 25:14 50:8,15 53:2 86:3

**appointment** 45:22

**approximate** 17:10

**approximation** 17:2

**area** 26:2

**arrive** 51:10

**arrived** 61:22

**aside** 81:14

**asked** 21:13 22:18 33:20 90:12

**asking** 15:2 22:16 30:16 38:3 42:15

**assemble** 50:10

**assigned** 48:10

**assist** 42:13 85:8

**associated** 31:7 46:23,25

**assume** 58:21 61:10 72:16 75:16 81:5,9

**attempt** 67:2

**attended** 30:25

**attorney** 5:23

**attorneys** 3:5 6:7 13:13 14:2,6

**audio** 4:13,14 10:21

**authority** 24:16 84:19

**authorized** 3:17

**avail** 65:22

**availability** 36:20

**avenue** 2:14

**awkward** 9:6

**b**

**b** 14:25 89:6

**back** 12:15 21:22 54:15 61:24 64:4 67:11,12,14 77:16

**backs** 64:13

**ballpark** 20:10

**bank** 31:21 53:17 53:22 54:3,23,25 55:3,9 56:22

**banking** 53:25

**bare** 57:10

**base** 57:20 82:20

**based** 40:18 63:24 64:2 71:15 74:17

**basically** 25:14 36:5 42:24 76:23 77:3

**basis** 40:12

**battle** 63:10

**beginning** 5:22 54:16

**behalf** 2:3,12 5:25 6:6 34:18

**believe** 24:8,18 26:8 27:16 28:2 31:22 32:11 33:18 33:25 34:8,13 35:14 36:25 37:17 38:10 40:13 41:13 43:9 47:9 50:5,17 50:20 51:19 53:16 58:14 65:13 66:11 66:22 68:12 71:12 72:3,13 73:7,22 74:10 75:13 80:14 80:19 82:2 85:14

**believed** 28:11

**best** 9:7

**better** 48:18,24,25 49:5,7

**bi** 58:15 59:15

**bills** 56:13,16 57:4

**bit** 8:23 15:10 36:3 47:4,6,19 51:4 71:19 87:6

**blankets** 37:17

**blattenberger** 1:1 1:16 2:1 3:1 4:1 4:21 5:1 6:1 7:1,2 7:19 8:1,5 9:1 10:1 11:1 12:1,18 13:1 14:1 15:1 16:1,22 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1,24 29:1,12 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1,19 55:1 56:1 57:1,12,23 58:1,25 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1,12 83:1,8 84:1 85:1 86:1 87:1,18,23 88:1 89:1 90:1,8 90:18 91:2,24

**block** 53:3

**blood** 88:18

**blue** 80:6,9

**bond** 73:15,19,25 74:5

**books** 21:7

**[bottom - complicated]**

**bottom** 68:14 83:10
**bought** 14:13
**box** 2:6 75:6 76:3 76:6
**brands** 50:17
**break** 11:4,5,10 54:22 86:9
**breaks** 11:6
**brehm** 2:16 5:24 5:24 8:4,6 12:6,17 21:19 54:5,18 87:13 89:4
**brief** 26:15
**bring** 42:6
**brought** 47:14
**brt** 31:17
**budget** 37:2
**buffalo** 16:5 25:17 35:7 47:6,7 49:18 87:7
**building** 52:25
**buried** 43:2
**bus** 15:7 20:23
**business** 16:4 23:9 23:18,20 31:11,14 31:22,25 53:17,25 54:23 55:25 65:25 79:21 85:16 86:3
**buy** 80:10

**c**

**c** 2:2 24:8 88:2,2 90:2
**calculated** 81:22
**call** 22:15 48:15 52:7,11,13,15 67:10,10
**called** 15:6,24 16:11 22:13 52:5 52:21 74:21 80:24 83:14

**calling** 76:25 79:2
**calls** 52:20 53:6,7
**capped** 55:14
**care** 66:5
**carl** 70:14
**carrier** 17:13,16 24:13,16,17 25:8 27:9 72:7 84:19
**carry** 37:5
**case** 1:8 5:6 8:8,12 13:11
**category** 69:5 72:19 83:11,14
**caused** 35:24
**cbs** 83:21
**cdl** 14:25 21:2
**cel** 58:20
**cel's** 54:23,24 55:5 55:19 56:6,15,19 58:22 61:25 65:11 65:19,21 66:16,23 69:3,9,17 71:11,25 72:11 73:2 74:7 76:14 77:15 78:2 78:19 79:12,20,25 80:3,12 85:2,4,8 85:15,20,24 86:6 86:12,15,22 87:3
**celcel** 57:22 58:17 82:22
**cell** 4:10 13:3
**cells** 16:11,13,16 17:4,15 18:19 19:11,13 20:11 21:10,15 22:7,12 22:24 23:3,17 24:2,6,10,15 25:3 25:11,20 26:13 27:3 29:17,21 30:17 31:5,14,20 32:9,15,19 33:12

34:9,19 36:11,23 37:11 38:4,12,17 39:6,11 42:20 43:7,18 44:3 45:16 46:23 47:2 50:4,6,19 51:25 53:9,16,21 54:2
**cellular** 4:8
**cents** 63:16 65:7 65:16 74:25 80:25
**certain** 47:12
**certification** 3:7
**certify** 88:10,16 90:8
**chance** 76:9
**change** 27:2 51:22 52:2 91:4,7,10,13 91:16,19
**charge** 32:8 69:22 69:23 74:13 75:5 75:11,14 77:4,5,16 77:21,23 79:4,16 81:6,6,24
**charged** 33:7 71:2 73:20 80:7,14 84:7,10
**charging** 69:12,21 70:2,3,3,7
**chautauqua** 68:7
**check** 53:23,24 75:10 76:4
**cheektowaga** 16:9 26:5
**choose** 26:13
**chose** 38:8
**claim** 55:16 74:21 75:3,4 77:2,4 78:6 78:9,12 79:13 81:5,8
**claimed** 76:24

**claims** 55:16 76:15 76:22 77:5,16,25 78:3,20 79:11,19 79:20 81:14
**clamping** 75:22
**class** 14:25
**clear** 6:14
**close** 10:16,18
**closed** 55:5,6
**column** 58:25
**columns** 60:12
**come** 26:16 47:16
**comes** 16:7
**coming** 50:21 70:15
**commission** 90:25
**communicate** 61:15
**communicated** 9:4
**comp** 31:18 71:20
**company** 15:6,7 15:18,20,23 16:10 16:14 18:14,16,25 22:17,25 23:15 24:20 26:12,14,17 26:20 27:2,7 31:20 59:12 86:4 86:7
**compensation** 33:14 53:13 69:18 72:2
**complete** 51:12 60:24 61:14,16,23 90:11
**completed** 60:14 60:18,21 65:6,11 65:15,16
**completion** 60:25 61:4
**complicated** 69:20

Veritext Legal Solutions
800-336-4000

**[computer - day]**

computer  64:12
  64:18
computers  38:15
concluded  87:24
concludes  87:17
confinaddr  66:12
confincaddrct
  61:8
confirmed  61:11
  61:12,25 66:13,17
  66:21 70:11
connection  8:7
consent  51:24
consider  23:7 27:8
consistent  35:2
  66:20 73:5
consistently  35:10
  35:14 49:23
consists  60:21
constant  63:10
  77:7
contact  51:9
context  17:23
continue  4:15
continued  12:17
  54:18
contract  16:17
  17:5,7,13,16 20:12
  22:19,22 23:21
  26:6,11,13,22 27:9
  29:14,17,22 30:5,8
  30:16,18,20 31:6
  45:14,23 53:10
  74:3 84:10
contracted  19:11
  27:15 55:18
contracting  16:11
  16:13,17 17:4,15
  18:19 19:11,13
  20:11 21:3,10,15
  22:7,12,24 23:4,17

24:2,7,11,15 25:3
25:11,20 27:3,8
29:17,21 30:17
31:5,15,20 32:9,15
32:19 34:19 36:11
36:23 37:11 38:4
38:12,17,18 39:6
39:11 42:21 43:7
43:18 44:4 45:16
46:23 47:2 50:4,4
50:6,19 51:25
53:9,17,21 54:3,23
54:24 55:5,19
56:7,15 58:23
61:25 65:11,21
66:16 69:9 71:11
71:25 72:11 73:2
74:7 76:14 77:15
78:2,19 79:12,20
79:25 80:3,12
85:2,4,8,15,20,24
86:6,12,15,23 87:3
contractor  29:10
29:23 30:24 49:14
89:10
contractors  28:10
28:13,17 38:22,23
38:25 39:6,11
42:21 44:17 47:10
49:6,17,19,25
77:22
conversation
13:19
conversations  4:8
conversely  46:8
conveyed  61:24
copies  59:6,9 82:4
82:7
copy  6:10,13
57:19 82:19

corner  58:16
83:21
corp  24:8,8
corporation  23:4
correct  12:19 13:4
13:5,9 15:8,13,17
17:21 18:20 19:7
19:12,23 20:25
21:4 22:7,8,23
23:2,23,24 24:5
25:18,19 26:7
27:5,6 28:23 30:5
30:6 33:24 34:3
34:21 37:23 38:9
38:10 39:25 40:4
40:23,25 41:2,19
41:20 44:2 45:7,8
46:24 47:3,17
53:18,19 54:20
56:16,17 57:8
59:4,15 60:19
63:9,16 64:5,6,25
65:2,8 66:14,18
67:25 69:3,6,19
71:7,23,24 74:9,18
74:19,25 75:15
76:16 78:10,11
79:18 80:21 82:5
82:6 83:2,5 84:17
87:9 90:12,15
correctly  24:18
26:10 31:3 43:13
cost  33:12
costs  30:25 31:7
could've  18:8 51:2
63:2 84:9
counsel  4:25 5:16
6:12 11:20
county  68:7,7 88:6
90:6

couple  11:6 14:10
  36:9 37:2 39:12
  42:25 82:9
court  1:2 3:19 5:4
  5:11 6:16,18 7:5,9
  7:14,20,25 9:22,25
  10:13 11:17 12:5
cover  28:18 72:14
covered  36:2
crack  78:16
create  60:9
ct  60:14
cubic  76:5
currently  12:21
  20:16
cursor  58:10
customer  51:9
  52:5 60:23 75:7
  78:13 79:2
customers  53:22
cv  1:8

**d**

d  89:2 90:2,2
daily  57:9
damage  35:23
  44:20 75:12,15,17
  76:12,20 77:25
  78:3,6,9,12,20,24
  79:11,20
damaged  75:19
  76:2
dark  59:24
date  1:13 29:6
  57:18 62:7 65:6
  82:18 91:24
dates  80:16
david  2:21 5:8
  19:20 49:24
day  20:4,9,10 26:4
  36:7 40:16,19
  41:16 45:15,17,19

[day - ends]

45:21 46:9 47:20
48:19 52:21 53:8
62:14,16,25 63:5
63:19 64:16,18,20
65:12 76:5 88:21
90:21
**days**  46:3,17 60:6
**dealt**  77:8
**decide**  22:11 23:3
44:19
**decided**  22:6 45:3
52:4
**deciding**  23:15
**decision**  42:6 46:2
48:16
**decisions**  52:9
**deduct**  38:9 79:21
**deducted**  33:13
69:2,18 74:16
76:15,20 78:20
80:18
**deduction**  71:22
73:5 74:7 78:10
**deductions**  32:4
78:23 79:7 85:16
**deem**  29:2
**deemed**  82:13
**deeming**  57:14
**defendant**  1:11
2:12 4:25 5:25 8:6
**deliver**  28:21 50:7
50:10 53:3 86:3,7
**delivered**  25:13,15
26:2 28:19
**deliveries**  17:25
33:21 44:6,9 45:7
47:5,20,23,25
50:22 51:18,20,23
52:2
**delivering**  50:19
68:6

**delivery**  49:5
51:12 52:6,8,16
58:5,6,12 59:7
60:24,25 61:5
68:16 77:10 79:16
82:25 83:12
**denniston**  1:18
5:12 88:8,25
**dent**  75:7
**department**  16:3
**depend**  56:18
**depended**  46:4,14
53:7
**dependent**  73:11
**depending**  36:20
41:15 63:2
**depends**  18:8
**deposed**  8:9 13:7
**deposit**  53:22,24
54:24 73:21 74:6
**deposited**  54:3
**deposition**  1:16
3:16 4:13,17,20,24
8:21,22 11:7
13:14,24 14:4
87:22 88:11,13
90:10,13
**derby**  14:17
**description**  89:9
89:20,23
**desk**  22:14
**desperate**  28:9,12
**determination**
40:2
**determine**  40:5
48:10,13 49:11
56:25 62:15
**determined**  59:22
60:2 63:21
**determining**  60:6

**dickies**  80:11
**different**  26:12,14
43:19 48:22 49:10
64:14 66:23 84:8
**differently**  74:13
**ding**  76:25 78:14
**directions**  51:17
**directly**  32:3
34:20 38:5 70:8,9
70:21 71:5,7 72:5
72:12 80:13
**discretion**  52:4
**discussed**  22:2
42:4 47:6 65:14
66:13 72:15 84:19
**discussing**  54:23
**discussion**  15:11
**displaying**  82:13
**distribute**  57:2
**distributions**  56:6
**district**  1:2,3 5:4,5
**dock**  52:24
**doctor's**  45:21
**document**  29:4,8,9
29:11 30:23 57:16
57:24 58:5 60:5
63:6 82:16
**documented**  42:19
**documents**  13:23
**doing**  21:7 44:22
50:22 53:8
**dollars**  63:16
65:16,24 66:17
73:17,23 74:11,25
76:18 77:6 80:25
83:15 84:21
**dollies**  37:14
**dolly**  37:23
**door**  75:8 87:2
**dot**  86:25 87:3

**drive**  45:15,18
63:4
**driver**  17:25 18:6
18:16 19:5 27:4
27:17 39:22 40:18
40:22 41:5,15,23
45:9 58:24 59:18
59:23 77:10,18
83:7
**drivers**  18:9 77:17
**driveway**  78:17
**driving**  15:3 27:9
46:3,18
**drove**  20:23 39:23
60:7 62:14,16
**due**  33:22
**duly**  88:12

e

**e**  2:2,2,14 88:2,2
89:2,6 90:2,2,2,2,2
91:3,3,3
**earlier**  13:6 51:5
72:15 84:19
**eat**  77:24
**education**  14:19
**effect**  3:18
**eight**  39:9
**either**  27:2 59:15
**electronic**  57:19
82:19
**ellipticals**  50:9
**empire**  20:16,20
**employed**  20:14
**employee**  19:21
48:7
**employees**  38:21
**employment**  20:13
**ended**  20:9 21:10
21:15 23:21 64:20
**ends**  50:24

Veritext Legal Solutions
800-336-4000

[entered - guess]

**entered** 29:18,22
31:5
**entering** 30:4
**enterprise** 33:2,9
34:12 35:18,25
36:21 69:10,23
70:2,7,9,21,24
71:3,6,7
**entirely** 48:20
74:12
**entity** 23:9,12
84:16
**equals** 63:11
**equipment** 25:14
37:10,13,14,19
38:5 50:8,14
**equipped** 44:23
**erie** 68:6 72:6,8
**esq** 2:8,16
**estimate** 62:22
**et** 5:2 91:1
**everybody** 44:7
53:7
**exact** 30:14
**exactly** 43:2 51:5
62:25 69:20 77:13
**examination** 8:3
89:3
**example** 48:18,23
49:4
**excel** 57:20,22
82:20 89:13,16
**executed** 16:17
**exhibit** 28:25 29:2
29:5 57:13,14,17
82:13,17 89:9,10
89:13,16
**expenses** 31:12,14
31:24 32:6 66:2
68:20 79:21 85:17

**experience** 26:24
**expires** 90:25
**explain** 64:7
**explained** 66:2
**extra** 63:4 67:7
68:9

**f**

**f** 88:2 90:2
**face** 10:19 11:25
**facilitated** 33:9
69:13
**fade** 10:16
**fair** 33:17 45:4
46:10 57:5 66:7
81:10
**familiar** 15:12,21
15:23 16:10 17:12
24:12 29:24 43:4
**families** 77:20
**far** 86:2
**feary** 2:13
**feasible** 65:24 76:5
**federal** 24:12,16
25:8
**fee** 69:15,21 70:4
73:20 81:5,6 84:9
84:11,13
**fees** 31:17 32:2
70:18
**feet** 76:6
**felt** 26:25
**figure** 63:25
**file** 85:4,11
**filed** 5:3
**filing** 3:6
**filled** 23:10 30:2
**financial** 42:12
56:19
**financially** 5:15
**find** 19:14 33:3,4
39:18 41:3,21

70:6 77:17 79:17
**finding** 36:19
**finish** 9:8,10
**finished** 20:7
61:22
**firm** 5:9,12
**first** 8:25 15:6
18:21 20:24 21:5
22:24 29:9 32:9
67:8 69:5
**flat** 20:3,5 40:13
41:11
**flex** 36:11,18
**flexed** 32:16
**flexing** 35:3 36:3
**flood** 42:23 82:8
**floor** 78:14,15
79:3
**foolishly** 28:10
**force** 3:18
**forced** 11:4
**form** 3:11 16:19
16:20 22:6 29:14
35:12 75:16 84:25
**formed** 25:3
**forming** 23:7,12
27:7 84:16
**forth** 64:5 88:12
**found** 37:8 70:10
72:8 76:25
**four** 32:16 49:24
**fpg** 1:8
**free** 46:20
**frequent** 77:8
**fridge** 75:5 77:2
**friedman** 2:4 6:5
**friend** 19:17 39:20
**fuel** 63:13,19
**full** 76:5
**funds** 55:8,12

**further** 3:10,15
87:14 88:16
**future** 55:16

**g**

**g** 90:2
**garvin** 2:13
**gas** 63:11
**generated** 54:2,25
64:12,18
**gentleman** 28:2
**getting** 56:5 70:25
**give** 6:22 7:11
53:23
**given** 39:7 40:19
41:16 48:19 63:5
71:16 73:12 74:17
75:19 81:25 87:18
88:14 90:14
**gm** 28:4
**go** 4:16 8:23 11:6
12:2,6 15:3 16:21
23:20 36:8 44:22
45:24 46:6 49:3
54:5 64:13,21
67:7,11,12,14 71:3
**going** 4:3 8:20 9:3
10:20 11:23,24
12:10 26:25 36:6
51:8 52:6 54:9
57:12 70:15 75:11
82:11,21
**good** 4:2 8:5
**grab** 49:3
**grade** 47:9
**graduate** 14:21
**grand** 74:2
**granite** 20:17
**grew** 39:20 41:4
**ground** 8:20
**guess** 16:7 56:5

Veritext Legal Solutions
800-336-4000

**[guy - judeen]**

**guy** 70:14 75:22
**guys** 11:25 22:14
  36:9 39:4 43:16
  44:6,12,13,15 46:6
  46:9 48:7,24 53:5
  55:11,13,17 77:20

### h

**h** 89:6 91:3
**half** 68:14 83:10
**hamburg** 4:23
  7:24 12:22
**hand** 6:19 7:15
  62:20 83:21 88:21
**handled** 24:20
  52:24
**hanson** 2:13
**happened** 27:14
  55:8 74:4 75:24
  77:7,13
**happy** 22:16
**hard** 70:15 84:8
**hardest** 77:19,23
**hdl** 15:16,21 16:8
  16:15,17 17:5,16
  18:15 19:11 20:12
  21:3,11,12,16,24
  22:3,14 23:6,10,13
  23:21 24:20,25
  25:12,21 26:6,11
  26:25 27:3,8,15,23
  27:24 28:6 29:18
  29:23 30:3,5 31:6
  31:15 32:3,7,10
  33:6,6,9 34:14
  35:7 36:5 37:12
  37:17 38:8,18
  43:15,24 45:15
  47:9 48:7,10,20
  49:2,11,16 50:23
  52:11 53:10,14,23
  55:14,18 58:15,21

59:7,21 60:9
61:24 62:20 63:7
63:18,22 64:5,21
65:10 66:9,20
67:10,10 69:11,13
70:11,12 72:10
73:20 75:4 77:2,8
79:4 80:4,7,14,20
81:19 86:19,20
87:6
**hdl's** 46:14 47:11
  48:15 51:24 52:4
**hdlid** 58:17
**hdlk000099** 29:8
**hdlk000107** 29:9
**hdlk002069** 57:20
  89:14
**hdlk002178** 82:20
  89:17
**head** 9:18
**healed** 45:25
**hear** 7:2,7,7 9:23
  10:8,11,22,24 12:2
**hearing** 11:18,19
  11:20
**held** 1:16 4:18
**help** 8:23 23:11
  37:19
**helped** 17:24 28:2
**helper** 17:22,24
  18:2 39:24 40:18
  41:7,16,25 45:12
  77:10
**helpers** 18:6
**hereunto** 88:21
**hey** 67:10
**high** 14:20,21
**higher** 40:21
  65:19
**highest** 14:18 35:9

**hit** 77:5
**hold** 11:25 73:21
**home** 14:16 60:23
  67:8 68:16 78:6,9
  78:12,19 79:11,20
  83:12
**homedeliverylink**
  1:10 5:3 6:2 8:7
  15:12 80:7 91:1
**homeless** 56:2
**honest** 7:4 68:4
**honestly** 62:4
**hourly** 57:9
**hours** 76:8
**house** 14:13 52:15
  75:7
**how'd** 19:14 37:25
  40:5

### i

**idea** 83:19
**identification** 29:5
  57:17 82:17
**implement** 44:11
**important** 9:5
**inability** 61:16
**include** 61:2,4
  84:18
**income** 54:2,25
**incomplete** 61:11
  61:12,23 62:2
  66:14,18,21
**increase** 39:2
**increased** 33:16
**independent** 29:10
  29:23 38:21 89:10
**individual** 40:24
**individuals** 42:4
**industry** 18:12,22
**information** 51:9
**injury** 8:14 13:7

**innovel** 15:19
**input** 59:17 60:10
**inserts** 89:23
**inspect** 76:7
**install** 50:10
**installation** 51:12
  61:2
**installed** 25:13
**instances** 18:7
  64:7
**insurance** 31:18
  37:5 72:6,7,9,12
  72:19,23,25 78:3
  79:13
**insure** 37:3
**insured** 37:5
**insurer** 72:5
**interest** 24:2
**interested** 5:15
  88:19
**interfere** 4:12
**interference** 4:9
**involved** 77:10
**ish** 14:14
**issues** 10:21 54:7
  58:2 63:8 70:25
  78:16
**it'll** 8:23
**item** 76:7
**items** 58:3

### j

**janeen** 21:19
**job** 1:23 18:21
  19:10,14 20:22
  21:6 44:8,22 91:2
**jobs** 21:9,15,24,25
  22:2
**joshua** 39:15
  41:19,21
**judeen** 1:17 5:11
  88:8,25

Veritext Legal Solutions
800-336-4000

**[judeen's - mind]**

**judeen's** 8:25
**july** 88:22
**june** 1:13 4:4
  90:10

**k**

**k** 90:2
**keep** 10:15 55:25
  57:11 74:6
**kept** 22:15
**kilbourn** 2:14
**kind** 24:14 62:20
  73:21 77:22
**kitchen's** 53:2
**kloppel** 1:5 91:1
**knew** 36:6 44:21
  46:5,9
**know** 10:4,5,22
  11:5 13:21 15:18
  17:20 28:12 37:5
  42:22 47:8,11,13
  47:18 48:5 50:11
  50:23 56:8 58:3
  59:22,24 60:2
  61:8 73:8,11
  74:12 75:21,25
  77:13 81:21 83:18
  83:19 84:20 87:10
**knowing** 75:18
  76:11 77:9
**knowledge** 60:8
**known** 41:22
**koppel** 5:2

**l**

**l** 3:2 90:2
**labeled** 57:20,22
  60:14 61:8 63:12
  82:20
**labor** 57:6
**lackey** 39:15 41:19
  41:21

**lakawana** 14:22
**lawsuit** 14:7
**laying** 82:10
**leaderboard** 48:24
  49:4
**leading** 16:19
**learned** 70:20
**lease** 32:22 35:21
**leased** 32:21 33:8
**leasing** 69:11
**leave** 26:4
**left** 48:16 52:24
  56:3 58:16 81:4
  83:20
**leftover** 55:12
**legal** 2:21
**level** 14:18
**lg** 50:16
**licensed** 14:25
**light** 2:13
**limit** 73:25 74:2,9
  77:3
**line** 68:21,23
  76:17 91:4,7,10,13
  91:16,19
**lines** 9:14 68:8,25
**link** 68:16 83:12
**list** 39:13 64:11
  78:15
**listed** 59:18,23
  62:22,23 63:16
  67:25 69:6 71:22
  72:20 73:17 74:24
  75:14 78:10 80:24
  83:15
**little** 8:23 9:6
  15:10 20:21 28:7
  47:4,19 51:4
  71:19 87:6
**lived** 14:11

**living** 42:24
**llc** 23:7
**load** 26:3
**located** 4:21 12:21
**location** 25:21
  26:5
**logos** 86:23
**long** 13:19 19:8
  20:20 29:25 51:13
**look** 82:21
**looked** 85:22
**looking** 52:18
  57:21 58:2 60:5
**looks** 60:17 63:15
  65:7 66:16 69:4
**lost** 26:11 82:8
**lot** 30:3 41:22
  42:22 46:20 49:22
  49:22,25 50:13
  82:8

**m**

**m** 1:17 88:8,25
  90:2
**macey** 28:5
**macy** 87:8
**main** 2:5
**maintenance** 31:2
  31:8 35:25
**major** 50:17
**making** 42:9 45:7
  47:5,20 48:16
**manager** 22:15
  23:6 70:11,12
  87:7
**manifest** 48:8,14
  48:18 51:5,6,15
  52:18 62:21
**march** 11:4
**marked** 29:2,4
  57:14,16 82:13,16

**marriage** 88:18
**matter** 5:2 88:19
**maximum** 32:14
**mean** 16:6 17:18
  18:18 28:15 34:16
  36:4 40:15 51:16
  55:24 58:20 60:12
  70:23 77:12 81:7
  84:16
**means** 69:24 76:18
  86:5
**media** 4:19 54:11
  54:17 87:19
**meet** 13:13
**mentioned** 37:22
  40:24 41:18 44:10
  64:4 82:3
**merchandise**
  28:18,22 33:23
  36:10 37:16 74:21
  75:3,19 76:6,12,15
  76:21 77:11,16
  79:19 81:8
**mess** 44:21
**mic** 10:14,16
**michael** 39:14
  40:25 41:3
**microphones** 4:5
  4:11
**middleman** 47:9
**might've** 36:25
**mike** 1:5 5:2 91:1
**mileage** 62:7,11,13
  62:15,22,24 63:4,9
  63:11,25 64:3,5,21
  64:24
**miles** 62:13 64:15
  64:20 67:9
**milwaukee** 2:15
**mind** 16:7

**[mine - party]**

| | | | |
|---|---|---|---|
| **mine** 19:17 39:20 | **narrowed** 77:12 | **objection** 16:18,20 | **order** 9:4 51:20,22 |
| **minimum** 57:10 | **navy** 80:6,9 | 35:12 | **orders** 52:2 |
| **minute** 36:19 | **necessary** 61:2 | **objections** 3:11 | **organize** 23:3 |
| **minutes** 13:21 | **need** 11:4 28:20 | 5:19 6:3,8 | **outcome** 5:16 |
| **miserable** 26:24 | 66:4 86:9 | **obtain** 24:15 32:24 | 88:19 |
| **mislead** 10:4 | **needed** 24:21 | 53:13 | **overseeing** 44:5 |
| **mister** 82:12 | 33:21 37:11 39:3 | **obtained** 34:4 72:4 | **owned** 22:25 |
| **mjp** 1:8 | 52:23 56:15 57:10 | **obviously** 44:9 | **owner** 19:18,19 |
| **model** 65:25 | **needs** 46:5,14 | 55:20 | 59:11 60:4 |
| **monday** 60:17 | **negotiate** 65:19 | **occasion** 39:23 | **ownership** 24:2 |
| 67:24 | 66:23 67:17 | 67:13 | |
| **money** 27:16 34:2 | **negotiation** 66:6 | **occurred** 76:12,20 | **p** |
| 38:2,8 55:22 | **neither** 49:8 | 78:23,24 79:7 | **p** 2:2,3 3:2 90:2 |
| 56:14,21,23 63:11 | **never** 25:23 26:17 | **odds** 50:23 | **p.c.** 2:4,13 |
| 70:2,7,25 76:9 | **new** 1:3,19 2:7 | **odometer** 62:17 | **p.m.** 87:24 |
| **months** 77:6 78:25 | 4:23 5:5 7:24 | **offer** 67:13 | **page** 15:11 29:7,9 |
| 78:25 | 12:22 14:17 25:4 | **offered** 43:21 | 83:11 89:3,9,20,23 |
| **morning** 4:2 6:23 | 26:17 27:2 88:4 | **officer** 3:17 | 91:4,7,10,13,16,19 |
| 8:5 26:3 36:8 | 88:10 | **oh** 7:5 58:11 76:22 | **paid** 19:24,25 20:3 |
| 47:22 52:18,20 | **night** 47:16 | 78:22 79:3 | 31:16,16,17 40:11 |
| 62:21 75:11 76:3 | **nine** 29:7 | **okay** 6:18,21 7:5,9 | 41:9,11 42:10 |
| **morning's** 7:11 | **nodding** 9:18 | 7:14 8:12,19 | 55:23,24 56:11 |
| **motor** 24:13,15,16 | **nope** 13:2 | 38:12 39:18 58:2 | 61:25 63:18 64:24 |
| 25:8 84:18 | **nordic** 50:13 | 58:11 62:6 65:14 | 65:3,10 66:10,17 |
| **mouth** 19:16 | **notary** 1:18 88:9 | 68:19,25 79:4 | 66:21 71:11,14 |
| **move** 52:8 | 90:24 | 83:6 | 77:15 |
| **moved** 32:12 | **note** 4:4 | **once** 50:3 82:21 | **pants** 80:9 |
| **moving** 37:14,14 | **notice** 1:17 36:5 | **open** 55:3 75:6,10 | **paper** 42:18 59:9 |
| 37:17 75:23 | **noticed** 79:3 | 76:2,6 | 82:4 |
| **multiple** 48:12 | **noticing** 5:22 | **operate** 65:25 | **paperwork** 23:10 |
| | **number** 4:19 5:6 | **operated** 77:22 | 24:24,25 28:3 |
| **n** | 35:9 38:25 54:11 | 86:16,23 | 30:2,13 42:23 |
| **n** 2:2 3:2 89:2 90:2 | 54:17 62:18 65:7 | **operating** 32:10 | 46:19,22,23 64:9 |
| 90:2,2,2 | 86:25 87:4,19 | 49:16 68:10 | 64:11 66:2 84:13 |
| **name** 5:8 7:16 | **numbered** 29:8 | **operation** 31:2,8 | 84:15 |
| 15:18 18:24 26:19 | | **operational** 85:5 | **parenthesis** 83:21 |
| 59:17 61:18 70:16 | **o** | **operator** 60:4 | **part** 11:23 48:9 |
| 87:11 | **o** 3:2 90:2,2,2 | **opportunity** 36:15 | 59:25 77:24 |
| **name's** 8:6 | **o0o** 87:25 | 43:22,25 | **parties** 3:6 4:16 |
| **named** 70:14 | **oath** 3:18 11:14 | **option** 38:11 78:2 | 88:17 |
| **names** 39:10 | 12:19 54:20 90:10 | 79:12 | **party** 5:14 |

Veritext Legal Solutions
800-336-4000

[pay - recall]

pay  30:25 31:7,11 31:24 32:3 34:19 35:19 38:4 40:3,6 40:8 42:3 47:8 55:17 56:9,12,16 57:4,6,8 58:15 71:6 72:11 80:12 86:12
paying  40:13 55:11,13 63:9 64:16
payment  25:4,8 68:9
payments  42:21 53:20
payroll  33:7 42:14 58:22
pc  6:5
penalty  6:25
pending  11:8
people  36:19 52:22
performance  73:14,19,24 74:5
performed  71:16 73:12 74:17 79:8 81:11,25 84:22
perjury  6:25
person  41:18
personal  8:14 13:7
personally  34:13 34:15,22 37:8 47:21 48:17
phone  11:25 13:4 13:17 61:17,20
phones  4:10 38:13
physically  45:24 47:24
pick  4:6 48:8,18 49:5,6,13,14

piece  30:2,12
placards  86:24
place  4:10,15 26:2 42:23
plaintiff  1:6 2:3 6:6
plaintiff's  6:11
please  4:4,9 5:16 5:20 6:16,20 7:17 7:22 10:6,22 39:13 58:3 64:8
pm  87:16
po  2:6
point  22:6 58:3
pointless  11:24
policy  72:2,12,14 76:22
poor  56:4
poorly  19:25
portion  21:22
positive  16:4
possibly  58:15
pot  67:14
potentially  69:9
pre  52:20 53:6,7
preparation  13:24
present  2:20 22:3
president  24:9,10
presume  15:11
pretty  25:25 32:12 32:12 50:22 76:17
previous  8:22
previously  57:3
prior  13:14 18:14 18:18 19:13 20:22 21:5 27:3 76:24
private  4:7
probably  20:8 30:9 39:9 49:24 62:25

problem  77:8
proceeding  5:20
process  47:5
processed  84:14
product  47:13 48:2,6 50:6,12,18 51:8,8
production  89:20
products  37:20
profit  36:15
program  15:5 33:9 69:14
programmer  20:19
promise  6:21 7:10
properly  44:8
provide  9:16 17:2 25:12,20 30:24 37:11 43:7
provided  25:23 53:21 57:7 59:9 60:9
provider  36:24
public  1:18 88:9 90:24
pull  61:21
purchase  37:14,20 37:25 38:12
purchased  14:16 37:22
purposes  18:9
pursuant  1:17
put  7:14 32:6 33:6 58:21 60:3 61:23 78:14,16

**q**

queens  88:6
question  3:12 9:8 9:9,10,11 10:5,7,8 10:9,23 11:8,9 21:20 56:5 86:5

questions  9:17,20
quickbooks  42:16
quickly  32:12 33:16

**r**

r  2:2 88:2 91:3,3
r75  74:24
raise  6:19
ran  32:15
ranzenhofer  2:4
ranzenhoffer  6:5
ratchet  37:15
rate  20:3,5 40:5,8 40:14,21 41:12,14 56:10,12 57:6,9 65:20 66:20,24 71:10
reached  74:9
read  21:22 30:7,18 30:20 31:3 90:9
reads  29:10
realistic  76:8
really  29:25 39:15 49:2 56:20 67:12 72:16 75:25 77:21 84:8
rearrange  52:17
reason  10:21 11:15 91:6,9,12,15 91:18,21
recall  8:15,21 15:22 16:24,25 17:7,9 18:24 19:24 20:5 22:9 24:18,23 25:6,7,10 25:25 26:10,19 27:24 28:4 29:16 29:20,21,25 30:4,7 30:10,17 34:24,25 35:4,15 37:4,7,9 39:10,17 40:7,8,10

Veritext Legal Solutions
800-336-4000

[recall - section]

40:11,17 41:9,10
41:11 43:13,21,24
51:3 61:18 62:4
63:8,24 68:4,13
70:17,19 72:8,13
72:17,24,25 73:4
73:10,13 74:12
76:19 78:4 79:14
79:23 80:15,17
84:8,11 85:3,6,7
85:15,18 86:20
**receive** 59:6,11
84:25
**received** 82:3
**recess** 12:12 54:12
**recognize** 29:14
**recollect** 70:16
**recollection** 68:11
84:5
**recommended**
23:5
**record** 4:3,17 5:18
6:10 7:16,22 12:7
12:11,16 29:7
30:23 54:6,10,16
87:16 88:14 90:12
90:14
**recorded** 4:20
**recording** 4:14
**records** 42:20
85:19
**redundant** 11:24
**refer** 15:15 32:4
68:19 72:10
**referred** 19:18
32:5
**reflected** 63:5
**refresh** 84:5
**relate** 84:22
**related** 5:13 14:24
79:8 81:7,13,24

85:20 88:17
**relation** 21:24
**relationship** 21:10
21:12,16
**remember** 39:16
80:8 84:12
**remotely** 1:17 2:9
2:17 4:18
**rent** 34:5,11 36:23
70:24
**rental** 32:6,23
33:13 34:17,23
35:2,21 68:22
69:6,14 71:6,10,10
**rentals** 70:18
**rented** 33:8 71:5
**renting** 69:9 70:21
**repairs** 35:23
**repeat** 10:9,23
21:17,20
**repeated** 10:9
**repeating** 12:3
**report** 62:18
**reporter** 1:18 5:11
6:16,18 7:5,9,14
7:20,25 9:22,25
10:13 11:17 12:5
21:23 88:9
**represent** 8:6
**request** 89:20
**requested** 21:21
**requesting** 6:12
**requirement**
24:19
**reschedule** 52:23
**reserved** 3:12
**reside** 14:15
**respective** 3:5
**response** 8:16 9:13
11:12 54:4 83:24

**responsible** 31:11
35:22 42:9
**retailers** 50:11,25
**retain** 85:19
**retained** 87:21
**returns** 85:5
**review** 13:23
**richter** 39:14,19
**rid** 22:20
**ridiculous** 76:23
**right** 6:19 11:22
13:8 58:24 60:2
76:18
**road** 4:22 7:24
12:22
**roads** 63:2
**rochester** 25:24
**role** 44:3 45:6
**room** 12:24
**rothstein** 2:21 5:8
**rough** 62:22
**round** 44:15
**route** 52:21
**routes** 48:25 49:6
49:7 51:17
**routing** 51:15,16
**row** 60:13 61:7
62:6 63:12,12
65:5,5 66:12 67:4
67:21 71:20 72:18
73:14 74:20 78:5
78:5 79:24 80:23
81:15 83:7,14,20
**rows** 67:21
**ruined** 42:25
**rule** 8:25 11:3
**rules** 8:20
**run** 47:7
**running** 34:2 35:5
35:10,14 45:16
48:12 73:3,24

**s**

**s** 2:2 3:2,2 24:8
56:13 75:7 89:6
91:3
**safety** 24:13,17
25:8
**salary** 20:2,3
55:19,20
**samsung** 50:16
**samuel** 2:8 6:4
**saying** 76:25 78:13
**says** 30:23 58:5,17
58:25 62:8 66:12
67:4,21 68:21
71:20 81:5 83:7
83:21
**scenarios** 64:14
**school** 14:20,21
15:3,7 20:23
**schooling** 14:24
**scopelitis** 2:13
**scores** 48:25
**scott** 28:4 70:13
87:8,10
**scratched** 78:14
79:3
**screen** 28:25 57:13
82:11
**scrolling** 68:14
71:19
**sdo** 67:21 68:3
**sealing** 3:6
**seamlessly** 8:24
**sears** 15:24 16:2
25:15 26:12 47:7
47:10 50:16,18
**second** 12:8 34:4
**section** 30:22
60:14 61:8 62:7
68:15 74:20 78:6
79:24 80:23

Veritext Legal Solutions
800-336-4000

**[secure - sure]**

secure  37:15
security  74:6
see  9:17,17 29:11
    57:23 58:9,11,18
    59:2 60:13,15
    62:8 63:13 67:22
    68:17 71:20 72:20
    73:15 74:21 78:6
    80:25 81:16 82:23
    83:12,16,22
semis  47:15
send  43:10,16,18
sensitive  4:6
sentence  31:3
separately  35:19
service  51:11
    53:10
services  19:4,6,13
    19:15,18,22 22:18
    22:20 25:11,21,23
    27:4,18 37:11
    44:25 50:3 53:20
    57:7 81:16 85:25
servicing  35:17,20
set  24:22 34:17,22
    48:2,5 88:12,21
settlement  38:9
    55:15 58:5,6,12
    59:7 69:3 73:6
    74:8 76:16 78:20
    80:18 81:20 82:4
    82:25
share  57:12 82:11
shareholder  24:4
sharing  28:24
shipped  75:24
shirts  80:6
short  12:12 36:5
    43:15 54:12 86:9
shorthand  88:8

shot  59:24
show  9:18 47:21
showed  65:25
showing  62:24
    64:11
shown  29:4 30:13
    51:5 57:16 82:16
side  63:7,23 75:8
signature  88:24
signed  3:16,19
    30:17
signing  30:8
similar  29:16,19
    42:17 79:15
single  76:3,7
sir  6:18 7:15 8:17
    10:2,17 26:21
    86:10
situation  35:2 38:7
    52:12 64:19 65:23
    79:15
situational  46:14
situations  36:12
    45:10 67:16
six  30:22 39:8
skip  52:7
smaller  62:3
software  42:13
sold  25:15 50:16
somebody  17:24
    67:8 76:25
sorry  9:22 10:13
    11:17 16:20 21:14
    21:17 37:21 58:8
sound  59:21
sounds  15:21
    29:24 64:23
speak  13:16
special  67:5,6,17
specials  67:4,13

specific  44:11
specifically  30:10
    30:12 57:21
spent  55:10
spoke  70:9,10,17
spoken  14:3,7
spreadsheet  57:20
    57:22 82:20 89:13
    89:16
ss  88:5 90:5
staffing  46:5
stand  62:10
standard  45:20
    47:20 56:9,12
    71:10
stands  61:9,10
    62:13
start  8:19 18:11
    22:11,19,21 23:15
    28:3,7 84:10,15
started  16:14 20:7
    20:8 26:17 32:9
    32:11,18 38:17
    50:22
starting  24:19
startup  84:13
state  1:19 5:17,20
    7:16,21 25:5
    31:17 43:10,19
    88:4,10 90:4
stated  14:10 57:3
statement  58:6,7
    58:13 68:15 69:3
    74:8,11 83:2
statements  59:7
    59:19 73:6 76:16
    78:21 80:18 82:4
states  1:2 5:4
stick  64:17 66:3
stickers  28:8

stillwell  4:22 7:23
    12:22
stipulated  3:4,10
    3:15
stock  80:8
stop  40:12 52:21
    60:14,21,22 61:13
    61:16 65:17,20
    66:5,10,14,18
stops  52:17 60:18
    62:2 64:13 65:11
    65:15 66:21
store  16:3
stored  35:6
straps  37:15,15
street  2:5
structured  42:3
student  15:6 20:24
    21:5
stuff  21:8 31:18,19
    35:25 37:16 45:20
    45:22 50:8,14,20
    67:7 72:17 77:20
    82:8
subject  6:24
submit  78:3 79:12
submitted  24:23
subscribed  90:20
success  56:19
successful  66:4,7
    67:19
suite  2:14
supplied  80:4
supposed  51:11
supposedly  77:6
sure  7:6 8:21
    17:14 21:19 32:12
    38:2,4 39:14 42:9
    44:6,7 48:2 50:22
    62:9 63:14 65:18
    69:13 74:14 76:17

[sure - turning]

86:4
**surgery** 45:24
**swear** 6:16
**sweeten** 67:13
**sworn** 3:16,19
88:12 90:20
**system** 34:7 58:22
61:17
**systems** 48:22
49:10

**t**

**t** 3:2,2 88:2,2 89:6
90:2,2 91:3,3
**take** 4:15 11:5,6,9
35:16 36:9 46:3,9
46:15 51:17 55:19
56:6,22 57:4
73:24 74:5 75:6
76:7,9,14 81:19
86:9
**taken** 1:17 4:24
11:13 12:13 14:23
32:3 54:13 63:3
90:10
**talk** 9:6 15:9 47:4
47:19
**talked** 36:3 51:4
87:6
**tax** 85:4,16,19
**taxes** 31:17 79:22
85:9,11
**team** 43:19 74:14
**teams** 6:6 43:5,8
43:14 49:5,13
79:16
**technical** 54:7
**tell** 10:6 11:14,15
27:12 30:14 43:3
52:7 63:22 65:23
81:14

**term** 17:12 43:4
43:12
**terminal** 16:6
25:18 35:7 43:15
43:16 47:6,7
49:18
**terminated** 17:8
20:11 26:7 74:3
**terminology** 15:10
**testifying** 13:10
**testimony** 6:22
7:10 87:17 88:14
90:9
**texas** 5:9,13 87:21
**thank** 7:25 9:25
87:13
**thing** 11:7 12:3
18:15 76:8
**things** 8:23 42:25
44:20,21 49:13
63:7,23 76:4
82:10 84:8
**think** 8:23 12:6
15:20 16:3 24:10
26:15,16 32:22
43:13,20 54:6
60:3 62:3,23
66:13 68:4 82:9
87:10
**thought** 23:22
27:13 59:14
**thousand** 64:14
76:5
**three** 14:13 18:5
18:14,17,18 19:9
38:20 44:15 82:14
**throwing** 28:8
**tight** 75:22
**time** 1:14 3:12
5:21 11:5 12:9,14
12:25 21:18 22:3

22:4,22 26:15
27:13 28:4,6
31:23 35:11 39:2
39:7 46:20 48:4
48:13,23 50:24,24
51:11,11 54:8,14
66:9 67:8 77:3
82:12
**timeframe** 51:10
**times** 12:4 14:11
18:5 32:17 37:2
52:14,19 65:3
**title** 24:6 60:10
**titled** 29:22 62:7
65:6 68:15 82:22
**today** 8:24 9:4
10:4 11:14,16
14:8 15:11
**today's** 13:14,24
14:3 87:17
**told** 27:21,22,24
28:6 69:21 86:17
86:18
**tony** 83:7
**top** 58:4,9 70:2
**total** 87:19
**tough** 77:21
**track** 50:13
**train** 27:12 44:13
**traina** 19:4,6,12
19:14,17,19,20,21
22:18,20 27:4,17
44:25 49:24 50:3
**trained** 44:7,24
**training** 15:5 18:9
44:10,11 45:4
46:19,25
**transcript** 6:11
9:3,15,19 90:9,11
**transportation**
14:23 18:12,22

**travel** 43:5,8,14
**treadmills** 50:9
**trial** 3:13 13:10
16:20
**tried** 65:21 70:22
70:23 77:19,23
79:16
**troop** 70:14
**truck** 15:3 17:25
18:3 32:18,19,24
33:3,4 34:4 36:9
36:24 37:16 44:15
45:15,25 46:7
48:14 53:2 68:22
69:5,16 70:4,18
71:2,9,13,18 73:23
74:14 78:17
**trucking** 32:5
68:20
**trucks** 28:21 31:16
32:10,13,15,17
33:17,21 34:2,9
35:5,10,15,16
36:20,22,24 37:3
39:3 44:5 45:16
47:15 48:13 69:8
71:4 73:2 86:16
86:22
**true** 79:6 88:13
90:11,14
**truth** 6:23,24 7:12
11:14,16
**try** 11:6 36:13,17
52:23 64:17 67:6
67:18 86:6
**trying** 10:3 36:18
49:12 86:2
**turn** 4:9 83:10
**turned** 69:24
**turning** 30:22

Veritext Legal Solutions
800-336-4000

[two - zoom]

**two** 18:4,6,9,13,17
18:18 19:9 32:12
33:17 34:2 35:15
38:20 67:21 87:20
**type** 8:12 21:7
31:19 37:16 86:13
**typically** 52:13

**u**

**u** 3:2
**understand** 9:12
9:21 10:6,7,10,25
11:11,13 12:19
31:10 35:13 54:19
**understanding**
31:6 43:11 60:11
**uniforms** 79:25
80:2,4,4,5,13,15
80:20
**unit** 4:19 54:11,17
**united** 1:2 5:4
**units** 87:20
**unrelated** 81:11
**upper** 58:16
**usually** 44:14
46:19 52:3 64:15
76:19

**v**

**v** 91:1
**vacations** 46:15
**variations** 49:12
**varied** 73:8
**varies** 49:15
**vary** 40:17 41:14
66:10 71:15 74:16
**vehicle** 30:24
**verbal** 8:16 9:13
9:16 11:12 54:4
83:24
**verbally** 9:20

**verify** 21:8
**veritext** 5:9,12
87:21
**versus** 5:2
**video** 4:14,20
11:23
**videographer** 2:21
4:2 5:10 6:15 12:9
12:14 54:8,14
87:15
**videotaped** 1:16
**volume** 28:18,21
33:22

**w**

**w** 90:2
**w2** 84:25
**wages** 31:17
**waived** 3:8
**want** 6:10,13 7:6
10:4 12:2
**wanted** 22:20 49:3
66:3 67:15 76:2
**warehouse** 16:8,8
35:8 37:18 47:11
47:14,21 48:7
75:10,22,23 87:7
**way** 10:15 48:21
60:6 75:18,25
76:11 77:9,14
81:4 88:18
**we've** 21:25 42:4
**wear** 80:9
**week** 60:7 71:13
71:16,18 73:8,9,12
74:18 75:20 76:20
78:24 79:9 81:12
81:25 83:4 84:23
**weekly** 19:25
58:14,15 59:15,15
**weeks** 44:14

**weight** 78:17
**went** 16:3 36:18
37:2 49:23 50:2
60:22 61:13 67:8
69:23
**western** 1:3 5:5
**where'd** 14:15,21
**whereof** 88:20
**whichever** 74:2
**whispering** 4:7
**why's** 27:11,20
46:12
**wi** 2:15
**wide** 25:25
**wisner** 39:15
40:25 41:3
**withdraw** 56:14
**witness** 6:17 7:3,8
7:13,18,23 9:23,24
10:18 11:18,19,21
29:3 57:15 82:15
88:11,15,20
**word** 16:5 19:16
**work** 17:23 20:15
20:16 36:19 71:16
71:20 73:12 74:4
79:8 81:11,24
84:22
**worked** 18:13 19:5
19:12 28:6 39:11
49:19
**worker's** 31:18
**workers** 18:4
22:14 36:7 38:13
38:18 42:7 61:20
71:25 72:14
**working** 18:11
19:17 22:17 39:7
**workout** 25:14
50:8,14

**works** 65:15 72:17
**worksheet** 57:21
82:22
**worth** 53:2 67:12
**would've** 17:24
24:22 26:4 30:3
32:22 33:2,6
38:23 43:15 51:7
64:2 69:15 71:17
85:12
**wrong** 87:12

**x**

**x** 1:4,12 66:4 89:2
89:6

**y**

**yeah** 7:8 15:25
33:18 37:13 47:23
48:4 59:3,5 67:23
68:18 71:12,21
72:6 74:23 76:17
78:8,22 81:2
83:17
**year** 20:21 28:7
76:24 85:5
**years** 8:18 14:13
18:14,17,18 19:9
41:22
**yep** 58:11
**york** 1:3,19 2:7
4:23 5:6 7:24
12:23 14:17 25:5
88:4,10

**z**

**zone** 68:5,10
**zoom** 9:7 58:4

Page 14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 19

```
1

2        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF NEW YORK
3        ------------------------------------------X
         MIKE KLOPPEL, et al.,
4

                                  PLAINTIFFS,
5

6           -against-        Case No.:  6:17-cv-06296
                             FPG-MJP
7

8        HOMEDELIVERYLINK, INC.,

9                                 DEFENDANT.
         ------------------------------------------X
10

11                  DATE:  APRIL 21, 2021

12                  TIME:  2:05 p.m.

13

14

15              VIDEOTAPED DEPOSITION of the

16       Plaintiff, MICHAEL COLLINS, taken by the

17       Defendant, pursuant to a Notice and to the

18       Federal Rules of Civil Procedure, held via

19       video teleconference, before Diane Buchanan,

20       a Notary Public of the State of New York.

21

22

23

24

25

                                         Page  1
```

```
 1
 2        A P P E A R A N C E S:
 3
          LICHTEN & LISS-RIORDAN, P.C.
 4        Attorneys for the Plaintiff Samora Minors
              100 Cambridge Street
 5            Boston, MA 02114
              BY:  BENJAMIN WEBER, ESQ.
 6            Bjweber@llrlaw.com
 7
          SCOPELITIS, GARVIN, LIGHT,
 8        HANSON & FEARY, P.C.
          Attorneys for the Defendant
 9            30 W. Monroe Street
              Chicago, Illinois 60603
10            BY:  ANDREW J. BUTCHER, ESQ.
              Abutcher@scopelitis.com
11
12
          ALSO PRESENT:  Ryan Gallagher, Videographer
13
14                      *         *         *
15
16
17
18
19
20
21
22
23
24
25
```

Page  2

1

2             F E D E R A L   S T I P U L A T I O N S

3

4              IT IS HEREBY STIPULATED AND AGREED

5       by and between the counsel for the respective

6       parties herein that the sealing, filing and

7       certification of the within deposition be

8       waived; that the original of the deposition

9       may be signed and sworn to by the witness

10      before anyone authorized to administer an

11      oath, with the same effect as if signed

12      before a Judge of the Court; that an unsigned

13      copy of the deposition may be used with the

14      same force and effect as if signed by the

15      witness, 30 days after service of the

16      original & 1 copy of same upon counsel for

17      the witness.

18

19              IT IS FURTHER STIPULATED AND AGREED

20      that all objections except as to form, are

21      reserved to the time of trial.

22

23                  *     *     *     *

24

25

Page 3

```
1                    MICHAEL COLLINS
2              THE VIDEOGRAPHER:  We are now going
3         on the record at approximately 2:03 p.m.
4         This is media unit one of the video
5         recorded deposition of Michael Collins
6         taken by counsel for defendant in the
7         matter of Mike Kloppel versus
8         Homedeliverlink, Inc filed in the United
9         States District Court for the Western
10        District of New York, Case No.
11        6:17-cv-06296-FPG-MJP.  This deposition
12        is being held via zoom.  My name is Ryan
13        Gallagher.  The court reporter is Diane
14        Buchanan.  We are both from the firm
15        Veritext Legal Solutions.
16              At this point all attorneys present
17        will identify themselves for the record.
18              MR. BUTCHER:  Andy Butcher on
19        behalf of Homedeliverylink.
20              MR. WEBER:  And Benjamin Weber on
21        behalf of the plaintiffs.
22              THE VIDEOGRAPHER:  At this time the
23        court reporter will swear in the witness
24        and we can proceed.
25
```

Page 4

```
1              MICHAEL COLLINS
2    M I C H A E L   C O L L I N S, having been
3    first duly sworn by a Notary Public of the
4    State of New York, was examined and testified
5    as follows:
6    EXAMINATION BY
7    MR. BUTCHER:
8         Q.   Mr. Collins, can you state your
9    full name and address, for the record.
10        A.   314 Cameron Hill Drive, Rochester,
11   New York 11462.
12        Q.   And your name, please?
13        A.   Michael Collins.
14        Q.   Mr. Collins, my name is Andy
15   Butcher.  I am an attorney representing
16   Homedeliverylink or HDL in a lawsuit filed
17   against them and a notice of your deposition
18   and I will be taking your deposition today.
19   Have you had your deposition taken before?
20        A.   I have, yes.
21        Q.   How many times?
22        A.   Once.
23        Q.   What was that in relation to?
24        A.   My company was sued over a damage
25   claim.
```

Page 5

```
                      MICHAEL COLLINS
 1

 2        Q.    And which company was that?

 3        A.    Collins Home Delivery.

 4        Q.    Do you recall how long ago that

 5   was?

 6        A.    About five years ago.

 7        Q.    What type of damage claim?

 8        A.    Water damage.

 9        Q.    So, I'm going to go through some

10   background rules.  You may remember this from

11   the previous time that you had your

12   deposition taken, but it's always helpful to

13   have a refresher at the beginning here.  With

14   the court reporter taking down everything

15   that is being said, so we have to make sure

16   we don't talk over each other at all.  Normal

17   human interaction with the question you may

18   jump in and say Andy, I know the answer and I

19   want to provide the response.  Resist the

20   urge, make sure you wait until I'm done with

21   the question before you give your answer.  If

22   you are not, if I at any point interrupt you

23   while you are not done with an answer, please

24   let me know you have not finished and I will

25   go ahead and let you respond, it makes a
```

Page 6

MICHAEL COLLINS

1

2    clearer record that way.  Do you understand?

3        A.   Yes.

4        Q.   This is not any kind of forced

5    march here.  If you need a break at any

6    point, let me know.  I may need to finish a

7    question or two on the record but we will

8    take breaks as needed throughout the

9    deposition.  Is that okay?

10        A.   Yes.

11        Q.   Also if you don't understand a

12    question, make sure that you say so and I

13    will rephrase it.  If you proceed with

14    answering a question it's going to be

15    excepted that you understood what was being

16    asked; is that fair?

17        A.   Yes.

18        Q.   Are you represented by a lawyer

19    here today?

20        A.   Yes.

21        Q.   Who was that?

22        A.   Ben Weber.

23        Q.   How many times have you

24    communicated with Mr. Weber in preparation

25    for the deposition?

```
1                    MICHAEL COLLINS
2          A.    Twice, three times.
3          Q.    Do you recall when were those two
4     to three times that you communicated with
5     him?
6          A.    Last time was yesterday.
7     Previously it was probably about six weeks
8     ago when we were supposed to do this.
9          Q.    Have you communicated with anyone
10    besides your lawyer about this lawsuit?
11         A.    No.
12         Q.    Do you have any messages through
13    Facebook with Mike Kloppel about the lawsuit?
14         A.    No.
15         Q.    What did you do to prepare for the
16    deposition today?
17         A.    Not much.  I just got the folder
18    today so I did prepare some papers for
19    Mr. Weber and my tax returns and sent them to
20    him.
21         Q.    Other than tax returns what other
22    paper did you prepare for Mr. Weber?
23         A.    Some payroll reports.
24         Q.    Do you recall how many payroll
25    reports you had provided to Mr. Weber?
```

Page 8

```
 1                    MICHAEL COLLINS
 2          A.    I believe it was two to three years
 3     worth.
 4          Q.    I will walk through your
 5     educational background.  Did you graduate
 6     high school?
 7          A.    Yes.
 8          Q.    Any post-high school schooling?
 9          A.    A semester of college.
10          Q.    You formed Collins Home Delivery in
11     2011; is that right?
12          A.    Yes.
13          Q.    Prior to working at Collins Home
14     Delivery where did you work?
15          A.    I was -- Kical Enterprises.  It was
16     a d/b/a doing the same thing.
17          Q.    When you say doing the same thing,
18     where was that?
19          A.    I contracted with 3PD and GTS to do
20     home delivery for Sears.
21          Q.    How long were you with Kical
22     Enterprises for?
23          A.    I formed that in 2004.
24          Q.    Did you -- is Kical Enterprises
25     still in business?
```

Page 9

```
 1                  MICHAEL COLLINS
 2          A.   No, I changed it to Collins Home
 3     Delivery.
 4          Q.   Why did you change it to Collins
 5     Home Delivery?
 6          A.   HDL said we had to be incorporated
 7     to remain in business.
 8          Q.   Who from HDL told you that?
 9          A.   I -- that was I believe David Manes
10     was the manager at the time.
11          Q.   And when you were with Kical
12     Enterprises Kical was providing services to
13     GTS and 3PD?
14          A.   No, not at the same time.  GTS was
15     bought out by 3PD.
16          Q.   Kical Enterprises was providing to
17     GTS and 3PD out of the Rochester location?
18          A.   Yes.
19          Q.   Prior to Kical Enterprises where
20     were you working?
21          A.   I worked for GTS as an employee
22     doing deliveries for Sears.
23          Q.   What made you decide to leave GTS
24     as an employee and form Kical Enterprises?
25          A.   It wasn't a choice.  They said
```

Page 10

```
 1              MICHAEL COLLINS
 2      either become a subcontractor or find another
 3      job.
 4           Q.   So GTS switched from an employee
 5      model to independent contractor model?
 6           A.   Yes.
 7           Q.   Other than Collins Home Delivery
 8      and Kical Enterprises are there any other
 9      companies that you had an ownership interest
10      in?
11           A.   No.
12           Q.   With Collins Home Delivery are you
13      still the owner of that company?
14           A.   No.
15           Q.   Is Collins Home Delivery still in
16      existence?
17           A.   No.
18           Q.   When did Collins Home Delivery go
19      out of business?
20           A.   Officially when I filed my taxes
21      last year.
22           Q.   You say officially last year, when
23      was the last time that Collins Home Delivery
24      had any revenue?
25           A.   January of 2019.
```

Page 11

```
1                    MICHAEL COLLINS
2         Q.    Did Collins Home Delivery have
3    motor carrier authority from the Federal
4    Motor Carrier Safety Administration?
5         A.    Yes.
6         Q.    Was that authority transferred to
7    Collins Home Delivery by GTS?
8         A.    No, by HDL.
9         Q.    Walk me how HDL provided GTS with
10   motor carrier authority?
11        A.    They said you have to be
12   incorporated so they had us fill out some
13   paperwork and I sent them some money I think
14   a few hundred dollars and they incorporated
15   me and switched over all my stuff over for
16   me.
17        Q.    Did you, did Collins Home Delivery,
18   make filings with Federal Motor Carrier
19   Safety Administration other than what you are
20   referring HDL did for you?
21        A.    No.
22        Q.    Did Collins Home Delivery have any
23   New York State filings for products?
24        A.    No.
25        Q.    Were you the sole owner of Collins
```

Page 12

```
1                    MICHAEL COLLINS

2         Home Delivery?

3              A.    Yes.

4              Q.    What was the business address for

5         Collins Home Delivery?

6              A.    Originally it was 163 Arcadia

7         Parkway, Rochester, New York 14612.

8              Q.    Was that different from your home

9         address?

10             A.    That was my home at that time.

11             Q.    At some point you switched the

12        business address of Collins Home Delivery?

13             A.    Yes, when I moved.

14             Q.    And the Collins Home Delivery

15        address became the same address as your home

16        address?

17             A.    Yes.

18             Q.    Were you the president of Collins

19        Home Delivery?

20             A.    Yes.

21             Q.    Did Collins Home Delivery provide

22        deliveries for Inerval?

23             A.    Yes.

24             Q.    Did Collins Home Delivery deliver

25        products for companies other than Inerval?
```

Page 13

```
                        MICHAEL COLLINS
 1
 2          A.    No.
 3          Q.    The only revenue source for Collins
 4    Home Delivery was from product delivered for
 5    Inerval?
 6          A.    Yes.
 7          Q.    So Collins Home Delivery never
 8    delivered mattresses for another company?
 9          A.    No.
10          Q.    What locations did Collins Home
11    Delivery provide those delivery services out
12    of?
13          A.    It was 100 100 Mushroom Boulevard,
14    Rochester, New York 14262.
15          Q.    Any other locations that Collins
16    Home Delivery provided delivery services from
17    other than the Rochester location?
18          A.    Very rarely I would work out of the
19    Buffalo office.  And I did work in Nashville
20    for maybe a month helping out because they
21    didn't have enough drivers and out of
22    Virginia also.  Same situation, they didn't
23    have enough drivers so I worked there for a
24    couple of months.
25          Q.    Nashville, Tennessee you worked out
```

Page 14

```
 1                 MICHAEL COLLINS
 2      of for a month?
 3           A.   Yes.
 4           Q.   And you said it was a couple of
 5      months you worked out of the Virginia
 6      location?
 7           A.   Yes.  About that, yes.
 8           Q.   Collins Home Delivery provide any
 9      general contractor services?
10           A.   No.
11           Q.   Do you have ownership in any other
12      company besides Collins Home Delivery between
13      2011 and the present?
14           A.   No.
15           Q.   What were your job responsibilities
16      as president of Collins Home Delivery?
17           A.   I do arrange for the trucks, hire
18      the people, do the payroll, deliver the
19      product.  Look out for all of the taxes,
20      basically whatever business needed to be
21      done.  I did provide uniforms, obtain them.
22           Q.   All right.  Uniforms, what uniforms
23      did you provide?
24           A.   Originally when HDL took over we
25      wore their uniforms that we had purchased
```

Page 15

MICHAEL COLLINS

```
 1
 2     from them, the shirts, and later I was able
 3     to get my own and I just bought shirts for
 4     them.  My company name on them after about
 5     five or six years after HDL came in.
 6          Q.   And the initial uniforms you are
 7     referring to you said you purchased those
 8     from HDL?
 9          A.   Yes.
10          Q.   Tell us about the uniforms, what
11     did they --
12          A.   Shirts, we had to wear their shirt
13     and we were required to wear blue pants,
14     everything had to be blue and I provided
15     pants.  Well, actually employees, my
16     employees had to buy their own pants.  I
17     provided with hats, jackets and hats.
18          Q.   Did the shirt have any writing on
19     it?
20          A.   The HDL shirts that said
21     Homedeliverylink on them.
22          Q.   You referenced hats and jackets as
23     well as part of the uniform?
24          A.   Yes, I provided those and they were
25     plain navy blue.
```

Page 16

```
 1                    MICHAEL COLLINS
 2          Q.   And do you know the uniforms when
 3     you initially started with HDL they make any
 4     reference to Sears on them at all?
 5          A.   No.  Actually no, no, they didn't.
 6          Q.   To the best of your recollection
 7     the shirts you wore while starting contract
 8     with HDL said HDL on them?
 9          A.   Yes, they do.  They said
10     Homedeliverylink on them, yes.
11          Q.   At some point you decided to change
12     the shirts that said Collins Home Delivery?
13          A.   Yes, eventually they said they
14     didn't want to us wear their shirts anymore
15     and we had to provide our own.
16          Q.   Do you recall approximately when
17     that was?
18          A.   I believe it was about 2016, '15.
19          Q.   Did other companies that you were
20     contracting with HDL also have the company
21     names placed on the shirts.
22          A.   No, most of them wore plain blue.
23          Q.   Why did you decide to have Collins
24     Home Delivery name placed on the shirts?
25          A.   Because I was able to get a good
```

Page 17

MICHAEL COLLINS

1

2 price on them and give my employees a little

3 pride.  They liked working for me they liked

4 the shirts.

5   Q. I want to talk about Inerval would

6 consolidate products, it's products at

7 different retailers?

8   A. Yes.

9   Q. When you made deliveries to a

10 customers home do you know which retailer the

11 customer purchased product from?

12   A. It was almost exclusively Sears.

13 We did do a little bit of Amazon, but not

14 much.

15   Q. Any other retailers that you would

16 deliver for besides Amazon and Sears?

17   A. No.

18   Q. And was the Amazon and Sears,

19 deliveries, those would occur at Rochester

20 and at Buffalo?

21   A. Yes.  Very little Buffalo.  It was

22 very rare, but mostly Rochester.

23   Q. When you were -- when Collins was

24 contracting with HDL how many trucks did you

25 operate?

```
 1                    MICHAEL COLLINS
 2           A.    They allowed me two to start.
 3           Q.    You said they only allowed you two,
 4      who was this?
 5           A.    HDL.
 6           Q.    Anyone specifically from HDL said
 7      that you should only have two?
 8           A.    Yes, it was the upper management
 9      came in to start everything up and they
10      didn't want anybody having too many trucks
11      there.
12           Q.    Do you recall specifically who from
13      upper management at HDL told you that?
14           A.    Chris, I can't think of his last
15      name.  I know his first name was Chris.  He
16      was a big manager.
17           Q.    Did you have more than two trucks
18      to operate when you initially started
19      contracting with Homedeliverylink?
20           A.    I had more available, yes.
21           Q.    How many did you have available?
22           A.    Three to four.
23           Q.    What did you do with the other one
24      to two trucks that were available but that
25      you could not utilize to HDL?
```

Page 19

1                  MICHAEL COLLINS

2          A.    I rented my trucks week to week.

3     So, I turned them in, the other guys went to

4     work for other contractors that came in.

5          Q.    Where did you rent the trucks from?

6          A.    That time I believe it was

7     Enterprise.

8          Q.    And why did you initially rent the

9     trucks from Enterprise?

10         A.    Why?  Because it was the best price

11    I could get.

12         Q.    And at some point did you change

13    truck rental companies?

14         A.    Yes.

15         Q.    What company did you change to?

16         A.    Penske.

17         Q.    Why?

18         A.    Enterprise wasn't very reliable.

19    The truck was breaking.  HDL told me I needed

20    to change companies or they would give

21    somebody else my work.

22         Q.    Who from HDL told you you needed to

23    change companies?

24         A.    A manager Mike Rex.

25         Q.    Mike Rex had been an employee of

Page 20

MICHAEL COLLINS

1

2     Collins Home Delivery at one point, correct?

3          A.    Yes.

4          Q.    How long was he employed by Collins

5     Home Delivery?

6          A.    Three, four years roughly.

7          Q.    And it was your decision then to

8     choose Penske to rent the trucks from?

9          A.    Yes.

10         Q.    Did Collins Home Delivery own any

11    trucks?

12         A.    No.

13         Q.    Why did you decide to rent trucks

14    as opposed to purchase the trucks?

15         A.    In the end I just found it would be

16    cheaper and easier because they fix the

17    trucks, I didn't have to worry about much.

18         Q.    When you said they fixed the trucks

19    meaning the truck leasing company?

20         A.    Yes.

21         Q.    Did you have to purchase insurance

22    for those trucks that you --

23         A.    Yes.

24         Q.    Just to make sure the record is

25    clear, this is one of those instances just

Page 21

MICHAEL COLLINS

```
 1
 2    insuring, wait until I finish with the
 3    question even if you know exactly where I'm
 4    going.  I will repeat it so we have a clear
 5    record.  Did Collins Home Delivery purchase
 6    insurance for those rental trucks?
 7         A.    Yes.
 8         Q.    And where did Collins Home Delivery
 9    purchase that insurance?
10         A.    In the beginning I used State Farm.
11         Q.    At some point did you switch from
12    State Farm?
13         A.    They decided not to insure this
14    industry anymore.
15         Q.    What insurer did you use after
16    State Farm?
17         A.    Erie Insurance.
18         Q.    That's Erie Insurance?
19         A.    Yes.
20         Q.    Why did you select Erie Insurance?
21         A.    The best price.
22         Q.    You initially started a contract
23    with HDL and had two trucks at some point,
24    did you increase the number of trucks you had
25    operating?
```

Page 22

MICHAEL COLLINS

1

2      A.    Yes.

3      Q.    Why did you increase the number of

4  trucks?

5      A.    They added demand because a couple

6  of contractors left and they needed

7  deliveries.

8      Q.    And what was the incentive to

9  Collins Home Delivery and adding trucks?

10      A.    Sorry, I didn't understand that.

11      Q.    Why would Collins Home Delivery add

12  trucks?

13      A.    Why?  Increase my revenue a little

14  bit and give me some of the guys that used to

15  work for me were out of work now give them

16  jobs.

17      Q.    What is the peak number of trucks

18  you had operating for at Homedeliverylnk?

19      A.    I believe it was five.

20      Q.    And how long did you have the five

21  trucks in operation?

22      A.    Two years maybe.

23      Q.    At some point the number of trucks

24  was reduced from five trucks?

25      A.    Yes.

Veritext Legal Solutions
800-336-4000

```
 1                      MICHAEL COLLINS
 2              Q.    And why is that?
 3              A.    It was a lack of volume because
 4       Sears wasn't doing so well.
 5              Q.    Do you recall when the contract
 6       between Collins Home Delivery and HDL was
 7       terminated?
 8              A.    January of 2019.
 9              Q.    Did you terminate the contract or
10       did HDL?
11              A.    I did.
12              Q.    Was Alejandro Colon a driver or
13       helper for Collins Home Delivery?
14              A.    Yes, he was a helper and then he
15       became a driver.
16              Q.    How did you meet Mr. Colon?
17              A.    He had worked previously for
18       another contractor.
19              Q.    And did you interview Mr. Colon
20       before hiring him?
21              A.    Not really.  I knew him pretty
22       well.
23              Q.    Did you know him just from the HDL
24       facility?
25              A.    That's where I met him, yes, we
```

Page 24

```
 1                    MICHAEL COLLINS
 2        occasionally had social interaction.
 3             Q.   And how long did Mr. Colon work for
 4        Collins Home Delivery?
 5             A.   I would say about six years, I
 6        think.
 7             Q.   Why did he transition from a helper
 8        to a driver?
 9             A.   More money.
10             Q.   What about Axel Rodriguez, are you
11        familiar with Mr. Rodriguez?
12             A.   Yes.
13             Q.   Was Mr. Rodriguez a driver for
14        Collins Home Delivery?
15             A.   Yes.
16             Q.   How did you come to meet
17        Mr. Rodriguez?
18             A.   One of my drivers introduced me to
19        him.  He moved here from Puerto Rico and
20        needed a job.
21             Q.   And which driver made that
22        introduction?
23             A.   It was Manual Rodriguez.
24             Q.   How long did Axel Rodriguez work as
25        a driver for Collins Home Delivery?
```

Page 25

```
 1                MICHAEL COLLINS
 2          A.   I think it was about a year and a
 3     half.
 4          Q.   Did you terminate Mr. Rodriguez
 5     employment from Collins Home Delivery?
 6          A.   No, he left and moved back to
 7     Puerto Rico.
 8          Q.   What about Mr. Colon, did he leave
 9     Collins Home Delivery on his own or did you
10     terminate the relationship?
11          A.   No, he left on his own.
12          Q.   Did Ben Worrells work as a driver
13     for Collins Home Delivery?
14          A.   Yes.
15          Q.   How long did Mr. Worrells work as a
16     driver?
17          A.   About three years.
18          Q.   Why did Mr. Worrells leave Collins
19     Home Delivery?
20          A.   He found another job.
21          Q.   Do you know where he found another
22     job?
23          A.   He went to be a tow truck driver.
24          Q.   Benjamin -- I'm sorry, Charles Fox
25     was he a driver for Collins Home Delivery?
```

Page 26

```
1                    MICHAEL COLLINS
2          A.    Yes.
3          Q.    Chris Zapf, Z-A-P-F, was he a
4     driver or helper for Collins Home Delivery?
5          A.    He was a driver.
6          Q.    How long was he a driver for?
7          A.    Five years, I believe.
8          Q.    Did Mr. Zapf ever leave on his own
9     or did Collins Home Delivery terminate the
10    relationship?
11         A.    He left on his own.
12         Q.    Do you know why he left?
13         A.    He found another job.
14         Q.    Mr. Rivera was a driver for Collins
15    Home Delivery?
16         A.    Yes.  Yes.
17         Q.    Part-time driver?
18         A.    Yes.
19         Q.    Was he the only part-time driver
20    that Collins Home Delivery had?
21         A.    The one I used the most.  I might
22    have used a couple of guys here and there.
23    He usually work Saturdays so I can have off.
24         Q.    How did you meet Mr. Rivera?
25         A.    He worked for another contractor
```

Page 27

```
 1                    MICHAEL COLLINS
 2     previously.
 3          Q.   How long was Mr. Rivera a part-time
 4     driver for Collins Home Delivery?
 5          A.   Three years.
 6          Q.   Is there a reason you stopped using
 7     Mr. Rivera as a part-time driver?
 8          A.   I went out of business.  I didn't
 9     need him any more.  Actually before that,
10     because it had gotten so low I didn't need
11     him any more.
12          Q.   What about Ivan Relman, was he a
13     driver or helper?
14          A.   Yes.
15          Q.   Which one, driver or helper?
16          A.   Driver.
17          Q.   How long was Mr. Relman a driver
18     for?
19          A.   Three months, four months.
20          Q.   Did he leave on his own accord or
21     did Collins Home Delivery terminate the
22     relationship?
23          A.   I terminated it.
24          Q.   Why did you terminate it?
25          A.   He damaged a lot of things.
```

Page 28

```
 1                    MICHAEL COLLINS
 2          Q.    When you say he damaged a lot of
 3     things, what do you mean by that?
 4          A.    He had several property damages and
 5     he damaged a couple of my trucks.
 6          Q.    When Mr. Relman would damage some
 7     property did you charge him for that damage?
 8          A.    No.
 9          Q.    Same I guess goes for the truck,
10     the damage to the truck, did you not seek
11     repayment for him for?
12          A.    No.
13          Q.    Why not?
14          A.    Because he was an employee.  It's
15     my responsibility.
16          Q.    Other than Mr. Relman were there
17     any Collins Home Delivery employees who you
18     terminated the relationship of?
19          A.    No.
20          Q.    Jake Burrows, B-U-R-R-O-W-S, was he
21     a driver for Collins Home Delivery?
22          A.    Yes, he was a driver and helper,
23     yes.
24          Q.    Was Mr. Burrows a driver some days
25     and helper other days?
```

Page 29

```
 1                    MICHAEL COLLINS
 2         A.    Yes.
 3         Q.    Would he get paid a different rate
 4    depending whether he was working as a driver
 5    or helper?
 6         A.    No.
 7         Q.    Was that a flat rate for Collins
 8    Home Delivery drivers and helpers?
 9         A.    No.
10         Q.    Why did Mr. Burrows have the same
11    rate for providing helper services versus
12    driver services?
13         A.    Because I hired him as a driver and
14    if I needed him as a helper it wasn't his
15    fault, I paid him accordingly.
16         Q.    How did you meet Mr. Burrows?
17         A.    He also worked for a previous
18    contractor.
19         Q.    Do you recall which contractor that
20    was?
21         A.    I believe it was Ditmax.
22              (Whereupon, an off-the-record
23         discussion was held.)
24         Q.    Prior to the break the discussion
25    about the videographer, we were talking about
```

Page 30

```
 1              MICHAEL COLLINS
 2       Jake Burrows, I believe your testimony
 3       Mr. Collins is that he came from a different
 4       contractor named Ditmax; is that correct?
 5            A.   Yes.
 6            Q.   D-I-T-M-A-X?
 7            A.   Yes.
 8            Q.   What was the flat rate you were
 9       paying Mr. Burrows?
10            A.   It was $8.50 for each delivery.
11            Q.   And did Collins Home Delivery pay
12       helpers on a per delivery basis?
13            A.   Yes.
14            Q.   And did Collins Home Delivery pay
15       drivers on a per delivery basis?
16            A.   Yes.
17            Q.   Why did you decide to pay out any
18       per delivery basis?
19            A.   Well, when I was an employee that's
20       how I got paid and it seemed to make sense
21       because it would motivate them to get the
22       deliveries done and want to do more
23       deliveries.
24            Q.   Luis Cariano, C-A-R-I-A-N-O, was he
25       a helper or driver for Collins Home Delivery?
```

Page 31

```
 1              MICHAEL COLLINS
 2         A.   I don't remember that name, no.
 3    No, I don't recall that name.
 4         Q.   Luis Rivera, was he a helper or
 5    driver?
 6         A.   Again, he started as a helper and
 7    became a driver.
 8         Q.   How would you decide if someone was
 9    going to be a helper versus a driver for
10    Collins Home Delivery?
11         A.   Based on their performance.
12         Q.   What type of performance metrics
13    were you looking for?
14         A.   Great customer service and the
15    amount of property damage or truck --
16    property damage, if they were a helper.
17         Q.   Better customer service a helper
18    provided and the least amount of damage done
19    to deliveries or truck meant they would be
20    expedited to become a driver for the company?
21         A.   Yes.
22         Q.   Did you know Mike Conception?
23         A.   Yes.
24         Q.   And was Mike Conception a driver or
25    helper?
```

Page 32

```
 1              MICHAEL COLLINS
 2         A.    He was a driver.
 3         Q.    How long was Mr. Conception a
 4    driver for?
 5         A.    It wasn't long, three years.
 6         Q.    Do you recall why Mr. Conception
 7    left the company?
 8         A.    Yes, he found other employment.
 9         Q.    Mike Rex we referenced earlier, he
10    was a driver for Collins Home Delivery?
11         A.    Yes.
12         Q.    How long was Mr. Rex a driver for?
13         A.    A couple of years.
14         Q.    How did you meet Mr. Rex?
15         A.    I've known him from when we were
16    both employees for GTX.
17         Q.    Why did Mr. Rex leave Collins Home
18    Delivery?
19         A.    He was in a truck accident and he
20    wasn't able to work any more.
21         Q.    Was that the accident you referred
22    to earlier in which you had your deposition
23    taken previously?
24         A.    Sorry, what was the question?
25         Q.    At the beginning of the deposition
```

Page 33

```
 1                    MICHAEL COLLINS
 2      you said there was one other deposition you
 3      had taken, right?
 4           A.   Yes, but, no, that has no -- that
 5      wasn't a deposition.
 6           Q.   Where did Mike Rex leave to work to
 7      after he left Collins Home Delivery?
 8           A.   Homedeliverylink.
 9           Q.   And what position did Mr. Rex take
10      at Homedeliverylnk?
11           A.   He's the manager at the Rochester.
12           Q.   Is he the manager of the Rochester
13      branch currently?
14           A.   Yes.
15           Q.   Is that the position he had the
16      entire time he has been at Homedeliverylnk,
17      to the best of your knowledge?
18           A.   No, I believe he was assistant
19      manager for a period.
20           Q.   So he started as the assistant
21      manager and became the manager at the
22      Rochester location?
23           A.   Yes.
24           Q.   Do you know who Mike Rex replaced
25      as a general manager at the Rochester
```

<div align="center">Page 34</div>

```
 1                    MICHAEL COLLINS
 2        location?
 3               A.    Yes, Jim Lockner.
 4               Q.    How long was Jim Lockner the
 5        general manager?
 6               A.    A year or so.
 7               Q.    Prior to Jim Lockner who was the
 8        general manager?
 9               A.    David Manes.
10               Q.    How long was David Manes there as
11        the general manager?
12               A.    Four years, I believe.
13               Q.    Anyone that was the general manager
14        prior to David Mane at that location that you
15        recall?
16               A.    When HDL came in he became the
17        manager.
18               Q.    What type of interactions would you
19        have on a daily basis with the general
20        manager of HDL?
21               A.    It would be a lot, have our manager
22        meetings in the morning and then throughout
23        the day if there was a problem with one of my
24        delivery trucks he would contact me and then
25        at night he would call me and tell me how
```

Page 35

MICHAEL COLLINS

1
2  many trucks he needed me for the next day.
3  If there was any damage claim he would call
4  me and let me know.
5       Q.   How about the assistant manager,
6  what interactions did you have with the
7  assistant manager of HDL on a daily basis?
8       A.   Occasionally he would be the one,
9  one to call me at night to tell me how many
10 trucks they needed for the next day.  And he
11 would be involved with any customer service
12 issues.
13      Q.   What type of customer issues would
14 he be involved in?
15      A.   Perhaps a customer wasn't home for
16 the delivery and we had to go back to them
17 when they came home.  Delivery wasn't done
18 properly.  Something wasn't hooked up right.
19      Q.   Would the assistant manager also be
20 adding the morning meeting you referred to?
21      A.   Sometimes.
22      Q.   But not always?
23      A.   Once in a while if the general
24 manager was off the assist manager would do
25 it.

Veritext Legal Solutions
800-336-4000

```
 1                    MICHAEL COLLINS
 2          Q.    Would there also be Inerval
 3     employees at the morning meeting?
 4          A.    Yes.
 5          Q.    Who from Inerval would have been at
 6     the morning meeting?
 7          A.    Jerry Meade, he was kind of the
 8     Inerval roster.
 9          Q.    Did Mr. Meade lead the morning
10     meeting?
11          A.    Usually not, no.
12          Q.    How often would Mr. Meade lead the
13     morning meeting?
14          A.    Maybe every couple of weeks he
15     might.
16          Q.    Would he leave the meeting for an
17     entire week or would it be a day here or
18     there for a couple of weeks?
19          A.    The meetings were supposed to be
20     every morning.
21          Q.    So Mr. Meade would be the lead for
22     the morning.  How often was Mr. Meade the
23     lead for the morning meeting?
24          A.    About once every two weeks.
25          Q.    You said the meetings were every
```

Page 37

MICHAEL COLLINS

1
2      morning, were there times the morning meeting
3      did not occur?
4          A.   Not rarely, maybe if things were
5      running way behind, if the product didn't get
6      there or if it was bad weather.  And we were
7      in a hurry, but not very often.
8          Q.   And would the morning meetings
9      occur but you would not attend in those
10     instances?
11         A.   I would attend them at least unless
12     I wasn't working that day I probably wouldn't
13     attend it.  But most days I was out on
14     delivery trucks I would have to attend it.
15         Q.   Were there any days you were out on
16     a delivery truck in which you would did not
17     attend the morning meeting?
18         A.   No.
19         Q.   So the times you reference were
20     maybe bad weather or things were running
21     behind, there was no morning meeting at all?
22         A.   Correct.
23         Q.   What would be covered at a morning
24     meeting?
25         A.   The day before customer service

MICHAEL COLLINS

1
2      scores, any new products we might get trained
3      on, anything that Inerval or HDL didn't feel
4      we were doing right would be addressed in
5      that.
6           Q.   The scores you just referred to the
7      customer service scores those were Inerval
8      customer service scores?
9           A.   Yes.
10          Q.   And the new product demonstration
11     is that something an Inerval employee would
12     speak to?
13          A.   No, usually it would be HDL.
14          Q.   How often were there new products
15     and that someone at the morning meeting would
16     speak about?
17          A.   Very, a lot.  The once a month,
18     maybe six months, it would depend when things
19     came out.
20          Q.   How long did these morning meetings
21     last?
22          A.   About 15 minutes.
23          Q.   Would it be sometimes less than 15
24     minutes?
25          A.   Yes.

Veritext Legal Solutions
800-336-4000

```
  1                    MICHAEL COLLINS
  2           Q.    How frequently were they less than
  3      15 minutes?
  4           A.    Rarely.  It was almost always 15
  5      minutes for sometimes a little more, but
  6      maybe about 15 minutes almost every day.
  7           Q.    So, it was discussion points would
  8      be new product, customer service scores, and
  9      then identifying things that were not done
 10      right; is that correct?
 11           A.    Yes.
 12           Q.    What did you mean by things that
 13      were not done correctly?
 14           A.    If Inerval or HDL didn't feel we
 15      were filling out our paperwork right or we
 16      weren't updating our stops properly on our
 17      phones or weren't using Inerval customer
 18      versus the way we were supposed to.
 19           Q.    You said filling out paperwork
 20      correctly, what paperwork would you be
 21      filling out?
 22           A.    In most cases it would be we had to
 23      use extra parts that were provided, account
 24      for where we used it, so they can replace it
 25      and bill somebody for it.  That was the main
```

Page 40

```
 1                    MICHAEL COLLINS
 2       topic usually.
 3            Q.    And did that paperwork have a
 4       specific name it was referred to as?
 5            A.    Parts for replenishment sheet.
 6            Q.    And the parts for replenishment
 7       sheet would be used when a contractor would
 8       borrow the equipment or explain to me what
 9       the parts replacement sheet is used for?
10            A.    We would have a big tote full of
11       extra installation parts from dryer vents to
12       washer hoses, refrigerator water lines and if
13       we used anything out of there we had to write
14       down what we used and where we used it.
15            Q.    What would happen after you wrote
16       down the information on the parts replacement
17       sheet?
18            A.    They provide us with a replacement
19       to put back in the tote.
20            Q.    And the totes were brought with the
21       delivery trucks?
22            A.    Yes.
23            Q.    Do you know that was Inerval or HDL
24       that provided the parts replacement?
25            A.    It was Inerval.
```

Page 41

MICHAEL COLLINS

Q.   I believe you testified that in the
evenings you would receive a call from either
the general manager or assistant manager
letting you know how many manifests were
available for the trucks the next day; is
that correct?

A.   Yes.

Q.   And a manifest would contain the
number of deliveries for the next day?

A.   Yes.

Q.   And were there some manifests that
were preferred over other manifests?

A.   Yes.

Q.   Why would one manifest be
preferable over the other?

A.   The delivery areas would be a big
part.  The number of deliveries, we would get
the total volume on that sheet, depending on
less value per delivery.

Q.   And so a manifest with more
deliveries would be more revenue and a better
manifest?

A.   Yes.

Q.   So when you had five trucks, for

Page 42

MICHAEL COLLINS

1

2      example, and HDL would call and say we have

3      enough loads for five trucks or four trucks

4      for you tomorrow?

5          A.   Yes.

6          Q.   And how did you then determine

7      which manifest you would take and those you

8      would give to the other Collins Home Delivery

9      drivers?

10         A.   Well, for a long period of time

11     when David Manes was the manager I didn't

12     choose whoever had the best customer service

13     scores, he would let them choose their own.

14         Q.   So, would Mr. Manes, the Collins

15     Home Delivery drivers would be able to choose

16     the manifest directly from HDL?

17         A.   Yes.

18         Q.   And after David Manes left and Jim

19     Lockner came did that process change?

20         A.   It remained in effect for a short

21     period and then they started asking me to

22     assign them myself.

23         Q.   And how would you assign the

24     manifest?

25         A.   I would try to rotate it around to

Veritext Legal Solutions
800-336-4000

```
 1                    MICHAEL COLLINS
 2      try to give everything an equal amount of
 3      work.
 4            Q.   Was there a particular manifest
 5      that you would look for and try to take?
 6            A.   Sometimes I would try to take the
 7      lesser deliveries.
 8            Q.   Meaning fewer stops on a route?
 9            A.   Correct.
10            Q.   I mentioned previously that drivers
11      and helpers were paid on a per delivery
12      basis.  When you were working as a driver for
13      Collins Home Delivery would you also pay
14      yourself on a per delivery basis?
15            A.   No.
16            Q.   How were you paid for the work
17      performed by Collins Home Delivery?
18            A.   I paid myself a flat rate to try to
19      keep up on my taxes so I had my federal taxes
20      deducted and then any other profit that was
21      left would be mine.
22            Q.   What was the flat rate that you
23      paid?
24            A.   $400 a week.
25            Q.   And you paid yourself that on
```

Page 44

MICHAEL COLLINS

1

2    unemployment contribution taxes; is that
3    right?
4         A.   Yes, and all of my taxes, my Social
5    Security taxes, Medicaid that way it would
6    all be paid throughout the year.
7         Q.   And after Mr. Lockner was the
8    general manager remind me who came after him?
9         A.   Mike Rex.
10        Q.   And did the same process for
11   distributing manifests carry over from
12   Lockner to Mike Rex?
13        A.   Yes.
14        Q.   Once you distributed the manifest
15   would those eventually get turned back into
16   HDL?
17        A.   Yes.
18        Q.   When would those get turned back
19   into HDL?
20        A.   At the end of the day.
21        Q.   Is there any indication on the
22   manifest as to who was the driver on that
23   given day?
24        A.   Yes.
25        Q.   Who would have input that

Veritext Legal Solutions
800-336-4000

1               MICHAEL COLLINS
2     information on the manifest?
3          A.   HDL.
4          Q.   So when would you have told HDL the
5     driver that was going to be assigned to each
6     manifest?
7          A.   The evening before.
8          Q.   Did you ever change the driver on a
9     given manifest in between the evening before
10    and the morning of the delivery?
11         A.   Unless somebody called in sick or
12    couldn't come to work, no.
13         Q.   And was that a frequent occurrence
14    that you would have at least one person who
15    was either sick or a no-show?
16         A.   Very rare.
17         Q.   In those rare instances to have
18    somebody reporting in sick or being a no-show
19    do you recall whether the name of the driver
20    would be changed on the manifest?
21         A.   Some times.  Usually it would, they
22    could change it in the morning.
23         Q.   Sometimes the name would not be
24    changed?
25         A.   Occasionally.

Page 46

MICHAEL COLLINS

1

2      Q.   Were you always working as a driver

3   when providing delivery services at Collins

4   Home Delivery?

5      A.   I would be a helper occasionally.

6      Q.   The occasions you were a helper

7   would your name appear on the manifest?

8      A.   Yes.

9      Q.   Was that always the case?

10      A.   Probably 98 percent of the time at

11   least, always, always, yes.

12      Q.   Do you know if that manifest would

13   then be used to create a delivery settlement

14   statement at the end of each week?

15      A.   Yes.

16      Q.   What is a delivery settlement

17   statement?

18      A.   It would show how many deliveries

19   broken down by driver is, what income, what

20   revenue they generated from my company.

21      Q.   Do you know the process through

22   which that manifest information was being

23   transmitted over to these delivery settlement

24   statements?

25      A.   No, I'm not 100 percent sure

Page 47

MICHAEL COLLINS

1

2     because the manager would do that, but I

3     think they would just put in whatever ratio

4     they had on the computer, they would type in

5     what was done the day before.  I believe.  I

6     didn't ever do that or watch them do it.

7     They would do that when we were out

8     delivering.

9          Q.   Did the helpers for Collins

10    Delivery always receive the same flat

11    delivery amount?

12         A.   No, they would all start the same

13    occasionally they get small raises.

14         Q.   What would warrant a raise?

15         A.   Performance, the length of time

16    they been there.

17         Q.   Would you do performance reviews

18    with the employees of Collins Home Delivery?

19         A.   No.

20         Q.   Likewise with -- did the drivers

21    have varying per delivery rates depending on

22    performance?

23         A.   Yes.  Yes.

24         Q.   When you were given manifests for

25    deliveries in Buffalo would you personally

Page 48

MICHAEL COLLINS

1

2      take the Buffalo manifest?

3            A.    No.

4            Q.    Why not?

5            A.    I didn't want to drive to Buffalo.

6      Once in a while I would, but rarely.

7            Q.    Now, that was an instance of you

8      would ask one of your employees to take that

9      particular manifest because it was a Buffalo

10     manifest?

11           A.    Yes.

12           Q.    The time that you had gone to

13     Nashville or for a month to make deliveries

14     tell us about that and why you went there?

15           A.    Well, they were -- didn't have

16     enough people there so originally I sent them

17     a team and that team would go just do the

18     same thing there.

19           Q.    So then one team of yours to

20     Nashville and then it was a need for a second

21     team and at that point you went out?

22           A.    No, I went out, they had hired some

23     new people and they needed somebody to train

24     new people, so I went by myself just to train

25     new people.

Page 49

MICHAEL COLLINS

1

2    Q.   Who did you train?

3    A.   I don't remember.  It was a female.

4    She was going to be her own contractor, but I

5    don't recall her name.

6    Q.   Do you remember whether Collins

7    Delivery received additional compensation for

8    going out to Nashville to conduct the

9    training?

10   A.   Yes.

11   Q.   What was the additional

12   compensation?

13   A.   I believe I was getting paid, I

14   think it was something like $300 a day I

15   think I was getting.

16   Q.   Were hotel expenses covered?

17   A.   Yes.

18   Q.   Any other expenses covered while

19   working in Nashville as a trainer?

20   A.   My rental car and my airfare.

21   Q.   And that is training you did took

22   approximately a month in Nashville?

23   A.   No, I was there two weeks.

24   Q.   Were you there in two weeks in

25   Nashville as a trainer, did you provide

Page 50

MICHAEL COLLINS

1
2    delivery services in Nashville personally?

3        A.   Personally, yes.  Because the
4    person I was going to train, her helper never
5    came so they had nobody.  So, I went out with
6    her by myself for a few days till they found
7    somebody else.

8        Q.   Any other delivery work that you
9    personally performed in Nashville?

10        A.   No.

11        Q.   So you personally were in Nashville
12    working for approximately two weeks; is that
13    right?

14        A.   Yes.

15        Q.   During that two-week period did
16    Collins Home Delivery also have trucks
17    running in Rochester?

18        A.   Yes.

19        Q.   And there was also a truck running
20    for Collins Home Delivery in Nashville
21    separate and apart from the training you were
22    doing, correct?

23        A.   No, no.  They were already back
24    here I went after they came back.

25        Q.   Who did you send to Nashville from

Page 51

MICHAEL COLLINS

```
 1                   MICHAEL COLLINS
 2      Collins Home Delivery?
 3           A.   Manual and Wilson Rodriguez.
 4           Q.   How did you decide to send those
 5      two?
 6           A.   They were the ones who wanted to
 7      go.
 8           Q.   Did HDL offer any additional
 9      compensation for Collins Home Delivery
10      sending a delivery team to Nashville?
11           A.   Yes.
12           Q.   Do you recall what the additional
13      compensation was?
14           A.   I think I was charging them
15      approximately around $600 a day.  Because I
16      was paying them extra to be out of town.
17           Q.   How much extra were you paying the
18      delivery team to be out of town in Nashville?
19           A.   The driver was getting paid $200 a
20      day and the helper 175 plus their meals.
21           Q.   So 600 per day you were charging
22      HDL covered that additional expense and was
23      there additional profit on it as well?
24           A.   A little bit.  I might have made
25      another $30d a day or something, not much.
```

Page 52

```
1                    MICHAEL COLLINS
2           Q.   Do you recall how you and HDL
3      arrived at the $600 per day number, was that
4      a negotiation process?
5           A.   No, that was what they were
6      offering to go.
7           Q.   Were there ever opportunities to
8      send travel teams to locations outside of
9      Rochester that you declined?
10          A.   Yes.
11          Q.   Why would you decline those other
12     opportunities?
13          A.   Nobody wanted to go.
14          Q.   No one from Collins Home Delivery
15     wanted to go?
16          A.   Right.
17          Q.   Do you recall with the Virginia
18     travel team that you referenced earlier in
19     the deposition what the rate per day was for
20     sending a travel team there?
21          A.   The same rate.
22          Q.   And did you personally go to
23     Virginia on that travel time?
24          A.   I did, yes.
25          Q.   Why did you personally go instead
```

Page 53

<pre>
                    MICHAEL COLLINS
 1
 2     of sending an employee of Collins Home
 3     Delivery?
 4          A.   Nobody wanted to go.  It was a
 5     rough job.
 6          Q.   What was rough about the Virginia
 7     job as to what was going on in Rochester?
 8          A.   It was delivering all furniture and
 9     you were expected to deliver 12 hours a day.
10          Q.   And how many hours per day were you
11     delivering product in Rochester?
12          A.   About eight.
13          Q.   Did the money that HDL was paying
14     deposited in a Collins Home Delivery bank
15     account?
16          A.   Yes.
17          Q.   That bank account was separate from
18     your personal bank account?
19          A.   Yes.
20          Q.   You had provided tax information,
21     some tax return information for Collins Home
22     Delivery, did you also have personal taxes
23     that would be filled out during the time you
24     owned Collins Home Delivery?
25          A.   Yes.
</pre>

Page 54

```
 1                    MICHAEL COLLINS
 2          Q.   What would be reported on the
 3     personal income tax returns?
 4          A.   My salary plus any other profit
 5     that I made.
 6          Q.   Were there certain years of Collins
 7     Home Delivery operation that were more
 8     profitable than others?
 9          A.   Yes.
10          Q.   What years?
11          A.   2011 to 2015.
12          Q.   2011 to 2015 were good years for
13     Collins?
14          A.   Yes.
15          Q.   Why is that?
16          A.   There was a lot of volume, we
17     delivered seven days a week then.  And I also
18     would get some significant bonus money.
19          Q.   Who provided you with the bonus
20     money?
21          A.   There was two bonuses I could get,
22     one was from HDL and one was from Inerval.
23          Q.   What were those bonuses for?
24          A.   Customer service.
25          Q.   So during that 2011, 2015 time
```

Page 55

MICHAEL COLLINS

1

2    period approximately there were bonus

3    incentives from Inerval and separate from HDL

4    for good customer service?

5         A.   Yes.

6         Q.   And you generally had success in

7    obtaining those good customer service awards?

8         A.   Yes.

9         Q.   That changed after 2015?

10        A.   They took the bonus program away

11   for the most part.

12        Q.   When you say for the most part what

13   do you mean?

14        A.   Then they switched to, they would

15   give out Wal-Mart gift cards on a daily

16   basis.  And they would, you know, they would

17   hand them directly to my employees, I

18   wouldn't really have any say in it.  If

19   somebody met the metrics for 84 they would

20   get a card.

21        Q.   Was that Inerval that would hand

22   the Wal-Mart give carts out or HDL?

23        A.   HDL.

24        Q.   So the prior bonus would go

25   directly to Collins on delivery and increase

Page 56

```
 1                    MICHAEL COLLINS
 2        your profits?
 3               A.    Yes.
 4               Q.    When the Wal-Mart gift cards were
 5        being handed right to your employees and in
 6        turn did not have an impact on your bottom
 7        line?
 8               A.    Correct.
 9               Q.    Did the gift card program remain in
10        place until you terminated the contract for
11        2019?
12               A.    No.
13               Q.    When did the gift card program end?
14               A.    Sometime in 2018.
15               Q.    Was there a bonus program that
16        replaced the gift card program in 2018?
17               A.    No.
18               Q.    From 2018 forward there were no
19        additional bonuses for customer service?
20               A.    No.
21               Q.    I have a double-negative in there
22        so I will re-ask the question.  Were there
23        any bonus programs for customer service after
24        2018?
25               A.    No.
```

Veritext Legal Solutions
800-336-4000

```
 1              MICHAEL COLLINS
 2         Q.   Did the number of you personally
 3    worked delivering for Collins Home Delivery
 4    change in a given week?
 5         A.   No.
 6         Q.   How many days per week did you
 7    drive for Collins Home Delivery?
 8         A.   First five years from 2011 to '16.
 9    It would be five to six days a week because
10    we delivered seven days a week.  By 2018 it
11    was about four days a week because we only
12    delivered five days a week.
13         Q.   Did the $400 salary that Collins
14    Home Delivery was paying you change at any
15    point between the 2011 and 2019 period?
16         A.   No.
17         Q.   So whether you were working five
18    days per week or four days per week it was
19    consistently the $400 salary plus the draws?
20         A.   Yes.
21              MR. BUTCHER:  We have been going
22         for an hour and 15, why don't we give
23         the court reporter a break five minutes
24         or so unless you need more time.
25              MR. WEBER:  That's fine with me.
```

Veritext Legal Solutions
800-336-4000

```
 1                MICHAEL COLLINS
 2         That's fine.
 3                THE VIDEOGRAPHER:  Going off the
 4         record at 3:14 p.m.
 5                (Whereupon, a short recess was
 6         taken.)
 7                THE VIDEOGRAPHER:  We are now going
 8         back on the record at approximately 3:27
 9         p.m.  Go ahead, Counsel.
10         Q.   Mr. Collins, you mentioned right
11    before the deposition began that you had
12    received the exhibit binder.  Do you have it
13    near you?
14         A.   Yes.
15         Q.   Turn to --
16                MR. WEBER:  Sorry, can we go off
17         the record a second.
18                MR. BUTCHER:  Sure.
19                THE VIDEOGRAPHER:  Going off the
20         record at 3:28 p.m.
21                (Whereupon, an off-the-record
22         discussion was held.)
23                THE VIDEOGRAPHER:  We are now back
24         on the record at approximately 3:32 p.m.
25         Go ahead, Counsel.
```

Veritext Legal Solutions
800-336-4000

```
 1                    MICHAEL COLLINS
 2          Q.   I'm going to be referring to the
 3     document it's contained in the exhibit binder
 4     tab number 2, for the record, is a document
 5     that begins with Bates number MCOLLINS 1
 6     through 85.
 7               Mr. Collins, these are the tax
 8     returns that were turned over by your counsel
 9     in this case.
10          A.   Okay.
11          Q.   I would like to turn to page
12     MCollins 24.
13          A.   Okay.
14          Q.   The taxes and license statement
15     one.
16          A.   Yes.
17          Q.   Who did you hire to fill out the
18     Collins Home Delivery tax returns?
19          A.   Rick Poochie, he is a CPA.
20          Q.   How did you come to choose Rick?
21          A.   Some other contractors had used him
22     in the past.
23          Q.   And they recommended him to you?
24          A.   Yes.
25          Q.   Underneath the other deductions
```

Page 60

MICHAEL COLLINS

1
2      heading on this MCollins page 24, do you see
3      there was an administrative fee of $17,751?
4            A.   Yes.
5            Q.   Do you know what that fee is with
6      respect to?
7            A.   Yes, that's what HDL charged me for
8      administrative fee, they charge 3.8 percent
9      of my gross income.
10           Q.   And was the 3.8 percent
11     administrative fee consistent across the
12     entire time that Collins Home Delivery was
13     contracting with HDL?
14           A.   No.
15           Q.   When did HDL, to the best of your
16     recollection, again, institute this
17     administrative fee?
18           A.   2013.
19           Q.   Do you know why HDL started
20     charging the administrative fee?
21           A.   Well, from what I was told was the
22     owner wasn't happy because the contractors
23     were making more than him.  And I was never
24     given any notice or anything, I got my
25     paycheck one day and it was just taken out.

Page 61

MICHAEL COLLINS

1

2     And I never got a revised contract or

3     anything.

4         Q.    Did you ask anyone at HDL why the

5     change was being made on a going forward

6     basis?

7         A.    Yes.

8         Q.    And the response you received is

9     what you just testified to regarding the

10    owner?

11        A.    Yes.

12        Q.    Who specifically did you talk to at

13    HDL to get that?

14        A.    Bob the owner.

15        Q.    So you spoke to Bob Fleischer

16    personally?

17        A.    Yes.

18        Q.    How well do you know Bob Fleischer?

19        A.    Not well.  I only met him when he

20    was down here to start up Rochester.

21        Q.    So did you call Bob Fleischer to

22    speak with him about this administrative fee?

23        A.    Yes, I did.

24        Q.    And did -- he took your call and

25    how long did you speak with him for?

Veritext Legal Solutions
800-336-4000

MICHAEL COLLINS

1

2      A.   It wasn't long.  He pretty much

3   told me if I didn't like it I could go find

4   somewhere else to work.

5      Q.   And did you search around for other

6   opportunities at that time?

7      A.   No, at the moment I did not.  I

8   figured I will have to find a way to make it

9   work because I have a lot of employees who

10  were my friends and I wanted to keep them

11  employed, so I just kept going.

12     Q.   There's also a deduction for damage

13  claims.  It looks like it's $3,581, is that

14  correct?

15     A.   Yes.

16     Q.   Is that a write off of the damage

17  deductions that were taken by HDL?

18     A.   They could have been taken by HDL

19  or you may have paid for them personally, but

20  they were property damage that HDL decided I

21  should pay.

22     Q.   So there were times where you would

23  personally pay for damage claims and they

24  were not deducted from a settlement

25  statement?

Page 63

```
 1                 MICHAEL COLLINS
 2         A.    Correct, because they would charge
 3    me a fee if they paid them.
 4         Q.    So to avoid the fee you would
 5    negotiate directly with the customer to
 6    resolve the damage claim?
 7         A.    No, HDL would not allow me to
 8    negotiate with the customer.  They would
 9    negotiate and I pay the customer directly.
10         Q.    Did you ever try to negotiate
11    directly with the customer?
12         A.    No, we were not allowed to.
13         Q.    Who told you you were not allowed
14    to negotiate directly with the customer?
15         A.    Mike Rex.
16         Q.    Prior to Mike Rex did anyone tell
17    you you were not allowed to negotiate
18    directly?
19         A.    Yes, David Manes, Jim Lockner.
20         Q.    When would Dave and Jim have told
21    you that?
22         A.    Pretty much from the time HDL came,
23    came in because we did previously, but they
24    said people were being too confrontational
25    with the customers so they wouldn't allow us
```

Page 64

```
 1                   MICHAEL COLLINS
 2      to do that anymore.
 3           Q.   So it was during this period of
 4      time you could negotiate directly with the
 5      customer, is that 2011, 2012, what is the
 6      period of time?
 7           A.   I think some time 2012, I believe
 8      we stopped.
 9           Q.   And when you testified that there
10      were times you would pay a damage claim
11      personally, I'm assuming, did you mean you
12      would pay it through Collins Home Delivery
13      for the damage claim?
14           A.   Yes, I pay through my business
15      account, yes.
16           Q.   If you go further down there's
17      meals and entertainment deduction for $4,225;
18      is that correct?
19           A.   Yes.
20           Q.   What type of meal and entertainment
21      expenses was Collins Home Delivery incurring?
22           A.   I believe a good part of that was
23      when my guys were traveling I provided their
24      meals and I believe that -- what year was it?
25      I think I took about ten people to a Bills
```

Page 65

MICHAEL COLLINS

1
2      game and I included that in there.
3          Q.   Who were the ten individuals you
4      took to the Bills game?
5          A.   It was all my people that had
6      worked for me either previously or worked for
7      me currently.
8          Q.   And it was a goodwill gesture on
9      behalf of Collins Home Delivery?
10         A.   Yes.
11         Q.   Did Collins Home Delivery do any
12     type of advertising?
13         A.   No.
14         Q.   There's also a $2566 processing fee
15     deduction, do you see that?
16         A.   Yes.
17         Q.   What payroll processing company
18     were you using?
19         A.   Paychecks.
20         Q.   Why did you select Paychecks?
21         A.   They are a local company and they
22     were reliable.
23         Q.   At any point were you performing
24     the payroll processing on your own?
25         A.   No.

Page 66

MICHAEL COLLINS

1

2        Q.   You decided it was a better for

3    your business to use the payroll company?

4        A.   Yes, I wanted to make sure my taxes

5    were all in line.

6        Q.   The payment process fee there's a

7    small tool deduction, what was the small tool

8    deduction related to?

9        A.   Delivery equipment, dollies,

10   removing straps, small hand tools.

11       Q.   And that, again, was something an

12   expense that would come out of the Collins

13   Home Delivery account?

14       A.   Yes.

15       Q.   Did you personally pay for any of

16   the expenses associated with operating

17   Collins Home Delivery?

18       A.   No, never.

19       Q.   There's a telephone deduction

20   underneath the small tools, do you see that?

21       A.   Yes.

22       Q.   What would the telephone deduction

23   have related to?

24       A.   That would be cellphone, my

25   personal cellphone that I use mostly for

Page 67

```
 1                   MICHAEL COLLINS
 2      business and then I had to have another one
 3      because we had to update to deliveries
 4      Inerval line phone and I had to keep a spare
 5      one in case somebody didn't have a phone that
 6      day, I had to let them use that to update
 7      deliveries.
 8           Q.   There was a ap on the phone that
 9      Inerval required?
10           A.   Yes.
11           Q.   And the ap would be used to update
12      the status of deliveries?
13           A.   Yes.
14           Q.   And you had an extra one of those
15      phones in the event that a Collins Home
16      Delivery employee forgotten theirs that day
17      so you could give him one to use?
18           A.   Yes.
19           Q.   There's a $91,114 charge for truck
20      fuel, do you see that?
21           A.   Yes.
22           Q.   Did you give Collins Home Delivery
23      employees fuel cards to use?
24           A.   No.
25           Q.   Did you instruct and counsel
```

Veritext Legal Solutions
800-336-4000

MICHAEL COLLINS

1

2       delivery drivers to fill up the trucks?

3              A.    Yes.

4              Q.    Where did you tell them to go to

5       fill up the trucks?

6              A.    At the Quick Fill on Henrietta,

7       New York.

8              Q.    Why did you instruct them to go to

9       that Quick Fill?

10             A.    The lowest prices.

11             Q.    Did you arrange any type -- do you

12      know what the Quick Fill to get better

13      pricing?

14             A.    No.

15             Q.    So would the Collins Home Delivery

16      employees use their personal money to fill up

17      the truck and you pay them back?

18             A.    No, I kept debit card from my

19      company on file with Quick Fill.

20             Q.    Would you also use that Quick Fill

21      to fill up your personal vehicle?

22             A.    No.

23             Q.    And the card that you kept on file

24      with Quick Fill, were there any kick backs

25      that you got from using that card?

Veritext Legal Solutions
800-336-4000

```
 1                    MICHAEL COLLINS
 2           A.   No.
 3           Q.   It was purely a debit card
 4      transaction?
 5           A.   Yes.
 6           Q.   There's a Workers' Compensation
 7      deduction here for $851, do you see that?
 8           A.   Yes.
 9           Q.   Where did you obtain Workers'
10      Compensation?
11           A.   Through Erie Insurance.
12           Q.   Why did you select Erie Insurance
13      for the Workers' Compensation?
14           A.   Price.
15           Q.   Do you recall if that Workers'
16      Compensation policy covered you personally?
17           A.   At that time I believe it did, yes.
18           Q.   Was there a point in time in which
19      you had a Workers' Compensation policy for
20      your employees but not you?
21           A.   Yes.
22           Q.   When was that?
23           A.   2017 and '18.  In 2017.
24           Q.   Why did you make that change?
25           A.   Because my revenue had gone down
```

Page 70

```
 1                    MICHAEL COLLINS
 2         significantly and I couldn't afford to insure
 3         myself anymore.
 4              Q.    Did you change the existing policy
 5         with Erie to exclude you?
 6              A.    Yes.
 7              Q.    That was a cost saving measure?
 8              A.    Yes.
 9              Q.    Did Collins Delivery have any
10         assets when it shut down?
11              A.    No.
12              Q.    After Collins Home Delivery shut
13         down what was your next place of work?
14              A.    WB Mason.
15              Q.    What did you do at WB Mason?
16              A.    I'm a delivery driver.
17              Q.    Employee delivery driver?
18              A.    Yes.
19              Q.    How long have you worked for WB
20         Mason?
21              A.    Just over two years.
22              Q.    Did you terminate the contract with
23         HDL and go directly working for WB Mason?
24              A.    Yes.
25              Q.    Turn now to still on tab 2, I don't
```

Page 71

MICHAEL COLLINS

1

2     recall if we marked this as Exhibit 1.  If

3     not I would like to mark this as Exhibit 1.

4              MR. BUTCHER:  Let's go off the

5          record.

6              THE VIDEOGRAPHER:  We are now going

7          back on the record at approximately 3:49

8          p.m.

9              MR. BUTCHER:  We have been looking

10         at a document that's Bates stamped

11         MCollins 1 through MCollins 85.  I am

12         marking this as Exhibit 1 to the

13         deposition of Mike Collins.

14             (Exhibit 1, MCollins 1 through

15         MCollins 85, marked for identification,

16         as of this date.)

17         Q.   We are now looking at page 61 of

18    this exhibit.

19         A.   Okay.

20         Q.   Listings for deductions from

21    Collins Home Delivery on tax returns; is that

22    correct, Mr. Collins?

23         A.   Yes.

24         Q.   There was an auto expense or $2295,

25    do you see that?

Veritext Legal Solutions
800-336-4000

```
 1                  MICHAEL COLLINS
 2          A.   Yes.
 3          Q.   Do you recall what that auto
 4     expense would have been for?
 5          A.   I believe it was I rented cars to
 6     guys, the guys back and forth to Virginia.
 7          Q.   When you say you rented a car to
 8     drive back and forth to Virginia, how often
 9     were you driving back and forth to Virginia?
10          A.   I think I spent a total of six
11     weeks there.  Every two weeks I would change
12     crews.
13          Q.   So they -- that transport was in
14     relation to time you were personally
15     providing the services in Virginia?
16          A.   Myself I went for two weeks and
17     then I had another crew go for two weeks and
18     then I went back for two more weeks.
19          Q.   It's more economical to rent a
20     vehicle to get down to Virginia from
21     Rochester than flying?
22          A.   Yes.
23          Q.   There's also an expense toward the
24     bottom for office.  It's $4,817, do you see
25     that?
```

Veritext Legal Solutions
800-336-4000

MICHAEL COLLINS

1

2      A.    Yes.

3      Q.    Were you renting office space?

4      A.    I was using, I had a dedicated

5  office in my home, so I was writing that off

6  as part of my expenses.

7      Q.    Let me turn now to tab 3 of the

8  exhibit binder, it's a Bates numbered

9  document MCollins 86 to 87, by Plaintiff's

10  Counsel on the case, I would like to mark

11  this as Exhibit 2.

12          (Exhibit 2, documents, marked for

13      identification, as of this date.)

14      Q.    Mr. Collins, you testified, I

15  believe, earlier you turned over

16  approximately two to three years worth of

17  these payroll records?

18      A.    Yes.

19      Q.    Do you also maintain underlying

20  documentation for the tax return information

21  for Collins Home Delivery Inc.?

22      A.    Sorry, I don't understand.

23      Q.    Was the underlying documentation

24  for the Collins Home Delivery tax returns

25  that you maintained as well?

Veritext Legal Solutions
800-336-4000

MICHAEL COLLINS

1

2      A.   Yes.

3      Q.   And you still maintain that

4  information?

5      A.   Yes.  But I don't personally, my

6  accountant has it all.

7      Q.   All right.  We will now turn to tab

8  5 of the exhibit notebook.  It's a single

9  page Excel spreadsheet that I will represent,

10  for the record, is a printout of an

11  electronic document produced in this case as

12  HDL underscore K002020.  And mark this as

13  Exhibit 3.  Top of the spreadsheet says

14  Homedeliverylink Delivery Settlement

15  Statement?

16           (Exhibit 3, spreadsheet, marked for

17        identification, as of this date.)

18      A.   Yes.

19      Q.   This appears to be a delivery copy

20  of a delivery settlement statement that you

21  would have received, Mr. Collins?

22      A.   Yes.

23      Q.   And would you receive these

24  delivery statements electronically?

25      A.   No.

Page 75

MICHAEL COLLINS

1

2          Q.    How did you receive the delivery

3     settlement statements?

4          A.    They were printed out.

5          Q.    And handed to you or mailed to you?

6          A.    Handed to me.

7          Q.    And were there a separate delivery

8     settlement statements for each truck in

9     operation for that given week?

10         A.    It was broken down by each driver.

11         Q.    So if you had eight drivers working

12    in a given week you would receive eight

13    delivery settlement statements?

14         A.    Yes.

15         Q.    Was there also a cover page to

16    these delivery settlement statements that

17    showed the gross amount of revenue for the

18    week?

19         A.    No.

20         Q.    It would just be in the example I'm

21    giving eight separate delivery statements?

22         A.    Yes.

23         Q.    The settlement statement it says

24    it's for the week ending January 17, 2015,

25    correct?

Page 76

MICHAEL COLLINS

1

2      A.    Yes.

3      Q.    And you're listed as a delivery

4   driver on the settlement statement?

5      A.    Yes.

6      Q.    I believe you testified earlier you

7   don't know who was who put your name on the

8   settlement statement?

9      A.    Who input it on the settlement

10   statement?  Well, it would have been tied to

11   my manifest, but I don't know who generates

12   the settlement statement, no.

13      Q.    Did you compare routinely the

14   settlement statements you received to the

15   manifest to insure that the names matched?

16      A.    I would keep a running list of what

17   everybody did each week and I compare it to

18   that.

19      Q.    Where would you maintain that

20   running list?

21      A.    I would have my own Excel

22   spreadsheet I made.

23      Q.    Do you still have that spreadsheet?

24      A.    No.

25      Q.    Do you recall when you would have

Page 77

                        MICHAEL COLLINS

1
2    discard that spreadsheet?
3         A.   No.   Probably when I got my new
4    laptop.   I think it was on my old laptop a
5    year ago.
6         Q.   So based on this delivery
7    settlement statement it's marked as Exhibit
8    3, how many days during this week of January
9    17 were you a driver?
10        A.   Just one, but I was in Buffalo that
11   day, so I would have had a separate sheet for
12   when I worked in Rochester.
13        Q.   So the separate sheets were given
14   depending on the location?
15        A.   Yes.
16        Q.   So during this week of January 17,
17   assuming you worked in Rochester as well you
18   would have received two settlement
19   statements?
20        A.   Yes.
21        Q.   Let's turn now to paragraph 7 of
22   the exhibit binder.   I will represent, for
23   the record, is a printout of an electronic
24   file produced at HDL underscore K 00281.   We
25   will mark this as Exhibit 4.

                                        Page 78

```
 1                    MICHAEL COLLINS
 2              (Exhibit 4, printout, marked for
 3           identification, as of this date.)
 4         Q.   Mr. Collins, does this appear to be
 5    a copy of a delivery settlement statement of
 6    work you performed at Buffalo in May week
 7    ending May 28, 2016?
 8         A.   Yes.
 9         Q.   This indicates you worked one day
10    that week in Buffalo; is that correct?
11         A.   Yes.
12         Q.   Underneath the delivery heading in
13    row 6 there is a completed stop count row, do
14    you see that?
15         A.   Okay.   Yes.
16         Q.   And how many completed stop counts
17    are recorded in that row?
18         A.   Completed stops, one -- or 15,
19    sorry.
20         Q.   Are you looking at what is the date
21    on top of the week ending in this delivery
22    statement you are looking at?
23         A.   12/17.
24         Q.   I'm currently referring to --
25              MR. BUTCHER:   Can we go off the
```

Veritext Legal Solutions
800-336-4000

```
 1                    MICHAEL COLLINS
 2          record for a second.
 3                    THE VIDEOGRAPHER:  Going off the
 4          record at 4:00 p.m.
 5                    (Whereupon, an off-the-record
 6          discussion was held.)
 7                    THE VIDEOGRAPHER:  Back on the
 8          record now at 4:01 p.m.  Go ahead,
 9          Counsel.
10          Q.    Prior to the break, Mr. Collins,
11     you testified that you -- there were 15
12     completed stops on this delivery settlement
13     statement that's Exhibit 4; is that correct?
14          A.    Yes.
15          Q.    Does that mean you made 15
16     completed stops on that day?
17          A.    Yes.
18          Q.    Were there times that a delivery
19     settlement statement would show more
20     completed stops than you actually made?
21          A.    No.
22          Q.    HDL would never include more
23     completed stops as a way to increase payment?
24          A.    No, they would put as carrier
25     specials or something, but they would never
```

Page 80

```
 1                MICHAEL COLLINS
 2      increase the carrier stops, no.
 3           Q.   If we go now to row 11 it has the
 4      mileage for deliveries on December 14.
 5           A.   Yes.
 6           Q.   Would you report that mileage
 7      number to Inerval?
 8           A.   On the manifest I would have to
 9      write my beginning and ending mileage and
10      they would go off of that.
11           Q.   And was that a beginning and ending
12      mileage based on the odometer mileage?
13           A.   Yes.
14           Q.   It would indicate you made 15 stops
15      within 51 miles?
16           A.   Yes.
17           Q.   What would make a manifest an
18      attractive one, would this be an attractive
19      manifest to make?
20           A.   Yes.
21           Q.   Is that because it's quite a few
22      stops in a small area?
23           A.   Yes.
24           Q.   You also testified that you would
25      rarely go to Buffalo, instead you would send
```

Page 81

MICHAEL COLLINS

1

2       someone from your company there to perform

3       work; is that right?

4            A.   Yes.

5            Q.   Would you have taken this

6       opportunity to deliver in Buffalo because of

7       the attractiveness of this manifest?

8            A.   No, I would have done it because

9       nobody else wanted to go.  I wouldn't even

10      know the manifest until I got to Buffalo.

11           Q.   How would you be notified that a

12      manifest was available in Buffalo to take?

13           A.   Probably some point the day before

14      they would call me to ask me if I had anybody

15      available because they didn't have enough

16      people.

17           Q.   Would the person that called you be

18      the Buffalo general manager?

19           A.   No, it would usually be the

20      Rochester.

21           Q.   You said usually, was it times it

22      was the Buffalo general manager?

23           A.   Maybe, but not often.  It was

24      almost always Rochester.

25           Q.   And how frequently would you turn

Page 82

MICHAEL COLLINS

1

2      down the offers to have a manifest for the

3      next day in Buffalo?

4            A.   I would probably, probably accept

5      80, 85 of percent of them.

6            Q.   And the 15 to 20 percent you would

7      not accept, what were the reasons for?

8            A.   I couldn't get anybody to go.

9            Q.   Was it ever an economic decision

10     that there wasn't enough money being offered

11     to take a manifest?

12           A.   No.

13           Q.   So the only reason in that 15 to 20

14     percent of the time that you declined the

15     offer is because you didn't have enough

16     employees to send somebody there?

17           A.   Correct.

18           Q.   Who was the general manager at the

19     Buffalo facility?

20           A.   It was Luke Windale for a while.  I

21     don't really remember.  They went through a

22     lot of them there.  Scott, I can't think of

23     his last name, was one.  Those are the only

24     two I recall.

25           Q.   Would you attend the morning

Page 83

```
 1                    MICHAEL COLLINS
 2      meetings in Buffalo on days you provided
 3      delivery services there?
 4           A.   Yes.
 5           Q.   And who from Inerval would lead the
 6      morning meetings in the Buffalo location?
 7           A.   The general manager who was working
 8      that day if not the assistant.
 9           Q.   Would that be the assistant
10      manager, general manager of HDL?
11           A.   Yes.
12           Q.   Were there times an Inerval
13      employee would be leading those meetings at
14      Buffalo?
15           A.   They might chime in, but they
16      wouldn't be leading them, no.
17           Q.   Any difference in how the morning
18      meetings were run in Buffalo versus
19      Rochester?
20           A.   They were pretty much the same,
21      load your truck and have your meeting.  It
22      would be about.
23           Q.   Same topics covered between Buffalo
24      and Rochester in those morning meetings?
25           A.   Yes.
```

Page 84

MICHAEL COLLINS

1

2      Q.    Would you ever have meetings with

3   your own team at the Rochester location prior

4   to the morning meeting?

5      A.    No, it might have once or twice but

6   in general, no.  If I had to address

7   something, I do it individually.

8      Q.    But there were times you would

9   address the Collins Home Delivery group

10  collectively?

11     A.    Yes.

12     Q.    Do you recall a situation arose in

13  which that collective discussion occurred?

14     A.    Usually overall damage claims done

15  a lot recently we have to slow down or we

16  won't have jobs.  That was probably really

17  the only reason I would do it.

18     Q.    Going back to Exhibit 4 labeled

19  fuel, it shows Collins Home Delivery paid

20  $14.27 in fuel for the work performed on

21  December 17; is that right?

22     A.    Yes.

23     Q.    Do you know how that fuel number is

24  calculated?

25     A.    It was -- it was so much per mile

Veritext Legal Solutions
800-336-4000

MICHAEL COLLINS

1
2     based on the fuel price at the time.
3           Q.   If you go to the row 14 now,
4     there's a payment for completed stops; is
5     that right?
6           A.   Yes.
7           Q.   Accounts on delivery $457.17 for
8     those 15 stops, correct?
9           A.   Yes.
10          Q.   Was there a set first per stop
11    delivery that HDL would pay?
12          A.   Yes.
13          Q.   Did that amount increase at any
14    point while you were contracting with HDL?
15          A.   It did.
16          Q.   Did you ever negotiate a higher
17    rate per delivery with HDL?
18          A.   No.
19          Q.   Did you ever try and negotiate a
20    higher per delivery rate with HDL?
21          A.   Yes.
22          Q.   Who did you try and negotiate that
23    with?
24          A.   With Mike Rex.
25          Q.   And how many times did you try to

Page 86

MICHAEL COLLINS

1

2    negotiate with Mike Rex to get a higher per

3    stop rate?

4         A.   Probably a couple of times a year.

5    He would take it to corporate and they say no

6    and that would be it.

7         Q.   Would Mike Rex provide additional

8    compensation through other mechanisms?

9         A.   I personally was compensated higher

10   than other contractors.  And corporate

11   approved that and paid me a little extra.

12        Q.   And would that additional -- strike

13   that.

14             Collins Home Delivery was paid a

15   higher per stop delivery rate than other

16   contractors?

17        A.   No, I was paid an additional flat

18   rate per week extra.

19        Q.   Why were you paid the additional

20   amount per week?

21        A.   Because they couldn't get any other

22   contractors and I couldn't afford to do it

23   for what they were paying.

24        Q.   Where on the settlement statement

25   would that additional flat amount appear?

Page 87

```
1                    MICHAEL COLLINS
2            A.   It would show HDL specials.
3            Q.   So we are referring to this Exhibit
4       4, is that line 30, HDL specials?
5            A.   Yes.
6            Q.   So that $358 was the additional
7       flat amount that you would have received?
8            A.    That would have been extra they
9       paid me to go to Buffalo that day, they must
10      have been in a big bind because they would
11      not have normally gave me that much money.
12            Q.   So there was an incentive payment
13      offered to Collins Home Delivery in order to
14      take the Buffalo delivery on this day?
15            A.   Yes.
16            Q.   And would the entire $453 amount
17      under the HDL special been attributable to
18      this, that additional amount to get you to
19      come to Buffalo?
20            A.   Yes.
21            Q.   Do you recall what the additional
22      flat weekly amount was that Collins Home
23      Delivery was being paid?
24            A.    It was 160 a week.
25            Q.    Who did you negotiate with in order
```

Page 88

MICHAEL COLLINS

1

2      to get that 160 per week amount?

3          A.   I went through Mike Rex who had to

4      go to our corporate people.

5          Q.   Do you recall when that additional

6      $160 flat amount when HDL had given it to

7      you?

8          A.   Maybe 15, 16, 16.

9          Q.   Did that continue through the end

10     of the relationship with HDL?

11         A.   For the most part.  A couple of

12     times they stopped it and they would give me

13     no warning and I would tell them, well, then

14     I'm not going to deliver your stuff anymore

15     and they would put it right back.

16         Q.   If you look at 16 do you know what

17     that row is reflecting?

18         A.   $20?

19         Q.   Yes.

20         A.   That would be the extra they paid

21     you to go back if someone wasn't home for

22     delivery.

23         Q.   So you would -- if someone wasn't

24     home, if they weren't there you leave and you

25     get more money to go back?

Page 89

```
 1                    MICHAEL COLLINS
 2          A.   Yes.
 3          Q.   Was that an incentive from HDL to
 4     entice you to go back and make the delivery?
 5          A.   I'm pretty sure that was part of
 6     our contract.
 7          Q.   To the best of your recollection,
 8     there was $20 is paid and you need to go back
 9     and make the --
10          A.   Yes, it was kind of up to the
11     driver if they want to join up if they did
12     they would get the $20.  If they didn't they
13     wouldn't get paid anything.  You wouldn't get
14     paid if a customer wasn't home and you didn't
15     do any delivery.
16          Q.   So the option to either not make
17     the delivery that day and not get paid for it
18     or return to the customers home and get the
19     additional $20 but the stop fee?
20          A.   Correct.
21          Q.   Did you personally have any policy
22     with your Collins Home Delivery drivers that
23     they need to do, try a second delivery if
24     called upon?
25          A.   They knew I preferred if they did.
```

Page 90

MICHAEL COLLINS

1

2     But if they had done all of the requirements

3     that Inerval had and the customer wasn't home

4     the first time, it was kind of up to them,

5     but if they told me no too many times they

6     might not get a very good manifest for a

7     couple of days.

8          Q.   Meaning you would give them the

9     least desirable manifest?

10         A.   Yes, when I was picking it, yes.

11         Q.   You mentioned Inerval requirements.

12    What Inerval requirements were you referring

13    to?

14         A.   If the customer wasn't home we had

15    to call the customer service and then they

16    had to attempt to contact the customer while

17    we stayed there.  And if they couldn't get

18    ahold of the customer then they would give us

19    an authorization code to leave and then we

20    would have to take pictures of the home on

21    the ap to prove we had been at the right

22    location.

23         Q.   Do you recall the names of any

24    individuals at Inerval that you would have

25    spoken to?

Page 91

1                    MICHAEL COLLINS

2          A.    No, it was all some foreign call

3     center.   It was always somebody different.

4          Q.    Are you familiar with a gentleman

5     named Greg Smigelsky?

6          A.    I met Greg, yes.

7          Q.    Who is Greg Smigelsky?

8          A.    He is a corporate person for HDL.

9          Q.    And is Mr. Smigelsky somebody you

10    would have negotiated with over rates at any

11    point?

12         A.    Not directly, no.

13         Q.    For the record, S-M-I-G-E-L-S-K-Y.

14               Referring back down to Exhibit 4 it

15    shows the total for deliveries that day it

16    was $849.77; is that correct?

17         A.    Yes.

18         Q.    The amount that you received this

19    week December 17, 2017 would have been the

20    $400 flat salary though along with any draw

21    that you took, correct?

22         A.    Yes.

23         Q.    You personally did not take the

24    $849.77?

25         A.    No.

Page 92

MICHAEL COLLINS

1

2      Q.   That was a double negative.  Let me

3   rephrase that.  Did you personally receive

4   the $849.77?

5      A.   No.

6      Q.   You may have testified to this

7   earlier, but I need to clarify.  Collins Home

8   Delivery had no other revenue source other

9   than Homedeliverylink?

10      A.   Correct.

11      Q.   When you would hire helpers or

12   drivers did you have them fill any paperwork

13   out?

14      A.   Well, they would have to fill out a

15   packet for HDL and I went with that because

16   they would do the background checks and the

17   drug testing and all of that.

18      Q.   Any other information?

19      A.   No, W-9 or whatever the tax form is

20   they have to fill out for the payroll taxes.

21      Q.   And all of the Collins Home

22   Delivery helpers and drivers were paid as

23   paid employees of Collins?

24      A.   Yes.

25      Q.   Why did you decide to pay them as

Veritext Legal Solutions
800-336-4000

MICHAEL COLLINS

1

2    employees as opposed to contractors?

3        A.   Because I didn't think it was fair

4    to pay them as contractors because their

5    taxes by the time they were done they would

6    be making no money.

7        Q.   We talked earlier about Kical

8    Enterprises, were you the sole owner of

9    Kical?

10        A.   Yes.

11        Q.   Did Kical have any revenue source

12    other than deliveries for 3PD?

13        A.   No.

14        Q.   Turning to the first tab of the

15    exhibit binder.  For the record, this is a

16    document Bates numbered HDL underscore K99

17    through 107.

18        MR. BUTCHER:  We will mark this as

19        Exhibit 5.  The top of the document it

20        says Independent Contractor Agreement.

21        (Exhibit 5, Independent Contractor

22        Agreement, marked for identification, as

23        of this date.)

24        Q.   Mr. Collins, have you seen this

25    independent contractor agreement before?

Page 94

```
 1                 MICHAEL COLLINS
 2        A.   Yes.
 3        Q.   Do you recall how many independent
 4   contractor agreements like this you entered
 5   into with HDL?
 6        A.   I believe I only signed the first
 7   one.  The other ones they put changes in and
 8   I didn't agree with the changes so I wouldn't
 9   sign them, but they just went with the new
10   agreement anyway and paid me what the new
11   agreement said.
12        Q.   Do you recall what changes were
13   made in the other versions of this contract
14   that you disagreed with?
15        A.   Well, one was the administration
16   fee.  Another was the original rate of pay
17   when they both came with significantly higher
18   and about three months later they realized it
19   was too high for them to afford and they came
20   in and slashed that way back.
21        Q.   You have different versions you
22   didn't sign, but you continued to provide
23   services for HDL nonetheless?
24        A.   Yes.
25        Q.   With this contract would you have
```

MICHAEL COLLINS

1

2     read it before signing it?

3          A.    Yes.

4          Q.    Moving onto the second page Bates

5     marked HDL underscore K 100 section 6,

6     expenses.  Do you see that?

7          A.    Yes.

8          Q.    Was it your understanding when

9     entering this contract that Collins Home

10    Delivery was responsible for providing its

11    own vehicles?

12         A.    Yes.

13         Q.    And it was your understanding that

14    Collins Home Delivery was responsible for the

15    payment of those vehicle expenses?

16         A.    Yes.

17         Q.    Were there any specific permits you

18    had to obtain in order to operate Collins

19    Home Delivery?

20         A.    No, I just had to maintain my DOT

21    number and MC number.

22         Q.    Was there any cost associated with

23    maintaining those?

24         A.    The DOT has an annual fee based on

25    the number of trucks.

```
 1                    MICHAEL COLLINS
 2            Q.    And did Collins Home Delivery pay
 3       for those fees?
 4            A.    Yes.
 5            Q.    It was your understanding when
 6       entering the contract Collins Home Delivery
 7       would be paying for those fees?
 8            A.    Yes.
 9            Q.    We referred earlier to occasions
10       which you had meeting with Collins Home
11       Delivery workers as a group.  Would you have
12       those meetings in an HDL office at the
13       Rochester warehouse?
14            A.    Probably just right out in the
15       warehouse.
16            Q.    Do you recall using the HDL office
17       at the Rochester warehouse to get that
18       meeting with Collins Home Delivery workers?
19            A.    No.
20            Q.    At the start of the dep you
21       mentioned, you testified, I should say, that
22       this was the second deposition you had sat
23       for; is that correct?
24            A.    Yes.
25            Q.    Was the first deposition you sat
```

Page 97

```
 1                    MICHAEL COLLINS
 2       for in relation to a 2015 lawsuit in Monroe
 3       County?
 4            A.    Yes.
 5            Q.    And was Sears also a defendant in
 6       that lawsuit?
 7            A.    Yes.
 8            Q.    Was HDL also a defendant in that
 9       lawsuit?
10            A.    I believe so, yes.
11            Q.    And what was Collins Home Delivery
12       being sued for?
13            A.    Allegedly my employee had hooked up
14       to a customers water line to the refrigerator
15       incorrectly and if had leaked and done over a
16       hundred thousand dollars worth of damage to
17       the home.
18            Q.    Did you recall why Sears was being
19       sued as part of that lawsuit?
20            A.    They are the one who sold the
21       merchandise.
22            Q.    Do you recall why if -- what HDL
23       was being sued for in that lawsuit?
24            A.    I'm sorry, why HDL was being sued?
25            Q.    Correct, as part of that lawsuit.
```

Page 98

```
 1                    MICHAEL COLLINS
 2          A.   Because they are the ones who
 3     contracted me.
 4          Q.   Did Collins Home Delivery
 5     ultimately have to pay any money as part of
 6     that lawsuit?
 7          A.   No.
 8          Q.   Did the case go to trial?
 9          A.   Yes.
10          Q.   Did a jury trial?
11          A.   Yes.
12          Q.   And the jury found in favor of the
13     defendants in the case?
14          A.   Yes.
15          Q.   To the best of your knowledge,
16     Sears was not held liable?
17          A.   Correct.
18          Q.   And HDL was not held liable either?
19          A.   Correct.
20          Q.   Who was your attorney in that
21     lawsuit?
22          A.   I don't remember.  My insurance
23     company provided the attorney.
24          Q.   Was that Erie Insurance that
25     provided the attorney?
```

Page 99

```
 1                    MICHAEL COLLINS
 2          A.   Yes.
 3          Q.   Was the plaintiff in that case
 4     Heidi Maus, M-A-U-S?
 5          A.   Yes.
 6          Q.   Do you recall ever having a tax
 7     warrant placed on Collins Home Delivery?
 8          A.   No.
 9               MR. BUTCHER:  Let's go off the
10          record.
11               THE VIDEOGRAPHER:  Going off the
12          record it's 4:28 p.m.
13               (Whereupon, a short recess was
14          taken.)
15               THE VIDEOGRAPHER:  We are now going
16          back on the record at 4:38 p.m.  This is
17          the beginning of media 7.
18          Q.   Mr. Collins, while Collins Home
19     Delivery was contracting with HDL did you
20     have vacation time that you had set aside for
21     yourself?
22          A.   Yes.
23          Q.   How often would you take time off
24     while contracting, while Collins Home
25     Delivery was contracting with HDL?
```

Page 100

MICHAEL COLLINS

1
2       A.   I would take about three weeks a
3  year off.  But not completely off.  I would
4  still have to answer phones, but I wouldn't
5  go do delivery for that time.
6       Q.   You said answer calls, calls from
7  Collins Home Delivery drivers that weren't
8  around if they had questions?
9       A.   Yes, more from HDL general manager
10 of the nightly assignments or if he had a
11 major issue, you know.
12      Q.   When you say the night manager, you
13 mean when they would call about the manifest
14 for the next day?
15      A.   Correct.
16      Q.   When you were in New York making
17 deliveries were those deliveries always
18 within the State of New York?
19      A.   No, we crossed into Pennsylvania.
20      Q.   How often would you cross into
21 Pennsylvania?
22      A.   Pretty much every Tuesday.
23      Q.   Why every Tuesday did you head into
24 Pennsylvania?
25      A.   They would want to have enough

Page 101

MICHAEL COLLINS

```
 1
 2    deliveries to make it worth going down there
 3    so they concentrate them in one day.
 4         Q.   "They" meaning Inerval would
 5    consolidate them for Tuesdays?
 6         A.   Yes.
 7         Q.   Other than every Tuesday deliveries
 8    to Pennsylvania, were there other days in
 9    which you would deliver outside of New York?
10         A.   No.
11         Q.   I'm sorry, did you say that was
12    every Tuesday or every other Tuesday,
13    Pennsylvania deliveries?
14         A.   Every Tuesday.
15         Q.   Was there additional compensation
16    associated with the Pennsylvania deliveries?
17         A.   Yes, those days the truck would get
18    paid a flat rate for the days for the
19    delivery because you couldn't do many
20    deliveries.
21         Q.   And were you always given the
22    opportunity first to take those Pennsylvania
23    deliveries?
24         A.   Usually I would take them because
25    most of my guys wanted nothing to do with it.
```

Page 102

```
 1              MICHAEL COLLINS
 2       Q.    HDL would offer those, the
 3    Pennsylvania deliveries through Collins Home
 4    Delivery not another contractor?
 5       A.    No, not always, no.
 6       Q.    Why would Collins Home Delivery
 7    receive the option to take the Pennsylvania
 8    manifest certain weeks but not others?
 9       A.    Usually it wasn't an option.
10    Nobody really wanted to do it, it was like a
11    --
12       Q.    You would take the Pennsylvania
13    delivery along with the extra compensation?
14       A.    Yes.  It wasn't really extra you
15    got paid for 15 deliveries and you would be
16    out a long time because you were driving far.
17       Q.    But that was a higher rate than you
18    would receive for the New York deliveries?
19       A.    No, when you broke it down what the
20    truck got paid for the day it was no higher,
21    no.
22       Q.    Is that how you would view the
23    payment, payment the truck would make for the
24    day?
25       A.    That's how I would kind of try to
```

Page 103

```
1                    MICHAEL COLLINS
2        judge things.
3             Q.   Was there any Collins Home Delivery
4        employee that you would have as a helper any
5        time you were the driver?
6             A.   No, I would really rotate around
7        compare, I would take whoever was left, I
8        tried to keep my other teams, set teams and
9        if somebody was off or something I would take
10       the other guy.
11            Q.   Why did you take that approach?
12            A.   Because I wanted my other teams to
13       be comfortable and they were much happier if
14       they worked with the same guy all the time.
15            Q.   Did the Collins Home Delivery
16       trucks that you would rent have any signage
17       on them?
18            A.   I just require operated by Collins
19       Home Delivery and the DOT numbers.
20            Q.   Truck did not have home delivery
21       links signage anywhere on them?
22            A.   No.
23            Q.   Trucks did not have an Inerval
24       signage on them?
25            A.   No.
```

Page 104

```
 1                   MICHAEL COLLINS
 2            MR. BUTCHER:  I have nothing
 3         further.
 4            MR. WEBER:  I have a couple of
 5         questions, sorry.
 6    EXAMINATION BY
 7    MR. WEBER:
 8         Q.   Mr. Collins, you testified earlier
 9    about payments that you received for the
10    deliveries and that you paid yourself $400 a
11    week; is that right?
12         A.   Yes.
13         Q.   And you also paid yourself, what,
14    this so-called profits that were left over
15    that the company had left over?
16         A.   Yes.
17         Q.   And those profits that you are
18    talking about once you had paid for helpers,
19    fuel, trucks, the damage claims, insurance
20    any other deductions, that came out of the
21    check, was the money that was left over was
22    that the profits?
23         A.   Yes.
24         Q.   And you then, you know, you would
25    then pay yourself what was left over; is that
```

Page 105

```
 1                    MICHAEL COLLINS
 2        accurate?
 3             A.    Yes.
 4             Q.    Okay.  And you also testified that
 5        you paid yourself $400 a week, were there any
 6        weeks where the amount you had left over
 7        after you had paid for expenses and helpers
 8        and stuff like that, the amount left over was
 9        less than $400?
10             A.    Yes.
11             Q.    And what happened then to your --
12        the amount you were paying yourself?
13             A.    I, I wouldn't give myself any
14        payroll because there would probably only be
15        a hundred extra dollars and I would take it
16        from the business.
17             Q.    So your -- the pay would be less
18        than $400 if you paid everyone else and you
19        didn't have that much left over?
20             A.    Yes.
21             Q.    And how often did that happen?
22             A.    For the first seven years, never.
23        But the last couple of years probably be, I
24        don't know, four, five times a year for the
25        week.
```

Page 106

1                    MICHAEL COLLINS

2              MR. WEBER:  That's all I have.

3              MR. BUTCHER:  Nothing further.

4              THE VIDEOGRAPHER:  Going off the

5         record now at 4:46 p.m.

6              (Time noted:  4:46 p.m.)

7

8                    _____

9                    MICHAEL COLLINS

10

11    Subscribed and sworn to before me

12    this ___ day of _____, 2021.

13

14    _____

15

16

17

18

19

20

21

22

23

24

25

                                   Page 107

```
 1                    MICHAEL COLLINS
 2                 C E R T I F I C A T E
 3        STATE OF NEW YORK      )
 4                               : ss.
 5        COUNTY OF KINGS        )
 6
 7             I, DIANE BUCHANAN, a Notary Public
 8        within and for the State of New York, do
 9        hereby certify:
10             That MICHAEL COLLINS, the witness
11        whose deposition is hereinbefore set
12        forth, was duly sworn by me and that
13        such deposition is a true record of the
14        testimony given by the witness.
15             I further certify that I am not
16        related to any of the parties to this
17        action by blood or marriage, and that I
18        am in no way interested in the outcome
19        of this matter.
20             IN WITNESS WHEREOF, I have hereunto
21        set my hand this 13th day of May, 2021.
22
23                    Diane Buchanan
24              DIANE BUCHANAN
25
```

Page 108

```
 1                  MICHAEL COLLINS
 2        --------------- I N D E X --------------------
 3        WITNESS            EXAMINATION BY          PAGE
 4        MICHAEL COLLINS  MR. BUTCHER               4
 5                         MR. WEBER                 105
 6
 7        --------- INFORMATION REQUESTS ---------------
 8        DIRECTIONS:  None
 9        RULINGS:  None
10        TO BE FURNISHED:  None
11        REQUESTS:  None
12        MOTIONS:  None
13
14        --------------- EXHIBITS --------------------
15                                FOR ID.
16        Exhibit 1        Mcollins 1-85          72
17        Exhibit 2        Documents              74
18        Exhibit 3        Spreadsheet            75
19        Exhibit 4        Printout               79
20        Exhibit 5        Agreement              94
21
22
23
24
25
```

Page 109

```
 1   Kloppel, Mike, Et Al. v. Homedeliverylink, Inc.

 2   Michael Collins Job No. 4539862

 3                    E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____       _____

24   Michael Collins                              Date

25
```

Page 110

```
1    Kloppel, Mike, Et Al. v. Homedeliverylink, Inc.

2    Michael Collins 4539862

3               ACKNOWLEDGEMENT OF DEPONENT

4       I, Michael Collins, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____   _____

12   Michael Collins                         Date

13   *If notary is required

14                       SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                       _____ DAY OF _____, 20____.

16

17

18                       _____

19                       NOTARY PUBLIC

20

21

22

23

24

25

                                         Page 111
```

**[& - additional]**

| & | 2 | 358 88:6 | 74 109:17 |
|---|---|---|---|

**&** 2:3,8 3:16

**0**

**00281** 78:24
**02114** 2:5
**06296** 1:6 4:11

**1**

**1** 3:16 60:5 72:2,3
 72:11,12,14,14
 109:16
**1-85** 109:16
**100** 2:4 14:13,13
 47:25 96:5
**105** 109:5
**107** 94:17
**11** 81:3
**11462** 5:11
**12** 54:9
**12/17** 79:23
**13th** 108:21
**14** 81:4 86:3
**14.27** 85:20
**14262** 14:14
**14612** 13:7
**15** 17:18 39:22,23
 40:3,4,6 58:22
 79:18 80:11,15
 81:14 83:6,13
 86:8 89:8 103:15
**16** 58:8 89:8,8,16
**160** 88:24 89:2,6
**163** 13:6
**17** 76:24 78:9,16
 85:21 92:19
**17,751** 61:3
**175** 52:20
**18** 70:23

**2** 60:4 71:25 74:11
 74:12 109:17
**20** 83:6,13 89:18
 90:8,12,19 111:15
**200** 52:19
**2004** 9:23
**2011** 9:11 15:13
 55:11,12,25 58:8
 58:15 65:5
**2012** 65:5,7
**2013** 61:18
**2015** 55:11,12,25
 56:9 76:24 98:2
**2016** 17:18 79:7
**2017** 70:23,23
 92:19
**2018** 57:14,16,18
 57:24 58:10
**2019** 11:25 24:8
 57:11 58:15
**2021** 1:11 107:12
 108:21
**21** 1:11
**2295** 72:24
**24** 60:12 61:2
**2566** 66:14
**28** 79:7
**2:03** 4:3
**2:05** 1:12

**3**

**3** 74:7 75:13,16
 78:8 109:18
**3,581** 63:13
**3.8** 61:8,10
**30** 2:9 3:15 88:4
**300** 50:14
**30d** 52:25
**314** 5:10

**358** 88:6
**3:14** 59:4
**3:28** 59:20
**3:32** 59:24
**3pd** 9:19 10:13,15
 10:17 94:12

**4**

**4** 78:25 79:2 80:13
 85:18 88:4 92:14
 109:4,19
**4,225** 65:17
**4,817** 73:24
**400** 44:24 58:13,19
 92:20 105:10
 106:5,9,18
**453** 88:16
**4539862** 110:2
 111:2
**457.17** 86:7
**4:00** 80:4
**4:01** 80:8
**4:28** 100:12
**4:38** 100:16
**4:46** 107:5,6

**5**

**5** 75:8 94:19,21
 109:20
**51** 81:15
**5502** 108:23

**6**

**6** 79:13 96:5
**600** 52:15,21 53:3
**60603** 2:9
**61** 72:17
**6:17** 1:6 4:11

**7**

**7** 78:21 100:17
**72** 109:16

**74** 109:17
**75** 109:18
**79** 109:19

**8**

**8.50** 31:10
**80** 83:5
**84** 56:19
**849.77** 92:16,24
 93:4
**85** 60:6 72:11,15
 83:5
**851** 70:7
**86** 74:9
**87** 74:9

**9**

**9** 93:19
**91,114** 68:19
**94** 109:20
**98** 47:10

**a**

**able** 16:2 17:25
 33:20 43:15
**abutcher** 2:10
**accept** 83:4,7
**accident** 33:19,21
**accord** 28:20
**account** 40:23
 54:15,17,18 65:15
 67:13
**accountant** 75:6
**accounts** 86:7
**accurate** 106:2
**acknowledgement**
 111:3
**action** 108:17
**add** 23:11
**added** 23:5
**adding** 23:9 36:20
**additional** 50:7,11
 52:8,12,22,23

Page 1

[additional - better]

57:19 87:7,12,17
87:19,25 88:6,18
88:21 89:5 90:19
102:15
**additions** 111:6
**address** 5:9 13:4,9
13:12,15,15,16
85:6,9
**addressed** 39:4
**administer** 3:10
**administration**
12:4,19 95:15
**administrative**
61:3,8,11,17,20
62:22
**advertising** 66:12
**afford** 71:2 87:22
95:19
**ago** 6:4,6 8:8 78:5
**agree** 95:8
**agreed** 3:4,19
**agreement** 94:20
94:22,25 95:10,11
109:20
**agreements** 95:4
**ahead** 6:25 59:9
59:25 80:8
**ahold** 91:18
**airfare** 50:20
**al** 1:3 110:1 111:1
**alejandro** 24:12
**allegedly** 98:13
**allow** 64:7,25
**allowed** 19:2,3
64:12,13,17
**amazon** 18:13,16
18:18
**amount** 32:15,18
44:2 48:11 76:17
86:13 87:20,25
88:7,16,18,22 89:2

89:6 92:18 106:6
106:8,12
**andrew** 2:10
**andy** 4:18 5:14
6:18
**annual** 96:24
**answer** 6:18,21,23
101:4,6
**answering** 7:14
**anybody** 19:10
82:14 83:8
**anymore** 17:14
22:14 65:2 71:3
89:14
**anyway** 95:10
**ap** 68:8,11 91:21
**apart** 51:21
**appear** 47:7 79:4
87:25
**appears** 75:19
**appended** 111:7
**approach** 104:11
**approved** 87:11
**approximately** 4:3
17:16 50:22 51:12
52:15 56:2 59:8
59:24 72:7 74:16
**april** 1:11
**arcadia** 13:6
**area** 81:22
**areas** 42:17
**arose** 85:12
**arrange** 15:17
69:11
**arrived** 53:3
**aside** 100:20
**asked** 7:16
**asking** 43:21
**assets** 71:10
**assign** 43:22,23

**assigned** 46:5
**assignments**
101:10
**assist** 36:24
**assistant** 34:18,20
36:5,7,19 42:4
84:8,9
**associated** 67:16
96:22 102:16
**assuming** 65:11
78:17
**attempt** 91:16
**attend** 38:9,11,13
38:14,17 83:25
**attorney** 5:15
99:20,23,25
**attorneys** 2:4,8
4:16
**attractive** 81:18
81:18
**attractiveness**
82:7
**attributable** 88:17
**authority** 12:3,6
12:10
**authorization**
91:19
**authorized** 3:10
**auto** 72:24 73:3
**available** 19:20,21
19:24 42:6 82:12
82:15
**avoid** 64:4
**awards** 56:7
**axel** 25:10,24

**b**

**b** 9:16 29:20
**back** 26:6 36:16
41:19 45:15,18
51:23,24 59:8,23
69:17 72:7 73:6,8

73:9,18 80:7
85:18 89:15,21,25
90:4,8 92:14
95:20 100:16
**background** 6:10
9:5 93:16
**backs** 69:24
**bad** 38:6,20
**bank** 54:14,17,18
**based** 32:11 78:6
81:12 86:2 96:24
**basically** 15:20
**basis** 31:12,15,18
35:19 36:7 44:12
44:14 56:16 62:6
**bates** 60:5 72:10
74:8 94:16 96:4
**began** 59:11
**beginning** 6:13
22:10 33:25 81:9
81:11 100:17
**begins** 60:5
**behalf** 4:19,21
66:9
**believe** 9:2 10:9
17:18 20:6 23:19
27:7 30:21 31:2
34:18 35:12 42:2
48:5 50:13 65:7
65:22,24 70:17
73:5 74:15 77:6
95:6 98:10
**ben** 7:22 26:12
**benjamin** 2:5 4:20
26:24
**best** 17:6 20:10
22:21 34:17 43:12
61:15 90:7 99:15
**better** 32:17 42:22
67:2 69:12

Page 2

[big - collins]

| | | | |
|---|---|---|---|
| **big** 19:16 41:10 42:17 88:10 | 83:3,19 84:2,6,14 84:18,23 88:9,14 88:19 | **case** 1:6 4:10 47:9 60:9 68:5 74:10 75:11 99:8,13 | 65:13 |
| **bill** 40:25 | **burrows** 29:20,24 | 100:3 | **claims** 63:13,23 85:14 105:19 |
| **bills** 65:25 66:4 | 30:10,16 31:2,9 | **cases** 40:22 | **clarify** 93:7 |
| **bind** 88:10 | **business** 9:25 10:7 | **cellphone** 67:24 | **clear** 21:25 22:4 |
| **binder** 59:12 60:3 74:8 78:22 94:15 | 11:19 13:4,12 15:20 28:8 65:14 | 67:25 | **clearer** 7:2 |
| **bit** 18:13 23:14 52:24 | 67:3 68:2 106:16 | **center** 92:3 | **code** 91:19 |
| **bjweber** 2:6 | **butcher** 2:10 4:18 4:18 5:7,15 58:21 | **certain** 55:6 103:8 | **collective** 85:13 |
| **blood** 108:17 | 59:18 72:4,9 | **certification** 3:7 | **collectively** 85:10 |
| **blue** 16:13,14,25 17:22 | 79:25 94:18 100:9 105:2 107:3 109:4 | **certify** 108:9,15 | **college** 9:9 |
| **bob** 62:14,15,18 62:21 | **buy** 16:16 | **change** 10:4 17:11 20:12,15,20,23 43:19 46:8,22 | **collins** 1:16 4:1,5 5:1,8,13,14 6:1,3 7:1 8:1 9:1,10,13 |
| **bonus** 55:18,19 56:2,10,24 57:15 57:23 | **c** | 58:4,14 62:5 70:24 71:4 73:11 110:4,7,10,13,16 | 10:1,2,4 11:1,7,12 11:15,18,23 12:1,2 12:7,17,22,25 13:1 |
| **bonuses** 55:21,23 57:19 | **c** 2:2 5:2,2 31:24 108:2,2 | 110:19 | 13:5,12,14,18,21 13:24 14:1,3,7,10 |
| **borrow** 41:8 | **calculated** 85:24 | **changed** 10:2 46:20,24 56:9 | 14:15 15:1,8,12,16 16:1 17:1,12,23 |
| **boston** 2:5 | **call** 35:25 36:3,9 42:3 43:2 62:21 | **changes** 95:7,8,12 111:6 | 18:1,23 19:1 20:1 21:1,2,4,10 22:1,5 |
| **bottom** 57:6 73:24 | 62:24 82:14 91:15 92:2 101:13 | **charge** 29:7 61:8 64:2 68:19 | 22:8 23:1,9,11 24:1,6,13 25:1,4 |
| **bought** 10:15 16:3 | **called** 46:11 82:17 90:24 105:14 | **charged** 61:7 | 25:14,25 26:1,5,9 |
| **boulevard** 14:13 | **calls** 101:6,6 | **charging** 52:14,21 61:20 | 26:13,18,25 27:1,4 27:9,14,20 28:1,4 |
| **branch** 34:13 | **cambridge** 2:4 | **charles** 26:24 | 28:21 29:1,17,21 |
| **break** 7:5 30:24 58:23 80:10 | **cameron** 5:10 | **cheaper** 21:16 | 30:1,7 31:1,3,11 31:14,25 32:1,10 |
| **breaking** 20:19 | **car** 50:20 73:7 | **check** 105:21 | 33:1,10,17 34:1,7 |
| **breaks** 7:8 | **card** 56:20 57:9,13 57:16 69:18,23,25 | **checks** 93:16 | 35:1 36:1 37:1 |
| **broke** 103:19 | 70:3 | **chicago** 2:9 | 38:1 39:1 40:1 |
| **broken** 47:19 76:10 | **cards** 56:15 57:4 68:23 | **chime** 84:15 | 41:1 42:1 43:1,8 43:14 44:1,13,17 |
| **brought** 41:20 | **cariano** 31:24 | **choice** 10:25 | 45:1 46:1 47:1,3 |
| **buchanan** 1:19 4:14 108:7,24 | **carrier** 12:3,4,10 12:18 80:24 81:2 | **choose** 21:8 43:12 43:13,15 60:20 | 48:1,9,18 49:1 50:1,6 51:1,16,20 |
| **buffalo** 14:19 18:20,21 48:25 | **carry** 45:11 | **chris** 19:14,15 27:3 | 52:1,2,9 53:1,14 54:1,2,14,21,24 |
| 49:2,5,9 78:10 79:6,10 81:25 | **cars** 73:5 | **civil** 1:18 | 55:1,6,13 56:1,25 |
| 82:6,10,12,18,22 | **carts** 56:22 | **claim** 5:25 6:7 36:3 64:6 65:10 | |

Veritext Legal Solutions
800-336-4000

[collins - damage]

57:1 58:1,3,7,13
59:1,10 60:1,7,18
61:1,12 62:1 63:1
64:1 65:1,12,21
66:1,9,11 67:1,12
67:17 68:1,15,22
69:1,15 70:1 71:1
71:9,12 72:1,13,21
72:22 73:1 74:1
74:14,21,24 75:1
75:21 76:1 77:1
78:1 79:1,4 80:1
80:10 81:1 82:1
83:1 84:1 85:1,9
85:19 86:1 87:1
87:14 88:1,13,22
89:1 90:1,22 91:1
92:1 93:1,7,21,23
94:1,24 95:1 96:1
96:9,14,18 97:1,2
97:6,10,18 98:1,11
99:1,4 100:1,7,18
100:18,24 101:1,7
102:1 103:1,3,6
104:1,3,15,18
105:1,8 106:1
107:1,9 108:1,10
109:1,4 110:2,24
111:2,4,12
**colon** 24:12,16,19
25:3 26:8
**come** 25:16 46:12
60:20 67:12 88:19
**comfortable**
104:13
**communicated**
7:24 8:4,9
**companies** 11:9
13:25 17:19 20:13
20:20,23

**company** 5:24 6:2
11:13 14:8 15:12
16:4 17:20 20:15
21:19 32:20 33:7
47:20 66:17,21
67:3 69:19 82:2
99:23 105:15
**compare** 77:13,17
104:7
**compensated** 87:9
**compensation**
50:7,12 52:9,13
70:6,10,13,16,19
87:8 102:15
103:13
**complete** 111:8
**completed** 79:13
79:16,18 80:12,16
80:20,23 86:4
**completely** 101:3
**computer** 48:4
**concentrate** 102:3
**conception** 32:22
32:24 33:3,6
**conduct** 50:8
**confrontational**
64:24
**consistent** 61:11
**consistently** 58:19
**consolidate** 18:6
102:5
**contact** 35:24
91:16
**contain** 42:9
**contained** 60:3
**continue** 89:9
**continued** 95:22
**contract** 17:7
22:22 24:5,9
57:10 62:2 71:22
90:6 95:13,25

96:9 97:6
**contracted** 9:19
99:3
**contracting** 17:20
18:24 19:19 61:13
86:14 100:19,24
100:25
**contractor** 11:5
15:9 24:18 27:25
30:18,19 31:4
41:7 50:4 94:20
94:21,25 95:4
103:4
**contractors** 20:4
23:6 60:21 61:22
87:10,16,22 94:2,4
**contribution** 45:2
**copy** 3:13,16
75:19 79:5
**corporate** 87:5,10
89:4 92:8
**correct** 21:2 31:4
38:22 40:10 42:7
44:9 51:22 57:8
63:14 64:2 65:18
72:22 76:25 79:10
80:13 83:17 86:8
90:20 92:16,21
93:10 97:23 98:25
99:17,19 101:15
111:8
**corrections** 111:6
**correctly** 40:13,20
**cost** 71:7 96:22
**counsel** 3:5,16 4:6
59:9,25 60:8
68:25 74:10 80:9
**count** 79:13
**counts** 79:16
**county** 98:3 108:5

**couple** 14:24 15:4
23:5 27:22 29:5
33:13 37:14,18
87:4 89:11 91:7
105:4 106:23
**court** 1:2 3:12 4:9
4:13,23 6:14
58:23
**cover** 76:15
**covered** 38:23
50:16,18 52:22
70:16 84:23
**cpa** 60:19
**create** 47:13
**crew** 73:17
**crews** 73:12
**cross** 101:20
**crossed** 101:19
**currently** 34:13
66:7 79:24
**customer** 18:11
32:14,17 36:11,13
36:15 38:25 39:7
39:8 40:8,17
43:12 55:24 56:4
56:7 57:19,23
64:5,8,9,11,14
65:5 90:14 91:3
91:14,15,16,18
**customers** 18:10
64:25 90:18 98:14
**cv** 1:6 4:11

| **d** |
| --- |

**d** 3:2 9:16 31:1
109:2
**daily** 35:19 36:7
56:15
**damage** 5:24 6:7,8
29:6,7,10 32:15,16
32:18 36:3 63:12
63:16,20,23 64:6

Page 4

[damage - distributing]

65:10,13 85:14
98:16 105:19
**damaged** 28:25
29:2,5
**damages** 29:4
**date** 1:11 72:16
74:13 75:17 79:3
79:20 94:23
110:24 111:12
**dave** 64:20
**david** 10:9 35:9,10
35:14 43:11,18
64:19
**day** 35:23 36:2,10
37:17 38:12,25
40:6 42:6,10
45:20,23 48:5
50:14 52:15,20,21
52:25 53:3,19
54:9,10 61:25
68:6,16 78:11
79:9 80:16 82:13
83:3 84:8 88:9,14
90:17 92:15
101:14 102:3
103:20,24 107:12
108:21 111:15
**days** 3:15 29:24,25
38:13,15 51:6
55:17 58:6,9,10,11
58:12,18,18 78:8
84:2 91:7 102:8
102:17,18
**debit** 69:18 70:3
**december** 81:4
85:21 92:19
**decide** 10:23 17:23
21:13 31:17 32:8
52:4 93:25
**decided** 17:11
22:13 63:20 67:2

**decision** 21:7 83:9
**declare** 111:4
**decline** 53:11
**declined** 53:9
83:14
**dedicated** 74:4
**deducted** 44:20
63:24
**deduction** 63:12
65:17 66:15 67:7
67:8,19,22 70:7
**deductions** 60:25
63:17 72:20
105:20
**deemed** 111:6
**defendant** 1:9,17
2:8 4:6 98:5,8
**defendants** 99:13
**deliver** 13:24
15:18 18:16 54:9
82:6 89:14 102:9
**delivered** 14:4,8
55:17 58:10,12
**deliveries** 10:22
13:22 18:9,19
23:7 31:22,23
32:19 42:10,18,22
44:7 47:18 48:25
49:13 68:3,7,12
81:4 92:15 94:12
101:17,17 102:2,7
102:13,16,20,23
103:3,15,18
105:10
**delivering** 48:8
54:8,11 58:3
**delivery** 6:3 9:10
9:14,20 10:3,5
11:7,12,15,18,23
12:2,7,17,22 13:2
13:5,12,14,19,21

13:24 14:4,7,11,11
14:16,16 15:8,12
15:16 17:12,24
21:2,5,10 22:5,8
23:9,11 24:6,13
25:4,14,25 26:5,9
26:13,19,25 27:4,9
27:15,20 28:4,21
29:17,21 30:8
31:10,11,12,14,15
31:18,25 32:10
33:10,18 34:7
35:24 36:16,17
38:14,16 41:21
42:17,20 43:8,15
44:11,13,14,17
46:10 47:3,4,13,16
47:23 48:10,11,18
48:21 50:7 51:2,8
51:16,20 52:2,9,10
52:18 53:14 54:3
54:14,22,24 55:7
56:25 58:3,7,14
60:18 61:12 65:12
65:21 66:9,11
67:9,13,17 68:16
68:22 69:2,15
71:9,12,16,17
72:21 74:21,24
75:14,19,20,24
76:2,7,13,16,21
77:3 78:6 79:5,12
79:21 80:12,18
84:3 85:9,19 86:7
86:11,17,20 87:14
87:15 88:13,14,23
89:22 90:4,15,17
90:22,23 93:8,22
96:10,14,19 97:2,6
97:11,18 98:11
99:4 100:7,19,25

101:5,7 102:19
103:4,6,13 104:3
104:15,19,20
**demand** 23:5
**demonstration**
39:10
**dep** 97:20
**depend** 39:18
**depending** 30:4
42:19 48:21 78:14
**deponent** 111:3
**deposited** 54:14
**deposition** 1:15
3:7,8,13 4:5,11
5:17,18,19 6:12
7:9,25 8:16 33:22
33:25 34:2,5
53:19 59:11 72:13
97:22,25 108:11
108:13
**desirable** 91:9
**determine** 43:6
**diane** 1:19 4:13
108:7,24
**difference** 84:17
**different** 13:8 18:7
30:3 31:3 92:3
95:21
**directions** 109:8
**directly** 43:16
56:17,25 64:5,9,11
64:14,18 65:4
71:23 92:12
**disagreed** 95:14
**discard** 78:2
**discussion** 30:23
30:24 40:7 59:22
80:6 85:13
**distributed** 45:14
**distributing** 45:11

Page 5

**[district - feary]**

**district**  1:2,2 4:9
  4:10
**ditmax**  30:21 31:4
**document**  60:3,4
  72:10 74:9 75:11
  94:16,19
**documentation**
  74:20,23
**documents**  74:12
  109:17
**doing**  9:16,17
  10:22 24:4 39:4
  51:22
**dollars**  12:14
  98:16 106:15
**dollies**  67:9
**dot**  96:20,24
  104:19
**double**  57:21 93:2
**draw**  92:20
**draws**  58:19
**drive**  5:10 49:5
  58:7 73:8
**driver**  24:12,15
  25:8,13,21,25
  26:12,16,23,25
  27:4,5,6,14,17,19
  28:4,7,13,15,16,17
  29:21,22,24 30:4
  30:12,13 31:25
  32:5,7,9,20,24
  33:2,4,10,12 44:12
  45:22 46:5,8,19
  47:2,19 52:19
  71:16,17 76:10
  77:4 78:9 90:11
  104:5
**drivers**  14:21,23
  25:18 30:8 31:15
  43:9,15 44:10
  48:20 69:2 76:11

**90:22 93:12,22**
  101:7
**driving**  73:9
  103:16
**drug**  93:17
**dryer**  41:11
**duly**  5:3 108:12

**e**

**e**  2:2,2 3:2,2 5:2
  92:13 108:2,2
  109:2 110:3,3,3
**earlier**  33:9,22
  53:18 74:15 77:6
  93:7 94:7 97:9
  105:8
**easier**  21:16
**economic**  83:9
**economical**  73:19
**educational**  9:5
**effect**  3:11,14
  43:20
**eight**  54:12 76:11
  76:12,21
**either**  11:2 42:3
  46:15 66:6 90:16
  99:18
**electronic**  75:11
  78:23
**electronically**
  75:24
**employed**  21:4
  63:11
**employee**  10:21,24
  11:4 20:25 29:14
  31:19 39:11 54:2
  68:16 71:17 84:13
  98:13 104:4
**employees**  16:15
  16:16 18:2 29:17
  33:16 37:3 48:18
  49:8 56:17 57:5

**63:9 68:23 69:16**
  70:20 83:16 93:23
  94:2
**employment**  26:5
  33:8
**entered**  95:4
**entering**  96:9 97:6
**enterprise**  20:7,9
  20:18
**enterprises**  9:15
  9:22,24 10:12,16
  10:19,24 11:8
  94:8
**entertainment**
  65:17,20
**entice**  90:4
**entire**  34:16 37:17
  61:12 88:16
**equal**  44:2
**equipment**  41:8
  67:9
**erie**  22:17,18,20
  70:11,12 71:5
  99:24
**esq**  2:5,10
**et**  1:3 110:1 111:1
**evening**  46:7,9
**evenings**  42:3
**event**  68:15
**eventually**  17:13
  45:15
**everybody**  77:17
**exactly**  22:3
**examination**  5:6
  105:6 109:3
**examined**  5:4
**example**  43:2
  76:20
**excel**  75:9 77:21
**excepted**  7:15

**exclude**  71:5
**exclusively**  18:12
**exhibit**  59:12 60:3
  72:2,3,12,14,18
  74:8,11,12 75:8,13
  75:16 78:7,22,25
  79:2 80:13 85:18
  88:3 92:14 94:15
  94:19,21 109:16
  109:17,18,19,20
**exhibits**  109:14
**existence**  11:16
**existing**  71:4
**expected**  54:9
**expedited**  32:20
**expense**  52:22
  67:12 72:24 73:4
  73:23
**expenses**  50:16,18
  65:21 67:16 74:6
  96:6,15 106:7
**explain**  41:8
**extra**  40:23 41:11
  52:16,17 68:14
  87:11,18 88:8
  89:20 103:13,14
  106:15

**f**

**f**  3:2 27:3 108:2
**facebook**  8:13
**facility**  24:24
  83:19
**fair**  7:16 94:3
**familiar**  25:11
  92:4
**far**  103:16
**farm**  22:10,12,16
**fault**  30:15
**favor**  99:12
**feary**  2:8

[federal - happen]

**federal**  1:18 12:3
  12:18 44:19
**fee**  61:3,5,8,11,17
  61:20 62:22 64:3
  64:4 66:14 67:6
  90:19 95:16 96:24
**feel**  39:3 40:14
**fees**  97:3,7
**female**  50:3
**fewer**  44:8
**figured**  63:8
**file**  69:19,23 78:24
**filed**  4:8 5:16
  11:20
**filing**  3:6
**filings**  12:18,23
**fill**  12:12 60:17
  69:2,5,6,9,12,16
  69:19,20,21,24
  93:12,14,20
**filled**  54:23
**filling**  40:15,19,21
**find**  11:2 63:3,8
**fine**  58:25 59:2
**finish**  7:6 22:2
**finished**  6:24
**firm**  4:14
**first**  5:3 19:15
  58:8 86:10 91:4
  94:14 95:6 97:25
  102:22 106:22
**five**  6:6 16:5 23:19
  23:20,24 27:7
  42:25 43:3 58:8,9
  58:12,17,23
  106:24
**fix**  21:16
**fixed**  21:18
**flat**  30:7 31:8
  44:18,22 48:10
  87:17,25 88:7,22

89:6 92:20 102:18
**fleischer**  62:15,18
  62:21
**flying**  73:21
**folder**  8:17
**follows**  5:5
**force**  3:14
**forced**  7:4
**foregoing**  111:5
**foreign**  92:2
**forgotten**  68:16
**form**  3:20 10:24
  93:19
**formed**  9:10,23
**forth**  73:6,8,9
  108:12
**forward**  57:18
  62:5
**found**  21:15 26:20
  26:21 27:13 33:8
  51:6 99:12
**four**  19:22 21:6
  28:19 35:12 43:3
  58:11,18 106:24
**fox**  26:24
**fpg**  1:6 4:11
**frequent**  46:13
**frequently**  40:2
  82:25
**friends**  63:10
**fuel**  68:20,23
  85:19,20,23 86:2
  105:19
**full**  5:9 41:10
**furnished**  109:10
**furniture**  54:8
**further**  3:19 65:16
  105:3 107:3
  108:15

### g

**g**  92:13
**gallagher**  2:12
  4:13
**game**  66:2,4
**garvin**  2:7
**general**  15:9 34:25
  35:5,8,11,13,19
  36:23 42:4 45:8
  82:18,22 83:18
  84:7,10 85:6
  101:9
**generally**  56:6
**generated**  47:20
**generates**  77:11
**gentleman**  92:4
**gesture**  66:8
**getting**  50:13,15
  52:19
**gift**  56:15 57:4,9
  57:13,16
**give**  6:21 18:2
  20:20 23:14,15
  43:8 44:2 56:15
  56:22 58:22 68:17
  68:22 89:12 91:8
  91:18 106:13
**given**  45:23 46:9
  48:24 58:4 61:24
  76:9,12 78:13
  89:6 102:21
  108:14 111:9
**giving**  76:21
**go**  6:9,25 11:18
  36:16 49:17 52:7
  53:6,13,15,22,25
  54:4 56:24 59:9
  59:16,25 63:3
  65:16 69:4,8
  71:23 72:4 73:17
  79:25 80:8 81:3

81:10,25 82:9
  83:8 86:3 88:9
  89:4,21,25 90:4,8
  99:8 100:9 101:5
**goes**  29:9
**going**  4:2 6:9 7:14
  22:4 32:9 46:5
  50:4,8 51:4 54:7
  58:21 59:3,7,19
  60:2 62:5 63:11
  72:6 80:3 85:18
  89:14 100:11,15
  102:2 107:4
**good**  17:25 55:12
  56:4,7 65:22 91:6
**goodwill**  66:8
**gotten**  28:10
**graduate**  9:5
**great**  32:14
**greg**  92:5,6,7
**gross**  61:9 76:17
**group**  85:9 97:11
**gts**  9:19 10:13,14
  10:17,21,23 11:4
  12:7,9
**gtx**  33:16
**guess**  29:9
**guy**  104:10,14
**guys**  20:3 23:14
  27:22 65:23 73:6
  73:6 102:25

### h

**h**  5:2 110:3
**half**  26:3
**hand**  56:17,21
  67:10 108:21
**handed**  57:5 76:5
  76:6
**hanson**  2:8
**happen**  41:15
  106:21

Veritext Legal Solutions
800-336-4000

[happened - initial]

**happened** 106:11
**happier** 104:13
**happy** 61:22
**hats** 16:17,17,22
**hdl** 5:16 10:6,8
  12:8,9,20 15:24
  16:5,8,20 17:3,8,8
  17:20 18:24 19:5
  19:6,13,25 20:19
  20:22 22:23 24:6
  24:10,23 35:16,20
  36:7 39:3,13
  40:14 41:23 43:2
  43:16 45:16,19
  46:3,4 52:8,22
  53:2 54:13 55:22
  56:3,22,23 61:7,13
  61:15,19 62:4,13
  63:17,18,20 64:7
  64:22 71:23 75:12
  78:24 80:22 84:10
  86:11,14,17,20
  88:2,4,17 89:6,10
  90:3 92:8 93:15
  94:16 95:5,23
  96:5 97:12,16
  98:8,22,24 99:18
  100:19,25 101:9
  103:2
**head** 101:23
**heading** 61:2
  79:12
**heidi** 100:4
**held** 1:18 4:12
  30:23 59:22 80:6
  99:16,18
**helper** 24:13,14
  25:7 27:4 28:13
  28:15 29:22,25
  30:5,11,14 31:25
  32:4,6,9,16,17,25

47:5,6 51:4 52:20
  104:4
**helpers** 30:8 31:12
  44:11 48:9 93:11
  93:22 105:18
  106:7
**helpful** 6:12
**helping** 14:20
**henrietta** 69:6
**hereinbefore**
  108:11
**hereto** 111:7
**hereunto** 108:20
**high** 9:6,8 95:19
**higher** 86:16,20
  87:2,9,15 95:17
  103:17,20
**hill** 5:10
**hire** 15:17 60:17
  93:11
**hired** 30:13 49:22
**hiring** 24:20
**home** 6:3 9:10,13
  9:20 10:2,5 11:7
  11:12,15,18,23
  12:2,7,17,22 13:2
  13:5,8,10,12,14,15
  13:19,21,24 14:4,7
  14:10,16 15:8,12
  15:16 17:12,24
  18:10 21:2,5,10
  22:5,8 23:9,11
  24:6,13 25:4,14,25
  26:5,9,13,19,25
  27:4,9,15,20 28:4
  28:21 29:17,21
  30:8 31:11,14,25
  32:10 33:10,17
  34:7 36:15,17
  43:8,15 44:13,17
  47:4 48:18 51:16

51:20 52:2,9
  53:14 54:2,14,21
  54:24 55:7 58:3,7
  58:14 60:18 61:12
  65:12,21 66:9,11
  67:13,17 68:15,22
  69:15 71:12 72:21
  74:5,21,24 85:9,19
  87:14 88:13,22
  89:21,24 90:14,18
  90:22 91:3,14,20
  93:7,21 96:9,14,19
  97:2,6,10,18 98:11
  98:17 99:4 100:7
  100:18,24 101:7
  103:3,6 104:3,15
  104:19,20
**homedeliverlink**
  4:8
**homedeliverylink**
  1:8 4:19 5:16
  16:21 17:10 19:19
  34:8 75:14 93:9
  110:1 111:1
**homedeliverylnk**
  23:18 34:10,16
**hooked** 36:18
  98:13
**hoses** 41:12
**hotel** 50:16
**hour** 58:22
**hours** 54:9,10
**human** 6:17
**hundred** 12:14
  98:16 106:15
**hurry** 38:7

**i**

**identification**
  72:15 74:13 75:17
  79:3 94:22

**identify** 4:17
**identifying** 40:9
**illinois** 2:9
**impact** 57:6
**incentive** 23:8
  88:12 90:3
**incentives** 56:3
**include** 80:22
**included** 66:2
**income** 47:19 55:3
  61:9
**incorporated** 10:6
  12:12,14
**incorrectly** 98:15
**increase** 22:24
  23:3,13 56:25
  80:23 81:2 86:13
**incurring** 65:21
**independent** 11:5
  94:20,21,25 95:3
**indicate** 81:14
**indicates** 79:9
**indication** 45:21
**individually** 85:7
**individuals** 66:3
  91:24
**industry** 22:14
**inerval** 13:22,25
  14:5 18:5 37:2,5,8
  39:3,7,11 40:14,17
  41:23,25 55:22
  56:3,21 68:4,9
  81:7 84:5,12 91:3
  91:11,12,24 102:4
  104:23
**information** 41:16
  46:2 47:22 54:20
  54:21 74:20 75:4
  93:18 109:7
**initial** 16:6

Veritext Legal Solutions
800-336-4000

**[initially - luis]**

initially  17:3
  19:18 20:8 22:22
input  45:25 77:9
installation  41:11
instance  49:7
instances  21:25
  38:10 46:17
institute  61:16
instruct  68:25
  69:8
insurance  21:21
  22:6,9,17,18,20
  70:11,12 99:22,24
  105:19
insure  22:13 71:2
  77:15
insurer  22:15
insuring  22:2
interaction  6:17
  25:2
interactions  35:18
  36:6
interest  11:9
interested  108:18
interrupt  6:22
interview  24:19
introduced  25:18
introduction
  25:22
involved  36:11,14
issue  101:11
issues  36:12,13
ivan  28:12

**j**

j  2:10
jackets  16:17,22
jake  29:20 31:2
january  11:25
  24:8 76:24 78:8
  78:16

jerry  37:7
jim  35:3,4,7 43:18
  64:19,20
job  11:3 15:15
  25:20 26:20,22
  27:13 54:5,7
  110:2
jobs  23:16 85:16
join  90:11
judge  3:12 104:2
jump  6:18
jury  99:10,12

**k**

k  78:24 92:13 96:5
k002020  75:12
k99  94:16
keep  44:19 63:10
  68:4 77:16 104:8
kept  63:11 69:18
  69:23
kical  9:15,21,24
  10:11,12,16,19,24
  11:8 94:7,9,11
kick  69:24
kind  7:4 37:7
  90:10 91:4 103:25
kings  108:5
kloppel  1:3 4:7
  8:13 110:1 111:1
knew  24:21 90:25
know  6:18,24 7:6
  17:2 18:10 19:15
  22:3 24:23 26:21
  27:12 32:22 34:24
  36:4 41:23 42:5
  47:12,21 56:16
  61:5,19 62:18
  69:12 77:7,11
  82:10 85:23 89:16
  101:11 105:24
  106:24

knowledge  34:17
  99:15
known  33:15

**l**

l  3:2,2 5:2,2,2
  92:13
labeled  85:18
lack  24:3
laptop  78:4,4
lawsuit  5:16 8:10
  8:13 98:2,6,9,19
  98:23,25 99:6,21
lawyer  7:18 8:10
lead  37:9,12,21,23
  84:5
leading  84:13,16
leaked  98:15
leasing  21:19
leave  10:23 26:8
  26:18 27:8 28:20
  33:17 34:6 37:16
  89:24 91:19
left  23:6 26:6,11
  27:11,12 33:7
  34:7 43:18 44:21
  104:7 105:14,15
  105:21,25 106:6,8
  106:19
legal  4:15
length  48:15
lesser  44:7
letting  42:5
liable  99:16,18
license  60:14
lichten  2:3
light  2:7
liked  18:3,3
likewise  48:20
line  57:7 67:5 68:4
  88:4 98:14 110:4
  110:7,10,13,16,19

lines  41:12
links  104:21
liss  2:3
list  77:16,20
listed  77:3
listings  72:20
little  18:2,13,21
  23:13 40:5 52:24
  87:11
llrlaw.com  2:6
load  84:21
loads  43:3
local  66:21
location  10:17
  14:17 15:6 34:22
  35:2,14 78:14
  84:6 85:3 91:22
locations  14:10,15
  53:8
lockner  35:3,4,7
  43:19 45:7,12
  64:19
long  6:4 9:21 21:4
  23:20 25:3,24
  26:15 27:6 28:3
  28:17 33:3,5,12
  35:4,10 39:20
  43:10 62:25 63:2
  71:19 103:16
look  15:19 44:5
  89:16
looking  32:13 72:9
  72:17 79:20,22
looks  63:13
lot  28:25 29:2
  35:21 39:17 55:16
  63:9 83:22 85:15
low  28:10
lowest  69:10
luis  31:24 32:4

[luke - month]

| | | | |
|---|---|---|---|
| **luke** 83:20 | **manifests** 42:5,12 | **meeting** 36:20 | 73:1 74:1 75:1 |

**m**

**m** 5:2 31:6 92:13 100:4
**ma** 2:5
**mailed** 76:5
**main** 40:25
**maintain** 74:19 75:3 77:19 96:20
**maintained** 74:25
**maintaining** 96:23
**major** 101:11
**making** 61:23 94:6 101:16
**management** 19:8 19:13
**manager** 10:10 19:16 20:24 34:11 34:12,19,21,21,25 35:5,8,11,13,17,20 35:21 36:5,7,19,24 36:24 42:4,4 43:11 45:8 48:2 82:18,22 83:18 84:7,10,10 101:9 101:12
**mane** 35:14
**manes** 10:9 35:9 35:10 43:11,14,18 64:19
**manifest** 42:9,15 42:21,23 43:7,16 43:24 44:4 45:14 45:22 46:2,6,9,20 47:7,12,22 49:2,9 49:10 77:11,15 81:8,17,19 82:7,10 82:12 83:2,11 91:6,9 101:13 103:8

**manifests** 42:5,12 42:13 45:11 48:24
**manual** 25:23 52:3
**march** 7:5
**mark** 72:3 74:10 75:12 78:25 94:18
**marked** 72:2,15 74:12 75:16 78:7 79:2 94:22 96:5
**marking** 72:12
**marriage** 108:17
**mart** 56:15,22 57:4
**mason** 71:14,15,20 71:23
**matched** 77:15
**matter** 4:7 108:19
**mattresses** 14:8
**maus** 100:4
**mc** 96:21
**mcollins** 60:5,12 61:2 72:11,11,14 72:15 74:9 109:16
**meade** 37:7,9,12 37:21,22
**meal** 65:20
**meals** 52:20 65:17 65:24
**mean** 29:3 40:12 56:13 65:11 80:15 101:13
**meaning** 21:19 44:8 91:8 102:4
**meant** 32:19
**measure** 71:7
**mechanisms** 87:8
**media** 4:4 100:17
**medicaid** 45:5
**meet** 24:16 25:16 27:24 30:16 33:14

**meeting** 36:20 37:3,6,10,13,16,23 38:2,17,21,24 39:15 84:21 85:4 97:10,18
**meetings** 35:22 37:19,25 38:8 39:20 84:2,6,13,18 84:24 85:2 97:12
**mentioned** 44:10 59:10 91:11 97:21
**merchandise** 98:21
**messages** 8:12
**met** 24:25 56:19 62:19 92:6
**metrics** 32:12 56:19
**michael** 1:16 4:1,5 5:1,13 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1

73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1,9 108:1,10 109:1,4 110:2,24 111:2,4 111:12
**mike** 1:3 4:7 8:13 20:24,25 32:22,24 33:9 34:6,24 45:9 45:12 64:15,16 72:13 86:24 87:2 87:7 89:3 110:1 111:1
**mile** 85:25
**mileage** 81:4,6,9 81:12,12
**miles** 81:15
**mine** 44:21
**minors** 2:4
**minutes** 39:22,24 40:3,5,6 58:23
**mjp** 1:6 4:11
**model** 11:5,5
**moment** 63:7
**money** 12:13 25:9 54:13 55:18,20 69:16 83:10 88:11 89:25 94:6 99:5 105:21
**monroe** 2:9 98:2
**month** 14:20 15:2 39:17 49:13 50:22

Page 10

**[months - paid]**

| | | | |
|---|---|---|---|
| **months** 14:24 15:5 28:19,19 39:18 95:18 | **needed** 7:8 15:20 20:19,22 23:6 25:20 30:14 36:2 36:10 49:23 | **numbers** 104:19 | **operation** 23:21 55:7 76:9 |

**months** 14:24 15:5
  28:19,19 39:18
  95:18
**morning** 35:22
  36:20 37:3,6,9,13
  37:20,22,23 38:2,2
  38:8,17,21,23
  39:15,20 46:10,22
  83:25 84:6,17,24
  85:4
**motions** 109:12
**motivate** 31:21
**motor** 12:3,4,10
  12:18
**moved** 13:13
  25:19 26:6
**moving** 96:4
**mushroom** 14:13

**n**

**n** 2:2 3:2 5:2 31:24
  109:2
**name** 4:12 5:9,12
  5:14 16:4 17:24
  19:15,15 32:2,3
  41:4 46:19,23
  47:7 50:5 77:7
  83:23
**named** 31:4 92:5
**names** 17:21 77:15
  91:23
**nashville** 14:19,25
  49:13,20 50:8,19
  50:22,25 51:2,9,11
  51:20,25 52:10,18
**navy** 16:25
**near** 59:13
**necessary** 111:6
**need** 7:5,6 28:9,10
  49:20 58:24 90:8
  90:23 93:7

**needed** 7:8 15:20
  20:19,22 23:6
  25:20 30:14 36:2
  36:10 49:23
**negative** 57:21
  93:2
**negotiate** 64:5,8,9
  64:10,14,17 65:4
  86:16,19,22 87:2
  88:25
**negotiated** 92:10
**negotiation** 53:4
**never** 14:7 51:4
  61:23 62:2 67:18
  80:22,25 106:22
**new** 1:2,20 4:10
  5:4,11 12:23 13:7
  14:14 39:2,10,14
  40:8 49:23,24,25
  69:7 78:3 95:9,10
  101:16,18 102:9
  103:18 108:3,8
**night** 35:25 36:9
  101:12
**nightly** 101:10
**normal** 6:16
**normally** 88:11
**notary** 1:20 5:3
  108:7 111:13,19
**notebook** 75:8
**noted** 107:6 111:7
**notice** 1:17 5:17
  61:24
**notified** 82:11
**number** 22:24
  23:3,17,23 42:10
  42:18 53:3 58:2
  60:4,5 81:7 85:23
  96:21,21,25
**numbered** 74:8
  94:16

**numbers** 104:19

**o**

**o** 3:2 5:2 29:20
  31:24
**oath** 3:11
**objections** 3:20
**obtain** 15:21 70:9
  96:18
**obtaining** 56:7
**occasionally** 25:2
  36:8 46:25 47:5
  48:13
**occasions** 47:6
  97:9
**occur** 18:19 38:3,9
**occurred** 85:13
**occurrence** 46:13
**odometer** 81:12
**offer** 52:8 83:15
  103:2
**offered** 83:10
  88:13
**offering** 53:6
**offers** 83:2
**office** 14:19 73:24
  74:3,5 97:12,16
**officially** 11:20,22
**okay** 7:9 60:10,13
  72:19 79:15 106:4
**old** 78:4
**once** 5:22 36:23
  37:24 39:17 45:14
  49:6 85:5 105:18
**ones** 52:6 95:7
  99:2
**operate** 18:25
  19:18 96:18
**operated** 104:18
**operating** 22:25
  23:18 67:16

**operation** 23:21
  55:7 76:9
**opportunities** 53:7
  53:12 63:6
**opportunity** 82:6
  102:22
**opposed** 21:14
  94:2
**option** 90:16 103:7
  103:9
**order** 88:13,25
  96:18
**original** 3:8,16
  95:16
**originally** 13:6
  15:24 49:16
**outcome** 108:18
**outside** 53:8 102:9
**overall** 85:14
**owned** 54:24
**owner** 11:13 12:25
  61:22 62:10,14
  94:8
**ownership** 11:9
  15:11

**p**

**p** 2:2,2 3:2 27:3
**p.c.** 2:3,8
**p.m.** 1:12 4:3 59:4
  59:9,20,24 72:8
  80:4,8 100:12,16
  107:5,6
**packet** 93:15
**page** 60:11 61:2
  72:17 75:9 76:15
  96:4 109:3 110:4
  110:7,10,13,16,19
**paid** 30:3,15 31:20
  44:11,16,18,23,25
  45:6 50:13 52:19
  63:19 64:3 85:19

Veritext Legal Solutions
800-336-4000

[paid - profit]

87:11,14,17,19
88:9,23 89:20
90:8,13,14,17
93:22,23 95:10
102:18 103:15,20
105:10,13,18
106:5,7,18
**pants**  16:13,15,16
**paper**  8:22
**papers**  8:18
**paperwork**  12:13
40:15,19,20 41:3
93:12
**paragraph**  78:21
**parkway**  13:7
**part**  16:23 27:17
27:19 28:3,7
42:18 56:11,12
65:22 74:6 89:11
90:5 98:19,25
99:5
**particular**  44:4
49:9
**parties**  3:6 108:16
**parts**  40:23 41:5,6
41:9,11,16,24
**pay**  31:11,14,17
44:13 63:21,23
64:9 65:10,12,14
67:15 69:17 86:11
93:25 94:4 95:16
97:2 99:5 105:25
106:17
**paycheck**  61:25
**paychecks**  66:19
66:20
**paying**  31:9 52:16
52:17 54:13 58:14
87:23 97:7 106:12
**payment**  67:6
80:23 86:4 88:12

**payments**  96:15 103:23,23
**payments**  105:9
**payroll**  8:23,24
15:18 66:17,24
67:3 74:17 93:20
106:14
**peak**  23:17
**pennsylvania**
101:19,21,24
102:8,13,16,22
103:3,7,12
**penske**  20:16 21:8
**people**  15:18
49:16,23,24,25
64:24 65:25 66:5
82:16 89:4
**percent**  47:10,25
61:8,10 83:5,6,14
**perform**  82:2
**performance**
32:11,12 48:15,17
48:22
**performed**  44:17
51:9 79:6 85:20
**performing**  66:23
**period**  34:19
43:10,21 51:15
56:2 58:15 65:3,6
**permits**  96:17
**person**  46:14 51:4
82:17 92:8
**personal**  54:18,22
55:3 67:25 69:16
69:21
**personally**  48:25
51:2,3,9,11 53:22
53:25 58:2 62:16
63:19,23 65:11
67:15 70:16 73:14
75:5 87:9 90:21
92:23 93:3

**phone**  68:4,5,8
**phones**  40:17
68:15 101:4
**picking**  91:10
**pictures**  91:20
**place**  57:10 71:13
**placed**  17:21,24
100:7
**plain**  16:25 17:22
**plaintiff**  1:16 2:4
100:3
**plaintiff's**  74:9
**plaintiffs**  1:4 4:21
**please**  5:12 6:23
**plus**  52:20 55:4
58:19
**point**  4:16 6:22 7:6
13:11 17:11 20:12
21:2 22:11,23
23:23 49:21 58:15
66:23 70:18 82:13
86:14 92:11
**points**  40:7
**policy**  70:16,19
71:4 90:21
**poochie**  60:19
**position**  34:9,15
**post**  9:8
**preferable**  42:16
**preferred**  42:13
90:25
**preparation**  7:24
**prepare**  8:15,18
8:22
**present**  2:12 4:16
15:13
**president**  13:18
15:16
**pretty**  24:21 63:2
64:22 84:20 90:5
101:22

**previous**  6:11
30:17
**previously**  8:7
24:17 28:2 33:23
44:10 64:23 66:6
**price**  18:2 20:10
22:21 70:14 86:2
**prices**  69:10
**pricing**  69:13
**pride**  18:3
**printed**  76:4
**printout**  75:10
78:23 79:2 109:19
**prior**  9:13 10:19
30:24 35:7,14
56:24 64:16 80:10
85:3
**probably**  8:7
38:12 47:10 78:3
82:13 83:4,4
85:16 87:4 97:14
106:14,23
**problem**  35:23
**procedure**  1:18
**proceed**  4:24 7:13
**process**  43:19
45:10 47:21 53:4
67:6
**processing**  66:14
66:17,24
**produced**  75:11
78:24
**product**  14:4
15:19 18:11 38:5
39:10 40:8 54:11
**products**  12:23
13:25 18:6,6 39:2
39:14
**profit**  44:20 52:23
55:4

Page 12

[profitable - reporter]

profitable  55:8
profits  57:2
    105:14,17,22
program  56:10
    57:9,13,15,16
programs  57:23
properly  36:18
    40:16
property  29:4,7
    32:15,16 63:20
prove  91:21
provide  6:19
    13:21 14:11 15:8
    15:21,23 17:15
    41:18 50:25 87:7
    95:22
provided  8:25
    12:9 14:16 16:14
    16:17,24 32:18
    40:23 41:24 54:20
    55:19 65:23 84:2
    99:23,25
providing  10:12
    10:16 30:11 47:3
    73:15 96:10
public  1:20 5:3
    108:7 111:19
puerto  25:19 26:7
purchase  21:14,21
    22:5,9
purchased  15:25
    16:7 18:11
purely  70:3
pursuant  1:17
put  41:19 48:3
    77:7 80:24 89:15
    95:7

**q**

question  6:17,21
    7:7,12,14 22:3
    33:24 57:22

questions  101:8
    105:5
quick  69:6,9,12,19
    69:20,24
quite  81:21

**r**

r  2:2 3:2 29:20,20
    31:24 108:2 110:3
    110:3
raise  48:14
raises  48:13
rare  18:22 46:16
    46:17
rarely  14:18 38:4
    40:4 49:6 81:25
rate  30:3,7,11 31:8
    44:18,22 53:19,21
    86:17,20 87:3,15
    87:18 95:16
    102:18 103:17
rates  48:21 92:10
ratio  48:3
read  96:2 111:5
realized  95:18
really  24:21 56:18
    83:21 85:16
    103:10,14 104:6
reason  28:6 83:13
    85:17 110:6,9,12
    110:15,18,21
reasons  83:7
recall  6:4 8:3,24
    17:16 19:12 24:5
    30:19 32:3 33:6
    35:15 46:19 50:5
    52:12 53:2,17
    70:15 72:2 73:3
    77:25 83:24 85:12
    88:21 89:5 91:23
    95:3,12 97:16
    98:18,22 100:6

receive  42:3 48:10
    75:23 76:2,12
    93:3 103:7,18
received  50:7
    59:12 62:8 75:21
    77:14 78:18 88:7
    92:18 105:9
recess  59:5 100:13
recollection  17:6
    61:16 90:7
recommended
    60:23
record  4:3,17 5:9
    7:2,7 21:24 22:5
    30:22 59:4,8,17,20
    59:21,24 60:4
    72:5,7 75:10
    78:23 80:2,4,5,8
    92:13 94:15
    100:10,12,16
    107:5 108:13
recorded  4:5
    79:17
records  74:17
reduced  23:24
reference  17:4
    38:19
referenced  16:22
    33:9 53:18
referred  33:21
    36:20 39:6 41:4
    97:9
referring  12:20
    16:7 60:2 79:24
    88:3 91:12 92:14
reflecting  89:17
refresher  6:13
refrigerator  41:12
    98:14
regarding  62:9

related  67:8,23
    108:16
relation  5:23
    73:14 98:2
relationship  26:10
    27:10 28:22 29:18
    89:10
reliable  20:18
    66:22
relman  28:12,17
    29:6,16
remain  10:7 57:9
remained  43:20
remember  6:10
    32:2 50:3,6 83:21
    99:22
remind  45:8
removing  67:10
rent  20:5,8 21:8
    21:13 73:19
    104:16
rental  20:13 22:6
    50:20
rented  20:2 73:5,7
renting  74:3
repayment  29:11
repeat  22:4
rephrase  7:13
    93:3
replace  40:24
replaced  34:24
    57:16
replacement  41:9
    41:16,18,24
replenishment
    41:5,6
report  81:6
reported  55:2
reporter  4:13,23
    6:14 58:23

**[reporting - short]**

**reporting** 46:18
**reports** 8:23,25
**represent** 75:9
 78:22
**represented** 7:18
**representing** 5:15
**requests** 109:7,11
**require** 104:18
**required** 16:13
 68:9 111:13
**requirements** 91:2
 91:11,12
**reserved** 3:21
**resist** 6:19
**resolve** 64:6
**respect** 61:6
**respective** 3:5
**respond** 6:25
**response** 6:19 62:8
**responsibilities**
 15:15
**responsibility**
 29:15
**responsible** 96:10
 96:14
**retailer** 18:10
**retailers** 18:7,15
**return** 54:21
 74:20 90:18
**returns** 8:19,21
 55:3 60:8,18
 72:21 74:24
**revenue** 11:24
 14:3 23:13 42:22
 47:20 70:25 76:17
 93:8 94:11
**reviews** 48:17
**revised** 62:2
**rex** 20:24,25 33:9
 33:12,14,17 34:6,9
 34:24 45:9,12

64:15,16 86:24
 87:2,7 89:3
**rick** 60:19,20
**rico** 25:19 26:7
**right** 9:11 15:22
 34:3 36:18 39:4
 40:10,15 45:3
 51:13 53:16 57:5
 59:10 75:7 82:3
 85:21 86:5 89:15
 91:21 97:14
 105:11
**riordan** 2:3
**rivera** 27:14,24
 28:3,7 32:4
**rochester** 5:10
 10:17 13:7 14:14
 14:17 18:19,22
 34:11,12,22,25
 51:17 53:9 54:7
 54:11 62:20 73:21
 78:12,17 82:20,24
 84:19,24 85:3
 97:13,17
**rodriguez** 25:10
 25:11,13,17,23,24
 26:4 52:3
**roster** 37:8
**rotate** 43:25 104:6
**rough** 54:5,6
**roughly** 21:6
**route** 44:8
**routinely** 77:13
**row** 79:13,13,17
 81:3 86:3 89:17
**rules** 1:18 6:10
**rulings** 109:9
**run** 84:18
**running** 38:5,20
 51:17,19 77:16,20

**ryan** 2:12 4:12

**s**

**s** 2:2 3:2,2 5:2
 29:20 92:13,13
 100:4 110:3
**safety** 12:4,19
**salary** 55:4 58:13
 58:19 92:20
**samora** 2:4
**sat** 97:22,25
**saturdays** 27:23
**saving** 71:7
**says** 75:13 76:23
 94:20
**school** 9:6,8
**schooling** 9:8
**scopelitis** 2:7
**scopelitis.com**
 2:10
**scores** 39:2,6,7,8
 40:8 43:13
**scott** 83:22
**sealing** 3:6
**search** 63:5
**sears** 9:20 10:22
 17:4 18:12,16,18
 24:4 98:5,18
 99:16
**second** 49:20
 59:17 80:2 90:23
 96:4 97:22
**section** 96:5
**security** 45:5
**see** 61:2 66:15
 67:20 68:20 70:7
 72:25 73:24 79:14
 96:6
**seek** 29:10
**seen** 94:24
**select** 22:20 66:20
 70:12

**semester** 9:9
**send** 51:25 52:4
 53:8 81:25 83:16
**sending** 52:10
 53:20 54:2
**sense** 31:20
**sent** 8:19 12:13
 49:16
**separate** 51:21
 54:17 56:3 76:7
 76:21 78:11,13
**service** 3:15 32:14
 32:17 36:11 38:25
 39:7,8 40:8 43:12
 55:24 56:4,7
 57:19,23 91:15
**services** 10:12
 14:11,16 15:9
 30:11,12 47:3
 51:2 73:15 84:3
 95:23
**set** 86:10 100:20
 104:8 108:11,21
**settlement** 47:13
 47:16,23 63:24
 75:14,20 76:3,8,13
 76:16,23 77:4,8,9
 77:12,14 78:7,18
 79:5 80:12,19
 87:24
**seven** 55:17 58:10
 106:22
**sheet** 41:5,7,9,17
 42:19 78:11
**sheets** 78:13
**shirt** 16:12,18
**shirts** 16:2,3,12,20
 17:7,12,14,21,24
 18:4
**short** 43:20 59:5
 100:13

[show - terminate]

show   46:15,18
    47:18 80:19 88:2
showed   76:17
shows   85:19 92:15
shut   71:10,12
sick   46:11,15,18
sign   95:9,22
signage   104:16,21
    104:24
signature   108:23
signed   3:9,11,14
    95:6
significant   55:18
significantly   71:2
    95:17
signing   96:2
single   75:8
situation   14:22
    85:12
six   8:7 16:5 25:5
    39:18 58:9 73:10
slashed   95:20
slow   85:15
small   48:13 67:7,7
    67:10,20 81:22
smigelsky   92:5,7,9
social   25:2 45:4
sold   98:20
sole   12:25 94:8
solutions   4:15
somebody   20:21
    40:25 46:11,18
    49:23 51:7 56:19
    68:5 83:16 92:3,9
    104:9
sorry   23:10 26:24
    33:24 59:16 74:22
    79:19 98:24
    102:11 105:5
source   14:3 93:8
    94:11

space   74:3
spare   68:4
speak   39:12,16
    62:22,25
special   88:17
specials   80:25
    88:2,4
specific   41:4 96:17
specifically   19:6
    19:12 62:12
spent   73:10
spoke   62:15
spoken   91:25
spreadsheet   75:9
    75:13,16 77:22,23
    78:2 109:18
ss   108:4
stamped   72:10
start   19:2,9 48:12
    62:20 97:20
started   17:3 19:18
    22:22 32:6 34:20
    43:21 61:19
starting   17:7
state   1:20 5:4,8
    12:23 22:10,12,16
    101:18 108:3,8
statement   47:14
    47:17 60:14 63:25
    75:15,20 76:23
    77:4,8,10,12 78:7
    79:5,22 80:13,19
    87:24
statements   47:24
    75:24 76:3,8,13,16
    76:21 77:14 78:19
states   1:2 4:9
status   68:12
stayed   91:17
stipulated   3:4,19

stop   79:13,16
    86:10 87:3,15
    90:19
stopped   28:6 65:8
    89:12
stops   40:16 44:8
    79:18 80:12,16,20
    80:23 81:2,14,22
    86:4,8
straps   67:10
street   2:4,9
strike   87:12
stuff   12:15 89:14
    106:8
subcontractor
    11:2
subscribed   107:11
    111:14
success   56:6
sued   5:24 98:12,19
    98:23,24
supposed   8:8
    37:19 40:18
sure   6:15,20 7:12
    21:24 47:25 59:18
    67:4 90:5
swear   4:23
switch   22:11
switched   11:4
    12:15 13:11 56:14
sworn   3:9 5:3
    107:11 108:12
    111:14

t

t   3:2,2 31:6 108:2
    108:2 110:3,3
tab   60:4 71:25
    74:7 75:7 94:14
take   7:8 34:9 43:7
    44:5,6 49:2,8
    82:12 83:11 87:5

88:14 91:20 92:23
    100:23 101:2
    102:22,24 103:7
    103:12 104:7,9,11
    106:15
taken   1:16 4:6
    5:19 6:12 33:23
    34:3 59:6 61:25
    63:17,18 82:5
    100:14
talk   6:16 18:5
    62:12
talked   94:7
talking   30:25
    105:18
tax   8:19,21 54:20
    54:21 55:3 60:7
    60:18 72:21 74:20
    74:24 93:19 100:6
taxes   11:20 15:19
    44:19,19 45:2,4,5
    54:22 60:14 67:4
    93:20 94:5
team   49:17,17,19
    49:21 52:10,18
    53:18,20 85:3
teams   53:8 104:8,8
    104:12
teleconference
    1:19
telephone   67:19
    67:22
tell   16:10 35:25
    36:9 49:14 64:16
    69:4 89:13
ten   65:25 66:3
tennessee   14:25
terminate   24:9
    26:4,10 27:9
    28:21,24 71:22

[terminated - usually]

**terminated** 24:7
28:23 29:18 57:10
**testified** 5:4 42:2
62:9 65:9 74:14
77:6 80:11 81:24
93:6 97:21 105:8
106:4
**testimony** 31:2
108:14 111:8
**testing** 93:17
**theirs** 68:16
**thing** 9:16,17
49:18
**things** 28:25 29:3
38:4,20 39:18
40:9,12 104:2
**think** 12:13 19:14
25:6 26:2 48:3
50:14,15 52:14
65:7,25 73:10
78:4 83:22 94:3
**thousand** 98:16
**three** 8:2,4 9:2
19:22 21:6 26:17
28:5,19 33:5
74:16 95:18 101:2
**tied** 77:10
**till** 51:6
**time** 1:12 3:21
4:22 6:11 8:6
10:10,14 11:23
13:10 20:6 27:17
27:19 28:3,7
34:16 43:10 47:10
48:15 49:12 53:23
54:23 55:25 58:24
61:12 63:6 64:22
65:4,6,7 70:17,18
73:14 83:14 86:2
91:4 94:5 100:20
100:23 101:5

103:16 104:5,14
107:6
**times** 5:21 7:23
8:2,4 38:2,19
46:21 63:22 65:10
80:18 82:21 84:12
85:8 86:25 87:4
89:12 91:5 106:24
**today** 5:18 7:19
8:16,18
**told** 10:8 19:13
20:19,22 46:4
61:21 63:3 64:13
64:20 91:5
**tomorrow** 43:4
**tool** 67:7,7
**tools** 67:10,20
**top** 75:13 79:21
94:19
**topic** 41:2
**topics** 84:23
**total** 42:19 73:10
92:15
**tote** 41:10,19
**totes** 41:20
**tow** 26:23
**town** 52:16,18
**train** 49:23,24
50:2 51:4
**trained** 39:2
**trainer** 50:19,25
**training** 50:9,21
51:21
**transaction** 70:4
**transcript** 111:5,8
**transferred** 12:6
**transition** 25:7
**transmitted** 47:23
**transport** 73:13
**travel** 53:8,18,20
53:23

**traveling** 65:23
**trial** 3:21 99:8,10
**tried** 104:8
**truck** 20:13,19
21:19 26:23 29:9
29:10 32:15,19
33:19 38:16 51:19
68:19 69:17 76:8
84:21 102:17
103:20,23 104:20
**trucks** 15:17 18:24
19:10,17,24 20:2,5
20:9 21:8,11,13,14
21:17,18,22 22:6
22:23,24 23:4,9,12
23:17,21,23,24
29:5 35:24 36:2
36:10 38:14 41:21
42:6,25 43:3,3
51:16 69:2,5
96:25 104:16,23
105:19
**true** 108:13 111:8
**try** 43:25 44:2,5,6
44:18 64:10 86:19
86:22,25 90:23
103:25
**tuesday** 101:22,23
102:7,12,12,14
**tuesdays** 102:5
**turn** 57:6 59:15
60:11 71:25 74:7
75:7 78:21 82:25
**turned** 20:3 45:15
45:18 60:8 74:15
**turning** 94:14
**twice** 8:2 85:5
**two** 7:7 8:3 9:2
19:2,3,7,17,24
22:23 23:22 37:24
50:23,24 51:12,15

52:5 55:21 71:21
73:11,16,17,18
74:16 78:18 83:24
**type** 6:7 32:12
35:18 36:13 48:4
65:20 66:12 69:11

**u**

**u** 3:2 29:20 100:4
**ultimately** 99:5
**underlying** 74:19
74:23
**underneath** 60:25
67:20 79:12
**underscore** 75:12
78:24 94:16 96:5
**understand** 7:2,11
23:10 74:22
**understanding**
96:8,13 97:5
**understood** 7:15
**unemployment**
45:2
**uniform** 16:23
**uniforms** 15:21,22
15:22,25 16:6,10
17:2
**unit** 4:4
**united** 1:2 4:8
**unsigned** 3:12
**update** 68:3,6,11
**updating** 40:16
**upper** 19:8,13
**urge** 6:20
**use** 22:15 40:23
67:3,25 68:6,17,23
69:16,20
**usually** 27:23
37:11 39:13 41:2
46:21 82:19,21
85:14 102:24
103:9

Page 16

**[utilize - zoom]**

**utilize** 19:25

**v**

**v** 110:1 111:1
**vacation** 100:20
**value** 42:20
**varying** 48:21
**vehicle** 69:21
  73:20 96:15
**vehicles** 96:11
**vents** 41:11
**veritext** 4:15
**versions** 95:13,21
**versus** 4:7 30:11
  32:9 40:18 84:18
**video** 1:19 4:4
**videographer** 2:12
  4:2,22 30:25 59:3
  59:7,19,23 72:6
  80:3,7 100:11,15
  107:4
**videotaped** 1:15
**view** 103:22
**virginia** 14:22
  15:5 53:17,23
  54:6 73:6,8,9,15
  73:20
**volume** 24:3 42:19
  55:16

**w**

**w** 2:9 29:20 93:19
**wait** 6:20 22:2
**waived** 3:8
**wal** 56:15,22 57:4
**walk** 9:4 12:9
**want** 6:19 17:14
  18:5 19:10 31:22
  49:5 90:11 101:25
**wanted** 52:6 53:13
  53:15 54:4 63:10
  67:4 82:9 102:25

103:10 104:12
**warehouse** 97:13
  97:15,17
**warning** 89:13
**warrant** 48:14
  100:7
**washer** 41:12
**watch** 48:6
**water** 6:8 41:12
  98:14
**way** 7:2 38:5
  40:18 45:5 63:8
  80:23 95:20
  108:18
**wb** 71:14,15,19,23
**wear** 16:12,13
  17:14
**weather** 38:6,20
**weber** 2:5 4:20,20
  7:22,24 8:19,22,25
  58:25 59:16 105:4
  105:7 107:2 109:5
**week** 20:2,2 37:17
  44:24 47:14 51:15
  55:17 58:4,6,9,10
  58:11,12,18,18
  76:9,12,18,24
  77:17 78:8,16
  79:6,10,21 87:18
  87:20 88:24 89:2
  92:19 105:11
  106:5,25
**weekly** 88:22
**weeks** 8:7 37:14
  37:18,24 50:23,24
  51:12 73:11,11,16
  73:17,18 101:2
  103:8 106:6
**went** 20:3 26:23
  28:8 49:14,21,22
  49:24 51:5,24

73:16,18 83:21
  89:3 93:15 95:9
**western** 1:2 4:9
**whereof** 108:20
**wilson** 52:3
**windale** 83:20
**witness** 3:9,15,17
  4:23 108:10,14,20
  109:3
**wore** 15:25 17:7
  17:22
**work** 9:14 14:18
  14:19 20:4,21
  23:15,15 25:3,24
  26:12,15 27:23
  33:20 34:6 44:3
  44:16 46:12 51:8
  63:4,9 71:13 79:6
  82:3 85:20
**worked** 10:21
  14:23,25 15:5
  24:17 27:25 30:17
  58:3 66:6,6 71:19
  78:12,17 79:9
  104:14
**workers** 70:6,9,13
  70:15,19 97:11,18
**working** 9:13
  10:20 18:3 30:4
  38:12 44:12 47:2
  50:19 51:12 58:17
  71:23 76:11 84:7
**worrells** 26:12,15
  26:18
**worry** 21:17
**worth** 9:3 74:16
  98:16 102:2
**write** 41:13 63:16
  81:9
**writing** 16:18 74:5

**wrote** 41:15

**x**

**x** 1:3,9 31:6 109:2

**y**

**y** 92:13
**year** 11:21,22 26:2
  35:6 45:6 65:24
  78:5 87:4 101:3
  106:24
**years** 6:6 9:2 16:5
  21:6 23:22 25:5
  26:17 27:7 28:5
  33:5,13 35:12
  55:6,10,12 58:8
  71:21 74:16
  106:22,23
**yesterday** 8:6
**york** 1:2,20 4:10
  5:4,11 12:23 13:7
  14:14 69:7 101:16
  101:18 102:9
  103:18 108:3,8

**z**

**z** 27:3
**zapf** 27:3,8
**zoom** 4:12

Veritext Legal Solutions
800-336-4000

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -x

MIKE KLOPPEL AND ADAM WILSON,

on behalf of themselves and all

other similarly situated persons,

              Plaintiffs,

                               Index No.

     vs.                   6:17cv-06296-FPG

SEARS HOLDINGS CORPORATION, SEARS

ROEBUCK & COMPANY,

AND HOMEDELIVERYLINK, INC.,

              Defendants.

- - - - - - - - - - - - - - - - - - -x

       DEPOSITION of SERGIO COREAS, taken by

Plaintiffs, held at the offices of Jackson Lewis, 58

South Service Road, Melville, New York, on

Wednesday, October 9, 2019, commencing at 12:11

p.m., before Jean Wilm, a Registered Professional

Reporter, Certified Manager of Reporting Services,

Certified LiveNote Reporter and Notary Public within

and for the State of New York.

4

```
1                        Coreas
2    S E R G I O   C O R E A S,
3    ·            called as a witness, having been first
4                 duly sworn/affirmed by Jean Wilm, a
5                 Notary Public within and for the State
6                 of New York, was examined and
7                 testified  as follows:
8    EXAMINATION
9    BY MR. SATTIRAJU:
10            Q     Please state your name and address for
11   the record.
12            A     Sergio Coreas, 7709 4th Avenue, North
13   Bergen, New Jersey 07047.
14            Q     My name is Ravi Sattiraju.  I am an
15   attorney.  I represent Mike Kloppel, Adam Wilson,
16   and a class of employees in a lawsuit against
17   HomeDeliveryLink and Sears Holding Corp. and Sears
18   Roebuck & Company.
19            Am I saying your name correctly,
20   Coreas?
21            A     It is Coreas, yes.
22            Q     That is how you pronounce it?
23            A     Yes.
24            Q     I just wanted to make sure I said it
25   right.
```

1                    Coreas

2         A     Yes.  Ten more days will be four

3   years.

4         Q     Where were you working before that?

5         A     I was working for Cory First Home

6   Delivery.

7         Q     Is that Cory Furniture?

8         A     Cory, yes.

9         Q     Where was that?

10        A     In Jersey.  New Jersey.

11        Q     What were you doing for them?

12        A     I was the same position, account

13  executive.  The same position is known over there as

14  a -- they have a different name.  Over here in

15  HomeDelivery, they call it as an account executive.

16  Over there is an account manager.

17        Q     You have been here since October 2015

18  at HDL, you said?

19        A     What was the question?

20        Q     You said that you have been at home

21  Delivery since October 2015?

22        A     Yes, sir.

23        Q     What was the first assignment you had?

24  What was your first job?

25        A     I was an assistant account executive

1                          Coreas

2              So the Innovel representative is

3    walking the floor.  Do they walk the floor with you

4    in the morning or do you guys walk around

5    separately?

6          A     The warehouse is small, so it's very

7    visible.

8          Q     So you both see each other?

9          A     Yes.

10         Q     By the way, how many trucks were

11   operating on a daily basis when you started?

12         A     When I started in 2015?

13         Q     Yes.

14         A     I think it was between ten and fifteen

15   trucks at the most.

16         Q     And it had been more before that?

17         A     I don't know.

18         Q     Did anyone ever tell you "We used to

19   be busier.  We used to have more trucks"?

20         A     That's what they say.

21         Q     But you don't know the specific

22   numbers?

23         A     I don't know the specific numbers, no.

24         Q     Every day there is a stand-up meeting,

25   correct?

1

2                   C E R T I F I C A T E

3      STATE OF NEW YORK   )

                           ) ss.

4      COUNTY OF NEW YORK )

5                    I, Jean Wilm, a Registered

6                    Professional Reporter and Notary

7                    Public of the State of New York, do

8                    hereby certify that the witness was

9                    duly sworn/affirmed by me.

10                   I further certify that the

11                   foregoing deposition of SERGIO

12                   COREAS, taken at the time and place

13                   aforesaid is a true and correct

14                   transcription of said deposition.

15                   I further certify that I am

16                   neither counsel for nor related to

17                   any party to said action, nor in any

18                   wise interested in the result or

19                   outcome thereof.

20                   IN WITNESS WHEREOF, I have

21                   hereunto set my hand this 17th day

22                   of October 2019.

23

24

25                   JEAN WILM, RPR, CMRS, CLR

# EXHIBIT 21

1

2               UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF NEW YORK
3 - - - - - - - - - - - - - - - - - - - - - - - - - -

MIKE KLOPPEL and ADAM WILSON, on behalf of
4 themselves and all other similarly situated
persons,

5

            Plaintiffs,
6

            Civil Action No. 6:17-cv-6296-FPG
7 v.

8 HOMEDELIVERYLINK, INC.,

9            Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - -
10

Deposition Upon Oral Examination Of:
11

            Michael Patrick Kloppel
12

13 Location:     Alliance Court Reporting, Inc.
               120 East Avenue, Suite 200
14             Rochester, New York 14604

15

16 Date:         December 2, 2019

17

18 Time:         11:00 a.m.

19

20

21 Reported By:  CHRISTINE KESTER

22             120 East Avenue, Suite 200

23             Rochester, New York 14604

24

25 JOB NO:       171587

1          MICHAEL PATRICK KLOPPEL - BY MR. BUTCHER

2    for their certified transcript charge, including any

3    expedite or other related production charges;

4              AND IT IS FURTHER STIPULATED, that the

5    Notary Public, CHRISTINE KESTER, may administer the

6    oath to the witness.

7                        *     *     *

8    MICHAEL PATRICK KLOPPEL,

9              called herein as a witness, first being sworn,

10             testified as follows:

11             EXAMINATION BY MR. BUTCHER:

12             Q.   Would you state your name for the record?

13             A.   Michael Patrick Kloppel.

14             Q.   And what's your current address,

15   Mr. Kloppel?

16             A.   217 Rush Mendon Townline Road in Honeoye

17   Falls, New York.

18             Q.   How long have you been at that address?

19             A.   Three and a half years, I believe.

20   Approximately.

21             Q.   Have you ever been deposed before?

22             A.   No.

23             Q.   A couple ground rules before we get

24   started here.  We've got the court reporter taking

25   down everything that's being said.  We want to make

1          MICHAEL PATRICK KLOPPEL - BY MR. BUTCHER

2          A.  No.  That got done after -- sometimes they

3    had to move the trucks around even.  So the manifests

4    are usually associated with like -- I think like a

5    lane.  They had like lanes, like doors.  And when they

6    come in, Rex or whoever had a general idea of what the

7    drivers were capable of and what they liked doing, so

8    they would try to accommodate them.  But it wasn't

9    assigned to the truck so much as the driver and

10   the -- specifically the lane.  And the truck kind of

11   just followed.

12          Q.  Did you have final say in what lane that

13   Kloppel Deliveries' drivers and helpers were assigned

14   to?

15          A.  I could try if I thought that it wasn't

16   going to work, talk with HDL.  And say, hey, we need

17   to move these guys around.  But it didn't always work

18   out like that.  I couldn't go and ask people to switch

19   routes with me normally.  I did not normally do that.

20          Q.  There were instances in which you asked

21   other Kloppel Deliveries' drivers and helpers to

22   switch with you?

23          A.  You mean like I'd come in instead of them

24   working kind of thing?

25          Q.  No.  Did you have final say over which

1          MICHAEL PATRICK KLOPPEL - BY MR. BUTCHER

2     lanes the Kloppel Deliveries' --

3          A.  Employees?

4          Q.  -- employees were going to on a given day?

5          A.  Generally speaking, yes.  There was just

6     pressure from HDL to stay within how they felt it

7     would comfortably work.  Most -- most of the time if

8     there -- I thought there was an issue, I could direct

9     them to another lane.  We all worked together.

10         Q.  You say most of the time.  Were there

11    instances in which you tried to direct someone to a

12    lane and you were told no, you cannot move that team?

13         A.  I don't -- I don't recall specific

14    incidents.  It was -- it would have been discouraged.

15         Q.  How do you know that?

16         A.  Like I said, Rex had -- Rex, James, all of

17    them had an idea of how things would go for a

18    particular team.  So they would assign those routes.

19    And I could discuss it with them and try to rearrange

20    it, but it just usually wasn't something that was

21    done.  I mean, it -- just didn't normally do it like

22    that.

23              I mean, you could.  It wasn't like it was

24    something that was restricted.  So I know I had

25    opportunity to discuss it, but they wouldn't want me

Page 182

1                  C E R T I F I C A T I O N

2    STATE OF NEW YORK:

3    COUNTY OF MONROE:

4              I, CHRISTINE KESTER, do hereby certify

5    that the foregoing testimony was duly sworn to; that I

6    reported in machine shorthand the foregoing pages of

7    the above-styled cause, and that they were produced by

8    computer-aided transcription (CAT) under my personal

9    supervision and constitute a true and accurate record

10   of the testimony in this proceeding;

11             I further certify that the witness

12   requests to review the transcript;

13             I further certify that I am not an

14   attorney or counsel of any parties, nor a relative or

15   employee of any attorney or counsel connected with the

16   action, nor financially interested in the action;

17             WITNESS my hand in the City of Rochester,

18   County of Monroe, State of New York.

19

20   DATED: DECEMBER 12, 2019

21

22

23   *Christine Kester*
     _____
     CHRISTINE KESTER
24   Freelance Court Reporter and
     Notary Public No. 01KE6093245
25   in and for Monroe County, New York

# EXHIBIT 22

```
1

2        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF NEW YORK
3        ------------------------------------------X
         MIKE KLOPPEL, et al.,
4
                                 PLAINTIFFS,
5
6            -against-        Case No.:  6:17-cv-06296
                              FPG-MJP
7
8        HOMEDELIVERYLINK, INC.,
9                                DEFENDANT.
         ------------------------------------------X
10
11                   DATE:  APRIL 16, 2021
12                   TIME:  10:05 a.m.
13
14
15            VIDEOTAPED DEPOSITION of the
16       Plaintiff, SAMORA MINORS, taken by the
17       Defendant, pursuant to a Notice and to the
18       Federal Rules of Civil Procedure, held via
19       video teleconference, before Diane Buchanan,
20       a Notary Public of the State of New York.
21
22
23
24
25
                                       Page 1
```

```
 1
 2      A P P E A R A N C E S:
 3
        LICHTEN & LISS-RIORDAS, P.C.
 4      Attorneys for the Plaintiff Samora Minors
            100 Cambridge Street
 5          Boston, MA 02114
            BY:  BENJAMIN WEBER, ESQ.
 6          Bjweber@llrlaw.com
 7
        SCOPELITIS, GARVIN, LIGHT,
 8      HANSON & FEARY, P.C.
        Attorneys for the Defendant
 9          30 W. Monroe Street
            Chicago, Illinois 60603
10          BY:  JARED S. KRAMER, ESQ.
            Jskramer@scopelitis.com
11
12
        ALSO PRESENT:  Kevin Gallagher, Videographer
13
14                    *         *         *
15
16
17
18
19
20
21
22
23
24
25
```

Page  2

```
1
2            F E D E R A L   S T I P U L A T I O N S
3
4
5        IT IS HEREBY STIPULATED AND AGREED by and
6    between the counsel for the respective
7    parties herein that the sealing, filing and
8    certification of the within deposition be
9    waived; that the original of the deposition
10   may be signed and sworn to by the witness
11   before anyone authorized to administer an
12   oath, with the same effect as if signed
13   before a Judge of the Court; that an unsigned
14   copy of the deposition may be used with the
15   same force and effect as if signed by the
16   witness, 30 days after service of the
17   original & 1 copy of same upon counsel for
18   the witness.
19
20                    IT IS FURTHER STIPULATED AND
21   AGREED that all objections except as to form,
22   are reserved to the time of trial.
23
24            *      *      *      *
25
```

Page 3

1
2              THE VIDEOGRAPHER:  We are going on
3       the record at approximately 10:06 a.m.
4       Today's date is April 16, 2021.  This is
5       media unit Number 1 of the video
6       recorded deposition of Samora Minors
7       taken by counsel for the defendant in
8       the matter of Mike Kloppel, et al versus
9       Homedeliverylink, Inc.  It's filed in
10      the U.S. District Court for the Western
11      Division of New York, Case Number is
12      6:17-c.v.-06296 FPG-MJP.  The deposition
13      is being held via zoom virtual
14      conferencing.  My name is Kevin
15      Gallagher.  The court reporter is Diane
16      Buchanan.  We are both from Veritext
17      Legal Solutions.
18           At this time the attorneys
19      attending the session will identify
20      themselves, for the record.
21           MR. KRAMER:  Good morning.  Jared
22      Kramer for the defendant,
23      Homedeliverylink.
24           MR. WEBER:  This is Ben Weber,
25      counsel for the plaintiffs.

                                    Page 4

```
1                    SAMORA MINORS
2              THE VIDEOGRAPHER:  And our court
3         reporter will now swear the witness and
4         we can proceed.
5    S A M O R A   M I N O R S , called as a
6    witness, having been first duly sworn by a
7    Notary Public of the State of New York, was
8    examined and testified as follows:
9    EXAMINATION BY
10   MR. KRAMER:
11            Q.   Good morning, Mr. Minors.  As you
12   just heard my name is Jared Kramer.  I
13   represent the defendant in this case
14   Homedeliverylink, Inc., Commonly referred to
15   as HDL in connection with this case.  To get
16   started can you state and spell your full
17   name for the record including any middle
18   name?
19            A.   Samora Nnamdi Minors, S-A-M-O-R-A,
20   Samora, middle name, N-N-A-M-D-I, last name
21   M-I-N-O-R-S, Minors.
22            Q.   And because we are taking this
23   deposition virtually I want to confirm you
24   can hear me okay?
25            A.   Yes.
```

Veritext Legal Solutions
800-336-4000

```
 1                   SAMORA MINORS
 2          Q.   And if at any point you have a hard
 3     time hearing me or there's any connectivity
 4     issues, just let me know and we can try to
 5     sort that out.  Okay?
 6          A.   Okay.
 7          Q.   Mr. Minors, have you ever been
 8     deposed before today?
 9          A.   No.  Well, no, no, I have never
10     been deposed before today.
11          Q.   And you hesitated for a moment, was
12     that because of any particular reason?
13          A.   No, I thought when I was talking
14     with my lawyer from before, but this was us
15     talking about the deposition, but this is my
16     first official deposition I ever had.
17          Q.   Had you ever given sworn testimony
18     in any other format?
19          A.   Yes.
20          Q.   And when was that?
21          A.   That was maybe 12 to 15 years ago.
22     That was for something with court, but that
23     was a personal matter.
24          Q.   Okay.  And that was sworn testimony
25     in court?
```

Page 6

```
1                    SAMORA MINORS
2           A.   Yes.
3           Q.   So, to get started I'm just going
4      to go over a few ground rules for the
5      deposition.  So, first the court reporter who
6      is with us is taking down everything that you
7      say and everything that I say.  And so in
8      order for her to be able to do that
9      effectively it's extremely important that we
10     don't talk over each other at all.  Okay?
11          A.   Okay.
12          Q.   So, in other words, as I'm asking
13     you a question you may have a pretty good
14     sense of exactly where I'm headed with the
15     question and in normal conversation you just
16     go ahead and answer before I finish the
17     question.  I'm going ask you to please
18     refrain from doing that, let me finish the
19     question and go ahead and answer so that the
20     court reporter is able to take down the
21     complete question for the record.  Does that
22     make sense?
23          A.   Yes.
24          Q.   And I will make sure that I try to
25     return the favor and make sure that I let you
```

Veritext Legal Solutions
800-336-4000

```
1                    SAMORA MINORS
2        finish your answer before I jump in with the
3        next question.  Okay?
4             A.   Okay.
5             Q.   So another thing that will make the
6        court reporter's job a little easier is to
7        make sure you answer out loud with an audible
8        yes, no, maybe or whatever your answer might
9        be as opposed to making gestures like nodding
10       or shaking your head or saying things like
11       um-hum or ah-ha.  Does that make sense?
12            A.   Yes.
13            Q.   And, again, that's just so that the
14       record is clear.  And so if at any point I
15       clarify by saying so is that a yes or is that
16       a no, I'm not trying to be antagonistic or
17       combative in any way, I just want to make
18       sure the record is clear for the court
19       reporter.  Okay?
20            A.   Yes.
21            Q.   Also throughout the course of my
22       questioning today it's not my intention to
23       trick or mislead you at all.  If for any
24       reason you don't understand a question that I
25       ask or it just doesn't make sense to you, let
```

Page 8

```
1                    SAMORA MINORS
2      me know, I will do my best to clarify for
3      you.  Okay?
4           A.   Okay.
5           Q.   And similarly if for some reason
6      there's, like I said, an issue with your
7      audio, the video is breaking up or anything
8      like that, I ask that you please just let us
9      know.  Okay?
10          A.   Yes.
11          Q.   Throughout the course of the day if
12     at any time you need to take a break, just
13     let me know, we will go ahead and do that.
14     The only thing I would ask is that we don't
15     take a break in the middle of a question.
16     So, if a question is pending I ask that you
17     answer it and then we can go ahead and take a
18     break for however long you need.  Okay?
19          A.   Okay.
20          Q.   All right.  So, you understand that
21     you've taken an oath to tell the truth today,
22     right?
23          A.   Yes.
24          Q.   And so you understand that even
25     though we are doing this in what might feel a
```

Page 9

SAMORA MINORS

```
 1
 2    bit of an informal setting on a video call, I
 3    understand you are on your phone right now,
 4    the oath you have taken to testify is under
 5    penalty of perjury and it carries the same
 6    weight and the same effect as if you are in
 7    court sitting in front of a judge and jury,
 8    do you understand that?
 9         A.   Yes.
10         Q.   Is there any reason that you feel
11    today you wouldn't be able to provide your
12    full, complete and honest testimony?
13         A.   No.
14         Q.   So, in other words, have you taken
15    any sort of medication or drugs or alcohol,
16    is there any other reason you think would
17    keep you from testifying to your best ability
18    today?
19         A.   No.
20         Q.   And so because this is a bit of an
21    unusual setting and we can't see all of each
22    others surroundings, I also want to confirm,
23    for the record, there's no one else currently
24    in the room with you where you are; is that
25    accurate?
```

Page 10

                         SAMORA MINORS

1

2         A.    That is accurate.

3         Q.    So without telling me anything that

4    you have spoken about with Mr. Weber or any

5    other attorneys that represent you, what did

6    you do to prepare for giving testimony today?

7         A.    Just off of my own recollection of

8    my past with HDL.

9         Q.    Did you meet with any attorneys?

10        A.    Beside Mr. Weber?

11        Q.    Well, without telling me anything

12   that you spoke about, did you meet with Mr.

13   Weber?

14        A.    I did not meet with Mr. Weber, but

15   we have spoken.

16        Q.    Did you speak over the phone or on

17   video call?

18        A.    Only over the phone and through

19   e-mail.

20        Q.    And when was that?

21        A.    Over the last several months I

22   would say.

23        Q.    Did you meet with him specifically

24   to prepare for testifying today?

25        A.    Yes.

                                            Page 11

```
 1                    SAMORA MINORS
 2         Q.    Approximately how long did you meet
 3    or talk over the phone in order to do that?
 4         A.    Approximately 17 minutes, 18
 5    minutes or so.
 6         Q.    Did you review any documents in
 7    order to prepare for testimony?
 8         A.    Yes.
 9         Q.    Which documents did you review?
10         A.    The documents that I had given to
11    them, but then they had sent back to me which
12    is this (indicating).
13         Q.    So you are holding up a tabbed
14    binder.  Was that a binder that was sent to
15    you via Fed Ex yesterday?
16         A.    Yes.
17         Q.    Okay.  And you reviewed the
18    exhibits that were in that binder before
19    testifying today?
20         A.    Yes.
21         Q.    I should also mention that it's
22    important that the only items you refer to
23    while you are testifying because you are on
24    your phone are exhibits that are introduced
25    into evidence that are in the binder or that
```

Veritext Legal Solutions
800-336-4000

```
 1                    SAMORA MINORS
 2        I share with you on the screen.  Does that
 3        make sense?
 4              A.   Yes.
 5              Q.   Besides the attorneys that -- or
 6        Mr. Weber, did you speak to anyone else about
 7        the testimony you are giving today?
 8              A.   No.
 9              Q.   Besides Samora Minors, have you
10        ever been known by any other names?
11              A.   No.
12              Q.   And what is your date of birth, Mr.
13        Minors?
14              A.   June 10, 1988.
15              Q.   And where are you currently living?
16              A.   421 Venetian Boulevard,
17        Lindenhurst, New York 11757.
18              Q.   How long have you lived at that
19        address for?
20              A.   A little over a year and a half.
21        About a year and nine or ten months.
22              Q.   And where were you living prior to
23        that?
24              A.   In Brooklyn, New York.
25              Q.   What is the address that was at in
```

```
 1                    SAMORA MINORS
 2      Brooklyn?
 3           A.   1655 Flatbush Avenue, Brooklyn,
 4      New York 11221 -- 11210.  And the address
 5      before that was 4407 Avenue, L Brooklyn,
 6      New York 11234.
 7           Q.   Okay.  The first address in
 8      Brooklyn, how long were you at that address
 9      for?
10           A.   Approximately 13, 14 years.
11           Q.   Okay.  What about the address on
12      Avenue L?
13           A.   I'm sorry, that was the address
14      that I was at 13 or 14 years was Avenue L.
15           Q.   Got it, I'm sorry.  So how long
16      were you at the address after that?
17           A.   About two years.  A little under
18      two years.
19           Q.   Okay.  Do you own or rent property
20      at any other locations?
21           A.   No.
22           Q.   Since 2013 have you owned or rented
23      property at any other locations besides the
24      ones you just mentioned?
25           A.   Yes.
```

Page 14

```
1                    SAMORA MINORS
2          Q.    Where is that?
3          A.    Since 2013?
4          Q.    Yes.
5          A.    I lived in several states.  The
6     first one is Florida and -- well, not several
7     states, but I went to upstate, Upstate,
8     New York, Upstate, New York I'm sorry.
9          Q.    Let's start with Florida when did
10    you live there?
11         A.    From 2015 to about 2018.
12         Q.    And what address did you live at in
13    Florida during that time?
14         A.    4264 Sable Park Drive, Tampa
15    Florida 33610, Unit 201.
16         Q.    Any other addresses in Florida?
17         A.    The same address, but I moved a
18    different unit.
19         Q.    Got it.  And when did you move
20    units, do you recall?
21         A.    It would have been mid 2016.
22         Q.    And what -- any other locations in
23    Florida?
24         A.    No.
25         Q.    What other states have you lived in
```

Page 15

```
 1                   SAMORA MINORS
 2      since 2013?
 3           A.   New York and Florida.  Those are
 4      the only two states I lived in, that I
 5      resided in.
 6           Q.   Okay.  Have you spent shorter
 7      periods of time in other locations besides
 8      I'm not talking about a week or two for
 9      vacation?
10           A.   No.
11           Q.   I want to ask you a bit about your
12      educational background.  Did you attend high
13      school in New York?
14           A.   Yes.
15           Q.   Is that where you grew up?
16           A.   Yes.
17           Q.   And where did you attend high
18      school?
19           A.   Canarsie High School.
20           Q.   Did you graduate?
21           A.   Yes.
22           Q.   And what year did you graduate in?
23           A.   2007.
24           Q.   And did you attend any school after
25      high school?
```

Page 16

```
1                    SAMORA MINORS
2           A.   Yes.
3           Q.   What school?
4           A.   I attended Troy, Troy University,
5      but it's a JUCO, it's a two-year school.
6      It's Upstate, New York.
7           Q.   Okay.  And did you receive a degree
8      from Troy?
9           A.   No, I transferred to Kingsborough,
10     an Associates and back to Downstate,
11     Brooklyn.
12          Q.   That's Kingsborough Community
13     College in Brooklyn?
14          A.   Correct.
15          Q.   Did you receive a degree from
16     Kingsborough?
17          A.   Yes.
18          Q.   What was the degree?
19          A.   It was in criminal justice.
20          Q.   Okay.  What year did you receive
21     the degree?
22          A.   That was 2011.
23          Q.   2011, okay.  Any additional school
24     after receiving your degree from
25     Kingsborough?
```

Veritext Legal Solutions
800-336-4000

```
1                    SAMORA MINORS
2          A.    Yes.  I went to John Jay.
3          Q.    Okay.  And did you also study
4     criminal justice at John Jay?
5          A.    Yes.
6          Q.    Did you receive an additional
7     degree from there?
8          A.    No.
9          Q.    Okay.  Have you ever been involved
10    in a lawsuit before?
11         A.    Yes.
12         Q.    And was that personally or through
13    a business that you were involved in?
14         A.    Through a business I was involved
15    in.
16         Q.    And what was that business?
17         A.    That was with XBO.
18         Q.    And was it, was the business that
19    you owned Minors Contracting LLC?
20         A.    Yes.
21         Q.    Okay.  And what was the nature of
22    the lawsuit with XBO.
23         A.    That was labor loss.
24         Q.    And you were the plaintiff in the
25    lawsuit or were you suing XBO?
```

Veritext Legal Solutions
800-336-4000

```
1                    SAMORA MINORS
2           A.    It was a class action.
3           Q.    Were you one of the named
4     plaintiffs or were you a part of the class in
5     that case?
6           A.    I was part of the class.
7           Q.    Okay.  So similar to in this case;
8     is that correct?
9           A.    I'm not sure.  I can't really put
10    those two together.  This is not -- I'm not
11    sure.  It's two different states.
12          Q.    I understand.  When was that
13    lawsuit, approximately?
14          A.    I believe it was 20 -- I'm not
15    sure, honestly.  When it started it was a
16    while.  It was 2014, I believe, but I'm not
17    sure when it transpired and when it ended.  I
18    know it ended around 2016.
19          Q.    Okay.  Did you provide any
20    testimony in that lawsuit?
21          A.    No.
22          Q.    Did you ever have to respond to any
23    sort of discovery demands in that lawsuit?
24          A.    No.
25          Q.    Did you personally have any
```

Veritext Legal Solutions
800-336-4000

SAMORA MINORS

```
 1
 2    interaction with any of the lawyers involved
 3    with that lawsuit?
 4         A.    No.
 5         Q.    Did you ultimately just receive any
 6    sort of settlement check as a result of the
 7    lawsuit?
 8         A.    Yes.
 9         Q.    Are you the owner of Minors
10    Contracting LLC?
11         A.    Yes.
12         Q.    How long has Minors Contracting
13    been in business?
14         A.    11 and a half years, since 2009.
15         Q.    And is that when you filed
16    organization for the business?
17         A.    Yes.
18         Q.    What kind of services does Minors
19    Contracting provide?
20         A.    Delivery service.
21         Q.    And do you provide what is commonly
22    referred to as final mile delivery services?
23         A.    Yes.
24         Q.    Has that always been the type of
25    services that the company provides?
```

Page 20

```
 1                    SAMORA MINORS
 2          A.    No.
 3          Q.    What other services has the company
 4     provided since it started in 2009?
 5          A.    I did building management and
 6     inception for two years.
 7          Q.    So you started it in approximately
 8     April of 2011 and for approximately two years
 9     you did building management; is that
10     accurate?
11          A.    I started in April of 2009.
12          Q.    I'm sorry I misspoke, April of 2009
13     until about 2011 you did building management?
14          A.    Give or take a few months.  I'm not
15     exactly.  This was over a decade ago.
16          Q.    Was that in Brooklyn predominantly?
17          A.    Yes.
18          Q.    What led you to start Minors
19     Contracting back in 2009?
20          A.    I was doing building management
21     under self-employed under myself and I was
22     advised to go into an LLC and to bid onto,
23     bid on contracts for building management at
24     the time.
25          Q.    Okay.  Who advised you to organize
```

Page 21

SAMORA MINORS

1

2      the business as an LLC?

3           A.   It was an -- it was my accountant

4      and one of the representatives that I was

5      doing the contracting, the business with at

6      that time.

7           Q.   When you organized the company were

8      you the only member of the LLC?

9           A.   Yes.

10          Q.   And you organized the company in

11     New York; is that correct?

12          A.   Yes.

13          Q.   How did you end up making the

14     transition to final mile delivery services?

15          A.   My contract ended with building

16     management and I was looking for new work.  I

17     went to work with my uncle and he introduced

18     me to a new industry.

19          Q.   What is your uncle's name?

20          A.   Steve Minors.

21          Q.   And how, how was he involved in the

22     industry?

23          A.   A decade ago he was a contractor.

24          Q.   Do you know who he was a contractor

25     with?

Veritext Legal Solutions
800-336-4000

```
 1                    SAMORA MINORS
 2         A.   At the time I believe it was Spirit
 3    and another -- I think it was Spirit, I
 4    believe.  This was a long time ago.  I think
 5    it was Spirit.
 6         Q.   Do you recall the name of -- well,
 7    do you know if he personally contracted with
 8    Spirit or did he own a business that
 9    contracted with Spirit?
10         A.   That I wasn't privy to.
11         Q.   So when he advised you to go into
12    the industry did you go into business with
13    him directly?
14         A.   No, he didn't advise me to go into
15    business and I didn't go into business with
16    him directly.
17         Q.   Okay.  And so what kind of
18    services, who did you begin providing
19    delivery services for in 2011?
20         A.   I never provided delivery service
21    in 2011.  It was 2013 my first delivery
22    business was partnership or work was with
23    HDL.
24         Q.   Okay.  So you mentioned before you
25    were doing building management for about two
```

Page 23

```
1                    SAMORA MINORS
2        years between '09 and 2011.  And if you
3        didn't begin working with HDL what did the
4        company do between 2011 and 2013?
5             A.   Nothing.
6             Q.   Then what did you do for work
7        during that time?
8             A.   Nothing, I went to school.  That's
9        when I went to school.
10            Q.   Understood.  And that was when --
11       sorry were you at Kingsborough during that
12       time?
13            A.   No, I already finished
14       Kingsborough.  I was in John Jay.
15            Q.   Okay.  What is the business address
16       for Minors Contracting LLC?
17            A.   421 Venetian Boulevard,
18       Lindenhurst, New York 11757.
19            Q.   Has the address listed ever been
20       1959 Troy Avenue in Brooklyn, New York?
21            A.   Yes.  That was a long time ago.
22       That was almost a mistake, but I tried to
23       correct it, but that was a long time ago,
24       once, yes.
25            Q.   What was located at that address?
```

Page 24

1                    SAMORA MINORS
2          A.   I lived there with my girlfriend at
3     the time I was going to move in and it didn't
4     work out and I had to change my address.
5          Q.   Okay.  Do you recall when you moved
6     out of that address?
7          A.   I don't.  I would be guessing, 2010
8     maybe.  It was a little while after.
9          Q.   Okay.  Besides New York where is
10    Minors Contracting registered to do business?
11         A.   As of right now nowhere.  At one
12    point it was Florida.
13         Q.   Okay.  And when did -- do you
14    remember when you first registered the
15    business to conduct business in Florida?
16         A.   2016.
17         Q.   And does around March of 2016 sound
18    accurate?
19         A.   I believe so.
20         Q.   Why did you decide to register the
21    company to do business in Florida at that
22    time?
23         A.   It was a choice, personal choice, I
24    was moving.
25         Q.   Okay.  So that's when you moved to

Veritext Legal Solutions
800-336-4000

```
 1                    SAMORA MINORS
 2      the address you mentioned before in Tampa; is
 3      that correct?
 4           A.   Yes.
 5           Q.   And so from March of 2016 how long
 6      were you living in Tampa for?
 7           A.   Until the end of 2018.
 8           Q.   Okay.  You mentioned that the
 9      company is no longer registered to do
10      business in Florida, right?
11           A.   Correct.
12           Q.   When did the company become
13      inactive?
14           A.   End of 2018.
15           Q.   And why was that?
16           A.   I was moving back to -- well, at
17      the time I was not doing any -- I cancelled
18      my work with HDL and at the time I wasn't
19      doing any work with the business.  I was on a
20      hiatus and I was moving back to New York with
21      my fiancee.
22           Q.   Okay.  That's when you moved back
23      to your current address in Lindenhurst?
24           A.   No, I first, I moved back into the
25      Brooklyn address 1655 Flatbush Avenue address
```

Page 26

and then I came here.

Q. Was the company active in New York during that hiatus?

A. No.

Q. When did the company become active again after moving back to New York?

A. Beginning of 2019.

Q. Besides yourself does anyone else have an ownership interest in the company in Minors Contracting LLC?

A. Yes.

Q. And who is that?

A. Quani Minors.

Q. Sorry, what was that name?

A. Her name is Quani Minors, Q-U-A-N-I.

Q. And is she related to you?

A. Yes, she's my sister.

Q. What is her ownership interest in the company?

A. One percent.

Q. How long has she had that interest in the company?

A. 2016, since 2016.

```
1                   SAMORA MINORS
2          Q.   And what led to her acquiring that
3     one percent interest in the company?
4          A.   She invested some money into me,
5     into the company.
6          Q.   How much money did she invest in
7     order to acquire that one percent interest?
8          A.   Over time I think it was maybe
9     5,000.
10         Q.   And has she ever worked for the
11    company?
12         A.   No.
13         Q.   Has she ever provided services for
14    the company as a contractor or anything like
15    that?
16         A.   No.
17         Q.   Since you started the company in
18    2009 have you worked for anyone else besides
19    Minors Contracting?
20         A.   Yes, I have been employed.
21         Q.   Where at?
22         A.   Company called Big Dog in Brooklyn,
23    New York.
24         Q.   What did you do for Big Dog?
25         A.   I was an assistant, I want to say
```

Page 28

```
 1                    SAMORA MINORS
 2       lead with their party rental company and they
 3       set up occasions and I did their warehouse
 4       and their unloading and loading and doing
 5       their deliveries for their occasional -- what
 6       is that?  Like parties and whatnot for or
 7       anything they deliver.
 8            Q.   Did you receive a W-2 from Big Dog?
 9            A.   Correct.
10            Q.   And when were you employed by them?
11            A.   This was like mid summer of 2018
12       for about two and a half months.
13            Q.   You said your position was
14       assistant lead, was that right?
15            A.   Correct.
16            Q.   Did you work as a driver as part of
17       your duties?
18            A.   No.
19            Q.   And that was while you were still
20       in school?  I'm sorry, I'm mixing up dates
21       here.  You can disregard that.  So you
22       mentioned earlier that you originally
23       organized the company as a limited liability
24       company back in 2009, right?
25            A.   Correct.
```

Page 29

```
1                    SAMORA MINORS
2         Q.   Did you ever decide to change the
3    companies organization so that it became a
4    partnership?
5         A.   Yes, but you do not have to.
6    It's -- I'm not an accountant.  Yes.
7         Q.   When was that?
8         A.   That was in 2016.
9         Q.   Why did you decide to make that
10   change?
11        A.   Because I had a partner.
12        Q.   That was when your sister purchased
13   the one percent interest in the company?
14        A.   Correct.
15        Q.   You mentioned you are not an
16   accountant, did you speak to any accountants
17   to get advice regarding that?
18        A.   Yes, but I was going to say that
19   you don't have to change your articles of
20   organizations, that's just on the state
21   level.  That's for tax purposes you can when
22   it's an LLC, you can give a share, you write
23   up the share and you do the billing and you
24   do the -- it's much simpler you don't have to
25   change.  The question you asked is irrelevant
```

Page 30

```
 1                    SAMORA MINORS
 2      to the LLC.
 3           Q.    Was the only way you changed is the
 4      way you file your taxes at the end of the
 5      year 2016?
 6           A.    I'm unsure what you asked.
 7           Q.    Okay.
 8           A.    Well, we can talk a little more
 9      about that later.
10           Q.    What is your current title at
11      Minors Contracting?
12           A.    Owner, CEO.
13           Q.    Have you always been the CEO?
14           A.    Yes.
15           Q.    When you registered the business to
16      conduct business in Florida, do you recall
17      filing annual reports with the Florida
18      Secretary of State?
19           A.    Yes.
20           Q.    And do you remember that back in
21      2017 in the annual report you filed you were
22      listed as the CFO of the company?
23           A.    No, I don't recall.  It could have
24      been a mistake.  I don't recall though.
25           Q.    Do you recall listing Karen Minors
```

Page 31

SAMORA MINORS

1

2     as the CEO of the company in that year?

3          A.   No, I don't recall, but it probably

4     would have been a mistake.

5          Q.   Is Karen Minors related to you?

6          A.   That is Quani Minors, that is her

7     middle name.

8          Q.   Quani is her first name?

9          A.   Correct.

10          Q.   That's your sister who owned the

11    one percent interest in the company?

12          A.   Yes.

13          Q.   So you have no idea why Karen

14    Minors would have been listed as CEO in 2017?

15          A.   No.  At that time, no. I don't see

16    why that would have been a typo or mistake.

17          Q.   Okay.  Do you recall listing

18    Samori -- Samori Minors as the

19    vice-president?

20          A.   Yes, I do.

21          Q.   And who is Samori Minors?

22          A.   That's my brother.

23          Q.   Was he working as the

24    vice-president of the company at that time?

25          A.   Yes, at that time it was minimal,

Page 32

```
 1                    SAMORA MINORS
 2        minimal work in terms of what we were doing
 3        as vice-president.  Those names and titles
 4        were more so just for show for myself and
 5        what I was filing, but it wasn't in respect
 6        to what we were doing.  We were very minimal
 7        in what we were doing.  He worked with me as
 8        a driver and as a person who worked with me
 9        with the company.
10             Q.   So how were you paying him while
11        you were working as a helper or driver with
12        the company?
13             A.   As a 1099.
14             Q.   When did he start performing those
15        services for the company?
16             A.   2013.  2013.
17             Q.   Do you know why in 2017 the annual
18        report changed to list him as vice-president
19        when he hadn't been listed as that before?
20             A.   I must have decided to make him
21        that.
22             Q.   And do you recall why that was?
23             A.   I probably promoted him for reason
24        that I deemed it necessary.  When I do things
25        like that that's probably the reason why.
```

Page 33

```
 1                    SAMORA MINORS
 2         Q.    As CEO of the company that was your
 3    decision to make?
 4         A.    Yes.
 5         Q.    And you also listed Joaquim Minors
 6    as another vice-president, do you recall
 7    that?
 8         A.    Yes.
 9         Q.    And what was his role in the
10    company at that time?
11         A.    His role was to be a driver.
12    Again, this was more of just a label for, I
13    think for whatever banking and paperwork that
14    I was opening up.  They were just people that
15    were either family and I gave them a position
16    so they can have access to do -- to put fuel
17    and gas and to oversee the daily deliveries.
18         Q.    Okay.  And so those individuals
19    were listed as officers in 2017 and 2018,
20    does that sound accurate?
21         A.    Yes.
22         Q.    In 2019 do you know why they would
23    have been removed as officer in the company
24    filings?
25         A.    Yes, I no longer worked with any of
```

Page 34

```
 1                      SAMORA MINORS
 2      them.
 3           Q.   Okay.  And did -- what happened to
 4      cause that relation, that working
 5      relationship to end?
 6           A.   Nothing.  It just ended.
 7           Q.   Did they decide to work elsewhere
 8      or did you decide you no longer wanted them
 9      to work for the company?
10           A.   No, they decided to work elsewhere
11      and I no longer wanted to work with HDL, so I
12      wasn't really working at all so there was no
13      work at the time and they decided to continue
14      on and get their own employment.
15           Q.   Understood.  Okay.  At this time
16      I'm going to introduce and ask you to take a
17      look at the document in that binder that you
18      have which has been pre-marked as Exhibit 1.
19                (Exhibit 1, LinkedIn profile page,
20           marked for identification, as of this
21           date.)
22           Q.   Can you take a look at that,
23      Mr. Minors.
24           A.   Okay.
25           Q.   Is that a photo or screen shot of
```

Page 35

```
1                    SAMORA MINORS
2      your LinkedIn account profile?
3              A.   Yes.
4              Q.   Is that a photo of you appearing in
5      the upper left-hand corner?
6              A.   Correct.
7              Q.   I assume you created this LinkedIn
8      profile; is that correct?
9              A.   Yes.
10             Q.   Do you remember around when you
11     first created the profile?
12             A.   I don't.  I don't.
13             Q.   And where it says about two-thirds
14     of the way down the page is that a
15     description that you had written describing
16     your experience as a CEO in the
17     transportation industry?
18             A.   Yes.
19             Q.   So it says that your experience
20     chief executive officer with a demonstrated
21     working in transportation/trucking/railroad
22     industry.  I know we spoke a bit about the
23     services your company provided and the
24     transportation industry.  Can you describe
25     your experience in the railroad industry?
```

Page 36

```
1                    SAMORA MINORS
2          A.    I don't have any.
3          Q.    Okay.  So that piece is just not
4     accurate?
5          A.    No, this was probably a copy and
6     paste and it's definitely not accurate.  I
7     started this when I was 21.  This was not
8     accurate.  This was just me making a profile
9     for LinkedIn.  I never used it.  It was more
10    so like a social media.  These connections
11    mean nothing.  This means nothing.  This is
12    just a social media for me.
13         Q.    The description of your experience
14    just mentions that the company Minors
15    Contracting provided logistic services,
16    deliveries for small and large businesses.
17    Home Depot, Bob's Furniture, et cetera.
18    Other than those companies are there any
19    other customers Minor Contracting has
20    provided delivery services for?
21         A.    No.
22         Q.    So when you wrote et cetera, that
23    wasn't referring to any specific additional
24    companies?
25         A.    No.  Again, this is almost like a
```

Page 37

SAMORA MINORS

```
 1                    SAMORA MINORS
 2     filibuster just putting stuff there on paper.
 3          Q.   Okay.  Did you mention whether
 4     Minor Contracting, LLC is still active?
 5          A.   I did not mention that.
 6          Q.   Is it still active?
 7          A.   It is still active.
 8          Q.   Okay.  And was the only hiatus the
 9     one you described after your contract was
10     terminated with HDL?
11          A.   Yes.
12          Q.   Why did you decide to name the
13     company Minors Contracting, LLC back in 2009
14     besides the fact that Minors is obviously
15     your last name?
16          A.   Yes.  I was doing contracting so I
17     decided to name it Minors Contracting and
18     then I figured any business I'm going to do
19     is a contract.  So, it just doesn't matter
20     what I do, it's just a contract.
21          Q.   Okay.  How many individuals are
22     currently working for Minors Contracting?
23          A.   I don't have anybody working for
24     me.  I have subcontractors I have on demand
25     as I need them.
```

Veritext Legal Solutions
800-336-4000

```
1                    SAMORA MINORS
2         Q.    And how many people do you have on
3    demand right now?
4         A.    Four.
5         Q.    Besides you as the CEO does the
6    company currently have any other officers?
7         A.    No.
8         Q.    Fair to say that the number of
9    individuals that have worked as
10   subcontractors with Minors Contracting
11   fluctuated over time?
12        A.    Yes.
13        Q.    Have you ever had any W-2 employees
14   with Minors Contracting?
15        A.    No.
16        Q.    So they have all been paid on 1099?
17        A.    Yes.
18        Q.    What is the most or the highest
19   number of individuals that Minors had, Minors
20   contracted with at any given time?
21        A.    Any given time and period of
22   year -- I'm not understanding the question, I
23   am a sorry.
24        Q.    So, you mentioned right now you
25   have got four people that will are providing
```

Veritext Legal Solutions
800-336-4000

```
                    SAMORA MINORS
```

1               SAMORA MINORS

2    services as subcontractors.  You mentioned

3    that that number has fluctuated over time.

4    Right?

5        A.   Yes.

6        Q.   So my question is:  What is the

7    highest number that's fluctuated to over

8    time?

9        A.   I want to say between eight and

10   ten.

11       Q.   Was there ever a time when you

12   didn't have any subcontractors that were

13   performing services for the company?

14       A.   No.  If I was working I had

15   subcontractors.

16       Q.   Okay.  Do you recall what period of

17   time Minors Contracting had between eight and

18   ten people that were providing services as

19   subcontractors?

20       A.   That would be anywhere from 2014

21   all the way up to 2017.  Again, it

22   fluctuated, it could have been a little

23   higher.  These aren't set in stone numbers.

24   I don't have great memory on those type of

25   records because, again, they were a long time

Veritext Legal Solutions
800-336-4000

SAMORA MINORS

1

2      ago.  I would have to go through them, but it

3      could have been a little more, maybe 12.  If

4      somebody worked for me for two weeks and I

5      put them on my 1099 list that's it, then I

6      never see them again.  I still comp them as

7      one of my 1099 guys.

8           Q.   What kinds of records do you have

9      that would show that kind of information who

10     was subcontracting for the company at any

11     given time?

12          A.   Those are my records, my business

13     records.  All of my records would show that.

14          Q.   Any particular kind of business

15     records that show that?

16          A.   My bookkeeping, my data, my

17     filings, my tax filings, my 1099 filings.  I

18     would put that in my filings in 1099 and tax

19     filings.

20          Q.   Did you perform bookkeeping for the

21     business yourself or did you hire anyone to

22     do that?

23          A.   I performed it myself.

24          Q.   Did you use a particular software

25     or program in order to help you do that?

Page 41

SAMORA MINORS

1

2     A.    No, primitive, mostly by hand and I

3     record mostly everything on my phone and I

4     put it up into a PDF.  Later on I would

5     upload it into my computer.

6     Q.    And have you saved all those

7     records?

8     A.    Some I have, some I don't.  I

9     discard after three, four years once I do

10    what I need with them.

11    Q.    What would be your best estimate of

12    the average number of individuals that

13    Minors Contracting had working for them since

14    you founded it?

15    A.    I would be guessing on average

16    four, six, between four and six.

17    Q.    Did you ever have less than four at

18    any particular time?

19    A.    Yes.

20    Q.    Around when was that?

21    A.    Between 2013 and 2014.  Between

22    2013 and 2014.  Those two years I didn't have

23    much people.

24    Q.    Was it two or three?

25    A.    Yes, including myself.

Veritext Legal Solutions
800-336-4000

SAMORA MINORS

1

2      Q.   How have you found workers for

3      Minors Contracting?

4      A.   Through word of mouth or ads on

5      Craig's List.  A lot of times in the

6      beginning it was family.

7      Q.   And would you have been the one to

8      place the ad on Craig's List?

9      A.   Yes.

10     Q.   Did you ever have to pay for

11     advertisements to find people to work for the

12     company?

13     A.   Yes.

14     Q.   And when it wasn't family members

15     what was your kind of process for deciding

16     whether or not you wanted to start that

17     business relationship with someone?

18     A.   Once I interviewed them I met with

19     them, I would have to give the paperwork and

20     everything over to HDL.  They would do a

21     background check and they would tell me if

22     he's good to work or not.

23     Q.   Did that differ at all before your

24     contracting with HDL back in 2009 to 2011

25     when you were contracting with building

Page 43

```
 1                    SAMORA MINORS
 2      management companies?
 3           A.    Yes, when I contracted with
 4      building management companies they didn't --
 5      they didn't have that control.
 6           Q.    What was your process for hiring
 7      people then?  Not hiring, but locating
 8      subcontractors to perform services for the
 9      company?
10           A.    We would negotiate a rate and once
11      we came to an agreement and they understood
12      what they were doing and they showed me
13      experience I would then hire them and we
14      would go from there.  The first day I would
15      know, if they knew what they were doing or
16      not.
17           Q.    And how did you determine how much
18      you were going to pay these individuals?
19           A.    Which individuals?  I'm sorry.  In
20      the beginning of my business or through the
21      last companies?
22           Q.    Let's start with the beginning of
23      the business.
24           A.    It was based on what work I had
25      that day.  Every day was different.  It would
```

Page 44

SAMORA MINORS

1

2      have been a clean out, it would have been a

3      plumber.  I would have to hire, that would

4      have been their own rates.  It would have

5      been a sheetrock guy that would have been

6      their rates, so I would get the job and I

7      would break down those jobs and subcontractor

8      them out and I would have a one set number

9      that I couldn't go over.  And I would bid out

10     within that frame?

11         Q.   And how did you determine how much

12     to pay drivers and helpers when you started

13     performing final mile deliveries?

14         A.   Based on what HDL was paying me.  I

15     saw that I was able to pay a driver X and pay

16     a helper X and that was the most I would be

17     able to pay.  It wasn't something I said,

18     well, I can set a salary and I can do it that

19     way.  It wasn't possible.

20         Q.   And since the company has been

21     performing work after your contract was

22     terminated with HDL, how have you decided how

23     much to pay subcontractors you work with?

24         A.   Based on their performance.

25         Q.   As the CEO were you always the one

SAMORA MINORS

```
 1
 2      that negotiated how much the company you
 3      would pay subcontractors?
 4           A.   Yes, on a small scale.  I'm talking
 5      to each individual person I work with and we
 6      negotiate a price. It's not an overall
 7      everybody gets one price.
 8           Q.   Would it depend on the level of
 9      experience that the individual had in the
10      industry?
11           A.   Correct.
12           Q.   So you mentioned that you began
13      contracting with HDL and got involved in the
14      final mile delivery business after speaking
15      to your uncle; is that right?
16           A.   Correct.
17           Q.   What did he tell you that led you
18      to decide to enter that business?
19           A.   He explained to me the companies
20      you see don't do their own deliveries so in
21      my mind when I was that age I saw Home Depot
22      I thought they did their delivers, I saw
23      Sears, I thought they did their own
24      deliveries, they said they don't and that was
25      it.
```

Veritext Legal Solutions
800-336-4000

SAMORA MINORS

1

2     Q.   Was he contracting with HDL at that

3     time?

4          A.   At that time, no.

5          Q.   Did know if he ever contracted with

6     HDL?

7          A.   I can't recall.  I think he -- I'm

8     sorry.

9          Q.   So you were saying I can't recall

10    if he ever contracted with HDL; is that

11    right?

12         A.   Yes, I know he did some work with

13    them, but I don't know if they ever

14    contracted with them. I know he was

15    contracted with at the time it was called 3PD

16    before it was XBO.

17         Q.   And so what led you to decide to

18    have Minors Contracting LLC your company be

19    in your contracting with HDL back in 2013?

20         A.   They were the ones in Long Island

21    doing the Sears delivery.  And once you go

22    online it was one of, you know, there would

23    be HDL promotes a lot of their hiring on

24    Craig's List and all of these companies.

25         Q.   So did you see an ads on Craig's

Page 47

```
1                    SAMORA MINORS
2        List for contractor positions with HDL?
3             A.   Yes, they had ads on Craig's List
4        at the time he had, I think it was my uncle
5        that said to me, Listen they might, I think
6        this company is hiring because he worked with
7        them true 3PD where they borrowed some
8        contractors I believe where one company
9        borrowed contractors from another company
10       because they needed the work and he said I
11       know about this address and then he said go
12       online and find out some information.  And
13       once I did the information was there and
14       that's when I started with HDL.
15            Q.   Prior to contracting with HDL did
16       you have a commercial driver's license?
17            A.   No, and I currently don't have a
18       commercial driver's license.
19            Q.   Okay.  Did you have to obtain any
20       licenses or permits before you started
21       contracting with HDL?
22            A.   No.
23            Q.   Did you undergo any sort of
24       training before you got into that industry?
25            A.   No, not through HDL.
```

Page 48

SAMORA MINORS

1

2  Q.   Did you receive training elsewhere?

3  A.   This would have been on the job

4  with my -- when I was with my uncle.

5  Q.   Okay.  So, did you work as a

6  driver/helper with your uncle's business?

7  A.   As a helper.

8  Q.   When did you start doing that?

9  A.   That was just here and there when

10  he would need me in 20 -- like 2012, end of

11  2012.

12  Q.   Okay.  And then you began

13  contracting with HDL in April of 2013; is

14  that right?

15  A.   That's correct.  I believe that's

16  correct.

17  Q.   Okay.  And so is it fair to say

18  that's how you got your experience or

19  familiarize yourself with the industry before

20  you decided to be in contracting with HDL or

21  have your business be in contracting with

22  HDL?

23  A.   Correct.

24  Q.   Okay.  When you first began

25  contracting with HDL how many trucks was

Page 49

```
 1                    SAMORA MINORS
 2      Minors Contracting operating?
 3           A.   One.
 4           Q.   And how many drivers and helpers
 5      were performing services for the company at
 6      that time?
 7           A.   At that time two.
 8           Q.   And do you remember those
 9      individual's names?
10           A.   It was Robert Shaw and Denver
11      Joseph.
12           Q.   And were they working as drivers?
13           A.   Robert Shaw was a driver.
14           Q.   And Mr. Denver was a helper?
15           A.   Correct.
16           Q.   Did Mr. Shaw ever also work as a
17      helper?
18           A.   Yes.
19           Q.   And were you working as a driver or
20      a helper?
21           A.   Correct.
22           Q.   Were you working as both?
23           A.   Both.
24           Q.   Okay.  Which location, which HDL --
25      I'm sorry, which location was Minors
```

Page 50

```
 1                    SAMORA MINORS
 2      Contracting performing services out of when
 3      you first began contracting with HDL in 2013?
 4           A.    Syosset location.
 5           Q.    Okay.  Did there come a time where
 6      you started performing work out of the
 7      Rochester location?
 8           A.    That's correct.
 9           Q.    Do you remember when that was?
10           A.    I'm not great with time.  That was
11      around, it could have been end of 2014.
12           Q.    Okay.
13           A.    I believe.
14           Q.    What caused the company to begin
15      working out of the Rochester location as
16      opposed to Syosset?
17           A.    They paid more per stop.
18           Q.    Out of Rochester?
19           A.    Yes, it was, they paid more.  It
20      was more incentive.
21           Q.    Were you still living down in
22      Brooklyn at that time?
23           A.    At the time that I went up to
24      Rochester I moved up to Rochester.
25           Q.    And that was in you believe that
```

Page 51

```
 1                   SAMORA MINORS
 2      around the end of May, sorry, the end of
 3      2014?
 4           A.   Yes.
 5           Q.   Is it accurate to say Minors
 6      Contracting was performing work mostly out of
 7      Rochester from that time period through
 8      around July the summer of 2016?
 9           A.   I'm not sure.  I did work in
10      Syosset and in Rochester.  I can't say for
11      sure that's predominantly we were in
12      Rochester.  I was in Rochester predominantly
13      but the exact dates I don't recall.
14           Q.   Did you perform work out of Buffalo
15      during that time period?
16           A.   Yes.
17           Q.   How -- do you remember during what
18      time period you were performing work out of
19      the Buffalo location?
20           A.   No, whenever we were there the
21      totality of when we were there if they ever
22      needed an extra hand they would ask us if we
23      want to go out there and run an extra route
24      out there.  If they had work or they needed
25      help so that would just vary.  It was
```

Page 52

SAMORA MINORS

1

2    something that was just seldom.

3        Q.   How did the amount of work that you

4    -- I'm sorry, I just realized you said you

5    seldom worked out of the Buffalo location; is

6    that right?

7        A.   Yes.

8        Q.   It was on an as-needed basis when

9    they asked you if you could help out with

10   deliveries out of that terminal; is that

11   right?

12       A.   Yes.

13       Q.   Okay.  How much work did you, did

14   the company perform out of the Syosset

15   location versus the Rochester location and

16   I'm talking specifically about the time

17   period from 2013 when you started contracting

18   through around the summer of 2016?

19       A.   I wouldn't know the answer.  I

20   would have to go back into detail and look at

21   dates and look at time frames.  I'm not sure

22   the answer to that.

23       Q.   Okay.  Is your general recollection

24   that it was a combination, but you don't

25   remember exactly how much during that time

Page 53

SAMORA MINORS

1
2      period?
3          A.   That is correct.  I do remember
4      that I had both Rochester and in Syosset, but
5      not in Buffalo.  I wasn't assigned in Buffalo
6      that was upon as needed but I was contracted
7      in Buffalo -- sorry, in Rochester and in
8      Syosset.
9          Q.   Did there come a time Minors
10     Contracting stopped working out of the
11     Rochester and Buffalo terminals and began
12     providing services mostly out of the Syosset
13     terminal?
14         A.   Yes.
15         Q.   I know you are saying it's
16     difficult to remember exact time periods, can
17     you estimate around when that was?
18         A.   That was 2017.  And I want to say
19     the beginning of 2017.  I want to say -- yes,
20     I want to say beginning or late 2016 where I
21     was officially out of Rochester.  The last
22     e-mail with the manager there giving them the
23     30-day notice it might have been November
24     2016 going into November 2017, it definitely
25     was done by 2017.

Page 54

```
 1               SAMORA MINORS
 2       Q.   Do you recall who the Rochester
 3   manager was that you gave your 30-day notice
 4   to?
 5       A.   I forget the full name.  Michael
 6   Rex.  Michael Rex.
 7       Q.   And was there anything in
 8   particular that caused you to decide to stop
 9   performing work out of the Rochester location
10   and move down to Syosset predominantly?
11       A.   Yes, they were claiming we left
12   them.  We weren't making a profit.  They
13   would route me to Elmira, route me deep in
14   the south.  I wasn't making anything.  They
15   would overcharge for Penske rentals.  They
16   would blackout, they would redact the
17   receipts from Penske, add their own bills and
18   I could not fight anything.  And everything
19   was just debited.  Everything was debited.
20   If the customer said something happened they
21   took the money out.  If they said my guys
22   were late, they charged me for everything.
23   Anything that was a claim they could come out
24   and charge me, they charged me for.  I wasn't
25   making any money.  They claim me, they
```

Page 55

```
1                    SAMORA MINORS
2        charged me.
3            Q.    When you say they were claiming
4        you, are you referring to like merchandise
5        claims and in-home damage claims?
6            A.    Merchandise claims, in-house damage
7        claim, Penske rental claims, product in terms
8        of not just merchandise but accessories,
9        escorial claims, where we were supposed to do
10       an install and we didn't, and if they had a
11       team go back they would charge us for that.
12       If there was a discrepancy with a customer
13       and the customer was unhappy they gave them a
14       hundred dollars.  Sears would charge HDL and
15       HDL would take it out of my pay and I could
16       not fight that.
17           Q.    And so obviously that was impacting
18       the amount of profit that the business was
19       able to generate.
20           A.    I couldn't make ends meet.  I
21       couldn't pay my bills.  The profit, I didn't
22       have profits.  They -- I couldn't pay, they
23       didn't pay me for the services rendered.
24       They would hold monies and say they had
25       claims that they would charge me for and I
```

Page 56

SAMORA MINORS

```
 1
 2      never would really see them.  And then they
 3      say there's claims for merchandise claims and
 4      you don't get the merchandise.  They just
 5      charge you a percentage and you ask for a
 6      receipt the receipt is them deducting the
 7      money.  They don't show the receipt to the
 8      receipt to the last party.  So, if there's a
 9      claim they don't show them paying the
10      customer, they show you deducting the money
11      and that's the receipt.  How do I know what
12      they did, I don't.
13           Q.   I understand.  How would the
14      deductions appear, would they show up on the
15      settlement statements issued to the company?
16           A.   That's correct.
17           Q.   And so ultimately you had to make
18      the business decision to stop performing work
19      out of the Rochester terminal for all of
20      those reasons?
21           A.   Correct.
22           Q.   And, I'm sorry, you may have said
23      this already.  What was the time period when
24      that happened?
25           A.   Leaving Rochester?
```

Page 57

```
 1                    SAMORA MINORS
 2         Q.   Yes.
 3         A.   I believe it was the end of 2016,
 4    early 2017.
 5         Q.   And when you moved down to
 6    Rochester you were still working with the
 7    same individuals and drivers and helpers.
 8    Sorry, when you moved down to Syosset were
 9    you still working with the same individuals
10    and drivers and helpers for the company?
11         A.   Yes.
12         Q.   Do you remember around how many
13    people that was at the time?
14         A.   At that time was on the higher
15    side.  It would have been between -- it would
16    have been on the higher side, maybe eight to
17    ten people.  Because it wasn't all of the
18    people, so some of the people that were up in
19    Rochester came down, they came up with me to
20    Rochester so they came back down to Brooklyn
21    with me and some people in Rochester that I
22    subcontracted out there I didn't work with
23    them any more so they stayed up there.
24         Q.   Did you have to find any new
25    drivers or helpers that were closer to
```

Page 58

SAMORA MINORS

1

2      Syosset?

3           A.   No, at the time that's when I was

4      more so dwindling my operations with HDL so

5      it wasn't me really trying to recruit more

6      people, it was maintain what I have already

7      have.

8           Q.   I want to back up a little bit to

9      closer to the beginning of the time you were

10     contracting with HDL in about the fall of

11     2013.  Do you recall adding Steve Minors as a

12     driver back then, your uncle?

13          A.   Yes, I do.

14          Q.   Do you remember how you decided to

15     begin having him perform services for the

16     company?

17          A.   Yes, at the time he was -- he was

18     not working and I told him I just started

19     working with HDL and I asked him to come on

20     and he said yes.

21          Q.   He obviously had experience in the

22     industry you mentioned, right?

23          A.   Yes, but unfortunately that ended

24     up not really, it was short lived.  He didn't

25     work a lot together, it was only for about

Page 59

```
 1                    SAMORA MINORS
 2      six months.  He was a chef, so he found work
 3      elsewhere.
 4            Q.   Do you recall adding a third driver
 5      Brian Bell in around April of 2014, spring of
 6      2014?
 7            A.   Yes, that's correct.
 8            Q.   How did you decide to hire
 9      Mr. Bell?  Sorry begin having him perform
10      work for Minors Contracting?
11            A.   He was a family friend and he asked
12      me if I had any work and I told him I did.
13            Q.   Did he have experience in the
14      industry before he started working with you?
15            A.   He did delivery for Fed Ex and UPS
16      and I believe Amazon.
17            Q.   Was he performing deliveries for
18      those other companies while he was performing
19      some work for Minors Contracting?
20            A.   I can't speak on what he did on his
21      own time, but he could have.
22            Q.   There's nothing, in other words,
23      you weren't stopping him from working for
24      other companies at that time?
25            A.   No.
```

Page 60

```
 1                    SAMORA MINORS
 2         Q.   Do you recall providing answers to
 3    some interrogatories written discovery
 4    demands in this case?
 5         A.   Yes.
 6         Q.   Do you remember stating that
 7    initially you had leased a 2011 Mitsubishi
 8    and 2013 Hilo from a company called Mendon
 9    when you started contracting with HDL?
10         A.   That's correct.
11         Q.   Do remember when you began leasing
12    those trucks?
13         A.   It was the beginning of 20 -- I
14    want to say the beginning of 2013.  It was
15    almost two to three months, two to three
16    weeks after I got the contract.  HDL was my
17    guarantor.  I didn't have a truck at the time
18    and before I could acquire a truck they --
19    they were my guarantor with Mendon and they
20    had a partnership with them.  And they gave
21    me the truck and they leased it to me.  Being
22    that I worked with HDL.
23         Q.   Okay.  What was your understanding
24    regarding why or if you needed a guarantor in
25    order to lease trucks when you first started
```

Page 61

```
1              SAMORA MINORS
2     performing services for HDL?
3          A.   My understanding was that they
4     wanted a certain level of year and they also
5     they had a partnership with them and it
6     wasn't easy to just go and get a lease
7     rental.  They had a cheaper rate and it was
8     at the time it seemed beneficial to get it
9     through HDL than to go on my own because it
10    was not that much of an option to go on my
11    own.  It was very expensive.
12         Q.   Did you begin leaving both of those
13    trucks at a period of time or was it one for
14    a period of time and you added a second
15    later?
16         A.   It was one for a period of time and
17    I added a second and then I gave both of them
18    in.
19         Q.   How long were you leasing each of
20    those trucks for, do you recall?
21         A.   The first one a little over a year.
22    And the second one no more than six months.
23         Q.   Okay.  Did you look at any other
24    leasing companies when you were considering?
25    Go ahead.  I'm sorry.  Go ahead.
```

Page 62

```
 1                    SAMORA MINORS
 2          A.   I did and I looked at Penske,
 3     Ryder, Hertz, I looked at a few of them, yes.
 4          Q.   You mentioned earlier that
 5     ultimately the rates were just lower for
 6     Mendez; is that right?
 7          A.   Yes.
 8          Q.   What caused you to turn in those
 9     trucks?
10          A.   I couldn't afford them.
11          Q.   Okay.  And so what did you do when
12     you turned in those trucks?
13          A.   When I turned in those trucks I
14     bought older, older trucks that were more
15     affordable for me.
16          Q.   Is that when you began renting
17     trucks from Penske?
18          A.   No, my Penske rentals through,
19     through my Penske or Ryder through HDL was a
20     national lease.  They rented those for me
21     when I could not get a rental on my own or I
22     refused and they would rent on my behalf and
23     yes.
24          Q.   Okay.  So, they would rent on your
25     behalf from Penske and from Ryder; is that
```

Page 63

```
1                    SAMORA MINORS
2        right?
3             A.    Um-hum.
4             Q.    Would you have to sign any
5        paperwork for the rental with Ryder?
6             A.    Yes, it was as a driver because I'm
7        the driver, I have to show my license.  I'm
8        the one physically picking it up.  But with
9        Ryder, there's a difference.  Penske you can
10       show your own insurance.  Ryder, when you
11       have a national lease the company that puts
12       their name up is the only insurance.  They
13       will take or they don't take your insurance
14       at all and they put their insurance and they
15       would charge me that difference, they would
16       redact it, they black it out and then they
17       had their own bond.
18            Q.    Fair to say you preferred to lease
19       with Penske when you needed an additional
20       truck?
21            A.    Yes, lease was not the right word,
22       it was a day rental.  Lease would mean six
23       months, a year, two lease.  Besides the
24       Mendon lease, I never leased with HDL besides
25       that.  The Penske rentals would just be
```

Page 64

```
 1                    SAMORA MINORS
 2       rentals.
 3            Q.   Understood.  That was to supplement
 4       the other trucks that you were operating if
 5       you needed them to perform additional
 6       deliveries; is that accurate?
 7            A.   Yes.  Not additional, if I broke
 8       down or if I didn't have.  Most of the time
 9       we do break downs if there was anything
10       additional it wasn't really additional, I
11       would only run what I can run.  It would be
12       most of the time a breakdown or I didn't have
13       a truck or I would have a week without a
14       truck and they say we will rent it for you
15       and we deduct it out of the settlement.
16            Q.   Did you have separate insurance
17       that was able to cover the rentals through
18       Penske?
19            A.   At the time, yes.  But not all of
20       my insurance -- at some points, yes, and some
21       points no because I had different, I had
22       different insurances and some were full
23       coverage and some were not.  Some would say,
24       yes, we cover rentals and some wouldn't.  So
25       I would have to pay Penske their own
```

Page 65

```
1                    SAMORA MINORS
2         insurance rate.
3              Q.   How would you decide what insurance
4         to or where you got insurance coverage?
5              A.   When I first started I was directed
6         to State Farm from an HDL representative.
7         Besides that it was just on my own.  I would
8         I would shop around for rates.
9              Q.   Okay.  So after you turned in your
10        trucks through Mendon you mentioned that you
11        purchased your own trucks is that right?
12             A.   That's correct.
13             Q.   And when I say you your business
14        Minors Contracting purchased those trucks,
15        right?
16             A.   Correct.
17             Q.   Which trucks, what kind of trucks
18        did the company purchase?
19             A.   24-foot box trucks.
20             Q.   Do you remember the make and year
21        of those trucks?
22             A.   Yes.  One was 1999 Mitsubishi.
23        Another was a 2000 International 4700.
24        Another one was a 98 International DT466.
25        There were two of those.  And these are just
```

Page 66

```
1                    SAMORA MINORS
2      in different varying times I would buy and
3      sell trucks or if I bought a truck broke down
4      I would part it out and sell it and buy
5      another truck.  Those are one of the things
6      to me was easier than leasing or going
7      through HDL.
8           Q.   Okay.  When you lease trucks, for
9      example, through Mendon, did they have any
10     requirements regarding how you maintain the
11     trucks or repaired them?
12          A.   Yes.  There was a lease, a lease
13     contract agreement you have to sign.  You
14     were liable for mechanical break downs if it
15     was passed, if you didn't do the maintenance,
16     regular maintenance and upkeep and the engine
17     blew on you, you were liable.  If you, you
18     know you were liable for a lot of things done
19     with the lease.  The lease was just a lease
20     you were still liable for the truck.
21          Q.   Okay.  And when you purchased
22     trucks the company purchased trucks is it
23     accurate to say that you didn't have those
24     requirements about how and where you maintain
25     and repaired the trucks, right?
```

Page 67

SAMORA MINORS

1

2 A. I'm not understanding.

3 Q. I think you mentioned when you

4 signed a lease agreement with Mendon there

5 were certain requirements that you had to

6 repair and maintain the trucks to keep them

7 in working condition, right?

8 A. Well, no, when I say repair I mean

9 that I would have to bring it to them for

10 their regular maintenance.  If, for example,

11 seven months go by and I had two maintenance

12 checks and I never went to the maintenance

13 checkups and I didn't do oil changes lease,

14 they maintain the lease maintains the upkeep.

15 But if you don't go to bring it in then and

16 then the engine blows that's on you because

17 you never did the preemptive work to keep

18 that truck going.  And you would be on the

19 hook if the transmission got stuck because

20 they would not have caught it in time.

21 Q. And you had to bring the truck

22 specifically to them in order to have them

23 maintained, right?

24 A. Yes.

25 Q. And so you didn't have those

Veritext Legal Solutions
800-336-4000

```
 1                  SAMORA MINORS
 2        requirements obviously when the company
 3        purchased the truck itself rather than
 4        leasing it from another company and entering
 5        into a separate agreement with that leasing
 6        company, right?
 7             A.   No, to the extent they would
 8        maintain HDL would maintain a record of your
 9        truck.  They maintain the physical feature.
10        They take pictures of your truck, they would,
11        you would have to be DOT compliant if you
12        were not DOT compliant, you can't drive and
13        work with HDL if your truck wasn't white you
14        couldn't work with them if it was not clean,
15        you couldn't work with them.  They had
16        smaller requirements, that some didn't follow
17        like the year of the trucks and if your
18        corner cap was messed up you had to get that
19        fixed or they wouldn't run you.
20             Q.   And Minors Contracting, did the
21        company have DOT operating authority?
22             A.   Yes.
23             Q.   Do you recall when the company
24        obtained that?
25             A.   In 2012, 2013.
```

Page 69

```
1                    SAMORA MINORS
2         Q.    Okay.  So was that shortly after
3    before you began contracting with HDL?
4         A.    That's correct.
5         Q.    Okay.  And so as a company that had
6    DOT operating authority were there specific
7    safety requirements that the company had to
8    adhere to for its trucks?
9         A.    That's correct.
10        Q.    Okay.  So, Minors Contracting also
11   had to be DOT compliant in to maintain that
12   DOT operating authority?
13        A.    That's correct.
14             MR. KRAMER:  We have been going for
15        almost an hour and a half now.  I think
16        it might be a good time, if it's all
17        right with you guys, to take a quick
18        five, ten-minute break.
19             MR. WEBER:  Sure.  Can we get a
20        breakout room.
21             THE VIDEOGRAPHER:  We are now going
22        off the record at approximately 11:24
23        a.m.
24             (Whereupon, a short recess was
25        taken.)
```

Page 70

SAMORA MINORS

1

2          THE VIDEOGRAPHER:  This is media

3      Number 2.  We are going back on the

4      record approximately 11:42 a.m.  Go

5      ahead, Counsel.

6      Q.   Thank you.  Mr. Minors, I just need

7   to remind you you are still under oath, okay?

8      A.   Yes.

9      Q.   I want to go back now to 2014 when

10   you added a third driver I believe it was

11   Mr. Bell to work as a driver for Minors

12   Contracting, how did adding an additional

13   driver impact your personal work schedule

14   back at that time?

15      A.   It didn't effect my personal work

16   schedule.

17      Q.   Okay.  So what was the reason for

18   adding the additional driver back then?

19      A.   The purpose of that being an

20   additional driver in case I needed him or

21   trained him to become a main driver in case I

22   didn't want to be exact.

23      Q.   I'm sorry, you didn't want to be

24   exact?

25      A.   So, if I had a truck or if I had

Page 71

```
 1                    SAMORA MINORS
 2     two trucks I had myself and one driver, if
 3     one of us something happened we would then be
 4     down one driver.  And you get charged if you
 5     drop the route.  If I woke up in the morning
 6     and said I'm not feeling well, HDL said okay,
 7     who do you have to pick up the route?  And I
 8     said nobody, they charge me the route plus
 9     money.  I would lose more than what I would
10     make.
11          Q.   Okay.  Around that time period were
12     there weeks when the company Minors
13     Contracting was performing deliveries for HDL
14     when you did not personally work as a driver
15     or a helper?
16          A.   No.
17          Q.   So each week you were on the truck
18     either as a driver or helper during that time
19     period?
20          A.   Yes.
21          Q.   Do you recall taking any time off
22     in the spring or summer of 2014?
23          A.   I took time off periodically.
24          Q.   Do you recall taking -- let me ask,
25     do you know how long those stretches of time
```

Page 72

```
 1                    SAMORA MINORS
 2       were they would take off around that time
 3       period?
 4            A.    Three, four days.
 5            Q.    And how did you decide, I guess,
 6       when you wanted to take time off?
 7            A.    However I felt like it.
 8            Q.    Okay.  I know it's kind of painful
 9       to go through this minutia details.  I thank
10       you for bearing with me.  I know it's not a
11       particularly enjoyable experience.  Just
12       going back to the time period when you were
13       working out of Syosset and Rochester
14       operating trucks out of those terminals, were
15       there days when Minors Contracting was
16       operating trucks out of both terminals on the
17       same day?
18            A.    Yes, that's correct.
19            Q.    Throughout the time the company was
20       under contract with HDL were you personally
21       providing delivery services, did you mostly
22       work as a driver or a helper or did it just
23       vary?
24            A.    I mostly worked as a driver.  The
25       only time I worked as a helper was when I was
```

Page 73

```
 1                    SAMORA MINORS
 2      training a driver or trying to teach somebody
 3      how to drive.
 4           Q.   Do you have any records that would
 5      show when you were working as a helper
 6      because you were training someone or showing
 7      them how to drive?
 8           A.   No.
 9           Q.   Can you briefly describe, besides
10      the obvious fact that the driver drove, how
11      did the job duties differ between those two
12      positions, was there any difference other
13      than the fact the driver was the person
14      driving the truck?
15           A.   That's correct.
16           Q.   That was the only difference?
17           A.   Yes.
18           Q.   What records would you look to
19      determine when you were working as a driver
20      on a truck?
21           A.   Once my name is on that paperwork
22      with the settlements I was driving.
23           Q.   Okay.  Were there ever any days in
24      which your name was on a delivery settlement
25      statement as a driver but you weren't
```

Veritext Legal Solutions
800-336-4000

```
1                      SAMORA MINORS
2        driving?
3              A.    Not that I recall.
4              Q.    Were there ever any days you were a
5        driver but for some reason your name did not
6        appear on the settlement statement?
7              A.    Yes.
8              Q.    There were times where that would
9        happen?
10             A.    Yes.
11             Q.    When that would happen would you
12       make efforts to correct that on the paperwork
13       that HDL issued you?
14             A.    I would correct it to the extent of
15       pay, so I would make sure they knew I would
16       get paid that day for that day I ran because
17       it was my route.  It would be a mistake or
18       either sometimes you pick up a route from
19       somebody else, somebody dropped a route or
20       there was a typo or a glitch where there were
21       no printed names or what have you.
22             Q.    Regardless of whether you were
23       listed as a driver on the delivery settlement
24       statement versus let's say your Uncle Steve
25       Minors, Minors Contracting was paid was paid
```

Veritext Legal Solutions
800-336-4000

```
 1                    SAMORA MINORS
 2      the same either way, right?
 3              A.    That's correct.
 4              Q.    Were you providing delivery
 5      services out of Syosset after you moved down
 6      to Lindenhurst?
 7              A.    I'm sorry.
 8              Q.    I'm sorry, at some point you moved
 9      from where you were I believe up in Rochester
10      back down to Brooklyn; is that right?
11              A.    Yes, that's correct.
12              Q.    And so when you were living in
13      Brooklyn at that time on the days when you
14      personally work as a driver or helper
15      training people was that always out of the
16      Syosset terminal?
17              A.    That's correct.
18              Q.    Did you ever go up, up to the
19      Rochester terminal or the Buffalo terminal at
20      that time period?
21              A.    I don't understand the question.
22              Q.    So during the time period you were
23      living in Brooklyn after you had moved back
24      down from Rochester Minors Contracting was
25      operating trucks you said it was a
```

Page 76

```
 1                  SAMORA MINORS
 2      combination between Rochester and Syosset,
 3      right?
 4           A.    That's correct.
 5           Q.    So my question is on the days that
 6      you provided the services personally as a
 7      driver or helper did you ever do that out of
 8      the Syosset terminal -- sorry, out of the
 9      Rochester terminal?
10           A.    Yes.
11           Q.    Even though you were living in
12      Brooklyn?
13           A.    Yes, for a short period of time.
14           Q.    How would that work if you were
15      living down in Brooklyn to make it all the
16      way up to Rochester to perform deliveries?
17           A.    Well, let me tell you exactly.
18      First they would tell me the day prior
19      because you get to know how much you are
20      working and how much you are working on
21      average set up to tell me when and I would
22      know who was working if I go up, I drive up
23      or take a four-hour bus ride or I would take
24      a half-hour flight.
25           Q.    Okay.  And so you would do that I
```

Page 77

SAMORA MINORS

1
2     guess the night before to then work the
3     following morning?
4         A.    The night or two days before.
5         Q.    How did you decide whether you
6     would work out of one terminal versus the
7     other?
8         A.    There were several variables to
9     determine those decisions depending how much
10    routes was needed in the week.  They would
11    know their workload the week before.  So,
12    hypothetically they would know, hey, we are
13    running, you know, five trucks every day for
14    the week.  We have a high load this week can
15    you be out here.  Rex would say I will be
16    running a lot of trucks this week or it's
17    peak season this week and I would say, yes, I
18    can make it out there for the same.  If I'm
19    in Rochester and New York and Syosset said we
20    need extra guys on hand, would you be able to
21    make it, yes, I would be able to make it and
22    I would make my way down there.
23        Q.    Where would you stay when you would
24    go up there?
25        A.    In Rochester?

Page 78

SAMORA MINORS

1

2      Q.   Yes.

3      A.   I would either stay at a hotel or I

4   would stay at one of -- a friend's house.

5      Q.   What about Buffalo, I know you said

6   it was seldom when you went to Buffalo, where

7   would you stay?

8      A.   The night of, I would not stay

9   overnight in Buffalo.

10      Q.   Did Minors Contracting have a

11   business account?

12      A.   Yes.

13      Q.   How would the company pay for your

14   travel expenses when you would have to go

15   back and forth between Rochester or Syosset

16   and Buffalo?

17      A.   I would pay with my debit card.

18      Q.   Your personal debit card?

19      A.   No, probably my business debit

20   card.

21      Q.   Where would you deduct those

22   expenses on your tax filings?

23      A.   Yes, I would.

24      Q.   Do you recall answering an

25   interrogatory that asked you to list all of

Page 79

SAMORA MINORS

1

2     the people Minors Contracting contracted with

3     to provide delivery services under that

4     contract with HDL?

5          A.   Under the contract with HDL like

6     their people or who am I contracted with HDL?

7          Q.   Who you, who Minors Contracting

8     contracted with to work as drivers or helpers

9     on the HDL account?

10         A.   They -- we did Sears.  They were

11    Inervel and Sears, Inervel is Sears.

12         Q.   My question we mentioned those

13    discovery requests that were sent to your

14    attorney earlier?

15         A.   Yes.

16         Q.   And one of the requests asked you

17    to list all the people that worked as drivers

18    or helpers in order to service the HDL

19    account, do you remember that?

20         A.   Yes.

21         Q.   Do you remember providing a list of

22    names of individuals that you remembered?

23         A.   Yes.

24         Q.   I just want to review some of those

25    people.  You listed the following seven

Page 80

```
 1                    SAMORA MINORS
 2       people as drivers, Brian Bell, Samori Minors,
 3       who we already spoke about, Randall Alvers,
 4       Freddie Torres, Aquel Andrews, Mario Duran
 5       and George Abbasega. Is it accurate that all
 6       of those people worked as drivers to perform
 7       delivery services under the HDL account?
 8            A.   Yes.
 9            Q.   Then you listed the following five
10       people as helpers, Hector Burgess, Germane
11       Bostick, Virgil Jose and Okeif Henry?
12            A.   Yes.
13            Q.   It's accurate that all of those
14       people worked as helpers?
15            A.   That's correct.
16            Q.   So it's a total of seven drivers,
17       five helpers, total of 12 that you
18       remembered?
19            A.   That's correct.
20            Q.   And I want to ask you about several
21       drivers listed on Minors Contracting.  Do you
22       remember having these people work as drivers,
23       Aquel Minors, do you remember him?
24            A.   Aquel Minors is not a person,
25       that's two names Aquel is Aquel Andrews and
```

Page 81

```
 1                    SAMORA MINORS
 2        Minors is my last name.
 3             Q.   If a delivery settlement statement
 4        listed Aquel Winters is that two different
 5        people?
 6             A.   No, that means Aquel worked for
 7        somebody named Winters.  That was their
 8        contractors name, whoever.  Whoever the last
 9        name is that means, I believe -- this is what
10        I believe, this is not -- I don't know, but
11        it -- that name had an Aquels first name and
12        Winters, that's a whole another person or his
13        first name coupled with the contractors last
14        name or the last name of his company or his
15        or her company.
16             Q.   So no one with the last name
17        Winters performed services for your company?
18             A.   Not that I can recall, no.
19             Q.   What about Alex Alan?
20             A.   Not that I recall, no.
21             Q.   Dimitri Scott, do you remember him?
22             A.   Yes, he was a contractor and he
23        lost his contractor agreement with HDL in
24        Rochester and Rex brought him to me and said
25        can he work for me, and I said okay.  And
```

Page 82

```
1                    SAMORA MINORS
2       then I said I don't like what is happening
3       and I said he can't work for me any more and
4       I believe that was it.
5            Q.   Willy Smallwood, do you remember
6       him?
7            A.   No, I do not.
8            Q.   What about Justin Hulse, H-U-L-S-E?
9            A.   No, I don't remember Justin Hulse.
10           Q.   I'm not sure if this is a typo
11      Samorfa, S-A-M-O-R-F-A, Minors?
12           A.   That must be a typo, that's not a
13      real person.
14           Q.   Presumably that's just referring to
15      you your name, Samora?
16           A.   Correct.
17           Q.   During the time period between
18      April 2013 and November 2017 when Minors
19      Contracting was under contract with HDL, did
20      Minors Contracting contract with any other
21      companies to provide services?
22           A.   During what time frame?
23           Q.   The end time period that the
24      company was under contract with HDL April of
25      2013 through November of 2017?
```

Page 83

SAMORA MINORS

1

2          A.    Yes, I contacted XPL in

3    Connecticut.

4          Q.    Do you recall when that was?

5          A.    That was late 2014, mid 2014, I

6    believe.

7          Q.    How long did Minors Contracting

8    provide services for XBO?

9          A.    About five months.

10         Q.    Do you recall in your interrogatory

11   answers saying around six months?  It's not a

12   huge difference but.

13         A.    I'm sorry, it could have been five

14   or six months.

15         Q.    Did you enter into a written

16   agreement with XBO in order for the company

17   to provide delivery services?

18         A.    I signed a contract.

19         Q.    And do you remember whether you

20   signed that contract on behalf of Minors

21   Contracting or individually on behalf of

22   yourself?

23         A.    I signed it as both because it's

24   almost as if it's one in the same when it's

25   looked at as an LLC.  So my name is on it,

Page 84

```
 1                    SAMORA MINORS
 2       it's like the business name and my name is
 3       under it when they do a paycheck or pay stub
 4       it's paid out to the company and to me.
 5            Q.   Would it say the company's name and
 6       care of your name or C/O, your name?
 7            A.   I believe so.
 8            Q.   Do you know whether the services
 9       that you performed under that contract with
10       XBO were they performed under Minors
11       Contracting DOT Authority or under XBO
12       Authority?
13            A.   At times it varied.
14            Q.   Okay.  It varied during that five
15       to six month period when you were contracting
16       with XBO?
17            A.   Yes.
18            Q.   How did you end up entering into
19       that agreement with XBO?
20            A.   I went online.  I was looking for
21       more work.  I needed to make more money
22       because I was drowning with my bills, my
23       overhead and the claims and it just looked
24       like a decent opportunity that paid well
25       but...
```

Page 85

1                        SAMORA MINORS
2          Q.   Were you able to make some
3     additional money by doing that?
4          A.   It didn't.  I had additional
5     revenue come in, but it didn't make any money
6     because it didn't work out.
7          Q.   And did you have to hire or find
8     additional drivers and helpers to service the
9     XBO account?
10          A.   I would say yes.
11          Q.   Okay.  Do you remember how many
12     other people you needed to find?
13          A.   Yes, it was two.
14          Q.   Okay.  Do you remember those
15     people's names?
16          A.   Yes, I do.
17          Q.   What were their names?
18          A.   They were Freddie Torres and
19     Germane Bostick.
20          Q.   And they Mr. Torres performed -- he
21     worked as a driver on the HDL account as
22     well, right?
23          A.   Yes, he moved him and Germane
24     Bostick moved to Rochester from Connecticut.
25          Q.   Okay.  And was that before or after

                                        Page 86

SAMORA MINORS

1

2      you contracted with XBO?

3            A.    That was after.

4            Q.    Okay.  When Mr. Bostick and

5      Mr. Torres were working on that XBO account

6      did they ever work as either a driver or

7      helper performing deliveries under the

8      contract with HDL?

9            A.    No.

10           Q.    How many trucks were servicing the

11     XBO contract?

12           A.    One.

13           Q.    Was that one of the same trucks

14     that was serving the HDL account?

15           A.    No.

16           Q.    Did you lease or purchase that

17     truck?

18           A.    I purchased.

19           Q.    Was that right around when you

20     started contracting with XBO?

21           A.    Yes, about maybe a month prior.

22           Q.    During that month prior did you

23     ever use that truck to provide delivery

24     services for HDL customers?

25           A.    No, it wasn't registered when you

Page 87

```
1                    SAMORA MINORS
2       purchased the vehicle you have to take into
3       the shop, I have to wait for the title, I
4       have to make sure it was good.  Had to go
5       through DOT inspection and I got the title
6       and everything.  So that took about a month.
7           Q.   Did you personally work as a
8       driver, helper, performing services under the
9       contract with XBO?
10          A.   For about three to four weeks give
11      or take some, give or take some weeks in and
12      out of the months I did.  Because I had to
13      get the truck out there.  I had to because I
14      was the owner, they wanted me physically
15      there for orientation and showing my guys how
16      things work.
17          Q.   Did you remember around when that
18      three to four weeks was, what time of year
19      that was?
20          A.   I would say probably the very first
21      week and then I would say a week every month
22      after that or like three days every month
23      after that I would go check up in
24      Connecticut.
25          Q.   On the other days when you were not
```

Page 88

SAMORA MINORS

1

2      checking up in Connecticut were you ever

3      performing deliveries on the HDL account in

4      either Syosset or Rochester?

5          A.    That's correct.

6          Q.    How did you decide whether or not

7      you were going to work performing deliveries

8      for HDL versus XBO during that time period?

9          A.    I put most of my resources to HDL.

10     XBO was secondary, that was my one truck I

11     set up.  I wasn't invested with XBO, it was

12     just secondary.

13         Q.    Did Minors Contracting also

14     contract with a company called Mark Four

15     operations during part of the time period

16     when it was under contract with HDL?

17         A.    No, I went to look at the work they

18     were doing, but I didn't like it.  I never

19     contracted with them.

20         Q.    Okay.  So, I just want to ask you

21     to take a look at the agreement that you

22     produced as part of your discovery responses.

23     It's pre-marked as Exhibit 16 in that binder.

24             (Exhibit 16, Discovery Responses,

25          marked for identification, as of this

Page 89

```
1                    SAMORA MINORS
2         date.)
3         Q.   We will introduce that exhibit.  If
4    you can take a look at that for me,
5    Mr. Minors.
6         A.   Exhibit 16?
7         Q.   Yes.  And I will represent for the
8    record it appears to be a portion of the
9    agreement SMINOR 000244 to 263.  Do you
10   recognize that?
11        A.   Looks like a contract.
12        Q.   Did you provide that contract to
13   your attorneys in response to some of the
14   discovery requests that were served in this
15   case?
16        A.   I gave this to my attorney, yes.
17        Q.   Okay.  It looks like the document
18   starts on page 8 of 41.  If you look at the
19   first page of the exhibit at the bottom.
20        A.   Yes.
21        Q.   Do you know, I guess, why the first
22   seven pages are missing?
23        A.   I probably just couldn't find it in
24   my files.
25        Q.   Do you recall looking for them?
```

Page 90

```
 1                    SAMORA MINORS
 2         A.    Yes.
 3         Q.    So I want to ask you to just flip
 4    to page 23 of 41 of the agreement.  SMINORS
 5    00259.
 6         A.    Yes.
 7         Q.    Is that your signature that is
 8    appearing on the page?
 9         A.    Yes, that is.
10         Q.    And underneath that is your name
11    and next to title it says owner.  I assume
12    that refers to you as the owner of Minors
13    Contracting LLC?
14         A.    Yes, that's correct.
15         Q.    And it appears to be dated November
16    15th of 2016?
17         A.    Yes.
18         Q.    So, I guess my question is:  Why
19    did you sign the contract if you never ended
20    up performing any services under it?
21         A.    With this industry you can sign a
22    two, three, four contracts and never follow
23    through.  They didn't sign.  I think I signed
24    just to give it to them and when I heard with
25    this specific company what they wanted and
```

Page 91

```
 1                   SAMORA MINORS
 2      what they were giving, I said I'm okay.  And
 3      I didn't follow through with any commitments.
 4           Q.   And so the company Minors
 5      Contracting never ended up actually
 6      performing any services under the terms of
 7      that contract?
 8           A.   No, sir.
 9           Q.   And they didn't pay you or your
10      company any money; is that right?
11           A.   No, that's correct.
12           Q.   You can put that document away, if
13      you want.  Besides trucks what other
14      equipment does Minors, does your business
15      Minors Contracting need for it's operation?
16           A.   Basic hand tools.
17           Q.   Okay.
18           A.   And a hand truck.
19           Q.   Okay.  And how did you communicate
20      with the drivers and helpers on a day-to-day
21      basis?
22           A.   By phone.
23           Q.   Okay.  And did the company have any
24      office space at any time?
25           A.   No.
```

Page 92

1                    SAMORA MINORS
2          Q.    Did the company own any phones
3     itself?
4          A.    No.
5          Q.    What about computers?
6          A.    Yes.
7          Q.    Do you know how many computers you
8     purchased for the company?
9          A.    One.
10         Q.    Your personal phone would you
11    deduct your expenses for your personal phone
12    as a business expense on your tax filings?
13         A.    No.
14         Q.    You mentioned basic hand tools that
15    are needed to perform deliveries.  Can you
16    tell me about some of those?
17         A.    Yes, a drill, you know, a socket
18    set, hammer, your basic screwdriver sets and
19    your hand truck and a measuring tape.
20         Q.    Is that all equipment that your
21    company had to bear the expense of in order
22    to perform deliveries under the contract with
23    HDL?
24         A.    That's correct.
25         Q.    Would you have to have a set of

Veritext Legal Solutions
800-336-4000

```
 1                    SAMORA MINORS
 2      those tools for each truck you were
 3      operating?
 4           A.   Yes, that's correct.
 5           Q.   How did the company pay for those
 6      items was it out of the -- go ahead, I'm
 7      sorry.  That's the question.
 8           A.   Out of the business account.
 9           Q.   Were those expenses all deducted on
10      tax filings at the end of the year?
11           A.   That's correct.
12           Q.   Did Minors Contracting provide
13      delivery services to any other entities
14      besides XBO during the time period between
15      2013 and 2017?
16           A.   No.
17           Q.   Are you familiar with a company
18      called home delivery America?
19           A.   Yes.
20           Q.   Did Minors Contracting ever have a
21      relationship with that company?
22           A.   Yes, but that was before home
23      delivery.
24           Q.   I apologize if I'm mistaken I
25      believe you testified that the first company
```

Page 94

```
1                  SAMORA MINORS
2      that Minors Contracting contracted with was
3      Homedeliverylink in 2013, is that not
4      accurate?
5           A.   I might be mistaken that was such a
6      long time I don't remember honestly.  I could
7      be mistaken.  Go ahead.
8           Q.   I was just going to ask you just is
9      it accurate to say you are just not sure
10     whether you provided services, your company
11     provided services to Home Delivery America
12     before or during the time you contracted with
13     HDL?
14          A.   Yes, I thought they were before,
15     but they probably were at the same time where
16     they overlapped and I just -- it's been so
17     long I probably just don't remember.
18          Q.   Can you tell me about the
19     circumstances of what you remember about how
20     you began contracting with Home Delivery
21     America?
22          A.   I remember Home Delivery America
23     was only for three months, I tried to go into
24     Jersey working with them, but then my -- it
25     had an interruption with my MC, with
```

Page 95

```
 1                  SAMORA MINORS
 2      something called the authority and I didn't
 3      know what that was.  And mine had gotten -- I
 4      didn't have it in place and you had to go
 5      through inter-state.  It was too much of a
 6      hassle to go through that.  It was something
 7      it wasn't for a long time.  I didn't even
 8      remember it.
 9          Q.   Just to make sure I understand, you
10      were required to have inter-state authority
11      in order to perform services for them?
12          A.   Yes, I did.  That's what I believe
13      at the time.
14          Q.   Did you ever personally work as a
15      driver or helper when the company did provide
16      services during that short period of time?
17          A.   Yes, yes, if I can recall yes, in
18      Jersey.
19          Q.   Do you recall whether any of the
20      other individuals we spoke about earlier that
21      were drivers or helpers also worked on that
22      account?
23          A.   No, it was only one truck with that
24      account and it's either -- I can't remember
25      which one started it first, but they weren't
```

Page 96

```
 1                    SAMORA MINORS
 2      together, those accounts they didn't, I
 3      didn't use guys from one account to the next
 4      account.  It was, I think I ended with them
 5      or started with them or ended and started
 6      with HDL, but that was something I couldn't
 7      keep up with because of it being in Jersey
 8      and their filing requirement for my MC
 9      authority.
10           Q.   Okay.  Did Minors Contracting enter
11      into a written agreement with Home Delivery
12      America?
13           A.   Yes.
14           Q.   Do you know if you still have that
15      agreement?
16           A.   No, I don't know if I still have
17      that.  If it's still in here a lot of my
18      records got washed away in the flood I had in
19      2013, 2014.
20           Q.   In addition to some of the hand
21      tools you mentioned did you also have to have
22      pads and ties in order to perform deliveries
23      for HDL?
24           A.   That would have been something they
25      required, but they didn't stress it, it's not
```

Page 97

SAMORA MINORS

1

2      something I remember being pushing together,

3      I remember we needed hand trucks and we

4      probably needed pads.  I'm sure we did, but

5      it wasn't a big thing because if you damage

6      something they claimed you.  It wasn't a

7      bother to them if you got claimed it is in

8      their best interest.  They hit you with a

9      claim fee, they hit you with a processing fee

10     and you get not to keep the product and they

11     can sell that product back again.  So, it's

12     in their best interest you have a claim.

13     Anything presumed claim became an actual

14     claim right away.

15          Q.   And are you saying that they didn't

16     dispute it with the customers?

17          A.   No.  They didn't, no.

18          Q.   Is one of the reasons for having

19     the pads and ties presumably is to help

20     protect against some of those claims in

21     theory?

22          A.   In theory you can say that, but in

23     practice they didn't care about that.  They

24     looked for claims because it's in their best

25     interest.  They made money when we had a

Page 98

SAMORA MINORS

1

2      claim.  They made more money than when we had

3      a delivery.

4           Q.   The hand trucks and dollies did you

5      purchase those before the business started

6      contracting with XBO?

7           A.   No.

8           Q.   You didn't have any of that

9      equipment in 2014 when you started

10      contracting with XBO?

11           A.   I'm sorry, I'm sorry.  I'm thinking

12      with when it came to XBO if I bought anything

13      with respect to XBO, it was bought new and

14      for XBO anything I had that was already

15      continuing working with I wasn't taking.  So

16      whatever I purchased already was already

17      being used.

18           Q.   What did you do with that equipment

19      when you terminated the contract with XBO?

20           A.   I would have brought it back to the

21      state where I was in which would be New York.

22           Q.   And would the contracting company,

23      would Minors Contracting then use that

24      equipment to perform services on the HDL

25      account?

Veritext Legal Solutions
800-336-4000

```
                        SAMORA MINORS
 1
 2          A.    Yes.   Yes, I would assume so if I
 3     was working and I had the tools and I brought
 4     them over back to New York and I needed them
 5     I would use them or I would keep them in
 6     storage.
 7          Q.    Did you provide uniforms to
 8     individuals that made deliveries for Minors
 9     Contracting?
10          A.    No.   HDL did.
11          Q.    Okay.   And were you required to
12     purchase those uniforms?
13          A.    From HDL, yes, I tried to buy it
14     outside like a Walmart for $5 and they would
15     tell me I can't.   I wouldn't be able to enter
16     the building without the Homedeliverylink
17     clothing.   I actually have videos of that.
18     Yes, they controlled us to that point.
19          Q.    Who told you that from HDL?
20          A.    An HDL representative.   It would
21     have been they changed.   At the time it was
22     Andrew Wilson.   Another one was Earl
23     something.   Another one was -- I mean you
24     have it was so many people that worked there
25     and they just sputed the same thing about
```

Page 100

SAMORA MINORS

1

2      what the company wanted.  So the person that

3      said it, it didn't matter it was what the

4      company told them to say, it wasn't just like

5      they would be walking around saying don't

6      walk in without the shirt.  You have to have

7      HDL home delivery shirts.

8          Q.   Who was in the videos you just

9      referenced?

10         A.   Contractors and Homedeliverylink

11     representatives were doing stand up in the

12     morning, us discussing what they want us to

13     do and don't want us to do and every morning

14     we have to take a picture.  Every Friday we

15     had to take a group picture to make sure we

16     had a uniform.  If we didn't have the red

17     shirt we would get audit and penalized.

18         Q.   What were the uniforms HDL

19     required?

20         A.   Blue shirt, blue pants, black

21     boots.  No hoodies and their shirts.  You

22     know it changed, if a new shirt came in you

23     had to buy the new shirt.  You couldn't wear

24     your old shirt.

25         Q.   Was that during the entire time

Page 101

```
1                    SAMORA MINORS
2        period that Minors Contracting was under
3        contract with them?
4             A.   That is correct.
5                  Can I go on hold for one second.
6                  MR. KRAMER:  Sure.  Do you want to
7             take a short break.
8                  THE WITNESS:  Yes, please.
9                  THE VIDEOGRAPHER:  We are off the
10            record at 12:22 p.m.
11                 (Whereupon, a short recess was
12            taken.)
13                 THE VIDEOGRAPHER:  This is the
14            beginning of media number 3, we are
15            going back on the record at
16            approximately 12:27 p.m.
17            Q.   Just reminding you, again,
18        Mr. Minors, you are still under oath.
19            A.   Yes.
20            Q.   Did HDL deduct the cost of uniforms
21        from settlement statements issued to Minors
22        Contracting?
23            A.   Yes.
24            Q.   Would you also deduct the cost of
25        the uniforms on Minors Contracting tax
```

                                        Page 102

```
 1                   SAMORA MINORS
 2        filings?
 3             A.   Yes.
 4             Q.   I know we spoke earlier about the
 5        time period during 2014.  After that were
 6        there weeks during which you didn't
 7        personally perform delivery services for HDL?
 8             A.   Yes, if my name wasn't on there, if
 9        it was somebody else working, that's who did
10        the services that day.  The name corresponds
11        with the work.
12             Q.   I believe you mentioned earlier
13        that there were some times where there would
14        be a different driver listed on the
15        settlement statement, but you actually had
16        your men that day, right?
17             A.   For the most part.  I can't speak
18        on every single instance, but I was talking
19        about extra like if a route was dropped or if
20        somebody didn't show up that would have to be
21        corrected in their internals.  I don't know
22        if they did that.  When the route was done on
23        the day before for the most part for 99
24        percent of the time you knew who was working
25        and the day before you had to confirm.  They
```

Page 103

SAMORA MINORS

1

2      would sent out the routes and you would know.

3      I would say ten times a year that would

4      change, 12 times a year that would change, if

5      somebody dropped a route or somebody didn't

6      have a name on the route or their systems

7      weren't loaded, but for the most part the

8      standard was you knew the day before.

9          Q.   Do you have any records showing

10     those ten or however many times when the

11     driver listed was not the person that drives?

12         A.   No.  This is just going off of

13     memory.

14         Q.   Okay.  During weeks when you

15     weren't personally working as either a driver

16     or a helper, was your company sometimes

17     making deliveries for HDL?

18         A.   Yes.

19         Q.   Do you remember the longest stretch

20     you ever went without personally working as

21     either a driver or helper?

22         A.   No more than a week.

23         Q.   Okay.  And so at some point you

24     mentioned that you moved down to Florida,

25     right?

Page 104

```
1                    SAMORA MINORS
2         A.   Yes.
3         Q.   And, I'm sorry, I believe you said
4    that was in 2016; is that correct?
5         A.   Yes.
6         Q.   Okay.  And so you lived in Florida
7    from -- do you remember approximately what
8    time period in 2016?
9         A.   When I moved down in 2016 I think
10   it was the beginning of 2016.
11        Q.   So, I know it was a while ago, but
12   do you remember if it was January or
13   February, do you remember which month it was?
14        A.   Could have been January.
15        Q.   Okay.  And so you lived in Florida
16   from January, approximately January of 2016
17   through the end of the time that you
18   contracted with HDL in November of 2017,
19   right?
20        A.   Yes.
21        Q.   So that was about two, three months
22   if my math is correct?
23        A.   Are you asking me?
24        Q.   Yes, I'm asking you.
25        A.   Yes.  I would guess, I didn't do
```

Page 105

```
 1                    SAMORA MINORS
 2      the math, but yes.
 3           Q.   And during the time period that you
 4      were living down in Florida you would go no
 5      longer than a week without actually
 6      performing delivery services up in New York?
 7           A.   No.   When I was in Florida there
 8      wasn't a lot of work that was in for the
 9      Syosset branch.   The work was really only in
10      the Rochester branch and when I wasn't there
11      the people on the truck were the ones that
12      were performing work.
13           Q.   Okay.   Do you remember the longest
14      stretch you went while you were living down
15      in Florida without going back up to New York
16      to personally perform deliveries?
17           A.   No, I don't recall that much time.
18      It would have been -- I don't recall.   I
19      would be guessing.
20           Q.   Okay.   So when you said it was a
21      week earlier that was incorrect.   I just want
22      to make sure that I am understanding your
23      testimony.
24           A.   What was incorrect?   I'm not sure.
25      I thought you were asking in terms of when my
```

Page 106

```
 1                  SAMORA MINORS
 2      vacations are whatnot.  The times I took
 3      vacations or the times I took off?
 4          Q.   I'm asking about times when you
 5      were not personally performing deliveries in
 6      New York for HDL.
 7          A.   The times that I weren't performing
 8      was when I wasn't here any time I no longer
 9      lived here.  If I was living in Florida, I
10      registered in Florida.  I was in Florida for
11      those times.  The only time I came out here
12      to check up with Rochester, I didn't have
13      much work in Syosset.
14          Q.   That would be from January 2016
15      through the end of your contract with HDL,
16      right?
17          A.   No, there were times where -- no,
18      that's not accurate.  There were times where
19      I would be -- I would be back and forth.  So,
20      I was in even though I was in Florida I was
21      in New York for four months, five months
22      running in New York.
23          Q.   Do you remember when around that
24      was?
25          A.   That would have been right before I
```

Page 107

```
 1                 SAMORA MINORS
 2     cancelled with them.  So for the last four,
 3     five months I was in New York working with
 4     them even though I was -- my business is in
 5     Florida, I came to New York and register --
 6     working with them and that's until I
 7     dissolved the partnership with HDL.
 8          Q.   Okay.  Where were you staying when
 9     you lived in New York during those four to
10     five months?
11          A.   That was the 1655 Flatbush --
12     sorry, 4407 Avenue L, Brooklyn, New York.
13          Q.   I thought you moved from that
14     location before you even moved up to
15     Rochester years before?
16          A.   Moving is not specifically leaving.
17     Just because I move from someplace, that's my
18     mother's house, I can go there whenever.
19          Q.   So I didn't know that was your
20     mother's house.  Okay.  You said it was the
21     last four or five months that you stopped
22     contracts in 2014 that you were living in
23     your mom's house?
24          A.   That would be correct.  During
25     these times I jumped around a lot, I moved, I
```

Page 108

```
 1                    SAMORA MINORS
 2      did a lot of things.  I moved around so going
 3      back on those specific, those exact dates I
 4      won't remember every specific.
 5           Q.   What made you decide to go back up
 6      to -- sorry I will back up.  While you were
 7      living down in Florida before you went back
 8      up to stay at your mom's, who was responsible
 9      for the day-to-day operations when it came to
10      running your business?
11           A.   Where?  I'm sorry, I didn't get --
12           Q.   Well, specifically I'm talking
13      about your business performing deliveries
14      under the contract with HDL.
15           A.   I would be.
16           Q.   Okay.  So, can you kind of describe
17      what your day-to-day activities were during
18      the time you were living down in Florida?
19           A.   My day-to-day activities I would
20      call in to make sure everything was going as
21      planned and there wasn't really much to be
22      done.  The routes were handed out the day
23      before.  Sears really controlled everything
24      on their end of the delivery spectrum where
25      all I would have to do is make sure my guys
```

Page 109

```
 1                    SAMORA MINORS
 2      were there, the truck was there.  That was
 3      it.
 4           Q.   Were you handling all of the
 5      bookkeeping responsibilities at that point?
 6           A.   That's correct.  I was handling,
 7      covered all of my bookkeeping.  I never
 8      outsourced.
 9           Q.   Were you operating any other
10      businesses during that time?
11           A.   No.
12           Q.   Did you have any businesses in
13      Florida?
14           A.   No, no.
15           Q.   So you had no -- before you asked
16      me where I was referring to you conducting
17      business, so were there any other locations
18      besides in New York during that time period
19      from January 2016 when you moved until you
20      terminated the contract?
21           A.   No, it was only with HDL.  I
22      thought you were talking in terms of
23      different locations where I was, like,
24      specific locations I thought you meant.
25           Q.   Okay.  Did you ever have an
```

Page 110

1                    SAMORA MINORS

2          ownership interest in any other companies

3          during the time your business was under

4          contract with HDL?

5               A.    No.

6               Q.    Earlier before you moved to Florida

7          do you remember a period of time in January

8          through October of 2015 when you did not work

9          as a driver?

10              A.    No, no.

11              Q.    No, you just don't remember or

12         there was never a gap of time back then?

13              A.    What is the gap of time?  What is

14         that time frame?

15              Q.    It was January through October of

16         2015.

17              A.    No, that's incorrect.

18              Q.    Within that time period were there

19         smaller periods of time where you took time

20         off?

21              A.    No, no.  For those eight months,

22         no, I had to work 2015.  No, I was not that

23         fortunate.

24              Q.    Okay.  Could you estimate the

25         longest stretch of time you took off back

                                        Page 111

SAMORA MINORS

1

2     around that time period?

3          A.   Again, no more than a week.  If I

4     stayed more than a week away from my

5     operations it would shut down.

6          Q.   What changed that allowed you to

7     take longer time periods off later on when

8     you moved to Florida?

9          A.   Well, I didn't really take time

10    off.  I was always working.  It's just that I

11    didn't do the deliveries.  I was in the back

12    end running the paperwork and stuff like

13    that.  But for some of the times if I wasn't

14    there that day making the physical delivery I

15    didn't deliver that day.  There were some

16    days I didn't deliver, some days I didn't go

17    on the truck.

18         Q.   So my question wasn't a good one.

19    I'm asking what changed that allowed you to

20    not be personally performing deliveries

21    around the time you decided to move to

22    Florida?

23         A.   I went down in trucks.  I didn't

24    run as much trucks.  I sold trucks and I

25    wasn't running a big operation.  So me

Page 112

```
1                    SAMORA MINORS
2      physically leaving I ran less trucks.
3           Q.   Okay.  Were all, were all of the
4      payments -- I'm sorry, I will back up.  Why
5      did you decide to move to Florida back in
6      January of 2016?
7           A.   Change of weather.  I lived in
8      Rochester, if you know anything about
9      Rochester, I was tired.
10          Q.   Yes, I've never been there, but I
11     heard the weather up there is rough.
12          A.   It's rough.
13          Q.   And were the payments that your
14     company received from HDL always deposited
15     into the company business account?
16          A.   That's correct.
17          Q.   What about the payments that your
18     company received from XBO?
19          A.   Same.  Entered into the company
20     business account.
21          Q.   Was it the same thing with Home
22     Delivery America?
23          A.   I don't -- I want to say I believe
24     so, but I don't think -- I think I got checks
25     and I cashed them from Home Delivery America.
```

Page 113

```
 1                 SAMORA MINORS
 2      I don't believe they went into my bank
 3      account.  But I can't remember for
 4      everything.  I can't remember.  It's a long
 5      time ago.
 6           Q.   Did you take a salary while you
 7      were the owner of Minors Contracting?
 8           A.   No.
 9           Q.   How did you pay yourself during
10      that time period?
11           A.    In the beginning I didn't pay
12      myself.  Whatever was in the end I would take
13      and then mostly off of tips I would have to
14      work, pay out guys, pay out claims.  There
15      would be not be enough, there wouldn't be
16      enough money for me at the end of the week.
17      If I had a $6,000 claim between claims, fuel
18      overhead and deductions, I would be left with
19      like $700.  And then I would have to pay for
20      the fuel for the week coming.  And that was
21      just tough /STKPWHR*.  It was really it was
22      hard to determine a salary when I really
23      couldn't pay my bills.
24           Q.   When you say at the beginning, what
25      time period are you referring to?
```

Page 114

SAMORA MINORS

1

2    A.   I guess for me it's not a time

3    period.  It was just the beginning, just the

4    beginning.  I guess the very beginning of

5    starting my contracting relationship with

6    this industry.

7    Q.   Okay.  So did the amount that you

8    ultimately took home to pay for your personal

9    expenses did that depend on the financial

10   success of the company?

11        MR. WEBER:  Objection.  Assuming --

12        just vague.

13   Q.   You can go ahead and answer if you

14   understand the question.

15   A.   To an extent, yes.

16   Q.   So did you take owner's drawers

17   from the company?

18   A.   I believe I did.  I believe I did

19   once or twice, but I would more so I would do

20   my taxes at the end of the year.  Quarterly I

21   would do my taxes and basically what my

22   comment I did after everything was said and

23   done there was $300,000 in revenue $22,000

24   was left and that's what I would show as pay

25   profit after all of my deductions, my

Page 115

```
 1                    SAMORA MINORS
 2      rentals, my fuel, my business overhead, all
 3      of my business overhead.  I would say this is
 4      what I have as profit and that would be what
 5      I cleared if it was 30,000, 22,000, negative
 6      11,000.  These are the things, that's how I
 7      made my pay.
 8           Q.   Did the money paid to you get taken
 9      from the Minors Contracting bank account?
10           A.   Correct.
11           Q.   Do you have records showing how
12      much money you were paid by the company?
13           A.   Would be my tax records.
14           Q.   Okay.  Your personal tax records or
15      the tax records from the company?
16           A.   Both.
17           Q.   Were you -- it sounds like you were
18      not paid in regular intervals by the company;
19      is that accurate?
20           A.   That's accurate.
21           Q.   So, did you have certain monthly
22      expenses just to live?
23           A.   In the beginning, no.  I live with
24      my parent, my mother.  So, the overhead was
25      for my personal life style was taken care of
```

Page 116

SAMORA MINORS

1

2      through my mom.

3           Q.   When did you move out from your

4      mother's house?

5           A.   I mean that's hard to put a point

6      on it, maybe 20, 24.

7           Q.   24.  I don't have my math straight,

8      what year would that have been?

9           A.   Maybe 2012, 2011.  I mean I left,

10     but I didn't move out, I would have my place

11     there.  I never moved out from my mother's

12     home.  My place is always there.  When did I

13     move out, permanently leave, I want to say

14     24, that's probably when I went to Rochester

15     and from there I went to Florida.

16          Q.   Were you renting or did you buy a

17     place up in Rochester?

18          A.   I rented for the time that I was in

19     Rochester.

20          Q.   Do you remember what your monthly

21     rent was up there?

22          A.   Yes, I think it was like -- I

23     rented a house and it was like four or five

24     of us in the house, so it was like 2300, but

25     it was 5 or 600 a person or 4, $500 a person,

Page 117

SAMORA MINORS

1

2      we split it up.

3           Q.   What about when you moved back down

4      to Brooklyn after that to the new place that

5      was not your mom's apartment?

6           A.   That was my girlfriends.  I didn't

7      have to pay rent.

8           Q.   What about when you moved back to

9      Florida?

10          A.   I paid rent and I had a roommate.

11          Q.   Did you ever purchase any property

12     down in Florida?

13          A.   No, I have no property.  I have yet

14     to purchase property.  It's kind of hard to

15     purchase property with this type of industry.

16          Q.   Have you ever purchased any

17     vehicles besides the trucks that we discussed

18     earlier?

19          A.   No, no.  I wasn't fortunate enough

20     to finance or purchase brand-new vehicles.

21     It was always used, what I could afford.

22          Q.   Did you lease vehicles?

23          A.   The very beginning through HDL I

24     did lease and that was it.

25          Q.   Okay.  When you were down in

Page 118

```
1                    SAMORA MINORS
2       Florida did you have a 23-foot vehicle
3       registered in your name?
4            A.    My personal name?
5            Q.    Yes, or in your businesses name.
6            A.    I don't know about 23-foot.  I
7       registered vehicles in my businesses name in
8       Florida, yes, that's correct.
9            Q.    So business you were conducting
10      with Florida?
11           A.    I didn't really conduct much
12      business in Florida.  My businesses were I
13      registered in Florida, I was trying to do
14      trucking there, but it didn't workout as
15      much.  And a lot of the -- I still was
16      operating in New York.
17           Q.    Okay.  So earlier you testified
18      that you didn't conduct any business in
19      Florida.  So, I'm trying to understand
20      whether you did or didn't.
21           A.    What do you mean?  I never said --
22      I don't recall saying.  You didn't ask me if
23      I conducted business in Florida.
24           Q.    What business did you conduct in
25      Florida?
```

<div align="right">Page 119</div>

1                    SAMORA MINORS

2          A.   I didn't conduct much business in

3     Florida.  I tried to conduct business in

4     Florida, but it didn't pan out.  I was

5     working with HDL in Florida and then they

6     blackballed me because they thought I did a

7     walkout in New York, in Syosset in 2014 or

8     '15.  They thought I did a walk out in

9     Syosset, so they black-balled me in Florida

10    and they asked me to go to Florida and run

11    some trucks there.  And when I went there

12    they didn't run me.

13         Q.   What kind of vehicles did you have

14    registered in your name in Florida?

15         A.   2000 International, 2002

16    International and 1999 Mitsubishi.  And the

17    1999 GMC.

18         Q.   Did you ever register a boat in

19    Florida?

20         A.   Yes.

21         Q.   What kind of boat?

22         A.   I never -- I don't recall.  I never

23    took it to the water.  It didn't have an

24    engine in it.

25         Q.   Just one moment.  Other than the

                                        Page 120

```
 1                    SAMORA MINORS
 2       owners that you discussed, did you receive
 3       other compensation from Minors Contracting?
 4            A.   No.
 5            Q.   Did the payment you received from
 6       the company depend at all on whether or not
 7       you personally performed delivery services
 8       during a particular week?
 9            A.   No.
10            Q.   Was the amount you were paid by the
11       company different depending on whether you
12       worked as a driver versus a helper on any
13       particular week?
14            A.   Sometimes.
15            Q.   How would it be impacted whether
16       you were working as a driver or helper?
17            A.   If I was working as a driver I
18       would pay myself as a driver.  If I was
19       working as a helper, I pay myself as a
20       helper.  If for some reason the business
21       pulled up short I wouldn't pay myself at all,
22       it would have to come out-of-pocket to pay
23       everything and then pay myself.  I was never
24       really on a salary.  Hypothetically if I
25       worked five days I still would pay myself
```

Page 121

```
1                    SAMORA MINORS
2     five days until I knew everything else was
3     covered.  And unfortunately this wasn't an
4     ever an industry where everything was covered
5     and I had hundreds of dollars left over.
6          Q.   Did you ever take draws from the
7     company during weeks you didn't personally
8     perform delivery services?
9          A.   Yes.
10          Q.   So I want to introduce what is
11     pre-marked as Exhibit 3 in that tab binder
12     you have.  If you could take a look at that.
13     So I will represent it's a total of 16 pages.
14     I'm just going to ask you about a few of
15     them.  Can you please turn to the third page
16     of that exhibit, which is SMINOR 00120.
17               (Exhibit 3, 16-page document,
18          marked for identification, as of this
19          date.)
20          A.   Exhibit 3?
21          Q.   Yes, it should be, yes, Exhibit 3.
22          A.   Yes, I see it.
23          Q.   Was this one of the documents that
24     you had given to your lawyer to produce as
25     part of this case?
```

Page 122

SAMORA MINORS

1

2          A.   Yes.

3          Q.   And at the top of that page is a

4     copy of what appears to be a check issued by

5     HDL to Minors Contracting LLC.  And it says

6     C/O is Samora Minors.  Is that a check your

7     company received from HDL?

8          A.   Yes, that's correct.

9          Q.   How often did you receive checks

10    from HDL?  Did your company or yourself

11    receive checks from HDL?

12         A.   Biweekly.  They paid out biweekly.

13         Q.   Were they always issued in this way

14    to your business where it says care of or C/O

15    Samora Minors underneath that?

16         A.   Yes.

17         Q.   Would you always deposit these

18    checks into your business account?

19         A.   Yes.

20         Q.   In the memo portion of the check in

21    the lower left-hand corner it says RCWE 10-11

22    and 10/18/14.  Do you see that?

23         A.   Yes.

24         Q.   What does that tell you about the

25    week the check is for?

Page 123

```
1                    SAMORA MINORS

2          A.   This says Rochester week of 10/11

3     and 10/18.

4          Q.   Do you know if WE stands for week

5     ending 10/11 and 10/18/14?

6          A.   That's correct.

7          Q.   And the amount issued to the

8     company in the check $7,207.31?

9          A.   That's correct.

10         Q.   Can you take a look at the

11    following six pages that are after that one,

12    they are Bates numbered SMINOR 00121 to 1267.

13    You can flip through them quickly to see what

14    they are.  The top of each page it says

15    Homedeliverylink, Home Delivery Settlement

16    Statement, right?

17         A.   That's correct.

18         Q.   These are all delivery settlement

19    statements that were issued to your company

20    between those two weeks ending October 11th

21    and October 18th of 2014, right?

22         A.   That's correct.

23         Q.   What is delivery settlement

24    statement, how would you describe what it

25    shows?
```

                                          Page 124

```
 1                    SAMORA MINORS
 2         A.   It shows the work that we provided
 3    and overall of what we did and how much they
 4    paid us.  It's an account.
 5         Q.   How often did your company receive
 6    delivery settlement statements from HDL?
 7         A.   Biweekly.
 8         Q.   So it looks like there are the
 9    first three documents is dates numbered
10    ending 121 to 123 in the upper left-hand
11    corner, week ending October 11th of 2014, do
12    you see that?
13         A.   Yes.
14         Q.   And the following three settlement
15    statements, statements October 18, 2014 is
16    the week ends, right?
17         A.   Yes.
18         Q.   So, obviously those were issued on
19    two consecutive weeks.  When you say you
20    received them biweekly were they just not
21    provided to you in hard copy form every week
22    or did you actually get them each week?
23         A.   No, I got them, I got them biweekly
24    based on when we got paid.
25         Q.   So when you would get them biweekly
```

Page 125

```
 1                    SAMORA MINORS
 2      they would be broken down into one-week
 3      periods; is that right?
 4            A.   Yes.
 5            Q.   So like her you got three for the
 6      week ending October 11th and another for week
 7      ending October 18th?
 8            A.   That's correct.
 9            Q.   So you would get -- would you get
10      different delivery statements for each driver
11      that performed deliveries during that time
12      period?
13            A.   Yes.
14            Q.   For the week ending October 11,
15      2014 there are three settlement statements,
16      one a Kyle Myers, one George Abbasega and one
17      lists Freddie Torres, right?
18            A.   Yes.
19            Q.   That means those were the three
20      drivers that performed deliveries during that
21      week?
22            A.   That's correct.
23            Q.   Then the following week it says
24      Aquel Andrews was a driver on one, George
25      Abbasega was a driver and then there's a
```

Page 126

```
 1                    SAMORA MINORS
 2      separate one for Freddie Torres who worked as
 3      a driver that week, right?
 4           A.   Yes.
 5           Q.   If I told you that the net due
 6      contractor amount at the bottom of those
 7      settlement statements, for these six
 8      settlement statements we were just talking
 9      about add up to the amount of the check you
10      got for those two weeks, would that indicate
11      to you that these were the six drivers that
12      worked that week?
13           A.   Yes.
14           Q.   So this was just a two-week period
15      where you were not working as a driver then;
16      is that accurate?
17           A.   Yes.
18           Q.   I know this was a long time ago,
19      but do you remember why you didn't work as a
20      driver during these two weeks?
21           A.   It wasn't just the two weeks.  I
22      believe now you said that -- I want to go
23      back.  You said that I for about eight months
24      I didn't work -- you said eight months I
25      didn't work.  Whatever the information is for
```

Page 127

SAMORA MINORS

1

2    eight months I lost my license, I was not a

3    driver, I was a helper, but I was still in

4    Rochester working.

5         Q.   How would we tell which dates you

6    were working as a helper during that time

7    period?

8         A.   Unfortunately there's not really a

9    way.  They didn't keep track of helpers.

10        Q.   Do the amounts you paid for each of

11   the settlement statements they pertain to the

12   work not only done by the driver listed on

13   the settlement statement but also by the

14   helper on the truck for the day, right?

15        A.   No.

16        Q.    It only shows the driver's name on

17   the settlement statement, but there was

18   always a helper on the truck with the driver,

19   right?

20        A.   Yes.

21        Q.   So the helper's name just didn't

22   appear on the settlement statements; is that

23   right?

24        A.   That's correct.

25        Q.    I want to direct your attention to

Page 128

```
 1                    SAMORA MINORS
 2      page 5 of this exhibit, Bates numbered
 3      SMINORS ending 122.  Let me know when you are
 4      at that page.
 5           A.   Exhibit 5?
 6           Q.   Still on page Exhibit 3, page 5.  I
 7      know it's a little confusing.
 8           A.   How would I know which is page 5?
 9           Q.   Flipping through from the beginning
10      of the exhibit if you flipped through five
11      pages.  And then the Bates number at the
12      bottom of the page in the binder it's really
13      the upper right-hand corner, it's ending 122.
14      Do you see George Abbasega is listed as the
15      driver for that week?
16           A.   Yes.
17           Q.   It's the week ending 10/11/2014?
18           A.   Yes.
19           Q.   So this shows there were completed
20      stops when he was driving the truck on three
21      days that week, right?
22           A.   Yes.
23           Q.   I'm sorry, four days, I misspoke,
24      Monday through Thursday?
25           A.   That's correct.
```

Page 129

SAMORA MINORS

1

2      Q.    And below where it shows the number

3    of stops completed each day it lists the

4    deduction as applied to the amount paid for

5    stops that he completed, right?

6      A.    That's correct.

7      Q.    One of the deductions listed is a

8    hundred dollar charge for performance bond,

9    right?

10     A.    Yes.

11     Q.    What is the performance bond?

12     A.    They put a hold on each truck you

13   put with them.

14     Q.    Do you know why the performance

15   bond appears on this settlement statement as

16   opposed to any of the other drivers that

17   worked that week?

18     A.    No, they did it however they

19   wanted.  They take it out from whichever they

20   wanted to.  They took claims on whichever

21   they wanted to.  If I had a claim in Syosset

22   they took it out in Rochester.  If I had a

23   claim in Rochester they took out in Syosset.

24   They took the money out from wherever they

25   took it.

Page 130

```
1                    SAMORA MINORS
2         Q.   There were deductions for claims on
3    one settlement statement let's say a
4    settlement statement issued for Freddie
5    Torres one week that didn't necessarily mean
6    that Freddie Torres was responsible for
7    allegedly damaging whatever property the
8    claim was based off of; is that right?
9         A.   That's correct.
10        Q.   So it doesn't directly relate to
11   the work that that settlement statement
12   reflects payment for, right?
13        A.   Exactly, that's correct.
14        Q.   I apologize if I asked this
15   already.  Did you receive a W-2 from Minors
16   Contracting LLC ever?
17        A.   No.
18        Q.   Did Minors Contracting file tax
19   returns each year when it was under contract
20   with HDL?
21        A.   Yes.
22        Q.   Who prepared those tax returns?
23        A.   An accountant.
24        Q.   Did you choose which accountant
25   prepared the tax returns?
```

Page 131

```
 1                    SAMORA MINORS

 2          A.   Yes.

 3          Q.   Was it always the same accountant

 4    each year?

 5          A.   Yes.

 6          Q.   Why did you select the accountant

 7    that prepared your taxes returns every year?

 8          A.   I found him in my neighborhood.

 9          Q.   Was that in your neighborhood in

10    Brooklyn?

11          A.   Yes.

12          Q.   Did you also file personal tax

13    returns during that time period every year?

14          A.   Yes.

15          Q.   Was it the same accountant that

16    prepared the tax returns for you personally?

17          A.   Yes.

18          Q.   Did the company, did Minor

19    Contracting maintain financial statements

20    between 2013 and 2017 when it contracted with

21    HDL?

22          A.   Yes.

23          Q.   Who prepared those financial

24    statements?

25          A.   My accountant.
```

Page 132

```
1                    SAMORA MINORS
2          Q.    Do you still have copies of all of
3     the financial statements?
4          A.    When you say financial statements,
5     you are talking about my tax returns?
6          Q.    Your financial statements filed as
7     part of your tax records, yes?
8          A.    I can get them from my accountant.
9     Some of the stuff I don't have.  Some he
10    keeps for me.
11         Q.    I know you mentioned you handled
12    bookkeeping for the business yourself.  Did
13    the company use a payroll company to issue
14    paychecks?
15         A.    No.
16         Q.    Like to subcontractors?
17         A.    No.
18         Q.    Were you in charge of handling all
19    of that?
20         A.    Yes.
21         Q.    Would you personally write the
22    checks yourself?
23         A.    Yes.
24         Q.    Did Minors Contracting, I belive
25    you mentioned it issued 1099s to
```

Page 133

```
1                    SAMORA MINORS
2      subcontractors; is that right?
3             A.    Yes.
4             Q.    It never issued W-2's?
5             A.    No.
6             Q.    How did you determine whether or
7      not you would issue 1099 versus take on W-2
8      employees?
9             A.    I looked at it purely as a
10     financial, I couldn't afford an employee.  I
11     cannot afford an employee, they know this.
12     If you are making $400 a day in New York.  If
13     you pay somebody $12 an hour, $15 an hour, it
14     costs 30 percent more on the back end.  That
15     is impossible okay.  You get one day I made
16     $397, another day $495.  You cannot run a
17     business off this money legitimate and all of
18     the above, you can't do it.  It's just
19     impossible.  You have the 1099 so you don't
20     have the overhead or you shut down.
21            Q.    How did you determine the amount
22     that the company would pay drivers and
23     helpers?
24            A.    Based on my overhead, my insurance,
25     based on -- it was based on my overhead.  I
```

Page 134

```
1                    SAMORA MINORS
2      determine what was feasible and I would keep
3      moving.
4           Q.   I believe you mentioned you had
5      written or stated in discovery responses the
6      company paid $130 a day for drivers; is that
7      accurate?
8           A.   Give or take, that was the average.
9           Q.   And did you remember the lowest
10     amount a company paid the driver?
11          A.   For driver that was the lowest.
12     For helper that would be the highest I would
13     have paid for a helper.  For a driver that
14     would have probably been 120 would have been
15     the lowest for a driver at that time.
16          Q.   When you say that time, are you
17     talking about the entire time period when you
18     were contracting with HDL?
19          A.   No.  Due to inflation, no, I would
20     say at the end of the contract with HDL I pay
21     my drivers 150, 140.  At least I would try.
22     Otherwise I couldn't keep a driver.
23          Q.   Sorry, I didn't mean to interrupt
24     you there.
25               In your discovery we received
```

Page 135

```
1                    SAMORA MINORS
2       Minors Contracting paid helpers $110 per day
3       in 2013.  Is that accurate?
4            A.    That's accurate, yes.
5            Q.    What was the most the company paid
6       helpers during the time period you contracted
7       with HDL?
8            A.    Depending on the experience the
9       most would have been 130, yes, 130, 135.
10           Q.    Did the amount the company paid
11      drivers or helpers depend on the number of
12      stops they completed in a particular day?
13           A.    No.  Once they went out that was
14      their minimum.  If they did extra I would pay
15      extra.  Once they went out that was their
16      minimum.
17           Q.    When you say "extra," what would be
18      extra work?  What would constitute extra
19      work?
20           A.    Something that's not on the
21      paperwork.  If we make a delivery for a
22      washer and they wanted us to install and
23      there was no install on the manifest so we
24      didn't have to install we would install.  Or
25      a haul away an old refrigerator that wasn't
```

Page 136

```
 1                    SAMORA MINORS
 2     on the paperwork they would ask to us take it
 3     out, that would be an extra, things like
 4     that.
 5          Q.   Was Minors Contracting ever paid
 6     what are referred to as specials?
 7          A.   Yes, specials, yes, back then they
 8     call them specials.
 9          Q.   Was that what you were just
10     describing?
11          A.   Yes.
12          Q.   When HDL and Minors Contracting
13     were contracted for specials would you say
14     you would pass along some of that amount to
15     the drivers and helpers that actually did
16     that work?
17          A.   That's correct.
18          Q.   Would you pass along the entire
19     amount that HDL paid for the specials or a
20     portion of the amount?
21          A.   At that time I don't recall.
22          Q.   Do you remember what HDL paid for
23     specials?
24          A.   It varied on a case-by-case basis.
25          Q.   Were there times when certain
```

Page 137

```
1                    SAMORA MINORS
2       drivers or helpers were deemed to be -- when
3       you determined them to be responsible for
4       damage claim for merchandise claims?
5            A.   I'm not sure I understand that.
6            Q.   So if an in-home damage claim
7       happened, I understand you are saying that
8       you would often be charged when it shouldn't
9       have been, but if a damage claim occurred
10      when a particular driver was working, my
11      question ultimately is whether you would
12      deduct any of that amount from their pay for
13      that particular day?
14           A.   It depended.
15           Q.   What would it depend on?
16           A.   It would depend on what happened.
17      It would depend if it was a manufacturer
18      defect.  It would depend if it was product
19      defect, Sears problem or a contractor.  The
20      only time I would ever really penalize them
21      for it if it was a physical install or they
22      dropped it or they admitted to the claim
23      where they didn't strap it or something along
24      the lines where it was their negligence where
25      something didn't happen.  Bust for the most
```

Page 138

SAMORA MINORS

```
 1
 2      part I didn't pass it on the claims because
 3      they were unfair to begin with.
 4           Q.   Were there ever times when guys
 5      would call you up and say Mr. Minors I messed
 6      up, I dropped the dryer and damaged it,
 7      there's a hole in the customers wall, you
 8      know, what have you, did that ever happen?
 9           A.   Yes.
10           Q.   And so in those instances I presume
11      your company would end up having to foot the
12      bill for whatever damage was allegedly
13      caused, right?
14           A.   Every single time anything ever
15      happened it came out of pocket.
16           Q.   If a contractor, subcontractor
17      admitted they did cause the damage to you in
18      those specific instances, how would you
19      handle, how it would impact their pay for
20      that particular day?
21           A.   It wouldn't effect the pay.  I
22      would just pay it out.
23           Q.   I thought you said there were some
24      circumstances where some of the pay would be
25      deducted from the subcontractors pay for the
```

Page 139

```
 1                    SAMORA MINORS
 2      damage cost?
 3           A.   I mean this was rare.  I mean, for
 4      example, I will give you one example, I had a
 5      guy he stole merchandise, Sears contacted me,
 6      they said we can do one of two things.  HDL
 7      contacted me.  Sorry.  What was the question?
 8           Q.   I think you were providing an
 9      example of a time when --
10           A.   Yes, yes.  So, a driver helper
11      stole a product and I was called and I was
12      asked what happened.  They put -- they opened
13      the video, they showed me what happened.  And
14      I charged him for that product.  I did not
15      pay for that product.  So something like that
16      I know they stole it, I wouldn't pay for it.
17      If I know that they -- if I knew they were
18      negligent to the point it could have been
19      avoided, I would not pay for it.  But that
20      was maybe five times in the total of these
21      years it was probably five or six times that
22      really happened.
23           Q.   Is there any way you would be able
24      to look back and determine when the portion
25      of a damage claim was passed onto a driver or
```

Page 140

```
 1                    SAMORA MINORS
 2      helper?
 3           A.   No, I don't keep half the records.
 4      Anything I sent to these guys is what I have.
 5      For the most part I didn't really charge
 6      them.  It was things like that if it was
 7      stolen or an install.  Most of the time it
 8      was three or four instances the times I
 9      couldn't charge them because it would have
10      went through insurance, how can I charge them
11      when the insurance company was taking care of
12      the claim?
13           Q.   You would basically have to look
14      back at an in-home claim damage report and
15      ask you or the helper what happened here?
16           A.   Yes, I would go off of that, but I
17      pushed my hardest not to charge my drivers
18      and helpers because I didn't think it was
19      right.
20           Q.   Understood.  So I'm going introduce
21      what has been pre-marked as Exhibit 22 in the
22      binder.  If I can go ahead and flip to that.
23      I will represent for the record it's a
24      nine-page document, Bates numbered HDL
25      K000099 through 107.  On the first page the
```

Page 141

```
1                    SAMORA MINORS
2       title reads Independent Contractor Agreement.
3       Mr. Minors, have you seen this form contract
4       before?
5                    (Exhibit 22, Independent Contractor
6            Agreement, marked for identification, as
7            of this date.)
8            A.    Yes.
9            Q.    Do you recall Minors Contracting
10      entering into a contract agreement with an
11      Independent Contractor Agreement with HDL?
12           A.    Yes.
13           Q.    Do you recall how many of those the
14      company entered into?
15           A.    I believe two, but they would
16      update their contracts on their own with or
17      without you signing them.  Maybe that was a
18      clause in their contract.
19           Q.    Do you recall when the two times
20      you signed the contractor contracts were?
21           A.    That I don't recall.  I just know I
22      did sign more than once.  I signed a new
23      contract.
24           Q.    Did you read the contract before
25      you signed it?
```

Page 142

```
 1                    SAMORA MINORS
 2          A.   Yes.  I overlooked, I skimmed
 3     through.  I mean I read it but things I
 4     didn't understand because it's so much legal
 5     jargon.
 6          Q.   So, I want to ask you just about
 7     one specific portion.  After you flip to the
 8     second page Bates stamped ending 100.  The
 9     first sentence of the paragraph number 6
10     where it says Expenses, do you see that?
11          A.   Um-hum.
12          Q.   It say, Contractor shall provide
13     it's own vehicle and shall pay all costs
14     attendant with it's operation and
15     maintenance; is that correct?
16          A.   Um-hum.
17          Q.   And was it your understanding when
18     you actually signed the contract that your
19     company would be responsible for providing
20     it's own vehicles?
21          A.   Yes.
22          Q.   Was it also your understanding that
23     the time that the company was going to be
24     responsible for payment of the vehicle
25     expenses too?
```

Page 143

```
 1                    SAMORA MINORS
 2          A.    Yes.
 3          Q.    Were there any specific permits
 4     that you had to obtain in order to operate
 5     Minors Contracting?
 6          A.    No.
 7          Q.    Okay.  Any specific licenses that
 8     Minors Contracting had to obtain?
 9          A.    No.
10          Q.    What about for in order to perform
11     the delivery services for XBO, did you have
12     to obtain specific permits for that?
13          A.    No.
14          Q.    Did you have to obtain any specific
15     operating authority?
16          A.    No.
17          Q.    And what about for Home Delivery
18     America, I believe you mentioned that you had
19     to have inter-state authority for that
20     contract, right?
21          A.    Yes, they wanted me to do
22     inter-state filing.  I didn't want to.
23          Q.    Besides that -- sorry, are you off?
24          A.    No.
25          Q.    Besides that inter-state authority,
```

Page 144

```
 1                    SAMORA MINORS
 2      did you have to obtain any other permits?
 3            A.    No.
 4            Q.    Okay.  Did Minors Contracting LLC
 5      name appear on any of the company's trucks
 6      that it operated?
 7            A.    Yes.
 8            Q.    And was it on all of the trucks
 9      that it operated?
10            A.    Legally it has to be once you owned
11      a truck and you have a DOT, New York State
12      you have to put your companies info on each
13      side of the truck.
14            Q.    Was that the same when you leased
15      those two trucks through Mendon?
16            A.    That's correct.
17            Q.    Where on the truck is the name of
18      your company placed?
19            A.    It could be on the door or the side
20      of the box.
21            Q.    Was there any specific requirement
22      for how large the lettering had to be?
23            A.    Yes, there's a DOT code which is
24      four, five inches and it has to be legible
25      and et cetera.
```

Page 145

```
 1                    SAMORA MINORS
 2          Q.   Where did you get the plaque cards
 3     with that information?
 4          A.   I got it from a store, a decal
 5     place.
 6          Q.   Did you just shop around for a good
 7     place to get them from?
 8          A.   Yes.  HDL does give you stickers to
 9     put on the side of your trucks so you
10     represent the trucks, but for the part of
11     your companies info you had your companies
12     info on the side of your truck.
13          Q.   Did HDL, I believe you mentioned
14     they had managers at the Rochester warehouse
15     while you were working there?
16          A.   That's correct.
17          Q.   Who were the managers during the
18     time that Minors Contracting was operating
19     out of the Rochester warehouse?
20          A.   The beginning was James Lockhard,
21     Lockhorn or something like that.  And then
22     became Michael Rex was the assistant and then
23     he became the manager.
24          Q.   Those were the only two during that
25     time period?
```

Page 146

```
1                    SAMORA MINORS
2           A.    That I can recall.
3           Q.    What about in the Buffalo
4     warehouse?
5           A.    I don't know.  I don't know them.
6     I just went over there to do some work.
7           Q.    Did you have any interaction with
8     the managers at the Buffalo warehouse?
9           A.    Not really.  I wouldn't remember if
10    I did.  It was vague.
11          Q.    What about the Syosset warehouse?
12          A.    Andrew Wilson.
13          Q.    Was that the only manager during
14    the time you were operating out of there?
15          A.    Yes, that I can recall.
16          Q.    Did Inervel also have managers at
17    the Rochester warehouse?
18          A.    Yes, I really didn't know them.
19    They would separate themselves.  They would
20    try to talk to HDL, talk to us and yes, I
21    didn't really interact.  I just remember one
22    person Brian he was a Sears -- I don't know
23    if he was Sears or Inervel because Inervel
24    was owned by Sears.  I wasn't sure who I was
25    talking to when I talked to him.  He was a
```

Page 147

```
                    SAMORA MINORS
 1
 2      boss for Sears and a boss for Inervel.
 3           Q.   When you mentioned Sears earlier,
 4      do you know did you use Sears and Inervel
 5      interchangeably or would you be specific
 6      about Sears?
 7           A.   In what regard?  Into specific
 8      about Sears in what regard?
 9           Q.   In terms of the people that you
10      interacted with, did you know who worked for
11      Sears technically versus who worked for
12      Inervel or was it one in the same for you?
13           A.   For me it was one in the same.
14      When they wanted it it was separate.  When it
15      was their benefit everything was separate.
16      When they didn't want to, when they needed to
17      do something they did what they needed to do,
18      they pushed HDL to the side when they did
19      stand ups and when they had the claim they
20      had total control.  HDL pushed their rules
21      and their orders.  It was -- they had
22      control.
23           Q.   Did the HDL manager have an office
24      in the warehouses, in each of the warehouses?
25           A.   That's correct.
```

Page 148

SAMORA MINORS

1

2      Q.    That was in Rochester, Syosset and

3   Buffalo?

4      A.    I don't know anything about

5   Buffalo.

6      Q.    Do you know whether the

7   representatives from Inervel also had

8   offices, had the locations in Rochester and

9   Syosset?

10     A.    They did.  Well, I can tell you

11  this about Buffalo.  They were one of the

12  more advanced locations, so they had a very

13  nice dock and they had offices for all of

14  their guys as well.  So HDL had their own

15  office and Sears and Inervel had their own

16  offices within the same building.

17     Q.    Did you ever hold meetings with

18  your guys, with your subcontractors while you

19  were at the terminals?

20     A.    No.

21     Q.    Okay.  You never used like any of

22  the office space in order to speak with any

23  of the subcontractors that worked with you?

24     A.    I didn't use their office, but I

25  would be in their building.  If we had a

Page 149

```
 1                    SAMORA MINORS
 2      problem they did stand up so in the mornings
 3      they did stand up.  We went over our scores,
 4      we went over scope of work and that changed
 5      every day.  For example, we are not touching
 6      gas, I'm not licensed to touch gas in any
 7      place, I'm not a plumber.  They tell you,
 8      especially in Long Island, can you just
 9      disconnect.  I'm not touching it.  Okay.
10      Another instance in Rochester, well, it's a
11      colony, so you can do gas or in Long Island
12      it's a county, you can do gas.  I'm not doing
13      it.  I don't do gas.  I'm not licensed to do
14      gas.
15           Q.   On all of the days that you worked
16      as a driver or a helper training someone to
17      drive is it fair to assume you attended the
18      stand up meetings?
19           A.   Yes.
20           Q.   And then conversely when you were
21      not driving or working as a helper you didn't
22      attend those stand up meetings?
23           A.   No, I would still sometimes be
24      there.
25           Q.   Sometimes you would and sometimes
```

Page 150

1                    SAMORA MINORS
2       you wouldn't?
3            A.    Correct.
4            Q.    One additional question I know is
5       never pleasant.  Has Minors Contracting ever
6       been sued before?
7            A.    I've had an auto claim and they --
8       a lawsuit from the City, from the State of
9       New York.
10           Q.    The auto claim was that like from
11      an accident that happened with one of the
12      trucks?
13           A.    An accident that was claimed to
14      have happened with one of the trucks, so they
15      had a video and they said that we had a
16      delivery that day and that video was very
17      blurry and it shows a truck down the block
18      and they went around and asked who had
19      deliveries, but there was a dump truck, a Fed
20      Ex truck, a cargo truck, and how can you say
21      it's that one truck.  It was dismissed.
22           Q.    Was that an insurance claim or did
23      it end up in court?
24           A.    It actually it ended up they were
25      -- they contacted me to sue me.  To what

                                        Page 151

```
 1                    SAMORA MINORS
 2        point it ended up in court, I'm not sure
 3        because my, my insurance people have -- my
 4        insurance covered the lawsuit.  Even if they
 5        sued me directly, my insurance set up my
 6        lawyer.
 7             Q.   Okay.
 8             A.   They didn't sue me directly, my
 9        company directly, but my insurance took care
10        of it.
11             Q.   And the other case you mentioned
12        this was brought by this State of New York?
13             A.   Yes, they put a freeze on my
14        account.  I had to fight and I won.
15             Q.   What was that for?
16             A.   That was for some HUD filings and
17        they had me, they had missed, they made
18        errors, they made errors, they put $7,000 in
19        collections into my company's name.  And then
20        the bank put another $7,000 because once you
21        get a thing to pull money out the banks
22        double down on it so it was negative 7,000,
23        14,000 in my account plus fees and for two
24        months, three months I had to fight and
25        explain what happened and send the proper
```

Page 152

```
 1                    SAMORA MINORS
 2      paperwork and it got reversed.
 3           Q.   Do you know in what county that was
 4      filed?
 5           A.   That was New York City.
 6           Q.   Kings County or New York County?
 7           A.   I believe it was Kings County.
 8           Q.   Okay.  And when was that around?
 9           A.   Maybe 2017 it lasted I think
10      between 2017, 2018.
11           Q.   Then I think we are somewhat
12      nearing the end.  I probably, I'm guessing, I
13      would still have another hour or so.  Do you
14      want to take a break for lunch now or power
15      through?  It's up to you guys.
16                THE WITNESS:  We can take a little
17           bit of charge.  It's all right.
18                MR. WEBER:  I think, I don't know.
19           Mr. Minors, do you want to keep going or
20           take a break?
21                THE WITNESS:  I will keep going.  I
22           don't mind, but if you want to take a
23           break, we can take a break.
24                MR. WEBER:  How about a five-minute
25           break.
```

Page 153

```
1                    SAMORA MINORS
2              MR. KRAMER:  Sure.  If it's all
3         right with you let'S take ten minutes.
4              THE VIDEOGRAPHER:  We are off the
5         record now at 1:31 p.m.
6              (Whereupon, a short recess was
7         taken.)
8              THE VIDEOGRAPHER:  We are now going
9         back on the record at approximately 1:55
10        p.m.  This is the beginning of media
11        four.
12        Q.   Mr. Minors, I'm reminding you again
13   you are still under oath.  I will introduce
14   what is pre-marked Exhibit 27 in that tab
15   binder.
16             (Exhibit 27, document, marked for
17        identification, as of this date.)
18        Q.   I will represent this is a document
19   marked confidential, contains SMINOR 00478
20   through 514.  Have you seen these documents
21   before?
22        A.   Yes, that's correct.
23        Q.   What are these?
24        A.   These are my taxes.
25        Q.   I want to direct your attention to
```

Page 154

SAMORA MINORS

1

2    the first page of the document, the Schedule

3    C for 2014 for your company Minors

4    Contracting.

5          A.   Yes.

6          Q.   Line E lists a hundred dollars

7    spent on advertising expense that year.  Can

8    you recall what that amount was based on?

9          A.   Yes, that was Craig's List.

10          Q.   Was that advertisement looking for

11    drivers or helpers to contract with the

12    company?

13          A.   That's correct.

14          Q.   Line 13.  I'm sorry, line 11 lists

15    $207,560 in contracts labor.  What does that

16    amount pertain to?

17          A.   Drivers and helpers and any

18    contractor/laborer that I had.

19          Q.   And would any portion of that

20    amount pertain to amounts that the company

21    paid you or draws that you took from the

22    company?

23          A.   No.

24          Q.   Line 13 on the same page lists

25    depreciation and amount of $25,560.  Do you

Page 155

SAMORA MINORS

1

2    know what property is being depreciated here?

3         A.   My trucks.

4         Q.   Okay.  And approximately how many

5    trucks were you operating back in 2014?

6         A.   Four.

7         Q.   Correct me if I'm wrong, I thought

8    you were leasing trucks from Mendon during

9    that time period; is that incorrect?

10        A.   It could have been.  It probably

11   was around that time period.  But, again, the

12   minute I got rid of them they overlapped so

13   if I had them I was in the process of buying.

14        Q.   Okay.  So this amount in

15   depreciation pertains to the trucks you had

16   purchased at the time, right?

17        A.   That's correct.

18        Q.   Line 20B in the same page lists

19   expenses for other business property.  What

20   other business property besides vehicle and

21   machinery and equipment that is accounted for

22   in line 20A would that $17,000 in -- $17,217

23   correspond to?

24        A.   That would be other business

25   transactions, anything that I -- anything

Page 156

```
 1                    SAMORA MINORS
 2      that has to be with the business, any
 3      property with the business, anything that I
 4      rented for the business.  Anything that I
 5      used for the business.  You know my those are
 6      my business transactions.
 7           Q.   So would that include things like
 8      tools and equipment that you had to purchase
 9      as part of running the business?
10           A.   Correct.
11           Q.   Did you separate what you included
12      as equipment for like 20A versus the amount
13      that is categorized as other business
14      property for 20B?
15           A.   That I would have to refer back to
16      my records and dig deeper into that.  I'm not
17      sure the answer to that.  I would have to go
18      in.  Off the top of my head I don't know.  I
19      don't know the answer.
20           Q.   What about supplies, do you know
21      what type of expenses that would pertain to?
22           A.   Yes, that would be like
23      miscellaneous things, extra straps,
24      harnesses, gloves, paste, putty.  Those are
25      just little nicks and nacks I would keep
```

Page 157

SAMORA MINORS

1
2        extra on the truck.
3             Q.   Okay.  And it lists $22,485 in
4        other expenses, do you know how that number
5        was determined?
6             A.   I would have to go back into my
7        business filings and sit down with my
8        accountant and go over that.  That I don't
9        know off the top of my head.
10            Q.   Sitting here today would you be
11       able to give other examples of another
12       expense that you have listed there?
13            A.   No, that I wouldn't know.  I don't
14       want to guess.
15            Q.   If you turn to the following page
16       Bates SMINORS 00479.  Per five lists other
17       expenses and below that it says see STM01
18       typed in, do you see that?
19            A.   Yes.
20            Q.   And do you know what was on STM01?
21            A.   No idea.  I am not an accountant.
22       I give my paperwork to my accountant and he
23       does the accounting.
24            Q.   Would you still have a copy of that
25       other document that's referenced there STM01?

Page 158

```
1                    SAMORA MINORS
2         A.    No.  No, I don't know what it is.
3         Q.    Are the documents you produced the
4    only tax records that you were able to find
5    for these years?
6         A.    That's correct.
7         Q.    Okay.  I want to ask you to turn to
8    the following page SMINOR 00480 the C-4 for
9    the company for 2015.  If you look at line 9
10   where it lists car and truck expenses.  That
11   amount increased from it was $83,109 in 2014
12   to $104,306 in 2015.  Do you have a sense of
13   why there was approximately about I guess a
14   $21,000 increase in expenses for car and
15   truck expenses that year?
16        A.    Yes, I'm sure I had more break
17   downs and I had to get them repaired.
18        Q.    Okay.  Were you operating more
19   trucks in 2015 would that account for part of
20   the increase?
21        A.    I don't know the answer to that.  I
22   don't recall, but the increase it could be
23   the same amount of trucks and just more
24   damages to those same trucks that caused more
25   money the same year over.
```

Page 159

```
 1                  SAMORA MINORS
 2          Q.    Line 17 of the same document
 3     indicates $500 spent on legal and
 4     professional services.  Do you recall what
 5     that was for?
 6          A.    I believe it was for my taxes.
 7          Q.    And line 24B lists $3,542 in
 8     deductible, meals and entertainment, do you
 9     know what that number pertains to?
10          A.    Yes, meals and entertainment.
11          Q.    Okay.  What kind of -- in what
12     circumstances would you deduct meals from
13     your companies tax filings?
14          A.    When I would be either sitting down
15     discussing company business or when I would
16     take my guys out and pay for their food on
17     the job.
18          Q.    Okay.  About how often would you
19     estimate that you took the guys out for food
20     while they were working?
21          A.    For the year about 3500, so I would
22     -- whenever it was maybe on a Friday, maybe a
23     weekend, something, I would do is I did it a
24     lot.  It was something I did a lot that I
25     just if I'm buying food for myself I would
```

Page 160

```
1                     SAMORA MINORS
2        buy breakfast in the morning for the guys or
3        I buy, give some, some money during the day
4        for food.
5             Q.   Was that part for entertainment or
6        was it all just for meals?
7             A.   Meals.
8             Q.   Okay.  Line 25 lists utilities.  Do
9        you know what that pertains to, it's about
10       $1,280?
11            A.   I don't recall.  It was for
12       something, but I don't recall.
13            Q.   On the next page under part 5 for
14       other expense it is, again, says STN01.  I
15       assume that's a document that you no longer
16       have; is that right?
17            A.   Yes, I don't know what the document
18       is, so I'm unsure.
19            Q.   Did you look for that document?
20            A.   No, I wasn't aware of the document
21       to look for it.
22            Q.   Okay.  Turning to the following
23       page it's Bates number ending 482.  And it
24       says at the top it's the 2016 financial
25       statements balance sheet.  This lists
```

Page 161

```
1                    SAMORA MINORS
2        $280,649 in assets as cash.  Was that money
3        in the Minors Contracting business account?
4             A.   No.
5             Q.   What does that pertain to?
6             A.   That's money that I spent a year
7        for total -- total assets.  I'm not even
8        sure.  I'm not sure what that.  I think
9        that's total.  I don't know financial
10       statement balance is what I paid out to
11       contractors, I believe.  If I'm looking at it
12       I'm not sure what that is.  My accountant did
13       these, so I don't know.
14            Q.   Okay.  It list $231,564 in accounts
15       payable, do you know what that would pertain
16       to?
17            A.   No, I'm unsure the financial
18       aspects of this.  I'm not privy to what it
19       is.  I just don't know.
20            Q.   Okay.  I assume -- I understand
21       your accountant put together the tax returns,
22       was that based on information and records
23       that you provided the accountant?
24            A.   For the most part, but sometimes he
25       puts in and duplicates things and I don't
```

Page 162

SAMORA MINORS

1

2       know why they are in one section or another.

3       If they are in that section, he has a reason.

4       I wasn't privy to the reason, it could just

5       be a coding.  I have no idea.

6            Q.   I know this is a tedious process,

7       but just bear with me.  If you can turn to

8       the next page.  Bates numbered ending 483.

9       Line number 25 lists partners capital

10      accounts if applicable.  And that's $49,085.

11      Did that pertain to your sisters capital in

12      the company as a partner?

13           A.   No.  That's my capital.

14           Q.   Okay.  Is any portion of that your

15      sister had invested into the company?

16           A.   No.

17           Q.   And so I think we discussed in 2016

18      that was when your sister had purchased part

19      of the company and it was your understanding

20      that that is when the LLC technically turned

21      into a partnership; is that right?

22           A.   Yes.

23           Q.   And so if you turn to the page

24      Bates number ending 486.  It's a couple

25      ahead, form 1065 for 2016 for the company.

Page 163

```
 1                    SAMORA MINORS
 2          A.    That's correct.
 3          Q.    So line 13 here lists $26,110 in
 4     rent.  Do you know what your paying rent for
 5     that year?
 6          A.    Rentals, truck rentals.
 7          Q.    Okay.  That's the truck rentals you
 8     said that you had facilitated by HDL through
 9     Penske and Ryder?
10          A.    No, these were also my own rentals
11     as well.
12          Q.    Okay.  Where else were you renting
13     trucks from?
14          A.    These are Penske and Enterprise,
15     mostly Enterprise rentals.
16          Q.    Were you also renting Enterprise
17     trucks to perform services for the HDL
18     account?
19          A.    Yes, I would rent trucks for, yes,
20     yes.
21          Q.    Okay.  I want to direct your
22     attention to the top of the page for the
23     address of the company.  I believe the
24     address was redacted for 2014 and 2015, the
25     Schedule C we looked at before.  This list
```

Page 164

SAMORA MINORS

```
 1                    SAMORA MINORS
 2     the, the Tampa, Florida address.  Is that
 3     because you had moved to Tampa, Florida in
 4     2016?
 5          A.   I believe so, yes.  I couldn't file
 6     if I wasn't there.
 7          Q.   If you flip ahead a couple of pages
 8     to the page Bates numbered ending 488.  Your
 9     personal address was also listed at that
10     location, right?
11          A.   Correct.
12          Q.   Do you still have that address?
13          A.   No.
14          Q.   Was that an apartment you were
15     renting at the time?
16          A.   Correct.
17          Q.   I want to flip ahead about three
18     more pages to a document that's Bates number
19     ending 491.  I will represent, for the
20     record, it's a 2016 form 1099 issued by
21     Minors Contracting to Verhillio Rodriguez.
22     Here the address was listed at what you said
23     is your mom's address 4407 Avenue L in
24     Brooklyn.  Do you know why you choose to list
25     the Brooklyn address here versus the Tampa
```

Page 165

1                    SAMORA MINORS
2      address in the form 1065?
3           A.   That was my accountants error.
4      That shouldn't have been made.
5           Q.   Can you just take a moment to flip
6      through the following eight pages up until
7      the document that's Bates numbered 499.
8           A.   Yes.
9           Q.   Are those eight documents also Form
10     1099 issued to individuals who worked as
11     drivers or helpers in Minors Contracting in
12     2016?
13          A.   That's correct.
14          Q.   Do you know if there was anyone
15     besides these nine people who the company had
16     issued 1099s for during that year?
17          A.   No.
18          Q.   It was just those nine people?
19          A.   Correct.
20          Q.   Did all of them perform services
21     under the contract with HDL?
22          A.   Yes.
23          Q.   You mentioned you were operating
24     some trucks down in Florida after you moved
25     there in January, 2016, were any of them

                                        Page 166

1                          SAMORA MINORS
2          working on the trucks that you were operating
3          down in Florida during that time?
4               A.    No.
5               Q.    Do you know who was working on the
6          trucks down in Florida during that time?
7               A.    I can't recall the names, I don't
8          know off the top of my head.
9               Q.    Would you have an issued additional
10         1099's to those people?
11              A.    If they worked, yes.
12              Q.    I ask you to turn to the following
13         page, the financial statements page for 2017
14         and that's Bates number SMINOR 00500.  So
15         this document lists $280,649 in cash assets
16         and 231,564 in accounts payable.  Is that
17         correct, did I say that right?
18              A.    I'm looking at it, I'm assuming
19         it's correct.  I'm just not sure what is
20         correct.
21              Q.    I wanted to ask you because it's
22         the same amounts listed in the balance sheet
23         for 2016, right?
24              A.    Okay.
25              Q.    So, do you know why those same

                                        Page 167

SAMORA MINORS

1
2   exact amounts would be listed for 2016 and
3   2017?
4          A.   Well, I do believe if you are
5   looking at it it says end of year 2016.  So I
6   guess it's just a continuance, but I'm not an
7   accountant, so I don't know.
8          Q.   Let's flip forward a couple of more
9   pages Bates ending 502 at the bottom.  That
10  says the financial statements income
11  statement 2017 at the top.  Line 11 there
12  lists a thousand dollars for advertising.  Do
13  you recall what kind of advertising you paid
14  for that year?
15         A.   I did, I believe I printed out some
16  stuff and bought some.  It was, it was on one
17  of them.  I know it was one of those employee
18  aps that I was trying -- employment aps I was
19  trying to look for.  I was trying to look for
20  something different, I never did advertising.
21  I tried to do something different in new
22  advertising.  I don't recall which ones, but
23  I tried to do some type of different
24  advertising.
25         Q.   Was it advertising to find drivers

Page 168

```
 1                   SAMORA MINORS
 2       or helpers or to find additional business for
 3       the company?
 4            A.   To find business.
 5            Q.   Okay.  I'm sorry, you said it was
 6       through like an ap service that would allow
 7       you to advertise?
 8            A.   Yes.  I mostly, I printed out some
 9       fliers, I printed out a lot of fliers.  It
10       was some other stuff I was doing.  I was
11       trying to do moving on the side and this
12       wasn't making -- it just wasn't adding up.
13       So, I was thinking about getting out and
14       doing other things.
15            Q.   Okay.  This was in 2017 toward the
16       end of your contract period with HDL?
17            A.   Pretty much around that time.
18            Q.   Did you have any success finding
19       work doing moving or anything else during
20       that time period?
21            A.   No.
22            Q.   If you flip forward about three
23       more pages to the document Bates numbered
24       ending 504.  At the top says U.S. Financials
25       Other Expenses, do you see that page?
```

Page 169

```
 1                   SAMORA MINORS
 2          A.    Yes.
 3          Q.    Directing your attention to the
 4    fourth line here below where it says
 5    description of other expense item.  It said
 6    Homedeliverylink fees and third-P-A-R-Y, I
 7    assume that is he a typo for party, do you
 8    see that?
 9          A.    Yes.
10          Q.    And the amount listed is $30,672.
11    Do you know what that pertains to?
12          A.    That is, I believe that's all the
13    claims that Homedeliverylink deducted from me
14    to read and yes.
15          Q.    So the third-parties that are
16    referenced there, do you know is that
17    referring to the, I guess, the third-party
18    that the damage or merchandise claim pertains
19    to?
20          A.    Well, I put it that way because in
21    my mind HDL charges me for whatever claim.
22    They don't give me a receipt of who they pay.
23    The receipt is them taking money out from me.
24          Q.    Okay.  I understood.
25          A.    So how do I know where the money
```

Page 170

```
1                       SAMORA MINORS
2        is?
3             Q.    So you just know it goes to a
4        third-party, but you don't know who or how
5        much, is that what you are saying?
6             A.    Pretty much.   There only proof is
7        that they took the money from me.
8             Q.    And the following line says 21
9        drivers, contractors fees paid in the amount
10       is $112,402.  Do you know what the 21 drivers
11       contractors refers to?
12            A.    That would be the amount of people
13       that I contracted or used through the year.
14            Q.    Below that lists fuel
15       reimbursement.  I believe it's fueled,
16       F-U-E-L-D reimbursement paid to contractors
17       and it's $25,600.  So did Minors Contracting
18       reimburse drivers for the amounts that they
19       paid for fuel?
20            A.    That's correct.
21            Q.    Did the company pay them or
22       reimburse them out of the companies business
23       account?
24            A.    That is correct.
25            Q.    Did you ever give drivers or
```

Page 171

```
 1                    SAMORA MINORS
 2      helpers a credit card or debit card to put
 3      fuel on?
 4           A.   Once, yes.
 5           Q.   How come it was just once as
 6      opposed to a regular thing?
 7           A.   I don't trust people.
 8           Q.   Was there an instance where people
 9      were putting other things besides fuel on the
10      card?
11           A.   No, I, I just don't trust people.
12      People are not trustworthy.  I don't give
13      them a chance.
14           Q.   Below that is a line for storage
15      the amount is $1,500.  Do you remember where
16      you were keeping storage during this year in
17      2017?
18           A.   2017 that was in Long Island.
19      That's when -- that was in Long Island in
20      2017 storage.
21           Q.   And what kind of items would the
22      company keep in storage there?
23           A.   That was my truck.
24           Q.   It was one of the trucks was kept
25      in storage?
```

Page 172

SAMORA MINORS

1

2     A.   Yes.

3     Q.   I think you mentioned after you had

4  contracted with XBO and you bought some

5  additional equipment to service that account

6  you ended up putting some of the additional

7  equipment in storage, would that have been

8  kept somewhere else?

9     A.   No, the storage I would use to have

10  the box truck.  If I have box truck, anything

11  in the truck would be storage, wherever I put

12  it, that would be my storage.

13     Q.   Even if you had to use the box

14  truck to perform deliveries?

15     A.   No, if it was stored I would put

16  the box truck as storage.  The box truck is

17  being stored somewhere.  I paid them and I

18  put the stuff inside the truck.

19     Q.   That was a truck that you weren't

20  utilizing to perform deliveries at the time

21  you had to keep in storage?

22     A.   Correct.  I put it in a garage,

23  basically it's called garage insurance.  I

24  don't take it off my insurance.  I put it in

25  the garage and I save on insurance, but I

Page 173

1                      SAMORA MINORS
2      don't have to pay the insurance lapse or
3      cancel insurance.
4           Q.   I want to ask you to turn to the
5      following page, page 505.  It states at the
6      top it's a Form 1065 for 2017 for Minors
7      Contracting.  So it's the last year you were
8      contracting with HDL.  So here there's a West
9      Palm Beach address listed for the company,
10     right?
11          A.   Yes.
12          Q.   What was located at that address?
13          A.   That was me at the time I moved
14     down to West Palm.
15          Q.   Okay.  And so that was your
16     residential address?
17          A.   I'm sorry, the business, not me,
18     the business.
19          Q.   So was it in an office located
20     there?
21          A.   But it was more so like an office,
22     it was a home office of a family friend.
23          Q.   What type of structure was
24     physically located there, was it an office
25     building or was it a house, what was there?

                                   Page 174

```
1                    SAMORA MINORS
2         A.    A home.
3         Q.    Who lives there?
4         A.    Bill Kirby, he owns the house.
5         Q.    So, why did you list that as your
6   business address?
7         A.    I was going to be going down.  I
8   was going to be relocating there and things
9   just didn't plan out that way.
10        Q.    Did you ever move down there or you
11  were always staying in Tampa?
12        A.    No, I stayed in Tampa.
13        Q.    I will ask you to please flip ahead
14  two pages to Bates number ending 507.  Here
15  your personal address listed at the end of
16  that form 1065 is the same one in Tampa,
17  Florida, correct?
18        A.    Correct.
19        Q.    You were still living down in Tampa
20  at the time you completed this?
21        A.    Correct.
22        Q.    I'm going to ask you to flip ahead
23  all the way to the second to last page of the
24  whole binder.  It's a document Bates ending
25  514?
```

Page 175

```
 1                    SAMORA MINORS
 2              MR. WEBER:  What exhibit number?
 3              MR. KRAMER:  This is still Exhibit
 4         27, yes.
 5         A.   I see it.
 6         Q.   This is the 1099 HDL issued to
 7    Minors Contracting for 2017, correct?
 8         A.   Correct.
 9         Q.   And the total amount of
10    compensation listed in box 7 is $375,296.79,
11    right?
12         A.   Correct.
13         Q.   And so if I told you that the total
14    settlement that the company received from HDL
15    out of the New York locations was $168,000,
16    around there, do you know what would explain
17    the difference between those two amounts?
18         A.   I'm not sure of the question.
19         Q.   So, I'm not going to ask you to do
20    this, if I told you that we added up all of
21    the amounts paid to Minors Contracting for
22    2017 based on the work performed out of the
23    Syosset location that amount was $168,594,
24    the 1099 from HDL reflects that HDL paid the
25    company a total of $375,000 that year.
```

Page 176

```
  1                    SAMORA MINORS

  2        A.    Okay.

  3        Q.    So, do you know what accounts for

  4   that almost or around $200,000 difference?

  5        A.    I did some work in Florida, like I

  6   said, and I also had -- I'm not sure if I had

  7   routes in Rochester.

  8        Q.    And do you know whether HDL had

  9   other warehouses or terminals located in

 10   Florida at that time?

 11        A.    I know of the one I worked at.  I

 12   don't know about the others.

 13        Q.    What was the one you were working

 14   at in Florida?

 15        A.    It was in Lakeland.

 16        Q.    Lakeland?

 17        A.    Lakeland, Florida.

 18        Q.    Did you have to have inter-state

 19   operating in Florida in order to operate down

 20   there?

 21        A.    Not in order to operate down there.

 22   But in order to operate in New York, yes.

 23        Q.    Just not in Florida?

 24        A.    Correct.

 25        Q.    I will introduce what is pre-marked
```

Page 177

1                    SAMORA MINORS

2       Exhibit 13.  I know we are bouncing around a

3       lot.  So, it's the document under tab 13 in

4       the binder.

5                    (Exhibit 13, promissory note,

6              marked for identification, as of this

7              date.)

8              Q.    The Bates number on that is

9       extremely small SMINOR 000101.  And at the

10      top it says Homedeliverylink promissory note.

11      Do you see that?

12             A.    This is for 13?

13             Q.    Exhibit 13, yes.  It's right after

14      the tab that's numbered 13.

15             A.    Yes, I see it.

16             Q.    Is that your signature at the

17      bottom?

18             A.    Yes, it is.

19             Q.    And it's dated it looks like

20      January 5th of 2017?

21             A.    Yes, it is.

22             Q.    And what was this promissory note

23      for?

24             A.    I probably needed the money to do

25      something.  I don't know what it was for.  If

                                        Page 178

```
 1                     SAMORA MINORS
 2     I asked for the money I was in debt and I
 3     needed to get out.
 4          Q.   Do you know if it was related to
 5     expenses that your business had at the time?
 6          A.   I'm sure it was.
 7          Q.   And I take it you deposited that
 8     amount into the company business account?
 9          A.   Correct.
10          Q.   Okay.  So is it fair to say it was
11     that amount was for the benefit of the
12     business and not just yourself or any
13     particular worker, right?
14          A.   Correct.
15          Q.   And so after this loan was given
16     would installments just be deducted from your
17     settlement statements?
18          A.   Correct.
19          Q.   Okay.  And it looks like it was in
20     eight equal installments of $863.52, right?
21          A.   That's correct.
22          Q.   Do you know whether those
23     deductions appeared on settlement statements
24     where you were the driver or someone else was
25     the driver?
```

Page 179

```
1                    SAMORA MINORS

2          A.    I don't know.

3          Q.    Okay.  Was there any particular

4    reason why that amount would appear in a

5    settlement statements where one person was a

6    driver versus another?

7          A.    That's HDL internals.  I don't

8    know.

9          Q.    I would like to introduce what is

10   pre-marked Exhibit 17.

11              (Exhibit 17, delivery settlement

12        statement, marked for identification, as

13        of this date.)

14         Q.    If you flip ahead to Exhibit 17.

15   This is Bates SMINOR 00310.  I will

16   represent, for the record, it's a delivery

17   settlement statement January 3rd of 2015.

18   Was this one of the documents you provided in

19   response to some of the discovery requests,

20   Mr. Minors?

21         A.    Yes.

22         Q.    Do you see the handwriting at the

23   bottom of the page?

24         A.    Yes.

25         Q.    Is that your handwriting?
```

Page 180

SAMORA MINORS

1

2       A.   Yes.

3       Q.   What does that handwriting pertain

4  to?  What does it reflect?

5       A.   I don't recall.  It looks like it's

6  adding things up.  I just don't remember what

7  I was adding up.  That could have been me

8  adding up that day and it could have been me

9  adding up something from before and minusing

10  something.  It looks like I was just

11  scribbling.

12       Q.   So you don't know whether or not

13  those numbers that are listed and the names

14  listed pertain to the work that's reflected

15  on that particular settlement statement?

16       A.   It could be but, again, I'm not

17  100 percent sure, so I can't really give you

18  an answer on that.

19       Q.   Do you know would there be any

20  reason why there would be four person's names

21  associated with one delivery settlement

22  statement?

23       A.   No, could have been writing on

24  something for something else.  No idea.  This

25  is just, no, I don't have any info on that.

Page 181

```
 1                    SAMORA MINORS
 2         Q.   I'm going to introduce what is
 3    pre-marked Exhibit 10.  This is Bates
 4    numbered SMINOR 000033 to 34.
 5              (Exhibit 10, e-mails, marked for
 6         identification, as of this date.)
 7         Q.   It appears to be an e-mail chain
 8    between you and Mike Rex from June of 2015;
 9    is that right?
10         A.   What exhibit?
11         Q.   Exhibit 10.
12         A.   Yes.
13         Q.   You mentioned before Mike Rex was
14    the manager for the Rochester warehouse; is
15    that right?
16         A.   Yes.
17         Q.   Or the HDL manager?
18         A.   Yes.
19         Q.   And it is, is the technical title
20    for him account executive; is that
21    understanding?
22         A.   Yes.
23         Q.   It's relatively short.  I want to
24    give you a moment to read through the e-mail
25    before I ask any questions about it.  So,
```

Page 182

1                      SAMORA MINORS

2       take a moment and let me know once you had a

3       chance to do that.

4             A.    I'm finished.

5             Q.    Also on the following page.

6             A.    Okay.

7             Q.    On the second page you are looking

8       at right now there's an e-mail dated from

9       June 11, 2015 saying:  Hey Rex, I'm sorry I

10      haven't gotten in contact with you.  I'm out

11      of the country.  You can contact me through

12      e-mail.  Do you happen to recall which

13      country you were in at the time?

14            A.    No.

15            Q.    Do you remember going out of the

16      country in the summer of 2015?

17            A.    Yes, that's my birthday, that's the

18      day before my birthday.

19            Q.    And you just, you can't recall

20      where you went?

21            A.    No.  I travel a lot.  It could have

22      been it was somewhere, it could have been a

23      Caribbean Island or Europe.  I'm not sure.

24            Q.    Would you typically let Mike Rex

25      know before you left the county or not

                                        Page 183

```
 1                    SAMORA MINORS
 2       necessarily?
 3            A.   Yes, I think I would have let him
 4       know.
 5            Q.   Do you remember how long you were
 6       out of the country for that trip?
 7            A.   Three or four days.  Three days, I
 8       think.
 9            Q.   And when you were out of the
10       country who would help run the day-to-day
11       operations during that time?
12            A.   I'm still running the day-to-day
13       operations.  The only thing if I'm not on the
14       truck helper or driver, there's a driver on
15       the truck driving.
16            Q.   So, we discussed there came a time
17       November of 2017 that you terminated the
18       contract with HDL, right?
19            A.   Yes.
20            Q.   Can you describe the circumstances
21       surrounding that?
22            A.   I was very tired of HDL's dealings
23       and I just, I was over it, I was just done.
24            Q.   And did you just provide, did you
25       provide notice of any sort?  How did you --
```

Page 184

```
1                     SAMORA MINORS
2       how did you actually terminate the contract?
3            A.    Through the contract stipulation
4       30-days notice, e-mail and yes, 30-day
5       notice.
6            Q.    Did you recall how many trucks you
7       were operating at the time that you
8       terminated the contract?
9            A.    No, no, I don't.
10           Q.    Okay.  Do you know whether, do you
11      have an approximation of how many trucks it
12      was?
13           A.    No.  Maybe three, two.
14           Q.    Do you know whether you owned or
15      were leasing those trucks?
16           A.    I own them.
17           Q.    And what did you do after you
18      terminated the contract with HDL?
19           A.    I sold the trucks.
20           Q.    What have you been doing for work
21      since then?
22           A.    Since then I was odd jobs here and
23      there.  And then I started working again
24      doing deliveries.
25           Q.    How long -- for how long of a
```

Page 185

```
 1                    SAMORA MINORS
 2      period of time were you doing odd jobs here
 3      and there?
 4           A.   Six, six, seven months maybe.
 5           Q.   What kinds of odd jobs?
 6           A.   A little bit of construction,
 7      building sheds, clean-outs, Sheetrocking,
 8      things like that.
 9           Q.   And then when did you get back into
10      the transportation industry?
11           A.   I would say maybe the second
12      quarter of 2018 maybe, mid 2018.
13           Q.   Has that been through the same
14      business Minors Contracting?
15           A.   Yes.
16           Q.   And are you -- when you got back
17      into the industry what was -- what kind of
18      services was Minors Contracting providing?
19           A.   Delivery.
20           Q.   Was it also final mile deliveries?
21           A.   Not at first.  At first it was with
22      doing freight, just local freight dispatch
23      dock to dock.
24           Q.   Did the company contract with other
25      motor carriers or how did you -- what, what
```

Page 186

```
 1                    SAMORA MINORS
 2      freight were you hauling?
 3           A.   This was direct.  This was direct
 4      with a company that had their freight.  This
 5      was whatever they hauled except for hazardous
 6      materials.  If they needed me to move some
 7      rubber from one location to another location
 8      within the state that's what I would do.  And
 9      then I -- then I contracted with another
10      company doing home delivery.
11           Q.   And what is the name of the other
12      company that you contracted with?
13           A.   FGO Delivery.
14           Q.   And have you been contracting with
15      them since?
16           A.   Yes.
17           Q.   Where are you -- where do you
18      perform deliveries now?  Where does the
19      company perform deliveries?
20           A.   New York.
21           Q.   Okay.  You have been operating a
22      truck in Florida since 2019 as well?
23           A.   No.
24           Q.   So you have no trucks you have been
25      operating in Florida since 2019?
```

                                        Page 187

```
1                    SAMORA MINORS
2          A.    No, that's not correct.  I have not
3     been operating trucks in Florida since end of
4     2017.
5          Q.    Are any of your trucks registered
6     with Florida license plates?
7          A.    No.
8          Q.    How many trucks did you say the
9     company is currently operating?
10         A.    I didn't.
11         Q.    Okay.  How many trucks is the
12    company currently operating?
13         A.    Three.
14         Q.    How many drivers or helpers do you
15    have available now to provide services as
16    contractors?
17         A.    Five, sometimes six.
18         Q.    Has that fluctuated at all since
19    you terminated the contract with HDL?
20         A.    Yes.  This is a fluctuating
21    industry.
22         Q.    Can you approximate what the
23    companies revenue was in 2018?
24         A.    Around three to four hundred
25    thousand in revenue.
```

Page 188

1                     SAMORA MINORS

2          Q.    What about in 2019 and 2020?

3          A.    I'm sorry, you said what years?

4          Q.    Before I asked 2018?

5          A.    No, 2018 was -- 2018 was 120,000 or

6     under 120,000.  I'm sorry, it was very low in

7     2018.

8          Q.    Okay.  What about 2019 and 2020?

9          A.    2019 was around 400,000.  And the

10    same in 2020.

11         Q.    I think we are just about done, if

12    I can have five minutes to review my notes I

13    would appreciate that.

14              MR. KRAMER:  Is that all right,

15         Ben?

16              MR. WEBER:  Sure.

17              THE VIDEOGRAPHER:  Off the record

18         now at 2:41 p.m.

19              (Whereupon, a short recess was

20         taken.)

21              THE VIDEOGRAPHER:  This is the

22         beginning of media 5, we are going back

23         on the record at 2:51 p.m.

24              MR. KRAMER:  Mr. Minors, I don't

25         have any other questions for you.  Thank

                                   Page 189

```
 1                    SAMORA MINORS
 2         you for your time and patience.
 3              THE WITNESS:  Thank you.
 4              MR. WEBER:  Okay.  Nothing from us
 5              THE VIDEOGRAPHER:  We are off the
 6         record at 2:52 p.m.
 7              (Time noted:  2:52 p.m.)
 8
 9                     _____
10                     SAMORA MINORS
11
12    Subscribed and sworn to before me
13    this ___ day of _____, 2021.
14
15    _____
16
17
18
19
20
21
22
23
24
25
```

Page 190

```
1                    SAMORA MINORS

2                 C E R T I F I C A T E

3        STATE OF NEW YORK     )

4                              : ss.

5        COUNTY OF KINGS       )

6

7              I, DIANE BUCHANAN, a Notary Public

8         within and for the State of New York, do

9         hereby certify:

10             That SAMORA MINORS, the witness

11        whose deposition is hereinbefore set

12        forth, was duly sworn by me and that

13        such deposition is a true record of the

14        testimony given by the witness.

15             I further certify that I am not

16        related to any of the parties to this

17        action by blood or marriage, and that I

18        am in no way interested in the outcome

19        of this matter.

20             IN WITNESS WHEREOF, I have hereunto

21        set my hand this 4th day of May,

22        2021.

23

24             DIANE BUCHANAN

25

                                    Page 191
```

```
 1                    SAMORA MINORS

 2        -------------- I N D E X --------------------

 3

 4     WITNESS              EXAMINATION BY         PAGE

 5     SAMORA MINORS      MR. KRAMER               3

 6

 7        --------- INFORMATION REQUESTS --------------

 8     DIRECTIONS:  None

 9     RULINGS:  None

10     TO BE FURNISHED:  None

11     REQUESTS:  None

12     MOTIONS:  None

13

14        --------------- EXHIBITS --------------------

15                                 FOR ID.

16     Exhibit 1          Profile                35

17     Exhibit 3          16-page document       122

18     Exhibit 10         e-mails                182

19     Exhibit 13         Promissory note        178

20     Exhibit 16         Discovery Responses    90

21     Exhibit 17         Statement              180

22     Exhibit 22         Agreement              142

23     Exhibit 27         Document               154

24

25
```

                                        Page 192

```
 1   Kloppel, Mike, Et Al. v. Homedeliverylink, Inc.
 2   Samora Minors (#4523609)
 3                 E R R A T A   S H E E T
 4   PAGE_____ LINE_____ CHANGE_____
 5   _____
 6   REASON_____
 7   PAGE_____ LINE_____ CHANGE_____
 8   _____
 9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____    _____
24   Samora Minors                           Date
25

                                         Page 193
```

```
1    Kloppel, Mike, Et Al. v. Homedeliverylink, Inc.

2    Samora Minors (#4523609)

3                  ACKNOWLEDGEMENT OF DEPONENT

4       I, Samora Minors, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____     _____

12   Samora Minors                       Date

13   *If notary is required

14                  SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                  _____ DAY OF _____, 20____.

16

17

18                  _____

19                  NOTARY PUBLIC

20

21

22

23

24

25

                                        Page 194
```

[& - 2016]

| & | | | |
|---|---|---|---|

**&**   2:3,8 3:17

**0**

**000033**   182:4
**000101**   178:9
**000244**   90:9
**00120**   122:16
**00121**   124:12
**00259**   91:5
**00310**   180:15
**00478**   154:19
**00479**   158:16
**00480**   159:8
**00500**   167:14
**02114**   2:5
**06296**   1:6 4:12
**09**   24:2

**1**

**1**   3:17 4:5 35:18
   35:19 192:16
**1,280**   161:10
**1,500**   172:15
**10**   13:14 182:3,5
   182:11 192:18
**10-11**   123:21
**10/11**   124:2,5
**10/11/2014**   129:17
**10/18**   124:3
**10/18/14**   123:22
   124:5
**100**   2:4 143:8
   181:17
**104,306**   159:12
**1065**   163:25 166:2
   174:6 175:16
**107**   141:25
**1099**   33:13 39:16
   41:5,7,17,18 134:7
   134:19 165:20
   166:10 176:6,24

**1099's**   167:10
**1099s**   133:25
   166:16
**10:05**   1:12
**10:06**   4:3
**11**   20:14 126:14
   155:14 168:11
   183:9
**11,000**   116:6
**110**   136:2
**112,402**   171:10
**11210**   14:4
**11221**   14:4
**11234**   14:6
**11757**   13:17 24:18
**11:42**   71:4
**11th**   124:20
   125:11 126:6
**12**   6:21 41:3 81:17
   104:4 134:13
**120**   135:14
**120,000**   189:5,6
**121**   125:10
**122**   129:3,13
   192:17
**123**   125:10
**1267**   124:12
**12:22**   102:10
**12:27**   102:16
**13**   14:10,14 155:14
   155:24 164:3
   178:2,3,5,12,13,14
   192:19
**130**   135:6 136:9,9
**135**   136:9
**14**   14:10,14
**14,000**   152:23
**140**   135:21
**142**   192:22
**15**   6:21 120:8
   134:13

**150**   135:21
**154**   192:23
**15th**   91:16
**16**   1:11 4:4 89:23
   89:24 90:6 122:13
   122:17 192:17,20
**1655**   14:3 26:25
   108:11
**168,000**   176:15
**168,594**   176:23
**17**   12:4 160:2
   180:10,11,14
   192:21
**17,000**   156:22
**17,217**   156:22
**178**   192:19
**18**   12:4 125:15
**180**   192:21
**182**   192:18
**18th**   124:21 126:7
**1959**   24:20
**1988**   13:14
**1999**   66:22 120:16
   120:17
**1:31**   154:5

**2**

**2**   29:8 39:13 71:3
   131:15 134:7
**2's**   134:4
**20**   19:14 49:10
   61:13 117:6
   194:15
**200,000**   177:4
**2000**   66:23 120:15
**2002**   120:15
**2007**   16:23
**2009**   20:14 21:4,11
   21:12,19 28:18
   29:24 38:13 43:24
**201**   15:15

**2010**   25:7
**2011**   17:22,23 21:8
   21:13 23:19,21
   24:2,4 43:24 61:7
   117:9
**2012**   49:10,11
   69:25 117:9
**2013**   14:22 15:3
   16:2 23:21 24:4
   33:16,16 42:21,22
   47:19 49:13 51:3
   53:17 59:11 61:8
   61:14 69:25 83:18
   83:25 94:15 95:3
   97:19 132:20
   136:3
**2014**   19:16 40:20
   42:21,22 51:11
   52:3 60:5,6 71:9
   72:22 84:5,5
   97:19 99:9 103:5
   108:22 120:7
   124:21 125:11,15
   126:15 155:3
   156:5 159:11
   164:24
**2015**   15:11 111:8
   111:16,22 159:9
   159:12,19 164:24
   180:17 182:8
   183:9,16
**2016**   15:21 19:18
   25:16,17 26:5
   27:25,25 30:8
   31:5 52:8 53:18
   54:20,24 58:3
   91:16 105:4,8,9,10
   105:16 107:14
   110:19 113:6
   161:24 163:17,25
   165:4,20 166:12

Page 1

[2016 - accountant]

166:25 167:23
168:2,5
**2017**   31:21 32:14
33:17 34:19 40:21
54:18,19,24,25
58:4 83:18,25
94:15 105:18
132:20 153:9,10
167:13 168:3,11
169:15 172:17,18
172:20 174:6
176:7,22 178:20
184:17 188:4
**2018**   15:11 26:7,14
29:11 34:19
153:10 186:12,12
188:23 189:4,5,5,7
**2019**   27:8 34:22
187:22,25 189:2,8
189:9
**2020**   189:2,8,10
**2021**   1:11 4:4
190:13 191:22
**207,560**   155:15
**20a**   156:22 157:12
**20b**   156:18 157:14
**21**   37:7 171:8,10
**21,000**   159:14
**22**   141:21 142:5
192:22
**22,000**   115:23
116:5
**22,485**   158:3
**23**   91:4 119:2,6
**2300**   117:24
**231,564**   162:14
167:16
**24**   66:19 117:6,7
117:14
**24b**   160:7

**25**   161:8 163:9
**25,560**   155:25
**25,600**   171:17
**26,110**   164:3
**263**   90:9
**27**   154:14,16 176:4
192:23
**280,649**   162:2
167:15
**2:41**   189:18
**2:51**   189:23
**2:52**   190:6,7

**3**

**3**   102:14 122:11,17
122:20,21 129:6
192:5,17
**3,542**   160:7
**30**   2:9 3:16 54:23
55:3 134:14 185:4
185:4
**30,000**   116:5
**30,672**   170:10
**300,000**   115:23
**33610**   15:15
**34**   182:4
**35**   192:16
**3500**   160:21
**375,000**   176:25
**375,296.79**   176:10
**397**   134:16
**3pd**   47:15 48:7
**3rd**   180:17

**4**

**4**   117:25 159:8
**400**   134:12
**400,000**   189:9
**41**   90:18 91:4
**421**   13:16 24:17
**4264**   15:14

**4407**   14:5 108:12
165:23
**4523609**   193:2
194:2
**4700**   66:23
**482**   161:23
**483**   163:8
**486**   163:24
**488**   165:8
**49,085**   163:10
**491**   165:19
**495**   134:16
**499**   166:7
**4th**   191:21

**5**

**5**   100:14 117:25
129:2,5,6,8 161:13
189:22
**5,000**   28:9
**500**   117:25 160:3
**502**   168:9
**504**   169:24
**505**   174:5
**507**   175:14
**514**   154:20 175:25
**5502**   191:23
**5th**   178:20

**6**

**6**   143:9
**6,000**   114:17
**600**   117:25
**60603**   2:9
**6:17**   1:6 4:12

**7**

**7**   176:10
**7,000**   152:18,20,22
**7,207.31**   124:8
**700**   114:19

**8**

**8**   90:18
**83,109**   159:11
**863.52**   179:20

**9**

**9**   159:9
**90**   192:20
**98**   66:24
**99**   103:23

**a**

**a.m.**   1:12 4:3
70:23 71:4
**abbasega**   81:5
126:16,25 129:14
**ability**   10:17
**able**   7:8,20 10:11
45:15,17 56:19
65:17 78:20,21
86:2 100:15
140:23 158:11
159:4
**access**   34:16
**accessories**   56:8
**accident**   151:11
151:13
**account**   36:2
79:11 80:9,19
81:7 86:9,21 87:5
87:14 89:3 94:8
96:22,24 97:3,4
99:25 113:15,20
114:3 116:9
123:18 125:4
152:14,23 159:19
162:3 164:18
171:23 173:5
179:8 182:20
**accountant**   22:3
30:6,16 131:23,24
132:3,6,15,25

[accountant - approximate]

133:8 158:8,21,22
162:12,21,23
168:7
**accountants** 30:16
166:3
**accounted** 156:21
**accounting** 158:23
**accounts** 97:2
162:14 163:10
167:16 177:3
**accurate** 10:25
11:2 21:10 25:18
34:20 37:4,6,8
52:5 65:6 67:23
81:5,13 95:4,9
107:18 116:19,20
127:16 135:7
136:3,4
**acknowledgement**
194:3
**acquire** 28:7 61:18
**acquiring** 28:2
**action** 19:2 191:17
**active** 27:3,6 38:4
38:6,7
**activities** 109:17
109:19
**actual** 98:13
**ad** 43:8
**add** 55:17 127:9
**added** 62:14,17
71:10 176:20
**adding** 59:11 60:4
71:12,18 169:12
181:6,7,8,9
**addition** 97:20
**additional** 17:23
18:6 37:23 64:19
65:5,7,10,10 71:12
71:18,20 86:3,4,8
151:4 167:9 169:2

173:5,6
**additions** 194:6
**address** 13:19,25
14:4,7,8,11,13,16
15:12,17 24:15,19
24:25 25:4,6 26:2
26:23,25,25 48:11
164:23,24 165:2,9
165:12,22,23,25
166:2 174:9,12,16
175:6,15
**addresses** 15:16
**adhere** 70:8
**administer** 3:11
**admitted** 138:22
139:17
**ads** 43:4 47:25
48:3
**advanced** 149:12
**advertise** 169:7
**advertisement**
155:10
**advertisements**
43:11
**advertising** 155:7
168:12,13,20,22
168:24,25
**advice** 30:17
**advise** 23:14
**advised** 21:22,25
23:11
**afford** 63:10
118:21 134:10,11
**affordable** 63:15
**age** 46:21
**ago** 6:21 21:15
22:23 23:4 24:21
24:23 41:2 105:11
114:5 127:18
**agreed** 3:5,21

**agreement** 44:11
67:13 68:4 69:5
82:23 84:16 85:19
89:21 90:9 91:4
97:11,15 142:2,6
142:10,11 192:22
**ah** 8:11
**ahead** 7:16,19
9:13,17 62:25,25
71:5 94:6 95:7
115:13 141:22
163:25 165:7,17
175:13,22 180:14
**al** 1:3 4:8 193:1
194:1
**alan** 82:19
**alcohol** 10:15
**alex** 82:19
**allegedly** 131:7
139:12
**allow** 169:6
**allowed** 112:6,19
**alvers** 81:3
**amazon** 60:16
**america** 94:18
95:11,21,22 97:12
113:22,25 144:18
**amount** 53:3
56:18 115:7
121:10 124:7
127:6,9 130:4
134:21 135:10
136:10 137:14,19
137:20 138:12
155:8,16,20,25
156:14 157:12
159:11,23 170:10
171:9,12 172:15
176:9,23 179:8,11
180:4

**amounts** 128:10
155:20 167:22
168:2 171:18
176:17,21
**andrew** 100:22
147:12
**andrews** 81:4,25
126:24
**annual** 31:17,21
33:17
**answer** 7:16,19
8:2,7,8 9:17 53:19
53:22 115:13
157:17,19 159:21
181:18
**answering** 79:24
**answers** 61:2
84:11
**antagonistic** 8:16
**anybody** 38:23
**ap** 169:6
**apartment** 118:5
165:14
**apologize** 94:24
131:14
**appear** 57:14 75:6
128:22 145:5
180:4
**appeared** 179:23
**appearing** 36:4
91:8
**appears** 90:8
91:15 123:4
130:15 182:7
**appended** 194:7
**applicable** 163:10
**applied** 130:4
**appreciate** 189:13
**approximate**
188:22

[approximately - benefit]

**approximately** 4:3
12:2,4 14:10
19:13 21:7,8
70:22 71:4 102:16
105:7,16 154:9
156:4 159:13
**approximation**
185:11
**april** 1:11 4:4 21:8
21:11,12 49:13
60:5 83:18,24
**aps** 168:18,18
**aquel** 81:4,23,24
81:25,25 82:4,6
126:24
**aquels** 82:11
**articles** 30:19
**asked** 30:25 31:6
53:9 59:19 60:11
79:25 80:16
110:15 120:10
131:14 140:12
151:18 179:2
189:4
**asking** 7:12
105:23,24 106:25
107:4 112:19
**aspects** 162:18
**assets** 162:2,7
167:15
**assigned** 54:5
**assistant** 28:25
29:14 146:22
**associated** 181:21
**associates** 17:10
**assume** 36:7 91:11
100:2 150:17
161:15 162:20
170:7
**assuming** 115:11
167:18

**attend** 16:12,17,24
150:22
**attendant** 143:14
**attended** 17:4
150:17
**attending** 4:19
**attention** 128:25
154:25 164:22
170:3
**attorney** 80:14
90:16
**attorneys** 2:4,8
4:18 11:5,9 13:5
90:13
**audible** 8:7
**audio** 9:7
**audit** 101:17
**authority** 69:21
70:6,12 85:11,12
96:2,10 97:9
144:15,19,25
**authorized** 3:11
**auto** 151:7,10
**available** 188:15
**avenue** 14:3,5,12
14:14 24:20 26:25
108:12 165:23
**average** 42:12,15
77:21 135:8
**avoided** 140:19
**aware** 161:20

**b**

**back** 12:11 17:10
21:19 26:16,20,22
26:24 27:7 29:24
31:20 38:13 43:24
47:19 53:20 56:11
58:20 59:8,12
71:3,9,14,18 73:12
76:10,23 79:15
98:11 99:20 100:4

102:15 106:15
107:19 109:3,5,6,7
111:12,25 112:11
113:4,5 118:3,8
127:23 134:14
137:7 140:24
141:14 154:9
156:5 157:15
158:6 186:9,16
189:22
**background** 16:12
43:21
**balance** 161:25
162:10 167:22
**balled** 120:9
**bank** 114:2 116:9
152:20
**banking** 34:13
**banks** 152:21
**based** 44:24 45:14
45:24 125:24
131:8 134:24,25
134:25 155:8
162:22 176:22
**basic** 92:16 93:14
93:18
**basically** 115:21
141:13 173:23
**basis** 53:8 92:21
137:24
**bates** 124:12 129:2
129:11 141:24
143:8 158:16
161:23 163:8,24
165:8,18 166:7
167:14 168:9
169:23 175:14,24
178:8 180:15
182:3
**beach** 174:9

**bear** 93:21 163:7
**bearing** 73:10
**began** 46:12 49:12
49:24 51:3 54:11
61:11 63:16 70:3
95:20
**beginning** 27:8
43:6 44:20,22
54:19,20 59:9
61:13,14 102:14
105:10 114:11,24
115:3,4,4 116:23
118:23 129:9
146:20 154:10
189:22
**behalf** 63:22,25
84:20,21
**believe** 19:14,16
23:2,4 25:19 48:8
49:15 51:13,25
58:3 60:16 71:10
76:9 82:9,10 83:4
84:6 85:7 94:25
96:12 103:12
105:3 113:23
114:2 115:18,18
127:22 135:4
142:15 144:18
146:13 153:7
160:6 162:11
164:23 165:5
168:4,15 170:12
171:15
**belive** 133:24
**bell** 60:5,9 71:11
81:2
**ben** 4:24 189:15
**beneficial** 62:8
**benefit** 148:15
179:11

Veritext Legal Solutions
800-336-4000

[benjamin - car]

**benjamin** 2:5
**best** 9:2 10:17
  42:11 98:8,12,24
**bid** 21:22,23 45:9
**big** 28:22,24 29:8
  98:5 112:25
**bill** 139:12 175:4
**billing** 30:23
**bills** 55:17 56:21
  85:22 114:23
**binder** 12:14,14
  12:18,25 35:17
  89:23 122:11
  129:12 141:22
  154:15 175:24
  178:4
**birth** 13:12
**birthday** 183:17
  183:18
**bit** 10:2,20 16:11
  36:22 59:8 153:17
  186:6
**biweekly** 123:12
  123:12 125:7,20
  125:23,25
**bjweber** 2:6
**black** 64:16
  101:20 120:9
**blackballed** 120:6
**blackout** 55:16
**blew** 67:17
**block** 151:17
**blood** 191:17
**blows** 68:16
**blue** 101:20,20
**blurry** 151:17
**boat** 120:18,21
**bob's** 37:17
**bond** 64:17 130:8
  130:11,15

**bookkeeping**
  41:16,20 110:5,7
  133:12
**boots** 101:21
**borrowed** 48:7,9
**boss** 148:2,2
**bostick** 81:11
  86:19,24 87:4
**boston** 2:5
**bother** 98:7
**bottom** 90:19
  127:6 129:12
  168:9 178:17
  180:23
**bought** 63:14 67:3
  99:12,13 168:16
  173:4
**boulevard** 13:16
  24:17
**bouncing** 178:2
**box** 66:19 145:20
  173:10,10,13,16
  173:16 176:10
**branch** 106:9,10
**brand** 118:20
**break** 9:12,15,18
  45:7 65:9 67:14
  70:18 102:7
  153:14,20,23,23
  153:25 159:16
**breakdown** 65:12
**breakfast** 161:2
**breaking** 9:7
**breakout** 70:20
**brian** 60:5 81:2
  147:22
**briefly** 74:9
**bring** 68:9,15,21
**broke** 65:7 67:3
**broken** 126:2

**brooklyn** 13:24
  14:2,3,5,8 17:11
  17:13 21:16 24:20
  26:25 28:22 51:22
  58:20 76:10,13,23
  77:12,15 108:12
  118:4 132:10
  165:24,25
**brother** 32:22
**brought** 82:24
  99:20 100:3
  152:12
**buchanan** 1:19
  4:16 191:7,24
**buffalo** 52:14,19
  53:5 54:5,5,7,11
  76:19 79:5,6,9,16
  147:3,8 149:3,5,11
**building** 21:5,9,13
  21:20,23 22:15
  23:25 43:25 44:4
  100:16 149:16,25
  174:25 186:7
**burgess** 81:10
**bus** 77:23
**business** 18:13,14
  18:16,18 20:13,16
  22:2,5 23:8,12,15
  23:15,22 24:15
  25:10,15,15,21
  26:10,19 31:15,16
  38:18 41:12,14,21
  43:17 44:20,23
  46:14,18 49:6,21
  56:18 57:18 66:13
  79:11,19 85:2
  92:14 93:12 94:8
  99:5 108:4 109:10
  109:13 110:17
  111:3 113:15,20
  116:2,3 119:9,12

119:18,23,24
  120:2,3 121:20
  123:14,18 133:12
  134:17 156:19,20
  156:24 157:2,3,4,5
  157:6,9,13 158:7
  160:15 162:3
  169:2,4 171:22
  174:17,18 175:6
  179:5,8,12 186:14
**businesses** 37:16
  110:10,12 119:5,7
  119:12
**bust** 138:25
**buy** 67:2,4 100:13
  101:23 117:16
  161:2,3
**buying** 156:13
  160:25

| c |
| --- |

**c** 2:2 85:6 123:6,14
  155:3 159:8
  164:25 191:2,2
**c.v.** 4:12
**call** 10:2 11:17
  109:20 137:8
  139:5
**called** 5:5 28:22
  47:15 61:8 89:14
  94:18 96:2 140:11
  173:23
**cambridge** 2:4
**canarsie** 16:19
**cancel** 174:3
**cancelled** 26:17
  108:2
**cap** 69:18
**capital** 163:9,11
  163:13
**car** 159:10,14

[card - company]

card   79:17,18,20
    172:2,2,10
cards   146:2
care   85:6 98:23
    116:25 123:14
    141:11 152:9
cargo   151:20
caribbean   183:23
carriers   186:25
carries   10:5
case   1:6 4:11 5:13
    5:15 19:5,7 61:4
    71:20,21 90:15
    122:25 137:24,24
    152:11
cash   162:2 167:15
cashed   113:25
categorized
    157:13
caught   68:20
cause   35:4 139:17
caused   51:14 55:8
    63:8 139:13
    159:24
ceo   31:12,13 32:2
    32:14 34:2 36:16
    39:5 45:25
certain   62:4 68:5
    116:21 137:25
certification   3:8
certify   191:9,15
cetera   37:17,22
    145:25
cfo   31:22
chain   182:7
chance   172:13
    183:3
change   25:4 30:2
    30:10,19,25 104:4
    104:4 113:7 193:4
    193:7,10,13,16,19

changed   31:3
    33:18 100:21
    101:22 112:6,19
    150:4
changes   68:13
    194:6
charge   55:24
    56:11,14,25 57:5
    64:15 72:8 130:8
    133:18 141:5,9,10
    141:17 153:17
charged   55:22,24
    56:2 72:4 138:8
    140:14
charges   170:21
cheaper   62:7
check   20:6 43:21
    88:23 107:12
    123:4,6,20,25
    124:8 127:9
checking   89:2
checks   68:12
    113:24 123:9,11
    123:18 133:22
checkups   68:13
chef   60:2
chicago   2:9
chief   36:20
choice   25:23,23
choose   131:24
    165:24
circumstances
    95:19 139:24
    160:12 184:20
city   151:8 153:5
civil   1:18
claim   55:23,25
    56:7 57:9 98:9,12
    98:13,14 99:2
    114:17 130:21,23
    131:8 138:4,6,9,22

140:25 141:12,14
    148:19 151:7,10
    151:22 170:18,21
claimed   98:6,7
    151:13
claiming   55:11
    56:3
claims   56:5,5,6,7,9
    56:25 57:3,3
    85:23 98:20,24
    114:14,17 130:20
    131:2 138:4 139:2
    170:13
clarify   8:15 9:2
class   19:2,4,6
clause   142:18
clean   45:2 69:14
    186:7
clear   8:14,18
cleared   116:5
closer   58:25 59:9
clothing   100:17
code   145:23
coding   163:5
collections   152:19
college   17:13
colony   150:11
combative   8:17
combination
    53:24 77:2
come   51:5 54:9
    55:23 59:19 86:5
    121:22 172:5
coming   114:20
comment   115:22
commercial   48:16
    48:18
commitments   92:3
commonly   5:14
    20:21

communicate
    92:19
community   17:12
comp   41:6
companies   30:3
    37:18,24 44:2,4,21
    46:19 47:24 60:18
    60:24 62:24 83:21
    111:2 145:12
    146:11,11 160:13
    171:22 188:23
company   20:25
    21:3 22:7,10 24:4
    25:21 26:9,12
    27:3,6,10,21,24
    28:3,5,11,14,17,22
    29:2,23,24 30:13
    31:22 32:2,11,24
    33:9,12,15 34:2,10
    34:23 35:9 36:23
    37:14 38:13 39:6
    40:13 41:10 43:12
    44:9 45:20 46:2
    47:18 48:6,8,9
    50:5 51:14 53:14
    57:15 58:10 59:16
    61:8 64:11 66:18
    67:22 69:2,4,6,21
    69:23 70:5,7
    72:12 73:19 79:13
    82:14,15,17 83:24
    84:16 85:4 89:14
    91:25 92:4,10,23
    93:2,8,21 94:5,17
    94:21,25 95:10
    96:15 99:22 101:2
    101:4 104:16
    113:14,15,18,19
    115:10,17 116:12
    116:15,18 121:6
    121:11 122:7

[company - correct]

123:7,10 124:8,19
125:5 132:18
133:13,13 134:22
135:6,10 136:5,10
139:11 141:11
142:14 143:19,23
145:18 152:9
155:3,12,20,22
159:9 160:15
163:12,15,19,25
164:23 166:15
169:3 171:21
172:22 174:9
176:14,25 179:8
186:24 187:4,10
187:12,19 188:9
188:12
**company's** 85:5
145:5 152:19
**compensation**
121:3 176:10
**complete** 7:21
10:12 194:8
**completed** 129:19
130:3,5 136:12
175:20
**compliant** 69:11
69:12 70:11
**computer** 42:5
**computers** 93:5,7
**condition** 68:7
**conduct** 25:15
31:16 119:11,18
119:24 120:2,3
**conducted** 119:23
**conducting** 110:16
119:9
**conferencing** 4:14
**confidential**
154:19

**confirm** 5:23
10:22 103:25
**confusing** 129:7
**connecticut** 84:3
86:24 88:24 89:2
**connection** 5:15
**connections** 37:10
**connectivity** 6:3
**consecutive**
125:19
**considering** 62:24
**constitute** 136:18
**construction**
186:6
**contact** 183:10,11
**contacted** 84:2
140:5,7 151:25
**contains** 154:19
**continuance** 168:6
**continue** 35:13
**continuing** 99:15
**contract** 22:15
38:9,19,20 45:21
61:16 67:13 73:20
80:4,5 83:19,20,24
84:18,20 85:9
87:8,11 88:9
89:14,16 90:11,12
91:19 92:7 93:22
99:19 102:3
107:15 109:14
110:20 111:4
131:19 135:20
142:3,10,18,23,24
143:18 144:20
155:11 166:21
169:16 184:18
185:2,3,8,18
186:24 188:19
**contracted** 23:7,9
39:20 44:3 47:5

47:10,14,15 54:6
80:2,6,8 87:2
89:19 95:2,12
105:18 132:20
136:6 137:13
171:13 173:4
187:9,12
**contracting** 18:19
20:10,12,19 21:19
22:5 24:16 25:10
27:11 28:19 31:11
37:15,19 38:4,13
38:16,17,22 39:10
39:14 40:17 42:13
43:3,24,25 46:13
47:2,18,19 48:15
48:21 49:13,20,21
49:25 50:2 51:2,3
52:6 53:17 54:10
59:10 60:10,19
61:9 66:14 69:20
70:3,10 71:12
72:13 73:15 75:25
76:24 79:10 80:2
80:7 81:21 83:19
83:20 84:7,21
85:11,15 87:20
89:13 91:13 92:5
92:15 94:12,20
95:2,20 97:10
99:6,10,22,23
100:9 102:2,22,25
114:7 115:5 116:9
121:3 123:5
131:16,18 132:19
133:24 135:18
136:2 137:5,12
142:9 144:5,8
145:4 146:18
151:5 155:4 162:3
165:21 166:11

171:17 174:7,8
176:7,21 186:14
186:18 187:14
**contractor** 22:23
22:24 28:14 48:2
82:22,23 127:6
138:19 139:16
142:2,5,11,20
143:12 155:18
**contractors** 48:8,9
82:8,13 101:10
162:11 171:9,11
171:16 188:16
**contracts** 21:23
91:22 108:22
142:16,20 155:15
**control** 44:5
148:20,22
**controlled** 100:18
109:23
**conversation** 7:15
**conversely** 150:20
**copies** 133:2
**copy** 3:14,17 37:5
123:4 125:21
158:24
**corner** 36:5 69:18
123:21 125:11
129:13
**correct** 17:14 19:8
22:11 24:23 26:3
26:11 29:9,15,25
30:14 32:9 36:6,8
46:11,16 49:15,16
49:23 50:15,21
51:8 54:3 57:16
57:21 60:7 61:10
66:12,16 70:4,9,13
73:18 74:15 75:12
75:14 76:3,11,17
77:4 81:15,19

Veritext Legal Solutions
800-336-4000

[correct - deep]

83:16 89:5 91:14
92:11 93:24 94:4
94:11 102:4 105:4
105:22 108:24
110:6 113:16
116:10 119:8
123:8 124:6,9,17
124:22 126:8,22
128:24 129:25
130:6 131:9,13
137:17 143:15
145:16 146:16
148:25 151:3
154:22 155:13
156:7,17 157:10
159:6 164:2
165:11,16 166:13
166:19 167:17,19
167:20 171:20,24
173:22 175:17,18
175:21 176:7,8,12
177:24 179:9,14
179:18,21 188:2
194:8
**corrected** 103:21
**corrections** 194:6
**correspond**
156:23
**corresponds**
103:10
**cost** 102:20,24
140:2
**costs** 134:14
143:13
**counsel** 3:6,17 4:7
4:25 71:5
**country** 183:11,13
183:16 184:6,10
**county** 150:12
153:3,6,6,7 183:25
191:5

**couple** 163:24
165:7 168:8
**coupled** 82:13
**course** 8:21 9:11
**court** 1:2 3:13
4:10,15 5:2 6:22
6:25 7:5,20 8:6,18
10:7 151:23 152:2
**cover** 65:17,24
**coverage** 65:23
66:4
**covered** 110:7
122:3,4 152:4
**craig's** 43:5,8
47:24,25 48:3
155:9
**created** 36:7,11
**credit** 172:2
**criminal** 17:19
18:4
**current** 26:23
31:10
**currently** 10:23
13:15 38:22 39:6
48:17 188:9,12
**customer** 55:20
56:12,13 57:10
**customers** 37:19
87:24 98:16 139:7
**cv** 1:6

### d

**d** 3:2 5:20 171:16
192:2
**daily** 34:17
**damage** 56:5,6
98:5 138:4,6,9
139:12,17 140:2
140:25 141:14
170:18
**damaged** 139:6

**damages** 159:24
**damaging** 131:7
**data** 41:16
**date** 1:11 4:4
13:12 35:21 90:2
122:19 142:7
154:17 178:7
180:13 182:6
193:24 194:12
**dated** 91:15
178:19 183:8
**dates** 29:20 52:13
53:21 109:3 125:9
128:5
**day** 9:11 44:14,25
44:25 54:23 55:3
64:22 73:17 75:16
75:16 77:18 78:13
92:20,20 103:10
103:16,23,25
104:8 109:9,9,17
109:17,19,19,22
112:14,15 128:14
130:3 134:12,15
134:16 135:6
136:2,12 138:13
139:20 150:5
151:16 161:3
181:8 183:18
184:10,10,12,12
185:4 190:13
191:21 194:15
**days** 3:16 73:4,15
74:23 75:4 76:13
77:5 78:4 88:22
88:25 112:16,16
121:25 122:2
129:21,23 150:15
184:7,7 185:4
**dealings** 184:22

**debit** 79:17,18,19
172:2
**debited** 55:19,19
**debt** 179:2
**decade** 21:15
22:23
**decal** 146:4
**decent** 85:24
**decide** 25:20 30:2
30:9 35:7,8 38:12
46:18 47:17 55:8
60:8 66:3 73:5
78:5 89:6 109:5
113:5
**decided** 33:20
35:10,13 38:17
45:22 49:20 59:14
112:21
**deciding** 43:15
**decision** 34:3
57:18
**decisions** 78:9
**declare** 194:4
**deduct** 65:15
79:21 93:11
102:20,24 138:12
160:12
**deducted** 94:9
139:25 170:13
179:16
**deductible** 160:8
**deducting** 57:6,10
**deduction** 130:4
**deductions** 57:14
114:18 115:25
130:7 131:2
179:23
**deemed** 33:24
138:2 194:6
**deep** 55:13

[deeper - dot]

| | | | |
|---|---|---|---|
| **deeper** 157:16 | **demand** 38:24 | **determined** 138:3 | **dispute** 98:16 |
| **defect** 138:18,19 | 39:3 | 158:5 | **disregard** 29:21 |
| **defendant** 1:9,17 | **demands** 19:23 | **diane** 1:19 4:15 | **dissolved** 108:7 |
| 2:8 4:7,22 5:13 | 61:4 | 191:7,24 | **district** 1:2,2 4:10 |
| **definitely** 37:6 | **demonstrated** | **differ** 43:23 74:11 | **division** 4:11 |
| 54:24 | 36:20 | **difference** 64:9,15 | **dock** 149:13 |
| **degree** 17:7,15,18 | **denver** 50:10,14 | 74:12,16 84:12 | 186:23,23 |
| 17:21,24 18:7 | **depend** 46:8 115:9 | 176:17 177:4 | **document** 35:17 |
| **deliver** 29:7 | 121:6 136:11 | **different** 15:18 | 90:17 92:12 |
| 112:15,16 | 138:15,16,17,18 | 19:11 44:25 65:21 | 122:17 141:24 |
| **deliveries** 29:5 | **depended** 138:14 | 65:22 67:2 82:4 | 154:16,18 155:2 |
| 34:17 37:16 45:13 | **depending** 78:9 | 103:14 110:23 | 158:25 160:2 |
| 46:20,24 53:10 | 121:11 136:8 | 121:11 126:10 | 161:15,17,19,20 |
| 60:17 65:6 72:13 | **deponent** 194:3 | 168:20,21,23 | 165:18 166:7 |
| 77:16 87:7 89:3,7 | **deposed** 6:8,10 | **difficult** 54:16 | 167:15 169:23 |
| 93:15,22 97:22 | **deposit** 123:17 | **dig** 157:16 | 175:24 178:3 |
| 100:8 104:17 | **deposited** 113:14 | **dimitri** 82:21 | 192:17,23 |
| 106:16 107:5 | 179:7 | **direct** 128:25 | **documents** 12:6,9 |
| 109:13 112:11,20 | **deposition** 1:15 | 154:25 164:21 | 12:10 122:23 |
| 126:11,20 151:19 | 3:8,9,14 4:6,12 | 187:3,3 | 125:9 154:20 |
| 173:14,20 185:24 | 5:23 6:15,16 7:5 | **directed** 66:5 | 159:3 166:9 |
| 186:20 187:18,19 | 191:11,13 | **directing** 170:3 | 180:18 |
| **delivers** 46:22 | **depot** 37:17 46:21 | **directions** 192:8 | **dog** 28:22,24 29:8 |
| **delivery** 20:20,22 | **depreciated** 156:2 | **directly** 23:13,16 | **doing** 7:18 9:25 |
| 22:14 23:19,20,21 | **depreciation** | 131:10 152:5,8,9 | 21:20 22:5 23:25 |
| 37:20 46:14 47:21 | 155:25 156:15 | **discard** 42:9 | 26:17,19 29:4 |
| 60:15 73:21 74:24 | **describe** 36:24 | **disconnect** 150:9 | 33:2,6,7 38:16 |
| 75:23 76:4 80:3 | 74:9 109:16 | **discovery** 19:23 | 44:12,15 47:21 |
| 81:7 82:3 84:17 | 124:24 184:20 | 61:3 80:13 89:22 | 49:8 86:3 89:18 |
| 87:23 94:13,18,23 | **described** 38:9 | 89:24 90:14 135:5 | 101:11 150:12 |
| 95:11,20,22 97:11 | **describing** 36:15 | 135:25 180:19 | 169:10,14,19 |
| 99:3 101:7 103:7 | 137:10 | 192:20 | 185:20,24 186:2 |
| 106:6 109:24 | **description** 36:15 | **discrepancy** 56:12 | 186:22 187:10 |
| 112:14 113:22,25 | 37:13 170:5 | **discussed** 118:17 | **dollar** 130:8 |
| 121:7 122:8 | **detail** 53:20 | 121:2 163:17 | **dollars** 56:14 |
| 124:15,18,23 | **details** 73:9 | 184:16 | 122:5 155:6 |
| 125:6 126:10 | **determine** 44:17 | **discussing** 101:12 | 168:12 |
| 136:21 144:11,17 | 45:11 74:19 78:9 | 160:15 | **dollies** 99:4 |
| 151:16 180:11,16 | 114:22 134:6,21 | **dismissed** 151:21 | **door** 145:19 |
| 181:21 186:19 | 135:2 140:24 | **dispatch** 186:22 | **dot** 69:11,12,21 |
| 187:10,13 | | | 70:6,11,12 85:11 |

Veritext Legal Solutions
800-336-4000

[dot - example]

88:5 145:11,23
**double** 152:22
**downs** 65:9 67:14
  159:17
**downstate** 17:10
**drawers** 115:16
**draws** 122:6
  155:21
**drill** 93:17
**drive** 15:14 69:12
  74:3,7 77:22
  150:17
**driver** 29:16 33:8
  33:11 34:11 45:15
  49:6 50:13,19
  59:12 60:4 64:6,7
  71:10,11,13,18,20
  71:21 72:2,4,14,18
  73:22,24 74:2,10
  74:13,19,25 75:5
  75:23 76:14 77:7
  86:21 87:6 88:8
  96:15 103:14
  104:11,15,21
  111:9 121:12,16
  121:17,18 126:10
  126:24,25 127:3
  127:15,20 128:3
  128:12,18 129:15
  135:10,11,13,15
  135:22 138:10
  140:10,25 150:16
  179:24,25 180:6
  184:14,14
**driver's** 48:16,18
  128:16
**drivers** 45:12 50:4
  50:12 58:7,10,25
  80:8,17 81:2,6,16
  81:21,22 86:8
  92:20 96:21

126:20 127:11
130:16 134:22
135:6,21 136:11
137:15 138:2
141:17 155:11,17
166:11 168:25
171:9,10,18,25
188:14
**drives** 104:11
**driving** 74:14,22
  75:2 129:20
  150:21 184:15
**drop** 72:5
**dropped** 75:19
  103:19 104:5
  138:22 139:6
**drove** 74:10
**drowning** 85:22
**drugs** 10:15
**dryer** 139:6
**dt466** 66:24
**due** 127:5 135:19
**duly** 5:6 191:12
**dump** 151:19
**duplicates** 162:25
**duran** 81:4
**duties** 29:17 74:11
**dwindling** 59:4

**e**

**e** 2:2,2 3:2,2 11:19
  54:22 83:8 155:6
  171:16 182:5,7,24
  183:8,12 185:4
  191:2,2 192:2,18
  193:3,3,3
**earl** 100:22
**earlier** 29:22 63:4
  80:14 96:20 103:4
  103:12 106:21
  111:6 118:18
  119:17 148:3

**early** 58:4
**easier** 8:6 67:6
**easy** 62:6
**educational** 16:12
**effect** 3:12,15 10:6
  71:15 139:21
**effectively** 7:9
**efforts** 75:12
**eight** 40:9,17
  58:16 111:21
  127:23,24 128:2
  166:6,9 179:20
**either** 34:15 72:18
  75:18 76:2 79:3
  87:6 89:4 96:24
  104:15,21 160:14
**elmira** 55:13
**employed** 21:21
  28:20 29:10
**employee** 134:10
  134:11 168:17
**employees** 39:13
  134:8
**employment** 35:14
  168:18
**ended** 19:17,18
  22:15 35:6 59:23
  91:19 92:5 97:4,5
  151:24 152:2
  173:6
**ends** 56:20 125:16
**engine** 67:16
  68:16 120:24
**enjoyable** 73:11
**enter** 46:18 84:15
  97:10 100:15
**entered** 113:19
  142:14
**entering** 69:4
  85:18 142:10

**enterprise** 164:14
  164:15,16
**entertainment**
  160:8,10 161:5
**entire** 101:25
  135:17 137:18
**entities** 94:13
**equal** 179:20
**equipment** 92:14
  93:20 99:9,18,24
  156:21 157:8,12
  173:5,7
**error** 166:3
**errors** 152:18,18
**escorial** 56:9
**especially** 150:8
**esq** 2:5,10
**estimate** 42:11
  54:17 111:24
  160:19
**et** 1:3 4:8 37:17,22
  145:25 193:1
  194:1
**europe** 183:23
**everybody** 46:7
**evidence** 12:25
**ex** 12:15 60:15
  151:20
**exact** 52:13 54:16
  71:22,24 109:3
  168:2
**exactly** 7:14 21:15
  53:25 77:17
  131:13
**examination** 5:9
  192:4
**examined** 5:8
**example** 67:9
  68:10 140:4,4,9
  150:5

Veritext Legal Solutions
800-336-4000

[examples - florida]

**examples** 158:11
**executive** 36:20
    182:20
**exhibit** 35:18,19
    89:23,24 90:3,6,19
    122:11,16,17,20
    122:21 129:2,5,6
    129:10 141:21
    142:5 154:14,16
    176:2,3 178:2,5,13
    180:10,11,14
    182:3,5,10,11
    192:16,17,18,19
    192:20,21,22,23
**exhibits** 12:18,24
    192:14
**expense** 93:12,21
    155:7 158:12
    161:14 170:5
**expenses** 79:14,22
    93:11 94:9 115:9
    116:22 143:10,25
    156:19 157:21
    158:4,17 159:10
    159:14,15 169:25
    179:5
**expensive** 62:11
**experience** 36:16
    36:19,25 37:13
    44:13 46:9 49:18
    59:21 60:13 73:11
    136:8
**explain** 152:25
    176:16
**explained** 46:19
**extent** 69:7 75:14
    115:15
**extra** 52:22,23
    78:20 103:19
    136:14,15,17,18
    136:18 137:3

157:23 158:2
**extremely** 7:9
    178:9

**f**

**f** 3:2 83:11 171:16
    191:2
**facilitated** 164:8
**fact** 38:14 74:10
    74:13
**fair** 39:8 49:17
    64:18 150:17
    179:10
**fall** 59:10
**familiar** 94:17
**familiarize** 49:19
**family** 34:15 43:6
    43:14 60:11
    174:22
**farm** 66:6
**favor** 7:25
**feary** 2:8
**feasible** 135:2
**feature** 69:9
**february** 105:13
**fed** 12:15 60:15
    151:19
**federal** 1:18
**fee** 98:9,9
**feel** 9:25 10:10
**feeling** 72:6
**fees** 152:23 170:6
    171:9
**felt** 73:7
**fgo** 187:13
**fiancee** 26:21
**fight** 55:18 56:16
    152:14,24
**figured** 38:18
**file** 31:4 131:18
    132:12 165:5

**filed** 4:9 20:15
    31:21 133:6 153:4
**files** 90:24
**filibuster** 38:2
**filing** 3:7 31:17
    33:5 97:8 144:22
**filings** 34:24 41:17
    41:17,17,18,19
    79:22 93:12 94:10
    103:2 152:16
    158:7 160:13
**final** 20:22 22:14
    45:13 46:14
    186:20
**finance** 118:20
**financial** 115:9
    132:19,23 133:3,4
    133:6 134:10
    161:24 162:9,17
    167:13 168:10
**financials** 169:24
**find** 43:11 48:12
    58:24 86:7,15
    90:23 159:4
    168:25 169:2,4
**finding** 169:18
**finish** 7:16,18 8:2
**finished** 24:13
    183:4
**first** 5:6 6:16 7:5
    14:7 15:6 23:21
    25:14 26:24 32:8
    36:11 44:14 49:24
    51:3 61:25 62:21
    66:5 77:18 82:11
    82:13 88:20 90:19
    90:21 94:25 96:25
    125:9 141:25
    143:9 155:2
    186:21,21

**five** 70:18 78:13
    81:9,17 84:9,13
    85:14 107:21
    108:3,10,21
    117:23 121:25
    122:2 129:10
    140:20,21 145:24
    153:24 158:16
    188:17 189:12
**fixed** 69:19
**flatbush** 14:3
    26:25 108:11
**fliers** 169:9,9
**flight** 77:24
**flip** 91:3 124:13
    141:22 143:7
    165:7,17 166:5
    168:8 169:22
    175:13,22 180:14
**flipped** 129:10
**flipping** 129:9
**flood** 97:18
**florida** 15:6,9,13
    15:15,16,23 16:3
    25:12,15,21 26:10
    31:16,17 104:24
    105:6,15 106:4,7
    106:15 107:9,10
    107:10,20 108:5
    109:7,18 110:13
    111:6 112:8,22
    113:5 117:15
    118:9,12 119:2,8
    119:10,12,13,19
    119:23,25 120:3,4
    120:5,9,10,14,19
    165:2,3 166:24
    167:3,6 175:17
    177:5,10,14,17,19
    177:23 187:22,25
    188:3,6

**[fluctuated - guys]**

**fluctuated**  39:11
40:3,7,22 188:18
**fluctuating**  188:20
**follow**  69:16 91:22
92:3
**following**  78:3
80:25 81:9 124:11
125:14 126:23
158:15 159:8
161:22 166:6
167:12 171:8
174:5 183:5
**follows**  5:8
**food**  160:16,19,25
161:4
**foot**  66:19 119:2,6
139:11
**force**  3:15
**foregoing**  194:5
**forget**  55:5
**form**  3:21 125:21
142:3 163:25
165:20 166:2,9
174:6 175:16
**format**  6:18
**forth**  79:15 107:19
191:12
**fortunate**  111:23
118:19
**forward**  168:8
169:22
**found**  43:2 60:2
132:8
**founded**  42:14
**four**  39:4,25 42:9
42:16,16,17 73:4
77:23 88:10,18
89:14 91:22
107:21 108:2,9,21
117:23 129:23
141:8 145:24

154:11 156:6
181:20 184:7
188:24
**fourth**  170:4
**fpg**  1:6 4:12
**frame**  45:10 83:22
111:14
**frames**  53:21
**freddie**  81:4 86:18
126:17 127:2
131:4,6
**freeze**  152:13
**freight**  186:22,22
187:2,4
**friday**  101:14
160:22
**friend**  60:11
174:22
**friend's**  79:4
**front**  10:7
**fuel**  34:16 114:17
114:20 116:2
171:14,19 172:3,9
**fueled**  171:15
**full**  5:16 10:12
55:5 65:22
**furnished**  192:10
**furniture**  37:17
**further**  3:20
191:15

**g**

**gallagher**  2:12
4:15
**gap**  111:12,13
**garage**  173:22,23
173:25
**garvin**  2:7
**gas**  34:17 150:6,6
150:11,12,13,14
**general**  53:23

**generate**  56:19
**george**  81:5
126:16,24 129:14
**germane**  81:10
86:19,23
**gestures**  8:9
**getting**  169:13
**girlfriend**  25:2
**girlfriends**  118:6
**give**  21:14 30:22
43:19 88:10,11
91:24 135:8 140:4
146:8 158:11,22
161:3 170:22
171:25 172:12
181:17 182:24
**given**  6:17 12:10
39:20,21 41:11
122:24 179:15
191:14 194:9
**giving**  11:6 13:7
54:22 92:2
**glitch**  75:20
**gloves**  157:24
**gmc**  120:17
**go**  7:4,16,19 9:13
9:17 21:22 23:11
23:12,14,15 41:2
44:14 45:9 47:21
48:11 52:23 53:20
56:11 62:6,9,10,25
62:25 68:11,15
71:4,9 73:9 76:18
77:22 78:24 79:14
88:4,23 94:6 95:7
95:23 96:4,6
102:5 106:4
108:18 109:5
112:16 115:13
120:10 127:22
141:16,22 157:17

158:6,8
**goes**  171:3
**going**  4:2 7:3,17
25:3 30:18 35:16
38:18 44:18 54:24
67:6 68:18 70:14
70:21 71:3 73:12
89:7 95:8 102:15
104:12 106:15
109:2,20 122:14
141:20 143:23
153:19,21 154:8
175:7,7,8,22
176:19 182:2
183:15 189:22
**good**  4:21 5:11
7:13 43:22 70:16
88:4 112:18 146:6
**gotten**  96:3 183:10
**graduate**  16:20,22
**great**  40:24 51:10
**grew**  16:15
**ground**  7:4
**group**  101:15
**guarantor**  61:17
61:19,24
**guess**  73:5 78:2
90:21 91:18
105:25 115:2,4
158:14 159:13
168:6 170:17
**guessing**  25:7
42:15 106:19
153:12
**guy**  45:5 140:5
**guys**  41:7 55:21
70:17 78:20 88:15
97:3 109:25
114:14 139:4
141:4 149:14,18
153:15 160:16,19

Veritext Legal Solutions
800-336-4000

[guys - honestly]

161:2

**h**

**h** 83:8 193:3
**ha** 8:11
**half** 13:20 20:14
  29:12 70:15 77:24
  141:3
**hammer** 93:18
**hand** 36:5 42:2
  52:22 78:20 92:16
  92:18 93:14,19
  97:20 98:3 99:4
  123:21 125:10
  129:13 191:21
**handed** 109:22
**handle** 139:19
**handled** 133:11
**handling** 110:4,6
  133:18
**handwriting**
  180:22,25 181:3
**hanson** 2:8
**happen** 75:9,11
  138:25 139:8
  183:12
**happened** 35:3
  55:20 57:24 72:3
  138:7,16 139:15
  140:12,13,22
  141:15 151:11,14
  152:25
**happening** 83:2
**hard** 6:2 114:22
  117:5 118:14
  125:21
**hardest** 141:17
**harnesses** 157:24
**hassle** 96:6
**haul** 136:25
**hauled** 187:5

**hauling** 187:2
**hazardous** 187:5
**hdl** 5:15 11:8
  23:23 24:3 26:18
  35:11 38:10 43:20
  43:24 45:14,22
  46:13 47:2,6,10,19
  47:23 48:2,14,15
  48:21,25 49:13,20
  49:22,25 50:24
  51:3 56:14,15
  59:4,10,19 61:9,16
  61:22 62:2,9
  63:19 64:24 66:6
  67:7 69:8,13 70:3
  72:6,13 73:20
  75:13 80:4,5,6,9
  80:18 81:7 82:23
  83:19,24 86:21
  87:8,14,24 89:3,8
  89:9,16 93:23
  95:13 97:6,23
  99:24 100:10,13
  100:19,20 101:7
  101:18 102:20
  103:7 104:17
  105:18 107:6,15
  108:7 109:14
  110:21 111:4
  113:14 118:23
  120:5 123:5,7,10
  123:11 125:6
  131:20 132:21
  135:18,20 136:7
  137:12,19,22
  140:6 141:24
  142:11 146:8,13
  147:20 148:18,20
  148:23 149:14
  164:8,17 166:21
  169:16 170:21

  174:8 176:6,14,24
  176:24 177:8
  180:7 182:17
  184:18 185:18
  188:19
**hdl's** 184:22
**head** 8:10 157:18
  158:9 167:8
**headed** 7:14
**hear** 5:24
**heard** 5:12 91:24
  113:11
**hearing** 6:3
**hector** 81:10
**held** 1:18 4:13
**help** 41:25 52:25
  53:9 98:19 184:10
**helper** 33:11 45:16
  49:6,7 50:14,17,20
  72:15,18 73:22,25
  74:5 76:14 77:7
  87:7 88:8 96:15
  104:16,21 121:12
  121:16,19,20
  128:3,6,14,18
  135:12,13 140:10
  141:2,15 150:16
  150:21 184:14
**helper's** 128:21
**helpers** 45:12 50:4
  58:7,10,25 80:8,18
  81:10,14,17 86:8
  92:20 96:21 128:9
  134:23 136:2,6,11
  137:15 138:2
  141:18 155:11,17
  166:11 169:2
  172:2 188:14
**henry** 81:11
**hereinbefore**
  191:11

**hereto** 194:7
**hereunto** 191:20
**hertz** 63:3
**hesitated** 6:11
**hey** 78:12 183:9
**hiatus** 26:20 27:4
  38:8
**high** 16:12,17,19
  16:25 78:14
**higher** 40:23
  58:4,16
**highest** 39:18 40:7
  135:12
**hilo** 61:8
**hire** 41:21 44:13
  45:3 60:8 86:7
**hiring** 44:6,7
  47:23 48:6
**hit** 98:8,9
**hold** 56:24 102:5
  130:12 149:17
**holding** 12:13
**hole** 139:7
**home** 37:17 46:21
  56:5 94:18,22
  95:11,20,22 97:11
  101:7 113:21,25
  115:8 117:12
  124:15 138:6
  141:14 144:17
  174:22 175:2
  187:10
**homedeliverylink**
  1:8 4:9,23 5:14
  95:3 100:16
  101:10 124:15
  170:6,13 178:10
  193:1 194:1
**honest** 10:12
**honestly** 19:15
  95:6

Veritext Legal Solutions
800-336-4000

[hoodies - issued]

hoodies 101:21
hook 68:19
hotel 79:3
hour 70:15 77:23
 77:24 134:13,13
 153:13
house 56:6 79:4
 108:18,20,23
 117:4,23,24
 174:25 175:4
hud 152:16
huge 84:12
hulse 83:8,9
hum 8:11 64:3
 143:11,16
hundred 56:14
 130:8 155:6
 188:24
hundreds 122:5
hypothetically
 78:12 121:24

**i**

idea 32:13 158:21
 163:5 181:24
identification
 35:20 89:25
 122:18 142:6
 154:17 178:6
 180:12 182:6
identify 4:19
illinois 2:9
impact 71:13
 139:19
impacted 121:15
impacting 56:17
important 7:9
 12:22
impossible 134:15
 134:19
inactive 26:13

incentive 51:20
inception 21:6
inches 145:24
include 157:7
included 157:11
including 5:17
 42:25
income 168:10
incorrect 106:21
 106:24 111:17
 156:9
increase 159:14,20
 159:22
increased 159:11
independent 142:2
 142:5,11
indicate 127:10
indicates 160:3
indicating 12:12
individual 46:5,9
individual's 50:9
individually 84:21
individuals 34:18
 38:21 39:9,19
 42:12 44:18,19
 58:7,9 80:22
 96:20 100:8
 166:10
industry 22:18,22
 23:12 36:17,22,24
 36:25 46:10 48:24
 49:19 59:22 60:14
 91:21 115:6
 118:15 122:4
 186:10,17 188:21
inervel 80:11,11
 147:16,23,23
 148:2,4,12 149:7
 149:15
inflation 135:19

info 145:12 146:11
 146:12 181:25
informal 10:2
information 41:9
 48:12,13 127:25
 146:3 162:22
 192:7
initially 61:7
inside 173:18
inspection 88:5
install 56:10
 136:22,23,24,24
 138:21 141:7
installments
 179:16,20
instance 103:18
 150:10 172:8
instances 139:10
 139:18 141:8
insurance 64:10
 64:12,13,14 65:16
 65:20 66:2,3,4
 134:24 141:10,11
 151:22 152:3,4,5,9
 173:23,24,25
 174:2,3
insurances 65:22
intention 8:22
inter 96:5,10
 144:19,22,25
 177:18
interact 147:21
interacted 148:10
interaction 20:2
 147:7
interchangeably
 148:5
interest 27:10,20
 27:23 28:3,7
 30:13 32:11 98:8
 98:12,25 111:2

interested 191:18
internals 103:21
 180:7
international
 66:23,24 120:15
 120:16
interrogatories
 61:3
interrogatory
 79:25 84:10
interrupt 135:23
interruption 95:25
intervals 116:18
interviewed 43:18
introduce 35:16
 90:3 122:10
 141:20 154:13
 177:25 180:9
 182:2
introduced 12:24
 22:17
invest 28:6
invested 28:4
 89:11 163:15
involved 18:9,13
 18:14 20:2 22:21
 46:13
irrelevant 30:25
island 47:20 150:8
 150:11 172:18,19
 183:23
issue 9:6 133:13
 134:7
issued 57:15 75:13
 102:21 123:4,13
 124:7,19 125:18
 131:4 133:25
 134:4 165:20
 166:10,16 167:9
 176:6

Page 14

[issues - legal]

**issues** 6:4
**item** 170:5
**items** 12:22 94:6
 172:21

**j**

**james** 146:20
**january** 105:12,14
 105:16,16 107:14
 110:19 111:7,15
 113:6 166:25
 178:20 180:17
**jared** 2:10 4:21
 5:12
**jargon** 143:5
**jay** 18:2,4 24:14
**jersey** 95:24 96:18
 97:7
**joaquim** 34:5
**job** 8:6 45:6 49:3
 74:11 160:17
**jobs** 45:7 185:22
 186:2,5
**john** 18:2,4 24:14
**jose** 81:11
**joseph** 50:11
**jskramer** 2:10
**juco** 17:5
**judge** 3:13 10:7
**july** 52:8
**jump** 8:2
**jumped** 108:25
**june** 13:14 182:8
 183:9
**jury** 10:7
**justice** 17:19 18:4
**justin** 83:8,9

**k**

**k000099** 141:25
**karen** 31:25 32:5
 32:13

**keep** 10:17 68:6,17
 97:7 98:10 100:5
 128:9 135:2,22
 141:3 153:19,21
 157:25 172:22
 173:21
**keeping** 172:16
**keeps** 133:10
**kept** 172:24 173:8
**kevin** 2:12 4:14
**kind** 20:18 23:17
 41:9,14 43:15
 66:17 73:8 109:16
 118:14 120:13,21
 160:11 168:13
 172:21 186:17
**kinds** 41:8 186:5
**kings** 153:6,7
 191:5
**kingsborough**
 17:9,12,16,25
 24:11,14
**kirby** 175:4
**kloppel** 1:3 4:8
 193:1 194:1
**knew** 44:15 75:15
 103:24 104:8
 122:2 140:17
**know** 6:4 9:2,9,13
 19:18 22:24 23:7
 33:17 34:22 36:22
 44:15 47:5,12,13
 47:14,22 48:11
 53:19 54:15 57:11
 67:18 72:25 73:8
 73:10 77:19,22
 78:11,12,13 79:5
 82:10 85:8 90:21
 93:7,17 96:3
 97:14,16 101:22
 103:4,21 104:2

105:11 108:19
113:8 119:6 124:4
127:18 129:3,7,8
130:14 133:11
134:11 139:8
140:16,17 142:21
147:5,5,18,22
148:4,10 149:4,6
151:4 153:3,18
156:2 157:5,18,19
157:20 158:4,9,13
158:20 159:2,21
160:9 161:9,17
162:9,13,15,19
163:2,6 164:4
165:24 166:14
167:5,8,25 168:7
168:17 170:11,16
170:25 171:3,4,10
176:16 177:3,8,11
177:12 178:2,25
179:4,22 180:2,8
181:12,19 183:2
183:25 184:4
185:10,14
**known** 13:10
**kramer** 2:10 4:21
 4:22 5:10,12
 70:14 102:6 154:2
 176:3 189:14,24
 192:5
**kyle** 126:16

**l**

**l** 3:2,2 14:5,12,14
 83:8 108:12
 165:23 171:16
**label** 34:12
**labor** 18:23
 155:15
**laborer** 155:18

**lakeland** 177:15
 177:16,17
**lapse** 174:2
**large** 37:16 145:22
**lasted** 153:9
**late** 54:20 55:22
 84:5
**lawsuit** 18:10,22
 18:25 19:13,20,23
 20:3,7 151:8
 152:4
**lawyer** 6:14
 122:24 152:6
**lawyers** 20:2
**lead** 29:2,14
**lease** 61:25 62:6
 63:20 64:11,18,21
 64:22,23,24 67:8
 67:12,12,19,19,19
 68:4,13,14 87:16
 118:22,24
**leased** 61:7,21
 64:24 145:14
**leasing** 61:11
 62:19,24 67:6
 69:4,5 156:8
 185:15
**leave** 117:13
**leaving** 57:25
 62:12 108:16
 113:2
**led** 21:18 28:2
 46:17 47:17
**left** 36:5 55:11
 114:18 115:24
 117:9 122:5
 123:21 125:10
 183:25
**legal** 4:17 143:4
 160:3

[legally - mail]

**legally** 145:10
**legible** 145:24
**legitimate** 134:17
**lettering** 145:22
**level** 30:21 46:8
  62:4
**liability** 29:23
**liable** 67:14,17,18
  67:20
**license** 48:16,18
  64:7 128:2 188:6
**licensed** 150:6,13
**licenses** 48:20
  144:7
**lichten** 2:3
**life** 116:25
**light** 2:7
**limited** 29:23
**lindenhurst** 13:17
  24:18 26:23 76:6
**line** 155:6,14,14
  155:24 156:18,22
  159:9 160:2,7
  161:8 163:9 164:3
  168:11 170:4
  171:8 172:14
  193:4,7,10,13,16
  193:19
**lines** 138:24
**linkedin** 35:19
  36:2,7 37:9
**liss** 2:3
**list** 33:18 41:5
  43:5,8 47:24 48:2
  48:3 79:25 80:17
  80:21 155:9
  162:14 164:25
  165:24 175:5
**listed** 24:19 31:22
  32:14 33:19 34:5
  34:19 75:23 80:25

81:9,21 82:4
103:14 104:11
128:12 129:14
130:7 158:12
165:9,22 167:22
168:2 170:10
174:9 175:15
176:10 181:13,14
**listen** 48:5
**listing** 31:25 32:17
**lists** 126:17 130:3
  155:6,14,24
  156:18 158:3,16
  159:10 160:7
  161:8,25 163:9
  164:3 167:15
  168:12 171:14
**little** 8:6 13:20
  14:17 25:8 31:8
  40:22 41:3 59:8
  62:21 129:7
  153:16 157:25
  186:6
**live** 15:10,12
  116:22,23
**lived** 13:18 15:5
  15:25 16:4 25:2
  59:24 105:6,15
  107:9 108:9 113:7
**lives** 175:3
**living** 13:15,22
  26:6 51:21 76:12
  76:23 77:11,15
  106:4,14 107:9
  108:22 109:7,18
  175:19
**llc** 18:19 20:10
  21:22 22:2,8
  24:16 27:11 30:22
  31:2 38:4,13
  47:18 84:25 91:13

123:5 131:16
145:4 163:20
**llrlaw.com** 2:6
**load** 78:14
**loaded** 104:7
**loading** 29:4
**loan** 179:15
**local** 186:22
**located** 24:25
  174:12,19,24
  177:9
**locating** 44:7
**location** 50:24,25
  51:4,7,15 52:19
  53:5,15,15 55:9
  108:14 165:10
  176:23 187:7,7
**locations** 14:20,23
  15:22 16:7 110:17
  110:23,24 149:8
  149:12 176:15
**lockhard** 146:20
**lockhorn** 146:21
**logistic** 37:15
**long** 9:18 12:2
  13:18 14:8,15
  20:12 23:4 24:21
  24:23 26:5 27:23
  40:25 47:20 62:19
  72:25 84:7 95:6
  95:17 96:7 114:4
  127:18 150:8,11
  172:18,19 184:5
  185:25,25
**longer** 26:9 34:25
  35:8,11 106:5
  107:8 112:7
  161:15
**longest** 104:19
  106:13 111:25

**look** 35:17,22
  53:20,21 62:23
  74:18 89:17,21
  90:4,18 122:12
  124:10 140:24
  141:13 159:9
  161:19,21 168:19
  168:19
**looked** 63:2,3
  84:25 85:23 98:24
  134:9 164:25
**looking** 22:16
  85:20 90:25
  155:10 162:11
  167:18 168:5
  183:7
**looks** 90:11,17
  125:8 178:19
  179:19 181:5,10
**lose** 72:9
**loss** 18:23
**lost** 82:23 128:2
**lot** 43:5 47:23
  59:25 67:18 78:16
  97:17 106:8
  108:25 109:2
  119:15 160:24,24
  169:9 178:3
  183:21
**loud** 8:7
**low** 189:6
**lower** 63:5 123:21
**lowest** 135:9,11,15
**lunch** 153:14

**m**

**m** 5:5,5,19,20,21
  83:11
**ma** 2:5
**machinery** 156:21
**mail** 11:19 54:22
  182:7,24 183:8,12

[mail - minors]

185:4
mails  182:5
  192:18
main  71:21
maintain  59:6
  67:10,24 68:6,14
  69:8,8,9 70:11
  132:19
maintained  68:23
maintains  68:14
maintenance
  67:15,16 68:10,11
  68:12 143:15
making  8:9 22:13
  37:8 55:12,14,25
  104:17 112:14
  134:12 169:12
management  21:5
  21:9,13,20,23
  22:16 23:25 44:2
  44:4
manager  54:22
  55:3 146:23
  147:13 148:23
  182:14,17
managers  146:14
  146:17 147:8,16
manifest  136:23
manufacturer
  138:17
march  25:17 26:5
mario  81:4
mark  89:14
marked  35:18,20
  89:23,25 122:11
  122:18 141:21
  142:6 154:14,16
  154:19 177:25
  178:6 180:10,12
  182:3,5

marriage  191:17
materials  187:6
math  105:22 106:2
  117:7
matter  4:8 6:23
  38:19 101:3
  191:19
mc  95:25 97:8
meals  160:8,10,12
  161:6,7
mean  37:11 64:22
  68:8 100:23 117:5
  117:9 119:21
  131:5 135:23
  140:3,3 143:3
means  37:11 82:6
  82:9 126:19
meant  110:24
measuring  93:19
mechanical  67:14
media  4:5 37:10
  37:12 71:2 102:14
  154:10 189:22
medication  10:15
meet  11:9,12,14
  11:23 12:2 56:20
meetings  149:17
  150:18,22
member  22:8
members  43:14
memo  123:20
memory  40:24
  104:13
men  103:16
mendez  63:6
mendon  61:8,19
  64:24 66:10 67:9
  68:4 145:15 156:8
mention  12:21
  38:3,5

mentioned  14:24
  23:24 26:2,8
  29:22 30:15 39:24
  40:2 46:12 59:22
  63:4 66:10 68:3
  80:12 93:14 97:21
  103:12 104:24
  133:11,25 135:4
  144:18 146:13
  148:3 152:11
  166:23 173:3
  182:13
mentions  37:14
merchandise  56:4
  56:6,8 57:3,4
  138:4 140:5
  170:18
messed  69:18
  139:5
met  43:18
michael  55:5,6
  146:22
mid  15:21 29:11
  84:5 186:12
middle  5:17,20
  9:15 32:7
mike  1:3 4:8 182:8
  182:13 183:24
  193:1 194:1
mile  20:22 22:14
  45:13 46:14
  186:20
mind  46:21 153:22
  170:21
mine  96:3
minimal  32:25
  33:2,6
minimum  136:14
  136:16
minor  37:19 38:4
  132:18

minors  1:16 2:4
  4:6 5:1,11,19,21
  6:1,7 7:1 8:1 9:1
  10:1 11:1 12:1
  13:1,9,13 14:1
  15:1 16:1 17:1
  18:1,19 19:1 20:1
  20:9,12,18 21:1,18
  22:1,20 23:1 24:1
  24:16 25:1,10
  26:1 27:1,11,14,16
  28:1,19 29:1 30:1
  31:1,11,25 32:1,5
  32:6,14,18,21 33:1
  34:1,5 35:1,23
  36:1 37:1,14 38:1
  38:13,14,17,22
  39:1,10,14,19,19
  40:1,17 41:1 42:1
  42:13 43:1,3 44:1
  45:1 46:1 47:1,18
  48:1 49:1 50:1,2
  50:25 51:1 52:1,5
  53:1 54:1,9 55:1
  56:1 57:1 58:1
  59:1,11 60:1,10,19
  61:1 62:1 63:1
  64:1 65:1 66:1,14
  67:1 68:1 69:1,20
  70:1,10 71:1,6,11
  72:1,12 73:1,15
  74:1 75:1,25,25
  76:1,24 77:1 78:1
  79:1,10 80:1,2,7
  81:1,2,21,23,24
  82:1,2 83:1,11,18
  83:20 84:1,7,20
  85:1,10 86:1 87:1
  88:1 89:1,13 90:1
  90:5 91:1,12 92:1
  92:4,14,15 93:1

Veritext Legal Solutions
800-336-4000

**[minors - necessarily]**

| | | | |
|---|---|---|---|
| 94:1,12,20 95:1,2 | 187:1 188:1 189:1 | 152:21 159:25 | 108:13,14,25 |
| 96:1 97:1,10 98:1 | 189:24 190:1,10 | 161:3 162:2,6 | 109:2 110:19 |
| 99:1,23 100:1,8 | 191:1,10 192:1,5 | 170:23,25 171:7 | 111:6 112:8 |
| 101:1 102:1,2,18 | 193:2,24 194:2,4 | 178:24 179:2 | 117:11 118:3,8 |
| 102:21,25 103:1 | 194:12 | **monies**  56:24 | 165:3 166:24 |
| 104:1 105:1 106:1 | **minusing**  181:9 | **monroe**  2:9 | 174:13 |
| 107:1 108:1 109:1 | **minute**  70:18 | **month**  85:15 | **moving**  25:24 |
| 110:1 111:1 112:1 | 153:24 156:12 | 87:21,22 88:6,21 | 26:16,20 27:7 |
| 113:1 114:1,7 | **minutes**  12:4,5 | 88:22 105:13 | 108:16 135:3 |
| 115:1 116:1,9 | 154:3 189:12 | **monthly**  116:21 | 169:11,19 |
| 117:1 118:1 119:1 | **minutia**  73:9 | 117:20 | **myers**  126:16 |
| 120:1 121:1,3 | **miscellaneous** | **months**  11:21 | **n** |
| 122:1 123:1,5,6,15 | 157:23 | 13:21 21:14 29:12 | **n**  2:2 3:2 5:5,20,20 |
| 124:1 125:1 126:1 | **mislead**  8:23 | 60:2 61:15 62:22 | 5:21 27:17 192:2 |
| 127:1 128:1 129:1 | **missed**  152:17 | 64:23 68:11 84:9 | **nacks**  157:25 |
| 130:1 131:1,15,18 | **missing**  90:22 | 84:11,14 88:12 | **name**  4:14 5:12,17 |
| 132:1 133:1,24 | **misspoke**  21:12 | 95:23 105:21 | 5:18,20,20 22:19 |
| 134:1 135:1 136:1 | 129:23 | 107:21,21 108:3 | 23:6 27:15,16 |
| 136:2 137:1,5,12 | **mistake**  24:22 | 108:10,21 111:21 | 32:7,8 38:12,15,17 |
| 138:1 139:1,5 | 31:24 32:4,16 | 127:23,24 128:2 | 55:5 64:12 74:21 |
| 140:1 141:1 142:1 | 75:17 | 152:24,24 186:4 | 74:24 75:5 82:2,8 |
| 142:3,9 143:1 | **mistaken**  94:24 | **morning**  4:21 5:11 | 82:9,11,11,13,14 |
| 144:1,5,8 145:1,4 | 95:5,7 | 72:5 78:3 101:12 | 82:14,16 83:15 |
| 146:1,18 147:1 | **mitsubishi**  61:7 | 101:13 161:2 | 84:25 85:2,2,5,6,6 |
| 148:1 149:1 150:1 | 66:22 120:16 | **mornings**  150:2 | 91:10 103:8,10 |
| 151:1,5 152:1 | **mixing**  29:20 | **mother**  116:24 | 104:6 119:3,4,5,7 |
| 153:1,19 154:1,12 | **mjp**  1:6 4:12 | **mother's**  108:18 | 120:14 128:16,21 |
| 155:1,3 156:1 | **mom**  117:2 | 108:20 117:4,11 | 145:5,17 152:19 |
| 157:1 158:1 159:1 | **mom's**  108:23 | **motions**  192:12 | 187:11 |
| 160:1 161:1 162:1 | 109:8 118:5 | **motor**  186:25 | **named**  19:3 82:7 |
| 162:3 163:1 164:1 | 165:23 | **mouth**  43:4 | **names**  13:10 33:3 |
| 165:1,21 166:1,11 | **moment**  6:11 | **move**  15:19 25:3 | 50:9 75:21 80:22 |
| 167:1 168:1 169:1 | 120:25 166:5 | 55:10 108:17 | 81:25 86:15,17 |
| 170:1 171:1,17 | 182:24 183:2 | 112:21 113:5 | 167:7 181:13,20 |
| 172:1 173:1 174:1 | **monday**  129:24 | 117:3,10,13 | **national**  63:20 |
| 174:6 175:1 176:1 | **money**  28:4,6 | 175:10 187:6 | 64:11 |
| 176:7,21 177:1 | 55:21,25 57:7,10 | **moved**  15:17 25:5 | **nature**  18:21 |
| 178:1 179:1 180:1 | 72:9 85:21 86:3,5 | 25:25 26:22,24 | **nearing**  153:12 |
| 180:20 181:1 | 92:10 98:25 99:2 | 51:24 58:5,8 76:5 | **necessarily**  131:5 |
| 182:1 183:1 184:1 | 114:16 116:8,12 | 76:8,23 86:23,24 | 184:2 |
| 185:1 186:1,14,18 | 130:24 134:17 | 104:24 105:9 | |

Veritext Legal Solutions
800-336-4000

[necessary - okay]

**necessary** 33:24
194:6
**need** 9:12,18 38:25
42:10 49:10 71:6
78:20 92:15
**needed** 48:10
52:22,24 53:8
54:6 61:24 64:19
65:5 71:20 78:10
85:21 86:12 93:15
98:3,4 100:4
148:16,17 178:24
179:3 187:6
**negative** 116:5
152:22
**negligence** 138:24
**negligent** 140:18
**negotiate** 44:10
46:6
**negotiated** 46:2
**neighborhood**
132:8,9
**net** 127:5
**never** 6:9 23:20
37:9 41:6 57:2
64:24 68:12,17
89:18 91:19,22
92:5 110:7 111:12
113:10 117:11
119:21 120:22,22
121:23 134:4
149:21 151:5
168:20
**new** 1:2,20 4:11
5:7 13:17,24 14:4
14:6 15:8,8 16:3
16:13 17:6 22:11
22:16,18 24:18,20
25:9 26:20 27:3,7
28:23 58:24 78:19
99:13,21 100:4

101:22,23 106:6
106:15 107:6,21
107:22 108:3,5,9
108:12 110:18
118:4,20 119:16
120:7 134:12
142:22 145:11
151:9 152:12
153:5,6 168:21
176:15 177:22
187:20 191:3,8
**nice** 149:13
**nicks** 157:25
**night** 78:2,4 79:8
**nine** 13:21 141:24
166:15,18
**nnamdi** 5:19
**nodding** 8:9
**normal** 7:15
**notary** 1:20 5:7
191:7 194:13,19
**note** 178:5,10,22
192:19
**noted** 190:7 194:7
**notes** 189:12
**notice** 1:17 54:23
55:3 184:25 185:4
185:5
**november** 54:23
54:24 83:18,25
91:15 105:18
184:17
**number** 4:5,11
39:8,19 40:3,7
42:12 45:8 71:3
102:14 129:11
130:2 136:11
143:9 158:4 160:9
161:23 163:9,24
165:18 167:14
175:14 176:2

178:8
**numbered** 124:12
125:9 129:2
141:24 163:8
165:8 166:7
169:23 178:14
182:4
**numbers** 40:23
181:13

**o**

**o** 3:2 5:5,5,19,21
83:11 85:6 123:6
123:14
**oath** 3:12 9:21
10:4 71:7 102:18
154:13
**objection** 115:11
**objections** 3:21
**obtain** 48:19 144:4
144:8,12,14 145:2
**obtained** 69:24
**obvious** 74:10
**obviously** 38:14
56:17 59:21 69:2
125:18
**occasional** 29:5
**occasions** 29:3
**occurred** 138:9
**october** 111:8,15
124:20,21 125:11
125:15 126:6,7,14
**odd** 185:22 186:2
186:5
**office** 92:24
148:23 149:15,22
149:24 174:19,21
174:22,24
**officer** 34:23
36:20
**officers** 34:19 39:6

**offices** 149:8,13,16
**official** 6:16
**officially** 54:21
**oil** 68:13
**okay** 5:24 6:5,6,24
7:10,11 8:3,4,19
9:3,4,9,18,19
12:17 14:7,11,19
16:6 17:7,20,23
18:3,9,21 19:7,19
21:25 23:17,24
24:15 25:5,9,13,25
26:8,22 31:7
32:17 34:18 35:3
35:15,24 37:3
38:3,8,21 40:16
48:19 49:5,12,17
49:24 50:24 51:5
51:12 53:13,23
61:23 62:23 63:11
63:24 66:9 67:8
67:21 70:2,5,10
71:7,17 72:6,11
73:8 74:23 77:25
82:25 85:14 86:11
86:14,25 87:4
89:20 90:17 92:2
92:17,19,23 97:10
100:11 104:14,23
105:6,15 106:13
106:20 108:8,20
109:16 110:25
111:24 113:3
115:7 116:14
118:25 119:17
134:15 144:7
145:4 149:21
150:9 152:7 153:8
156:4,14 158:3
159:7,18 160:11
160:18 161:8,22

Veritext Legal Solutions
800-336-4000

[okay - partner]

162:14,20 163:14
164:7,12,21
167:24 169:5,15
170:24 174:15
177:2 179:10,19
180:3 183:6
185:10 187:21
188:11 189:8
190:4
**okeif** 81:11
**old** 101:24 136:25
**older** 63:14,14
**once** 24:24 42:9
43:18 44:10 47:21
48:13 74:21
115:19 136:13,15
142:22 145:10
152:20 172:4,5
183:2
**ones** 14:24 47:20
106:11 168:22
**online** 47:22 48:12
85:20
**opened** 140:12
**opening** 34:14
**operate** 144:4
177:19,21,22
**operated** 145:6,9
**operating** 50:2
65:4 69:21 70:6
70:12 73:14,16
76:25 94:3 110:9
119:16 144:15
146:18 147:14
156:5 159:18
166:23 167:2
177:19 185:7
187:21,25 188:3,9
188:12
**operation** 92:15
112:25 143:14

**operations** 59:4
89:15 109:9 112:5
184:11,13
**opportunity** 85:24
**opposed** 8:9 51:16
130:16 172:6
**option** 62:10
**order** 7:8 12:3,7
28:7 41:25 61:25
68:22 80:18 84:16
93:21 96:11 97:22
144:4,10 149:22
177:19,21,22
**orders** 148:21
**organization**
20:16 30:3
**organizations**
30:20
**organize** 21:25
**organized** 22:7,10
29:23
**orientation** 88:15
**original** 3:9,17
**originally** 29:22
**outcome** 191:18
**outs** 186:7
**outside** 100:14
**outsourced** 110:8
**overall** 46:6 125:3
**overcharge** 55:15
**overhead** 85:23
114:18 116:2,3,24
134:20,24,25
**overlapped** 95:16
156:12
**overlooked** 143:2
**overnight** 79:9
**oversee** 34:17
**owned** 14:22
18:19 32:10
145:10 147:24

185:14
**owner** 20:9 31:12
88:14 91:11,12
114:7
**owner's** 115:16
**owners** 121:2
**ownership** 27:10
27:20 111:2
**owns** 175:4

**p**

**p** 2:2,2 3:2 170:6
**p.c.** 2:3,8
**p.m.** 102:10,16
154:5,10 189:18
189:23 190:6,7
**pads** 97:22 98:4,19
**page** 35:19 36:14
90:18,19 91:4,8
122:15,17 123:3
124:14 129:2,4,6,6
129:8,12 141:24
141:25 143:8
155:2,24 156:18
158:15 159:8
161:13,23 163:8
163:23 164:22
165:8 167:13,13
169:25 174:5,5
175:23 180:23
183:5,7 192:4,17
193:4,7,10,13,16
193:19
**pages** 90:22
122:13 124:11
129:11 165:7,18
166:6 168:9
169:23 175:14
**paid** 39:16 51:17
51:19 75:16,25,25
85:4,24 116:8,12
116:18 118:10

121:10 123:12
125:4,24 128:10
130:4 135:6,10,13
136:2,5,10 137:5
137:19,22 155:21
162:10 168:13
171:9,16,19
173:17 176:21,24
**painful** 73:8
**palm** 174:9,14
**pan** 120:4
**pants** 101:20
**paper** 38:2
**paperwork** 34:13
43:19 64:5 74:21
75:12 112:12
136:21 137:2
153:2 158:22
**paragraph** 143:9
**parent** 116:24
**park** 15:14
**part** 19:4,6 29:16
67:4 89:15,22
103:17,23 104:7
122:25 133:7
139:2 141:5
146:10 157:9
159:19 161:5,13
162:24 163:18
**particular** 6:12
41:14,24 42:18
55:8 121:8,13
136:12 138:10,13
139:20 179:13
180:3 181:15
**particularly** 73:11
**parties** 3:7 29:6
170:15 191:16
**partner** 30:11
163:12

[partners - picking]

partners  163:9
partnership  23:22
  30:4 61:20 62:5
  108:7 163:21
party  29:2 57:8
  170:7,17 171:4
pass  137:14,18
  139:2
passed  67:15
  140:25
paste  37:6 157:24
patience  190:2
pay  43:10 44:18
  45:12,15,15,17,23
  46:3 56:15,21,22
  56:23 65:25 75:15
  79:13,17 85:3
  92:9 94:5 114:9
  114:11,14,14,19
  114:23 115:8,24
  116:7 118:7
  121:18,19,21,22
  121:23,25 134:13
  134:22 135:20
  136:14 138:12
  139:19,21,22,24
  139:25 140:15,16
  140:19 143:13
  160:16 170:22
  171:21 174:2
payable  162:15
  167:16
paycheck  85:3
paychecks  133:14
paying  33:10
  45:14 57:9 164:4
payment  121:5
  131:12 143:24
payments  113:4
  113:13,17

payroll  133:13
pdf  42:4
peak  78:17
penalize  138:20
penalized  101:17
penalty  10:5
pending  9:16
penske  55:15,17
  56:7 63:2,17,18,19
  63:25 64:9,19,25
  65:18,25 164:9,14
people  34:14 39:2
  39:25 40:18 42:23
  43:11 44:7 58:13
  58:17,18,18,21
  59:6 76:15 80:2,6
  80:17,25 81:2,6,10
  81:14,22 82:5
  86:12 100:24
  106:11 148:9
  152:3 166:15,18
  167:10 171:12
  172:7,8,11,12
people's  86:15
percent  27:22 28:3
  28:7 30:13 32:11
  103:24 134:14
  181:17
percentage  57:5
perform  41:20
  44:8 52:14 53:14
  59:15 60:9 65:5
  77:16 81:6 93:15
  93:22 96:11 97:22
  99:24 103:7
  106:16 122:8
  144:10 164:17
  166:20 173:14,20
  187:18,19
performance
  45:24 130:8,11,14

performed  41:23
  82:17 85:9,10
  86:20 121:7
  126:11,20 176:22
performing  33:14
  40:13 45:13,21
  50:5 51:2,6 52:6
  52:18 55:9 57:18
  60:17,18 62:2
  72:13 87:7 88:8
  89:3,7 91:20 92:6
  106:6,12 107:5,7
  109:13 112:20
period  39:21
  40:16 52:7,15,18
  53:17 54:2 57:23
  62:13,14,16 72:11
  72:19 73:3,12
  76:20,22 77:13
  83:17,23 85:15
  89:8,15 94:14
  96:16 102:2 103:5
  105:8 106:3
  110:18 111:7,18
  112:2 114:10,25
  115:3 126:12
  127:14 128:7
  132:13 135:17
  136:6 146:25
  156:9,11 169:16
  169:20 186:2
periodically  72:23
periods  16:7 54:16
  111:19 112:7
  126:3
perjury  10:5
permanently
  117:13
permits  48:20
  144:3,12 145:2

person  33:8 46:5
  74:13 81:24 82:12
  83:13 101:2
  104:11 117:25,25
  147:22 180:5
person's  181:20
personal  6:23
  25:23 71:13,15
  79:18 93:10,11
  115:8 116:14,25
  119:4 132:12
  165:9 175:15
personally  18:12
  19:25 23:7 72:14
  73:20 76:14 77:6
  88:7 96:14 103:7
  104:15,20 106:16
  107:5 112:20
  121:7 122:7
  132:16 133:21
pertain  128:11
  155:16,20 157:21
  162:5,15 163:11
  181:3,14
pertains  156:15
  160:9 161:9
  170:11,18
phone  10:3 11:16
  11:18 12:3,24
  42:3 92:22 93:10
  93:11
phones  93:2
photo  35:25 36:4
physical  69:9
  112:14 138:21
physically  64:8
  88:14 113:2
  174:24
pick  72:7 75:18
picking  64:8

[picture - put]

picture  101:14,15

pictures  69:10

piece  37:3

place  43:8 96:4
  117:10,12,17
  118:4 146:5,7
  150:7

placed  145:18

plaintiff  1:16 2:4
  18:24

plaintiffs  1:4 4:25
  19:4

plan  175:9

planned  109:21

plaque  146:2

plates  188:6

pleasant  151:5

please  7:17 9:8
  102:8 122:15
  175:13

plumber  45:3
  150:7

plus  72:8 152:23

pocket  121:22
  139:15

point  6:2 8:14
  25:12 76:8 100:18
  104:23 110:5
  117:5 140:18
  152:2

points  65:20,21

portion  90:8
  123:20 137:20
  140:24 143:7
  155:19 163:14

position  29:13
  34:15

positions  48:2
  74:12

possible  45:19

power  153:14

practice  98:23

pre  35:18 89:23
  122:11 141:21
  154:14 177:25
  180:10 182:3

predominantly
  21:16 52:11,12
  55:10

preemptive  68:17

preferred  64:18

prepare  11:6,24
  12:7

prepared  131:22
  131:25 132:7,16
  132:23

present  2:12

president  32:19,24
  33:3,18 34:6

presumably  83:14
  98:19

presume  139:10

presumed  98:13

pretty  7:13 169:17
  171:6

price  46:6,7

primitive  42:2

printed  75:21
  168:15 169:8,9

prior  13:22 48:15
  77:18 87:21,22

privy  23:10
  162:18 163:4

probably  32:3
  33:23,25 37:5
  79:19 88:20 90:23
  95:15,17 98:4
  117:14 135:14
  140:21 153:12
  156:10 178:24

problem  138:19
  150:2

procedure  1:18

proceed  5:4

process  43:15 44:6
  156:13 163:6

processing  98:9

produce  122:24

produced  89:22
  159:3

product  56:7
  98:10,11 138:18
  140:11,14,15

professional  160:4

profile  35:19 36:2
  36:8,11 37:8
  192:16

profit  55:12 56:18
  56:21 115:25
  116:4

profits  56:22

program  41:25

promissory  178:5
  178:10,22 192:19

promoted  33:23

promotes  47:23

proof  171:6

proper  152:25

property  14:19,23
  118:11,13,14,15
  131:7 156:2,19,20
  157:3,14

protect  98:20

provide  10:11
  19:19 20:19,21
  80:3 83:21 84:8
  84:17 87:23 90:12
  94:12 96:15 100:7
  143:12 184:24,25
  188:15

provided  21:4
  23:20 28:13 36:23
  37:15,20 77:6
  95:10,11 125:2,21
  162:23 180:18

provides  20:25

providing  23:18
  39:25 40:18 54:12
  61:2 73:21 76:4
  80:21 140:8
  143:19 186:19

public  1:20 5:7
  191:7 194:19

pull  152:21

pulled  121:21

purchase  66:18
  87:16 99:5 100:12
  118:11,14,15,20
  157:8

purchased  30:12
  66:11,14 67:21,22
  69:3 87:18 88:2
  93:8 99:16 118:16
  156:16 163:18

purely  134:9

purpose  71:19

purposes  30:21

pursuant  1:17

pushed  141:17
  148:18,20

pushing  98:2

put  19:9 34:16
  41:5,18 42:4
  64:14 89:9 92:12
  117:5 130:12,13
  140:12 145:12
  146:9 152:13,18
  152:20 162:21
  170:20 172:2
  173:11,15,18,22
  173:24

[puts - relation]

| | | | |
|---|---|---|---|
| **puts**  64:11 162:25 | **reads**  142:2 | **receipt**  57:6,6,7,8 | **refer**  12:22 157:15 |
| **putting**  38:2 172:9 | **real**  83:13 | 57:11 170:22,23 | **referenced**  101:9 |
| 173:6 | **realized**  53:4 | **receipts**  55:17 | 158:25 170:16 |
| **putty**  157:24 | **really**  19:9 35:12 | **receive**  17:7,15,20 | **referred**  5:14 |
| **q** | 57:2 59:5,24 | 18:6 20:5 29:8 | 20:22 137:6 |
| **quani**  27:14,16 | 65:10 106:9 | 49:2 121:2 123:9 | **referring**  37:23 |
| 32:6,8 | 109:21,23 112:9 | 123:11 125:5 | 56:4 83:14 110:16 |
| **quarter**  186:12 | 114:21,22 119:11 | 131:15 | 114:25 170:17 |
| **quarterly**  115:20 | 121:24 128:8 | **received**  113:14 | **refers**  91:12 |
| **question**  7:13,15 | 129:12 138:20 | 113:18 121:5 | 171:11 |
| 7:17,19,21 8:3,24 | 140:22 141:5 | 123:7 125:20 | **reflect**  181:4 |
| 9:15,16 30:25 | 147:9,18,21 | 135:25 176:14 | **reflected**  181:14 |
| 39:22 40:6 76:21 | 181:17 | **receiving**  17:24 | **reflects**  131:12 |
| 77:5 80:12 91:18 | **reason**  6:12 8:24 | **recess**  70:24 | 176:24 |
| 94:7 112:18 | 9:5 10:10,16 | 102:11 154:6 | **refrain**  7:18 |
| 115:14 138:11 | 33:23,25 71:17 | 189:19 | **refrigerator** |
| 140:7 151:4 | 75:5 121:20 163:3 | **recognize**  90:10 | 136:25 |
| 176:18 | 163:4 180:4 | **recollection**  11:7 | **refused**  63:22 |
| **questioning**  8:22 | 181:20 193:6,9,12 | 53:23 | **regard**  148:7,8 |
| **questions**  182:25 | 193:15,18,21 | **record**  4:3,20 5:17 | **regarding**  30:17 |
| 189:25 | **reasons**  57:20 | 7:21 8:14,18 | 61:24 67:10 |
| **quick**  70:17 | 98:18 | 10:23 42:3 69:8 | **regardless**  75:22 |
| **quickly**  124:13 | **recall**  15:20 23:6 | 70:22 71:4 90:8 | **register**  25:20 |
| **r** | 25:5 31:16,23,24 | 102:10,15 141:23 | 108:5 120:18 |
| **r**  2:2 3:2 5:5,5,19 | 31:25 32:3,17 | 154:5,9 165:20 | **registered**  25:10 |
| 5:21 83:11 170:6 | 33:22 34:6 40:16 | 180:16 189:17,23 | 25:14 26:9 31:15 |
| 191:2 193:3,3 | 47:7,9 52:13 55:2 | 190:6 191:13 | 87:25 107:10 |
| **railroad**  36:21,25 | 59:11 60:4 61:2 | **recorded**  4:6 | 119:3,7,13 120:14 |
| **ran**  75:16 113:2 | 62:20 69:23 72:21 | **records**  40:25 41:8 | 188:5 |
| **randall**  81:3 | 72:24 75:3 79:24 | 41:12,13,13,15 | **regular**  67:16 |
| **rare**  140:3 | 82:18,20 84:4,10 | 42:7 74:4,18 | 68:10 116:18 |
| **rate**  44:10 62:7 | 90:25 96:17,19 | 97:18 104:9 | 172:6 |
| 66:2 | 106:17,18 119:22 | 116:11,13,14,15 | **reimburse**  171:18 |
| **rates**  45:4,6 63:5 | 120:22 137:21 | 133:7 141:3 | 171:22 |
| 66:8 | 142:9,13,19,21 | 157:16 159:4 | **reimbursement** |
| **rcwe**  123:21 | 147:2,15 155:8 | 162:22 | 171:15,16 |
| **read**  142:24 143:3 | 159:22 160:4 | **recruit**  59:5 | **relate**  131:10 |
| 170:14 182:24 | 161:11,12 167:7 | **red**  101:16 | **related**  27:18 32:5 |
| 194:5 | 168:13,22 181:5 | **redact**  55:16 64:16 | 179:4 191:16 |
| | 183:12,19 185:6 | **redacted**  164:24 | **relation**  35:4 |

Veritext Legal Solutions
800-336-4000

[relationship - rough]

**relationship** 35:5
43:17 94:21 115:5
**relatively** 182:23
**relocating** 175:8
**remember** 25:14
31:20 36:10 50:8
51:9 52:17 53:25
54:3,16 58:12
59:14 61:6,11
66:20 80:19,21
81:22,23 82:21
83:5,9 84:19
86:11,14 88:17
95:6,17,19,22 96:8
96:24 98:2,3
104:19 105:7,12
105:13 106:13
107:23 109:4
111:7,11 114:3,4
117:20 127:19
135:9 137:22
147:9,21 172:15
181:6 183:15
184:5
**remembered**
80:22 81:18
**remind** 71:7
**reminding** 102:17
154:12
**removed** 34:23
**rendered** 56:23
**rent** 14:19 63:22
63:24 65:14
117:21 118:7,10
164:4,4,19
**rental** 29:2 56:7
62:7 63:21 64:5
64:22
**rentals** 55:15
63:18 64:25 65:2
65:17,24 116:2

**rented** 14:22
63:20 117:18,23
157:4
**renting** 63:16
117:16 164:12,16
165:15
**repair** 68:6,8
**repaired** 67:11,25
159:17
**report** 31:21 33:18
141:14
**reporter** 4:15 5:3
7:5,20 8:19
**reporter's** 8:6
**reports** 31:17
**represent** 5:13
11:5 90:7 122:13
141:23 146:10
154:18 165:19
180:16
**representative**
66:6 100:20
**representatives**
22:4 101:11 149:7
**requests** 80:13,16
90:14 180:19
192:7,11
**required** 96:10
97:25 100:11
101:19 194:13
**requirement** 97:8
145:21
**requirements**
67:10,24 68:5
69:2,16 70:7
**reserved** 3:22
**resided** 16:5
**residential** 174:16
**resources** 89:9

**respect** 33:5 99:13
**respective** 3:6
**respond** 19:22
**response** 90:13
180:19
**responses** 89:22
89:24 135:5
192:20
**responsibilities**
110:5
**responsible** 109:8
131:6 138:3
143:19,24
**result** 20:6
**return** 7:25
**returns** 131:19,22
131:25 132:7,13
132:16 133:5
162:21
**revenue** 86:5
115:23 188:23,25
**reversed** 153:2
**review** 12:6,9
80:24 189:12
**reviewed** 12:17
**rex** 55:6,6 78:15
82:24 146:22
182:8,13 183:9,24
**rid** 156:12
**ride** 77:23
**right** 9:20,22 10:3
25:11 26:10 29:14
29:24 39:3,24
40:4 46:15 47:11
49:14 53:6,11
59:22 63:6 64:2
64:21 66:11,15
67:25 68:7,23
69:6 70:17 76:2
76:10 77:3 86:22
87:19 92:10 98:14

103:16 104:25
105:19 107:16,25
124:16,21 125:16
126:3,17 127:3
128:14,19,23
129:13,21 130:5,9
131:8,12 134:2
139:13 141:19
144:20 153:17
154:3 156:16
161:16 163:21
165:10 167:17,23
174:10 176:11
178:13 179:13,20
182:9,15 183:8
184:18 189:14
**riordas** 2:3
**robert** 50:10,13
**rochester** 51:7,15
51:18,24,24 52:7
52:10,12,12 53:15
54:4,7,11,21 55:2
55:9 57:19,25
58:6,19,20,21
73:13 76:9,19,24
77:2,9,16 78:19,25
79:15 82:24 86:24
89:4 106:10
107:12 108:15
113:8,9 117:14,17
117:19 124:2
128:4 130:22,23
146:14,19 147:17
149:2,8 150:10
177:7 182:14
**rodriguez** 165:21
**role** 34:9,11
**room** 10:24 70:20
**roommate** 118:10
**rough** 113:11,12

[route - sense]

**route**  52:23 55:13
  55:13 72:5,7,8
  75:17,18,19
  103:19,22 104:5,6
**routes**  78:10 104:2
  109:22 177:7
**rubber**  187:7
**rules**  1:18 7:4
  148:20
**rulings**  192:9
**run**  52:23 65:11
  65:11 69:19
  112:24 120:10,12
  134:16 184:10
**running**  78:13,16
  107:22 109:10
  112:12,25 157:9
  184:12
**ryder**  63:3,19,25
  64:5,9,10 164:9

**s**

**s**  2:2,10 3:2,2 5:5,5
  5:19,21 83:8,11
  193:3
**sable**  15:14
**safety**  70:7
**salary**  45:18 114:6
  114:22 121:24
**samora**  1:16 2:4
  4:6 5:1,19,20 6:1
  7:1 8:1 9:1 10:1
  11:1 12:1 13:1,9
  14:1 15:1 16:1
  17:1 18:1 19:1
  20:1 21:1 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  38:1 39:1 40:1

41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1,15 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1,6,15
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1

163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1,10 191:1,10
192:1,5 193:2,24
194:2,4,12
**samorfa**  83:11
**samori**  32:18,18
  32:21 81:2
**save**  173:25
**saved**  42:6
**saw**  45:15 46:21
  46:22
**saying**  8:10,15
  47:9 54:15 84:11
  98:15 101:5
  119:22 138:7
  171:5 183:9
**says**  36:13,19
  91:11 123:5,14,21
  124:2,14 126:23
  143:10 158:17
  161:14,24 168:5
  168:10 169:24
  170:4 171:8
  178:10
**scale**  46:4
**schedule**  71:13,16
  155:2 164:25
**school**  16:13,18,19
  16:24,25 17:3,5,23
  24:8,9 29:20
**scope**  150:4
**scopelitis**  2:7

**scopelitis.com**
  2:10
**scores**  150:3
**scott**  82:21
**screen**  13:2 35:25
**screwdriver**  93:18
**scribbling**  181:11
**sealing**  3:7
**sears**  46:23 47:21
  56:14 80:10,11,11
  109:23 138:19
  140:5 147:22,23
  147:24 148:2,3,4,6
  148:8,11 149:15
**season**  78:17
**second**  62:14,17
  62:22 102:5 143:8
  175:23 183:7
  186:11
**secondary**  89:10
  89:12
**secretary**  31:18
**section**  163:2,3
**see**  10:21 32:15
  41:6 46:20 47:25
  57:2 122:22
  123:22 124:13
  125:12 129:14
  143:10 158:17,18
  169:25 170:8
  176:5 178:11,15
  180:22
**seen**  142:3 154:20
**seldom**  53:2,5 79:6
**select**  132:6
**self**  21:21
**sell**  67:3,4 98:11
**send**  152:25
**sense**  7:14,22 8:11
  8:25 13:3 159:12

[sent - sorry]

sent  12:11,14
  80:13 104:2 141:4
sentence  143:9
separate  65:16
  69:5 127:2 147:19
  148:14,15 157:11
served  90:14
service  3:16 20:20
  23:20 80:18 86:8
  169:6 173:5
services  20:18,22
  20:25 21:3 22:14
  23:18,19 28:13
  33:15 36:23 37:15
  37:20 40:2,13,18
  44:8 50:5 51:2
  54:12 56:23 59:15
  62:2 73:21 76:5
  77:6 80:3 81:7
  82:17 83:21 84:8
  84:17 85:8 87:24
  88:8 91:20 92:6
  94:13 95:10,11
  96:11,16 99:24
  103:7,10 106:6
  121:7 122:8
  144:11 160:4
  164:17 166:20
  186:18 188:15
servicing  87:10
serving  87:14
session  4:19
set  29:3 40:23 45:8
  45:18 77:21 89:11
  93:18,25 152:5
  191:11,21
sets  93:18
setting  10:2,21
settlement  20:6
  57:15 65:15 74:24
  75:6,23 82:3

102:21 103:15
  124:15,18,23
  125:6,14 126:15
  127:7,8 128:11,13
  128:17,22 130:15
  131:3,4,11 176:14
  179:17,23 180:5
  180:11,17 181:15
  181:21
settlements  74:22
seven  68:11 80:25
  81:16 90:22 186:4
shaking  8:10
share  13:2 30:22
  30:23
shaw  50:10,13,16
sheds  186:7
sheet  161:25
  167:22
sheetrock  45:5
sheetrocking
  186:7
shirt  101:6,17,20
  101:22,23,24
shirts  101:7,21
shop  66:8 88:3
  146:6
short  59:24 70:24
  77:13 96:16 102:7
  102:11 121:21
  154:6 182:23
  189:19
shorter  16:6
shortly  70:2
shot  35:25
show  33:4 41:9,13
  41:15 57:7,9,10,14
  64:7,10 74:5
  103:20 115:24
showed  44:12
  140:13

showing  74:6
  88:15 104:9
  116:11
shows  124:25
  125:2 128:16
  129:19 130:2
  151:17
shut  112:5 134:20
side  58:15,16
  145:13,19 146:9
  146:12 148:18
  169:11
sign  64:4 67:13
  91:19,21,23
  142:22
signature  91:7
  178:16 191:23
signed  3:10,12,15
  68:4 84:18,20,23
  91:23 142:20,22
  142:25 143:18
signing  142:17
similar  19:7
similarly  9:5
simpler  30:24
single  103:18
  139:14
sir  92:8
sister  27:19 30:12
  32:10 163:15,18
sisters  163:11
sit  158:7
sitting  10:7 158:10
  160:14
six  42:16,16 60:2
  62:22 64:22 84:11
  84:14 85:15
  124:11 127:7,11
  140:21 186:4,4
  188:17

skimmed  143:2
small  37:16 46:4
  178:9
smaller  69:16
  111:19
smallwood  83:5
sminor  90:9
  122:16 124:12
  154:19 159:8
  167:14 178:9
  180:15 182:4
sminors  91:4
  129:3 158:16
social  37:10,12
socket  93:17
software  41:24
sold  112:24 185:19
solutions  4:17
somebody  41:4
  74:2 75:19,19
  82:7 103:9,20
  104:5,5 134:13
someplace  108:17
somewhat  153:11
sorry  14:13,15
  15:8 21:12 24:11
  27:15 29:20 39:23
  44:19 47:8 50:25
  52:2 53:4 54:7
  57:22 58:8 60:9
  62:25 71:23 76:7
  76:8 77:8 84:13
  94:7 99:11,11
  105:3 108:12
  109:6,11 113:4
  129:23 135:23
  140:7 144:23
  155:14 169:5
  174:17 183:9
  189:3,6

[sort - sure]

sort   6:5 10:15
    19:23 20:6 48:23
    184:25
sound   25:17 34:20
sounds   116:17
south   55:14
space   92:24
    149:22
speak   11:16 13:6
    30:16 60:20
    103:17 149:22
speaking   46:14
specials   137:6,7,8
    137:13,19,23
specific   37:23 70:6
    91:25 109:3,4
    110:24 139:18
    143:7 144:3,7,12
    144:14 145:21
    148:5,7
specifically   11:23
    53:16 68:22
    108:16 109:12
spectrum   109:24
spell   5:16
spent   16:6 155:7
    160:3 162:6
spirit   23:2,3,5,8,9
split   118:2
spoke   11:12 36:22
    81:3 96:20 103:4
spoken   11:4,15
spring   60:5 72:22
sputed   100:25
ss   191:4
stamped   143:8
stand   101:11
    148:19 150:2,3,18
    150:22
standard   104:8

stands   124:4
start   15:9 21:18
    33:14 43:16 44:22
    49:8
started   5:16 7:3
    19:15 21:4,7,11
    28:17 37:7 45:12
    48:14,20 51:6
    53:17 59:18 60:14
    61:9,25 66:5
    87:20 96:25 97:5
    97:5 99:5,9
    185:23
starting   115:5
starts   90:18
state   1:20 5:7,16
    30:20 31:18 66:6
    96:5,10 99:21
    144:19,22,25
    145:11 151:8
    152:12 177:18
    187:8 191:3,8
stated   135:5
statement   74:25
    75:6,24 82:3
    103:15 124:16,24
    128:13,17 130:15
    131:3,4,11 162:10
    168:11 180:12,17
    181:15,22 192:21
statements   57:15
    102:21 124:19
    125:6,15,15
    126:10,15 127:7,8
    128:11,22 132:19
    132:24 133:3,4,6
    161:25 167:13
    168:10 179:17,23
    180:5
states   1:2 15:5,7
    15:25 16:4 19:11

174:5
stating   61:6
stay   78:23 79:3,4,7
    79:8 109:8
stayed   58:23 112:4
    175:12
staying   108:8
    175:11
steve   22:20 59:11
    75:24
stickers   146:8
stipulated   3:5,20
stipulation   185:3
stkpwhr   114:21
stm01   158:17,20
    158:25
stn01   161:14
stole   140:5,11,16
stolen   141:7
stone   40:23
stop   51:17 55:8
    57:18
stopped   54:10
    108:21
stopping   60:23
stops   129:20 130:3
    130:5 136:12
storage   100:6
    172:14,16,20,22
    172:25 173:7,9,11
    173:12,16,21
store   146:4
stored   173:15,17
straight   117:7
strap   138:23
straps   157:23
street   2:4,9
stress   97:25
stretch   104:19
    106:14 111:25

stretches   72:25
structure   174:23
stub   85:3
stuck   68:19
study   18:3
stuff   38:2 112:12
    133:9 168:16
    169:10 173:18
style   116:25
subcontracted
    58:22
subcontracting
    41:10
subcontractor
    45:7 139:16
subcontractors
    38:24 39:10 40:2
    40:12,15,19 44:8
    45:23 46:3 133:16
    134:2 139:25
    149:18,23
subscribed   190:12
    194:14
success   115:10
    169:18
sue   151:25 152:8
sued   151:6 152:5
suing   18:25
summer   29:11
    52:8 53:18 72:22
    183:16
supplement   65:3
supplies   157:20
supposed   56:9
sure   7:24,25 8:7
    8:18 19:9,11,15,17
    52:9,11 53:21
    70:19 75:15 83:10
    88:4 95:9 96:9
    98:4 101:15 102:6
    106:22,24 109:20

Veritext Legal Solutions
800-336-4000

**[sure - three]**

109:25 138:5
147:24 152:2
154:2 157:17
159:16 162:8,8,12
167:19 176:18
177:6 179:6
181:17 183:23
189:16
**surrounding**
184:21
**surroundings**
10:22
**swear**  5:3
**sworn**  3:10 5:6
6:17,24 190:12
191:12 194:14
**syosset**  51:4,16
52:10 53:14 54:4
54:8,12 55:10
58:8 59:2 73:13
76:5,16 77:2,8
78:19 79:15 89:4
106:9 107:13
120:7,9 130:21,23
147:11 149:2,9
176:23
**systems**  104:6

**t**

**t**  3:2,2 191:2,2
193:3,3
**tab**  122:11 154:14
178:3,14
**tabbed**  12:13
**take**  7:20 9:12,15
9:17 21:14 35:16
35:22 56:15 64:13
64:13 69:10 70:17
73:2,6 77:23,23
88:2,11,11 89:21
90:4 101:14,15
102:7 112:7,9

114:6,12 115:16
122:6,12 124:10
130:19 134:7
135:8 137:2
153:14,16,20,22
153:23 154:3
160:16 166:5
173:24 179:7
183:2
**taken**  1:16 4:7
9:21 10:4,14
70:25 102:12
116:8,25 154:7
189:20
**talk**  7:10 12:3 31:8
147:20,20
**talked**  147:25
**talking**  6:13,15
16:8 46:4 53:16
103:18 109:12
110:22 127:8
133:5 135:17
147:25
**tampa**  15:14 26:2
26:6 165:2,3,25
175:11,12,16,19
**tape**  93:19
**tax**  30:21 41:17,18
79:22 93:12 94:10
102:25 116:13,14
116:15 131:18,22
131:25 132:12,16
133:5,7 159:4
160:13 162:21
**taxes**  31:4 115:20
115:21 132:7
154:24 160:6
**teach**  74:2
**team**  56:11
**technical**  182:19

**technically**  148:11
163:20
**tedious**  163:6
**teleconference**
1:19
**tell**  9:21 43:21
46:17 77:17,18,21
93:16 95:18
100:15 123:24
128:5 149:10
150:7
**telling**  11:3,11
**ten**  13:21 40:10,18
58:17 70:18 104:3
104:10 154:3
**terminal**  53:10
54:13 57:19 76:16
76:19,19 77:8,9
78:6
**terminals**  54:11
73:14,16 149:19
177:9
**terminate**  185:2
**terminated**  38:10
45:22 99:19
110:20 184:17
185:8,18 188:19
**terms**  33:2 56:7
92:6 106:25
110:22 148:9
**testified**  5:8 94:25
119:17
**testify**  10:4
**testifying**  10:17
11:24 12:19,23
**testimony**  6:17,24
10:12 11:6 12:7
13:7 19:20 106:23
191:14 194:8
**thank**  71:6 73:9
189:25 190:3

**theory**  98:21,22
**thing**  8:5 9:14 98:5
100:25 113:21
152:21 172:6
184:13
**things**  8:10 33:24
67:5,18 88:16
109:2 116:6 137:3
140:6 141:6 143:3
157:7,23 162:25
169:14 172:9
175:8 181:6 186:8
**think**  10:16 23:3,4
28:8 34:13 47:7
48:4,5 68:3 70:15
91:23 97:4 105:9
113:24,24 117:22
140:8 141:18
153:9,11,18 162:8
163:17 173:3
184:3,8 189:11
**thinking**  99:11
169:13
**third**  60:4 71:10
122:15 170:6,15
170:17 171:4
**thirds**  36:13
**thought**  6:13
46:22,23 95:14
106:25 108:13
110:22,24 120:6,8
139:23 156:7
**thousand**  168:12
188:25
**three**  42:9,24
61:15,15 73:4
88:10,18,22 91:22
95:23 105:21
125:9,14 126:5,15
126:19 129:20
141:8 152:24

[three - trucks]

| | | | |
|---|---|---|---|
| 165:17 169:22 | 127:18 128:6 | **top**   123:3 124:14 | **trip**   184:6 |
| 184:7,7 185:13 | 132:13 135:15,16 | 157:18 158:9 | **troy**   17:4,4,8 |
| 188:13,24 | 135:17 136:6 | 161:24 164:22 | 24:20 |
| **thursday**   129:24 | 137:21 138:20 | 167:8 168:11 | **truck**   61:17,18,21 |
| **ties**   97:22 98:19 | 139:14 140:9 | 169:24 174:6 | 64:20 65:13,14 |
| **time**   1:12 3:22 | 141:7 143:23 | 178:10 | 67:3,5,20 68:18,21 |
| 4:18 6:3 9:12 | 146:18,25 147:14 | **torres**   81:4 86:18 | 69:3,9,10,13 71:25 |
| 15:13 16:7 21:24 | 156:9,11,16 | 86:20 87:5 126:17 | 72:17 74:14,20 |
| 22:6 23:2,4 24:7 | 165:15 167:3,6 | 127:2 131:5,6 | 87:17,23 88:13 |
| 24:12,21,23 25:3 | 169:17,20 173:20 | **total**   81:16,17 | 89:10 92:18 93:19 |
| 25:22 26:17,18 | 174:13 175:20 | 122:13 140:20 | 94:2 96:23 106:11 |
| 28:8 32:15,24,25 | 177:10 179:5 | 148:20 162:7,7,9 | 110:2 112:17 |
| 34:10 35:13,15 | 183:13 184:11,16 | 176:9,13,25 | 128:14,18 129:20 |
| 39:11,20,21 40:3,8 | 185:7 186:2 190:2 | **totality**   52:21 | 130:12 145:11,13 |
| 40:11,17,25 41:11 | 190:7 | **touch**   150:6 | 145:17 146:12 |
| 42:18 47:3,4,15 | **times**   43:5 67:2 | **touching**   150:5,9 | 151:17,19,20,20 |
| 48:4 50:6,7 51:5 | 75:8 85:13 103:13 | **tough**   114:21 | 151:21 158:2 |
| 51:10,22,23 52:7 | 104:3,4,10 107:2,3 | **track**   128:9 | 159:10,15 164:6,7 |
| 52:15,18 53:16,21 | 107:4,7,11,17,18 | **trained**   71:21 | 172:23 173:10,10 |
| 53:25 54:9,16 | 108:25 112:13 | **training**   48:24 | 173:11,14,16,16 |
| 57:23 58:13,14 | 137:25 139:4 | 49:2 74:2,6 76:15 | 173:18,19 184:14 |
| 59:3,9,17 60:21,24 | 140:20,21 141:8 | 150:16 | 184:15 187:22 |
| 61:17 62:8,13,14 | 142:19 | **transactions** | **trucking**   36:21 |
| 62:16 65:8,12,19 | **tips**   114:13 | 156:25 157:6 | 119:14 |
| 68:20 70:16 71:14 | **tired**   113:9 184:22 | **transcript**   194:5,8 | **trucks**   49:25 61:12 |
| 72:11,18,21,23,25 | **title**   31:10 88:3,5 | **transferred**   17:9 | 61:25 62:13,20 |
| 73:2,6,12,19,25 | 91:11 142:2 | **transition**   22:14 | 63:9,12,13,14,17 |
| 76:13,20,22 77:13 | 182:19 | **transmission** | 65:4 66:10,11,14 |
| 83:17,22,23 88:18 | **titles**   33:3 | 68:19 | 66:17,17,19,21 |
| 89:8,15 92:24 | **today**   6:8,10 8:22 | **transpired**   19:17 | 67:3,8,11,22,22,25 |
| 94:14 95:6,12,15 | 9:21 10:11,18 | **transportation** | 68:6 69:17 70:8 |
| 96:7,13,16 100:21 | 11:6,24 12:19 | 36:17,21,24 | 72:2 73:14,16 |
| 101:25 103:5,24 | 13:7 158:10 | 186:10 | 76:25 78:13,16 |
| 105:8,17 106:3,17 | **today's**   4:4 | **travel**   79:14 | 87:10,13 92:13 |
| 107:8,11 109:18 | **told**   59:18 60:12 | 183:21 | 98:3 99:4 112:23 |
| 110:10,18 111:3,7 | 100:19 101:4 | **trial**   3:22 | 112:24,24 113:2 |
| 111:12,13,14,18 | 127:5 176:13,20 | **trick**   8:23 | 118:17 120:11 |
| 111:19,19,25 | **tools**   92:16 93:14 | **tried**   24:22 95:23 | 145:5,8,15 146:9 |
| 112:2,7,9,21 114:5 | 94:2 97:21 100:3 | 100:13 120:3 | 146:10 151:12,14 |
| 114:10,25 115:2 | 157:8 | 168:21,23 | 156:3,5,8,15 |
| 117:18 126:11 | | | 159:19,23,24 |

**[trucks - want]**

164:13,17,19
166:24 167:2,6
172:24 185:6,11
185:15,19 187:24
188:3,5,8,11
**true** 48:7 191:13
194:8
**trust** 172:7,11
**trustworthy**
172:12
**truth** 9:21
**try** 6:4 7:24
135:21 147:20
**trying** 8:16 59:5
74:2 119:13,19
168:18,19,19
169:11
**turn** 63:8 122:15
158:15 159:7
163:7,23 167:12
174:4
**turned** 63:12,13
66:9 163:20
**turning** 161:22
**twice** 115:19
**two** 14:17,18 16:4
16:8 17:5 19:10
19:11 21:6,8
23:25 29:12 36:13
41:4 42:22,24
50:7 61:15,15
64:23 66:25 68:11
72:2 74:11 78:4
81:25 82:4 86:13
91:22 105:21
124:20 125:19
127:10,14,20,21
140:6 142:15,19
145:15 146:24
152:23 175:14
176:17 185:13

**type** 20:24 40:24
118:15 157:21
168:23 174:23
**typed** 158:18
**typically** 183:24
**typo** 32:16 75:20
83:10,12 170:7

**u**

**u** 3:2 27:17 83:8
171:16
**u.s.** 4:10 169:24
**ultimately** 20:5
57:17 63:5 115:8
138:11
**um** 8:11 64:3
143:11,16
**uncle** 22:17 46:15
48:4 49:4 59:12
75:24
**uncle's** 22:19 49:6
**undergo** 48:23
**underneath** 91:10
123:15
**understand** 8:24
9:20,24 10:3,8
19:12 57:13 76:21
96:9 115:14
119:19 138:5,7
143:4 162:20
**understanding**
39:22 61:23 62:3
68:2 106:22
143:17,22 163:19
182:21
**understood** 24:10
35:15 44:11 65:3
141:20 170:24
**unfair** 139:3
**unfortunately**
59:23 122:3 128:8

**unhappy** 56:13
**uniform** 101:16
**uniforms** 100:7,12
101:18 102:20,25
**unit** 4:5 15:15,18
**united** 1:2
**units** 15:20
**university** 17:4
**unloading** 29:4
**unsigned** 3:13
**unsure** 31:6
161:18 162:17
**unusual** 10:21
**update** 142:16
**upkeep** 67:16
68:14
**upload** 42:5
**upper** 36:5 125:10
129:13
**ups** 60:15 148:19
**upstate** 15:7,7,8
17:6
**use** 41:24 87:23
97:3 99:23 100:5
133:13 148:4
149:24 173:9,13
**utilities** 161:8
**utilizing** 173:20

**v**

**v** 193:1 194:1
**vacation** 16:9
**vacations** 107:2,3
**vague** 115:12
147:10
**variables** 78:8
**varied** 85:13,14
137:24
**vary** 52:25 73:23
**varying** 67:2
**vehicle** 88:2 119:2
143:13,24 156:20

**vehicles** 118:17,20
118:22 119:7
120:13 143:20
**venetian** 13:16
24:17
**verhillio** 165:21
**veritext** 4:16
**versus** 4:8 53:15
75:24 78:6 89:8
121:12 134:7
148:11 157:12
165:25 180:6
**vice** 32:19,24 33:3
33:18 34:6
**video** 1:19 4:5 9:7
10:2 11:17 140:13
151:15,16
**videographer** 2:12
4:2 5:2 70:21 71:2
102:9,13 154:4,8
189:17,21 190:5
**videos** 100:17
101:8
**videotaped** 1:15
**virgil** 81:11
**virtual** 4:13
**virtually** 5:23

**w**

**w** 2:9 29:8 39:13
131:15 134:4,7
**wait** 88:3
**waived** 3:9
**walk** 101:6 120:8
**walking** 101:5
**walkout** 120:7
**wall** 139:7
**walmart** 100:14
**want** 5:23 8:17
10:22 16:11 28:25
40:9 52:23 54:18
54:19,20 59:8

Page 30

**[want - written]**

61:14 71:9,22,23
80:24 81:20 89:20
91:3 92:13 101:12
101:13 102:6
106:21 113:23
117:13 122:10
127:22 128:25
143:6 144:22
148:16 153:14,19
153:22 154:25
158:14 159:7
164:21 165:17
174:4 182:23
**wanted**   35:8,11
43:16 62:4 73:6
88:14 91:25 101:2
130:19,20,21
136:22 144:21
148:14 167:21
**warehouse**   29:3
146:14,19 147:4,8
147:11,17 182:14
**warehouses**
148:24,24 177:9
**washed**   97:18
**washer**   136:22
**water**   120:23
**way**   8:17 31:3,4
36:14 40:21 45:19
76:2 77:16 78:22
123:13 128:9
140:23 170:20
175:9,23 191:18
**wear**   101:23
**weather**   113:7,11
**weber**   2:5 4:24,24
11:4,10,13,14 13:6
70:19 115:11
153:18,24 176:2
189:16 190:4

**week**   16:8 65:13
72:17 78:10,11,14
78:14,16,17 88:21
88:21 104:22
106:5,21 112:3,4
114:16,20 121:8
121:13 123:25
124:2,4 125:11,16
125:21,22 126:2,6
126:6,14,21,23
127:3,12,14
129:15,17,21
130:17 131:5
**weekend**   160:23
**weeks**   41:4 61:16
72:12 88:10,11,18
103:6 104:14
122:7 124:20
125:19 127:10,20
127:21
**weight**   10:6
**went**   15:7 18:2
22:17 24:8,9
51:23 68:12 79:6
85:20 89:17
104:20 106:14
109:7 112:23
114:2 117:14,15
120:11 136:13,15
141:10 147:6
150:3,4 151:18
183:20
**west**   174:8,14
**western**   1:2 4:10
**whatnot**   29:6
107:2
**whereof**   191:20
**whichever**   130:19
130:20
**white**   69:13

**willy**   83:5
**wilson**   100:22
147:12
**winters**   82:4,7,12
82:17
**witness**   3:10,16,18
5:3,6 102:8
153:16,21 190:3
191:10,14,20
192:4
**woke**   72:5
**won**   152:14
**word**   43:4 64:21
**words**   7:12 10:14
60:22
**work**   22:16,17
23:22 24:6 25:4
26:18,19 29:16
33:2 35:7,9,10,11
35:13 43:11,22
44:24 45:21,23
46:5 47:12 48:10
49:5 50:16 51:6
52:6,9,14,18,24
53:3,13 55:9
57:18 58:22 59:25
60:2,10,12,19
68:17 69:13,14,15
71:11,13,15 72:14
73:22 76:14 77:14
78:2,6 80:8 81:22
82:25 83:3 85:21
86:6 87:6 88:7,16
89:7,17 96:14
103:11 106:8,9,12
107:13 111:8,22
114:14 125:2
127:19,24,25
128:12 131:11
136:18,19 137:16
147:6 150:4

169:19 176:22
177:5 181:14
185:20
**worked**   28:10,18
33:7,8 34:25 39:9
41:4 48:6 53:5
61:22 73:24,25
80:17 81:6,14
82:6 86:21 96:21
100:24 121:12,25
127:2,12 130:17
148:10,11 149:23
150:15 166:10
167:11 177:11
**worker**   179:13
**workers**   43:2
**working**   24:3
32:23 33:11 35:4
35:12 36:21 38:22
38:23 40:14 42:13
50:12,19,22 51:15
54:10 58:6,9
59:18,19 60:14,23
68:7 73:13 74:5
74:19 77:20,20,22
87:5 95:24 99:15
100:3 103:9,24
104:15,20 108:3,6
112:10 120:5
121:16,17,19
127:15 128:4,6
138:10 146:15
150:21 160:20
167:2,5 177:13
185:23
**workload**   78:11
**workout**   119:14
**write**   30:22 133:21
**writing**   181:23
**written**   36:15 61:3
84:15 97:11 135:5

Page 31

[wrong - zoom]

| | |
|---|---|
| **wrong**  156:7 | 14:6 15:8,8 16:3 |
| **wrote**  37:22 | 16:13 17:6 22:11 |
| **x** | 24:18,20 25:9 |
| **x**  1:3,9 45:15,16 | 26:20 27:3,7 |
| 192:2 | 28:23 78:19 99:21 |
| **xbo**  18:17,22,25 | 100:4 106:6,15 |
| 47:16 84:8,16 | 107:6,21,22 108:3 |
| 85:10,11,16,19 | 108:5,9,12 110:18 |
| 86:9 87:2,5,11,20 | 119:16 120:7 |
| 88:9 89:8,10,11 | 134:12 145:11 |
| 94:14 99:6,10,12 | 151:9 152:12 |
| 99:13,14,19 | 153:5,6 176:15 |
| 113:18 144:11 | 177:22 187:20 |
| 173:4 | 191:3,8 |
| **xpl**  84:2 | **z** |
| **y** | **zoom**  4:13 |
| **y**  170:6 | |
| **year**  13:20,21 | |
| 16:22 17:5,20 | |
| 31:5 32:2 39:22 | |
| 62:4,21 64:23 | |
| 66:20 69:17 88:18 | |
| 94:10 104:3,4 | |
| 115:20 117:8 | |
| 131:19 132:4,7,13 | |
| 155:7 159:15,25 | |
| 160:21 162:6 | |
| 164:5 166:16 | |
| 168:5,14 171:13 | |
| 172:16 174:7 | |
| 176:25 | |
| **years**  6:21 14:10 | |
| 14:14,17,18 20:14 | |
| 21:6,8 24:2 42:9 | |
| 42:22 108:15 | |
| 140:21 159:5 | |
| 189:3 | |
| **yesterday**  12:15 | |
| **york**  1:2,20 4:11 | |
| 5:7 13:17,24 14:4 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 23

**In the Matter Of:**

*Kloppel vs*

*HomeDeliveryLink, Inc.*

*ELADIO BONILLA RAMOS*

*June 01, 2021*

1

1

2    IN THE UNITED STATES DISTRICT COURT

3    FOR THE WESTERN DISTRICT OF NEW YORK

4    ---------------------------------------------x

5    MIKE KLOPPEL, et al,

6                      Plaintiff(s),

7                Case No. 6:17-cv-06296-FPG-MJP

8           -against-

9    HOMEDELIVERYLINK, INC.,

10                     Defendant(s).

11   ---------------------------------------------x

12

13                  June 1, 2021
                    2:33 p.m.
14

15          VIDEO RECORDED VIDEO CONFERENCED

16   EXAMINATION BEFORE TRIAL of Plaintiff ELADIO

17   BONILLA RAMOS, pursuant to Order, before Laura B.

18   Lowenthal, a Notary Public within and for the

19   State of New York.

20

21

22

23

24

25

Eladio Bonilla Ramos - June 01, 2021

2

1

2        A P P E A R A N C E S:

3

         LICHTEN & LISS-RIORDAN, P.C.
4        Attorneys for Plaintiff(s)
           100 Cambridge Street, 20th Floor
5          Boston, Massachusetts 02114

6        BY: BENJAMIN J. WEBER, ESQ.
           E-mail:  bjweber@llrlaw.com
7

8        SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY,
         P.C.
9        Attorneys for Defendant(s)
           777 Main Street, Suite 3450
10         Fort Worth, Texas 76102

11       BY: EMILY A. QUILLEN, ESQ.
           E-mail:  equillen@scopelitis.com
12

13     ALSO PRESENT:

14       HORIZON LEGAL SOLUTIONS
         Spanish Interpreter
15         West Palm Beach, Florida

16       BY: MARIO PAZ

17
         Aydaline Garcia, Lexitas
18         Monitor and Videographer

19

20

21

22

23

24

25

3

1

2                  STIPULATIONS

3

4            IT IS HEREBY STIPULATED AND AGREED by

5     and between the attorneys for the respective

6     parties herein, that filing and sealing be and

7     the same are hereby waived.

8            IT IS FURTHER STIPULATED AND AGREED

9     that all objections, except as to the form of the

10    question, shall be reserved to the time of the

11    trial.

12           IT IS FURTHER STIPULATED AND AGREED

13    that the within deposition may be sworn to and

14    signed before any officer authorized to

15    administer an oath, with the same force and

16    effect as if signed and sworn to before the

17    Court.

18                  oOo

19

20

21

22

23

24

25

Eladio Bonilla Ramos - June 01, 2021

4

1

2                 VIDEOCONFERENCE STIPULATION

3

4             IT IS HEREBY STIPULATED AND AGREED by

5     and between counsel for all parties present that

6     pursuant to the CPLR section 3113(d) this

7     deposition is to be conducted by video

8     conference, that the court reporter, all counsel,

9     and the witness are all in separate remote

10    locations and participating via videoconference

11    (LegalView/Zoom) meeting under the control of

12    Lexitas Court Reporting Service, that the officer

13    administering the oath to the witness need not be

14    in the place of the deposition and the witness

15    shall be sworn in remotely by the court reporter

16    after confirming the witnesses identity, that

17    this videoconference will not be recorded in any

18    manner and that any recording without the express

19    written consent of all parties shall be

20    considered unauthorized, in violation of law, and

21    shall not be used for any purpose in this

22    litigation or otherwise.

23             IT IS FURTHER STIPULATED that exhibits

24    may be marked by the attorney presenting the

25    exhibit to the witness, and that a copy of any

Eladio Bonilla Ramos - June 01, 2021

5

1

2  exhibit presented to a witness shall be e-mailed

3  to or otherwise in possession of all counsel

4  prior to any questioning of a witness regarding

5  the exhibit in question. All parties shall bear

6  their own costs in the conduct of this deposition

7  by videoconference, notwithstanding the

8  obligation by CPLR to supply a copy of the

9  transcript to the deposed party by the taking

10 party in civil litigation matters.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eladio Bonilla Ramos - June 01, 2021

6

1

2      VIDEOGRAPHER:  We are going on the

3      record for the remote video deposition

4      of Eladio Bonilla Ramos on June 1,

5      2021 at approximately 2:33 p.m.

6      eastern time in the matter of Mike

7      Kloppel, et al versus HomeDeliveryLink

8      Inc.

9      My name is Aydaline Garcia and I will

10     be video recording today's deposition

11     on behalf of Lexitas.

12     Will counsels please introduce

13     themselves and who they represent

14     beginning with the party noticed in

15     this proceeding.

16     MS. QUILLEN:  Emily Quillen, attorney

17     at Scopelitis, Garvin, Light, Hanson &

18     Feary representing defendant

19     HomeDeliveryLink.

20     MR. WEBER:  Benjamin Weber for Lichten

21     & Liss-Riordan representing plaintiffs

22     Eladio Bonilla Ramos.

23     VIDEOGRAPHER:  Will the court reporter

24     please swear in the witness and the

25     interpreter.

7

1

2   M A R I O   P A Z,

3       an interpreter, having been duly sworn by

4       the Notary Public, translated as follows:

5   E L A D I O   B O N I L L A   R A M O S,

6       called as a witness, having been first duly

7       sworn by a Notary Public, was examined and

8       testified as follows:

9   EXAMINATION BY

10  MS. QUILLEN:

11      Q     Can you please state your full name

12  for the record?

13      A     Eladio Bonilla Ramos.

14      Q     Can you please state your current home

15  address for the record?

16      A     I live at 532 Lowell Street, Westbury,

17  New York  11590.

18      Q     Sir, my name is Emily Quillen.  I am

19  an attorney in Ft. Worth, Texas. I represent

20  HomeDeliveryLink.

21          You used to contract with

22  HomeDeliveryLink; is that correct?

23      A     Yes.

24      Q     Do you understand who I represent?

25      A     Yes.

Eladio Bonilla Ramos - June 01, 2021

8

1          E. Bonilla Ramos

2     Q     You're currently represented today by

3  Mr. Benjamin Weber; is that right?

4     A     Yes.

5     Q     You may have been explained how this

6  process works but I will walk you through a few

7  of the rules.

8     A     Okay.

9     Q     You have been sworn and you're under

10  oath; do you understand that?

11     A     Yes.

12     Q     All of your answers today are being

13  taken down by the court reporter who will create

14  a written record.

15     A     I am in agreement.

16     Q     That record may be offered to the

17  court where this case is currently pending.

18     A     I am in agreement.

19     Q     As a result because we are creating a

20  record I need you to answer verbally.

21     A     Okay.

22     Q     If at any point you don't understand

23  my question or the translation of the question

24  will you please let me know before you answer?

25     A     Okay, that is fine.

Eladio Bonilla Ramos - June 01, 2021

9

```
 1              E. Bonilla Ramos
 2       Q     It is also important especially
 3   because we have a translator here that only one
 4   person talks at a time.
 5       A     Okay.
 6       Q     If you will allow me to finish asking
 7   my question before you answer I also will try to
 8   let you answer the question before talking.
 9       A     Okay.
10       Q     If you need a break at any point just
11   let me know and as long as there is not a
12   question that has not been answered I am happy to
13   let you take breaks.
14       A     Okay.
15       Q     Can you think of any reason why you
16   are not able to offer truthful testimony today,
17   sir?
18       A     Repeat the question again.
19       Q     Are there any reasons why you might be
20   unable to testify truthfully today?
21       A     Perhaps maybe I won't remember.
22       Q     What I am asking is you are not under
23   the influence of drugs or alcohol or lack of
24   sleep today that might interfere with your
25   ability to testify?
```

Eladio Bonilla Ramos - June 01, 2021

10

1              E. Bonilla Ramos

2        A    No, everything is fine.

3        Q    What is your current address?

4        A    532 Lowell Street, Westbury, New York.

5        Q    How long have you lived there?

6        A    Oh, since 2000.

7        Q    Before that did you reside in New

8    York?

9        A    Before what?

10       Q    Before you lived at your current

11   address?

12       A    Yes, I have always lived there. First

13   in El Salvador, then I came and I lived in

14   another address for about a year and then I lived

15   there.

16       Q    What year did you come to the United

17   States from El Salvador?

18       A    Okay, I came from the El Salvador in

19   1994.

20       Q    Could you tell me your understanding

21   of the English language; can you speak English,

22   understand English?

23       A    Yes, I understand it and I can speak

24   it as well.  Almost everything she is telling me

25   I can understand in part maybe about 80 or 90,

Eladio Bonilla Ramos - June 01, 2021

11

1          E. Bonilla Ramos

2    no, 70 to 80 percent.

3          Q      Have you ever been involved in another

4    lawsuit, sir?

5          A      Lawsuit?  Like in what kind of

6    lawsuit?

7          Q      Any case besides maybe a divorce or a

8    family dispute?

9          A      Yes, I am divorced.

10         Q      Have you ever been involved in any

11   other kind of lawsuit?

12         A      Like what other kind of lawsuit?  Can

13   you explain a little bit more?

14         Q      Have you ever been involved in a civil

15   lawsuit say involving a motor vehicle accident?

16         A      Yes, one time I was parked on the side

17   of the road, I was in a deli buying some food and

18   a car hit the back of my truck.

19         Q      Do you know what year that happened?

20         A      No, I don't remember exactly.

21         Q      Do you believe it was around 2010?

22         A      No.

23         Q      Was it before that?

24         A      Yes.

25         Q      Did you give a deposition in that

Eladio Bonilla Ramos - June 01, 2021

12

E. Bonilla Ramos

1

case?

3     A     Yes.

4     Q     More than once?

5     A     I don't remember how many times but I

6     did remember that there was.

7     Q     Do you know how that lawsuit was

8     resolved?

9     A     I don't remember exactly.

10    Q     That lawsuit was before you started

11    contracting with HomeDeliveryLink?

12    A     Yes, that is correct.

13    Q     Do you recall the year you started

14    driving for HomeDeliveryLink?

15    A     No, I don't remember exactly but it

16    was around 2008, 2009, 2008, 2009, thereabouts.

17    Q     I understand you have not been able to

18    locate any documents that relate to the time that

19    you drove for HDL; is that right?

20    A     Yes.

21    Q     Have you looked for those records or

22    tax returns?

23    A     Yes, I looked for them. I had them in

24    the garage but I don't know where they went.

25    Q     How long ago were you asked to try to

13

1          E. Bonilla Ramos

locate those documents?

3      A     It would be about a month to two

months ago. The truth is I honestly don't

remember when it was.

6      Q     Other than the motor vehicle accident

can you recall any other case that you might have

been involved in or business reasons?

9      A     No.

10     Q     Have you ever been involved in any

criminal cases?

12     A     No.

13     Q     Bankruptcies?

14     A     No.

15     Q     Immigration matters?

16     A     Like problems with immigration or

what?

18     Q     Yes.

19     A     No.

20         MR. WEBER:   Objection to these any

21         questions about immigration status. It

22         is not appropriate in this case. I

23         don't think you're even trying to get

24         into that. I am objecting and advising

25         my client not answer the other

Eladio Bonilla Ramos - June 01, 2021

14

1           E. Bonilla Ramos

2       questions about immigration.

3       MS. QUILLEN:  I wasn't asking about

4       immigration status.  I was just asking

5       if he had been involved in any

6       immigration case since he said he was

7       not sure what kind of cases might

8       exist.

9       MR. WEBER:   I don't think it is

10      relevant in this case.

11      You can translate this, Mr. Paz.

12      Q      How did you prepare for today's

13  deposition?

14      A    I spoke to my attorney.

15      Q    I don't want to know what you spoke

16  with your attorney about but how many times did

17  you speak with him?

18      A    One time.

19      Q    How long was that conversation?

20      A    Not very long. Like ten or twenty

21  minutes.

22      Q    Did you review any documents in

23  preparation for your deposition today?

24      A    No.

25      Q    Did you review any papers relating to

Eladio Bonilla Ramos - June 01, 2021

15

1              E. Bonilla Ramos

2    the lawsuit before your deposition today?

3         A    No.

4         Q    What is the highest level of your

5    education that you have completed?

6         A    Ninth grade.

7         Q    When did you complete that?

8         A    In El Salvador.

9         Q    What year?

10        A    1993, I don't remember.  It was very

11   long ago.

12        Q    When did you receive your commercial

13   driver's license?

14        A    In New York.

15        Q    What year?

16        A    I don't remember exactly.

17        Q    It would have been before you started

18   driving for HDL around 2008, 2009?

19        A    Yes, before.

20        Q    Did you go to a truck driving school

21   in order to get that license?

22        A    Yes, I went to the school but then I

23   passed on my own.

24        Q    Where did you attend that school?

25        A    I was attending some classes in Bay

E. Bonilla Ramos

1

2   Shore, Bay Shore, but I didn't attend very many

3   of them.  It was like four or five of them.  And

4   then I rented a truck and I practiced with a

5   friend who taught me.

6        Q     Other than truck driving school have

7   you attended any other schools besides your

8   graduation from ninth grade in El Salvador?

9        A     I went to BOCES to learn a little bit

10  of English.

11       Q     Where do you currently work?

12       A     Around Westbury. The company is called

13  Jamaica Ash.

14       Q     What do you do there?

15       A     Driver.

16       Q     What type of driving work is it?

17       A     I drive a garbage truck.

18       Q     How long have you been driving for

19  Jamaica Ash?

20       A     27th of this month I think I am going

21  to be there a year.

22       Q     Where did you work before that?

23       A     Doing construction.

24       Q     What type?

25       A     I was in different jobs.  First I was

Eladio Bonilla Ramos - June 01, 2021

17

1          E. Bonilla Ramos

2    doing construction, then I was working in a car

3    wash.

4          Q      What were you doing for the

5    construction work?

6          A      I was cutting wood.

7          Q      Do you recall the company you worked

8    for?

9          A      It was called Tower Building. Tower

10   Building.

11         Q      How long did you do that?

12         A      I didn't do it very long. I did it for

13   about some six months I think. I don't remember

14   really too well.

15         Q      You said you worked with a car wash.

16                Did that have anything to do with

17   driving?

18         A      Yes, sometimes I would drive the cars.

19   I would bring them through the tunnel sometimes

20   for a wash but I didn't do it all the time.

21         Q      Before the car wash where did you

22   work?

23         A      Before, I don't remember.

24         Q      According to HDL's records you quit

25   driving for them in 2015; does that sound right?

Eladio Bonilla Ramos - June 01, 2021

18

E. Bonilla Ramos

1

2      A     Yes, that is correct.

3      Q     After you stopped driving for HDL did

4     you have any other job where you drove a

5     commercial vehicle besides the garbage truck you

6     currently drive?

7      A     I think not.

8      Q     Do you still have a company named

9     Bonilla Ramos Delivery Incorporated?

10     A     No, I no longer have that. That is why

11    I am working for a company.

12     Q     So after you quit driving for HDL you

13    didn't continue to keep that corporation active?

14     A     No, I don't think so because I told

15    the accountant to just cut the company.

16     Q     Do you recall when you formed the

17    company?

18     A     No.

19     Q     If the State of New York shows your

20    company as filing for corporate status in October

21    of 2012 does that sound right?

22     A     2012, no, I don't remember.

23           (Whereupon, Defendant's Exhibit 4,

24           Department of State, Existing

25           Corporations and Businesses,

19

```
 1            E. Bonilla Ramos
 2            Corporation & Business Entity Database
 3            Search, 3 pages, was marked for
 4            identification.)
 5        Q    Sir, can you see the screen in front
 6   of you with the video?
 7        A    Uh-huh.
 8        Q    I am going to share a document with
 9   you. Can you see a document that says Department
10   of State?
11        A    Uh-huh.
12        Q    Sir, I am sorry, I will have to ask
13   you is that a yes?
14        A    Yes.
15        Q    I just want to make sure since I am
16   not in the room with you that you can see the
17   exhibit.
18            Is this your company Bonilla Ramos
19   Delivery Inc?
20        A    That is correct.
21        Q    This record shows October 19, 2012 as
22   the day of the initial filing; do you see that?
23        A    I think so, yes.
24        Q    Does that help refresh your memory as
25   to when you formed the corporation?
```

Eladio Bonilla Ramos - June 01, 2021

20

                    E. Bonilla Ramos

1

2      A    No.

3      Q    Do you have any reason to believe that

4  that is not correct?

5      A    It is that I just don't remember

6  exactly so I can't tell you yes or no.

7      Q    It lists you as the Chief Executive

8  Officer; do you see that?

9      A    Yes.

10     Q    Was there ever any other person who

11  was involved in your company Bonilla Ramos

12  Delivery Incorporated?

13     A    No.

14     Q    Why did you form this corporation?

15     A    Because they asked me to do so so that

16  I can do delivery.

17     Q    Who asked you?

18     A    The company where I was working.

19     Q    What is the name of the company, sir?

20     A    It would have to be the company that

21  you represent.

22     Q    Why do you believe that?

23     A    Because they were asking that of all

24  the drivers.

25     Q    Did you retain an accountant to help

Eladio Bonilla Ramos - June 01, 2021

21

E. Bonilla Ramos

1

2    set the company up?

3        A    I don't exactly remember.

4        Q    But HDL did not set it up for you;

5    right?

6        A    No, I think, no.

7        Q    How did you learn about the

8    independent contractor opportunity with HDL?

9        A    Because there were some friends that

10   worked there.

11       Q    Who was that?

12       A    There were guys who were independent

13   but they worked for a driver.

14       Q    Do you recall their names?

15       A    His name was, I think his name was, I

16   don't remember very well because it's been too

17   long.

18       Q    I take it that your friends said it

19   was a good place to work?

20           MR. WEBER:   Objection.

21       A    He didn't tell me anything. He just

22   told me that they were hiring people there.

23       Q    Why was the work attractive to you?

24           MR. WEBER:   Objection. Lack of

25           foundation.

Eladio Bonilla Ramos - June 01, 2021

22

1        E. Bonilla Ramos

2        A      Because they said that they paid well

3    but at the end of it all it was not correct what

4    they were saying.

5        Q      So the reason that you applied for

6    work there was because of the pay?

7        A      Yes, I think so because if you're

8    going to, yes, that is true, yes.

9        Q      And you were driving for Sears at the

10   beginning; correct?

11       A      What do you mean for Sears?

12       Q      Were you delivering Sears products?

13       A      That is right. The washers, the

14   delivery that I did was for Sears.

15       Q      Were you still driving when ever Sears

16   changed its name or the entity changed to

17   Innovel?

18       A      I don't understand Innovel very well.

19       Q      No problem.  We will just move on.

20             You drove primarily out of the Syosset

21   location; is that correct?

22       A      Yes.

23       Q      Did you drive at any other HDL

24   location?

25       A      Let me see, no, I don't remember. I

Eladio Bonilla Ramos - June 01, 2021

23

1           E. Bonilla Ramos

2    don't think so.

3        Q     Do you recall driving a couple of

4    weeks in Buffalo?

5        A     Oh yes, yes, that is true.

6        Q     Did you ever drive in Rochester?

7        A     Rochester, I don't remember, but I did

8    go to Buffalo.

9        Q     Did you ever make deliveries outside

10   of New York?

11       A     What is the question you're asking?

12   Doing deliveries from Syosset to another state?

13       Q     Yes, did you ever take product from

14   Syosset and deliver it across state line?

15       A     No.

16       Q     Did you ever initiate work outside of

17   New York?

18       A     No.

19       Q     Were you familiar with any other

20   drivers based in Buffalo or Rochester?

21       A     No, because I was not there very long.

22   Buffalo I was there only two weeks I think.

23       Q     What about Syosset, were you familiar

24   with any of the other trucking companies based

25   there?

Eladio Bonilla Ramos - June 01, 2021

24

E. Bonilla Ramos

1

2      A     Yes, there were other companies but I

3    don't remember what the names of those other

4    companies were.

5      Q     I take it you didn't stay in touch

6    with any of the other drivers at Syosset?

7      A     Almost no.

8      Q     Are you familiar with the named

9    plaintiffs in this case, Mike Kloppel and Adam

10   Wilson?

11     A     Aaron Wilson or Angel Wilson?

12     Q     Adam Wilson?

13     A     Did he work in Syosset.

14     Q     He may have driven there. He was not

15   based there?

16     A     No, then no, I don't remember him.

17     Q     Before you formed Bonilla Ramos

18   Delivery Incorporated did you have any

19   transportation experience with other companies?

20     A     What do you mean another company?

21     Q     Did you ever drive for another company

22   besides HDL delivering appliances?

23     A     No, I don't remember.

24     Q     Do you recall driving for a company

25   called Niatco Trucking?

Eladio Bonilla Ramos - June 01, 2021

25

E. Bonilla Ramos

1

2      A      Oh yes, yes, I was working with them.

3   Yes, that is true.

4      Q      You were a contractor with them?

5      A      Yes, but before I worked for them.

6      Q      So before you became a driver for

7   Bonilla Ramos Delivery Incorporated you were

8   driving as a contractor for Niatco Trucking?

9      A      Yes.

10     Q      And you delivered appliances?

11     A      Yes, that is correct.

12     Q      What is Capital Warehouse?

13     A      Capital Warehouse was the location

14   where I think where they would stage everything.

15     Q      So that was where you would pick up or

16   deliver the items for Niatco Trucking?

17     A      Yes, that is correct.

18     Q      So can you think of any other

19   companies where you may have been doing

20   commercial driving?

21     A      I don't remember.

22     Q      The motor vehicle accident that you

23   mentioned that became a lawsuit that was while

24   you were delivering for Niatco Trucking?

25     A      Yes.

26

1          E. Bonilla Ramos

2      Q      What was the reason why you quit

3  driving in 2015?

4      A      Because they didn't pay very well and

5  they were not giving me much work. They were not

6  giving me enough days. It was not enough work. In

7  other words, it was not enough money for me to

8  continue to pay for the insurance. The honest

9  truth is they didn't pay what they were suppose

10  to pay.

11      Q      Are you still owed money?

12      A      I don't know what to say because

13  sometimes they would not pay for the stops I was

14  suppose to make.

15      Q      Do you remember the name of account

16  executive that you dealt with at Syosset?

17      A      Yes, I think his name was Andrew

18  Wilson.

19      Q      Any other managers or account

20  executives that you can recall?

21      A      There was another one named Joshua and

22  then there was another one named Chris, Chris I

23  don't remember his last name. But Chris wouldn't

24  be there in the office.

25      Q      Do you know what Chris did?

Eladio Bonilla Ramos - June 01, 2021

27

E. Bonilla Ramos

1

2     A     I think he was the Manager of all the

3     different locations I think. I don't know

4     exactly.

5     Q     Since Bonilla Ramos Delivery

6     Incorporated was formed have you always owned all

7     of that company?

8     A     No.

9     Q     Was the business address for your

10    company different from your home address?

11    A     My home address, yes.

12    Q     Have you had any ownership interest in

13    any other businesses besides Bonilla Ramos

14    Delivery Incorporated?

15    A     No, not for now.

16    Q     Other than Chief Executive Officer did

17    you have any other job title for your company?

18    A     No.

19    Q     How many individuals worked for

20    Bonilla Ramos Delivery Incorporated?

21    A     At first Will Bonilla drove with me

22    and then I had another driver driving with me, I

23    don't remember his name, because I had another

24    truck but since there was not enough business I

25    took the other truck out.

28

1        E. Bonilla Ramos

2        Q    Let me break that down a little bit.

3            You were operating up to two trucks;

4    is that right?

5        A    Yes, but it was not for very long.

6        Q    While you had two trucks you had at

7    least one other driver that was an employee of

8    Bonilla Ramos Delivery?

9        A    Yes, but like let me repeat, it was

10   not very long.

11       Q    Not at the same time but at different

12   points in time you had two different individuals

13   that you employed for that role?

14       A    Yes.

15       Q    Do you recall their names?

16       A    I remember Will Bonilla but I don't

17   remember the other one.

18       Q    Do you recall someone named Junis

19   Barrios?

20       A    Yes, I remember him, a little thin

21   guy, Junis.

22       Q    What about Roger Romero?

23       A    I don't remember Roger Romero. Roger

24   Romero, no, I don't remember him.

25       Q    Is Will Bonilla related to you?

Eladio Bonilla Ramos - June 01, 2021

29

1                    E. Bonilla Ramos

2        A    Yes.

3        Q    In what way?

4        A    Like family but like distant family,

5   like third cousin or something like that.

6        Q    Was Will Bonilla a driver or a helper?

7        A    Helper.

8        Q    Can you recall any other helpers that

9   your company employed?

10       A    The truth is I don't really remember.

11  Perhaps there were others that worked there but I

12  think they might have only worked there a few

13  days and then they left. I don't know.

14       Q    How did you decide to hire more

15  drivers or helpers?

16       A    Because they told me they were going

17  to give me another truck to drive but from what I

18  can see they were not giving me the necessary

19  days that I needed to be able to pay for my

20  expenses and the insurances.

21       Q    So from your perspective it was not

22  profitable for you to operate that second truck?

23           MR. WEBER:   Objection.

24       A    That is correct.

25           MS. QUILLEN:  Sir, we have been going

Eladio Bonilla Ramos - June 01, 2021

30

1              E. Bonilla Ramos

2         for almost an hour. Let's take a five

3         minute break for just comfort and we

4         will go off the record.

5         VIDEOGRAPHER:   We are going off the

6         record at 3:22.

7         VIDEOGRAPHER:   This meeting is being

8         recorded. The time is 3:35 and we are

9         back on the record.

10    Q     Mr. Bonilla Ramos, we are back on the

11    record and you're still under oath; do you

12    understand that?

13    A     Yes.

14    Q     Before we took our break we were

15    speaking about drivers and helpers that were

16    employed by Bonilla Ramos Delivery; do you recall

17    that testimony?

18    A     Yes.

19    Q     During the time period when you were

20    operating two trucks is it correct that the most

21    employees that you had were four at that time?

22    A     Yes, that is correct. Yes, but they

23    would not give us many days. Sometimes one truck

24    would work, the other one would not work.

25    Sometimes I would have to be in one, have to be

1          E. Bonilla Ramos

2    in the other because they would give me one truck

3    and not the other.

4          Q    Is it correct that the fewest number

5    of employees that Bonilla Ramos Delivery had were

6    two at any one time?

7          A    It could be two or three or four like

8    I mentioned because of the other truck but as I

9    mentioned sometimes the other truck worked and

10   sometimes it didn't work so I couldn't tell you

11   exactly.

12         Q    Did you own both of those trucks?

13         A    Yes.

14         Q    What kind of trucks were they?

15         A    I had a Hino and a GMC.

16         Q    Were they both box trucks?

17         A    Yes.

18         Q    Do you recall when you purchased those

19   trucks?

20         A    No, not the year exactly.

21         Q    Do you recall when you sold them?

22         A    After I finished working for the

23   company that she represents.

24         Q    In 2015 when you quit driving for HDL

25   that is you still owned both of those trucks?

Eladio Bonilla Ramos - June 01, 2021

32

E. Bonilla Ramos

1

2      A     Yes.

3      Q     When you started driving for HDL did

4   you own both of those trucks?

5      A     I had one then I bought the other.

6      Q     When you bought the second truck was

7   that around the same time when you hired the

8   second driver?

9      A     Yes, something like that.

10     Q     Did Bonilla Ramos Delivery have its

11  own business banking account?

12     A     Yes.

13     Q     Do you recall when you opened that

14  banking account?

15     A     No.

16     Q     Is it still open?

17     A     No.

18     Q     Did you deposit all of the payments

19  that HDL paid to Bonilla Ramos Delivery into that

20  account?

21     A     Yes.

22     Q     Did Bonilla Ramos Delivery earn income

23  from any source other than HDL between the years

24  2008 and 2015?

25     A     That I remember, no.

Eladio Bonilla Ramos - June 01, 2021

33

E. Bonilla Ramos

1

2     Q     What about you individually did you

3     work for any other company?

4     A     Yes, I believe I worked with another

5     person that did delivery of piping but I don't

6     remember if it was while I was still working for

7     their company or afterwards.  I don't remember.

8     Q     Did you say piping like for gas, gas

9     pipes?

10    A     No, it was like things for plumbing.

11    Q     You were operating a commercial

12    vehicle?

13    A     Yes.

14    Q     Do you recall the name of the company

15    or the person you worked for?

16    A     Yes, but it was not for very long. I

17    only did it one day a week, maybe ten, 15 times,

18    not a lot of times.

19    Q     Were you an employee or just a

20    contractor?

21    A     Contractor.

22    Q     How did Bonilla Ramos Delivery pay

23    you?

24    A     How?  I don't understand the question.

25    I don't know what.

Eladio Bonilla Ramos - June 01, 2021

34

1          E. Bonilla Ramos

2     Q     So you deposited payments from HDL

3   into the business bank account for Bonilla Ramos

4   Delivery; is that right?

5     A     Correct.

6     Q     Did you pay yourself from that same

7   bank account?

8     A     Yes, I did it. Yes, I did it that way,

9   yes.

10    Q     Did you have a set number that you

11  paid yourself?

12    A     Not exactly.

13    Q     Could you explain how you paid

14  yourself?

15    A     Well the accountant she took care of

16  that for me because basically when I needed

17  something I would take the money from there but

18  then my accountant she would break it all down

19  for me.  Basically she would ask me how much I

20  would make a year and how much was I taking out

21  from the company.

22    Q     So did you run your personal expenses

23  through the same business account?

24    A     We can say something like that.

25    Q     But it wasn't a salary, a set amount

Eladio Bonilla Ramos - June 01, 2021

35

1              E. Bonilla Ramos

2      that you took out?

3          A     No.

4          Q     Did the amount that you spent for your

5      personal expenses from that bank account depend

6      on how much money the company made that week?

7          A     I don't remember exactly.

8          Q     Do you recall how frequently you took

9      draws from that bank account?

10         A     No, I don't remember. I don't remember

11     exactly.

12         Q     You have looked for but then unable to

13     find any of those records relating to that

14     business bank account?

15         A     If I checked the bank records, is that

16     what you're asking?

17         Q     Did you check for those records?

18         A     Where, at the bank?

19         Q     Anywhere?

20         A     I searched for them but I didn't find

21     them but not through the bank.

22         Q     So you checked your records at home

23     but didn't find them?

24         A     Yes, exactly.

25         Q     Do you recall who your accountant was

Eladio Bonilla Ramos - June 01, 2021

36

E. Bonilla Ramos

1

2  at this time?

3      A     She would do my taxes. She is in

4  Westbury. She lives in Westbury.

5      Q     Do you recall the amount that you

6  would have taken in any year for your personal

7  payments from Bonilla Ramos Delivery?

8      A     No, I don't remember.

9      Q     Other than those bank accounts or your

10  accountant records are you aware of any other

11  place where you can find that information?

12      A     No.

13      Q     Did you pay your drivers and helpers

14  from that business bank account?

15      A     Yes, that is correct.

16      Q     Did you pay them by check or cash?

17      A     Check.

18      Q     How frequently?

19      A     Every week.

20      Q     What amount did you pay?

21      A     I don't remember the amount that I

22  would pay them because it was different based on

23  what they would work.

24      Q     Did you pay them a percentage of what

25  HDL paid your company?

Eladio Bonilla Ramos - June 01, 2021

37

                    E. Bonilla Ramos

1

2      A     No, I would pay the correct minimum

3    salary.

4      Q     So you paid an hourly rate?

5      A     We can say that.

6      Q     Did you give them a W-2 at the end of

7    the year or a 1099?

8      A     I don't remember.

9      Q     Was that handled by your accountant?

10     A     It seems that she would do it with the

11   checks she would do it at the end of the year.

12     Q     Would you say that the amount that you

13   took from the business bank account was according

14   to the amount of work that you did for the

15   company?

16     A     No, because there were times where we

17   would get home very late at night they would give

18   us a lot of deliveries but it was not sufficient

19   what they would pay me and that is the reason why

20   I left.

21     Q     Did you advertise your business

22   anywhere?

23     A     I don't understand that question.

24     Q     When you needed to hire a driver or a

25   helper did you ever advertise the job posting?

Eladio Bonilla Ramos - June 01, 2021

38

1          E. Bonilla Ramos

2     A     No.

3     Q     How did you locate the drivers and

4  helpers when you needed to hire one?

5     A     Sometimes through acquaintances.

6     Q     Any other way?

7     A     Or I would ask if anybody needed work.

8     Q     Did you ever advertise your delivery

9  services to any other company?

10     A     No.

11     Q     On days that you were not operating --

12     A     No, because at that time we were only

13  working for the company that she represents.

14     Q     On the days that you were not driving

15  for HDL did you drive for any other purpose with

16  your truck?

17     A     No, because they would not tell us

18  which days they would give us delivery.

19     Q     Did you have business cards for your

20  company?

21     A     No.

22     Q     Did Bonilla Ramos Delivery

23  Incorporated appear on the company's trucks?

24     A     Yes.

25     Q     Where on the truck?

Eladio Bonilla Ramos - June 01, 2021

39

1              E. Bonilla Ramos

2        A     On the side of the trucks.

3        Q     On like the door?

4        A     No, on the box.

5        Q     Was it painted?

6        A     It was like stickers.

7        Q     Did you have logos on your shirts for

8    Bonilla Ramos Delivery?

9        A     No.

10       Q     Did you have hats or any other items

11   that you wore that had your company name on it?

12       A     They would not allow us to put our

13   name.

14       Q     Who is they?

15       A     The company that we worked for.

16       Q     Did you wear any items that said HDL

17   on them?

18       A     Like, like what?

19       Q     Clothing items?

20       A     We wore the shirt that they gave us at

21   Sears a shirt that said Sears.  That is what the

22   shirt said.

23       Q     Did your company pay for that shirt?

24       A     We would pay for those shirts. We

25   would buy them there. And then they gave us other

Eladio Bonilla Ramos - June 01, 2021

40

E. Bonilla Ramos

1

2    shirts that said Home Delivery Experts and we

3    paid for those shirts also.

4        Q    When you hired a driver or a helper

5    you would pay for their clothing items?

6        A    I would pay for it, yes.

7        Q    Did you have a set number of days that

8    you worked per week?

9        A    No, I didn't have set days.

10       Q    Every week was different?

11       A    That is correct.

12       Q    Was there a certain time that you

13   started each day?

14       A    We had a start time but we didn't have

15   an end time.

16       Q    Was that the time that you needed to

17   be at the warehouse to pick up the Sears items?

18       A    Repeat that.  I didn't hear that too

19   well.

20       Q    Was that time where you needed to pick

21   up the items from the warehouse for Sears?

22       A    Yes, that is the time they would tell

23   us the time the arrival time we would arrive at

24   5:00 in the morning but we didn't have any end

25   time.

Eladio Bonilla Ramos - June 01, 2021

41

1          E. Bonilla Ramos

2      Q      Was that time set by Sears?

3      A      Probably because we worked for the

4   company that she represents they told us to

5   arrive at that time.

6      Q      That is your testimony that HDL told

7   you to arrive at that time?

8      A      Yes, because they were not our bosses.

9   Sears didn't tell us anything. The one who paid

10  us was the company HDL.

11     Q      How did you find out if you were

12  scheduled for deliveries?

13     A      They would let us know a day ahead in

14  the afternoon when we would get there and if not

15  they would call us.

16     Q      Who would call?

17     A      HDL.

18     Q      Did you have the ability to say you

19  didn't want to drive the next day?

20     A      No, we couldn't say that. If we said

21  no sometimes they would tell us okay you don't

22  have any more work here then.  So we really

23  couldn't, we couldn't say no.

24     Q      Who told you that?

25     A      The supervisors there, primarily

42

1            E. Bonilla Ramos

2    supervisor named Daniel Wilson.

3        Q      Did you have the ability to decide to

4    not personally work the next day if you had a

5    driver that was available?

6        A      Repeat the question.

7        Q      If HDL only needed one truck could you

8    have your other driver operate instead of

9    yourself?

10       A      In that, yes.

11       Q      When you would arrive would you

12   receive a manifest?

13       A      Yes.

14       Q      The manifest would show the number of

15   stops that the truck would have for the day?

16       A      Yes, that is right.

17       Q      You can take those stops in any order?

18           MR. WEBER:    Objection to the form.

19       A      No, because each stop was scheduled

20   for an hour and each stop we would have to arrive

21   by that hour. They wanted everything in order.

22       Q      So Sears customers expected their

23   delivery within a window of time?

24       A      Yes, I think that is how it was but I

25   am not sure if it was the client or they were the

1          E. Bonilla Ramos

2    ones that determined the orders like that.

3          Q      Were you ever able to take an order

4    out of sequence that was on the manifest?

5          A      That I remember, no, or, not that I

6    remember.

7          Q      If you arrived and the customer was

8    not at home could you reschedule?

9          A      We would have to call customer

10   service. Customer service would have to give us a

11   number, a code, so we can continue on our route.

12         Q      The number for customer service was

13   that Sears?

14         A      I think so.

15         Q      What was the reason other than

16   customer service for you to interact with Sears

17   while you were making deliveries?

18         A      No, I don't understand the question.

19         Q      Other than the inability to make your

20   delivery to a customer were there any other

21   reasons why you would contact Sears customer

22   service during the day?

23         A      No, only if the client was not at home

24   or if the client had rescheduled.

25         Q      Were there any reasons for you to

Eladio Bonilla Ramos - June 01, 2021

44

1          E. Bonilla Ramos

contact HDL while you were out making deliveries?

2

3       A    I don't think so.

4       Q    If you were ahead of scheduled were

5    you allowed to call a customer to see if they

6    would accept a delivery earlier than what was

7    shown on a manifest?

8       A    Yes, I think so.

9       Q    Would you have to contact Sears

10   customer service before you did that?

11      A    No, all we had to do was call the

12   client.

13      Q    That information was on the manifest?

14      A    Uh-huh, the order that we arrived, the

15   order that we leave.

16      Q    And the phone number for the customer?

17      A    It was on the manifest on the list.

18      Q    Did you ever lease a truck while you

19   were operating for HDL?

20      A    I don't think so.

21      Q    When you operated in Buffalo did you

22   take one of your two trucks there?

23      A    Oh yes, yes, that is true, that is

24   true, I remember I rented a truck.

25      Q    When you drove in Buffalo you rented a

45

1           E. Bonilla Ramos

2    truck specifically for that purpose?

3       A    Yes.

4       Q    What was the reason why you operated

5    in Buffalo for a couple of weeks?

6       A    Because the supervisor the boss Chris

7    needed people in Buffalo.

8       Q    Did you have a truck continue to

9    operate in Syosset during those weeks?

10      A    I don't think so. I am not too sure

11   but no.

12      Q    Did Chris offer you higher rates if

13   you would work in Buffalo?

14      A    He told me he would pay me for the

15   day.

16      Q    Is that how you usually got paid in

17   Syosset?

18      A    No, in Syosset they would pay me per

19   stop.

20      Q    Did you end up making more in Buffalo

21   than you would have if you stayed in Syosset

22   those weeks?

23      A    What was that?

24      Q    Did you end up making more in Buffalo

25   for the two weeks that you worked there than if

Eladio Bonilla Ramos - June 01, 2021

46

1          E. Bonilla Ramos

2    you would have stayed in Syosset?

3          A     I don't think so because between my

4    renting the truck and what I spent in gas because

5    of Buffalo we would run do a lot more runs so I

6    think we can say that it was not much that I

7    made.

8          Q     Your company paid for the insurance

9    for your two trucks; is that right?

10         A     Yes, me, yes, that is correct.

11         Q     Insurance for the individuals workers'

12   compensation did you have anything like that that

13   covered your workers?

14         A     Yes, I had workman's comp insurance.

15         Q     And your company paid for that?

16         A     That is correct.

17         Q     Did you have a cell phone that you

18   used during work?

19         A     Yes.

20         Q     Was that paid for by your company?

21         A     I would pay that, the company.

22         Q     Did you have a note on your two trucks

23   or did you buy them outright?

24         A     No, hold on, the Hino I was paying,

25   how do you call that, I got from a dealer I was

47

1              E. Bonilla Ramos

2    paying a dealer.

3        Q      The GMC you paid outright for?

4        A      Yes, I paid for it.

5        Q      Both the purchase of the truck and

6    then the payments that you were making to the

7    dealership those were all run through the

8    business bank account through your company?

9        A      I think so, yes, yes.

10       Q      The expenses were maintained?

11       A      But I was paying for it while I was

12   working for Niatco Truck.  When I was working for

13   Sears I don't remember if I was still making

14   payments.  I don't remember.

15       Q      So you had the Hino before you started

16   working for HDL?

17       A      That is correct.

18       Q      And then all of the maintenance for

19   your two trucks those were paid for by your

20   company?

21       A      Yes.

22       Q      Tires, oil changes, breakdowns?

23       A      Yes.

24       Q      All of the gas while you were

25   operating the truck?

Eladio Bonilla Ramos - June 01, 2021

48

1          E. Bonilla Ramos

2      A     Yes.

3      Q     Other than expenses for shirts that

4  you purchased that said Sears on them can you

5  recall any other expenses that were deducted from

6  your settlement from HDL?

7      A     They would deduct also if we had a

8  small claim like a small damage or anything they

9  would deduct that as well.

10     Q     The deduction for those damages those

11 damage could have been caused by one of your

12 drivers; is that right?

13     A     Uh-huh, yes, yes.

14     Q     Rather than charge the driver or the

15 helper for those damages those were expenses that

16 you paid for through your company?

17     A     Yes, I would pay for them.

18     Q     If you caused the damage it also would

19 be paid for by the company?

20     A     Yes, yes.

21          Could you repeat the question?  Are

22 you saying if I damaged something would I have to

23 pay for it, is that what you're saying?

24     Q     Yes, did you personally pay for it or

25 is that something that you paid for through your

Eladio Bonilla Ramos - June 01, 2021

49

1          E. Bonilla Ramos

2    business bank account?

3          A    No, like if there was a claim they

4    would deduct that from your paycheck.  For

5    instance, if there was damage to a refrigerator

6    they would deduct that from your check.

7          Q    It was just that much less that would

8    be deposited into your business bank account?

9          A    No, they would sometimes deduct like

10   $50 a week or something a check that they would

11   pay me, like for instance, depending on the size

12   of the damage or the claim.  One time there was a

13   claim that they charged me for for a leak to a

14   refrigerator and they charged me $5,000 for that

15   claim and they were just deducting that little by

16   little off the checks they were giving me.

17         Q    Do you recall receiving a weekly

18   settlement statement from HDL?

19         A    Yes, they would give me a check every

20   week.  I think if I recall every week they would

21   give me a check.

22         Q    With your check you would get a

23   statement to show how many stops had been

24   completed and were being paid?

25         A    Exactly, yes, exactly but sometimes I

Eladio Bonilla Ramos - June 01, 2021

50

```
1         E. Bonilla Ramos
2   would complain that they would not put all the
3   stops that I had done.
4         (Whereupon, Defendant's Exhibit 1,
5         HomeDeliveryLink Delivery Settlement
6         Statement, 1 page, was marked for
7         identification.)
8    Q     I am showing you what has been marked
9   Exhibit 1. Can you see a spreadsheet, sir?
10   A     Yes.
11   Q     Now this is an electronic file that
12   you would have received a paper copy with your
13   check that would have looked like this; right?
14   A     Correct.  I don't remember. I just
15   remember that I received a check. I don't
16   remember if there was a stub associated.
17   Q     Does this Exhibit 1 look familiar to
18   you?
19   A     Yes, it seems to be, yes.
20   Q     So this is titled Delivery Settlement
21   Statement; do you see that at the top?
22   A     Uh-huh.
23   Q     Is that a yes?
24   A     I don't, it seems to be, yes.
25   Q     This is a record that relates to week
```

Eladio Bonilla Ramos - June 01, 2021

51

1          E. Bonilla Ramos

2    ending June 21, 2014; do you see that?

3        A    Uh-huh.

4        Q    Is that a yes?

5        A    It seems to be.  It appears to be that

6    way, yes, I think it is correct but I am not sure

7    exactly if that is what that is.

8        Q    I know its been a while since you have

9    driven for HDL and this record is from 2014.

10         You have not been able to locate any

11   records relating to that time; correct?

12       A    Yes, that is right.

13       Q    So this is a record that HDL has been

14   able to locate relating to this leak.

15         Do you have any reason to believe that

16   this record is not accurate?

17       A    I honestly I just don't remember. Do

18   you understand?

19       Q    I am not asking you to remember

20   everything that is on this record.

21         I am just asking as you sit here today

22   can you think of any reason why HDL's records

23   would not be accurate?

24       A    I wouldn't be able to tell you

25   regarding the statement. I wouldn't be able to

Eladio Bonilla Ramos - June 01, 2021

52

1          E. Bonilla Ramos

2    tell you anything regarding the statement. I

3    wouldn't be able to say regarding this statement,

4    I don't know.

5          Q     This record shows you working every

6    single day of the week of June 21, 2014.

7               Are you saying that you can't verify

8    that?

9               MR. WEBER:   Objection.

10         A     No, I don't have any record right now,

11   no.

12         Q     And you're not sure if that is

13   correct?

14         A     Yes, that is right.  I am not sure.

15         Q     HDL's records may not accurately

16   reflect the days that you personally worked?

17              MR. WEBER:   Objection. You can

18              answer.

19         A     What was that?  I didn't understand. I

20   didn't hear what you said.

21         Q     You didn't hear my question or you

22   didn't hear what your counsel said?

23         A     I don't know what they said, nothing,

24   no one.  I didn't hear nothing that no one said.

25              (Whereby, the requested portion was

Eladio Bonilla Ramos - June 01, 2021

53

1          E. Bonilla Ramos

2          read back by the reporter.)

3      A     Oh, I wouldn't know.  I wouldn't be

4   able to tell you that because I don't have any

5   proof.

6      Q     Sir, I am directing your attention to

7   Exhibit 1 the spreadsheet.  I just want to ask

8   you some questions about it.

9          Now it says that there were some

10  completed stops the week of June 21, 2014.

11         Was your company paid by the stop, a

12  set amount, a flat rate?

13         MR. WEBER:   Objection. Misleading.

14     Q     You can answer the question.

15     A     I think it doesn't.

16     Q     How were you paid by HDL?

17     A     Could you repeat the question again

18  because I am an little confused with the question

19  you made. Can you please repeat it.

20     Q     You were not paid by the hour;

21  correct?

22     A     No, they always paid per stop.

23     Q     And so a settlement statement like

24  this would have shown you the stops that you were

25  getting paid for; is that right?

Eladio Bonilla Ramos - June 01, 2021

54

|     |                                                    |
| --- | -------------------------------------------------- |
| 1   | E. Bonilla Ramos                                   |
| 2   | A    Uh-huh, that is correct.                      |
| 3   | Q    The day on the settlement sheet with          |
| 4   | the most stops is the Sunday with 18; do you see   |
| 5   | that?                                              |
| 6   | A    Uh-huh, yes.                                  |
| 7   | Q    There is also the same day when you           |
| 8   | had the most pay for completed deliveries because  |
| 9   | it was per stop that you were paid?                |
| 10  | A    But I don't remember if I did all of          |
| 11  | those stops.                                       |
| 12  | Q    Okay, so even though it says that             |
| 13  | you're the driver on the settlement statement you  |
| 14  | are not sure if you completed all 18 of those      |
| 15  | stops?                                             |
| 16  | MR. WEBER:   Objection.  Misstating                |
| 17  | his testimony.                                     |
| 18  | A    That is why I don't understand the            |
| 19  | question. That is why I am a little confused. I    |
| 20  | am confused had with the question you're asking.   |
| 21  | Q    So you stated that you were not sure          |
| 22  | if you completed all of the deliveries for those   |
| 23  | 18 stops; is that right?                           |
| 24  | MR. WEBER:   Objection.                            |
| 25  | A    I don't remember. I don't remember how        |

Eladio Bonilla Ramos - June 01, 2021

55

1           E. Bonilla Ramos

2    could I remember.

3       Q     This record shows you as the driver

4    but you're saying that that may not be accurate?

5           MR. WEBER:    Objection.

6       A     I don't know what to tell you.

7       Q     Is there something specific about my

8    question that you are not understanding, sir?

9       A     The paper that they gave me that is

10   how they were paid but I couldn't tell you

11   whether it was yes or no.

12      Q     You're not sure if you completed those

13   18 stops that are shown on this Exhibit 1?

14           MR. WEBER:    Objection. Misstating his

15           testimony.

16      A     The question that you're asking me is

17   that you're saying I am not sure.  Of course I am

18   not sure because it's been a long time.

19      Q     And you're not sure that this record

20   is correct?

21           MR. WEBER:    Objection. Misstating his

22           testimony again. Asked and answered.

23      A     Repeat again what you said.

24           (Whereby, the requested portion was

25           read back by the reporter.)

1          E. Bonilla Ramos

2     A     Exactly, I don't know. I wouldn't be

3   able to tell you because its been a long time.

4     Q     Sir, do you need to take a break?

5     A     Yes, please.

6          VIDEOGRAPHER:    The time is 4:30 and

7          we are going off the record.

8          VIDEOGRAPHER:  This meeting is being

9          recorded. It is 4:44 and we are back

10         on the record.

11         MS. QUILLEN:  I pass the witness.

12         MR. WEBER:    I have a couple of

13         followup questions.

14   EXAMINATION BY

15   MR. WEBER:

16     Q     When you had one truck on the road

17   generally would you drive the truck?

18     A     Yes.

19     Q     And is that because you would make no

20   money if you paid someone else to drive your

21   truck?

22         MS. QUILLEN:  Objection.  Leading.

23     A     Yes, that is correct.

24     Q     Earlier I believe one of the questions

25   was whether you owned all of your trucking

Eladio Bonilla Ramos - June 01, 2021

57

E. Bonilla Ramos

1        company and your answer was no.

2

3               Did anyone else have an ownership

4        interest in the trucking company?

5        A     No, just me.

6        Q     We ended with a lot of questions about

7        your pay stub from Miss Quillen and you said you

8        couldn't remember --

9               Let me back up.

10              Generally when you got your pay stub

11       if it said that you had made for example 18 stops

12       on one day was that accurate?

13       A     No, I don't remember.  Its been too

14       long.  I wouldn't know what to tell you. The

15       honest truth is I don't remember.

16       Q     You don't remember whether on the day

17       that the pay check we were looking at whether you

18       actually made 18 stops; is that correct?

19       A     I do not remember.

20       Q     But when you worked for HDL and when

21       you got your pay stub at the end of the week in

22       general if the pay stub said you drove seven days

23       a week or five days a week or what ever the pay

24       stub said would that generally speaking be

25       accurate?

58

1            E. Bonilla Ramos

2            MS. QUILLEN:  Objection.  Leading.

3      A     Well, I think so.

4            MR. WEBER:  That is all I have.

5            MS. QUILLEN:  No further questions.

6            VIDEOGRAPHER:    The time is 4:48.

7            This concludes the deposition.

8             (Time noted: 4:48 p.m.)

9

10

11                  ELADIO BONILLA RAMOS

12

13      Subscribed and sworn to before me

14      this      day of              , 2021.

15

16

17                  NOTARY PUBLIC

18

19

20

21

22

23

24

25

59

1          E. Bonilla Ramos

2     --------------- EXHIBIT INDEX-----------------

3     WITNESS            EXAMINATION BY    PAGE

4     ELADIO BONILLA RAMOS MS. QUILLEN        7

5               MR. WEBER        56

6

7     ------------------ EXHIBITS------------------

8     DEFENDANT'S     PAGE

9     Exhibit 4,      18   Department of State,

10               Existing Corporations and

11               Businesses, Corporation &

12               Business Entity Database

13               Search, 3 pages

14    Exhibit 1,      50   HomeDeliveryLink Delivery

15               Settlement Statement, 1 page

16

17      "INFORMATION/DOCUMENTATION REQUEST INDEX"

18

19    -------------- DOCUMENT REQUEST --------------

20               -NONE-

21    --------- INFORMATION TO BE FURNISHED --------

22               -NONE-

23    ----------------- RULINGS --------------------

24               -NONE-

25                  oOo

Eladio Bonilla Ramos - June 01, 2021

60

1        E. Bonilla Ramos

2          CERTIFICATION

3    STATE OF NEW YORK  )
                        )  ss.:
4    COUNTY OF NEW YORK )

5

6          I, LAURA B. LOWENTHAL, a Notary

7    Public within and for the State of New York, do

8    hereby certify:

9          That ELADIO BONILLA RAMOS the

10   witness(es) whose deposition(s) is(are)

11   hereinbefore set forth, was(were) duly sworn by

12   me and that such deposition(s) is(are) a true and

13   accurate record of the testimony given by such

14   witness(es).

15          I further certify that I am not

16   related to any of the parties to the action by

17   blood or marriage; and that I am in no way

18   interested in the outcome of this matter.

19          IN WITNESS WHEREOF, I have

20   hereunto set my hand this 1st day of June, 2021.

21

22   _____

23          LAURA B. LOWENTHAL

24

25

## $

**$5,000** 49:14

**$50** 49:10

## 1

**1** 6:4 50:4,6,9,17 53:7 55:13

**1099** 37:7

**11590** 7:17

**15** 33:17

**18** 54:4,14,23 55:13 57:11,18

**19** 19:21

**1993** 15:10

**1994** 10:19

## 2

**2000** 10:6

**2008** 12:16 15:18 32:24

**2009** 12:16 15:18

**2010** 11:21

**2012** 18:21,22 19:21

**2014** 51:2,9 52:6 53:10

**2015** 17:25 26:3 31:24 32:24

**2021** 6:5 58:14

**21** 51:2 52:6 53:10

**27th** 16:20

**2:33** 6:5

## 3

**3** 19:3

**3:22** 30:6

**3:35** 30:8

## 4

**4** 18:23

**4:30** 56:6

**4:44** 56:9

**4:48** 58:6,8

## 5

**532** 7:16 10:4

**5:00** 40:24

## 7

**70** 11:2

## 8

**80** 10:25 11:2

## 9

**90** 10:25

## A

**Aaron** 24:11

**ability** 9:25 41:18 42:3

**accept** 44:6

**accident** 11:15 13:6 25:22

**account** 26:15,19 32:11,14,20 34:3, 7,23 35:5,9,14 36:14 37:13 47:8 49:2, 8

**accountant** 18:15 20:25 34:15,18 35:25 36:10 37:9

**accounts** 36:9

**accurate** 51:16,23 55:4 57:12,25

**accurately** 52:15

**acquaintances** 38:5

**active** 18:13

**Adam** 24:9,12

**address** 7:15 10:3,11,14 27:9,10,11

**advertise** 37:21,25 38:8

**advising** 13:24

**afternoon** 41:14

**agreement** 8:15,18

**ahead** 41:13 44:4

**alcohol** 9:23

**allowed** 44:5

**amount** 34:25 35:4 36:5,20,21 37:12, 14 53:12

**Andrew** 26:17

**Angel** 24:11

**answers** 8:12

**appears** 51:5

**appliances** 24:22 25:10

**applied** 22:5

**approximately** 6:5

**arrival** 40:23

**arrive** 40:23 41:5,7 42:11,20

**arrived** 43:7 44:14

**Ash** 16:13,19

**attend** 15:24 16:2

**attended** 16:7

**attending** 15:25

**attention** 53:6

**attorney** 6:16 7:19 14:14,16

**attractive** 21:23

**aware** 36:10

**Aydaline** 6:9

## B

**back** 11:18 30:9,10 53:2 55:25 56:9 57:9

**bank** 34:3,7 35:5,9,14,15,18,21 36:9, 14 37:13 47:8 49:2,8

**banking** 32:11,14

**Bankruptcies** 13:13

**Barrios** 28:19

**based** 23:20,24 24:15 36:22

**basically** 34:16,19

**Bay** 15:25 16:2

**beginning** 6:14 22:10

**behalf** 6:11

**Benjamin** 6:20 8:3

**bit** 11:13 16:9 28:2

Eladio Bonilla Ramos - June 01, 2021

**BOCES** 16:9

**Bonilla** 6:4,22 7:13 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1,9 19:1,18 20:1,11 21:1 22:1 23:1 24:1, 17 25:1,7 26:1 27:1,5,13,20,21 28:1, 8,16,25 29:1,6 30:1,10,16 31:1,5 32:1,10,19,22 33:1,22 34:1,3 35:1 36:1,7 37:1 38:1,22 39:1,8 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1,11

**boss** 45:6

**bosses** 41:8

**bought** 32:5,6

**box** 31:16 39:4

**break** 9:10 28:2 30:3,14 34:18 56:4

**breakdowns** 47:22

**breaks** 9:13

**bring** 17:19

**Buffalo** 23:4,8,20,22 44:21,25 45:5, 7,13,20,24 46:5

**Building** 17:9,10

**business** 13:8 19:2 27:9,24 32:11 34:3,23 35:14 36:14 37:13,21 38:19 47:8 49:2,8

**businesses** 18:25 27:13

**buy** 39:25 46:23

**buying** 11:17

**C**

**call** 41:15,16 43:9 44:5,11 46:25

**called** 7:6 16:12 17:9 24:25

**Capital** 25:12,13

**car** 11:18 17:2,15,21

**cards** 38:19

**care** 34:15

**cars** 17:18

**case** 8:17 11:7 12:2 13:7,22 14:6,10 24:9

**cases** 13:11 14:7

**cash** 36:16

**caused** 48:11,18

**cell** 46:17

**changed** 22:16

**charge** 48:14

**charged** 49:13,14

**check** 35:17 36:16,17 49:6,10,19,21, 22 50:13,15 57:17

**checked** 35:15,22

**checks** 37:11 49:16

**Chief** 20:7 27:16

**Chris** 26:22,23,25 45:6,12

**civil** 11:14

**claim** 48:8 49:3,12,13,15

**classes** 15:25

**client** 13:25 42:25 43:23,24 44:12

**clothing** 39:19 40:5

**code** 43:11

**comfort** 30:3

**commercial** 15:12 18:5 25:20 33:11

**comp** 46:14

**companies** 23:24 24:2,4,19 25:19

**company** 16:12 17:7 18:8,11,15,17, 20 19:18 20:11,18,19,20 21:2 24:20, 21,24 27:7,10,17 29:9 31:23 33:3,7, 14 34:21 35:6 36:25 37:15 38:9,13,20 39:11,15,23 41:4,10 46:8,15,20,21 47:8,20 48:16,19 53:11 57:2,4

**company's** 38:23

**compensation** 46:12

**complain** 50:2

**complete** 15:7

**completed** 15:5 49:24 53:10 54:8, 14,22 55:12

**concludes** 58:7

**confused** 53:18 54:19,20

**construction** 16:23 17:2,5

**contact** 43:21 44:2,9

**continue** 18:13 26:8 43:11 45:8

**contract** 7:21

**contracting** 12:11

**contractor** 21:8 25:4,8 33:20,21

**conversation** 14:19

**copy** 50:12

**corporate** 18:20

**corporation** 18:13 19:2,25 20:14

**Corporations** 18:25

**correct** 7:22 12:12 18:2 19:20 20:4 22:3,10,21 25:11,17 29:24 30:20,22 31:4 34:5 36:15 37:2 40:11 46:10,16 47:17 50:14 51:6,11 52:13 53:21 54:2 55:20 56:23 57:18

**counsel** 52:22

**counsels** 6:12

**couple** 23:3 45:5 56:12

**court** 6:23 8:13,17

**cousin** 29:5

**covered** 46:13

**create** 8:13

**creating** 8:19

**criminal** 13:11

**current** 7:14 10:3,10

**customer** 43:7,9,10,12,16,20,21 44:5,10,16

**customers** 42:22

**cut** 18:15

**cutting** 17:6

**D**

**damage** 48:8,11,18 49:5,12

**damaged** 48:22

**damages** 48:10,15

**Daniel** 42:2

**Database** 19:2

**day** 19:22 33:17 40:13 41:13,19 42:4, 15 43:22 45:15 52:6 54:3,7 57:12,16 58:14

**days** 26:6 29:13,19 30:23 38:11,14, 18 40:7,9 52:16 57:22,23

**dealer** 46:25 47:2

**dealership** 47:7

**dealt** 26:16

Eladio Bonilla Ramos - June 01, 2021

**decide** 29:14 42:3

**deduct** 48:7,9 49:4,6,9

**deducted** 48:5

**deducting** 49:15

**deduction** 48:10

**defendant** 6:18

**Defendant's** 18:23 50:4

**deli** 11:17

**deliver** 23:14 25:16

**delivered** 25:10

**deliveries** 23:9,12 37:18 41:12 43:17 44:2 54:8,22

**delivering** 22:12 24:22 25:24

**delivery** 18:9 19:19 20:12,16 22:14 24:18 25:7 27:5,14,20 28:8 30:16 31:5 32:10,19,22 33:5,22 34:4 36:7 38:8,18,22 39:8 40:2 42:23 43:20 44:6 50:5,20

**Department** 18:24 19:9

**depend** 35:5

**depending** 49:11

**deposit** 32:18

**deposited** 34:2 49:8

**deposition** 6:3,10 11:25 14:13,23 15:2 58:7

**determined** 43:2

**directing** 53:6

**dispute** 11:8

**distant** 29:4

**divorce** 11:7

**divorced** 11:9

**document** 19:8,9

**documents** 12:18 13:2 14:22

**door** 39:3

**draws** 35:9

**drive** 16:17 17:18 18:6 22:23 23:6 24:21 29:17 38:15 41:19 56:17,20

**driven** 24:14 51:9

**driver** 16:15 21:13 25:6 27:22 28:7 29:6 32:8 37:24 40:4 42:5,8 48:14 54:13 55:3

**driver's** 15:13

**drivers** 20:24 23:20 24:6 29:15 30:15 36:13 38:3 48:12

**driving** 12:14 15:18,20 16:6,16,18 17:17,25 18:3,12 22:9,15 23:3 24:24 25:8,20 26:3 27:22 31:24 32:3 38:14

**drove** 12:19 18:4 22:20 27:21 44:25 57:22

**drugs** 9:23

**duly** 7:3,6

## E

**earlier** 44:6 56:24

**earn** 32:22

**eastern** 6:6

**education** 15:5

**El** 10:13,17,18 15:8 16:8

**Eladio** 6:4,22 7:13 58:11

**electronic** 50:11

**Emily** 6:16 7:18

**employed** 28:13 29:9 30:16

**employee** 28:7 33:19

**employees** 30:21 31:5

**end** 22:3 37:6,11 40:15,24 45:20,24 57:21

**ended** 57:6

**ending** 51:2

**English** 10:21,22 16:10

**entity** 19:2 22:16

**et al** 6:7

**EXAMINATION** 7:9 56:14

**examined** 7:7

**executive** 20:7 26:16 27:16

**executives** 26:20

**exhibit** 18:23 19:17 50:4,9,17 53:7 55:13

**exist** 14:8

**Existing** 18:24

**expected** 42:22

**expenses** 29:20 34:22 35:5 47:10 48:3,5,15

**experience** 24:19

**Experts** 40:2

**explain** 11:13 34:13

**explained** 8:5

## F

**familiar** 23:19,23 24:8 50:17

**family** 11:8 29:4

**Feary** 6:18

**fewest** 31:4

**file** 50:11

**filing** 18:20 19:22

**find** 35:13,20,23 36:11 41:11

**fine** 8:25 10:2

**finish** 9:6

**finished** 31:22

**flat** 53:12

**followup** 56:13

**food** 11:17

**form** 20:14 42:18

**formed** 18:16 19:25 24:17 27:6

**foundation** 21:25

**frequently** 35:8 36:18

**friend** 16:5

**friends** 21:9,18

**front** 19:5

**Ft** 7:19

**full** 7:11

## G

**garage** 12:24

**garbage** 16:17 18:5

**Garcia** 6:9

**Garvin** 6:17

**gas** 33:8 46:4 47:24

Eladio Bonilla Ramos - June 01, 2021

gave 39:20,25 55:9

general 57:22

generally 56:17 57:10,24

give 11:25 29:17 30:23 31:2 37:6,17 38:18 43:10 49:19,21

giving 26:5,6 29:18 49:16

GMC 31:15 47:3

good 21:19

grade 15:6 16:8

graduation 16:8

guy 28:21

guys 21:12

**H**

handled 37:9

Hanson 6:17

happened 11:19

happy 9:12

hats 39:10

HDL 12:19 15:18 18:3,12 21:4,8 22:23 24:22 31:24 32:3,19,23 34:2 36:25 38:15 39:16 41:6,10,17 42:7 44:2,19 47:16 48:6 49:18 51:9,13 53:16 57:20

HDL's 17:24 51:22 52:15

hear 40:18 52:20,21,22,24

helper 29:6,7 37:25 40:4 48:15

helpers 29:8,15 30:15 36:13 38:4

higher 45:12

highest 15:4

Hino 31:15 46:24 47:15

hire 29:14 37:24 38:4

hired 32:7 40:4

hiring 21:22

hit 11:18

hold 46:24

home 7:14 27:10,11 35:22 37:17 40:2 43:8,23

Homedeliverylink 6:7,19 7:20,22 12:11,14 50:5

honest 26:8 57:15

honestly 13:4 51:17

hour 30:2 42:20,21 53:20

hourly 37:4

**I**

identification 19:4 50:7

immigration 13:15,16,21 14:2,4,6

important 9:2

inability 43:19

income 32:22

Incorporated 18:9 20:12 24:18 25:7 27:6,14,20 38:23

independent 21:8,12

individually 33:2

individuals 27:19 28:12 46:11

influence 9:23

information 36:11 44:13

initial 19:22

initiate 23:16

Innovel 22:17,18

instance 49:5,11

insurance 26:8 46:8,11,14

insurances 29:20

interact 43:16

interest 27:12 57:4

interfere 9:24

interpreter 6:25 7:3

introduce 6:12

involved 11:3,10,14 13:8,10 14:5 20:11

involving 11:15

items 25:16 39:10,16,19 40:5,17,21

**J**

Jamaica 16:13,19

job 18:4 27:17 37:25

jobs 16:25

Joshua 26:21

June 6:4 51:2 52:6 53:10

Junis 28:18,21

**K**

kind 11:5,11,12 14:7 31:14

Kloppel 6:7 24:9

**L**

lack 9:23 21:24

language 10:21

late 37:17

lawsuit 11:4,5,6,11,12,15 12:7,10 15:2 25:23

Leading 56:22 58:2

leak 49:13 51:14

learn 16:9 21:7

lease 44:18

leave 44:15

left 29:13 37:20

level 15:4

Lexitas 6:11

license 15:13,21

Lichten 6:20

Light 6:17

Liss-riordan 6:21

list 44:17

lists 20:7

live 7:16

lived 10:5,10,12,13,14

lives 36:4

locate 12:18 13:2 38:3 51:10,14

location 22:21,24 25:13

locations 27:3

logos 39:7

long 9:11 10:5 12:25 14:19,20 15:11 16:18 17:11,12 21:17 23:21 28:5,10 33:16 55:18 56:3 57:14

Eladio Bonilla Ramos - June 01, 2021

**longer** 18:10
**looked** 12:21,23 35:12 50:13
**lot** 33:18 37:18 46:5 57:6
**Lowell** 7:16 10:4

**M**

**made** 35:6 46:7 53:19 57:11,18
**maintained** 47:10
**maintenance** 47:18
**make** 19:15 23:9 26:14 34:20 43:19 56:19
**making** 43:17 44:2 45:20,24 47:6,13
**Manager** 27:2
**managers** 26:19
**manifest** 42:12,14 43:4 44:7,13,17
**marked** 19:3 50:6,8
**matter** 6:6
**matters** 13:15
**meeting** 30:7 56:8
**memory** 19:24
**mentioned** 25:23 31:8,9
**Mike** 6:6 24:9
**minimum** 37:2
**minute** 30:3
**minutes** 14:21
**Misleading** 53:13
**Misstating** 54:16 55:14,21
**money** 26:7,11 34:17 35:6 56:20
**month** 13:3 16:20
**months** 13:4 17:13
**morning** 40:24
**motor** 11:15 13:6 25:22
**move** 22:19

**N**

**named** 18:8 24:8 26:21,22 28:18 42:2
**names** 21:14 24:3 28:15

**needed** 29:19 34:16 37:24 38:4,7 40:16,20 42:7 45:7
**Niatco** 24:25 25:8,16,24 47:12
**night** 37:17
**ninth** 15:6 16:8
**Notary** 7:4,7 58:17
**note** 46:22
**noted** 58:8
**noticed** 6:14
**number** 31:4 34:10 40:7 42:14 43:11,12 44:16

**O**

**oath** 8:10 30:11
**objecting** 13:24
**Objection** 13:20 21:20,24 29:23 42:18 52:9,17 53:13 54:16,24 55:5,14,21 56:22 58:2
**October** 18:20 19:21
**offer** 9:16 45:12
**offered** 8:16
**office** 26:24
**Officer** 20:8 27:16
**oil** 47:22
**open** 32:16
**opened** 32:13
**operate** 29:22 42:8 45:9
**operated** 44:21 45:4
**operating** 28:3 30:20 33:11 38:11 44:19 47:25
**opportunity** 21:8
**order** 15:21 42:17,21 43:3 44:14,15
**orders** 43:2
**outright** 46:23 47:3
**owed** 26:11
**owned** 27:6 31:25 56:25
**ownership** 27:12 57:3

**P**

**p.m.** 6:5 58:8
**pages** 19:3
**paid** 22:2 32:19 34:11,13 36:25 37:4 40:3 41:9 45:16 46:8,15,20 47:3,4,19 48:16,19,25 49:24 53:11,16,20,22,25 54:9 55:10 56:20
**painted** 39:5
**paper** 50:12 55:9
**papers** 14:25
**parked** 11:16
**part** 10:25
**party** 6:14
**pass** 56:11
**passed** 15:23
**pay** 22:6 26:4,8,9,10,13 29:19 33:22 34:6 36:13,16,20,22,24 37:2,19 39:23,24 40:5,6 45:14,18 46:21 48:17,23,24 49:11 54:8 57:7,10,17, 21,22,23
**paycheck** 49:4
**paying** 46:24 47:2,11
**payments** 32:18 34:2 36:7 47:6,14
**Paz** 14:11
**pending** 8:17
**people** 21:22 45:7
**percent** 11:2
**percentage** 36:24
**period** 30:19
**person** 9:4 20:10 33:5,15
**personal** 34:22 35:5 36:6
**personally** 42:4 48:24 52:16
**perspective** 29:21
**phone** 44:16 46:17
**pick** 25:15 40:17,20
**pipes** 33:9
**piping** 33:5,8
**place** 21:19 36:11

**plaintiffs** 6:21 24:9

**plumbing** 33:10

**point** 8:22 9:10

**points** 28:12

**portion** 52:25 55:24

**posting** 37:25

**practiced** 16:4

**preparation** 14:23

**prepare** 14:12

**primarily** 22:20 41:25

**problem** 22:19

**problems** 13:16

**proceeding** 6:15

**process** 8:6

**product** 23:13

**products** 22:12

**profitable** 29:22

**proof** 53:5

**Public** 7:4,7 58:17

**purchase** 47:5

**purchased** 31:18 48:4

**purpose** 38:15 45:2

**put** 39:12 50:2

### Q

**question** 8:23 9:7,8,12,18 23:11
33:24 37:23 42:6 43:18 48:21 52:21
53:14,17,18 54:19,20 55:8,16

**questions** 13:21 14:2 53:8 56:13,24
57:6 58:5

**Quillen** 6:16 7:10,18 14:3 29:25
56:11,22 57:7 58:2,5

**quit** 17:24 18:12 26:2 31:24

### R

**Ramos** 6:4,22 7:13 8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1 16:1 17:1 18:1,9
19:1,18 20:1,11 21:1 22:1 23:1 24:1,
17 25:1,7 26:1 27:1,5,13,20 28:1,8
29:1 30:1,10,16 31:1,5 32:1,10,19,22

33:1,22 34:1,3 35:1 36:1,7 37:1 38:1,
22 39:1,8 40:1 41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1 56:1 57:1 58:1,11

**rate** 37:4 53:12

**rates** 45:12

**read** 53:2 55:25

**reason** 9:15 20:3 22:5 26:2 37:19
43:15 45:4 51:15,22

**reasons** 9:19 13:8 43:21,25

**recall** 12:13 13:7 17:7 18:16 21:14
23:3 24:24 26:20 28:15,18 29:8 30:16
31:18,21 32:13 33:14 35:8,25 36:5
48:5 49:17,20

**receive** 15:12 42:12

**received** 50:12,15

**receiving** 49:17

**record** 6:3 7:12,15 8:14,16,20 19:21
30:4,6,9,11 50:25 51:9,13,16,20 52:5,
10 55:3,19 56:7,10

**recorded** 30:8 56:9

**recording** 6:10

**records** 12:21 17:24 35:13,15,17,22
36:10 51:11,22 52:15

**reflect** 52:16

**refresh** 19:24

**refrigerator** 49:5,14

**relate** 12:18

**related** 28:25

**relates** 50:25

**relating** 14:25 35:13 51:11,14

**relevant** 14:10

**remember** 9:21 11:20 12:5,6,9,15
13:5 15:10,16 17:13,23 18:22 20:5
21:3,16 22:25 23:7 24:3,16,23 25:21
26:15,23 27:23 28:16,17,20,23,24
29:10 32:25 33:6,7 35:7,10 36:8,21
37:8 43:5,6 44:24 47:13,14 50:14,15,
16 51:17,19 54:10,25 55:2 57:8,13,
15,16,19

**remote** 6:3

**rented** 16:4 44:24,25

**renting** 46:4

**repeat** 9:18 28:9 40:18 42:6 48:21
53:17,19 55:23

**reporter** 6:23 8:13 53:2 55:25

**represent** 6:13 7:19,24 20:21

**represented** 8:2

**representing** 6:18,21

**represents** 31:23 38:13 41:4

**requested** 52:25 55:24

**reschedule** 43:8

**rescheduled** 43:24

**reside** 10:7

**resolved** 12:8

**result** 8:19

**retain** 20:25

**returns** 12:22

**review** 14:22,25

**road** 11:17 56:16

**Rochester** 23:6,7,20

**Roger** 28:22,23

**role** 28:13

**Romero** 28:22,23,24

**room** 19:16

**route** 43:11

**rules** 8:7

**run** 34:22 46:5 47:7

**runs** 46:5

### S

**salary** 34:25 37:3

**Salvador** 10:13,17,18 15:8 16:8

**scheduled** 41:12 42:19 44:4

**school** 15:20,22,24 16:6

**schools** 16:7

**Scopelitis** 6:17

**screen** 19:5

**Search** 19:3

**searched** 35:20

Eladio Bonilla Ramos - June 01, 2021

**Sears** 22:9,11,12,14,15 39:21 40:17, 21 41:2,9 42:22 43:13,16,21 44:9 47:13 48:4

**sequence** 43:4

**service** 43:10,12,16,22 44:10

**services** 38:9

**set** 21:2,4 34:10,25 40:7,9 41:2 53:12

**settlement** 48:6 49:18 50:5,20 53:23 54:3,13

**share** 19:8

**sheet** 54:3

**shirt** 39:20,21,22,23

**shirts** 39:7,24 40:2,3 48:3

**Shore** 16:2

**show** 42:14 49:23

**showing** 50:8

**shown** 44:7 53:24 55:13

**shows** 18:19 19:21 52:5 55:3

**side** 11:16 39:2

**single** 52:6

**sir** 7:18 9:17 11:4 19:5,12 20:19 29:25 50:9 53:6 55:8 56:4

**sit** 51:21

**size** 49:11

**sleep** 9:24

**small** 48:8

**sold** 31:21

**sound** 17:25 18:21

**source** 32:23

**speak** 10:21,23 14:17

**speaking** 30:15 57:24

**specific** 55:7

**specifically** 45:2

**spent** 35:4 46:4

**spoke** 14:14,15

**spreadsheet** 50:9 53:7

**stage** 25:14

**start** 40:14

**started** 12:10,13 15:17 32:3 40:13

47:15

**state** 7:11,14 18:19,24 19:10 23:12, 14

**stated** 54:21

**statement** 49:18,23 50:6,21 51:25 52:2,3 53:23 54:13

**States** 10:17

**status** 13:21 14:4 18:20

**stay** 24:5

**stayed** 45:21 46:2

**stickers** 39:6

**stop** 42:19,20 45:19 53:11,22 54:9

**stopped** 18:3

**stops** 26:13 42:15,17 49:23 50:3 53:10,24 54:4,11,15,23 55:13 57:11, 18

**Street** 7:16 10:4

**stub** 50:16 57:7,10,21,22,24

**Subscribed** 58:13

**sufficient** 37:18

**Sunday** 54:4

**supervisor** 42:2 45:6

**supervisors** 41:25

**suppose** 26:9,14

**swear** 6:24

**sworn** 7:3,7 8:9 58:13

**Syosset** 22:20 23:12,14,23 24:6,13 26:16 45:9,17,18,21 46:2

---

**T**

**taking** 34:20

**talking** 9:8

**talks** 9:4

**taught** 16:5

**tax** 12:22

**taxes** 36:3

**telling** 10:24

**ten** 14:20 33:17

**testified** 7:8

**testify** 9:20,25

**testimony** 9:16 30:17 41:6 54:17 55:15,22

**Texas** 7:19

**thereabouts** 12:16

**thin** 28:20

**things** 33:10

**time** 6:6 9:4 11:16 12:18 14:18 17:20 28:11,12 30:8,19,21 31:6 32:7 36:2 38:12 40:12,14,15,16,20,22,23,25 41:2,5,7 42:23 49:12 51:11 55:18 56:3,6 58:6,8

**times** 12:5 14:16 33:17,18 37:16

**Tires** 47:22

**title** 27:17

**titled** 50:20

**today** 8:2,12 9:16,20,24 14:23 15:2 51:21

**today's** 6:10 14:12

**told** 18:14 21:22 29:16 41:4,6,24 45:14

**top** 50:21

**touch** 24:5

**Tower** 17:9

**translate** 14:11

**translated** 7:4

**translation** 8:23

**translator** 9:3

**transportation** 24:19

**truck** 11:18 15:20 16:4,6,17 18:5 27:24,25 29:17,22 30:23 31:2,8,9 32:6 38:16,25 42:7,15 44:18,24 45:2, 8 46:4 47:5,12,25 56:16,17,21

**trucking** 23:24 24:25 25:8,16,24 56:25 57:4

**trucks** 28:3,6 30:20 31:12,14,16,19, 25 32:4 38:23 39:2 44:22 46:9,22 47:19

**true** 22:8 23:5 25:3 44:23,24

**truth** 13:4 26:9 29:10 57:15

**truthful** 9:16

**truthfully** 9:20

**tunnel** 17:19

**twenty** 14:20

**type** 16:16,24

---

**U**

**Uh-huh** 19:7,11 44:14 48:13 50:22
51:3 54:2,6

**unable** 9:20 35:12

**understand** 7:24 8:10,22 10:22,23,
25 12:17 22:18 30:12 33:24 37:23
43:18 51:18 52:19 54:18

**understanding** 10:20 55:8

**United** 10:16

---

**V**

**vehicle** 11:15 13:6 18:5 25:22 33:12

**verbally** 8:20

**verify** 52:7

**versus** 6:7

**video** 6:3,10 19:6

---

**W**

**W-2** 37:6

**walk** 8:6

**wanted** 42:21

**warehouse** 25:12,13 40:17,21

**wash** 17:3,15,20,21

**washers** 22:13

**wear** 39:16

**Weber** 6:20 8:3 13:20 14:9 21:20,24
29:23 42:18 52:9,17 53:13 54:16,24
55:5,14,21 56:12,15 58:4

**week** 33:17 35:6 36:19 40:8,10
49:10,20 50:25 52:6 53:10 57:21,23

**weekly** 49:17

**weeks** 23:4,22 45:5,9,22,25

**Westbury** 7:16 10:4 16:12 36:4

**Wilson** 24:10,11,12 26:18 42:2

**window** 42:23

**wood** 17:6

**words** 26:7

**wore** 39:11,20

**work** 16:11,16,22 17:5,22 21:19,23
22:6 23:16 24:13 26:5,6 30:24 31:10
33:3 36:23 37:14 38:7 41:22 42:4
45:13 46:18

**worked** 17:7,15 21:10,13 25:5 27:19
29:11,12 31:9 33:4,15 39:15 40:8
41:3 45:25 52:16 57:20

**workers** 46:13

**workers'** 46:11

**working** 17:2 18:11 20:18 25:2 31:22
33:6 38:13 47:12,16 52:5

**workman's** 46:14

**works** 8:6

**Worth** 7:19

**written** 8:14

---

**Y**

**year** 10:14,16 11:19 12:13 15:9,15
16:21 31:20 34:20 36:6 37:7,11

**years** 32:23

**York** 7:17 10:4,8 15:14 18:19 23:10,
17

# EXHIBIT 24

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

- - -

MIKE KLOPPEL AND ADAM WILSON, :
on behalf of themselves and    :
all other similarly situated   :
persons,                       :
                               :
          Plaintiff(s)    : NO. 6:17cv-06296-FPG
                               :
          vs              :
                               :
SEARS HOLDINGS CORPORATION,   :
SEARS, ROEBUCK & COMPANY, AND :
HOMEDELIVERYLINK, INC.,       :
                               :
          Defendant(s)    :
                      - - - - -

Wednesday, August 28, 2019

- - - - -

Oral deposition of MICHAEL R. REX
(Present via video conference call), on the above
date, beginning approximately 10:35 a.m., before
Louis A. Manchello, Certified Court Reporter (New
Jersey Lic. No. 30XI00141800) and Notary Public of
Pennsylvania, at the Offices of Regus, New Brunswick
Plaza II, 317 George Street, 3rd Floor, New
Brunswick, New Jersey  08901.

- - - - -

HUDSON COURT REPORTING & VIDEO          1-732-906-2078

1               (It was stipulated by and between

2          counsel for the respective parties that

3          sealing, certification, and filing are

4          waived, and that all objections, except as

5          to the form of the question, are reserved

6          until the time of trial.)

7                    - - - - -

8               MICHAEL R. REX, having been duly sworn

9          as a witness, was examined and testified as

10         follows . . .

11   BY MR. SATTIRAJU:

12         Q.    Mr. Rex, how are you?

13   A.     I'm good.  Yourself?

14               MR. SATTIRAJU:  Off the record one

15   second.

16               (Discussion off the record)

17   BY MR. SATTIRAJU:

18         Q.    Good morning, Mr. Rex.

19   A.      Good morning.

20         Q.    My name is Ravi Sattiraju.  I'm an

21   attorney.  I'm one of the attorneys representing

22   Mike Kloppel and Adam Wilson in a lawsuit they've

23   brought against entities including HomeDeliveryLink,

24   Incorporated.

25               You're here today for your

1    A.      1991.

2           Q.      When you first got to

3    HomeDeliveryLink, what was your title?

4    A.      Assistant account executive.

5           Q.      How long did you hold that title?

6    A.      I do not know, sir.

7           Q.      What year did you get to

8    HomeDeliveryLink?  Let's start there.  We're in

9    2019; was it approximately 2013?

10   A.      Somewhere around 2013, yes.

11          Q.      The first job you were in was

12   assistant account executive?

13   A.      Yes, sir.

14          Q.      And do you think it was more than a

15   year?  Couple years?  How long do you think it was?

16   A.      I can't speculate.  I don't remember.

17          Q.      What was the next title you had after

18   that?

19   A.      Account executive.

20          Q.      That's the title you still hold?

21   A.      Yes, sir.

22          Q.      Tell me about the -- have you always

23   worked at the same Rochester facility?

24   A.      Yes, sir.

25          Q.      Tell me what about that facility, what

1    them.  And they get what Innovel calls a control

2    code, which is a number that comes up in Innovel's

3    system and basically shows any notes that were

4    inputted into the system by Sears.

5         Q.     So are you made aware of these

6    communications?

7    A.      I am not made aware of those from Sears or

8    Innovel.  If the driver or carrier called me, then

9    I'm aware of it, and then I would relay it to

10   Innovel, and they would put the notes in.  But I'm

11   not made aware of issues from Innovel, not on a

12   normal basis.

13        Q.     Well, there is feedback solicited from

14   customers about how their delivery experience is;

15   correct?

16   A.      That is correct.

17        Q.     And you receive the results of that

18   feedback, customer feedback; right, from Innovel?

19   A.      That is correct.

20        Q.     In fact, you do a daily, there's a

21   stand-up meeting you do every day; right?

22   A.      There is a stand-up meeting we do.  I do not

23   do it daily.  I don't have a set schedule when I do

24   it.  But, yes, there is a stand-up meeting.

25        Q.     Do you run that meeting?

1

2              I, LOUIS A. MANCHELLO, Certified

3    Court Reporter (License No. 30XI00141800) and Notary

4    Public of Pennsylvania, do hereby certify the

5    foregoing to be a true and correct transcript of the

6    proceedings held in this matter as transcribed from

7    the stenographic notes taken by me on August 29,

8    2019.

9

10

                          _____

11

                          Louis A. Manchello

12                        Certified Court Reporter

                          (N.J. License No. 30XI00141800)

13

     Date:   September 4, 2019

14

15              (This certification does not apply to

16         any reproduction of this transcript, unless

17         under the direct supervision of the

18         certifying reporter.)

19

20

21

22

23

24

25

# EXHIBIT 25

```
 1                        E. SAMUELS

 2            IN THE UNITED STATES DISTRICT COURT

 3            FOR THE WESTERN DISTRICT OF NEW YORK

 4      - - - - - - - - - - - - - - - - - - - - - - - - x

 5      MIKE KLOPPEL,

 6                       Plaintiff,

 7

 8            -against-       Case No.: 6:17-cv-06296-FPG-MJP

 9

10      HOMEDELIVERYLINK, INC.,

11                       Defendant.

12      - - - - - - - - - - - - - - - - - - - - - - - - x

13                            Date: June 21, 2021

14                            Time: 5:33 p.m.

15

16         VIDEOTAPED DEPOSITION of EVERALD SAMUELS, held

17      Remotely, pursuant to Notice, taken before Judeen M.

18      Denniston, a reporter and Notary Public within and for the

19      State of New York.

20

21

22

23      JOB NO.: 4637254

24

25
```

Page 1

```
 1                      E. SAMUELS
 2     A p p e a r a n c e s:
 3     On behalf of Plaintiff:
 4         FRIEDMAN & RANZENHOFER, P.C.
 5               74 Main Street
 6               PO Box 31
 7               Akron, New York 14001
 8         BY:  SAMUEL A. ALBA, ESQ.
 9               (via remotely)
10
11
12     On behalf of Defendant:
13         SCOPELITIS GARVIN LIGHT HANSON & FEARY P.C.
14               330 E Kilbourn Avenue, Suite 827
15               Milwaukee, WI 53202
16         BY:  ANDREW BREHM, ESQ.
17               (via remotely)
18
19
20     ALSO PRESENT:
21     DAVID ROTHSTEIN - LEGAL VIDEOGRAPHER
22
23
24                    *   *   *   *   *
25
```

Page 2

```
 1                        E. SAMUELS
 2              S T I P U L A T I O N S
 3
 4         IT IS HEREBY STIPULATED AND AGREED by and
 5      between the attorneys for the respective
 6      parties herein, that filing, sealing and
 7      certification be and the same are hereby
 8      waived.
 9
10         IT IS FURTHER STIPULATED AND AGREED that
11      all objections, except as to the form of the
12      question shall be reserved to the time of the
13      trial.
14
15         IT IS FURTHER STIPULATED AND AGREED that
16      the within deposition may be signed and sworn
17      to before any officer authorized to administer
18      an oath, with the same force and effect as if
19      signed and sworn to before the Court.
20
21
22
23                    *   *   *   *   *
24
25
```

Page 3

```
1                         E. SAMUELS
2              THE VIDEOGRAPHER:  Good
3         afternoon, we are going on the
4         record at 5:30 PM on June 21,
5         2021. Please note that the
6         microphones are sensitive and
7         may pick up whispering, private
8         conversations, and cellular
9         interference. Please turn off
10        all cell phones or place them
11        away from the microphones, as
12        they can interfere with the
13        deposition audio. Audio and
14        video recording will continue
15        to take place unless all
16        parties agree to go off the
17        record. This deposition is
18        being held remotely.
19              This is media unit number
20        one of the video recorded
21        deposition of Everald Samuels,
22        located at 195-12 100th Avenue
23        in Hollis, New York. This
24        deposition is being taken by
25        counsel for the defendant in the
```

Page 4

```
 1                    E.  SAMUELS

 2             matter of Mike Kloppel et. Al

 3             versus HomeDeliveryLink Inc,

 4             filed in the United States

 5             District Court for the Western

 6             District of New York, case

 7             number 6:17-CV-06296-FPG-MJP.

 8                  My name is David Rothstein

 9             from the firm Veritext Texas,

10             and I am the videographer. The

11             court reporter is Judeen

12             Denniston, from the firm

13             Veritext Texas. I am not related

14             to any party in this action, nor

15             am I am financially interested

16             in the outcome.

17                  Counsel will now please

18             state their appearances and

19             affiliations for the record. If

20             there are any objections to the

21             proceeding, please state them at

22             the time of your appearance,

23             beginning with the noticing

24             attorney.

25                  MR. BREHM:  Andrew Brehm on
```

Page 5

```
1                         E. SAMUELS
2                   behalf of the defendant
3                   HomeDeliveryLink, Inc. There are
4                   no objections to this
5                   proceeding.
6                         MR. ALBA:  Samuel Alba,
7                   Friedman and Ranzenhofer, PC,
8                   for the plaintiff's counsel's
9                   team. There are no objections to
10                  the virtual deposition.
11                        THE VIDEOGRAPHER:  Will the
12                  court reporter please swear in
13                  the witness?
14                        COURT REPORTER:  Sir, could
15                  you raise your right hand
16                  please? Do you promise the
17                  testimony you're about to give
18                  this evening is the whole truth,
19                  nothing but the truth, subject
20                  to penalties of perjury?
21                        THE WITNESS:  Yes.
22      E V E R A L D  S A M U E L S, the witness herein,
23            having first been duly sworn by a Notary Public
24            of the State of New York, was examined and
25            testified as follows:
```

Page 6

E. SAMUELS

1

2          COURT REPORTER:  Okay, you
3      can put your hand down sir.
4          Could you state your name
5      for the record please?
6          THE WITNESS:  My name is
7      Everald Samuels.
8          COURT REPORTER:  And could
9      you state your address for the
10     record please?
11         THE WITNESS:  55 Lake
12     Drive, Wyandanch, New York,
13     11798.
14         COURT REPORTER:  Thank you,
15     first two questions are on the
16     record.
17  EXAMINATION BY
18  MR. BREHM:
19      Q.  Good afternoon, Mr. Samuels.
20      A.  How you doing?
21      Q.  My name is Andy Brim. I'm counsel
22  for defendant HomeDeliveryLink, Inc, in
23  connection with this case. Have you ever had
24  your deposition taken before?
25      A.  No.

Page 7

                         E. SAMUELS

1

2       Q.  Okay, I'd like to start by going

3    over some ground rules to help this go as

4    seamlessly as possible. First and foremost,

5    we have a court reporter, Judeen, here

6    taking down everything that's said. In order

7    for her to keep an accurate record of what

8    happens today, we need to make sure that we

9    do not talk over each other. I know this is

10    remote and we're over Zoom, so it could be a

11    little bit awkward. But I will do my best to

12    let you finish answering the question before

13    I ask another question. And I'd ask that you

14    let me finish my question before you answer,

15    even if you know where I'm going with the

16    question.

17            Do you understand that?

18       A.  Yes.

19       Q.  Okay, the other part of this, as I

20    mentioned, we're taking down a transcript of

21    what is being said today. So, I can see you

22    over Zoom, but the court reporter can't take

23    down if you nod your head yes or no, or if

24    you say things like mm-hmm (affirmative), or

25    uh-huh (affirmative). So, I'd ask that you

                                        Page 8

```
 1                        E.  SAMUELS
 2    answer my questions with verbal responses.
 3               Do you understand that?
 4         A.  Yes.
 5         Q.  Okay, my goal today is to learn what
 6    you know. I'm not trying to trick you or
 7    deceive you. If you don't understand a
 8    question that I ask, please ask me to repeat
 9    or rephrase the question. In the same
10    regard, if you're not sure of an answer to a
11    question that I ask, I'm not asking you to
12    guess or speculate. I want to know what you
13    know.
14               Do you understand that?
15         A.  Yes.
16         Q.  The last ground rule is that this is
17    not a forced march. If you need a break at
18    any time, we can take a break, just let me
19    know. I'd ask that you answer any question
20    that's pending before we go take a break.
21    And I'll do my best to take some breaks
22    throughout as we proceed this evening.
23               Do you understand that?
24         A.  Yes.
25         Q.  You understand that you've taken an
```

Page 9

```
 1                      E. SAMUELS
 2     oath to tell the truth today, correct?
 3          A.  Yes.
 4          Q.  Is there any reason why you would
 5     not be able to tell the truth today?
 6          A.  No.
 7          Q.  Are you taking any medication that
 8     would impact your ability to testify
 9     truthfully?
10          A.  No.
11          Q.  We're conducting this deposition
12     over Zoom. It appears that you're on your
13     iPhone, is that correct?
14          A.  Yes.
15          Q.  But you can hear me well enough?
16          A.  Yes.
17          Q.  And do you have any other windows
18     opened up on your iPhone right now?
19          A.  A sec, just email, let me close that
20     right here. Okay.
21          Q.  Thank you, you said you had never
22     had your deposition taken before, correct?
23          A.  Yes.
24          Q.  Have you ever given testimony in any
25     type of legal proceeding before?
```

Page 10

```
 1                        E. SAMUELS
 2          A.   No.
 3          Q.   Did you do anything to prepare for
 4     today's deposition?
 5          A.   No.
 6          Q.   Did you review any documents in
 7     preparation for today's deposition?
 8          A.   No.
 9          Q.   And I preface this, if you did meet
10     with your attorney, I do not want to know
11     anything that was said between you two, but
12     did you meet with your attorney in
13     preparation for today's deposition?
14          A.   Yeah, phone call.
15          Q.   Okay, and when was that phone call?
16          A.   Yesterday.
17          Q.   And how long did that phone call
18     last?
19          A.   15 minutes.
20          Q.   Was there anything else that you did
21     to prepare for today's deposition?
22          A.   No.
23          Q.   What is your current address?
24          A.   55 Lake Drive, Wyandanch, New York
25     11798.
```

Page 11

```
 1                        E. SAMUELS
 2          Q.  And how long have you resided at
 3     that address?
 4          A.  Two years.
 5          Q.  Where did you live before that?
 6          A.  3 Spruce Street, Wyandanch, New
 7     York, 11798.
 8          Q.  And how long did you reside at that
 9     address?
10          A.  17 years.
11          Q.  What's your highest level of
12     education, Mr. Samuels?
13          A.  Some college.
14          Q.  And where did you attend some
15     college?
16          A.  Suffolk County Community College.
17          Q.  What were you studying?
18          A.  Computer.
19          Q.  Do you recall how much course work
20     you completed?
21          A.  I think I was five credits away from
22     getting my, what's the first one,
23     associate's.
24          Q.  And did you graduate from high
25     school?
```

Veritext Legal Solutions
800-336-4000

```
 1                        E. SAMUELS
 2          A.  Yes.
 3          Q.  Where was that?
 4          A.  Centralized High School.
 5          Q.  Have you taken any business classes
 6      over the course of your education?
 7          A.  I've taken a few online courses.
 8          Q.  Have you taken any educational
 9      classes or coursework related to the
10      transportation industry?
11          A.  No.
12          Q.  So, you've never been to truck
13      driving school?
14          A.  No.
15          Q.  When did you start working in the
16      transportation industry?
17          A.  2000.
18          Q.  And what was your job in 2000?
19          A.  Loading and unloading trucks for
20      Seaman's Furniture
21          Q.  Did that involve making deliveries?
22          A.  Yes.
23          Q.  Were you a driver on the truck?
24          A.  Helper.
25          Q.  And were you an employee of the
```

Page 13

```
 1                         E.  SAMUELS
 2      company?
 3              A.   No.
 4              Q.   Did you receive a 10-99?
 5              A.   Yes.
 6              Q.   And who did you receive the 10-99
 7      from?
 8              A.   Triple T Trucking.
 9              Q.   How long did you work with Triple T
10      Trucking?
11              A.   For about eight months.
12              Q.   And then where did you go to work?
13              A.   I started doing a sole proprietor
14      for myself doing the same thing.
15              Q.   When you say sole proprietor doing
16      the same thing, what do you mean?
17              A.   Contracted for Seaman's Furniture to
18      do their transfers.
19              Q.   Did you own a truck?
20              A.   No.
21              Q.   Did you lease a truck?
22              A.   Rented.
23              Q.   Rented? Who'd you rent the truck
24      from?
25              A.   AA Trucking.
```

Page 14

```
 1                        E. SAMUELS
 2          Q.   And while you were a sole proprietor
 3     with Seaman's Furniture, did you have any
 4     employees?
 5          A.   Yes, a helper.
 6          Q.   Any other employees?
 7          A.   That's it, just one helper.
 8          Q.   And how long did you operate as a
 9     sole proprietor with this company?
10          A.   I think it closed in 2003, yes 2003,
11     so three years.
12          Q.   And when you say it closed, you mean
13     the furniture company?
14          A.   Yes, Seaman's filed bankrupt.
15          Q.   Okay, did you continue to operate a
16     delivery service?
17          A.   Yes.
18          Q.   And who did you contract with next?
19          A.   Levitz Furniture.
20          Q.   Did you use the same truck as you
21     used prior?
22          A.   Yes.
23          Q.   And did you have the same helper?
24          A.   Yes.
25          Q.   How long were you in contract with
```

Page 15

```
 1                           E. SAMUELS
 2      Levitz Furniture?
 3           A.   2004 or '05.
 4           Q.   Then what did you do after that?
 5           A.   I started appliances for Sears.
 6           Q.   And was that delivering appliances?
 7           A.   Yes.
 8           Q.   With your sole proprietorship?
 9           A.   Yes.
10           Q.   Were you using the same truck?
11           A.   No.
12           Q.   Did you purchase a new truck?
13           A.   No, I rented a different truck from
14      a different company.
15           Q.   Okay, and did you contract with
16      someone to provide delivery services of
17      appliances for Sears?
18           A.   Yes, GTS.
19           Q.   Where was GTS located?
20           A.   I think they're from Syracuse, New
21      York, I'm not too sure.
22           Q.   Do you recall where their terminal
23      or warehouse was that you worked out of?
24           A.   I worked out of Syosset.
25           Q.   How long were you under contract
```

Page 16

```
 1                        E. SAMUELS
 2    with GTS?
 3         A.  Up until 2008, when they were bought
 4    out by 3PD.
 5         Q.  Did you say GPD?
 6         A.  3PD.
 7         Q.  Did you continue to operate under
 8    contract with 3PD?
 9         A.  Yes.
10         Q.  And how long were you under contract
11    with 3PD?
12         A.  Until 2011.
13         Q.  While you were under contract with
14    3PD, did you have any employees?
15         A.  Yes.
16         Q.  Do you recall how many?
17         A.  Basically, one guy and a guy when he
18    couldn't work, so I'll say two guys.
19         Q.  And were they helpers or drivers?
20         A.  Helpers.
21         Q.  Okay, were you always the driver?
22         A.  Yes.
23         Q.  And then what happened in 2011 that
24    you left 3PD?
25         A.  I went to Connecticut to live for a
```

Page 17

```
 1                    E. SAMUELS
 2    little while.
 3        Q.  Did you work in the transportation
 4    industry while you were in Connecticut?
 5        A.  Yes.
 6        Q.  What did you do there?
 7        A.  Delivered for Sears.
 8        Q.  Was that also with 3PD?
 9        A.  No.
10        Q.  What company was that with?
11        A.  Home Delivery America.
12        Q.  Were you operating a sole
13    proprietorship --
14        A.  Yes.
15        Q.  -- with Home Delivery America? Did
16    you have any employees?
17        A.  One.
18        Q.  Where were you based out of while
19    you were working with Home Delivery America?
20        A.  Newington, Connecticut and
21    Torrington, Connecticut.
22        Q.  How long were you there?
23        A.  From middle 2012 to the end,
24    somewhere around there.
25        Q.  And then what did you do?
```

Page 18

<center>E.  SAMUELS</center>

1

2      A.  After that, I stopped for a little

3  while.

4      Q.  Was your next job working in the

5  transportation industry affiliated with

6  Ultimate Delivery System?

7      A.  Yes.

8      Q.  You formed Ultimate Delivery System

9  in December 2014, is that correct?

10                      MR. ALBA:  Object to the

11                 form of the question. You can go

12                 ahead and answer.

13      A.  Beginning of 2013, February, April

14  2013.

15      Q.  Why did you form Ultimate Delivery

16  System?

17      A.  Because the next company I signed up

18  with needed us to have a company, and they

19  weren't doing sole proprietorship. They

20  needed to be an LLC company.

21      Q.  And what company was that?

22      A.  HomeDeliveryLink.

23      Q.  Why did you decide to form Ultimate

24  Delivery System as an LLC?

25      A.  Because that's the only way they

<div align="right">Page 19</div>

1                          E. SAMUELS
2     would sign me on as a carrier.
3          Q.  Would they sign you on if you had an
4     incorporated entity?
5          A.  LLC or incorporated, it had to be a
6     business. It had to be a company.
7          Q.  Sure.
8          A.  Couldn't be a sole proprietor
9     anymore.
10          Q.  Okay, but did you ultimately
11     determine to create an LLC?
12          A.  Yes.
13          Q.  Was there a business reason behind
14     doing that?
15          A.  I needed to work.
16          Q.  Sure, my question though, not trying
17     to trick you, is there a business reason
18     behind you forming an LLC as opposed to an
19     incorporated company?
20          A.  Honestly, I think the LLC was
21     cheaper when I went to do it.
22          Q.  Okay, did you seek any advice when
23     you were forming Ultimate Delivery System?
24          A.  No.
25          Q.  And you formed Ultimate Delivery

                                        Page 20

```
 1                      E. SAMUELS
 2    System in the state of New York, correct?
 3         A.  Yes.
 4         Q.  Is Ultimate Delivery System still
 5    registered to do business in New York?
 6         A.  No.
 7         Q.  Was Ultimate Delivery System ever
 8    registered to do business in any other
 9    state?
10         A.  No.
11         Q.  Are you the sole member of Ultimate
12    Delivery System?
13         A.  Yes.
14         Q.  Is there anyone else with financial
15    interest in the company?
16         A.  No.
17         Q.  Has there ever been another owner of
18    the company?
19         A.  No.
20         Q.  Since spring 2013, have you worked
21    for any other company besides Ultimate
22    Delivery System?
23         A.  No.
24         Q.  Did you have a job title while you
25    were the owner of Ultimate Delivery System?
```

Page 21

E. SAMUELS

1

2      A.   Just owner.

3      Q.   Since 2013, have you had ownership

4  interests in any other company besides

5  Ultimate Delivery System?

6      A.   When you say since, does that mean

7  until this day today, or since when? Since

8  2013?

9      Q.   To this day.

10      A.   I formed a new company. Ultimate was

11  closed out in 2018 and I started a new

12  company.

13      Q.   Okay, let's break this down a little

14  bit. So, you started Ultimate in Spring

15  2013, correct?

16      A.   Yes.

17      Q.   And you said you closed it down in

18  2018?

19      A.   2018, yes.

20      Q.   And then what company did you start?

21      A.   Ultimate Logistics.

22      Q.   What is Ultimate Logistics?

23      A.   It's an LLC.

24      Q.   What type of service does Ultimate

25  Logistics provide?

```
 1                        E. SAMUELS
 2         A.   Installation.
 3         Q.   Installation of what?
 4         A.   Appliances.
 5         Q.   What accounts does Ultimate
 6    Logistics LLC service?
 7         A.   Best Buy.
 8         Q.   Any others?
 9         A.   No.
10         Q.   And Ultimate Logistics LLC is still
11    active?
12         A.   Yes.
13         Q.   Is there a reason you created
14    Ultimate Logistics, LLC?
15         A.   No.
16         Q.   Is there a reason you closed out
17    Ultimate Delivery System?
18         A.   Yes.
19         Q.   What is that?
20         A.   I'd rather not say.
21         Q.   I'd ask you to answer the question,
22    sir.
23         A.   Financial reasons.
24         Q.   And do you recall what time of the
25    year in 2018 that it was closed down?
```

Page 23

E. SAMUELS

1
2     A.   It would be probably close to the
3     end, November or December.
4          Q.   Did Ultimate Delivery System file
5     for bankruptcy?
6          A.   No.
7          Q.   At some point, Ultimate Delivery
8     System executed a contract with
9     HomeDeliveryLink, is that correct?
10         A.   Yes.
11         MR. ALBA:  Object to the form of the
12    question. Everald, just let me allow to the
13    objection. I'll try to be quicker. You can
14    answer.
15         A.   Yes.
16         Q.   Sorry, okay. Do you recall when that
17    was?
18         A.   Yes.
19         Q.   When was it?
20         A.   April 2013.
21         Q.   Had you already formed Ultimate
22    Delivery System as a company before
23    executing the contract with HDL?
24         A.   No.
25         Q.   What type of services did Ultimate

Veritext Legal Solutions
800-336-4000

```
 1                      E. SAMUELS
 2     Delivery System provide?
 3          A.   Deliveries.
 4          Q.   Deliveries of what?
 5          A.   Appliances.
 6          Q.   Did Ultimate Delivery System have
 7     motor carrier authority?
 8          A.   Yes.
 9          Q.   Did it have a DOT number?
10          A.   Yes.
11          Q.   And what accounts did it provide
12     services for?
13          A.   For Sears.
14          Q.   And when you say Sears, what do you
15     mean by that?
16          A.   HDL had a contract with Sears. I
17     provided delivery and manpower that HDL
18     required for the deliveries.
19          Q.   And do you consider Sears and]
20     Innervelt to be the same company?
21          A.   I have no idea who Innervelt is.
22          Q.   Did Ultimate Delivery System deliver
23     Sears' product?
24          A.   Yes.
25          Q.   Other than HDL, did Ultimate
```

Page 25

```
 1                          E. SAMUELS
 2    Delivery System contract with any other
 3    companies?
 4         A.  No.
 5         Q.  What made you decide to contract
 6    with HDL?
 7         A.  They were taking over Syosset and
 8    I've been there since it started, so it's
 9    basically how it rolls. I'm not sure, one
10    contract company loses the contract, a new
11    one comes in. They usually ask the guys that
12    do the job, "Get it done," and they discuss
13    the new contract.
14         Q.  So, the Syosset terminal was where
15    you had previously worked out of before you
16    contracted with HDL?
17         A.  Yes.
18         Q.  Is that accurate?
19         A.  Yes.
20         Q.  Prior to contracting with HDL, had
21    Ultimate Delivery System ever provided
22    services for HDL?
23         A.  No, I was a sole proprietor.
24         Q.  Had you ever provided services for
25    HDL?
```

Page 26

```
 1                    E. SAMUELS
 2         A.   Prior?
 3         Q.   Prior to contracting with them in
 4   2013.
 5         A.   No.
 6         Q.   Do you recall how you heard of HDL?
 7         A.   Yes, they actually came to the dock
 8   while we were working and said they had a
 9   new contract here.
10         Q.   And this was in 2013?
11         A.   Yes.
12         Q.   Who were you under contract with
13   immediately before that?
14         A.   HDA, Home Delivery America.
15         Q.   And you were operating out of the
16   Syosset terminal at that time?
17         A.   Yes.
18         Q.   When Ultimate Delivery System first
19   contracted with HDL, how many trucks did it
20   operate?
21         A.   One.
22         Q.   And did you own that truck?
23         A.   No.
24         Q.   Did you rent that truck?
25         A.   No.
```

Page 27

```
 1                        E. SAMUELS
 2          Q.  Did you lease the truck?
 3          A.  Yes.
 4          Q.  Who did Ultimate Delivery System
 5     lease the truck from?
 6          A.  Mendon Leasing.
 7          Q.  Sorry, what was that?
 8          A.  Mendon, M-E-N-D-O-N, Mendon.
 9          Q.  Were you operating this truck before
10     you began contracting with HDL?
11          A.  No.
12          Q.  During the time that Ultimate
13     Delivery System was under contract with HDL,
14     did it ever operate more than one truck?
15          A.  Yes.
16          Q.  And what were the most amount of
17     trucks that it operated at any given time?
18          A.  Two.
19          Q.  Do you recall what years it was
20     operating two trucks?
21          A.  It was between 2015 and 2016.
22          Q.  When Ultimate Delivery System began
23     contracting with HDL, did it have any
24     employees?
25          A.  No.
```

Page 28

```
 1                        E. SAMUELS
 2          Q.  Did it have any contractors?
 3          A.  No.
 4          Q.  So, was it just you?
 5          A.  Yes.
 6          Q.  Throughout your time contracting
 7     with HDL, did Ultimate Delivery System hire
 8     any employees?
 9          A.  I do a 10-99 contract as I hire a
10     helper. I pay a 10-99.
11          Q.  So, the company never had W2
12     employees, is that correct?
13          A.  No.
14          Q.  What was the most amount of people
15     that the people had working for it at any
16     given time?
17          A.  Me, plus three.
18          Q.  And what were the roles of the other
19     three?
20          A.  One helper, two drivers, two
21     helpers, one driver, sorry, plus me as a
22     driver.
23          Q.  So that would be when you were
24     running two trucks?
25          A.  Two trucks, yes.
```

Veritext Legal Solutions
800-336-4000

E. SAMUELS

1

2      Q.  And what was the least amount of

3   contractors that the company ever had

4   working for it?

5      A.  Just one, me and one guy.

6      Q.  Have you ever provided services for

7   HDL out of one of HDL's other locations?

8      A.  Yes, they sent me... they asked me

9   to go Rochester.

10      Q.  Do you recall when that was?

11      A.  No.

12      Q.  Did it occur on multiple occasions?

13      A.  A few times.

14      Q.  And would you provide services for a

15   certain period of time when you were in

16   Rochester?

17      A.  Yes, they usually do it for a week

18   or two, depends if it's... Let's say it's

19   busy and they're down a truck. They would

20   have us go up on a truck to balance out that

21   terminal.

22      Q.  And would you personally go to

23   Rochester?

24      A.  Yes.

25      Q.  Would you ever send your other truck

Page 30

1                          E.  SAMUELS
2        there?
3              A.   No.
4              Q.   Why's that?
5              A.   Because I don't trust nobody else
6        driving all the way to Rochester with a
7        truck.
8              Q.   And was that your decision to make?
9              A.   They usually want me to work there
10       because they want me to be able to handle
11       the load they have.
12             Q.   Could you have sent the other truck
13       if you wanted to, though?
14             A.   Not many guys want to go out of
15       town.
16             Q.   And why is that?
17             A.   Because you're going away for a week
18       and it might end up being two weeks, might
19       even end up being three weeks, depends on
20       how busy or how swamped that terminal is. So
21       most other guys don't want to go.
22             Q.   When you would go to Rochester, did
23       you ever negotiate higher rates?
24             A.   They usually set the rates and tell
25       you, "This is what you're going to get," and

                                            Page 31

```
 1                        E.  SAMUELS
 2      you go.
 3              Q.  Did you ask for more?
 4              A.  No.
 5              Q.  Did you ever try to negotiate?
 6              A.  Yes.
 7              Q.  And what happened on those
 8      occasions?
 9              A.  They said, "There's not enough
10      money."
11              Q.  Did you ever refuse to go to
12      Rochester?
13              A.  I've done it a few.
14              Q.  And were there any repercussions for
15      not going to Rochester?
16              A.  I don't know, I was home for a few
17      days, so I'm not sure. That's why they just
18      figured I needed some days off.
19              Q.  Did you ever provide services for
20      HDL out of the Buffalo location?
21              A.  I doubt that, I think I've only been
22      to Rochester.
23              Q.  What about Reardon, New Jersey?
24              A.  No.
25              Q.  And no other HDL locations?
```

Veritext Legal Solutions
800-336-4000

```
 1                        E. SAMUELS
 2        A.   Just Rochester.
 3        Q.   Have you ever heard the term travel
 4   team?
 5        A.   Yes.
 6        Q.   And what's that?
 7        A.   That's when they send you out of
 8   town on a team to go to a different terminal
 9   to go help out the terminal.
10        Q.   And is that what you would consider
11   Ultimate Delivery System did when it would
12   go to Rochester?
13        A.   Yes.
14        Q.   And the company never had
15   opportunities to go to a different HDL
16   location?
17        A.   No.
18        Q.   Mr. Samuels, I am going to share my
19   screen.
20        A.   Sure.
21        Q.   And I'm showing a document, a four-
22   page document, that's titled Plaintiff
23   Everald Samuels' Responses to Defendant's
24   First Set of Interrogatories.
25             Do you see this document?
```

Page 33

```
 1                    E.  SAMUELS
 2         A.   Yes.
 3         Q.   Okay, this is being deemed exhibit
 4    one, for the record.
 5                         (Whereupon, the witness was
 6                    shown a document marked as
 7                    Exhibit 1 for identification as
 8                    of this date.)
 9         Q.   Do you recognize this document, Mr.
10    Samuels?
11         A.   Yes.
12         Q.   Okay, I'm going to turn to the
13    bottom of page three and the top of page
14    four on this document. Are you able to read
15    the screen here, Mr. Samuels?
16         A.   Yes.
17         Q.   Okay, at the bottom of page three
18    here, it states, "Plaintiffs states that
19    during the time he worked for HDL, he
20    utilized the helper named Jerry Cesar from
21    2015 to 2016, and he was paid $130 per day;
22    a driver named Javel Williams, from 2015 to
23    2016, and he was paid $150 per day; a helper
24    named Hugh Jackson from 2014 to 2016, and he
25    was paid $120 per day; and a helper named
```

```
 1                    E. SAMUELS
 2    Shawn McLaren from 2013 to 2014, and he was
 3    paid $110 a day." Did I accurately read
 4    that?
 5         A.  Yes.
 6         Q.  Okay, I'd like to just talk briefly
 7    about some of these individuals you listed.
 8    So, Shawn McLaren, was he the first helper
 9    that you, at Ultimate Delivery System, had
10    brought onboard?
11         A.  Yes.
12         Q.  Okay, how did you find Shawn McLaren
13    as a helper?
14         A.  I knew him for years.
15         Q.  And you reached an agreement to pay
16    him $110 a day, is that correct?
17         A.  Yes.
18         Q.  And did that pay ever vary?
19         A.  No, it usually stayed basic.
20         Q.  So, if you had more stops in a given
21    day, you wouldn't provide more pay per day?
22         A.  No.
23         Q.  And if there were less stops in a
24    given day, you wouldn't decrease the amount
25    of pay?
```

Page 35

```
1                        E.  SAMUELS
2          A.   No.
3          Q.   Okay, then who was the next helper
4    that Ultimate Delivery Systems worked with?
5          A.   Hugh Jackson.
6          Q.   Okay, and did Hugh Jackson fill the
7    role after Shawn McLaren departed?
8          A.   Yes.
9          Q.   Okay, and you stated that you paid
10   Hugh Jackson $120 per day, correct?
11         A.   Yes.
12         Q.   Did that pay ever vary?
13         A.   No.
14         Q.   And how did you find Hugh Jackson?
15         A.   He was my ex-wife's nephew.
16         Q.   And was it your decision to hire
17   him?
18         A.   Yes, he came from Georgia. He was
19   here and needed some work.
20         Q.   Then it appears that you also had a
21   helper named Jerry Cesar, is that correct?
22         A.   That's when the second truck came
23   on. He was the helper for the second truck.
24         Q.   Okay, and how did you find Jerry
25   Cesar?
```

Page 36

```
 1                        E. SAMUELS
 2        A.  He was actually working with another
 3   guy that left the company, so he was looking
 4   for work.
 5        Q.  Was it your decision to hire him?
 6        A.  Yes, but at the same time, it had to
 7   be cleared by HDL, the other guy.
 8        Q.  Sure, and it says you paid him $130
 9   per day, correct?
10        A.  Yes.
11        Q.  Why did you pay him more than Hugh
12   Jackson?
13        A.  Because I am not on the truck, and
14   they take more responsibility if I'm not
15   there. Whoever I work with, I have to be all
16   responsibility for.
17        Q.  Okay, so did you ever work with
18   Jerry Cesar?
19        A.  No.
20        Q.  When you were on the truck as a
21   driver, were you always working with Hugh
22   Jackson?
23        A.  Yes.
24        Q.  And then Javel Williams, he was a
25   worker for Ultimate Delivery Systems,
```

Page 37

```
 1                          E.  SAMUELS

 2      correct?

 3              A.   Yes.

 4              Q.   And he was a driver?

 5              A.   Yes.

 6              Q.   And did he drive the second truck?

 7              A.   Yes.

 8              Q.   And did he always work with Jerry

 9      Cesar?

10              A.   Yes.

11              Q.   How did you find Javel Williams?

12              A.   They were a team prior.

13              Q.   And it says that you paid Javel

14      Williams $150 per day, correct?

15              A.   Yes.

16              Q.   Did that pay ever vary?

17              A.   No.

18              Q.   Did Hugh Jackson ever drive?

19              A.   No.

20              Q.   And did Jerry Cesar ever drive?

21              A.   No.

22              Q.   Did Ultimate Delivery Systems ever

23      have any other helpers or drivers?

24              A.   I can't recall.

25              Q.   Do you recall someone by the name of
```

Page 38

```
 1                    E. SAMUELS
 2    Steven Taylor?
 3         A.  Yes.
 4         Q.  Who's Steven Taylor?
 5         A.  He was a guy that comes on once in a
 6    while when I needed a third guy to help me
 7    out or whatever.
 8         Q.  And in what situations would that
 9    be?
10         A.  So, let's say I did a seven-day
11    week, and I started a new week, and I was a
12    little bit tired by the eighth or ninth day,
13    I would have him come in. That way, if I
14    have a simple delivery of a dryer that I
15    didn't have to go in, I would have him and
16    Shawn bring it in. That way I could shut my
17    eyes for a few minutes.
18         Q.  And would he be the driver of the
19    truck in those situations?
20         A.  No, I would drive. He would just be
21    the helper, the second helper.
22         Q.  So, in those situations you would
23    have two helpers on the truck?
24         A.  I would have two helpers.
25         Q.  Do you recall the name Rodney
```

Page 39

```
 1                    E. SAMUELS
 2     Patrick?
 3          A.   No. This is the thing, sometimes you
 4     bring a guy on and you run the name through
 5     HDL. And that person doesn't clear. It would
 6     still be like Steven, because he worked a
 7     couple times with me. Rodney, the name
 8     Rodney sounds familiar, but I do not recall
 9     who he is. So, it could've been someone I
10     had put in the system that just never
11     cleared, or it never showed up.
12          Q.   Were there any other drivers or
13     helpers that worked for Ultimate Delivery
14     System while you were contracted with HDL?
15          A.   No, but I've had a lot of guys that
16     came in, said they wanted work, and I put
17     them in, and they never showed up.
18          Q.   Is it accurate that while Ultimate
19     Delivery Systems was under contract with
20     HDL, you were not always the driver?
21          A.   No.
22          Q.   Did you ever take days off?
23          A.   Nope.
24          Q.   Did you ever take weeks off?
25          A.   No.
```

Page 40

```
 1                          E. SAMUELS
 2          Q.  Sitting here today, do you recall
 3     any instances that Ultimate Delivery System
 4     made deliveries for HDL where you were not
 5     the driver?
 6          A.  I can't recall.
 7          Q.  Mr. Samuels, are you familiar with
 8     the Federal Motor Carrier Safety
 9     Administration?
10          A.  Yes.
11          Q.  Did you register Ultimate Delivery
12     System with the Federal Motor Carrier Safety
13     Administration?
14          A.  Yes, I did.
15          Q.  And do you recall what filings you
16     made with the Federal Motor Carrier Safety
17     Administration?
18          A.  My binary and my insurance.
19          Q.  Did you personally make those
20     filings?
21          A.  Yes.
22          Q.  Does Ultimate Delivery System still
23     have motor carrier authority?
24          A.  No, it's no longer.
25          Q.  So did the motor carrier authority
```

Page 41

```
 1                      E. SAMUELS
 2    cease when you closed the company?
 3         A.  Yes.
 4         Q.  While you were performing deliveries
 5    for HDL out of the Syosset location, is it
 6    accurate that the product delivered would be
 7    stored at a warehouse?
 8         A.  In the warehouse or at a warehouse?
 9         Q.  Well, what do you mean by the
10    warehouse?
11         A.  Syosset is a hub. They don't keep
12    stuff. It's just whatever comes in, in the
13    morning, whatever is going out during the
14    day comes in, in the morning, on a trailer
15    and put in the lanes. Delivery teams then
16    come in, load up, take that to deliver it.
17    They don't keep products in the warehouse.
18         Q.  Okay.
19         A.  There's no inventory in the
20    warehouse.
21         Q.  Was that warehouse operated by
22    Sears?
23         A.  I think so.
24         Q.  And then were there other delivery
25    companies like Ultimate Delivery System at
```

Page 42

```
 1                            E. SAMUELS
 2     the warehouse?
 3          A.  Yes.
 4          Q.  Can you approximate how many?
 5          A.  I have no... I can't recall because
 6     the numbers change. They got peak where it's
 7     running multiple trucks, and then there's
 8     regular time where they're running way fewer
 9     trucks. So, it fluctuates with the needs of
10     HDL and Sears.
11          Q.  Would you change your business
12     strategies or approach based on peak season
13     or slow time?
14          A.  Yes.
15          Q.  And how would you do that?
16          A.  During peak, you get maybe one more
17     truck than need, that way you have a truck
18     regardless. And when it's slow, you just
19     keep your one truck.
20          Q.  So, while you were operating two
21     trucks, were there days that you would only
22     run one of those trucks?
23          A.  Yes.
24          Q.  And you would do that based on the
25     amount of product that was available for
```

Page 43

```
 1                    E. SAMUELS
 2    delivery?
 3         A.   I would do what?
 4         Q.   Decide to run two trucks versus one
 5    truck?
 6         A.   I don't decide, they'll decide that.
 7         Q.   What do you mean by that?
 8         A.   They tell you they need one or two
 9    trucks. They tell you how many trucks for
10    the next day. We only got several trucks, so
11    we only want to give you one tomorrow, or
12    the numbers are not good enough, so you're
13    going to sit for a day. I can't decide. I
14    can't say, "I want both my trucks running
15    every day." It doesn't work like that,
16    unfortunately.
17         Q.   And so HDL would say, "We have
18    enough product for you to run both your
19    trucks today if you want?"
20         A.   Yup, tomorrow, or the next day, or
21    Thursday, or whatever the day is.
22         Q.   Where would you store the trucks
23    when you weren't making deliveries?
24         A.   They're parked out in front of the
25    yard.
```

Page 44

```
1                    E. SAMUELS
2        Q.   And where is the yard?
3        A.   Syosset, 225 Robins Lane, Syosset.
4        Q.   While Ultimate Delivery Systems was
5   under contract with HDL, did it ever provide
6   services to another company?
7        A.   No.
8        Q.   Did it ever make deliveries for
9   another company?
10       A.   No.
11       Q.   Did you personally ever provide
12  services to another company?
13       A.   No.
14       Q.   And did you ever make deliveries for
15  another company?
16       A.   No.
17       Q.   And when did Ultimate Delivery
18  System end its contract with HDL?
19       A.   I think it's early 2017.
20       Q.   And why did it end its contract?
21       A.   Financial debate.
22       Q.   What do you mean by that?
23       A.   Meaning a new product came in that
24  took two and a half hours to be assembled. I
25  was the only one on dock that knew how to
```

Page 45

```
 1                    E. SAMUELS
 2    assemble it and first time it broke, they
 3    needed me to go and exchange it for free. So
 4    that means I had to go do double work, take
 5    the old one out, take it apart, bring the
 6    new one in, put it together, and because
 7    it's an exchange, it means the guy that did
 8    it prior got paid and I would have to do it
 9    for free.
10         Q.   Did you attempt to negotiate some
11    sort of other financial arrangement for
12    this?
13         A.   Yes, I did.
14         Q.   And what was that?
15         A.   I told them I need to get paid for
16    the job.
17         Q.   And what was the response?
18         A.   "You should be glad you got a job."
19         Q.   So then did you determine to end
20    your contract with HDL?
21         A.   No, then I was told to offload my
22    truck, go home, they'll call me.
23         Q.   And what happened then?
24         A.   They never called me.
25         Q.   Did you actually ever go back and
```

Page 46

```
 1                         E. SAMUELS
 2     reassemble the product?
 3          A.  No.
 4          Q.  And I'm not trying to trick you, I
 5     just want to make sure I understand the
 6     situation. So, they asked you to go back and
 7     reassemble this product, is that correct?
 8          A.  Yes [crosstalk] that I didn't
 9     deliver, nor did I set up. That was another
10     contractor that did that.
11          Q.  Okay, and you attempted to
12     negotiated pay for that?
13          A.  Yup.
14          Q.  And that attempt to negotiate was
15     unsuccessful?
16          A.  Yes.
17          Q.  So, you never went back to
18     reassemble the product, correct?
19          A.  No.
20          Q.  Did Ultimate Delivery System
21     contract with another company following its
22     termination of the contract with HDL?
23          A.  Yes, 60 days later.
24          Q.  And what company was that?
25          A.  FGO, no XVO, I'm sorry.
```

Page 47

```
1                        E. SAMUELS
2          Q.  Did Ultimate Delivery System use the
3     same trucks with XVO?
4          A.  Yes.
5          Q.  Both of them?
6          A.  Yes.
7          Q.  Did it keep its same workers when it
8     went to XVO?
9          A.  Yes.
10         Q.  And what services did it provide
11    XVO?
12         A.  Appliance deliveries for Home Depot.
13         Q.  And how long was Ultimate Delivery
14    System under contract with XVO?
15         A.  I can't recall.
16         Q.  Do you recall if there was another
17    company that Ultimate Delivery System
18    contracted with before it was closed?
19         A.  FGO.
20         Q.  FGO?
21         A.  Yes.
22         Q.  What's FGO?
23         A.  It's a logistics company, Last Mile
24    Logistics.
25         Q.  And what services did Ultimate
```

Page 48

```
 1                        E. SAMUELS
 2     Delivery System provide FGO?
 3           A.   Appliance delivery for Lowe's.
 4           Q.   Did it operate the same trucks that
 5     it had before?
 6           A.   Yes.
 7           Q.   And did it have the same workers
 8     that it had before?
 9           A.   No.
10           Q.   We've talked a little bit about the
11     trucks that Ultimate Delivery System
12     operated while under contract with HDL. How
13     did you insure those trucks?
14           A.   Through State Farm.
15           Q.   Did you find State Farm as an
16     insurer?
17           A.   Actually, HDL gave you some provided
18     insurance guys. You call them. You tell them
19     you're with HDL and they would give you a
20     quote based on who you work for.
21           Q.   And did Ultimate Delivery System pay
22     for insurance directly?
23           A.   Yes, except for Worker's Comp, which
24     I got through HDL.
25           Q.   So Ultimate Delivery Systems never
```

Page 49

```
 1                        E. SAMUELS
 2     had an insurance payment deducted from its
 3     settlement statement, is that fair?
 4          A.  Is Worker's Comp considered
 5     insurance?
 6          Q.  Sure, we'll talk about them
 7     separately. Speaking about liability
 8     insurance, did-
 9          A.  No.
10          Q.  ... Ultimate Delivery System...
11     Sorry let me ask my question first.
12          A.  Sorry.
13          Q.  Did Ultimate Delivery System ever
14     had an insurance payment deducted from its
15     settlement statement?
16          A.  I can't recall because I think at
17     one point I had insurance with them, but
18     it's been so long I do not recall. I know I
19     got mine in the end. I got my separate after
20     a while, but I wasn't sure if it's right
21     when I started with them or during the time
22     with them. So, I do not want to say no and
23     it's not. I think I did have insurance with
24     them at first.
25          Q.  But you do recall that at one point,
```

Page 50

```
 1                      E. SAMUELS
 2    you were paying directly for insurance, is
 3    that correct?
 4         A.   State Farm, yes.
 5         Q.   And was that payment system set up
 6    your decision to make?
 7         A.   Yes.
 8         Q.   Was the reason you chose to pay
 9    directly versus have the insurance deducted?
10         A.   Yes, because I think they were
11    charging too much, and I got my insurance
12    way cheaper than they were charging.
13         Q.   While you were under contract with
14    HDL, do you recall where you would take the
15    trucks for servicing?
16         A.   Yes, to Mendon.
17         Q.   And how did you choose that service
18    provider?
19         A.   I leased trucks from them.
20         Q.   Were you charged for that servicing?
21         A.   Yes.
22         Q.   And how did Ultimate Delivery
23    Systems pay for those service charges?
24         A.   Directly.
25         Q.   Would Ultimate Delivery Systems ever
```

Page 51

```
 1                      E. SAMUELS
 2    rent additional trucks on an as-needed
 3    basis?
 4          A.  Yes.
 5          Q.  Tell me about those situations.
 6          A.  If a truck broke down and you have a
 7    run for the next day, you've got to rent a
 8    truck to make sure that load goes out.
 9          Q.  And in those situations, who would
10    you rent the trucks from?
11          A.  Dodge it, U-Haul, CC Rental, Penske,
12    whichever one got a truck available at the
13    time.
14          Q.  Tell me a little bit about how that
15    would work, how you would determine which
16    company to rent from.
17          A.  I would ask the GM to make a
18    reservation. He would make the reservation.
19    And I would go and pick up the truck.
20          Q.  And when you say the GM, who's that?
21          A.  The general manager for the HDL
22    warehouse.
23          Q.  And do you recall that person's
24    name?
25          A.  Yes, Andre Wilson.
```

Page 52

                              E. SAMUELS

1
2        Q.   Was he the general manager the whole
3    time that Ultimate Delivery System was under
4    contract?
5        A.   Yes.
6        Q.   Did Ultimate Delivery System own
7    other business equipment?
8        A.   Huh?
9        Q.   Did Ultimate Delivery System own
10   cell phones?
11       A.   No, I just have my own personal
12   phone.
13       Q.   But it did not provide cell phones
14   to its workers?
15       A.   No, because we had HDL/Sears
16   actually gave you a phone that you would
17   use.
18       Q.   And did Ultimate Delivery System
19   have to pay for that phone?
20       A.   If it breaks, yeah.
21       Q.   But it didn't have to pay for the
22   use of it?
23       A.   No.
24       Q.   Did Ultimate Delivery System own any
25   computers?

                                         Page 53

```
 1                      E. SAMUELS

 2         A.   No.

 3         Q.   How about any equipment to help move

 4    appliances?

 5         A.   Yes, shoulder dollies, hand trucks.

 6         Q.   And those were owned by your

 7    company?

 8         A.   Yup.

 9         Q.   I've been going for about an hour

10    here. Why don't we go off the record and

11    take a 10-minute break?

12                    MR. ALBA:  Okay, sounds

13               good to me.

14                    THE VIDEOGRAPHER:  The time

15               is 6:29 and we are going off the

16               record. This is the end of media

17               unit number one.

18                    (Whereupon, a short recess

19               was taken.)

20                    THE VIDEOGRAPHER:  This is

21               the beginning of media unit

22               number two. The time is 6:42,

23               and we are back on the record.

24    BY MR. BREHM (continued):

25         Q.   Mr. Samuels, you understand that
```

Page 54

```
 1                        E. SAMUELS
 2     you're still under oath, correct?
 3          A.   Yes.
 4          Q.   Did Ultimate Delivery System have a
 5     company bank account?
 6          A.   Yes.
 7          Q.   Were payments that Ultimate Delivery
 8     System received from HDL deposited into that
 9     bank account?
10          A.   Yes.
11          Q.   Was all income that Ultimate
12     Delivery System generated deposited into
13     that bank account?
14          A.   Yes.
15          Q.   How were you paid by Ultimate
16     Delivery System?
17          A.   How was I paid?
18          Q.   Yes.
19          A.   Per check.
20          Q.   And what do you mean by that?
21          A.   I write myself a check, and
22     sometimes I just withdraw the money off the
23     card.
24          Q.   So, were you paid a salary?
25          A.   No.
```

Page 55

E. SAMUELS

1

2      Q.  Were you paid based on the labor

3  services you provided?

4      A.  No. I paid myself as I needed to pay

5  my bills.

6      Q.  And how would you determine how much

7  to pay yourself?

8      A.  I didn't pay myself because I never

9  took a salary. I never took a pay, I just

10  paid my bills.

11      Q.  So, you would take money from the

12  Ultimate Delivery System bank account when

13  you needed to pay bills?

14      A.  Yes.

15      Q.  Did you ever take draws or

16  distributions on top of that?

17      A.  What?

18      Q.  Did you ever pay yourself above and

19  beyond what you needed to pay the bills?

20      A.  No sir. I just paid the bills, paid

21  the mortgage, paid the truck payment, paid

22  insurance whenever bills needed to be paid.

23      Q.  So, you never took a salary,

24  correct?

25      A.  No.

Page 56

```
 1                    E.  SAMUELS
 2        Q.  And you never paid yourself a per
 3   day rate, correct?
 4        A.  No.
 5        Q.  Did you ever take money out of the
 6   business bank account on a consistent
 7   schedule?
 8        A.  No.
 9        Q.  So Ultimate Delivery System would
10   only pay you as needed for you to pay your
11   expenses?
12        A.  Yes.
13        Q.  Did anyone other than yourself have
14   signing authority with the business account?
15        A.  No.
16        Q.  Mr. Samuels, I'm going to share my
17   screen. On my screen here you can see what
18   has been deemed Exhibit 2.
19                      (Whereupon, the witness was
20                    shown a document marked as
21                    Exhibit 2 for identification as
22                    of this date.)
23        Q.  This is an electronic copy of an
24   Excel spreadsheet that's Bates labeled
25   HDL_K003132.
```

Page 57

<pre>
 1                        E.  SAMUELS
 2         A.   Yes.
 3         Q.   Do you see this document?
 4         A.   Yes sir.
 5         Q.   And I am currently sharing my screen
 6    on the spreadsheet that is marked UDY-UDY,
 7    do you see that?
 8         A.   Yes sir.
 9         Q.   At the top of this document it says,
10    "Home delivery link delivery settlement
11    statement." Do you see that?
12         A.   Yes sir.
13         Q.   And what's a home delivery link
14    delivery settlement statement?
15         A.   That's like a pay statement, pay
16    stub, however you say it.
17         Q.   Did Ultimate Delivery System receive
18    these statements from HDL?
19         A.   Yes, we did.
20         Q.   Would you receive paper copies of
21    these statements?
22         A.   Yes sir.
23         Q.   Do you have paper copies of these
24    statements?
25         A.   I said I have a few of them.
</pre>

Page 58

```
 1                    E. SAMUELS
 2        Q.  And did you receive them as the
 3   owner of Ultimate Delivery System?
 4        A.  Yes.
 5        Q.  How often did you receive these
 6   statements?
 7        A.  I think they were paying twice a
 8   week, biweekly. It's either biweekly or
 9   weekly. I'm not sure, but I think at one
10   point they went to biweekly.
11        Q.  Does it help your recollection to
12   look at Row 3 here where it says week ending
13   on June 29, 2013?
14        A.  So yeah, this is when they were
15   paying weekly, yes. 6/23-6/29. Yep.
16        Q.  And the fourth row here says,
17   "Driver Everald Samuels, is that correct?"
18        A.  Yes.
19        Q.  And what does that mean?
20        A.  That I was the driver.
21        Q.  Is there any way looking at this
22   document to tell if you were the driver
23   every day in this week?
24        A.  I would have to be because my name
25   ... They put the driver every day, so as you
```

Page 59

```
 1                         E. SAMUELS
 2    go in in the end of the week, that's when
 3    they tally up your days.
 4         Q.  Okay. And if there was someone else
 5    driving on one day of the week, would that
 6    change anything?
 7         A.  Like I said, sir, I never trust
 8    people to drive my vehicle because all it
 9    takes is one mistake to cost you everything
10    you've got. If one guy goes out there and
11    does what he's not supposed to, it could
12    cost everything.
13         Q.  So, did you ever have anyone other
14    than yourself driving your vehicle?
15         A.  No. Not until I went to the two
16    trucks, sir.
17         Q.  So, based on this statement here,
18    can you tell me how many days in this week
19    you were the driver?
20         A.  Six days.
21         Q.  And that's Monday through Saturday,
22    is that correct?
23         A.  Yes.
24         Q.  Were you the person that would
25    actually input the driver?s name on the
```

Page 60

```
 1                      E.  SAMUELS
 2    settlement statement?
 3         A.   No.
 4         Q.   Who would do that?
 5         A.   The GM.
 6         Q.   And that's Andre Wilson?
 7         A.   Yes, the general manager. That's how
 8    he makes his payroll. He puts your name in,
 9    the stop count like you can see right here.
10    All the stops I went back to, the schedule,
11    how much miles they paid us. [inaudible
12    00confirmed.
13         Q.   Did you review these settlement
14    statements when you received them?
15         A.   You mean my review where you just
16    got it, it's okay to put it away. I don't
17    know about reviewing because there's nothing
18    to review.
19         Q.   Did you check them for accuracy?
20         A.   Yes.
21         Q.   Were there ever any instances that
22    the settlement ... Sorry, let me finish my
23    question.
24         A.   Sorry.
25         Q.   Were there ever any instances that
```

Page 61

```
 1                      E. SAMUELS
 2     the settlement statement was inaccurate?
 3          A.  A lot of times, a few times, many
 4     times.
 5          Q.  And what would you do in those
 6     instances?
 7          A.  You would go to them, get the
 8     manifest, show them how much stops you did
 9     the day, how much callbacks and everything
10     else. And they would say, "Okay, we'll
11     correct it next time."
12          Q.  Did they ever have the wrong driver
13     listed on the settlement statements?
14          A.  No, because ... Nope.
15          Q.  And why did they never have the
16     incorrect driver listed?
17          A.  Because when you go in in the
18     morning, you get your paperwork. The
19     manager's going to make sure that the driver
20     is there, the helper is there. They have to
21     be noted. Approved drivers and helpers, so
22     when you go in someone house, they know who
23     they sending into the house. It's you.
24          Q.  So, what sorts of things would be
25     inaccurate on the settlement statements
```

Page 62

```
 1                          E. SAMUELS
 2     then?
 3          A.   A lot of stops, your go backs. Most
 4     of the time your mileage.
 5          Q.   When you received these settlement
 6     statements, would you ever write any
 7     notations on them yourself?
 8          A.   No. I would just bring my manifest
 9     and show it to them. That's about it.
10          Q.   Do you still have manifests from
11     when you were under contract at HDL?
12          A.   Yes. I should have a few. The
13     problem is I just moved, so I'm trying to
14     locate all of my paperwork from all these
15     companies.
16          Q.   Looking at this document, the
17     delivery settlement statement. Is there any
18     way of knowing who the helper was on this
19     occasion?
20          A.   Shawn McLaren.
21          Q.   And you know that based on your
22     personal knowledge of the workers you had
23     hired, correct?
24          A.   Yes.
25          Q.   But there's nothing on this document
```

Page 63

```
 1                      E. SAMUELS
 2    itself that I could go to and confirm as
 3    much?
 4         A.   No. They don't put helpers on there.
 5    They just have the driver and the contract
 6    company.
 7         Q.   But the work performed on this
 8    settlement statement would've been performed
 9    by both the driver and helper, is that
10    correct?
11         A.   And helper. Yes sir.
12         Q.   I'd just like to clarify a couple of
13    items on here. Looking at Row 11, which is
14    dated June 24, 2013, can you tell me how
15    many stops you had completed that day?
16         A.   16 stops that day.
17         Q.   And it appears that you were paid
18    $384 for those stops. Is that correct?
19         A.   Yes.
20         Q.   And that comes out to be $24 per
21    stop.
22         A.   Per stop, yep.
23         Q.   Was that always the rate that you
24    were paid per stop?
25         A.   Actually it's ... You got to do the
```

Page 64

```
 1                       E. SAMUELS
 2    go back, see the two go backs. That means it
 3    was 18 stops. They paid for an extra two
 4    stops.
 5         Q.  Would you please explain that to me?
 6         A.  All right, so let's say you get to a
 7    stop, customer's not at home, and you wait
 8    15 minutes, give them the time, they don't
 9    show up. You call and they give you a code.
10    You get to move on to your next stop. Then
11    say during the course of that day the
12    customer calls and says, "Hey. Is it
13    possible the team can come back?" And let's
14    say you are on time, if you're able to go
15    back and do that stop, they actually pay
16    you, I think it's instead of the ... You get
17    $10 or $13 if they're not at home, and then
18    you get $23 or $24. Whatever the pay rate
19    was, you got that extra stop plus $10 for
20    the go back.
21         Q.  Okay. And so, you're saying that on
22    this date there were 16 stops and two go
23    backs and confirmed, correct?
24         A.  Yes.
25         Q.  But would you look at Column L here,
```

Page 65

1                          E. SAMUELS

2       where it says go back and confirm add. Do

3       you see that?

4              A.  Yes. So, that was $40 for the go

5       backs, yep.

6              Q.  Okay. And that $40 encompasses the

7       two go backs. Is that accurate?

8              A.  Yes.

9              Q.  So, is it fair to say that on this

10      day you were paid $384 for the 16 stops, and

11      then an additional $40 for the two go backs?

12             A.  Go backs. Yes.

13             Q.  Then in Column H here, there's a

14      column labeled Fuel, where on this date June

15      24, 2013, it says $25.39. Do you see that?

16             A.  Yes.

17             Q.  Is this an amount that HDL would pay

18      you for fuel?

19             A.  Yes.

20             Q.  How was that calculated?

21             A.  I do not recall.

22             Q.  But it appears to vary by day here.

23      Correct?

24             A.  Yes. It depends on what ... I think

25      it varies on your mileage, plus ... It's

                                        Page 66

E. SAMUELS

1

2 basically your mileage times, I think it's

3 .49 or .48 per half a mile or per mile. It's

4 been so long, I don't remember what it was,

5 but they pay you a percentage of your

6 mileage.

7   Q. Okay. But is it your recollection

8 that the fuel amount paid by HDL was not

9 based directly on completed stops?

10   A. No, just mileage.

11   Q. And in Column G here, there is a

12 mileage category. Do you see that?

13   A. Yes.

14   Q. How was this mileage determined?

15   A. It was determined by what they said

16 you were supposed to do.

17   Q. And when you say they, who do you

18 mean?

19   A. So, I'm not sure who did the

20 routing, if it was HDL or Sears but they

21 would do the routing, and they would route

22 you a certain way. So, then they would say,

23 "You're supposed to do 35 miles." So even if

24 you did 60 miles, because they determined it

25 was supposed to be a 35-mile route. They put

Page 67

E. SAMUELS

1
2   you on parkways, freeways or whatever it
3   was, they pay you for the mileage they put
4   on the paperwork, not the actual mileage you
5   did.
6       Q.  Did you ever attempt to negotiate
7   higher mileage in those situations?
8       A.  Yes.
9       Q.  What was the result of that?
10      A.  Same thing. Just be glad you got a
11  job.
12      Q.  And would you describe to me what a
13  go back and confirm is?
14      A.  It means that I got to the stop, I
15  got a code that I could move on. I went back
16  to the stop, redid it, did the stop, called
17  back in and got another code confirmed by
18  the customer that the delivery was complete
19  on my second attempt.
20      Q.  Okay, and it appears that you were
21  paid on this occasion $20 per go back. Is
22  that correct?
23      A.  Yes.
24      Q.  How was that number determined?
25      A.  It determines how much stop I went

Page 68

E. SAMUELS

1
2   to that was not at home that I went back to.
3       Q.   But were you ever paid more than $20
4   for go back?
5       A.   No.
6       Q.   Were you ever paid less?
7       A.   I don't recall.
8       Q.   And was this an amount that was
9   offered to you by HDL?
10      A.   I think so.
11      Q.   Going one column over to Column M,
12  there's a category called specials. What are
13  specials?
14      A.   Specials is basically going above
15  and beyond to get something done for the
16  customer and it's confirmed by customer and
17  confirmed by Sears.
18      Q.   And-
19      A.   So ...
20      Q.   Sorry, go ahead.
21      A.   So, a special would be, okay, you're
22  bringing out a treadmill. It has to go up in
23  pieces. You have to take it apart, bring it
24  up, set it together, make sure it works. So,
25  they'll give you an extra stop for a special

Page 69

```
 1                        E. SAMUELS
 2    that you got completed.
 3         Q.  And it looks like there was one
 4    special on Saturday June 29, is that
 5    correct?
 6         A.  Yes. That's what it says.
 7         Q.  For $24?
 8         A.  Yep.
 9         Q.  Do you recall how the $24 figure was
10    determined?
11         A.  No, unfortunately I don't remember.
12         Q.  Is this something that you would
13    request?
14         A.  No. I think that's in the original
15    contract for specials, and the schedule A
16    that they give you, I think that was on it
17    for $24 and go backs were $20, and some
18    other stuff but I can't recall. It's been
19    that long, sir. Sorry.
20         Q.  Would a particular delivery counting
21    as a special be something that you would
22    request?
23         A.  No.
24         Q.  How was it determined whether a
25    particular delivery was a special?
```

Page 70

E. SAMUELS

1

2      A.  They determined what it was. Let's

3  say you get to a stop and the customer has

4  some special needs, and you want to help the

5  customer. You can call and say, "Look, I'm

6  here. The customer needs this, this, this

7  done." And they say, "Okay, we'll give you a

8  special for it." Basically, that's it. Or

9  I'll give you two specials. Sometimes they

10  say two, and when you're finished you only

11  get one.

12      Q.  Were you ever able to negotiate more

13  specials?

14      A.  I've done that, and they've said,

15  "Yes we will," but then when your pay comes

16  you only got one or you've got two instead

17  of four, one instead of three.

18      Q.  In those situations after reviewing

19  the settlement statement, would you go back

20  and tell them that they were wrong?

21      A.  Yes. You go to the GM, and you say,

22  "This is on my paperwork. You said three.

23  Blah, blah, blah." And it always comes back

24  down to, "We'll see what we can do next

25  way."

Page 71

```
 1                        E. SAMUELS
 2           Q.  It always comes back to that?
 3           A.  See what we'll do next week.
 4           Q.  So, were there ever any instances
 5      when you negotiated higher specials and you
 6      were paid for those higher specials?
 7           A.  I really don't recall getting them.
 8           Q.  But you recall not getting them?
 9           A.  Yes.
10           Q.  I'd like to direct your attention to
11      the bottom half of this settlement statement
12      here, beginning at Row 19. It says, "Do home
13      delivery link." Do you see that?
14           A.  Yep.
15           Q.  Is this the part of the settlement
16      statement that would show the deductions
17      taken from Ultimate Delivery System
18      settlements?
19           A.  Yes.
20           Q.  I'd like to just talk about a couple
21      of these. On Row 20, I apologize here, it
22      says "Worker's comp insurance." Do you see
23      that?
24           A.  Yes.
25           Q.  And that's for $104.
```

Veritext Legal Solutions
800-336-4000

```
1                        E. SAMUELS
2          A.   Yes.
3          Q.   What is worker's comp insurance?
4          A.   That's insurance that say they got
5     worker's comp for you. You pay them so they
6     pay your worker's comp.
7          Q.   And this worker's comp insurance was
8     facilitated through HDL?
9          A.   Yes.
10         Q.   Did Ultimate Delivery Systems
11    receive a deduction every week for worker's
12    comp?
13         A.   Yes.
14         Q.   Was it always $104?
15         A.   I think so. It might've went up
16    after a while. I'm not sure.
17         Q.   And did this insurance cover
18    worker's compensation for other Ultimate
19    Delivery System workers?
20         A.   No.
21         Q.   Who did it cover?
22         A.   No one actually.
23         Q.   What do you mean by that?
24         A.   Because even though I would ... I
25    couldn't be on it as an owner, and my
```

Page 73

```
 1                        E. SAMUELS
 2     helpers or carriers couldn't be on it, so we
 3     couldn't even file worker's comp even if we
 4     wanted. It was an umbrella filing. It was
 5     just basically worker's comp showing the
 6     state that we got worker's comp. That was
 7     it.
 8          Q.  So, did you actually receive a
 9     worker's comp policy?
10          A.  I got a policy number, and if you
11     don't mind, when I tried to use that policy
12     elsewhere, they said it was an HDL policy.
13     It wasn't for Ultimate Delivery System.
14          Q.  So, it's your testimony today that
15     the worker's comp insurance Ultimate
16     Delivery Systems paid for did not actually
17     provide coverage to anyone?
18          A.  Yes.
19          Q.  Going to Row 21 here, contractor
20     insurance package. Do you see that?
21          A.  Yes.
22          Q.  And there's no deduction for that,
23     correct?
24          A.  Yes.
25          Q.  And that's because you purchased
```

Page 74

```
 1                        E. SAMUELS
 2      insurance directly through State Farm,
 3      correct?
 4             A.   Yes.
 5             Q.   At Row 28 here, there's a category
 6      called uniforms, do you see that?
 7             A.   Yes.
 8             Q.   And there's a deduction for $184. Is
 9      that correct?
10             A.   Yes.
11             Q.   What is that for?
12             A.   For uniform shirt they say you have
13      to wear.
14             Q.   So, who said you have to wear?
15             A.   HDL says there's a particular shirt
16      or uniform marked "Authorized carrier" that
17      you have to wear, so they would sell it to
18      you, so you'd be in uniform compliance.
19             Q.   And who told you that you had to
20      wear a uniform that said authorized carrier?
21             A.   The regional manager and the GM when
22      they came down.
23             Q.   Did you have to purchase that
24      uniform through HDL?
25             A.   Yes. I even tried to make my own and
```

Page 75

E. SAMUELS

1

2     they said it wasn't good enough.

3          Q.   And tell me about that situation.

4          A.   I went and got the same blue color

5     shirts with the collar, the polo, and put

6     authorized carrier on it. They said it

7     wasn't up to their standard, so I had to

8     purchase their shirts.

9          Q.   Who told you it wasn't up to their

10    standard?

11         A.   The GM.

12         Q.   Who's the GM?

13         A.   Andre Wilson.

14         Q.   And this $184 that was deducted,

15    does this have anything to do with the work

16    that was performed in this week?

17         A.   No. That's just uniform that they

18    sell you. Pays when you got a uniform vest

19    dirty, and they give you one and tell you

20    you got to pay for it. So, let's say I wore

21    a shirt yesterday and unfortunately, I got a

22    stain, and I wasn't able to wash it, or I

23    got back to the warehouse and my shirt's a

24    little dirty, they're going to tell me I've

25    got to purchase a new shirt today because

Veritext Legal Solutions
800-336-4000

1                          E. SAMUELS
2      I'm going to people's houses. So, they'll
3      give you a shirt, and then they'll deduct
4      it.
5           Q.  Were these uniforms also for your
6      helpers and other drivers?
7           A.  Yes.
8           Q.  Did you charge them for uniforms?
9           A.  No.
10          Q.  The next row down here, 29,
11     performance bond. What is that?
12          A.   That's basically a security bond.
13     It's basically they hold onto $2500 per
14     truck, so just in case if after you leave
15     the company or whatever happens, they still
16     have that 25 plus whatever paycheck they
17     hold on to cover any claims or damages or
18     losses to HDL.
19          Q.  Do you recall the amount that the
20     performance bond was for?
21          A.  $2500.
22          Q.  And was there $100 deducted from the
23     settlement statement until that was
24     deposited?
25          A.  Yes.

Veritext Legal Solutions
800-336-4000

E. SAMUELS

1

2    Q.   And did that $100 vary week by week?

3    A.   It was $100 every week.

4    Q.   And that had nothing to do with the

5    amount of work performed in that week.

6    Correct?

7    A.   No.

8    Q.   And then Row 32 is administrative

9    fee. What is that?

10    A.   That's what they took out of your

11    paycheck for administration. I'm not sure. I

12    think it was 5% or something like that.

13    Q.   It was a percentage of the total

14    settlement?

15    A.   Yes.

16    Q.   And that percentage was consistent

17    across different settlements?

18    A.   Yes. It's basically 5% of whatever

19    your gross was.

20    Q.   Also going back here to Row 30,

21    there's a merchandise claim category. Do you

22    see that?

23    A.   Yes. That's just in case they say

24    you damage an appliance, or a fridge came

25    back with a dent, and they say you did it,

Page 78

1                      E. SAMUELS
2     it happened on your truck.
3          Q.   Did Ultimate Delivery System ever
4     have to pay for a merchandise claim?
5          A.   A few times.
6          Q.   And was that always deducted from
7     the settlement statement?
8          A.   Yes.
9          Q.   Could you have had the option to pay
10    directly?
11         A.   No.
12         Q.   And if it were to appear on a
13    settlement statement, would it appear on the
14    settlement statement for the week in which
15    the damage occurred?
16         A.   No.
17         Q.   So, would there be any way to tie
18    the merchandise claim back to the week in
19    which the damage occurred?
20         A.   No. So how it works is you bring a
21    fridge back on Monday. They take it in on
22    Monday, and then the warehouse people come
23    in on Wednesday and they go to all the
24    units, and they say, "This fridge looks like
25    it fell off the truck. It doesn't look like

```
 1                      E. SAMUELS
 2    XYZ," and they say, "Put the claim in under
 3    the driver." Sears would then do a claim
 4    form, give that to HDL management, which it
 5    depends on the time they took ... Sorry
 6    about it. Can you hear me?
 7         Q.   Yes.
 8         A.   So, it depends on the time between
 9    HDL gets the claim from Sears to the point
10    where they say, "Okay, we going to charge
11    this driver." That's when you get it. So, it
12    could be a week, could be two weeks, could
13    be three, could be a month.
14         Q.   And that amount of time varied
15    across the board?
16         A.   Yes.
17         Q.   Did you have an option to submit
18    merchandise claims to your insurance and
19    have insurance cover it?
20         A.   Yes, but half the time it would make
21    no sense because the payment you paying
22    would be less than the deductible.
23         Q.   So, you chose to have it deducted
24    instead?
25         A.   Yes. You can't have too much
```

Veritext Legal Solutions
800-336-4000

```
 1                    E. SAMUELS
 2    merchandise claims through insurance, or
 3    eventually they going to drop you. Sorry.
 4         Q.  Mr. Samuels, I'm going to share my
 5    screen. What I'm deeming marked as Exhibit
 6    3.
 7                         (Whereupon, the witness was
 8                          shown a document marked as
 9                          Exhibit 3 for identification as
10                          of this date.)
11         Q.  This is another Excel spreadsheet,
12    with 14 sheets. It is Bates labeled
13    HDL_K003195. Are you able to see this
14    document?
15         A.  Yes.
16         Q.  Actually, I apologize. I have the
17    wrong Bates label on this. It's actually
18    Bates labeled HDL_K002873. And I'm on the
19    page that says UDL UDL. Do you see that?
20         A.  Yes.
21         Q.  Okay. Or sorry, UDY UDY. You see
22    that?
23         A.  Yes.
24         Q.  And what does UDY UDY mean?
25         A.  I guess that's a location for
```

Page 81

```
 1                    E. SAMUELS
 2     Ultimate Delivery.
 3          Q.  On Row 3 here under driver, it says
 4     Everald Samuels, correct?
 5          A.  Yes.
 6          Q.  And it states week ending in
 7     11/14/2015. Is that correct?
 8          A.  Yes.
 9          Q.  Can you tell if you were the driver
10     for every day on this settlement statement?
11          A.  I should be.
12          Q.  I'd like to talk about starting at
13     Row 33 here, and this is do home delivery
14     link. Do you see that?
15          A.  Yes.
16          Q.  These are the deductions again.
17     Correct?
18          A.  Yes.
19          Q.  Okay, and in Row 34 there's truck
20     rental. Do you see that?
21          A.  Yes.
22          Q.  What is that deduction for?
23          A.  I think that's when I had Hino.
24          Q.  When you what?
25          A.  When they had me lease the Hino.
```

Page 82

1                          E. SAMUELS
2      That's when I leased the truck from Mendim.
3            Q.  And that amount was $450, correct?
4            A.  Yes.
5            Q.  Was that always $450 per week?
6            A.  Per week, yep.
7            Q.  And it did not vary based on the
8      amount of work performed in a week, right?
9            A.  Nope. Nope.
10           Q.  In the lease that you had set up,
11     you were choosing to have your lease
12     payments deducted from your settlement
13     statement. Is that correct?
14           A.  I didn't choose to do that actually.
15     HDL set it up with Mendim.
16           Q.  And you agreed to that system?
17           A.  Yes.
18           Q.  Going down to Row 43 here, it says
19     "In home damage claim." Do you see that?
20           A.  Yep. Yes sir.
21           Q.  And that's for $244.69. Is that
22     correct?
23           A.  Yes sir.
24           Q.  What's an in-home damage claim?
25           A.  That's if I go in a house, a

Veritext Legal Solutions
800-336-4000

```
 1                        E. SAMUELS
 2     customer calls and said I scratched their
 3     floor or wall, broke a picture. Whatever it
 4     is, in home. You damage something in the
 5     home.
 6          Q.   Is there any way of knowing what
 7     week this in home damage claim occurred in?
 8          A.   See that number right there, 221044?
 9          Q.   Yes.
10          A.   HDL would have that. That would be
11     an HDL number that they would use to track
12     the customer?s name and what was claimed on
13     the damage.
14          Q.   And do you know what that number
15     corresponds to?
16          A.   Like I said, it's an HDL number that
17     they locate to a claim number so they would
18     know who's a customer and what the customer
19     list in their incident.
20          Q.   Looking at this document, is there
21     any way of knowing who the driver was when
22     this damage claim occurred?
23          A.   If it says Everald Samuels, then
24     it's going to be me.
25          Q.   So, is it your testimony that if the
```

Veritext Legal Solutions
800-336-4000

```
 1                         E. SAMUELS
 2      driver ID in Row 3 here says Everald Samuels
 3      then you were the driver when the in-home
 4      damage claim occurred?
 5           A.  Yes. But you've also got to realize
 6      that even if that was on let's say Jared
 7      Caesar, it would still be UDY, so they would
 8      send it to my settlement regardless.
 9           Q.  So, did you ever review these
10      settlement statements to make sure the in-
11      home damage claims were applied to the
12      appropriate driver?
13           A.  Yes, but at the same time, by the
14      time you get an in-home damage, it's already
15      being deducted.
16           Q.  And is this a similar situation to
17      the merchandise claims where they could
18      appear weeks or months after the damage
19      occurred?
20           A.  Yes sir. Actually, with an in-home
21      damage it could be up to a year later.
22           Q.  Did you ever have an instance where
23      you received an in-home damage claim from a
24      driver, and it was deducted from your
25      paycheck while the driver no longer worked
```

Page 85

```
 1                    E.  SAMUELS
 2     for Ultimate Delivery System?
 3          A.   Yes.
 4          Q.   And what was that?
 5          A.   What was the claim?
 6          Q.   Tell me about the situation.
 7          A.   Yes. You have a driver that stops
 8     working for you and a claim comes in eight
 9     months, six months after he no longer works
10     for you.
11          Q.   And that actually happened to
12     Ultimate Delivery Systems?
13          A.   Yes.
14          Q.   And for these claims could you also
15     choose to submit them to insurance?
16          A.   You could, but like I said, by the
17     time you get it, even if you went to your
18     insurance, they would tell you that it's
19     been six months. We can look into it, we can
20     send an adjuster out, but that's about it.
21     They can't do anything else.
22          Q.   So, is it fair to say that an in-
23     home damage claim deduction may or may not
24     be related to the work you performed in a
25     given week?
```

Page 86

```
 1                          E. SAMUELS
 2           A.   Yes.
 3           Q.   Did Ultimate Delivery Systems file
 4      taxes?
 5           A.   Yes.
 6           Q.   And did they deduct in home damage
 7      claims from their taxes?
 8           A.   No.
 9           Q.   Would it deduct merchandise claims
10      from its taxes?
11           A.   No. Merchandise are kept by Sears
12      even though you pay for it.
13           Q.   What do you mean by that?
14           A.   So, let's say you damage a fridge.
15      They charge you for it, but Sears actually
16      keep that fridge. You don't even get the
17      property, so it's not for you to say, "I own
18      this. I can do anything with it."
19           Q.   Okay, but Ultimate Delivery System
20      would pay that damage claim, correct?
21           A.   Yes.
22           Q.   And on its taxes, it would not
23      deduct that as a business expense. Is that
24      accurate?
25           A.   Yes.
```

Veritext Legal Solutions
800-336-4000

E. SAMUELS

1

2        Q.   Okay. Mr. Samuels, I'm sharing my

3   screen with what has been deemed Exhibit 4.

4   This is another Excel spreadsheet Bates

5   labeled HDL_K003195.

6                        (Whereupon, the witness was

7                   shown a document marked as

8                   Exhibit 4 for identification as

9                   of this date.)

10       Q.   Do you see this document?

11       A.   Yes.

12       Q.   And this is another delivery

13   settlement statement, correct?

14       A.   Yes.

15       Q.   And this is for the date week ending

16   9/20/2014, correct?

17       A.   Yep.

18       Q.   And you are listed as the driver,

19   correct?

20       A.   Yes.

21       Q.   Okay. I'd like to go starting at Row

22   34 here where we have do home delivery link.

23   Do you see that?

24       A.   Yes.

25       Q.   And these are the deductions,

Page 88

```
 1                        E.  SAMUELS
 2      correct?
 3             A.   Yes sir.
 4             Q.   And at Row 35 we have another truck
 5      rental deduction, correct?
 6             A.   Yes.
 7             Q.   Do you believe this is for your
 8      lease of the truck that Ultimate Delivery
 9      Systems was operating?
10             A.   Yes.
11             Q.   It says $500 week, correct?
12             A.   Yes.
13             Q.   Was that a $500 deduction every
14      week?
15             A.   Yes.
16             Q.   And it did not vary based on the
17      amount of work performed in that week,
18      correct?
19             A.   No.
20             Q.   Okay. Down to Row 48, we have DMV
21      citations. Do you see that?
22             A.   Yes.
23             Q.   What is that deduction category for?
24             A.   It looks like it's a ticket.
25             Q.   And why do you say that?
```

Veritext Legal Solutions
800-336-4000

E. SAMUELS

1

2      A.   Parking ticket. Because it says DMV

3  citation, that number right there, and

4  because I was using a leased truck Mendim

5  will send the direct citation. HDL would pay

6  it and then deduct it.

7      Q.   Is there any way of knowing if this

8  citation occurred in the week that ends in

9  9/20/2014?

10     A.   No, and I doubt it would be the same

11  week. It would probably be a month prior.

12     Q.   Why do you say that?

13     A.   Because usually tickets when they

14  hit the leasing company, it's 30 days after

15  it was given.

16     Q.   And is there any way of knowing who

17  the driver was when this citation occurred?

18     A.   Yes. It says Everald Samuels. I

19  would know in the citation because it

20  wouldn't be in this week.

21     Q.   Sure. It was deducted from this

22  week's settlement statement though, correct?

23     A.   Yes.

24     Q.   But is it possible that it was

25  another driver that incurred the citation?

Page 90

```
 1                        E. SAMUELS
 2        A.   I doubt that because at the time I
 3   think I was still running one truck.
 4        Q.   Okay. Did you ever have any
 5   instances when a DMV citation was deducted
 6   from a settlement statement with your name
 7   on it and it was actually another driver
 8   that received the citation?
 9        A.   I don't recall to be honest.
10        Q.   And then on Row 50 here there's
11   another category. Do you see that?
12        A.   Yes.
13        Q.   And it says $465 for loan payment.
14        A.   Yes.
15        Q.   Do you know what that is for?
16        A.   Yes. That mean I borrowed some money
17   from HDL, and they were deducting it back.
18        Q.   And do you recall-
19        A.   I took a loan.
20        Q.   Sorry, go ahead.
21        A.   I mean I asked them for a loan and
22   they probably, not probably, they gave it to
23   me. Then they deducted the money back.
24        Q.   Do you recall what this particular
25   loan was for?
```

Page 91

```
 1                         E.  SAMUELS
 2         A.   I wish, no.
 3         Q.   Does this deduction have anything to
 4    do with the work performed in this given
 5    week?
 6         A.   No.
 7         Q.   Did you personally receive a W-2
 8    form from Ultimate Delivery System?
 9         A.   No.  1099.
10         Q.   You received a 1099?
11         A.   Yep.
12         Q.   Do you still have those 1099s?
13         A.   No.
14         Q.   You testified earlier that Ultimate
15    Delivery System filed taxes, correct?
16         A.   Yes.
17         Q.   Do you maintain any of those tax
18    returns?
19         A.   I would have to get them.
20         Q.   Do you have access to them?
21         A.   My accountant does.
22         Q.   Did your-
23         A.   My ex-accountant does.
24         Q.   Did your ex-accountant prepare the
25    tax filings for Ultimate Delivery Systems?
```

Page 92

```
 1                        E. SAMUELS
 2           A.   Yes.
 3           Q.   And were you the person who selected
 4      that accountant?
 5           A.   Yes.
 6           Q.   How'd you pick them?
 7           A.   Another contractor told me about
 8      him.
 9           Q.   Would you also file personal tax
10      returns separate from the company?
11           A.   Yes.
12           Q.   And did the same accountant prepare
13      those tax-
14           A.   No.
15           Q.   Who did?
16           A.   My sister.
17           Q.   On Ultimate Delivery System's tax
18      returns, would you deduct business expenses?
19           A.   I don't recall.
20           Q.   Did you provide 1099 forms for your
21      workers?
22           A.   Yes.
23           Q.   Do you still have any of those 1099
24      forms?
25           A.   He would have those unfortunately.
```

Page 93

```
1                           E.  SAMUELS
2            Q.   And when you say he, who do you
3       mean?
4            A.   My accountant. The problem is I
5       just, like I said, I moved about a year and
6       a half ago and a lot of my paperwork's there
7       in storage. Just haven't been -- I haven't
8       been there in a minute.
9            Q.   Did Ultimate Delivery Systems
10      maintain financial bookkeeping documents?
11           A.   No.
12           Q.   You didn't use QuickBooks?
13           A.   No. I just paid my guys the days
14      they worked.
15           Q.   And who was in charge of making sure
16      that your guys were paid?
17           A.   What was that?
18           Q.   Who was in charge of making sure
19      that your guys were paid?
20           A.   I am.
21           Q.   Did Ultimate Delivery Systems ever
22      advertise for services?
23           A.   No.
24           Q.   Did you ever put your name or logo
25      on any uniforms?
```

Page 94

```
 1                      E. SAMUELS
 2        A.   No. Not allowed to.
 3        Q.   What was that?
 4        A.   Not allowed to.
 5        Q.   Who wouldn't allow you to?
 6        A.   Either HDL or Sears. It just has to
 7   be a plain shirt that says authorized
 8   carrier. It can't have anything else on it.
 9        Q.   And who told you that there couldn't
10   be anything else on it?
11        A.   The management.
12        Q.   Who in management?
13        A.   The GM and the regional manager.
14        Q.   Who is the regional manager?
15        A.   I think his name was Cotton. I don't
16   remember his name.
17        Q.   Do you recall if that was an HDL or
18   Sears requirement?
19        A.   I'm not sure.
20        Q.   While Ultimate Delivery Systems was
21   under contract with HDL, it was responsible
22   for paying its business expenses, correct?
23        A.   Sorry, what was that?
24        Q.   While Ultimate Delivery Systems was
25   under contract with HDL, it was responsible
```

Page 95

```
 1                    E. SAMUELS
 2     for paying its business expenses, correct?
 3          A.   To pay my own business expenses.
 4          Q.   Mr. Samuels, can you hear us all
 5     right?
 6          A.   Yes.
 7          Q.   Okay.
 8          A.   I'm sorry. My earpiece died, and for
 9     some reason the Zoom is not loud. It's very
10     low, so I got to put it to my ears.
11          Q.   Let's go off the record for a second
12     here.
13          THE VIDEOGRAPHER:   The time is 7:29 and
14     we are going off the record.
15          THE VIDEOGRAPHER:   The time is 7:31. We
16     are back on the record.
17          Q.   Mr. Samuels, you understand that
18     you're still under oath, correct?
19          A.   Yes.
20          Q.   While Ultimate Delivery Systems was
21     under contract with HDL, was it responsible
22     for paying its business expenses?
23          A.   Yes.
24          Q.   And were those business expenses
25     paid from Ultimate Delivery Systems' bank
```

E. SAMUELS

1
2    account?
3         A.   For the most part, yes.
4         Q.   And what do you mean by for the most
5    part?
6         A.   As you saw in the settlement, HDL
7    took payments for the trucks and the
8    worker's comp insurance, so they took those
9    and paid those straight from your
10   settlement.
11        Q.   Were there ever instances where you
12   personally paid for business expenses of
13   Ultimate Delivery Systems?
14        A.   For diesel and equipment, yes.
15        Q.   But would those payments come out of
16   the Ultimate Delivery Systems bank account?
17        A.   Yes.
18        Q.   Okay. And you testified earlier that
19   you supplied your other drivers and helpers
20   with uniforms, correct?
21        A.   Yes.
22        Q.   And you did not make them pay for
23   those?
24        A.   Yes.
25        Q.   Yes, you did or yes you did not?

Page 97

```
 1                        E. SAMUELS
 2        A.   I did not have them pay for it.
 3        Q.   Okay. Would you a driver or helper
 4   pay for damage claim that they caused?
 5        A.   Yes, if they did.
 6        Q.   And how would you determine if they
 7   did it?
 8        A.   They would give you the date of the
 9   delivery and you will be able to see whose
10   driver is on the list for that day.
11        Q.   And would you charge just the driver
12   or also the helper?
13        A.   Both.
14        Q.   Were there any specific permits that
15   were required for Ultimate Delivery Systems
16   to operate?
17        A.   No.
18        Q.   Were there any licenses that
19   Ultimate Delivery System obtained?
20        A.   No.
21        Q.   The trucks you operated, did they
22   have any logos on them?
23        A.   Yes. Sears put logos.
24        Q.   What logos?
25        A.   Sears.
```

Page 98

```
 1                          E.  SAMUELS

 2          Q.  And they would say Sears?

 3          A.  Yes.

 4          Q.  Where were those logos located?

 5          A.  On the front and the sides and the

 6     back.

 7          Q.  Sorry, I cut you off. What was the

 8     last thing you said?

 9          A.  On the box.

10          Q.  Were these logos on all the trucks

11     that you operated while you were under

12     contact with HDL?

13          A.  Yes.

14          Q.  Mr. Samuels, I'm going to share my

15     screen with what has been deemed as Exhibit

16     5. This is a nine-page document. It's

17     labeled HDLK00099 through 107.

18                        (Whereupon, the witness was

19                        shown a document marked as

20                        Exhibit 5 for identification as

21                        of this date.)

22          Q.  Are you able to see this document?

23          A.  Yes.

24          Q.  And at the top it's titled

25     Independent Contractor Agreement, correct?
```

Page 99

```
 1                      E. SAMUELS
 2        A.  Yes.
 3        Q.  Do you recall Ultimate Delivery
 4   Systems entering into a contract titled
 5   Independent Contractor Agreement with HDL?
 6        A.  Yeah. Yes.
 7        Q.  Did you read that contract before
 8   signing it?
 9        A.  Yes.
10        Q.  And did you understand what the
11   contract said?
12        A.  Kind of, not really.
13        Q.  What do you mean by that?
14        A.  There's a lot of wording on there
15   that was not too ... It's basically a very
16   legal tender thing, and they didn't
17   basically give you permission to give it to
18   another lawyer to check for you. So, it was
19   basically, "This is what it says, this is
20   what it does, rah rah rah. Do you want to
21   get a job or not?"
22        Q.  Did you ask for the opportunity to
23   give it to a lawyer?
24        A.  Yes.
25        Q.  And what was told to you?
```

Page 100

```
 1                        E. SAMUELS
 2         A.   I was told it was just a regular
 3    contract, it's nothing major, don't worry
 4    about it.
 5         Q.   And you signed the contract then?
 6         A.   Yeah, I did. Yeah, it is what it is.
 7         Q.   Do you see paragraph six here?
 8         A.   Yes.
 9         Q.   Expenses.
10         A.   Yep.
11         Q.   It states, "Contractor shall provide
12    its own vehicle and shall pay all costs
13    attendant with its operation and
14    maintenance." Did I read that correctly?
15         A.   Yes.
16         Q.   Was this your understanding when
17    entering into the contract with HDL?
18         A.   Yes.
19         Q.   So, it was your understanding that
20    Ultimate Delivery Systems would be
21    responsible for the payment of any vehicle
22    expenses, correct?
23         A.   Yes.
24         Q.   And it was your understanding that
25    Ultimate Delivery Systems would be
```

Page 101

```
 1                          E.  SAMUELS
 2     responsible for providing its own vehicles,
 3     correct?
 4          A.  Yes, but on a special occasion HDL
 5     says, "We'll help you get a decent lease,
 6     and we'll help you to keep that lease
 7     going."
 8          Q.  So, HDL would facilitate leases of
 9     vehicles if you wished to follow that route.
10     Is that fair?
11          A.  Yes.
12          Q.  Let's go off the record here.
13                    THE VIDEOGRAPHER:  The time
14                is 7:37 and we are going off the
15                record.
16                    (Whereupon, a short recess
17                was taken.)
18                    THE VIDEOGRAPHER:  The time
19                is 7:49 and we are back on the
20                record.
21     BY MR. BREHM (continued):
22          Q.  Mr. Samuels, you understand that
23     you're still under oath, correct?
24          A.  Yes.
25          Q.  I'd like to go back to what has been
```

Page 102

```
 1                        E. SAMUELS
 2    marked or deemed exhibit one.
 3              I'll share my screen with you here,
 4    Mr. Samuels.
 5              Okay. Are you able to see my screen?
 6         A.  Yes.
 7         Q.  Okay. These are the interrogatories
 8    that we looked at earlier in the deposition.
 9    Do you recall that Mr. Samuels?
10         A.  Yes.
11         Q.  Okay. And at the middle of the page
12    here, the answer to interrogatory number
13    five states that plaintiff leased a 2013
14    Hino truck in 2013, and the lease was
15    returned in 2015. Plaintiff then purchased a
16    2006 International in 2015, and purchased
17    2008 International in 2015.
18              Did I read that correctly?
19         A.  Yes.
20         Q.  And these two trucks that Ultimate
21    Delivery System purchased in 2015, was that
22    when you were running two trucks with HDL?
23         A.  Yes.
24         Q.  Okay. And you said you leased those
25    trucks, correct?
```

Page 103

```
 1                      E.  SAMUELS
 2          A.   No.
 3          Q.   Oh,  you  purchased  them?
 4          A.   Yes.
 5          Q.   And  who'd  you  purchase  them  through?
 6          A.   I  bought  one  through  a  private
 7     seller,  both  through  private  sellers.
 8          Q.   Did  ultimate  delivery  systems  pay
 9     for  those  directly?
10          A.   Yes.
11          Q.   So  those  payments  were  not  deducted
12     from  Ultimate  Delivery  Systems  settlement
13     statements,  correct?
14          A.   Yes,  weren't.
15          Q.   And  then  after  your  contract  with
16     HDL  was  terminated,  did  Ultimate  Delivery
17     Systems  use  those  same  trucks  in  fulfilling
18     its  contract  with  XPO  Logistics?
19          A.   Yes.
20          Q.   And  then  did  Ultimate  Delivery
21     Systems  use  those  same  trucks  in  fulfilling
22     its  contract  with  FGO  Logistics?
23          A.   Yes.
24          Q.   Did  Ultimate  Delivery  Systems
25     contract  with  any  other  companies  to  provide
```

Page 104

```
1                      E.  SAMUELS
2    delivery services and equipment after FGO
3    Logistics?
4         A.   No.
5         Q.   So Ultimate Delivery Systems closed
6    after its contract with FGO, is that
7    accurate?
8         A.   Yes.
9         Q.   We talked a little bit about Andre
10   Wilson earlier. You said he was the general
11   manager, correct?
12        A.   Yes.
13        Q.   And was he with HDL or Sears?
14        A.   HDL.
15        Q.   Was there a Sears manager at the
16   Syosset warehouse as well?
17        A.   Yes.
18        Q.   Who was that?
19        A.   They had three during the time I was
20   there.
21        Q.   And could you tell me their names
22   and approximate years that they were there?
23        A.   Not really, because we don't really
24   deal with Sears. We deal with HDL, and they
25   deal with Sears.
```

Page 105

                              E. SAMUELS

1
2          The only one I know about was Bruce
3     because he was there from like forever until
4     he retired and then they had three that came
5     in and they kind of went and came. So, I
6     never knew them.
7          Q.  Was Andre Wilson there the entire
8     time that you were under contract with HDL?
9          A.  Yes.
10         Q.  And you had mentioned a regional
11    manager, is that correct?
12         A.  I know his name was Cott and I just
13    can't remember his first name. Chris Cott,
14    there you go. CC.
15         Q.  And was he the regional manager the
16    entire time that you were under contract
17    with HDL?
18         A.  From what I can recall, I'm not
19    really sure. Because I didn't see him for a
20    while the last few years.
21         Q.  Is there anyone else that was at the
22    Syosset warehouse that you would communicate
23    with about deliveries to be performed?
24         A.  Just the assistant manager, and the
25    manager, that's it.

                                        Page 106

```
 1                        E.  SAMUELS
 2          Q.   And who was the assistant manager?
 3          A.   I can't remember his name.
 4          Q.   Was it the same person the entire
 5     time you were under contract with HDL?
 6          A.   No, they had two assistant managers
 7     that came and went during that time.
 8          Q.   Do you recall either of their names?
 9          A.   Sergio, and... No, I can't remember
10     the first guy's name.
11          Q.   That's okay. This isn't a memory
12     quiz. How did you communicate with these
13     individuals?
14          A.   Spoke, text, call.
15          Q.   Email?
16          A.   No.
17          Q.   Do you know if you still have any of
18     the text?s communications with these
19     individuals?
20          A.   No, that's like 10 phones ago.
21          Q.   Has Ultimate Delivery Systems ever
22     been sued?
23          A.   Yes.
24          Q.   Tell me about that.
25          A.   Was one that said water damage
```

Page 107

```
 1                      E. SAMUELS
 2   occurred in his basement and he replaced the
 3   whole basement in one weekend. So, I sent it
 4   to my insurance because he wanted like
 5   $80,000.
 6        Q.   Was that while the company was under
 7   contract with HDL?
 8        A.   I can't recall to be honest. It was
 9   a while ago. I just know it was... I sent it
10   to my insurance, and they care of
11   everything.
12        Q.   Was there another occasion that
13   Ultimate Delivery Systems had been sued?
14        A.   Not that I recall.
15        Q.   Do you know Mike Kloppel?
16        A.   No.
17        Q.   Do you know Adam Wilson?
18        A.   No.
19        Q.   Besides your attorneys, have you
20   talked about this case with anyone?
21        A.   No.
22        Q.   That's all the questions I have Mr.
23   Samuels, I appreciate your time.
24        A.   Okay.
25                      MR. ALBA:  I don't have
```

Page 108

```
 1                       E. SAMUELS
 2          anything.
 3               THE VIDEOGRAPHER:  We are
 4          off the record at 7:56 PM and
 5          this concludes today's testimony
 6          given by Everald Samuels.
 7               The total number of media
 8          units used was two and will be
 9          retained by Veritext Texas.
10               (Whereupon, the deposition
11          of Everald Samuels was
12          concluded, at 7:56 p.m.)
13                    -o0o-
14
15
16
17
18
19
20
21
22
23               *   *   *   *   *
24
25
```

Page 109

```
 1                        E. SAMUELS

 2                  C E R T I F I C A T E

 3

 4      STATE OF NEW YORK)

 5                      :ss

 6      COUNTY OF QUEENS)

 7

 8              I, JUDEEN M. DENNISTON, a Shorthand

 9      Reporter and Notary Public, within and for the

10      State of New York, do hereby certify:

11              That, the witness whose deposition is

12      herein before set forth, was duly sworn by me

13      and that such deposition is a true record of

14      the testimony given by such witness.

15              I further certify that I am not

16      related to any of the parties to this action by

17      blood or marriage and that I am in no way

18      interested in the outcome of this matter.

19              IN WITNESS WHEREOF, I have

20      hereunto set my hand this 19th day of

21      July, 2021.

22

23

24              JUDEEN M. DENNISTON

25
```

Page 110

```
 1            1                         E. SAMUELS
 2            2                         I N D E X
 3            3      EXAMINATION BY                              PAGE
 4            4      Mr. Brehm                                     4
 5            5
 6            6                       E X H I B I T S
 7            7      EXHIBIT        DESCRIPTION                   PAGE
 8            8      Exhibit 1      HDLs First Set of
 9            9                     Interrogatories to E. Samuels  34
10           10      Exhibit 2
11                                  HDL_K003132 (Excel Document)   57

            11      Exhibit 3
12                                  HDL_K002873 (Excel Document)   81
13           12      Exhibit 4
                                    HDL_K003195 (Excel Document)   88
14
            13      Exhibit 5      Independent Contractor
15
            14                     Agreement                      99
16
            15
17
            16
18
            17      REQUEST PRODUCTION    DESCRIPTION             PAGE
19
            18      None
20
            19
21
            20
22
            21      INSERTS              DESCRIPTION             PAGE
23
            22      None
24
            23
25           24                        *   *   *   *   *
            25
```

Page 111

```
 1                          E.  SAMUELS
 2      A C K N O W L E D G E M E N T   O F   D E P O N E N T
 3

 4      STATE OF _____)
 5                        :ss
 6      COUNTY OF _____)
 7

 8              I, EVERALD SAMUELS, hereby certify that I
 9         have read the transcript of my testimony taken
10         under oath in my deposition of June 21, 2021;
11         that the transcript is a true, complete and
12         correct record of what was asked, answered and
13         said during this deposition, and that the
14         answers on the record as given by me are true
15         and correct.
16

17                           _____
18                           EVERALD SAMUELS
19

20      SUBSCRIBED AND SWORN BEFORE ME
21      THIS_____ DAY OF _____, 2021.
22

23      _____
24      Notary Public
25      My Commission Expires:_____
```

Page 112

```
1                    CHANGES AND SIGNATURE

                  TO THE ORAL DEPOSITION OF

2                       EVERALD SAMUELS

                        Volume 1 of 1

3                      June 21, 2021

4    PAGE    LINE    CHANGE          REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25        Job No. TX4637254


                                        Page 113
```

1        I, EVERALD SAMUELS, have read the foregoing
     deposition and hereby affix my signature that same is
2    true and correct, except as noted above.
3    Signed under penalty of perjury this ___ day of
4    _____, 20__.
5
6                            _____
                             EVERALD SAMUELS
7
8
             (If notary is requested use the following.)
9
10   STATE OF _____)
     COUNTY OF _____)
11
             Before me _____ on this day
12   personally appeared EVERALD SAMUELS, known to me
     (or proved to me under oath or through _____
13   (description of identity card or other document) to be
     the person whose name is subscribed to the foregoing
14   instrument and acknowledged to me that he executed the
     same for the purposes and consideration therein
15   expressed.
             (Seal)  Given under my hand and seal of office
16   this _____ day of _____, _____.
17
18
                            _____
19                          Notary Public in and for the
                            State of _____
20
21
22
23
24
25

                                                      Page 114

**[& - 99]**

| & |
| --- |
| **&**   2:4,13 |

| 0 |
| --- |
| **00confirmed** |
| 61:12 |
| **05**   16:3 |
| **06296**   1:8 5:7 |

| 1 |
| --- |
| **1**   34:7 111:1,8 |
| 113:2,2 |
| **10**   54:11 65:17,19 |
| 107:20 111:10 |
| **10-99**   14:4,6 29:9 |
| 29:10 |
| **100**   77:22 78:2,3 |
| **100th**   4:22 |
| **104**   72:25 73:14 |
| **107**   99:17 |
| **1099**   92:9,10 93:20 |
| 93:23 |
| **1099s**   92:12 |
| **11**   64:13 111:11 |
| **11/14/2015**   82:7 |
| **110**   35:3,16 |
| **11798**   7:13 11:25 |
| 12:7 |
| **12**   111:13 |
| **120**   34:25 36:10 |
| **13**   65:17 111:14 |
| **130**   34:21 37:8 |
| **14**   81:12 111:15 |
| **14001**   2:7 |
| **15**   11:19 65:8 |
| 111:16 |
| **150**   34:23 38:14 |
| **16**   64:16 65:22 |
| 66:10 111:17 |
| **17**   12:10 111:18 |
| **18**   65:3 111:19 |

| 184   75:8 76:14 |
| --- |
| **19**   72:12 111:20 |
| **195-12**   4:22 |
| **19th**   110:20 |

| 2 |
| --- |
| **2**   57:18,21 92:7 |
| 111:2,10 |
| **20**   68:21 69:3 |
| 70:17 72:21 |
| 111:21 114:4 |
| **2000**   13:17,18 |
| **2003**   15:10,10 |
| **2004**   16:3 |
| **2006**   103:16 |
| **2008**   17:3 103:17 |
| **2011**   17:12,23 |
| **2012**   18:23 |
| **2013**   19:13,14 |
| 21:20 22:3,8,15 |
| 24:20 27:4,10 |
| 35:2 59:13 64:14 |
| 66:15 103:13,14 |
| **2014**   19:9 34:24 |
| 35:2 |
| **2015**   28:21 34:21 |
| 34:22 103:15,16 |
| 103:17,21 |
| **2016**   28:21 34:21 |
| 34:23,24 |
| **2017**   45:19 |
| **2018**   22:11,18,19 |
| 23:25 |
| **2021**   1:13 4:5 |
| 110:21 112:10,21 |
| 113:3 |
| **21**   1:13 4:4 74:19 |
| 111:22 112:10 |
| 113:3 |
| **22**   111:23 |
| **221044**   84:8 |

| 225   45:3 |
| --- |
| **23**   65:18 111:24 |
| **24**   64:14,20 65:18 |
| 66:15 70:7,9,17 |
| 111:25 |
| **244.69.**   83:21 |
| **25**   77:16 111:25 |
| **25.39.**   66:15 |
| **2500**   77:13,21 |
| **28**   75:5 |
| **29**   59:13 70:4 |
| 77:10 |

| 3 |
| --- |
| **3**   12:6 59:12 81:6 |
| 81:9 82:3 85:2 |
| 111:3,11 |
| **30**   78:20 90:14 |
| **31**   2:6 |
| **32**   78:8 |
| **33**   82:13 |
| **330**   2:14 |
| **3305**   110:23 |
| **34**   82:19 88:22 |
| 111:9 |
| **35**   67:23,25 89:4 |
| **384**   64:18 66:10 |
| **3pd**   17:4,6,8,11,14 |
| 17:24 18:8 |

| 4 |
| --- |
| **4**   88:3,8 111:4,4,13 |
| **40**   66:4,6,11 |
| **43**   83:18 |
| **450**   83:3,5 |
| **4637254**   1:23 |
| **465**   91:13 |
| **48**   67:3 89:20 |
| **49**   67:3 |

| 5 |
| --- |
| **5**   78:12,18 99:16 |
| 99:20 111:5,14 |
| **50**   91:10 |
| **500**   89:11,13 |
| **53202**   2:15 |
| **55**   7:11 11:24 |
| **57**   111:10 |
| **5:30**   4:4 |
| **5:33**   1:14 |

| 6 |
| --- |
| **6**   111:6 |
| **6/23-6/29**   59:15 |
| **60**   47:23 67:24 |
| **6:17**   1:8 5:7 |
| **6:29**   54:15 |
| **6:42**   54:22 |

| 7 |
| --- |
| **7**   111:7 |
| **74**   2:5 |
| **7:29**   96:13 |
| **7:31**   96:15 |
| **7:37**   102:14 |
| **7:49**   102:19 |
| **7:56**   109:4,12 |

| 8 |
| --- |
| **8**   111:8 |
| **80,000**   108:5 |
| **81**   111:12 |
| **827**   2:14 |
| **88**   111:13 |

| 9 |
| --- |
| **9**   111:9 |
| **9/20/2014**   88:16 |
| 90:9 |
| **99**   111:15 |

Veritext Legal Solutions
800-336-4000

[aa - based]

| a | | | |
|---|---|---|---|
| **aa** 14:25 | **affiliated** 19:5 | **answering** 8:12 | **attend** 12:14 |
| **ability** 10:8 | **affiliations** 5:19 | **answers** 112:14 | **attendant** 101:13 |
| **able** 10:5 31:10 | **affirmative** 8:24 | **anymore** 20:9 | **attention** 72:10 |
| 34:14 65:14 71:12 | 8:25 | **apart** 46:5 69:23 | **attorney** 5:24 |
| 76:22 81:13 98:9 | **affix** 114:1 | **apologize** 72:21 | 11:10,12 |
| 99:22 103:5 | **afternoon** 4:3 7:19 | 81:16 | **attorneys** 3:5 |
| **access** 92:20 | **ago** 94:6 107:20 | **appear** 79:12,13 | 108:19 |
| **account** 55:5,9,13 | 108:9 | 85:18 | **audio** 4:13,13 |
| 56:12 57:6,14 | **agree** 4:16 | **appearance** 5:22 | **authority** 25:7 |
| 97:2,16 | **agreed** 3:4,10,15 | **appearances** 5:18 | 41:23,25 57:14 |
| **accountant** 92:21 | 83:16 | **appeared** 114:12 | **authorized** 3:17 |
| 92:23,24 93:4,12 | **agreement** 35:15 | **appears** 10:12 | 75:16,20 76:6 |
| 94:4 | 99:25 100:5 | 36:20 64:17 66:22 | 95:7 |
| **accounts** 23:5 | 111:15 | 68:20 | **available** 43:25 |
| 25:11 | **ahead** 19:12 69:20 | **appliance** 48:12 | 52:12 |
| **accuracy** 61:19 | 91:20 | 49:3 78:24 | **avenue** 2:14 4:22 |
| **accurate** 8:7 26:18 | **akron** 2:7 | **appliances** 16:5,6 | **awkward** 8:11 |
| 40:18 42:6 66:7 | **al** 5:2 | 16:17 23:4 25:5 | |
| 87:24 105:7 | **alba** 2:8 6:6,6 | 54:4 | b |
| **accurately** 35:3 | 19:10 24:11 54:12 | **applied** 85:11 | **b** 111:6 |
| **acknowledged** | 108:25 | **appreciate** 108:23 | **back** 46:25 47:6 |
| 114:14 | **allow** 24:12 95:5 | **approach** 43:12 | 47:17 54:23 61:10 |
| **action** 5:14 110:16 | **allowed** 95:2,4 | **appropriate** 85:12 | 65:2,13,15,20 66:2 |
| **active** 23:11 | **america** 18:11,15 | **approved** 62:21 | 68:13,15,17,21 |
| **actual** 68:4 | 18:19 27:14 | **approximate** 43:4 | 69:2,4 71:19,23 |
| **adam** 108:17 | **amount** 28:16 | 105:22 | 72:2 76:23 78:20 |
| **add** 66:2 | 29:14 30:2 35:24 | **april** 19:13 24:20 | 78:25 79:18,21 |
| **additional** 52:2 | 43:25 66:17 67:8 | **arrangement** | 91:17,23 96:16 |
| 66:11 | 69:8 77:19 78:5 | 46:11 | 99:6 102:19,25 |
| **address** 7:9 11:23 | 80:14 83:3,8 | **asked** 30:8 47:6 | **backs** 63:3 65:2,23 |
| 12:3,9 | 89:17 | 91:21 112:12 | 66:5,7,11,12 70:17 |
| **adjuster** 86:20 | **andre** 52:25 61:6 | **asking** 9:11 | **balance** 30:20 |
| **administer** 3:17 | 76:13 105:9 106:7 | **assemble** 46:2 | **bank** 55:5,9,13 |
| **administration** | **andrew** 2:16 5:25 | **assembled** 45:24 | 56:12 57:6 96:25 |
| 41:9,13,17 78:11 | **andy** 7:21 | **assistant** 106:24 | 97:16 |
| **administrative** | **answer** 8:14 9:2 | 107:2,6 | **bankrupt** 15:14 |
| 78:8 | 9:10,19 19:12 | **associate's** 12:23 | **bankruptcy** 24:5 |
| **advertise** 94:22 | 23:21 24:14 | **attempt** 46:10 | **based** 18:18 43:12 |
| **advice** 20:22 | 103:12 | 47:14 68:6,19 | 43:24 49:20 56:2 |
| | **answered** 112:12 | **attempted** 47:11 | 60:17 63:21 67:9 |
| | | | 83:7 89:16 |

Veritext Legal Solutions
800-336-4000

[basement - community]

**basement** 108:2,3
**basic** 35:19
**basically** 17:17
  26:9 67:2 69:14
  71:8 74:5 77:12
  77:13 78:18
  100:15,17,19
**basis** 52:3
**bates** 57:24 81:12
  81:17,18 88:4
**began** 28:10,22
**beginning** 5:23
  19:13 54:21 72:12
**behalf** 2:3,12 6:2
**believe** 89:7
**best** 8:11 9:21 23:7
**beyond** 56:19
  69:15
**bills** 56:5,10,13,19
  56:20,22
**binary** 41:18
**bit** 8:11 22:14
  39:12 49:10 52:14
  105:9
**biweekly** 59:8,8
  59:10
**blah** 71:23,23,23
**blood** 110:17
**blue** 76:4
**board** 80:15
**bond** 77:11,12,20
**bookkeeping**
  94:10
**borrowed** 91:16
**bottom** 34:13,17
  72:11
**bought** 17:3 104:6
**box** 2:6 99:9
**break** 9:17,18,20
  22:13 54:11

**breaks** 9:21 53:20
**brehm** 2:16 5:25
  5:25 7:18 54:24
  102:21 111:4
**briefly** 35:6
**brim** 7:21
**bring** 39:16 40:4
  46:5 63:8 69:23
  79:20
**bringing** 69:22
**broke** 46:2 52:6
  84:3
**brought** 35:10
**bruce** 106:2
**buffalo** 32:20
**business** 13:5 20:6
  20:13,17 21:5,8
  43:11 53:7 57:6
  57:14 87:23 93:18
  95:22 96:2,3,22,24
  97:12
**busy** 30:19 31:20
**buy** 23:7

**c**

**c** 2:2 110:2,2 112:2
**caesar** 85:7
**calculated** 66:20
**call** 11:14,15,17
  46:22 49:18 65:9
  71:5 107:14
**callbacks** 62:9
**called** 46:24 68:16
  69:12 75:6
**calls** 65:12 84:2
**card** 55:23 114:13
**care** 108:10
**carrier** 20:2 25:7
  41:8,12,16,23,25
  75:16,20 76:6
  95:8

**carriers** 74:2
**case** 1:8 5:6 7:23
  77:14 78:23
  108:20
**category** 67:12
  69:12 75:5 78:21
  89:23 91:11
**caused** 98:4
**cc** 52:11 106:14
**cease** 42:2
**cell** 4:10 53:10,13
**cellular** 4:8
**centralized** 13:4
**certain** 30:15
  67:22
**certification** 3:7
**certify** 110:10,15
  112:8
**cesar** 34:20 36:21
  36:25 37:18 38:9
  38:20
**change** 43:6,11
  60:6 113:4
**changes** 113:1
**charge** 77:8 80:10
  87:15 94:15,18
  98:11
**charged** 51:20
**charges** 51:23
**charging** 51:11,12
**cheaper** 20:21
  51:12
**check** 55:19,21
  61:19 100:18
**choose** 51:17
  83:14 86:15
**choosing** 83:11
**chose** 51:8 80:23
**chris** 106:13
**citation** 90:3,5,8
  90:17,19,25 91:5,8

**citations** 89:21
**claim** 78:21 79:4
  79:18 80:2,3,9
  83:19,24 84:7,17
  84:22 85:4,23
  86:5,8,23 87:20
  98:4
**claimed** 84:12
**claims** 77:17 80:18
  81:2 85:11,17
  86:14 87:7,9
**clarify** 64:12
**classes** 13:5,9
**clear** 40:5
**cleared** 37:7 40:11
**close** 10:19 24:2
**closed** 15:10,12
  22:11,17 23:16,25
  42:2 48:18 105:5
**code** 65:9 68:15,17
**collar** 76:5
**college** 12:13,15
  12:16
**color** 76:4
**column** 65:25
  66:13,14 67:11
  69:11,11
**come** 39:13 42:16
  65:13 79:22 97:15
**comes** 26:11 39:5
  42:12,14 64:20
  71:15,23 72:2
  86:8
**commission**
  112:25
**communicate**
  106:22 107:12
**communications**
  107:18
**community** 12:16

Veritext Legal Solutions
800-336-4000

[comp - day]

comp   49:23 50:4
72:22 73:3,5,6,7
73:12 74:3,5,6,9
74:15 97:8
companies   26:3
42:25 63:15
104:25
company   14:2
15:9,13 16:14
18:10 19:17,18,20
19:21 20:6,19
21:15,18,21 22:4
22:10,12,20 24:22
25:20 26:10 29:11
30:3 33:14 37:3
42:2 45:6,9,12,15
47:21,24 48:17,23
52:16 54:7 55:5
64:6 77:15 90:14
93:10 108:6
compensation
73:18
complete   68:18
112:11
completed   12:20
64:15 67:9 70:2
compliance   75:18
computer   12:18
computers   53:25
concluded   109:12
concludes   109:5
conducting   10:11
confirm   64:2 66:2
68:13
confirmed   65:23
68:17 69:16,17
connecticut   17:25
18:4,20,21
connection   7:23
consider   25:19
33:10

consideration
114:14
considered   50:4
consistent   57:6
78:16
contact   99:12
continue   4:14
15:15 17:7
continued   54:24
102:21
contract   15:18,25
16:15,25 17:8,10
17:13 24:8,23
25:16 26:2,5,10,10
26:13 27:9,12
28:13 29:9 40:19
45:5,18,20 46:20
47:21,22 48:14
49:12 51:13 53:4
63:11 64:5 70:15
95:21,25 96:21
100:4,7,11 101:3,5
101:17 104:15,18
104:22,25 105:6
106:8,16 107:5
108:7
contracted   14:17
26:16 27:19 40:14
48:18
contracting   26:20
27:3 28:10,23
29:6
contractor   47:10
74:19 93:7 99:25
100:5 101:11
111:14
contractors   29:2
30:3
conversations   4:8
copies   58:20,23

copy   57:23
correct   10:2,13,22
19:9 21:2 22:15
24:9 29:12 35:16
36:10,21 37:9
38:2,14 47:7,18
51:3 55:2 56:24
57:3 59:17 60:22
62:11 63:23 64:10
64:18 65:23 66:23
68:22 70:5 74:23
75:3,9 78:6 82:4,7
82:17 83:3,13,22
87:20 88:13,16,19
89:2,5,11,18 90:22
92:15 95:22 96:2
96:18 97:20 99:25
101:22 102:3,23
103:25 104:13
105:11 106:11
112:12,15 114:2
correctly   101:14
103:18
corresponds   84:15
cost   60:9,12
costs   101:12
cott   106:12,13
cotton   95:15
could've   40:9
counsel   4:25 5:17
7:21
counsel's   6:8
count   61:9
counting   70:20
county   12:16
110:6 112:6
114:10
couple   40:7 64:12
72:20
course   12:19 13:6
65:11

courses   13:7
coursework   13:9
court   1:2 3:19 5:5
5:11 6:12,14 7:2,8
7:14 8:5,22
cover   73:17,21
77:17 80:19
coverage   74:17
create   20:11
created   23:13
credits   12:21
crosstalk   47:8
current   11:23
currently   58:5
customer   65:12
68:18 69:16,16
71:3,5,6 84:2,12
84:18,18
customer's   65:7
cut   99:7
cv   1:8 5:7

d

d   6:22 28:8 111:2
112:2,2
damage   78:24
79:15,19 83:19,24
84:4,7,13,22 85:4
85:11,14,18,21,23
86:23 87:6,14,20
98:4 107:25
damages   77:17
date   1:13 34:8
57:22 65:22 66:14
81:10 88:9,15
98:8 99:21
dated   64:14
david   2:21 5:8
day   22:7,9 34:21
34:23,25 35:3,16
35:21,21,24 36:10
37:9 38:14 39:10

[day - driver]

39:12 42:14 44:10
44:13,15,20,21
52:7 57:3 59:23
59:25 60:5 62:9
64:15,16 65:11
66:10,22 82:10
98:10 110:20
112:21 114:3,11
114:16
**days** 32:17,18
40:22 43:21 47:23
60:3,18,20 90:14
94:13
**deal** 105:24,24,25
**debate** 45:21
**deceive** 9:7
**december** 19:9
24:3
**decent** 102:5
**decide** 19:23 26:5
44:4,6,6,13
**decision** 31:8
36:16 37:5 51:6
**decrease** 35:24
**deduct** 77:3 87:6,9
87:23 90:6 93:18
**deducted** 50:2,14
51:9 76:14 77:22
79:6 80:23 83:12
85:15,24 90:21
91:5,23 104:11
**deductible** 80:22
**deducting** 91:17
**deduction** 73:11
74:22 75:8 82:22
86:23 89:5,13,23
92:3
**deductions** 72:16
82:16 88:25
**deemed** 34:3
57:18 88:3 99:15

103:2
**deeming** 81:5
**defendant** 1:11
2:12 4:25 6:2 7:22
**defendant's** 33:23
**deliver** 25:22
42:16 47:9
**delivered** 18:7
42:6
**deliveries** 13:21
25:3,4,18 41:4
42:4 44:23 45:8
45:14 48:12
106:23
**delivering** 16:6
**delivery** 15:16
16:16 18:11,15,19
19:6,8,15,24 20:23
20:25 21:4,7,12,22
21:25 22:5 23:17
24:4,7,22 25:2,6
25:17,22 26:2,21
27:14,18 28:4,13
28:22 29:7 33:11
35:9 36:4 37:25
38:22 39:14 40:13
40:19 41:3,11,22
42:15,24,25 44:2
45:4,17 47:20
48:2,13,17 49:2,3
49:11,21,25 50:10
50:13 51:22,25
53:3,6,9,18,24
55:4,7,12,16 56:12
57:9 58:10,10,13
58:14,17 59:3
63:17 68:18 70:20
70:25 72:13,17
73:10,19 74:13,16
79:3 82:2,13 86:2
86:12 87:3,19

88:12,22 89:8
92:8,15,25 93:17
94:9,21 95:20,24
96:20,25 97:13,16
98:9,15,19 100:3
101:20,25 103:21
104:8,12,16,20,24
105:2,5 107:21
108:13
**denniston** 1:18
5:12 110:8,24
**dent** 78:25
**departed** 36:7
**depends** 30:18
31:19 66:24 80:5
80:8
**deposited** 55:8,12
77:24
**deposition** 1:16
3:16 4:13,17,21,24
6:10 7:24 10:11
10:22 11:4,7,13,21
103:8 109:10
110:11,13 112:10
112:13 113:1
114:1
**depot** 48:12
**describe** 68:12
**description** 111:7
111:18,22 114:13
**determine** 20:11
46:19 52:15 56:6
98:6
**determined** 67:14
67:15,24 68:24
70:10,24 71:2
**determines** 68:25
**died** 96:8
**diesel** 97:14
**different** 16:13,14
33:8,15 78:17

**direct** 72:10 90:5
**directly** 49:22
51:2,9,24 67:9
75:2 79:10 104:9
**dirty** 76:19,24
**discuss** 26:12
**distributions**
56:16
**district** 1:2,3 5:5,6
**dmv** 89:20 90:2
91:5
**dock** 27:7 45:25
**document** 33:21
33:22,25 34:6,9,14
57:20 58:3,9
59:22 63:16,25
81:8,14 84:20
88:7,10 99:16,19
99:22 111:10,12
111:13 114:13
**documents** 11:6
94:10
**dodge** 52:11
**doing** 7:20 14:13
14:14,15 19:19
20:14
**dollies** 54:5
**dot** 25:9
**double** 46:4
**doubt** 32:21 90:10
91:2
**draws** 56:15
**drive** 7:12 11:24
38:6,18,20 39:20
60:8
**driver** 13:23 17:21
29:21,22 34:22
37:21 38:4 39:18
40:20 41:5 59:17
59:20,22,25 60:19
60:25 62:12,16,19

Page 5

[driver - first]

| | | | f |
|---|---|---|---|
| 64:5,9 80:3,11 | 82:1 83:1 84:1 | equipment  53:7 | |
| 82:3,9 84:21 85:2 | 85:1 86:1 87:1 | 54:3 97:14 105:2 | **f**  110:2 112:2 |
| 85:3,12,24,25 86:7 | 88:1 89:1 90:1 | esq  2:8,16 | **facilitate**  102:8 |
| 88:18 90:17,25 | 91:1 92:1 93:1 | et  5:2 | **facilitated**  73:8 |
| 91:7 98:3,10,11 | 94:1 95:1 96:1 | evening  6:18 9:22 | **fair**  50:3 66:9 |
| **drivers**  17:19 | 97:1 98:1 99:1 | eventually  81:3 | 86:22 102:10 |
| 29:20 38:23 40:12 | 100:1 101:1 102:1 | everald  1:16 4:21 | **familiar**  40:8 41:7 |
| 62:21 77:6 97:19 | 103:1 104:1 105:1 | 7:7 24:12 33:23 | **farm**  49:14,15 |
| **driving**  13:13 31:6 | 106:1 107:1 108:1 | 59:17 82:4 84:23 | 51:4 75:2 |
| 60:5,14 | 109:1 110:1,2,2 | 85:2 90:18 109:6 | **feary**  2:13 |
| **drop**  81:3 | 111:1,2,6,9 112:1 | 109:11 112:8,18 | **february**  19:13 |
| **dryer**  39:14 | 112:2,2,2,2,2 | 113:2 114:1,6,12 | **federal**  41:8,12,16 |
| **duly**  6:23 110:12 | **earlier**  92:14 | ex  36:15 92:23,24 | **fee**  78:9 |
| | 97:18 103:8 | **examination**  7:17 | **fell**  79:25 |
| **e** | 105:10 | 111:3 | **fewer**  43:8 |
| **e**  1:1 2:1,2,2,14 3:1 | **early**  45:19 | examined  6:24 | **fgo**  47:25 48:19,20 |
| 4:1 5:1 6:1,22,22 | **earpiece**  96:8 | excel  57:24 81:11 | 48:22 49:2 104:22 |
| 6:22 7:1 8:1 9:1 | **ears**  96:10 | 88:4 111:10,12,13 | 105:2,6 |
| 10:1 11:1 12:1 | **education**  12:12 | **exchange**  46:3,7 | **figure**  70:9 |
| 13:1 14:1 15:1 | 13:6 | **executed**  24:8 | **figured**  32:18 |
| 16:1 17:1 18:1 | **educational**  13:8 | 114:14 | **file**  24:4 74:3 87:3 |
| 19:1 20:1 21:1 | **effect**  3:18 | **executing**  24:23 | 93:9 |
| 22:1 23:1 24:1 | **eight**  14:11 86:8 | **exhibit**  34:3,7 | **filed**  5:4 15:14 |
| 25:1 26:1 27:1 | **eighth**  39:12 | 57:18,21 81:5,9 | 92:15 |
| 28:1,8 29:1 30:1 | **either**  59:8 95:6 | 88:3,8 99:15,20 | **filing**  3:6 74:4 |
| 31:1 32:1 33:1 | 107:8 | 103:2 111:7,8,10 | **filings**  41:15,20 |
| 34:1 35:1 36:1 | **electronic**  57:23 | 111:11,13,14 | 92:25 |
| 37:1 38:1 39:1 | **email**  10:19 | **expense**  87:23 | **fill**  36:6 |
| 40:1 41:1 42:1 | 107:15 | **expenses**  57:11 | **financial**  21:14 |
| 43:1 44:1 45:1 | **employee**  13:25 | 93:18 95:22 96:2 | 23:23 45:21 46:11 |
| 46:1 47:1 48:1 | **employees**  15:4,6 | 96:3,22,24 97:12 | 94:10 |
| 49:1 50:1 51:1 | 17:14 18:16 28:24 | 101:9,22 | **financially**  5:15 |
| 52:1 53:1 54:1 | 29:8,12 | **expires**  112:25 | **find**  35:12 36:14 |
| 55:1 56:1 57:1 | **encompasses**  66:6 | **explain**  65:5 | 36:24 38:11 49:15 |
| 58:1 59:1 60:1 | **ends**  90:8 | **expressed**  114:15 | **finish**  8:12,14 |
| 61:1 62:1 63:1 | **entering**  100:4 | **extra**  65:3,19 | 61:22 |
| 64:1 65:1 66:1 | 101:17 | 69:25 | **finished**  71:10 |
| 67:1 68:1 69:1 | **entire**  106:7,16 | **eyes**  39:17 | **firm**  5:9,12 |
| 70:1 71:1 72:1 | 107:4 | | **first**  6:23 7:15 8:4 |
| 73:1 74:1 75:1 | **entity**  20:4 | | 12:22 27:18 33:24 |
| 76:1 77:1 78:1 | | | 35:8 46:2 50:11 |
| 79:1 80:1 81:1 | | | |

[first - helper]

50:24 106:13
107:10 111:8
**five** 12:21 103:13
**floor** 84:3
**fluctuates** 43:9
**follow** 102:9
**following** 47:21
114:8
**follows** 6:25
**force** 3:18
**forced** 9:17
**foregoing** 114:1
114:13
**foremost** 8:4
**forever** 106:3
**form** 3:11 19:11
19:15,23 24:11
80:4 92:8
**formed** 19:8 20:25
22:10 24:21
**forming** 20:18,23
**forms** 93:20,24
**forth** 110:12
**four** 33:21 34:14
71:17
**fourth** 59:16
**fpg** 1:8 5:7
**free** 46:3,9
**freeways** 68:2
**fridge** 78:24 79:21
79:24 87:14,16
**friedman** 2:4 6:7
**front** 44:24 99:5
**fuel** 66:14,18 67:8
**fulfilling** 104:17
104:21
**furniture** 13:20
14:17 15:3,13,19
16:2
**further** 3:10,15
110:15

**g**

**g** 67:11 112:2
**garvin** 2:13
**general** 52:21 53:2
61:7 105:10
**generated** 55:12
**georgia** 36:18
**getting** 12:22 72:7
72:8
**give** 6:17 44:11
49:19 65:8,9
69:25 70:16 71:7
71:9 76:19 77:3
80:4 98:8 100:17
100:17,23
**given** 10:24 28:17
29:16 35:20,24
86:25 90:15 92:4
109:6 110:14
112:14 114:15
**glad** 46:18 68:10
**gm** 52:17,20 61:5
71:21 75:21 76:11
76:12 95:13
**go** 4:16 8:3 9:20
14:12 19:11 30:9
30:20,22 31:14,21
31:22 32:2,11
33:8,9,12,15 39:15
46:3,4,22,25 47:6
52:19 54:10 60:2
62:7,17,22 63:3
64:2 65:2,2,14,20
65:22 66:2,4,7,11
66:12 68:13,21
69:4,20,22 70:17
71:19,21 79:23
83:25 88:21 91:20
96:11 102:12,25
106:14

**goal** 9:5
**goes** 52:8 60:10
**going** 4:3 8:2,15
31:17,25 32:15
33:18 34:12 42:13
44:13 54:9,15
57:16 62:19 69:11
69:14 74:19 76:24
77:2 78:20 80:10
81:3,4 83:18
84:24 96:14 99:14
102:7,14
**good** 4:2 7:19
44:12 54:13 76:2
**gpd** 17:5
**graduate** 12:24
**gross** 78:19
**ground** 8:3 9:16
**gts** 16:18,19 17:2
**guess** 9:12 81:25
**guy** 17:17,17 30:5
37:3,7 39:5,6 40:4
46:7 60:10
**guy's** 107:10
**guys** 17:18 26:11
31:14,21 40:15
49:18 94:13,16,19

**h**

**h** 66:13 111:6
**half** 45:24 67:3
72:11 80:20 94:6
**hand** 6:15 7:3 54:5
110:20 114:15
**handle** 31:10
**hanson** 2:13
**happened** 17:23
32:7 46:23 79:2
86:11
**happens** 8:8 77:15
**haul** 52:11

**hda** 27:14
**hdl** 24:23 25:16,17
25:25 26:6,16,20
26:22,25 27:6,19
28:10,13,23 29:7
30:7 32:20,25
33:15 34:19 37:7
40:5,14,20 41:4
42:5 43:10 44:17
45:5,18 46:20
47:22 49:12,17,19
49:24 51:14 52:21
53:15 55:8 57:25
58:18 63:11 66:17
67:8,20 69:9 73:8
74:12 75:15,24
77:18 80:4,9
81:13,18 83:15
84:10,11,16 88:5
90:5 91:17 95:6
95:17,21,25 96:21
97:6 99:12 100:5
101:17 102:4,8
103:22 104:16
105:13,14,24
106:8,17 107:5
108:7 111:10,12
111:13
**hdl's** 30:7
**hdlk00099** 99:17
**hdls** 111:8
**head** 8:23
**hear** 10:15 80:6
96:4
**heard** 27:6 33:3
**held** 1:16 4:18
**help** 8:3 33:9 39:6
54:3 59:11 71:4
102:5,6
**helper** 13:24 15:5
15:7,23 29:10,20

[helper - l]

34:20,23,25 35:8
35:13 36:3,21,23
39:21,21 62:20
63:18 64:9,11
98:3,12
**helpers** 17:19,20
29:21 38:23 39:23
39:24 40:13 62:21
64:4 74:2 77:6
97:19
**hereunto** 110:20
**hey** 65:12
**high** 12:24 13:4
**higher** 31:23 68:7
72:5,6
**highest** 12:11
**hino** 82:23,25
103:14
**hire** 29:7,9 36:16
37:5
**hired** 63:23
**hit** 90:14
**hmm** 8:24
**hold** 77:13,17
**hollis** 4:23
**home** 18:11,15,19
27:14 32:16 46:22
48:12 58:10,13
65:7,17 69:2
72:12 82:13 83:19
83:24 84:4,5,7
85:3,11,14,20,23
86:23 87:6 88:22
**homedeliverylink**
1:10 5:3 6:3 7:22
19:22 24:9
**honest** 91:9 108:8
**honestly** 20:20
**hour** 54:9
**hours** 45:24

**house** 62:22,23
83:25
**houses** 77:2
**how'd** 93:6
**hub** 42:11
**hugh** 34:24 36:5,6
36:10,14 37:11,21
38:18
**huh** 8:25 53:8

**i**

**idea** 25:21
**identification** 34:7
57:21 81:9 88:8
99:20
**identity** 114:13
**immediately** 27:13
**impact** 10:8
**inaccurate** 62:2,25
**inaudible** 61:11
**incident** 84:19
**income** 55:11
**incorporated** 20:4
20:5,19
**incorrect** 62:16
**incurred** 90:25
**independent** 99:25
100:5 111:14
**individuals** 35:7
107:13,19
**industry** 13:10,16
18:4 19:5
**innervelt** 25:20,21
**input** 60:25
**inserts** 111:22
**installation** 23:2,3
**instance** 85:22
**instances** 41:3
61:21,25 62:6
72:4 91:5 97:11
**instrument** 114:14

**insurance** 41:18
49:18,22 50:2,5,8
50:14,17,23 51:2,9
51:11 56:22 72:22
73:3,4,7,17 74:15
74:20 75:2 80:18
80:19 81:2 86:15
86:18 97:8 108:4
108:10
**insure** 49:13
**insurer** 49:16
**interest** 21:15
**interested** 5:15
110:18
**interests** 22:4
**interfere** 4:12
**interference** 4:9
**international**
103:16,17
**interrogatories**
33:24 103:7 111:9
**interrogatory**
103:12
**inventory** 42:19
**involve** 13:21
**iphone** 10:13,18
**items** 64:13

**j**

**jackson** 34:24
36:5,6,10,14 37:12
37:22 38:18
**jared** 85:6
**javel** 34:22 37:24
38:11,13
**jerry** 34:20 36:21
36:24 37:18 38:8
38:20
**jersey** 32:23
**job** 1:23 13:18
19:4 21:24 26:12
46:16,18 68:11

100:21 113:25
**judeen** 1:17 5:11
8:5 110:8,24
**july** 110:21
**june** 1:13 4:4
59:13 64:14 66:14
70:4 112:10 113:3

**k**

**k** 112:2
**k002873** 81:18
111:12
**k003132** 57:25
111:10
**k003195** 81:13
88:5 111:13
**keep** 8:7 42:11,17
43:19 48:7 87:16
102:6
**kept** 87:11
**kilbourn** 2:14
**kind** 100:12 106:5
**kloppel** 1:5 5:2
108:15
**knew** 35:14 45:25
106:6
**know** 8:9,15 9:6
9:12,13,19 11:10
32:16 50:18 61:17
62:22 63:21 84:14
84:18 90:19 91:15
106:2,12 107:17
108:9,15,17
**knowing** 63:18
84:6,21 90:7,16
**knowledge** 63:22
**known** 114:12

**l**

**l** 3:2 6:22,22 65:25
112:2

[label - mistake]

**label** 81:17
**labeled** 57:24
  66:14 81:12,18
  88:5 99:17
**labor** 56:2
**lake** 7:11 11:24
**lane** 45:3
**lanes** 42:15
**lawyer** 100:18,23
**learn** 9:5
**lease** 14:21 28:2,5
  82:25 83:10,11
  89:8 102:5,6
  103:14
**leased** 51:19 83:2
  90:4 103:13,24
**leases** 102:8
**leasing** 28:6 90:14
**leave** 77:14
**left** 17:24 37:3
**legal** 2:21 10:25
  100:16
**level** 12:11
**levitz** 15:19 16:2
**liability** 50:7
**licenses** 98:18
**light** 2:13
**line** 113:4
**link** 58:10,13
  72:13 82:14 88:22
**list** 84:19 98:10
**listed** 35:7 62:13
  62:16 88:18
**little** 8:11 18:2
  19:2 22:13 39:12
  49:10 52:14 76:24
  105:9
**live** 12:5 17:25
**llc** 19:20,24 20:5
  20:11,18,20 22:23
  23:6,10,14

**load** 31:11 42:16
  52:8
**loading** 13:19
**loan** 91:13,19,21
  91:25
**locate** 63:14 84:17
**located** 4:22 16:19
  99:4
**location** 32:20
  33:16 42:5 81:25
**locations** 30:7
  32:25
**logistics** 22:21,22
  22:25 23:6,10,14
  48:23,24 104:18
  104:22 105:3
**logo** 94:24
**logos** 98:22,23,24
  99:4,10
**long** 11:17 12:2,8
  14:9 15:8,25
  16:25 17:10 18:22
  48:13 50:18 67:4
  70:19
**longer** 41:24 85:25
  86:9
**look** 59:12 65:25
  71:5 79:25 86:19
**looked** 103:8
**looking** 37:3 59:21
  63:16 64:13 84:20
**looks** 70:3 79:24
  89:24
**loses** 26:10
**losses** 77:18
**lot** 40:15 62:3 63:3
  94:6 100:14
**loud** 96:9
**low** 96:10
**lowe's** 49:3

**m**

**m** 1:17 6:22 28:8
  69:11 110:8,24
  112:2
**main** 2:5
**maintain** 92:17
  94:10
**maintenance**
  101:14
**major** 101:3
**making** 13:21
  44:23 94:15,18
**management** 80:4
  95:11,12
**manager** 52:21
  53:2 61:7 75:21
  95:13,14 105:11
  105:15 106:11,15
  106:24,25 107:2
**manager's** 62:19
**managers** 107:6
**manifest** 62:8 63:8
**manifests** 63:10
**manpower** 25:17
**march** 9:17
**marked** 34:6
  57:20 58:6 75:16
  81:5,8 88:7 99:19
  103:2
**marriage** 110:17
**matter** 5:2 110:18
**mclaren** 35:2,8,12
  36:7 63:20
**mean** 14:16 15:12
  22:6 25:15 42:9
  44:7 45:22 55:20
  59:19 61:15 67:18
  73:23 81:24 87:13
  91:16,21 94:3
  97:4 100:13

**meaning** 45:23
**means** 46:4,7 65:2
  68:14
**media** 4:19 54:16
  54:21 109:7
**medication** 10:7
**meet** 11:9,12
**member** 21:11
**memory** 107:11
**mendim** 83:2,15
  90:4
**mendon** 28:6,8,8
  51:16
**mentioned** 8:20
  106:10
**merchandise**
  78:21 79:4,18
  80:18 81:2 85:17
  87:9,11
**microphones** 4:6
  4:11
**middle** 18:23
  103:11
**might've** 73:15
**mike** 1:5 5:2
  108:15
**mile** 48:23 67:3,3
  67:25
**mileage** 63:4
  66:25 67:2,6,10,12
  67:14 68:3,4,7
**miles** 61:11 67:23
  67:24
**milwaukee** 2:15
**mind** 74:11
**mine** 50:19
**minute** 54:11 94:8
**minutes** 11:19
  39:17 65:8
**mistake** 60:9

Page 9

**[mjp - page]**

**mjp**  1:8 5:7
**mm**  8:24
**monday**  60:21
  79:21,22
**money**  32:10
  55:22 56:11 57:5
  91:16,23
**month**  80:13
  90:11
**months**  14:11
  85:18 86:9,9,19
**morning**  42:13,14
  62:18
**mortgage**  56:21
**motor**  25:7 41:8
  41:12,16,23,25
**move**  54:3 65:10
  68:15
**moved**  63:13 94:5
**multiple**  30:12
  43:7

**n**

**n**  2:2 3:2 28:8,8
  111:2 112:2,2,2,2
**name**  5:8 7:4,6,21
  38:25 39:25 40:4
  40:7 52:24 59:24
  60:25 61:8 84:12
  91:6 94:24 95:15
  95:16 106:12,13
  107:3,10 114:13
**named**  34:20,22
  34:24,25 36:21
**names**  105:21
  107:8
**need**  8:8 9:17
  43:17 44:8 46:15
**needed**  19:18,20
  20:15 32:18 36:19
  39:6 46:3 52:2
  56:4,13,19,22

57:10
**needs**  43:9 71:4,6
**negotiate**  31:23
  32:5 46:10 47:14
  68:6 71:12
**negotiated**  47:12
  72:5
**nephew**  36:15
**never**  10:21 13:12
  29:11 33:14 40:10
  40:11,17 46:24
  47:17 49:25 56:8
  56:9,23 57:2 60:7
  62:15 106:6
**new**  1:3,19 2:7
  4:23 5:6 6:24 7:12
  11:24 12:6 16:12
  16:20 21:2,5
  22:10,11 26:10,13
  27:9 32:23 39:11
  45:23 46:6 76:25
  110:4,10
**newington**  18:20
**nine**  99:16
**ninth**  39:12
**nod**  8:23
**nope**  40:23 62:14
  83:9,9
**notary**  1:18 6:23
  110:9 112:24
  114:8,19
**notations**  63:7
**note**  4:5
**noted**  62:21 114:2
**notice**  1:17
**noticing**  5:23
**november**  24:3
**number**  4:19 5:7
  25:9 54:17,22
  68:24 74:10 84:8
  84:11,14,16,17

90:3 103:12 109:7
**numbers**  43:6
  44:12

**o**

**o**  3:2 28:8 112:2,2
  112:2
**o0o**  109:13
**oath**  3:18 10:2
  55:2 96:18 102:23
  112:10 114:12
**object**  19:10 24:11
**objection**  24:13
**objections**  3:11
  5:20 6:4,9
**obtained**  98:19
**occasion**  63:19
  68:21 102:4
  108:12
**occasions**  30:12
  32:8
**occur**  30:12
**occurred**  79:15,19
  84:7,22 85:4,19
  90:8,17 108:2
**offered**  69:9
**office**  114:15
**officer**  3:17
**offload**  46:21
**oh**  104:3
**okay**  7:2 8:2,19
  9:5 10:20 11:15
  15:15 16:15 17:21
  20:10,22 22:13
  24:16 34:3,12,17
  35:6,12 36:3,6,9
  36:24 37:17 42:18
  47:11 54:12 60:4
  61:16 62:10 65:21
  66:6 67:7 68:20
  69:21 71:7 80:10
  81:21 82:19 87:19

88:2,21 89:20
  91:4 96:7 97:18
  98:3 103:5,7,11,24
  107:11 108:24
**old**  46:5
**onboard**  35:10
**once**  39:5
**online**  13:7
**opened**  10:18
**operate**  15:8,15
  17:7 27:20 28:14
  49:4 98:16
**operated**  28:17
  42:21 49:12 98:21
  99:11
**operating**  18:12
  27:15 28:9,20
  43:20 89:9
**operation**  101:13
**opportunities**
  33:15
**opportunity**
  100:22
**opposed**  20:18
**option**  79:9 80:17
**oral**  113:1
**order**  8:6
**original**  70:14
**outcome**  5:16
  110:18
**owned**  54:6
**owner**  21:17,25
  22:2 59:3 73:25
**ownership**  22:3

**p**

**p**  2:2,2 3:2 112:2
**p.c.**  2:4,13
**p.m.**  1:14 109:12
**package**  74:20
**page**  33:22 34:13
  34:13,17 81:19

Veritext Legal Solutions
800-336-4000

[page - public]

99:16 103:11 111:3,7,18,22 113:4
**paid** 34:21,23,25 35:3 36:9 37:8 38:13 46:8,15 55:15,17,24 56:2,4 56:10,20,20,21,21 56:22 57:2 61:11 64:17,24 65:3 66:10 67:8 68:21 69:3,6 72:6 74:16 94:13,16,19 96:25 97:9,12
**paper** 58:20,23
**paperwork** 62:18 63:14 68:4 71:22
**paperwork's** 94:6
**paragraph** 101:7
**parked** 44:24
**parking** 90:2
**parkways** 68:2
**part** 8:19 72:15 97:3,5
**particular** 70:20 70:25 75:15 91:24
**parties** 3:6 4:16 110:16
**party** 5:14
**patrick** 40:2
**pay** 29:10 35:15 35:18,21,25 36:12 37:11 38:16 47:12 49:21 51:8,23 53:19,21 56:4,7,8 56:9,13,18,19 57:10,10 58:15,15 65:15,18 66:17 67:5 68:3 71:15 73:5,6 76:20 79:4 79:9 87:12,20

**90:**5 96:3 97:22 98:2,4 101:12 104:8
**paycheck** 77:16 78:11 85:25
**paying** 51:2 59:7 59:15 80:21 95:22 96:2,22
**payment** 50:2,14 51:5 56:21 80:21 91:13 101:21
**payments** 55:7 83:12 97:7,15 104:11
**payroll** 61:8
**pays** 76:18
**pc** 6:7
**peak** 43:6,12,16
**penalties** 6:20
**penalty** 114:3
**pending** 9:20
**penske** 52:11
**people** 29:14,15 60:8 79:22
**people's** 77:2
**percentage** 67:5 78:13,16
**performance** 77:11,20
**performed** 64:7,8 76:16 78:5 83:8 86:24 89:17 92:4 106:23
**performing** 42:4
**period** 30:15
**perjury** 6:20 114:3
**permission** 100:17
**permits** 98:14
**person** 40:5 60:24 93:3 107:4 114:13

**person's** 52:23
**personal** 53:11 63:22 93:9
**personally** 30:22 41:19 45:11 92:7 97:12 114:12
**phone** 11:14,15,17 53:12,16,19
**phones** 4:10 53:10 53:13 107:20
**pick** 4:7 52:19 93:6
**picture** 84:3
**pieces** 69:23
**place** 4:10,15
**plain** 95:7
**plaintiff** 1:6 2:3 33:22 103:13,15
**plaintiff's** 6:8
**plaintiffs** 34:18
**please** 4:5,9 5:17 5:21 6:12,16 7:5 7:10 9:8 65:5
**plus** 29:17,21 65:19 66:25 77:16
**pm** 4:4 109:4
**po** 2:6
**point** 24:7 50:17 50:25 59:10 80:9
**policy** 74:9,10,11 74:12
**polo** 76:5
**possible** 8:4 65:13 90:24
**preface** 11:9
**preparation** 11:7 11:13
**prepare** 11:3,21 92:24 93:12
**present** 2:20

**previously** 26:15
**prior** 15:21 26:20 27:2,3 38:12 46:8 90:11
**private** 4:7 104:6 104:7
**probably** 24:2 90:11 91:22,22
**problem** 63:13 94:4
**proceed** 9:22
**proceeding** 5:21 6:5 10:25
**product** 25:23 42:6 43:25 44:18 45:23 47:2,7,18
**production** 111:18
**products** 42:17
**promise** 6:16
**property** 87:17
**proprietor** 14:13 14:15 15:2,9 20:8 26:23
**proprietorship** 16:8 18:13 19:19
**proved** 114:12
**provide** 16:16 22:25 25:2,11 30:14 32:19 35:21 45:5,11 48:10 49:2 53:13 74:17 93:20 101:11 104:25
**provided** 25:17 26:21,24 30:6 49:17 56:3
**provider** 51:18
**providing** 102:2
**public** 1:18 6:23 110:9 112:24 114:19

Page 11

[purchase - rolls]

**purchase**  16:12
  75:23 76:8,25
  104:5
**purchased**  74:25
  103:15,16,21
  104:3
**purposes**  114:14
**pursuant**  1:17
**put**  7:3 40:10,16
  42:15 46:6 59:25
  61:16 64:4 67:25
  68:3 76:5 80:2
  94:24 96:10 98:23
**puts**  61:8

**q**

**queens**  110:6
**question**  3:12 8:12
  8:13,14,16 9:8,9
  9:11,19 19:11
  20:16 23:21 24:12
  50:11 61:23
**questions**  7:15 9:2
  108:22
**quickbooks**  94:12
**quicker**  24:13
**quiz**  107:12
**quote**  49:20

**r**

**r**  2:2 6:22 110:2
**rah**  100:20,20,20
**raise**  6:15
**ranzenhofer**  2:4
  6:7
**rate**  57:3 64:23
  65:18
**rates**  31:23,24
**reached**  35:15
**read**  34:14 35:3
  100:7 101:14
  103:18 112:9

114:1
**realize**  85:5
**really**  72:7 100:12
  105:23,23 106:19
**reardon**  32:23
**reason**  10:4 20:13
  20:17 23:13,16
  51:8 96:9 113:4
**reasons**  23:23
**reassemble**  47:2,7
  47:18
**recall**  12:19 16:22
  17:16 23:24 24:16
  27:6 28:19 30:10
  38:24,25 39:25
  40:8 41:2,6,15
  43:5 48:15,16
  50:16,18,25 51:14
  52:23 66:21 69:7
  70:9,18 72:7,8
  77:19 91:9,18,24
  93:19 95:17 100:3
  103:9 106:18
  107:8 108:8,14
**receive**  14:4,6
  58:17,20 59:2,5
  73:11 74:8 92:7
**received**  55:8
  61:14 63:5 85:23
  91:8 92:10
**recess**  54:18
  102:16
**recognize**  34:9
**recollection**  59:11
  67:7
**record**  4:4,17 5:19
  7:5,10,16 8:7 34:4
  54:10,16,23 96:11
  96:14,16 102:12
  102:15,20 109:4
  110:13 112:12,14

**recorded**  4:20
**recording**  4:14
**redid**  68:16
**refuse**  32:11
**regard**  9:10
**regardless**  43:18
  85:8
**regional**  75:21
  95:13,14 106:10
  106:15
**register**  41:11
**registered**  21:5,8
**regular**  43:8 101:2
**related**  5:13 13:9
  86:24 110:16
**remember**  67:4
  70:11 95:16
  106:13 107:3,9
**remote**  8:10
**remotely**  1:17 2:9
  2:17 4:18
**rent**  14:23 27:24
  52:2,7,10,16
**rental**  52:11 82:20
  89:5
**rented**  14:22,23
  16:13
**repeat**  9:8
**repercussions**
  32:14
**rephrase**  9:9
**replaced**  108:2
**reporter**  1:18 5:11
  6:12,14 7:2,8,14
  8:5,22 110:9
**request**  70:13,22
  111:18
**requested**  114:8
**required**  25:18
  98:15

**requirement**
  95:18
**reservation**  52:18
  52:18
**reserved**  3:12
**reside**  12:8
**resided**  12:2
**respective**  3:5
**response**  46:17
**responses**  9:2
  33:23
**responsibility**
  37:14,16
**responsible**  95:21
  95:25 96:21
  101:21 102:2
**result**  68:9
**retained**  109:9
**retired**  106:4
**returned**  103:15
**returns**  92:18
  93:10,18
**review**  11:6 61:13
  61:15,18 85:9
**reviewing**  61:17
  71:18
**right**  6:15 10:18
  10:20 50:20 61:9
  65:6 83:8 84:8
  90:3 96:5
**robins**  45:3
**rochester**  30:9,16
  30:23 31:6,22
  32:12,15,22 33:2
  33:12
**rodney**  39:25 40:7
  40:8
**role**  36:7
**roles**  29:18
**rolls**  26:9

[rothstein - settlements]

**rothstein**  2:21 5:8
**route**  67:21,25
  102:9
**routing**  67:20,21
**row**  59:12,16
  64:13 72:12,21
  74:19 75:5 77:10
  78:8,20 82:3,13,19
  83:18 85:2 88:21
  89:4,20 91:10
**rule**  9:16
**rules**  8:3
**run**  40:4 43:22
  44:4,18 52:7
**running**  29:24
  43:7,8 44:14 91:3
  103:22

**s**

**s**  2:2 3:2,2 6:22,22
  60:25 84:12
  107:18 111:6
**safety**  41:8,12,16
**salary**  55:24 56:9
  56:23
**samuel**  2:8 6:6
**samuels**  1:1,16 2:1
  3:1 4:1,21 5:1 6:1
  7:1,7,19 8:1 9:1
  10:1 11:1 12:1,12
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1,18
  33:23 34:1,10,15
  35:1 36:1 37:1
  38:1 39:1 40:1
  41:1,7 42:1 43:1
  44:1 45:1 46:1

47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1,25 55:1
56:1 57:1,16 58:1
59:1,17 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1,4 82:1,4
83:1 84:1,23 85:1
85:2 86:1 87:1
88:1,2 89:1 90:1
90:18 91:1 92:1
93:1 94:1 95:1
96:1,4,17 97:1
98:1 99:1,14
100:1 101:1 102:1
102:22 103:1,4,9
104:1 105:1 106:1
107:1 108:1,23
109:1,6,11 110:1
111:1,9 112:1,8,18
113:2 114:1,6,12
**saturday**  60:21
  70:4
**saw**  97:6
**saying**  65:21
**says**  37:8 38:13
  58:9 59:12,16
  65:12 66:2,15
  70:6 72:12,22
  75:15 81:19 82:3
  83:18 84:23 85:2
  89:11 90:2,18
  91:13 95:7 100:19
  102:5
**schedule**  57:7
  61:10 70:15

**school**  12:25 13:4
  13:13
**scopelitis**  2:13
**scratched**  84:2
**screen**  33:19 34:15
  57:17,17 58:5
  81:5 88:3 99:15
  103:3,5
**seal**  114:15,15
**sealing**  3:6
**seaman's**  13:20
  14:17 15:3,14
**seamlessly**  8:4
**sears**  16:5,17 18:7
  25:13,14,16,19,23
  42:22 43:10 53:15
  67:20 69:17 80:3
  80:9 87:11,15
  95:6,18 98:23,25
  99:2 105:13,15,24
  105:25
**season**  43:12
**sec**  10:19
**second**  36:22,23
  38:6 39:21 68:19
  96:11
**security**  77:12
**see**  8:21 33:25
  57:17 58:3,7,11
  61:9 65:2 66:3,15
  67:12 71:24 72:3
  72:13,22 74:20
  75:6 78:22 81:13
  81:19,21 82:14,20
  83:19 84:8 88:10
  88:23 89:21 91:11
  98:9 99:22 101:7
  103:5 106:19
**seek**  20:22
**selected**  93:3

**sell**  75:17 76:18
**seller**  104:7
**sellers**  104:7
**send**  30:25 33:7
  85:8 86:20 90:5
**sending**  62:23
**sense**  80:21
**sensitive**  4:6
**sent**  30:8 31:12
  108:3,9
**separate**  50:19
  93:10
**separately**  50:7
**sergio**  107:9
**service**  15:16
  22:24 23:6 51:17
  51:23
**services**  16:16
  24:25 25:12 26:22
  26:24 30:6,14
  32:19 45:6,12
  48:10,25 56:3
  94:22 105:2
**servicing**  51:15,20
**set**  31:24 33:24
  47:9 51:5 69:24
  83:10,15 110:12
  110:20 111:8
**settlement**  50:3,15
  58:10,14 61:2,13
  61:22 62:2,13,25
  63:5,17 64:8
  71:19 72:11,15
  77:23 78:14 79:7
  79:13,14 82:10
  83:12 85:8,10
  88:13 90:22 91:6
  97:6,10 104:12
**settlements**  72:18
  78:17

**seven** 39:10

**share** 33:18 57:16
81:4 99:14 103:3

**sharing** 58:5 88:2

**shawn** 35:2,8,12
36:7 39:16 63:20

**sheets** 81:12

**shirt** 75:12,15
76:21,25 77:3
95:7

**shirt's** 76:23

**shirts** 76:5,8

**short** 54:18 102:16

**shorthand** 110:8

**shoulder** 54:5

**show** 62:8 63:9
65:9 72:16

**showed** 40:11,17

**showing** 33:21
74:5

**shown** 34:6 57:20
81:8 88:7 99:19

**shut** 39:16

**sides** 99:5

**sign** 20:2,3

**signature** 110:23
113:1 114:1

**signed** 3:16,19
19:17 101:5 114:3

**signing** 57:14
100:8

**similar** 85:16

**simple** 39:14

**sir** 6:14 7:3 23:22
56:20 58:4,8,12,22
60:7,16 64:11
70:19 83:20,23
85:20 89:3

**sister** 93:16

**sit** 44:13

**sitting** 41:2

**situation** 47:6 76:3
85:16 86:6

**situations** 39:8,19
39:22 52:5,9 68:7
71:18

**six** 60:20 86:9,19
101:7

**slow** 43:13,18

**sole** 14:13,15 15:2
15:9 16:8 18:12
19:19 20:8 21:11
26:23

**sorry** 24:16 28:7
29:21 47:25 50:11
50:12 61:22,24
69:20 70:19 80:5
81:3,21 91:20
95:23 96:8 99:7

**sort** 46:11

**sorts** 62:24

**sounds** 40:8 54:12

**speaking** 50:7

**special** 69:21,25
70:4,21,25 71:4,8
102:4

**specials** 69:12,13
69:14 70:15 71:9
71:13 72:5,6

**specific** 98:14

**speculate** 9:12

**spoke** 107:14

**spreadsheet** 57:24
58:6 81:11 88:4

**spring** 21:20 22:14

**spruce** 12:6

**ss** 110:5 112:5

**stain** 76:22

**standard** 76:7,10

**start** 8:2 13:15
22:20

**started** 14:13 16:5
22:11,14 26:8
39:11 50:21

**starting** 82:12
88:21

**state** 1:19 5:18,21
6:24 7:4,9 21:2,9
49:14,15 51:4
74:6 75:2 110:4
110:10 112:4
114:10,19

**stated** 36:9

**statement** 50:3,15
58:11,14,15 60:17
61:2 62:2 63:17
64:8 71:19 72:11
72:16 77:23 79:7
79:13,14 82:10
83:13 88:13 90:22
91:6

**statements** 58:18
58:21,24 59:6
61:14 62:13,25
63:6 85:10 104:13

**states** 1:2 5:4
34:18,18 82:6
101:11 103:13

**stayed** 35:19

**steven** 39:2,4 40:6

**stipulated** 3:4,10
3:15

**stop** 61:9 64:21,22
64:24 65:7,10,15
65:19 68:14,16,16
68:25 69:25 71:3

**stopped** 19:2

**stops** 35:20,23
61:10 62:8 63:3
64:15,16,18 65:3,4
65:22 66:10 67:9
86:7

**storage** 94:7

**store** 44:22

**stored** 42:7

**straight** 97:9

**strategies** 43:12

**street** 2:5 12:6

**stub** 58:16

**studying** 12:17

**stuff** 42:12 70:18

**subject** 6:19

**submit** 80:17
86:15

**subscribed** 112:20
114:13

**sued** 107:22
108:13

**suffolk** 12:16

**suite** 2:14

**supplied** 97:19

**supposed** 60:11
67:16,23,25

**sure** 8:8 9:10
16:21 20:7,16
26:9 32:17 33:20
37:8 47:5 50:6,20
52:8 59:9 62:19
67:19 69:24 73:16
78:11 85:10 90:21
94:15,18 95:19
106:19

**swamped** 31:20

**swear** 6:12

**sworn** 3:16,19
6:23 110:12
112:20

**syosset** 16:24 26:7
26:14 27:16 42:5
42:11 45:3,3
105:16 106:22

**syracuse** 16:20

Veritext Legal Solutions
800-336-4000

[system - truck]

**system**   19:6,8,16
19:24 20:23 21:2
21:4,7,12,22,25
22:5 23:17 24:4,8
24:22 25:2,6,22
26:2,21 27:18
28:4,13,22 29:7
33:11 35:9 40:10
40:14 41:3,12,22
42:25 45:18 47:20
48:2,14,17 49:2,11
49:21 50:10,13
51:5 53:3,6,9,18
53:24 55:4,8,12,16
56:12 57:9 58:17
59:3 72:17 73:19
74:13 79:3 83:16
86:2 87:19 92:8
92:15 98:19
103:21
**system's**   93:17
**systems**   36:4
37:25 38:22 40:19
45:4 49:25 51:23
51:25 73:10 74:16
86:12 87:3 89:9
92:25 94:9,21
95:20,24 96:20,25
97:13,16 98:15
100:4 101:20,25
104:8,12,17,21,24
105:5 107:21
108:13

**t**

**t**   3:2,2 14:8,9
110:2,2 111:6
112:2,2
**take**   4:15 8:22
9:18,20,21 37:14
40:22,24 42:16
46:4,5 51:14

54:11 56:11,15
57:5 69:23 79:21
**taken**   1:17 4:24
7:24 9:25 10:22
13:5,7,8 54:19
72:17 102:17
112:9
**takes**   60:9
**talk**   8:9 35:6 50:6
72:20 82:12
**talked**   49:10 105:9
108:20
**tally**   60:3
**tax**   92:17,25 93:9
93:13,17
**taxes**   87:4,7,10,22
92:15
**taylor**   39:2,4
**team**   6:9 33:4,8
38:12 65:13
**teams**   42:15
**tell**   10:2,5 31:24
44:8,9 49:18 52:5
52:14 59:22 60:18
64:14 71:20 76:3
76:19,24 82:9
86:6,18 105:21
107:24
**tender**   100:16
**term**   33:3
**terminal**   16:22
26:14 27:16 30:21
31:20 33:8,9
**terminated**   104:16
**termination**   47:22
**testified**   6:25
92:14 97:18
**testify**   10:8
**testimony**   6:17
10:24 74:14 84:25
109:5 110:14

112:9
**texas**   5:9,13 109:9
**text**   107:14,18
**thank**   7:14 10:21
**thing**   14:14,16
40:3 68:10 99:8
100:16
**things**   8:24 62:24
**think**   12:21 15:10
16:20 20:20 32:21
42:23 45:19 50:16
50:23 51:10 59:7
59:9 65:16 66:24
67:2 69:10 70:14
70:16 73:15 78:12
82:23 91:3 95:15
**third**   39:6
**three**   15:11 29:17
29:19 31:19 34:13
34:17 71:17,22
80:13 105:19
106:4
**thursday**   44:21
**ticket**   89:24 90:2
**tickets**   90:13
**tie**   79:17
**time**   1:14 3:12
5:22 9:18 23:24
27:16 28:12,17
29:6,16 30:15
34:19 37:6 43:8
43:13 46:2 50:21
52:13 53:3 54:14
54:22 62:11 63:4
65:8,14 80:5,8,14
80:20 85:13,14
86:17 91:2 96:13
96:15 102:13,18
105:19 106:8,16
107:5,7 108:23

**times**   30:13 40:7
62:3,3,4 67:2 79:5
**tired**   39:12
**title**   21:24
**titled**   33:22 99:24
100:4
**today**   8:8,21 9:5
10:2,5 22:7 41:2
44:19 74:14 76:25
**today's**   11:4,7,13
11:21 109:5
**told**   46:15,21
75:19 76:9 93:7
95:9 100:25 101:2
**tomorrow**   44:11
44:20
**top**   34:13 56:16
58:9 99:24
**torrington**   18:21
**total**   78:13 109:7
**town**   31:15 33:8
**track**   84:11
**trailer**   42:14
**transcript**   8:20
112:9,11
**transfers**   14:18
**transportation**
13:10,16 18:3
19:5
**travel**   33:3
**treadmill**   69:22
**trial**   3:13
**trick**   9:6 20:17
47:4
**tried**   74:11 75:25
**triple**   14:8,9
**truck**   13:12,23
14:19,21,23 15:20
16:10,12,13 27:22
27:24 28:2,5,9,14
30:19,20,25 31:7

[truck - way]

31:12 36:22,23
37:13,20 38:6
39:19,23 43:17,17
43:19 44:5 46:22
52:6,8,12,19 56:21
77:14 79:2,25
82:19 83:2 89:4,8
90:4 91:3 103:14
**trucking**  14:8,10
14:25
**trucks**  13:19 27:19
28:17,20 29:24,25
43:7,9,21,22 44:4
44:9,9,10,14,19,22
48:3 49:4,11,13
51:15,19 52:2,10
54:5 60:16 97:7
98:21 99:10
103:20,22,25
104:17,21
**true**  110:13
112:11,14 114:2
**trust**  31:5 60:7
**truth**  6:18,19 10:2
10:5
**truthfully**  10:9
**try**  24:13 32:5
**trying**  9:6 20:16
47:4 63:13
**turn**  4:9 34:12
**twice**  59:7
**two**  7:15 11:11
12:4 17:18 28:18
28:20 29:20,20,24
29:25 30:18 31:18
39:23,24 43:20
44:4,8 45:24
54:22 60:15 65:2
65:3,22 66:7,11
71:9,10,16 80:12
103:20,22 107:6

109:8
**tx4637254**  113:25
**type**  10:25 22:24
24:25

**u**

**u**  3:2 6:22 52:11
**udl**  81:19,19
**udy**  58:6,6 81:21
81:21,24,24 85:7
**uh**  8:25
**ultimate**  19:6,8,15
19:23 20:23,25
21:4,7,11,21,25
22:5,10,14,21,22
22:24 23:5,10,14
23:17 24:4,7,21,25
25:6,22,25 26:21
27:18 28:4,12,22
29:7 33:11 35:9
36:4 37:25 38:22
40:13,18 41:3,11
41:22 42:25 45:4
45:17 47:20 48:2
48:13,17,25 49:11
49:21,25 50:10,13
51:22,25 53:3,6,9
53:18,24 55:4,7,11
55:15 56:12 57:9
58:17 59:3 72:17
73:10,18 74:13,15
79:3 82:2 86:2,12
87:3,19 89:8 92:8
92:14,25 93:17
94:9,21 95:20,24
96:20,25 97:13,16
98:15,19 100:3
101:20,25 103:20
104:8,12,16,20,24
105:5 107:21
108:13

**ultimately**  20:10
**umbrella**  74:4
**understand**  8:17
9:3,7,14,23,25
47:5 54:25 96:17
100:10 102:22
**understanding**
101:16,19,24
**unfortunately**
44:16 70:11 76:21
93:25
**uniform**  75:12,16
75:18,20,24 76:17
76:18
**uniforms**  75:6
77:5,8 94:25
97:20
**unit**  4:19 54:17,21
**united**  1:2 5:4
**units**  79:24 109:8
**unloading**  13:19
**unsuccessful**
47:15
**use**  15:20 48:2
53:17,22 74:11
84:11 94:12
104:17,21 114:8
**usually**  26:11
30:17 31:9,24
35:19 90:13
**utilized**  34:20

**v**

**v**  6:22
**varied**  80:14
**varies**  66:25
**vary**  35:18 36:12
38:16 66:22 78:2
83:7 89:16
**vehicle**  60:8,14
101:12,21

**vehicles**  102:2,9
**verbal**  9:2
**veritext**  5:9,13
109:9
**versus**  5:3 44:4
51:9
**vest**  76:18
**video**  4:14,20
**videographer**  2:21
4:2 5:10 6:11
54:14,20 96:13,15
102:13,18 109:3
**videotaped**  1:16
**virtual**  6:10
**volume**  113:2

**w**

**w**  92:7 112:2
**w2**  29:11
**wait**  65:7
**waived**  3:8
**wall**  84:3
**want**  9:12 11:10
31:9,10,14,21
44:11,14,19 47:5
50:22 71:4 100:20
**wanted**  31:13
40:16 74:4 108:4
**warehouse**  16:23
42:7,8,8,10,17,20
42:21 43:2 52:22
76:23 79:22
105:16 106:22
**wash**  76:22
**water**  107:25
**way**  19:25 31:6
39:13,16 43:8,17
51:12 59:21 63:18
67:22 71:25 79:17
84:6,21 90:7,16
110:17

Page 16

**[we've - zoom]**

| | | |
|---|---|---|

**we've**  49:10
**wear**  75:13,14,17
 75:20
**wednesday**  79:23
**week**  30:17 31:17
 39:11,11 59:8,12
 59:23 60:2,5,18
 72:3 73:11 76:16
 78:2,2,3,5 79:14
 79:18 80:12 82:6
 83:5,6,8 84:7
 86:25 88:15 89:11
 89:14,17 90:8,11
 90:20 92:5
**week's**  90:22
**weekend**  108:3
**weekly**  59:9,15
**weeks**  31:18,19
 40:24 80:12 85:18
**went**  17:25 20:21
 47:17 48:8 59:10
 60:15 61:10 68:15
 68:25 69:2 73:15
 76:4 86:17 106:5
 107:7
**western**  1:3 5:5
**whereof**  110:19
**whichever**  52:12
**whispering**  4:7
**why's**  31:4
**wi**  2:15
**wife's**  36:15
**williams**  34:22
 37:24 38:11,14
**wilson**  52:25 61:6
 76:13 105:10
 106:7 108:17
**windows**  10:17
**wish**  92:2
**wished**  102:9

**withdraw**  55:22
**witness**  6:13,21,22
 7:6,11 34:5 57:19
 81:7 88:6 99:18
 110:11,14,19
**wording**  100:14
**wore**  76:20
**work**  12:19 14:9
 14:12 17:18 18:3
 20:15 31:9 36:19
 37:4,15,17 38:8
 40:16 44:15 46:4
 49:20 52:15 64:7
 76:15 78:5 83:8
 86:24 89:17 92:4
**worked**  16:23,24
 21:20 26:15 34:19
 36:4 40:6,13
 85:25 94:14
**worker**  37:25
**worker's**  49:23
 50:4 72:22 73:3,5
 73:6,7,11,18 74:3
 74:5,6,9,15 97:8
**workers**  48:7 49:7
 53:14 63:22 73:19
 93:21
**working**  13:15
 18:19 19:4 27:8
 29:15 30:4 37:2
 37:21 86:8
**works**  69:24 79:20
 86:9
**worry**  101:3
**would've**  64:8
**write**  55:21 63:6
**wrong**  62:12 71:20
 81:17
**wyandanch**  7:12
 11:24 12:6

**x**

**x**  1:4,12 111:2,6
**xpo**  104:18
**xvo**  47:25 48:3,8
 48:11,14
**xyz**  80:2

**y**

**yard**  44:25 45:2
**yeah**  11:14 53:20
 59:14 100:6 101:6
 101:6
**year**  23:25 85:21
 94:5
**years**  12:4,10
 15:11 28:19 35:14
 105:22 106:20
**yep**  59:15 64:22
 66:5 70:8 72:14
 83:6,20 88:17
 92:11 101:10
**yesterday**  11:16
 76:21
**york**  1:3,19 2:7
 4:23 5:6 6:24 7:12
 11:24 12:7 16:21
 21:2,5 110:4,10
**yup**  44:20 47:13
 54:8

**z**

**zoom**  8:10,22
 10:12 96:9

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 26

1

IN THE UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF NEW YORK

Case No:  6-17-cv-06296-FPG-MJP

3    - - - - - - - - - - - - - - - - - - - -x

4    MIKE KLOPPEL, et al.,

5            Plaintiffs,

6        v.

7    HOMEDELIVERYLINK, INC.,

8            Defendant.

9    - - - - - - - - - - - - - - - - - - - -x

10

May 11, 2021

11                    2:04 p.m.

12

13

14

15

16       VIRTUAL REMOTE VIDEOTAPED

17   DEPOSITION of DAVID TRAINA, taken by

18   Defendant, pursuant to Notice, held in

19   Buffalo, New York, before Kathleen

20   Piazza Luongo, a Notary Public of the

21   State of New York.

22

23

24

25

                                    Page 1

```
 1
 2      A P P E A R A N C E S :
 3
 4      LICHTEN & LISS-RIORDAN, P.C.
 5      729 Boylston Street
 6      20th Floor
 7      Boston, Massachusetts  02116
 8           Attorneys For Plaintiffs
 9      BY:  BENJAMIN J. WEBER, ESQ.
10           bjweber@llrlaw.com
11
12
13      SCOPELITIS, GARVIN, LIGHT, HANSON &
14      FEARY, P.C.
15      777 Main Street
16      Fort Worth, Texas  76102
17           Attorneys for Defendant
18      BY   EMILY A. QUILLEN, ESQ.
19           equillen@scopelitis.com
20
21      ALSO PRESENT:
22           Josh Stivers, Videographer
23
24
25
```

Page  2

```
1
2              THE VIDEOGRAPHER:  Here begins
3       the deposition of David Traina.
4              Today's date is May 11, 2021.
5       The time is 2:04 at the witness's
6       location.
7              Counsel, please identify
8       yourself for the record and state who
9       you represent.
10             MS. QUILLEN:  Emily Quillen,
11      attorney at Scopelitis, representing
12      HomeDeliveryLink.
13             MR. WEBER:  Benjamin Weber for
14      the Plaintiffs.
15             THE VIDEOGRAPHER:  Will the
16      court reporter please swear in the
17      witness.
18  D A V I D   T R A I N A, called as a
19  witness, having first been duly sworn,
20  was examined and testified as follows:
21             MS. QUILLEN:  Mr. Traina, my
22      name is Emily Quillen.  I'm an
23      attorney for HomeDeliveryLink, a
24      defendant in a lawsuit that is
25      currently pending in New York.
```

Page 3

```
 1    EXAMINATION BY MS. QUILLEN:
 2         Q.     Could you please state your
 3    full name for the record.
 4         A.     David, middle initial S, like
 5    Scott, Traina.
 6         Q.     What is your correct address?
 7         A.     57 Wabash Avenue, Cheektowaga
 8    New York 14206.
 9         Q.     How long have you resided
10    there?
11         A.     Since 2006.
12         Q.     And before that did you reside
13    in New York?
14         A.     Yes, for my whole life.
15         Q.     Have you ever given your
16    deposition before?
17                Have you given your deposition
18    before?
19         A.     No.
20         Q.     Are you represented by a lawyer
21    for the deposition today?
22         A.     Yes.
23         Q.     And who is your lawyer?
24         A.     He's on with us, I forgot his
25    name, I'm sorry.
```

Page 4

1      Q.     Is it Ben Weber?

2      A.     Yes, it is.

3             THE WITNESS:  Am I supposed to

4      see any of you guys on here or just

5      me, myself?

6             MS. QUILLEN:  I believe you're

7      pinned as the main video that you

8      will see, you may be able to change

9      your view on your settings.

10            THE WITNESS:  Okay, I can see

11     it now.  I can see everyone now.

12     Thank you.

13  CONTINUED EXAMINATION BY MS. QUILLEN:

14     Q.     When did you first communicate

15  with Mr. Weber regarding your deposition?

16  I don't want to know what you discussed,

17  just when.

18     A.     I want to say about a month

19  ago.

20     Q.     And how many times have you

21  spoken with Mr. Weber?  Again, I don't

22  want to know what you talked about, just

23  how many times.

24     A.     Maybe five or six.

25     Q.     And how long were those

Veritext Legal Solutions
800-336-4000

1    conversations?

2        A.    They were brief, um, less than

3    a half hour.

4        Q.    You may have been provided some

5    explanation of how the proceedings are

6    going to go today.  It's a little

7    different because we are not in person,

8    we are taking this over Zoom, so I want

9    to make sure you understand how things

10   are going to work today.

11           Do you understand that you're

12   under oath, meaning that you're providing

13   true and accurate testimony just as you

14   would if you were in a court of law?

15       A.    Yes.

16       Q.    For purposes of the deposition

17   oral answers, verbal answers are

18   preferred, head shakes will be seen on

19   the video but will not show up on the

20   transcript; so at some point if I ask you

21   "Is that a yes" or "Is that a no," I'm

22   not meaning to do anything but clarify

23   for the record what your answer is.

24           Do you understand that?

25       A.    I understand.

Page 6

1        Q.    Also things like "um-hum" or

2    "um, ah, I think so," things like that

3    may not appear accurately on the record

4    if it's not clearly understood, so I may

5    ask you, again, to clarify your answer.

6              Okay?

7        A.    Okay.

8        Q.    It is very important that we

9    only speak one person at a time.   On

10   Zoom, audio sometimes doesn't come

11   through if we're sneaking at the same

12   time and the court reporter won't be able

13   to hear us both talking.

14             So if you will allow me to

15   finish my questions before you start

16   answering I will try to do the same for

17   your answers.

18             If for some reason you don't

19   hear the entirety of my question or

20   there's some interruption in the audio,

21   will you let me know so we can make sure

22   everyone hears the question and answers

23   accurately?

24       A.    I will.

25       Q.    Okay.

Page 7

```
 1              If you need to take a break at
 2   any point, I'm happy to let you do that,
 3   excuse me, as long as there is not a
 4   question that's pending on the record
 5   that you haven't answered, I'm happy to
 6   take breaks.
 7        A.    Okay.
 8        Q.    Are you aware of anything that
 9   would prevent you from testifying
10   truthfully today, such as medications
11   that you may be on or something of that
12   like?
13        A.    No.
14        Q.    Okay.
15              Mr. Traina, have you ever been
16   convicted of a crime?
17        A.    No.
18        Q.    Have you ever been involved in
19   another lawsuit?
20        A.    No.
21        Q.    Have you communicated with
22   anyone besides your lawyer regarding this
23   lawsuit?
24        A.    No.
25        Q.    Have you spoken with Mike
```

Page 8

1    Kloppel about the lawsuit?

2        A.    No.

3        Q.    Or Adam Wilson?

4        A.    No.

5        Q.    Are you familiar with either of

6    those two gentlemen?

7        A.    Adam, yes.  Mike sounds

8    familiar.

9        Q.    And how do you know Adam

10   Wilson?

11       A.    He was working when I was

12   working also in HomeDeliveryLink.

13       Q.    How long did you know him at

14   that time?

15       A.    That's when I met him.

16       Q.    Do you know approximately what

17   time period that was?

18       A.    Not exactly, no.

19       Q.    How long would you say you knew

20   him?

21       A.    I just met him there.  I didn't

22   really know him before that.

23       Q.    Have you talked with him since

24   you quit driving for HDL, for

25   HomeDeliveryLink?

Page 9

```
1        A.      No.

2        Q.      Okay.

3                And if I refer to

4   HomeDeliveryLink as HDL, will you know

5   what I'm referring to?

6        A.      Yes.

7        Q.      All right.

8                Have you prepared for your

9   deposition today?

10       A.      Yes.

11       Q.      How did you do that?

12       A.      Just conversation with the

13  attorney.

14       Q.      Okay.

15               Did you review any documents

16  outside of your conversations with your

17  attorney.

18       A.      What do you mean, documents

19  like what?

20       Q.      Did you go through any

21  documents that you may have in your

22  possession or that you may have been

23  given in preparation for the deposition?

24       A.      I sent him a few things that he

25  asked for.
```

Page 10

```
 1        Q.     Okay.
 2               Other than the documents that
 3   you sent him, did you review any
 4   documents that you received from the
 5   attorney?
 6        A.     I just had to sign something
 7   online, I forgot what it was, about the
 8   deposition here.
 9        Q.     Do you believe that was after
10   discovery response?
11        A.     I believe so, yes.
12        Q.     Okay.
13               Have you ever reviewed the
14   Complaint that has been filed with the
15   Court?
16        A.     No.
17        Q.     What is your understanding of
18   the lawsuit that's currently pending?
19        A.     Misclassification.
20        Q.     What does that mean to you?
21        A.     We were the misclassified as
22   contractors when we were -- should have
23   been employees.
24        Q.     Is it your understanding that
25   you were misclassified?
```

Veritext Legal Solutions
800-336-4000

```
 1        A.     Yes.
 2        Q.     Why do you believe that?
 3        A.     The way that we worked, the way
 4   they set everything up there, they ran
 5   the show.
 6        Q.     When you say "the way they set
 7   everything up," what are you referring
 8   to?
 9        A.     The routes that were given to
10   us were chosen by them, the hours we
11   worked were chosen by them, everything
12   was chosen by them pretty much.
13        Q.     Specifically though, when you
14   say "they" and "them," who are you
15   referring to?
16        A.     HomeDeliveryLink.
17        Q.     Do you have a high school
18   diploma, sir?
19        A.     Yes?
20        Q.     When did you graduate?
21        A.     '91.
22        Q.     From where?  From where?
23        A.     Williamsville South.
24        Q.     Where is that located, what
25   city?
```

Page 12

```
 1        A.     Williamsville, New York.
 2        Q.     Did you attend college or
 3   university?
 4        A.     I did not.
 5        Q.     Did you serve in the military?
 6        A.     No.
 7        Q.     Did you have any extra
 8   education or certificates that you
 9   received after high school?
10        A.     I did not, do not.
11        Q.     What was your first job in the
12   transportation industry?
13        A.     Years ago I drove a courier
14   van.
15        Q.     For what company?
16        A.     123 Delivery.
17        Q.     Did you contract for that
18   position?
19        A.     No, I was an employee.
20        Q.     You were an employee of 123
21   Delivery?
22        A.     Yes.
23        Q.     Was there a company that you
24   made deliveries for other than 123
25   Delivery?
```

Veritext Legal Solutions
800-336-4000

1        A.      At the time, no.

2        Q.      After doing the courier van,

3    what was your next job in the

4    transportation industry?

5        A.      Um, I believe I got involved

6    with HomeDeliveryLink.

7        Q.      What was your first involvement

8    with HomeDeliveryLink?

9        A.      I saw an ad for contractors,

10   workers, applied to the ad and they

11   accepted me.  And we went through the

12   whole process of onboarding and all that.

13       Q.      How long did you drive for 123

14   Delivery as a courier driver?

15       A.      Prior to HDL?

16       Q.      Yes.

17       A.      Over ten years.

18       Q.      Do you recall what year it was

19   that you first saw that ad for HDL?

20       A.      I do not.

21       Q.      When did you form Traina

22   Services LLC?

23       A.      2014 was when I -- it was

24   incorporated, before that I was a d/b/a.

25       Q.      What does it mean to you to be

Page 14

1    a d/b/a?

2         A.    Just have a business name

3    pretty much.

4         Q.    Before you formed the LLC did

5    you file taxes on behalf of your company

6    as a d/b/a?

7         A.    I've always filed taxes under

8    my, me, as person, personal.

9         Q.    Okay.

10             Did you claim the income that

11   Traina Services earned while it was a

12   d/b/a?

13        A.    No, because there was no Traina

14   Services before that.

15        Q.    Was Traina Services LLC the

16   first company that you owned?

17        A.    Yes.

18        Q.    And other than driving the

19   courier van, you had no other

20   transportation experience before you

21   started driving under Traina Services; is

22   that right?

23        A.    Correct.

24        Q.    Did you drive continuously for

25   HomeDeliveryLink beginning in 2011?

Veritext Legal Solutions
800-336-4000

1    A.    Yes.

2    Q.    Did you take some time off in

3    2013 and 2014 to do something different?

4    A.    No, I don't believe so.

5    Q.    The income that you reported

6    for Traina Services LLC in 2014, is it

7    your understanding that was paid for by

8    HDL?

9    A.    Can you repeat the question?

10    Q.    The income that you reported to

11    the IRS as being earned by Traina

12    Services LLC in 2014, is it your

13    testimony that was paid for by HDL?

14    A.    Yeah, they 1099'd me.

15    Q.    Have you produced all of the

16    1099s that you were able to locate?

17    A.    Yes.

18    Q.    You did not produce a 1099 for

19    the year 2013; do you know why?

20    A.    I couldn't find it.

21    Q.    Is it your understanding you

22    were given a 1099 for 2013?

23    A.    Yes.

24    Q.    Did you drive for any other

25    company in 2013?

Veritext Legal Solutions
800-336-4000

1        A.     No.

2        Q.     Did you work for any other

3   company in 2013?

4        A.     No.

5        Q.     Did you always drive in the

6   Buffalo location?

7        A.     No -- to start the day, yes.

8        Q.     And what I mean is, did you

9   ever start your day at another warehouse,

10  such as Syosset or Rochester?

11       A.     Oh, no.

12       Q.     Was Traina Services LLC based

13  in Buffalo?

14       A.     Yes.

15       Q.     What are you currently doing

16  for work?

17       A.     I do the same thing.

18       Q.     What is that?

19       A.     Transportation business.

20       Q.     Under Traina Services LLC?

21       A.     Yes.

22       Q.     Do you currently operate under

23  the same Department of Transportation

24  motor carrier number?

25       A.     Yes, I do.

Veritext Legal Solutions
800-336-4000

```
 1        Q.     And are you contracting with
 2   the company at this time?
 3        A.     Yes.
 4        Q.     And who is Traina Services LLC
 5   contracting with?
 6        A.     I have several at this time.
 7        Q.     What companies are you
 8   contracting with?
 9        A.     Um, okay, what does that have
10   to do with this deposition?  I'm confused
11   on that question.  Why does it matter
12   what I do now?
13        Q.     We're allowed to ask a lot of
14   questions in a deposition, sir.
15               Who are you currently
16   contracting with?
17        A.     XPO Logistics, Spiro Logistics,
18   Estes Express, R&L Carriers.
19        Q.     How many companies are you
20   currently contracting with at Traina
21   Services?
22        A.     Five.
23        Q.     Did you begin contracting with
24   those companies after you quit providing
25   services to HDL?
```

1      A.    Yes, this asked when I branched

2   off.

3      Q.    And that was in 2018?

4      A.    I don't recall the exact year.

5   I believe so.

6      Q.    What did you do when you say

7   you branched off?

8      A.    Well, when me and HDL parted

9   ways, business ways as partners or

10  whatever you want to call, what they

11  called it, I got other things so that I

12  could support myself, so.

13     Q.    And the only years that you say

14  that you drove for a company other than

15  HDL was in 2016 and 2017; is that right?

16     A.    To the best of my knowledge.

17     Q.    And during 2016 and 2017 you

18  drove for NFM [sic] and Spirit Delivery,

19  those two companies?

20     A.    Yes.

21     Q.    Are those two companies that

22  you're currently contracted with?

23     A.    Spirit, yes, MFM is no longer

24  in business.

25     Q.    Did you contract with NFM [sic]

Veritext Legal Solutions
800-336-4000

1    after 2018?

2         A.    I'm not, I don't recall whether

3    that was.  I'm not sure when we, when

4    they went out of business.

5         Q.    Did you contract with Spirit

6    Delivery in 2018?

7         A.    I believe so.  I believe so.

8         Q.    What type of delivery is Traina

9    Services doing for Spirit Delivery?

10        A.    That was the same type of

11   deliveries for HDL, appliance delivery.

12        Q.    And the other contract work

13   that you do currently, is it also

14   appliance deliveries?

15        A.    No.

16        Q.    What type of work do you do for

17   the other contracting -- other companies

18   that you contract with?

19        A.    General freights, sporting

20   goods, furniture.

21        Q.    NFM [sic], what kind of work

22   was Traina Services doing for that

23   company in 2016 and 2017?

24        A.    It's MFM, not N like Nancy.

25   That was general freight, pallet jack

Veritext Legal Solutions
800-336-4000

1    curbside delivery.

2        Q.    Are you saying it is N, like

3    Nancy, FM, like man?

4        A.    M like Mary, F like Frank, M

5    like Mary, MFM.

6        Q.    Got it, okay.

7              And you said it was general

8    freight?

9        A.    Yes, pallet jack curbside.

10       Q.    For someone who is not familiar

11   with what that means, could you describe

12   what type of deliveries that would

13   entail?

14       A.    Anything that's put on a pallet

15   and shipped through a warehouse.

16       Q.    Are you delivering those items

17   from one commercial location to another?

18       A.    Commercial to residential.

19       Q.    So you're delivering directly

20   to a customer?

21       A.    Yes.

22       Q.    Okay.

23             Are you the owner of Traina

24   Services LLC?

25       A.    Yes.

Veritext Legal Solutions
800-336-4000

1       Q.    Has that company been in
2   business since it was formed in 2014?
3       A.    Yes.
4       Q.    Where is it formed?  Is it a
5   New York LLC?
6       A.    Yes.
7       Q.    Does anyone else have an
8   ownership interest in Traina Services
9   LLC?
10      A.    No.
11      Q.    You own 100 percent of the
12  company?
13      A.    Yes.
14      Q.    And has that been true for the
15  entire time that it's been in business
16  since 2014?
17      A.    Yes.
18      Q.    The business address for Traina
19  Services, is it your residential address
20  that you gave at the beginning of the
21  deposition?
22      A.    Yes, it is.
23      Q.    Do you currently have an
24  ownership interest in any other company
25  besides Traina Services LLC?

```
 1          A.      No.

 2          Q.      What is your job title with

 3   Traina Services?

 4          A.      Owner.

 5          Q.      How many individuals currently

 6   work for Traina Services?

 7          A.      About 10.

 8          Q.      Has the number of individuals

 9   that worked for Traina Services

10   fluctuated over time?

11          A.      Yeah, it always does.

12          Q.      What is the most number of

13   individuals that Traina Services has

14   employed at one time?

15          A.      12 to 15, around there.

16          Q.      And do you recall what time

17   period that was?

18          A.      I do not.

19          Q.      How many -- what was the fewest

20   number of individuals that worked for

21   Traina Services at any one time?

22          A.      One.

23          Q.      When was that?

24          A.      I don't remember the year when

25   everyone -- when I worked for
```

Veritext Legal Solutions
800-336-4000

1    HomeDeliveryLink, it was just me and a

2    helper.

3         Q.    Was that in the very beginning,

4    in 2011?

5         A.    Yes.

6         Q.    Did that change?

7         A.    What do you mean?

8         Q.    Did you ever increase the

9    number of employees when you were

10   contracted with HDL?

11        A.    Yeah, when they asked for more

12   trucks or more teams, yes, I did.

13        Q.    When did that happen?

14        A.    I don't recall the year.

15        Q.    Do you believe it was around

16   2014?

17        A.    Possibly.

18        Q.    And at that time how many

19   employees do you think that you added to

20   your payroll?

21        A.    I think at the most I had three

22   trucks with them, I wanna say possibly

23   four, so besides myself and my helper,

24   four to six other guys, possibly.

25        Q.    So if you were operating three

1    trucks, that meant how many employees
2    they would have to have to operate those
3    three trucks?
4         A.    Besides me?  Five.
5         Q.    Each truck had a driver and a
6    helper; right?
7         A.    Yes.
8         Q.    So if you added a truck you'd
9    have to add two more employees?
10        A.    At their discretion, yes.
11        Q.    Did you hire the employees of
12   Traina certifications?
13        A.    I located them, they pretty
14   much hired them.  They did every -- they
15   did all the work, they had a strict
16   onboarding.
17        Q.    What did you do to locate
18   employees?
19        A.    Word of mouth, sometimes an ad
20   on Craig's List.
21        Q.    And you paid employees through
22   Traina Services; is that right?
23        A.    When it was Traina Services,
24   yes.
25        Q.    Before it was incorporated in

Veritext Legal Solutions
800-336-4000

1  2014 and you were operating a d/b/a, how

2  did you pay employees?

3      A.   I don't remember.  I don't

4  recall when -- when that happened, I

5  don't remember how all they were paid.

6           They were paid but I just, I

7  don't know, I don't recall how I did it

8  then before I have a payroll company that

9  I use now.

10     Q.   When did you begin working with

11 a payroll company?

12     A.   When I became incorporated,

13 2014 I believe.  Before that I did it

14 myself through Intuit Payroll.

15     Q.   And did the payroll company

16 take care of any withholdings that were

17 required to be made?

18     A.   Like, yeah, like payroll taxes

19 and stuff, yeah.

20     Q.   Yes.

21          And Medicare and that sort of

22 things for employees?

23     A.   Yes.

24     Q.   Did they also issue W-2s to

25 employees of Traina Services?

Page 26

```
 1        A.    Yes.
 2        Q.    Do you recall the name of the
 3   payroll company that you had to use in
 4   2014?
 5        A.    Paychex.
 6        Q.    Do you still use Paychex as
 7   your payroll company?
 8        A.    Yes.
 9        Q.    Do you input the amounts that
10   employees should be paid on -- into
11   Paychex?
12        A.    It's a base salary, pretty
13   much.
14        Q.    And what is that base salary?
15        A.    Five hundred a week.
16        Q.    Is that for helpers or drivers?
17        A.    That's for both, I treat them
18   equal.
19        Q.    So no matter how many stops a
20   helper or driver may have had, they were
21   paid $500.00 flat rate?
22        A.    Correct.
23        Q.    I'm sorry?
24        A.    Yes.
25        Q.    Okay.
```

Page 27

1                   Was that the case for the
2      entire time you provided services to HDL?
3          A.     Like I said, I started in 2014
4      with Paychex.  Before that I did it
5      myself through Intuit, but that was
6      pretty much, it was payroll, yes.
7          Q.     I'm sorry, my question wasn't
8      clear on that.
9                   The $500.00 per week, was that
10     the same rate you paid to drivers and
11     helpers since 2011?
12         A.     No, it might have been a little
13     lower.  It increased over time.
14         Q.     Has it ever increased past 500
15     per week?
16         A.     No.
17         Q.     Do you recall what the rate was
18     in the beginning in 2011?
19         A.     I don't.
20         Q.     So beginning in 2014, would you
21     say the average number of employees of
22     Traina Services was six or more than
23     that?
24         A.     I don't recall in 2014, that
25     was seven years ago.

Page 28

1      Q.     What about since 2015, do you
2  recall that?
3      A.     No.  It fluctuates.
4      Q.     Do you have any records that
5  would indicate who were the employees of
6  Traina Services at any given time period?
7      A.     I mean whatever Paychex has on
8  file.
9      Q.     Do you have access on Paychex
10  to W-2s that were issued to your
11  employees?
12      A.     From past years I'm not sure.
13      Q.     Why did you form Traina
14  Services LLC in 2014?
15      A.     Why?
16      Q.     Yes.
17      A.     I was instructed that I needed
18  to have a corporation --
19             THE WITNESS:  Hold on.  Let me
20      get my dog, I'm sorry.  Can you guys
21      hold one second, please?
22             MS. QUILLEN:  Sure.
23             THE WITNESS:  Sorry about that.
24             MS. QUILLEN:  No problem.
25      Q.     Who instructed you to form

Veritext Legal Solutions
800-336-4000

1    Traina Services LLC?

2         A.    I don't recall.  It was, I

3    believe, HomeDeliveryLink.

4         Q.    But you don't remember?

5         A.    I don't.

6         Q.    Do you recall if you considered

7    creating or forming a corporation

8    instead?

9         A.    No, just what I was told to do

10   or, you know, what was required to do.

11        Q.    Before 2014 did Traina Services

12   LLC have a Motor Carrier Authority?

13        A.    I don't recall when I got the

14   DOT number.

15        Q.    Do you recall how that

16   happened?

17        A.    How I got the DOT number?

18        Q.    Yes.

19        A.    We went on the website and

20   applied for one.

21        Q.    And you personally handled

22   those filings?

23        A.    Yes.

24        Q.    Do you make annual filings with

25   the Federal Motor Carrier Safety

Page 30

1    Administration or the Department of

2    Transportation?

3        A.    My insurance does some sort of

4    filing every year with them.

5        Q.    And you're currently authorized

6    for intrastate transportation or just

7    inside New York City; is that right?

8        A.    No, they're both.  I forget the

9    meaning of both, there is interstate and

10   intrastate I think.

11       Q.    So I-N-T-E-R, interstate; is

12   that right?

13       A.    Yeah, I'm allowed to go to PA

14   because I have an MC number also.

15       Q.    Do you make deliveries to

16   Pennsylvania?

17       A.    Just once a week, possibly one

18   day they limit it to across in PA.

19       Q.    Did you make deliveries to

20   Pennsylvania for HDL?

21       A.    I believe so.

22       Q.    And is that when you said you

23   were making them once a week to

24   Pennsylvania?

25       A.    I don't recall any times for

Veritext Legal Solutions
800-336-4000

1  them.

2      Q.     When those deliveries were made

3  to Pennsylvania, were you personally the

4  one making those deliveries?

5      A.     For HDL?

6      Q.     Yes.

7      A.     Yes, I've been there for -- for

8  them.  I don't recall how many times

9  though.

10     Q.     Is that indicated on settlement

11 statements as an SDO, when you would go

12 out of town?

13     A.     I believe that's what that

14 meant, yes, because that was a travel

15 route.

16     Q.     Have you always had interstate

17 authority to be able to travel between

18 New York and other states?

19     A.     Yes.

20     Q.     Your current filing with the

21 FMCSA lists that you have eight drivers;

22 is that accurate?

23     A.     That's close for right now,

24 yes.

25     Q.     And it also states that you

Page 32

```
 1   have eight power units, is that the
 2   number of trucks that you're currently
 3   operating?
 4        A.    Yes, close, that gets updated
 5   every year so it could change.
 6        Q.    And the most that you recall
 7   operating for HDL is four trucks; is that
 8   right?
 9        A.    I believe it was three,
10   possibly four, I'm not 100 percent on
11   that.
12        Q.    Have you ever owned trucks, or
13   do you lease them?
14        A.    I lease them through Budget.
15        Q.    Has that always been the case?
16        A.    Since I started.
17        Q.    Why did you make the decision
18   to lease trucks instead of own them?
19        A.    Just easier to handle.
20   Something happens to the truck, make a
21   phone call, get it replaced or fixed.
22        Q.    So you believe it's easier for
23   maintenance purposes to do a lease
24   instead of own?
25        A.    Yes.
```

Page 33

1      Q.      Are you required to handle any
2   kind of regular maintenance on the leased
3   trucks?
4      A.      Yeah, every 10,000 miles I'm
5   told it needs to have an oil change PM,
6   preventative maintenance.
7      Q.      Who tells you that, the leasing
8   company?
9      A.      Yes, yes.
10     Q.      Other than just an oil change,
11  if there is any other problems with the
12  leased vehicle, those are not the
13  responsibility of Traina Services; is
14  that right?
15     A.      It depends on the situation.
16  Someone takes a roof off a truck it's
17  something mechanical, it's not.
18     Q.      So if it's not something that
19  was caused by a driver of Traina Services
20  but it's normal wear and tear, you're not
21  responsible for repairing it?
22     A.      No.
23     Q.      Is that one of the reasons why
24  you find it beneficial to lease rather
25  than purchase?

Veritext Legal Solutions
800-336-4000

1    A.    Yes.

2    Q.    And if a driver of Traina

3  Services does do some damage to the

4  vehicle, that's an expense that Traina

5  Services takes on to make the repair; is

6  that right?

7    A.    Unfortunately.

8    Q.    Is that an unfortunately yes?

9    A.    Yes.

10    Q.    Okay.

11    A.    Sorry.

12    Q.    That's okay.  I knew what you

13  meant, I just wanted to make sure we were

14  clear on the record.

15         Does Traina Services LLC have

16  its own business banking account?

17    A.    Yes.

18    Q.    How long has it had its own

19  separate banking account?

20    A.    For as far as I can recall

21  since I started.

22    Q.    So since 2014 or was it before

23  when you were operating as a d/b/a?

24    A.    I didn't have a -- Traina

25  Services is not before 2014, so when I

Page 35

1    opened the corporation or the LLC I had

2    to get a bank account in that name.

3    Before that I believe it was just

4    personal, my personal account and going

5    through that.

6        Q.    So just to clarify, beginning

7    in 2011, whenever you were operating as a

8    d/b/a, you believe that Traina Services

9    operated through your own personal bank

10   account; is that right?

11       A.    Yes.

12       Q.    And after the LLC was formed

13   you opened a business banking account for

14   Traina Services LLC?

15       A.    Yes.

16       Q.    The payments that were received

17   for contracting with HDL, did Traina

18   Services deposit those into that business

19   bank account?

20       A.    Yes.

21       Q.    Whenever Traina Services was

22   contracting with other businesses in 2016

23   and 2017, were the amounts that were paid

24   as contractor services payments also

25   deposited in that business bank account?

Page 36

```
1        A.     Yes.
2        Q.     You didn't keep those payments
3  separately?
4        A.     They are listed separate when
5  some other places did direct deposit, HDL
6  gave me a check, so I knew what was what.
7        Q.     But all income, no matter what
8  the source, would have been deposited
9  into that business bank account?
10       A.     Yes.
11       Q.     Did you take a salary while you
12  had been the owner of Traina Services?
13       A.     I didn't have a set salary, no.
14       Q.     How did you pay yourself from
15  Traina Services's bank account?
16       A.     After all my expenses, whatever
17  was left I used for my personal expense,
18  living.
19       Q.     Was that on an annual basis or
20  weekly, monthly?  How did you make that
21  accounting?
22       A.     Every week, whatever was left
23  and whatever bills I had to pay at the
24  end of the week.
25       Q.     Okay.
```

Page 37

1              So let me make sure I

2    understand.  You would deposit all of the

3    payments to Traina Services in the

4    account; is that right?

5         A.    Yes.

6         Q.    And then any expenses for that

7    week would be paid from that account; is

8    that right?

9         A.    Um-hum.

10        Q.    Is that a yes?

11        A.    Yes.

12        Q.    And those expenses would have

13   been expenses of Traina Services LLC; is

14   that right?

15        A.    Yes.

16        Q.    All right.

17             So then whatever was left on a

18   weekly basis after those expenses of

19   Traina Services were paid, you would then

20   take the remainder for your payment as

21   the owner?

22        A.    Whatever was left was left and

23   if I had bills I would just run them

24   through that account, personal.

25        Q.    Okay.

Veritext Legal Solutions
800-336-4000

1           So if you had, say, your
2    personal vehicle or your house note, you
3    would pay those through the business bank
4    account?
5         A.    Yes.
6         Q.    So it wasn't a set amount on
7    any kind of a weekly basis that you took
8    from the bank account for either payments
9    for your personal expenses or for
10   personal uses?
11        A.    No.
12        Q.    At the end of the year did you
13   make an accounting of what you were paid
14   personally from the account of Traina
15   Services?
16        A.    My accountant did all that for
17   me.
18        Q.    So is that no, you didn't make
19   that accounting?
20        A.    No.
21        Q.    Who is your accountant that
22   would have done that for you?
23        A.    Jay Witmar.
24        Q.    Can you spell that?
25        A.    W-I-T-M-A-R, I believe it's

1  spelled.

2      Q.    Has he done your accounting

3  services since 2014?

4      A.    I believe so.

5      Q.    Any amounts that you would have

6  taken for the payment of your personal

7  expenses from the business account would

8  have been reported to the IRS as your

9  personal income; is that right?

10     A.    I'm not sure how he did it.

11     Q.    Do you have any recollection of

12 the amounts that you would have taken in

13 any year for your personal expenses from

14 the bank account of Traina Services?

15     A.    I don't.

16     Q.    Was there any tie to the work

17 that you performed personally and what

18 you took out of the bank business account

19 at the end of the week?

20     A.    No.

21     Q.    So depending on the success,

22 the amount of work that Traina Services

23 would have had in a given week and what

24 the expenses were, that determined what

25 money you received personally; is that

Page 40

1  right?

2      A.    Yes.

3      Q.    On some of the tax returns that

4  you produced there were indications that

5  there was contract labor; did you ever

6  contract with any individuals while you

7  were providing services to HDL?

8      A.    I'm not sure how I did my

9  taxes, whatever he put on there, I'm not

10 sure.

11     Q.    But it's your understanding

12 that any driver or helper that Traina

13 Services had while working for HDL would

14 have been employees?

15     A.    Yes.

16     Q.    Have there been weeks when you

17 did not drive for Traina Services?

18     A.    I don't recall.

19     Q.    Do you have any records that

20 would indicate what weeks you did drive

21 for Traina Services?

22     A.    I don't.

23     Q.    Do you recall if HDL had any

24 records that indicated when you drove for

25 Traina Services while operating for HDL?

Page 41

```
 1        A.    I would assume, yes, I'm not
 2   sure.
 3        Q.    Did your accountant have any
 4   involvement in the issuance of payroll to
 5   employees of Traina Services?
 6        A.    No.
 7        Q.    Have you ever advertised the
 8   business services of Traina Services?
 9        A.    Just for employees.
10        Q.    How did you advertise?
11        A.    Craig's List.
12        Q.    You paid for that service?
13        A.    Back then, no.  Now, yes.
14        Q.    Do you have business -- excuse
15   me -- business cards for Traina Services?
16        A.    No, I don't.
17        Q.    Did Traina Services' name
18   appear on any of the trucks that you
19   operate in?
20        A.    Every one of them.
21        Q.    How did that appear?
22        A.    A placard on the door.
23        Q.    Can you describe the size of
24   that placard?
25        A.    It's fits on the side of a
```

Veritext Legal Solutions
800-336-4000

1    door, I don't know, 12 by 13, 14 by 8.

2         Q.     Is that a magnetic placard or

3    is it painted on the door?

4         A.     Magnetic.

5         Q.     And it also has the DOT number

6    for Traina Services?

7         A.     Correct, yes.

8         Q.     Any other signage that you have

9    on your trucks?

10        A.     After Traina Services, no.

11        Q.     When you were driving for HDL

12   did you have those placards on the door?

13        A.     I've had them since DOT --

14   that's a requirement of the DOT to have

15   those once I acquired a DOT number.

16        Q.     And you're not sure when that

17   occurred; is that right?

18        A.     Yeah, I'm not sure exactly.

19        Q.     Do you have logos on the shirts

20   that your helpers or drivers wear?

21        A.     They were supplied for by HDL

22   with their name on it.

23        Q.     Have you ever had your drivers

24   wear shirts with Traina Services on the

25   logo?

Page 43

1      A.    No, they're always supplied by

2   the contractor.

3      Q.    So currently your drivers wear

4   shirts that are supplied by the company

5   that Traina Services contracts with?

6      A.    Yes.

7      Q.    What about hats, did you ever

8   have any hats that said Traina Services?

9      A.    Everything that had to do with

10  uniforms is supplied by the contractors.

11     Q.    So that's a no, you never had

12  any hats with Traina Services?

13     A.    Yes, no.  No, I have not.

14     Q.    Okay.

15           And any cost for advertisement,

16  that would have been paid from the Traina

17  Services's bank account; is that right?

18     A.    Yes.

19     Q.    So earlier you said that you

20  learned of the opportunity to contract

21  with HDL from an advertisement; is that

22  right?

23     A.    Yes, I believe it was on

24  Craig's List.

25     Q.    Why was that work something

Page 44

1    that you were interested in?

2        A.    I've been in the business for a

3    long time, me and my old boss were good

4    friends and I wanted to do something

5    different.

6        Q.    So you wanted to move on from

7    driving the delivery van to something

8    different; is it that right?

9        A.    That and the opportunity that

10   they put in the ad, the wording they

11   used.

12       Q.    What wording do you recall?

13       A.    Just the potential income that

14   you could make with them.

15       Q.    Do you recall what the

16   potential income was in the ad?

17       A.    It was 150,000 I believe or

18   more, 130 or more, somewhere around

19   there, six figures.

20       Q.    Do you recall who you spoke

21   with before you contracted with HDL?

22       A.    The first gentleman, I do not

23   remember his name.

24       Q.    Do you remember what he did for

25   HDL?

Veritext Legal Solutions
800-336-4000

1      A.      He, some regional kind of guy,

2   came into Buffalo to set everything up.

3      Q.      And you began contracting in

4   December of 2011; is that right?

5      A.      I don't recall an exact date.

6      Q.      Do you recall it was in 2011

7   though?

8      A.      I believe that was the year,

9   yes.

10      Q.      The 2011 1099 that you produced

11   shows compensation of about 6,500; does

12   that sound like the amount of payments

13   that you received from HDL that year?

14      A.      Yeah, when I first started it

15   might have been only a month, so if it

16   was December, obviously that was only

17   about a month of work.

18      Q.      So you don't believe that it

19   was very long that you were contracted in

20   2011, it was towards the end of the year?

21      A.      I'm not sure.  Based on the

22   1099 I would say yes.

23      Q.      Do you recall signing a

24   contract when you started sometime --

25   sometime in the end of 2011 in Buffalo?

Page 46

1     A.     Yeah, they had some sort of

2   agreement, yes.

3     Q.     Have you searched for that

4   agreement that you recall signing?

5     A.     I have.  I can't find it

6   anywhere.

7     Q.     And at that time do you recall

8   if you signed in your individual capacity

9   or on behalf of your d/b/a?

10     A.     I don't remember that.

11     Q.     Do you recall signing more than

12   one version of an agreement with HDL?

13     A.     There was multiple signatures,

14   I'm not sure what exactly they all were,

15   if they were different or the same.

16     Q.     And you haven't located any of

17   those agreements?

18     A.     No, I have not.

19     Q.     Over the time period that you

20   were contracted with HDL, do you recall

21   how many drivers you had over that period

22   of time?

23     A.     I do not.

24     Q.     If the records I have show that

25   there were eight drivers, does that sound

Veritext Legal Solutions
800-336-4000

1   like a right number?

2      A.   For HDL?  No, I've never had

3   eight drivers for HDL.

4      Q.   Okay.

5          I'm just going to go through

6   these names.  Let me know if these are

7   names that you recall for drivers that

8   there were employed by Traina Services.

9          Aaron --

10      A.   You mean currently?

11      Q.   I'm sorry?

12      A.   Currently employed or --

13      Q.   No, just over the time period

14   since 2011 --

15      A.   Okay.

16      Q.   -- until 2018, when you quit

17   driving for HDL; okay?

18      A.   Yup.

19      Q.   Aaron McAbe, M-C-A-B-E?

20      A.   I don't recall the name.  I'm

21   bad at names, but I don't recall that

22   name.

23      Q.   Okay.

24          The next one, forgive me, I'm

25   not sure how to pronounce it, Slafias

Veritext Legal Solutions
800-336-4000

1      Sancher, S-A-N-C-H-E-R, the last name.

2      The first name is S-L-A-F-I-A-S, Slafias

3      Sancher?

4           A.     Slafias Satcher.

5           Q.     Is it S-A-T-C-H-E-R?

6           A.     Yes.

7           Q.     Do you recall that employee?

8           A.     Yes.

9           Q.     Okay, here's another one.  Dan

10     W-L-O-S-K-I-W-O-I-C-Z?

11          A.     Yes.

12          Q.     How do you pronounce that?

13          A.     No idea.

14          Q.     All right.

15                 You do recall Dan W. though?

16          A.     Yes.

17          Q.     And do you recall what time

18     period he was an employee of Traina

19     Services?

20          A.     Towards the end, I wanna say,

21     of the HDL.  I'm not sure what year that

22     was.

23          Q.     2017/2018, that time period?

24          A.     Yes, '18.

25          Q.     And going back to Mr. Satcher,

Page 49

```
 1    do you recall what time period he was an
 2    employee?
 3         A.    I do not.
 4               I don't remember what I did
 5    five minutes ago.
 6         Q.    All right.
 7               Do you remember an employee
 8    named Devon Ceisla, C-E-I-S-L-A?
 9         A.    Yes.
10         Q.    Do you recall what time period
11    he was employed by Traina Services?
12         A.    I do not.
13               A lot of these guys were --
14    could have been fill-in's, on a day-to-
15    day basis, it just depended; but I don't
16    remember the dates, no.
17         Q.    Okay.
18               How about Hilberto Colon,
19    H-I-L-B-E-R-T-O, C-O-L-O-N?
20         A.    I don't recall the name.
21         Q.    Jeritt Wilson, J-E-R-I-T-T,
22    W-I-L-S-O-N?
23         A.    Yes.
24         Q.    Do you recall what time period
25    he was employed by Traina Services?
```

Page 50

```
 1        A.     I do not.
 2        Q.     Steve Bertine, B-E-R-T-I-N-E?
 3        A.     T-I-N-I, yes.
 4        Q.     T-I-N-I, sorry.
 5        A.     And no, I don't remember what
 6   year.
 7        Q.     And Tony Blattenberger?
 8        A.     Yes.
 9        Q.     Do you recall what time period?
10        A.     I don't.
11        Q.     Did any of those employees also
12   drive for the other companies that you're
13   contracted with in 2016 and 2017?
14        A.     No.
15        Q.     So they were solely driving for
16   Traina Services and performing for HDL?
17        A.     Yes.
18        Q.     Do you recall for any of those
19   employees that -- whose name you
20   recognized, whether you would have
21   located them through advertisements on
22   Craig's List?
23        A.     I don't recall that.
24        Q.     Do you recall interviewing any
25   of them before hiring them?
```

Page 51

1      A.     Phone interview, yes.

2      Q.     Do you recall if they did any

3  other work for Traina Services?

4      A.     I do not, other than delivery.

5  No, that's all they did.

6      Q.     And do you recall if they

7  continued to work for Traina Services

8  after May of 2018?

9      A.     When I was no longer with HDL?

10     Q.     Yes.

11     A.     I don't recall.  Maybe one or

12  two, but I don't recall.

13     Q.     Do you recall receiving

14  delivery settlement statements from HDL?

15     A.     Yeah, each time I got a check.

16     Q.     How would those have been

17  transmitted to you, electronically or by

18  paper?

19     A.     By paper.

20     Q.     Okay.

21            MS. QUILLEN:  Give me just a

22      minute.  I'm trying to open up a file

23      on my computer.

24            THE WITNESS:  Sure.

25            Just give me two seconds, I'll

Page 52

1        be right back.  Hold on one second?

2            MS. QUILLEN:  Sure.

3            (Exhibit 1, Document bearing

4        Bates numbers HDLK2274, having been

5        marked for identification, was shown

6        to the witness on Ms. Quillen's

7        shared screen.)

8            MS. QUILLEN:  Mr. Traina, can

9        you see a screen that I'm sharing

10       with an Excel file?

11           THE WITNESS:  Yes.

12           MS. QUILLEN:  All right.  This

13       is what I'm going to mark as Exhibit

14       1.  It's an electronic copy of an

15       Excel spreadsheet and it is Bates

16       numbered HDLK2274.

17   CONTINUED EXAMINATION BY MS. QUILLEN:

18       Q.    Does this appear to be similar

19   to the delivery settlement statement that

20   you would have received in a printout

21   from HDL?

22       A.    Exactly.

23       Q.    So on a weekly basis you would

24   have received a document that looked like

25   Exhibit 1; is that right?

Page 53

1      A.     I don't remember -- I don't

2  remember if it was every week, whether it

3  was every two weeks that they gave us

4  checks, you know, two of those in the

5  envelope, I believe, but yes, that's what

6  it would look like.

7      Q.     Okay.

8             So your payments would have

9  been put on a check every two weeks and

10 you would have received a separate

11 delivery settlement statement for each

12 week; is that right?

13     A.     When I got the check they had

14 whatever, yes, they had what that -- what

15 you're showing me, I believe two of them

16 with the check.

17     Q.     Okay.

18     A.     So you can compare, you know, a

19 lot of their -- what they have on there.

20     Q.     All right.

21            So it would have shown the

22 location where you were providing

23 services is Buffalo; right?

24     A.     Yes.

25     Q.     And it would have given the end

```
 1    of the week date; is that right?
 2         A.    Yup.
 3         Q.    And this Exhibit 1 shows
 4    December 10th of 2011; is that right?
 5         A.    I see that, yes.
 6         Q.    Okay.
 7               And you're shown as the driver;
 8    is that right?
 9         A.    Yes.
10         Q.    If there was another driver
11    that was operating for Traina Services,
12    it would have shown that driver's name on
13    the settlement sheet; is that right?
14         A.    I don't recall.  I believe so.
15    I don't remember, I never really looked
16    up there.  I was just more worried about
17    what they took out of the truck.
18         Q.    Okay.
19               And TNA, was that the
20    abbreviation for Traina Services?
21         A.    That's what they put me in as,
22    yes.
23         Q.    Okay.
24               And on this settlement
25    statement it shows that there was some
```

Page 55

```
1    amount paid for Tuesday, Wednesday,
2    Thursday, Friday and Saturday; is that
3    right?
4         A.    Yes.
5         Q.    Okay.
6               I'm going to ask you first
7    about the date Tuesday, December 6th, it
8    shows a flat rate DEL, delivery, type; is
9    that right?
10        A.    Yes.
11        Q.    And it shows something coded as
12   DT; do you recall what that means?
13        A.    That would have been a shuttle
14   like to just take product from their
15   warehouse to the Sears store.
16        Q.    Okay.
17              And did that stand for
18   dedicated truck?
19        A.    Yes.
20        Q.    Okay.
21              Do you recall -- I'm sorry.
22              MS. QUILLEN:  Let me ask
23        another question about this week.
24        Q.    You would have been paid a flat
25   rate for that shuttle truck or dedicated
```

Page 56

1   truck; is that right?

2       A.    Yes.

3       Q.    So it was 400 flat rate, plus

4   some mileage for that day; is that right?

5       A.    Yes.

6       Q.    And you were paid a fuel rate

7   of 50 cents per mile; right?

8       A.    I don't recall what the amount

9   was, but yes, there was some sort of fuel

10  reimbursement.

11      Q.    Okay.

12            Do you see that there is a fuel

13  rate on this settlement sheet of 50

14  cents?

15      A.    I see $3.98.

16            Where are you looking?

17      Q.    At the top --

18      A.    Oh, I see it, yes.

19      Q.    Under 6G?

20      A.    Yeah, I see that.  I see that,

21  yes.

22      Q.    So you would have driven eight

23  miles at 50 cents per mile; is that

24  right?

25      A.    Yes.

```
 1        Q.     Okay.
 2               And then the next day it's
 3    Wednesday, December 17, 2011, there is a
 4    flat rate delivery type coded CA; do you
 5    recall what that stood for?
 6        A.     I do not.
 7        Q.     You were paid a flat rate for
 8    the truck for whatever that delivery was
 9    that day of $300.00; is that right?
10        A.     That's what it looks like, yes.
11        Q.     And then the remaining days of
12    that week, Thursday, Friday and Saturday,
13    in the column "Completed Stops," it has
14    different numbers; is that right?
15        A.     Yes.
16        Q.     And so on, for example,
17    Thursday there would have been eight
18    completed stops?
19        A.     Yes.
20        Q.     When you had a completed stop,
21    what was that?
22        A.     That the stop was concluded, in
23    other words, installed.
24        Q.     Okay.
25               But you would have picked up
```

Page 58

1  your entire load for the day from the
2  warehouse in Buffalo; is that right?
3      A.    Yes.
4      Q.    And then there would have been
5  eight separate deliveries, not
6  necessarily items but eight separate
7  stops that you would have made to make
8  some delivery?
9      A.    Right, it could be more but it
10 says completed stops and so it was
11 completed for that day; if there were 10
12 stops and two people might not have been
13 at home.
14     Q.    Okay.
15           If there was a stop that wasn't
16 completed would it show here in the
17 column "Incomplete Stops"?
18     A.    I don't remember what that was
19 for.
20     Q.    Okay.
21           Do you recall what the column
22 "Go Back" was for?
23     A.    I do not.
24     Q.    And what about the column that
25 says "Specials"; do you recall what that

Page 59

1   column was for?

2       A.    That was if they added a little

3   extra maybe to a route because customer

4   asked for something more than what they

5   wanted done, and they would just tell the

6   customer yes and maybe add a little

7   compensation, but as you can see there's

8   nothing there, so.

9       Q.    Okay.

10          Or if we see those on another

11  settlement statement, I may ask you

12  questions about what the specials were

13  but there aren't any that appear on this

14  settlement statement, Exhibit 1; right?

15      A.    Right.  I wouldn't recall what

16  they were for if you hadn't them up

17  there, but yes, that would go maybe for

18  an extra, I'm not sure what exactly.

19          When they did this sheet here

20  they put things in spots that made no

21  sense sometimes.

22      Q.    You were paid a flat rate for

23  each completed stop; is that right?

24      A.    I don't recall how that worked.

25      Q.    Okay.

Veritext Legal Solutions
800-336-4000

```
 1          A.    I wanna say yes.
 2          Q.    And then at the end of the
 3    settlement sheet it adds up your total
 4    compensation is 1,947 and change; is that
 5    right?
 6          A.    Yes.
 7          Q.    Okay.
 8                The bottom of the settlement
 9    sheet there is more figures under "Due
10    HomeDeliveryLink"; do you see that?
11          A.    Yes.
12          Q.    Were these items that were
13    withheld from the compensation?
14          A.    Yes, yes, they took in a
15    Worker's Comp, they took an insurance
16    comp like their -- yes, they took money
17    out, correct; and I believe at the bottom
18    the total was total due to them, that
19    company, it says 630.89.
20          Q.    So $630.00 was withheld, and
21    then the net that you were paid for the
22    week was 1,316; is that right?
23          A.    Right.  When you used the word
24    "withheld," it was never returned, that
25    was money they took and kept, yes.
```

Page 61

1          Q.      Okay.

2                  But you were paid the 1,316;

3     right?

4          A.      Correct, yes.

5          Q.      The Workers' Comp withheld here

6     of $82.00; was that to cover your

7     Workers' Comp?

8          A.      I had my own, so I don't know

9     what that was for.  I had to have -- I

10    had to carry my own also, so I don't

11    understand why that was taken.

12         Q.      Do you recall if later in time

13    there was no Workers' Comp, in 2014 for

14    example?

15         A.      I don't remember, you'd have to

16    look at the manifest again.

17         Q.      All right.  We'll take a look

18    at that later.

19                 And then under "Contractor's

20    insurance package $138.89," do you know

21    what that covered?

22         A.      Say that again, I'm sorry.

23         Q.      "Contractor's insurance

24    package" shows as $139.88; do you know

25    what that insurance was for?

<div align="right">Page 62</div>

1      A.     That I have no idea because I
2   carried my own, so no, I do not.
3      Q.     And then under "Miscellaneous"
4   there is a $335.00 loan payment.  Do you
5   recall what loan you were given by HDL?
6      A.     That might have been a start-up
7   to help when you first start, help up
8   with expenses that may arise.
9      Q.     Okay.
10         Do you recall signing a loan
11   agreement with HDL?
12      A.     Yes, I do.
13      Q.     And at some point I assume that
14   loan was paid off?
15      A.     Correct, yes.
16      Q.     And the loan was paid by Traina
17   Services?
18      A.     Well, they took it out of the
19   settlements, so yes.
20      Q.     All right.
21         Take a look at Exhibit 2.
22         (Exhibit 2, Document bearing
23      Bates numbers HDLK2280, having been
24      marked for identification, was shown
25      to the witness on Ms. Quillen's

Page 63

1          shared screen.)

2              MS. QUILLEN:  For the record,

3      it's Bates number HDLK2280.

4              THE WITNESS:  I'm not the only

5      one with dogs.

6              MS. QUILLEN:  Well, that's fun,

7      the file is corrupt.

8              Let me see if I can get this to

9      open.

10             Here we go.  All right.

11     Exhibit 2 is another Excel file,

12     there's several tabs at the bottom,

13     we're going to be looking at the one

14     labeled TNA-TNA.

15  CONTINUED EXAMINATION BY MS. QUILLEN:

16     Q.    Do you see that, sir?

17  Mr. Traina, do you see Exhibit 2, another

18  spreadsheet?

19     A.    What was I looking at?

20     Q.    This is another spreadsheet,

21  it's Exhibit 2, it's settlement statement

22  for December 17, 2011; do you see that?

23     A.    Yes, I see.

24     Q.    Okay.

25             And this is the same format as

```
 1   Exhibit 1 that we just reviewed; is that
 2   right?
 3        A.    Correct.
 4        Q.    Okay.
 5              Now this one does have an
 6   indication of one incomplete stop; do you
 7   recall it if you were paid for incomplete
 8   stops?
 9        A.    I don't recall.
10        Q.    In the last column that says
11   "Flat Rate Delivery Type" there is an
12   indication of two days with a flat rate
13   paid for a truck under a coding called
14   SH; do you recall if that's another
15   shuttle run?
16        A.    Okay.  As I see this it brings
17   back more memories.  $300 was the
18   shuttle, as I said, for the store.  That
19   other one, that dedicated, I believe that
20   might have been like a contract sale, so
21   like a new build where you just go to one
22   location and they're just, you know,
23   people haven't moved in yet, like a condo
24   complex, something like that is kind of
25   what I recall.
```

Veritext Legal Solutions
800-336-4000

1      Q.     So it would have been a similar
2   delivery, just instead of a retail
3   location, it would have been to a
4   customer location but not a residential
5   occupied space?
6      A.     Correct.  Soon to be occupied,
7   but yes, it was not occupied at the time.
8      Q.     All right.
9             And this settlement statement
10  again shows that loan payment of $335.00?
11     A.     I see that, yes.
12            Administration fee was on there
13  also.  I don't think it was on the first
14  one.  That was also a percentage they
15  also took out of the check.
16     Q.     Okay.
17     A.     For whatever reason they took
18  it.
19            MS. QUILLEN:  This is not going
20         to cooperate with me.  Give me just a
21         moment.  Sorry, it's going to take
22         longer than I wanted it to.
23            All right.  We are looking at a
24         file that's been marked as Exhibit 3,
25         this is Bates number HDLK2286.

Veritext Legal Solutions
800-336-4000

```
 1              (Exhibit 3, Document bearing
 2        Bates numbers HDLK2286, having been
 3        marked for identification, was shown
 4        to the witness on Ms. Quillen's
 5        shared screen.)
 6              MS. QUILLEN:  This is another
 7        spreadsheet, sir, we are going to
 8        look at the tab that says TNA.
 9   CONTINUED EXAMINATION BY MS. QUILLEN:
10        Q.    Do you see that now?
11        A.    Yes.
12        Q.    All right.
13              Yes.  And this is the next week
14   of December 24, 2011; do you see that?
15        A.    Yes.
16        Q.    All right.
17              On this spreadsheet, it's very
18   similar to the other two we've looked at,
19   but it looks like there is another
20   miscellaneous deduction here and it's for
21   $170.00 for qualification fee for D.
22   Traina; do you recall what that was for?
23        A.    That's what they charged me to
24   run backgrounds or drug tests or whatever
25   it might have been, I'm not sure that
```

Page 67

```
 1    amount, but whatever they ran on a helper
 2    or a driver is what they charged.
 3         Q.    Okay.
 4              So it might have been not for
 5    you but for one of the drivers or helpers
 6    that Traina Services hired that charge
 7    would have appeared on your settlement
 8    statement?
 9         A.    Yeah, I'm not sure who that was
10    for.  I believe that could have been me.
11    I'm not sure if they changed the name on
12    that box, you know, for the other guys
13    once they were qualified.
14              THE WITNESS:  I'm not sure that
15         how that came across, but I have a
16         question.  Could I -- is there any
17         way to get five minutes?  My phone is
18         blowing up and I need to go take care
19         of something for five minutes; is
20         that possible?
21              MS. QUILLEN:  Sure, let's take
22         a 10-minute break, take care of any
23         personal things that you need to take
24         care of and we will be back here at
25         12 -- I'm sorry, your time is 3:09.
```

Page 68

1           THE WITNESS:  Okay, so what do
2      I do?  Do I leave this on or do I
3      come back and do what I did when I
4      first signed on?
5           MS. QUILLEN:  It's probably
6      best to just turn on off the video
7      and audio so you don't have to
8      reconnect.
9           MR. WEBER:  Can the help person
10     just put me and Mr. Traina in the
11     side conference room and then he can
12     join?
13          THE VIDEOGRAPHER:  Going off
14     the record, the time is 3:09.
15          (Whereupon, a brief recess was
16     taken.)
17          THE VIDEOGRAPHER:  We are back
18     on the record.  The time is 3:21.
19  CONTINUED EXAMINATION BY MS. QUILLEN:
20     Q.    All right.  Mr. Traina, before
21  we took the break we were looking at
22  Exhibit 3, spreadsheet for the week of
23  December 24, 2011.
24     A.    Yes.
25     Q.    I wanted to ask you to confirm

Page 69

1   that the settlement statement shows that
2   you were the driver for five days this
3   week; is that right?
4       A.    That's what it looks like, yes.
5       Q.    Do you know who input you as
6   the driver for these specific dates and
7   deliveries?
8       A.    I do not recall, no.
9       Q.    Do you have any reason to think
10  that you may not have been the driver for
11  these deliveries?
12      A.    No.
13      Q.    Was there ever any accounting
14  that did at the end of the week to ensure
15  that the settlement statement was correct
16  for your deliveries?
17      A.    I might have wrote on a piece
18  of paper each day how many I had, but
19  there's nothing I can find or have.
20      Q.    Okay.
21            But as you sit here today, you
22  don't have any reason to think that if
23  you were shown as the driver, that you
24  weren't actually the driver for these
25  deliveries?

Veritext Legal Solutions
800-336-4000

1          A.     No, if I'm listed I should have
2     been the driver.
3               MS. QUILLEN:  Okay.
4               The next settlement statement
5          that I have is a -- Exhibit 4, Bates
6          number HDLK2291.  Give me just a
7          moment to open it.
8               (Exhibit 4, Document bearing
9          Bates numbers HDLK2291, having been
10         marked for identification, was shown
11         to the witness on Ms. Quillen's
12         shared screen.)
13    CONTINUED EXAMINATION BY MS. QUILLEN:
14         Q.     Okay.  Give me just a moment.
15         A.     Is that the same one as the
16    last one?
17         Q.     All right.  So Exhibit 4 is a
18    settlement statement under the tab TNA
19    for the week ending December 31, 2011; do
20    you see that?
21         A.     Yes.
22         Q.     I'm not going to ask you
23    questions that you already answered;
24    there's a few things on the settlement
25    statement that are different.

Page 71

1          Under "Pads and Ties" there is

2     an amount of $87.50; do you see that?

3          A.   Yeah, that was for equipment

4     that they supplied, tie-downs and carry

5     straps, things like that.

6          Q.   Okay.

7               It specifically lists six pads,

8     10 tie-downs, one floor slider and one

9     team strap; do you see that?

10         A.   I do.

11         Q.   And it looks like they divide

12    the amount into two payments?

13         A.   Yes.

14         Q.   Do you recall if that was

15    something that you requested the division

16    between two settlement statements?

17         A.   No, they just did whatever they

18    felt necessary.

19         Q.   Okay.

20              Do you recall who it was

21    specifically who would have been making

22    that decision at this time in 2011 at

23    HDL?

24         A.   I do not.

25         Q.   Okay.

Page 72

1              For this number of pads and
2   tie-downs, do you recall if that was for
3   one truck or more than one?
4        A.    No, that would be one truck at
5   that point.
6        Q.    Okay.
7              Were these pads and ties that
8   you needed at the startup of your
9   business?
10        A.    That was just to tie down
11   their -- their, um, whatever they put on
12   our truck, tie it down so it didn't get
13   damaged and we covered with pads.
14        Q.    These were things that you
15   didn't need repeatedly though, they were
16   needed up front for you to operate your
17   truck; right?
18        A.    Yeah, that was enough for that
19   truck, correct.
20        Q.    Did you have the option of
21   buying those pads and tie-downs at some
22   other location?
23        A.    I don't recall.
24        Q.    Later in time during your
25   business did you ever buy pads and

Veritext Legal Solutions
800-336-4000

1   tie-downs and things for your truck

2   separate from HDL?

3       A.    I don't recall when I started

4   buying my own, no.

5       Q.    But at some point you did buy

6   some separate from HDL?

7       A.    It could have been after I

8   wasn't with them any longer.

9       Q.    Okay.

10        But it could have been while

11   you were still driving for HDL?

12       A.    I'm not sure.

13       Q.    Okay.

14        And then under "Uniform" it

15   shows three jackets, five shirts, one of

16   two payments; do you see that?

17       A.    Yes.

18       Q.    Do you recall if those were

19   jackets and shirts for your helper at

20   this time?

21       A.    That was just whatever they

22   supplied for their -- with their name on

23   it.  I'm not sure who it was for or not.

24       Q.    Okay.

25        So it could have been for your

Veritext Legal Solutions
800-336-4000

1    helper, you don't recall?

2         A.    Could have been for me or the

3    helper or both, I'm not sure.

4         Q.    Okay.

5               All right.  That's all the

6    questions I have on Exhibit 4.

7               MS. QUILLEN:  I believe that's

8         the last statement for 2011.

9         Q.    So we looked at four separate

10   statements for four separate weeks in

11   December of 2011; is that right?

12        A.    Yes.

13        Q.    Okay.

14              MS. QUILLEN:  Exhibit 5 under

15        the tab TNA relates to the week

16        ending of January 7, 2012.

17              (Exhibit 5, TNA re the week

18        ending of January 7, 2012, having

19        been marked for identification, was

20        shown to the witness on Ms. Quillen's

21        shared screen.)

22   CONTINUED EXAMINATION BY MS. QUILLEN:

23        Q.    Is that right?

24        A.    Yes.

25        Q.    And you're again shown as the

Page 75

1   driver for this settlement statement?

2     A.   Yes.

3     Q.   And the pads and ties, the

4   uniforms that we talked about here, here

5   again is the second payment; is that

6   right?

7     A.   Yes.

8     Q.   All right.

9     And then there is a performance

10  bond that appears on this settlement

11  statement that hasn't been on any

12  previous settlement statement; do you

13  know what that performance bond of

14  $100.00 is?

15     A.   They took so much every week

16  until they got to a certain amount to

17  have kind of like a cushion amount.

18     For example, just say $5,000, I

19  don't remember the amount, but it could

20  have been 5000 per truck, once they get

21  the 5000 they stop taking that out.

22     Q.   And when you terminated your

23  contracting relationship with HDL, did

24  they refund the performance bond to you?

25     A.   Minus any fictitious claims

Page 76

1    they had, yes.

2        Q.    Do you have any outstanding

3    claims against HDL for amounts that you

4    claim that they are owed -- that you're

5    owed?

6        A.    No, I do not.

7        Q.    Okay.

8            All right.  That was my only

9    question on Exhibit 5.

10           MS. QUILLEN:  We are going to

11      open Exhibit 6, which is Bates

12      numbered HDLK2018.

13           (Exhibit 6, Document bearing

14      Bates numbers HDLK2018, having been

15      marked for identification, was shown

16      to the witness on Ms. Quillen's

17      shared screen.)

18           THE WITNESS:  Are you still,

19      there?  I can't hear you, Emily.

20           MS. QUILLEN:  I'm here, I'm

21      sorry, my Excel is not cooperating.

22           THE WITNESS:  If my camera

23      kicks out just let me know.

24           MS. QUILLEN:  All right.

25           We are looking at the file now

Page 77

1      Exhibit 6, and it relates to the week

2      ending of January 14, 2012.

3  CONTINUED EXAMINATION BY MS. QUILLEN:

4      Q.    Do you see that?

5      A.    Yes.

6      Q.    All right.

7            And the item that I want to ask

8  you about here under that last column

9  "Flat Rate Delivery Type," there is an

10  indication of SDO.

11            Earlier you said that that

12  would have been an out-of-town delivery;

13  is that right?

14      A.    I believe so.  I don't recall

15  exactly.  I believe so.  I'm not sure

16  what SDO meant.

17      Q.    Okay.

18            So on this day there is a flat

19  rate truck payment of $100.00; is that

20  right?

21      A.    Yeah, that makes no sense but

22  okay, yes.

23      Q.    And then there is also some

24  completed stops that are paid and the

25  mileage of 180; do you see that?

Page 78

```
 1        A.    Yes.
 2        Q.    Does that look like the mileage
 3   would have been for an out-of-town
 4   delivery?
 5        A.    Oh, yeah, 180 miles, yes, I
 6   suppose.
 7        Q.    Okay.
 8        A.    It wouldn't be out of --
 9        Q.    Sorry, go ahead.
10        A.    It wouldn't be out-of-state, it
11   would be same state but mileage-wise down
12   south probably.
13        Q.    Okay.
14              So an SDO would have been out
15   of town and it might have been out of
16   state?
17        A.    Yeah, it would have been more
18   miles than that though, but yes.
19        Q.    Okay.
20              On this delivery it looks like
21   there's a special paid of $20.00; do you
22   see that?
23        A.    I see that.
24        Q.    And earlier you said that a
25   special could be anything that would make
```

```
1   the work a little more difficult or some
2   special customer service that was given;
3   is that right?
4        A.    Yeah, I couldn't even tell you
5   what that was for.
6        Q.    Do you recall ever negotiating
7   an additional amount for a special?
8        A.    No.
9        Q.    Do you ever recall asking for
10  additional compensation to make any kind
11  of special delivery or an SDO delivery?
12       A.    No.
13       Q.    Do you recall if you ever
14  negotiated anything on your rate paid by
15  HDL?
16       A.    No, their rate was their rate,
17  there was no negotiating for this.
18       Q.    And there is another uniform
19  deduction for two shirts, a jacket and a
20  winter hat.
21            Again, you don't know if that
22  was clothes for yourself or your helper
23  or another driver; is that right?
24       A.    Yeah, I don't know who that was
25  for.
```

```
 1              MS. QUILLEN:  I'm going to open
 2       another spreadsheet, hopefully it
 3       works, Exhibit 7.
 4              (Exhibit 7, Document bearing
 5       Bates numbers HDLK2023, having been
 6       marked for identification, was shown
 7       to the witness on Ms. Quillen's
 8       shared screen.)
 9              MS. QUILLEN:  Bates number
10       HDLK2023.  I don't know, it keeps
11       telling me my file is corrupt.
12  CONTINUED EXAMINATION BY MS. QUILLEN:
13       Q.    Okay.
14              So on this spreadsheet there
15  are two tabs here, one that has TNA-TNA
16  and another one that says TNA-TNA2.
17              Do you recall ever receiving
18  settlement statements in multiples like
19  that for a week?
20       A.    I don't remember.  I don't
21  even -- no, I don't remember, like
22  sometimes they paid every two weeks.
23              So I think in the beginning, to
24  be honest with you, they paid every week,
25  and then it changed to every two weeks,
```

Page 81

1    is my recollection, and that's why on

2    some of these it might say 2, that would

3    have been week two.

4        Q.    Regardless of how frequently

5    you received checks, you did get a

6    settlement statement for each week?

7        A.    Yes.  So if you looked at the

8    one you just said, then you look at two,

9    it's probably the week following the week

10   prior to that one.

11       Q.    Okay.

12             We will take a look, I think

13   it's for the same week but we will

14   explore that.

15             So the first tab, TNA-TNA, is

16   for week ending January 21, 2012; do you

17   see that?

18       A.    I do.

19       Q.    And you're shown as the driver

20   here?

21       A.    Yes.

22       Q.    Okay.

23             Now I'm going to click on the

24   second tab that's TNA-TNA2.  This is also

25   for week January 21, 2012 and you as the

Page 82

1    driver; do you see that?

2        A.    Yes.

3        Q.    Okay.

4              So the time period appear to be

5    overlapped.  On the second tab it shows

6    you as completing the SH, shuttle,

7    delivery, 86 miles on Thursday, January

8    19; do you see that?

9        A.    Yeah, I only see that one day

10   on that one, 80.

11       Q.    Okay.

12             We're going to go back to the

13   first tab and look at that January 19th,

14   looks like there was also a DT flat

15   delivery type dedicated truck for 33

16   miles that same day; do you see that?

17       A.    Yeah, they probably added that

18   to that shuttle because that shuttle

19   didn't take too long to do.

20       Q.    Okay.

21             So on that day you had two flat

22   rate amounts that were paid to you; is

23   that right?

24       A.    That's what it looks like, yes.

25       Q.    Okay.

Page 83

1              All right.  That's all I have
2    on that exhibit.
3              MS. QUILLEN:  We're going to
4         open Exhibit 8.
5              (Exhibit 8, Document bearing
6         Bates numbers HDLK2029, having been
7         marked for identification, was shown
8         to the witness on Ms. Quillen's
9         shared screen.)
10             MS. QUILLEN:  Bates numbers
11        HDLK2029.  This is a file that
12        relates to the week ending January
13        28, 2012.
14   CONTINUED EXAMINATION BY MS. QUILLEN:
15        Q.   Do you see that?
16        A.   I do.
17        Q.   All right.
18             So far we've been moving
19   consecutively week by week; is that
20   right?
21        A.   Yes.
22        Q.   Okay.
23             The thing I want to note and
24   ask you about here on this settlement
25   sheet for January 28th is, there is a

Veritext Legal Solutions
800-336-4000

1    merchandise claim of $158.78?

2         A.    Yes.

3         Q.    Do you recall as you sit here

4    today what that would have related to?

5         A.    That's (inaudible) frequently

6    for whatever reasons I had.

7               (Witness frozen on screen.)

8         Q.    Mr. Traina, I'm not sure if

9    it's my internet --

10        A.    (Inaudible).

11              MS. QUILLEN:  I'm sorry, I

12        didn't get your answer, you kind of

13        froze on my end.  I don't know if

14        it's my internet or not.

15        Q.    But could you say again, as you

16   sit here today, what that merchandise

17   claim is?  Do you recall what that was?

18        A.    I don't recall what it was.  It

19   was a claim they took out for some sort

20   of damage.

21        Q.    Okay.

22              And there is a place for in-

23   home damage, that's actual damage to a

24   customer's home when the delivery is

25   being made, the floor being scratched or

Veritext Legal Solutions
800-336-4000

1    the wall being dinged; is that right?

2         A.    Yes.

3         Q.    And the merchandise claim could

4    have been the item that you were

5    delivering was damaged and somehow either

6    in the delivery or at some point in time

7    before it arrived at the customer's home;

8    is that right?

9         A.    Exactly.  It could have been in

10   the box damaged, but yes.

11        Q.    Okay.

12             And from looking at this

13   settlement sheet you can't tell if this

14   was a merchandise claim that was caused

15   by your helper or by you; is that right?

16        A.    No idea.

17        Q.    Okay.

18             Did you keep any records that

19   would have indicated who caused what

20   merchandise claim?

21        A.    If I did I no longer have them.

22        Q.    If it was another helper or

23   another driver who caused the damage,

24   would you have deducted that off of their

25   weekly pay amount?

1      A.      Normally I think they just took

2   it out of my settlement and I ate the

3   cost.

4      Q.      All right.

5           So no matter who caused the

6   damage, another driver, you, or a helper,

7   that would have been an expense that

8   Traina Services absorbed rather than

9   passing it through to any specific

10  individual worker; is that right?

11     A.      Yeah, or as I started to say,

12  they took it right out.

13     Q.      All right.

14           Now, we looked at several of

15  these spreadsheets now, would you agree

16  that on any given week you would have

17  worked different days, different numbers

18  of days, different number of deliveries;

19  is that right?

20     A.      Yes.

21     Q.      And you didn't have any set

22  ahead of schedule?

23     A.      What does that mean?

24     Q.      Like you didn't work Monday

25  through Friday or only on the weekends,

1    your schedule varied through the weeks?

2        A.    They expected us to be there

3    Monday through Saturday at a certain

4    time.

5        Q.    Okay.

6              And if you weren't shown as

7    making deliveries on a given day, what

8    was the reason for that?

9        A.    I'm not sure what it would have

10   been.

11       Q.    Okay.

12             Were there times though when

13   you didn't want to work and you told them

14   you were going to be off on a given day?

15       A.    Not that I recall.

16       Q.    Were there days when they

17   didn't have deliveries for you to

18   complete and so they wouldn't call you to

19   let you know there was work?

20       A.    If that was the case they would

21   have let me know ahead of time, but...

22       Q.    Okay.

23             Would you have known at least

24   the day beforehand that you wouldn't be

25   making deliveries the next day?

Veritext Legal Solutions
800-336-4000

1         A.      Yes.

2         Q.      Was there any kind of schedule

3    that you were given in advance other than

4    that day before the call that you might

5    have received.

6         A.      No.

7         Q.      Okay.

8              When you had drivers that were

9    employed by Traina Services, how were

10   those drivers scheduled for the multiple

11   trucks that you were operating?

12        A.      Everybody was scheduled to be

13   there at the same time.

14        Q.      And same thing, day before you

15   would have received a call to let you

16   know how many trucks were needed to be at

17   the warehouse the next day?

18        A.      I believe so.

19        Q.      Okay.

20              And would you have decided

21   which, which drivers would have been

22   operating the trucks?

23        A.      I don't recall how I did that.

24        Q.      Okay.

25              Let's say you have three, three

Page 89

1    trucks that were ready to go, but HDL

2    said they only needed two trucks, do you

3    recall how you would have decided which

4    individuals operated the trucks for the

5    next day?

6         A.    I probably would have asked my

7    guys who -- if anyone needed off.

8         Q.    Okay.

9              All right.

10             (Exhibit 13, Document bearing

11        Bates numbers HDLK20174, having been

12        marked for identification, was shown

13        to the witness on Ms. Quillen's

14        shared screen.)

15             MS. QUILLEN:  I'm going to show

16        you Exhibit 13.  This is Bates

17        numbered HDLK20174.  I'm not going to

18        open that one, hold on.

19             All right, this relates to

20        March 24, 2012.

21    CONTINUED EXAMINATION BY MS. QUILLEN:

22        Q.    Do you see that?

23        A.    Yes.

24        Q.    All right.

25             Here we have an in-home damage

Page 90

1  claim.  Again, this is different from the

2  merchandise claim but you handled it in

3  the same way, no matter who caused the

4  in-home damage claim, this was a cost

5  that you absorbed through Traina

6  Services; is that right?

7     A.     Yes, you can see the second of

8  four payments.

9     Q.     And you don't know, as you sit

10  here today, if this was an in-home damage

11  caused by you or another driver or a

12  helper; is that right?

13     A.     I have no clue.

14     Q.     All right.

15         MS. QUILLEN:  I'm going to open

16     Exhibit 14, this is HDLK2285.

17         (Exhibit 14, Document bearing

18     Bates numbers HDLK2285, having been

19     marked for identification, was shown

20     to the witness on Ms. Quillen's

21     shared screen.)

22         THE WITNESS:  You have too many

23     files on your computer, that's what

24     it is.

25         MS. QUILLEN:  All right.

Page 91

```
 1    CONTINUED EXAMINATION BY MS. QUILLEN:
 2        Q.    Now, this one jumps to 2017.  I
 3    will represent to you that in HDL's data
 4    from that last settlement sheet we looked
 5    at, Exhibit 13, for March 24, 2012, until
 6    December 23, 2017, from 2012 to this 2017
 7    date, that there is only a handful of
 8    settlement spreadsheets for you that show
 9    you as a driver.
10              Is it your recollection that
11    you would have operated a truck for
12    Traina Services on the contract that you
13    had with HDL for those years in between
14    2012 and 2017?
15        A.    Say that again?
16        Q.    Sure.
17              I don't have any records that
18    show you as a driver in the year 2013 or
19    2014, 2015 or 2016; do you know if you
20    were operating a truck during that period
21    of time for Traina Services?
22        A.    For HDL I believe, yes.
23        Q.    Okay.
24        A.    They could have put it under a
25    different driver's name possibly, they've
```

Page 92

1    done that a lot.

2         Q.    Okay.

3               So there were times when your

4    work showed up on another settlement

5    spreadsheet and it just -- it wasn't

6    accurate in terms of who they showed as

7    the driver?

8         A.    Yes, whatever they decided to

9    do, I mean I'm not sure why they did what

10   they did and how they did it, but, yes,

11   I've noticed that a few times.

12        Q.    Did you ever notice that other

13   drivers's work showed up on your

14   settlement sheets when you were listed as

15   the driver?

16        A.    I don't recall that.

17        Q.    Okay.

18               Now, on the 2017 spreadsheet,

19   Exhibit 14, there is --

20        A.    It's different.

21        Q.    Yes, it's a different format;

22   isn't it?

23        A.    Yeah, I've never seen that

24   before.

25        Q.    Does this not look at all like

Page 93

1  a settlement spreadsheet that you would

2  have received?

3      A.    I don't recall.  I don't even

4  know what that is.  I mean, unless they

5  changed it, but I don't remember seeing

6  anything like that.  I'm trying to look

7  at it.

8      Q.    Okay.

9            It does say at the top Delivery

10  Settlement Statement; do you see that?

11     A.    I do see that, yes.

12     Q.    Okay.

13     A.    But I think maybe this was on

14  their computer but not the printout they

15  gave us, I'm not sure.  I don't know.

16            This doesn't bring back any

17  memories.

18     Q.    So the settlement spreadsheet

19  that you may have received may have been

20  in a different format?

21     A.    Yes.  Unless they changed it,

22  but I don't remember.  I don't recall

23  seeing one like this, no.

24     Q.    All right.

25            And this 2017 file, it doesn't

Page 94

1    show for this week that there was any
2    amount deducted for Workers' Comp; right?
3        A.    Yeah, I don't see anything, but
4    like I said I've never seen this
5    spreadsheet or this, you know, this was
6    something I did not receive.
7            So the ones you were going
8    through before is what we got every week.
9        Q.    Okay.
10           Do you have any reason to
11   believe that --
12       A.    I don't recall seeing this one.
13       Q.    Sorry to talk over you.
14           Do you have any reason to think
15   that the amounts shown on this document
16   aren't accurate even if it is a different
17   format than what you were used to seeing?
18       A.    I have no clue.
19       Q.    Okay.
20           It also doesn't show any amount
21   deducted for insurance; is that right?
22       A.    I don't see any.
23       Q.    Okay.
24           Do you recall in 2017 if you
25   had your own Workers' Comp and insurance

Veritext Legal Solutions
800-336-4000

1    for your trucks?

2         A.    Oh, 100 percent.

3         Q.    Okay.

4               The only deduction that's made

5    for this week is for the administrative

6    services, 26.80?

7         A.    Yeah, I see that.

8         Q.    Is that right?

9         A.    Right.

10        Q.    Okay.

11        A.    Yes.

12        Q.    All right.  And I'm going to go

13   to the second tab here, it's called IC

14   Work.  This is not a document that you

15   would have received, this is internal

16   accounting that HDL had.  It does show

17   that there was work done by HBC, I

18   believe this is the Alberto Colon.  You

19   didn't recall that driver though; right?

20        A.    I don't, no, I don't, not the

21   name right now.  I'd have to look back.

22        Q.    Okay.

23        A.    It could be a possibility.

24        Q.    If there was another driver of

25   a second truck, you would have gotten a

Page 96

1    separate settlement sheet for that

2    driver; correct?

3        A.    Yeah, I believe so.

4        Q.    Okay.

5              I believe you said earlier that

6    you did not drive in Syosset; is that

7    right?

8        A.    I did not, no.

9        Q.    Or Rochester?

10       A.    As a starting point, no.

11       Q.    Okay.

12             Were you familiar with any of

13   the contractors that operated there?

14       A.    No.

15       Q.    Do you recall any of the other

16   contractors out of the Buffalo location

17   besides, I believe you said you knew

18   Mr. Wilson?

19       A.    Just from seeing them on the

20   dock.  I don't recall the other guys that

21   were there, no.

22       Q.    You don't recall any of their

23   names?

24       A.    If you mentioned them I -- if

25   you mentioned them I'd probably say yes,

Veritext Legal Solutions
800-336-4000

1    I remember, but I'm not good at names.

2        Q.    Okay.

3              Have you communicated with any

4    of those other contractors since you left

5    HDL?

6        A.    No.

7        Q.    Okay?

8        A.    Because I don't remember who

9    they were.

10       Q.    For the items that Traina

11   Services was delivering, if they were

12   Sears or Innovel items; is that right?

13       A.    Yes.

14       Q.    And you said earlier they were

15   appliances, what kind of appliances?

16       A.    Washer, dryer, stove,

17   refrigerator.

18       Q.    So many large appliances?

19       A.    Yeah, there were some

20   microwaves.

21       Q.    When you would deliver an item,

22   would you also set it up and connect it,

23   make sure it was working?

24       A.    If that was part of the

25   agreement with the customer, yes.

Page 98

1    Q.    Okay.

2          Would you pick up their old

3    items?  Like if they were replacing a

4    refrigerator, would you also pick up the

5    old refrigerator?

6    A.    If that's something the

7    customer paid for, yes.

8    Q.    Okay.

9          What would happen with that old

10   item that you picked up?

11   A.    You return to HDL and they

12   would dispose of it in whatever way they

13   did.

14   Q.    When you had an item like that,

15   would you have to return it to the

16   warehouse the same day?

17   A.    Yes.

18          THE WITNESS:  Can you hang on

19      one second?

20          Sorry about that.  Go ahead.

21   Q.    We were talking about the

22   appliances and if you had an item that

23   you brought back from a customer's

24   location, would you have to return that

25   back to the warehouse same day.

Veritext Legal Solutions
800-336-4000

1       A.      Yeah, that would be that night,

2    yes.

3       Q.      Was there an additional amount

4    that you received in compensation for any

5    of those pick-up items from the

6    customer's location?

7       A.      No.

8       Q.      If you didn't have an item to

9    return to the warehouse, did you have to

10   return back to the warehouse after you

11   made your last delivery?

12      A.      I don't understand the

13   question.

14      Q.      At the end of a day if you had

15   delivered all your items and you didn't

16   have any return items or old items in

17   your truck, did you have to return back

18   to the warehouse or were you free to go

19   home?

20      A.      I'll return there and hand in

21   the paperwork.

22      Q.      Okay.

23              Was there a time when it was

24   all electronic and you didn't have

25   paperwork to turn in?

Page 100

1        A.      No, not that I recall.

2        Q.      So earlier you said you leased

3    your trucks from Budget, was that on a

4    weekly basis?

5        A.      Yes.

6        Q.      If HDL didn't need two trucks,

7    would you then reduce your lease for the

8    next week to one truck?

9        A.      If that was the case, yeah.  I

10   don't recall that happening though.

11       Q.      Okay.

12               Do you recall what rate you

13   were paying to Budget?

14       A.      Between six to 700 a week.

15       Q.      Were those amounts that were

16   paid directly from Traina Services's bank

17   account?

18       A.      Yeah.

19       Q.      So from 2011 until today you're

20   still leasing from Budget Rental?

21       A.      Yes.

22       Q.      And did you lease a certain

23   type of truck?

24       A.      Box truck with a lift gate on

25   it, 26 foot, whatever was required by

Page 101

1    them.

2        Q.    Were there certain models or

3    makes that you preferred?

4        A.    Whatever I had to get the job

5    done.

6        Q.    Okay.

7              Were there any requirements

8    other than the length and size of the

9    truck that you gave to Budget?

10       A.    Besides the size of the truck

11   and the lift gate, no.

12       Q.    I think your interrogatory

13   answers said that you leased

14   Internationals; is that right?

15       A.    Most of the time.  90 percent

16   was International; there could have been,

17   you know, different trucks that came

18   along.

19       Q.    Was that up to what Budget had

20   available for you to lease?

21       A.    Yes, if one of the trucks broke

22   down and that's all they had was Hino or

23   a Freightliner or a Ford, then that's

24   whatever they gave me to return I took.

25       Q.    Would you pay for your

                           Page 102

1    insurance through Budget also for those

2    trucks?

3         A.    I didn't then, I do now.

4         Q.    Do you recall when that

5    changed?

6         A.    Recently, last year.

7         Q.    Okay.

8              So before that where did you

9    get your insurance for your trucks?

10        A.    Whatever insurance company I

11   was dealing with.

12        Q.    How did you decide what

13   insurance company to use?

14        A.    Just word of mouth, who had the

15   best coverage, things like that.

16        Q.    Did you shop around and find

17   different rates?

18        A.    When I first started doing it I

19   was referred to Erie Insurance through, I

20   forgot who it was, and then once I

21   started shopping, if I started shopping

22   around, yes.

23        Q.    So as you got more experience,

24   do you learn to find a policy that was at

25   a different, at a better rate for you?

Page 103

```
 1       A.    In some cases, yes, some cases
 2  no.
 3       Q.    Okay.
 4             On any -- I know we talked
 5  about the repairs and the expenses, those
 6  were paid for by Traina Services from its
 7  business bank account; right?
 8       A.    Depending on what it was, yes.
 9       Q.    Does the leasing company tell
10  you where you're supposed to get that
11  service or do you get to select?
12       A.    "Service" is a broad word, it
13  depends on what service you're talking.
14       Q.    Okay.
15             Let's start with the oil
16  changes; is there a specific location
17  where they tell you to go get your oil
18  changed?
19       A.    Yeah, they do that where I went
20  for them.
21       Q.    And if there was a repair that
22  was needed for the truck, do you select
23  or do they tell you where to get that
24  repair?
25       A.    They just repair it there
```

Page 104

1    because he does multiple things there.

2        Q.    I'm sorry, I didn't hear that

3    answer.

4        A.    Where I rent from he does

5    multiple things, so he usually repairs

6    also.

7        Q.    Okay.

8        A.    He's an agent.

9        Q.    Do you have any records from

10   Budget that would show the number of

11   trucks that you operated in any given

12   week?

13       A.    That I don't.  I've asked them.

14   I cannot get it for some reason, I'm not

15   sure why.  It's not something they keep

16   on their database.

17       Q.    Other than the truck and the

18   expenses that went along with it, was

19   there any other equipment that you needed

20   to operate your business?

21       A.    You broke up there.  Repeat

22   that, please.

23       Q.    Sure.

24             Other than the truck and the

25   expenses related to operating the truck,

Page 105

1    the fuel, the oil changes, that sort of

2    thing, was there any other equipment that

3    you provided for the work that Traina

4    Services did for HDL?

5        A.    Service supplies if they were

6    lost or like carry straps possibly, yes.

7        Q.    Okay.

8              So those are some of the same

9    supplies we already talked about that

10   were showing up on your settlement

11   spreadsheets?

12       A.    Yeah, never pads.  I mean

13   carrier straps break or get lost or left

14   in a customer's home so that was

15   something that I'd need to replace if

16   need be.

17       Q.    Okay.

18             What about a cell phone, did

19   you supply cell phones to your employees?

20       A.    They used their own, I used my

21   own.  I didn't -- we didn't really need

22   cell phones.  It was just the GPS.  They

23   didn't have -- there was no manifest or

24   nothing on the phone like it is now.

25       Q.    So while you were operating for

Page 106

1   HDL there was no electronic manifest on

2   your phone?

3        A.    Not that I recall.

4        Q.    Okay.

5              And the phone that you did use,

6   you had it before you contracted with

7   HDL; is that right?

8        A.    I had the service, I'm not sure

9   if it was the same exact phone.

10       Q.    Okay.

11             Where did Traina Services keep

12   its trucks when they weren't being used?

13       A.    At their warehouse.

14       Q.    At HDL's warehouse?

15       A.    Yes.

16       Q.    When you were operating

17   simultaneously for HDL and for MFM and

18   Spirit Delivery, where did you keep

19   Traina Services's trucks?

20       A.    Each location had their own

21   location and I kept them there.

22       Q.    Did you ever store trucks at

23   HDL's warehouse that were used for Spirit

24   deliveries?

25       A.    Never.

Page 107

1     Q.     Or for MFM?

2     A.     Never.

3     Q.     Did you ever use some of the

4  same trucks that you leased from Budget

5  for both HDL and the other two companies

6  that Traina Services contracted with?

7     A.     That's impossible to do, no.

8     Q.     Was there ever a day when you

9  weren't operating for HDL and the truck

10 that you had available for HDL was used

11 elsewhere for another contractor?

12    A.     No.

13    Q.     So the trucks that you leased

14 from Budget you had dedicated to HDL for

15 the time period 2016 and 2017; is that

16 right?

17    A.     Yes.

18    Q.     And then similarly the trucks

19 that you had leased for Spirit Delivery

20 were operated exclusively for Spirit

21 Delivery?

22    A.     Yes.

23    Q.     And same thing for MFM?

24    A.     Yes.

25    Q.     Other than the straps and your

Page 108

1  phone, was there any other equipment that
2  Traina Services owned for its operations?
3       A.    No.
4       Q.    On the tax returns it looked
5  like you had deducted for use of office
6  space; did you have a separate office for
7  your business or did you use your home
8  office?
9       A.    It would be the home office.
10       Q.    Do you have a separate space in
11  your home that's used for your business?
12       A.    Yes, it's a separate room with
13  my office in it, yes.
14       Q.    Okay.
15            Has that been the case since
16  2011?
17       A.    Yes.
18       Q.    Did you or your accountant
19  decide how much to deduct for the use of
20  your home office?
21       A.    It was whatever the standards
22  are that he goes by, I'm not sure.
23       Q.    Okay.
24            All right.
25            MS. QUILLEN:  I'm going to show

Page 109

```
 1         you documents that we received from
 2         your attorney.  One moment.
 3               (Exhibit 19, Document bearing
 4         Bates numbers TRAINA 1 through 18,
 5         having been marked for
 6         identification, was shown to the
 7         witness on Ms. Quillen's shared
 8         screen.)
 9               MS. QUILLEN:  All right.  I'm
10         showing you what I've marked as
11         Exhibit 19, it's Bates numbered at
12         the bottom of each page beginning
13         with TRAINA 1 through 18.  So give me
14         just a moment.
15    CONTINUED EXAMINATION BY MS. QUILLEN:
16         Q.    Do you recognize these
17    documents as documents you provided to
18    your attorney to produce?
19         A.    Yes.
20         Q.    Okay.
21               On the first page of Exhibit 19
22    is your 2011 1099 that was issued by
23    HomeDelivery -- HomeDeliverLink --
24    HomeDeliveryinc -- Link!  I'm going to
25    get it right.  HomeDeliveryLink, Inc.; do
```

Page 110

1    you see that?

2        A.    It's only been two hours so I

3    guess the excuse is okay.

4        Q.    I'm just going to call them

5    HDL; all right?

6        A.    Yes.

7        Q.    So HDL issued this 1099 to you;

8    is that right?

9        A.    Yes.

10       Q.    And then we've already talked

11   about the amount for a few weeks in 2011;

12   right?

13       A.    Right.

14       Q.    Okay.

15             The second page of this exhibit

16   is the 2012 1099 from HDL; do you see

17   that?

18       A.    Yes.

19       Q.    All right.

20             So this amount is 26,859; do

21   you see that?

22       A.    Yes.

23       Q.    All right.

24             I'm going to go to your 2012

25   tax return.

Page 111

1              It shows up later in this
2    exhibit.  All right, it is showing as
3    page Traina 7 at the bottom; do you see
4    that?
5         A.    Yup.
6         Q.    Okay.
7              And this is a portion of your
8    tax return, it's called the Schedule C;
9    do you see that?
10        A.    Yup.
11        Q.    All right.  It shows you as the
12   proprietor of a business in the service
13   of trucking; do you see that?
14        A.    Yes.
15        Q.    Okay.
16              And on this document it shows
17   that there were gross receipts for sales
18   in 2012 of 78,292; is that right?
19        A.    Yeah.
20        Q.    So earlier we looked at page 2,
21   is that 1099 that showed an amount of
22   26,859; right?
23        A.    That's what I see.
24        Q.    Okay.
25              So do you recall what made up

Page 112

1    the difference in what was reported on

2    your 2012 Schedule C?

3         A.    My accountant did it.  I'm not

4    sure.

5         Q.    Okay.

6         A.    I don't do my own taxes.

7         Q.    You don't know what other

8    amounts may have been paid to Traina

9    Services for trucking; is that right?

10        A.    I don't recall in that year,

11   no.

12        Q.    Okay.

13              Now, on the second page of this

14   Schedule C for 2012 it shows startup

15   costs; do you see that?

16        A.    Yes.

17        Q.    Do you know if this is that

18   loan that you received from HDL?

19        A.    Possible.  I'm not sure what

20   that was.  Like I said, I don't do my

21   taxes, my accountant does.

22        Q.    Okay.

23              And you don't know what the

24   non-reimbursed expenses is of a little

25   over $10,000?

Page 113

```
 1        A.    If I'm not mistaken that might
 2   have been claims taken out or that's
 3   something that HDL took out throughout
 4   the year, I'm not sure.
 5        Q.    So you don't have any documents
 6   that would establish what that amount was
 7   for; is that right?
 8        A.    I did.  I don't any longer, I
 9   don't know where they are.
10        Q.    Okay.
11              Going back to page 1 of the
12   Schedule C, it does show that you made a
13   profit this year of 14,431?
14        A.    I see that there.
15        Q.    Okay.
16              And you didn't have any
17   advertising expenses reported for this
18   year?
19        A.    I'm not sure.  I don't see
20   them.  Like I said, I don't do my taxes
21   so I'm not sure what was on there or not.
22        Q.    Okay.
23              It shows car and truck expenses
24   of almost 19,000, is that your lease
25   expenses?
```

Page 114

1      A.     I'm assuming that's what that
2  is.
3      Q.     Okay.
4             Do you know what the separate
5  expense here is for 28,596?
6      A.     I do not.
7      Q.     All right.
8             On your 1099s, the next we are
9  we have is 2014, and you already said you
10  didn't locate then the '13 1099 from HDL;
11  right?
12     A.     Yeah, I do not know where it
13  is.
14     Q.     Okay.
15            And the amount on this 1099 for
16  2014 is 123,800?
17     A.     Right.
18     Q.     All right.
19            At this point in time it is
20  show as the recipient being Traina
21  Services LLC; right?
22     A.     Yes.
23     Q.     Okay.
24            So you had formed your company
25  by this time in 2014?

Page 115

1    A.    That's what I said, 2014, in

2    the beginning of the deposition, yes.

3    Q.    Okay.

4          Then going to your Schedule C

5    for 2014.  It appears on page Traina 11.

6    This, again, correlates to -- I'm sorry,

7    Traina Services LLC showing as the

8    business name on the Schedule C; is that

9    right?

10   A.    Say that again?  Sorry.

11   Q.    Sure.  This Schedule C for

12   2014, this is the first time that your

13   records show that the IRS is receiving

14   paperwork for Traina Services LLC; is

15   that right?

16   A.    That's what it looks like, yes.

17   Q.    Okay.

18         And then gross receipts or

19   sales for this year is $273,750; is that

20   right?

21   A.    That's what's down there, yes.

22   Q.    Okay.

23         Do you know what accounts for

24   the difference between the 1099 you

25   received for 123,000 and this figure

Page 116

1    that's on Schedule C?

2        A.    I don't.

3        Q.    You don't know of any other

4    payments that Traina Services LLC would

5    have received in 2014 other than what was

6    paid by HDL?

7        A.    I don't know.  I searched for

8    1099s, I didn't find any, so I'm not

9    sure.

10       Q.    But it is your testimony that

11   there wouldn't have been any other

12   trucking services that Traina Services

13   provided other than the HDL; right?

14       A.    I'm not sure.

15       Q.    Okay.

16             So you may have contracted with

17   another company then in 2014?

18       A.    I'm not sure.

19       Q.    Okay.

20             This year there's advertising

21   of $105.00 that's deducted; is it your

22   recollection that that would have been

23   for those Craig's List ads that were

24   placed for employee drivers?

25       A.    I would assume so, yes.

Page 117

1       Q.     Okay.

2              And then there is a contract

3    labor payment totalling 100 -- I'm sorry,

4    totalling 92,276; do you see that?

5       A.     I see it.

6       Q.     And you don't know what that

7    relates to?

8       A.     I do not.  I keep telling you

9    in the beginning I don't do my taxes, so

10   anything you ask me on my tax returns, I

11   don't recall.  Whatever the accountant

12   does he did, and that's it.

13      Q.     Okay.

14             And I'm sorry, I still have to

15   ask the questions just so that I have it

16   on the record that you do or don't know

17   certain things so, because there may be

18   some information that you know from these

19   tax returns and I need to know what you

20   do recall, okay?

21      A.     I've never even looked at

22   these, tell you the truth.  Go ahead.

23      Q.     Do you recall signing and

24   turning in your taxes at the end of the

25   year?

                              Page 118

1    A.    When he comes here and does

2    them I sign something and that's it.

3         Q.    Okay.

4              Under Deductions there is a

5    legal services of a little over $6,000;

6    do you know what that related to for

7    Traina Services?

8         A.    Legal services, I'm not sure,

9    might have been -- could have been a

10   handful of things.  I'm not sure.

11   Corporation -- what year is this, 2014?

12        Q.    Yes.

13        A.    Okay.  It could have been when

14   I incorporated, it could have been a few

15   other things, I'm not sure exactly what

16   it is.

17        Q.    And there is insurance of 8,400

18   that's deducted, it says "Other than

19   health"; so do you recall what that would

20   have been for?

21        A.    Insurance obviously, I'm not

22   sure what it is.

23        Q.    Okay.  It could have been truck

24   insurance or Workers' Comp for your

25   drivers; is that right?

Page 119

1      A.    Yeah, it could have been

2  anything insurance-related I believe.

3      Q.    All right.

4          On the second page of the 2014

5  Schedule C there is an expense listed as

6  "UGO/MFM payroll expense"; do you know

7  what that's for?

8      A.    That might have been something

9  to do with MFM.  I'm not sure.

10     Q.    Okay.

11         Do you know what UGO is?

12     A.    No, I don't.

13     Q.    Okay.

14         If that does relate to the MFM,

15 do you recall if you might have been

16 contracting with MFM in 2014?

17     A.    I'm not sure.  It could have

18 been when I first started talking to

19 them.  I'm not sure that what that is.

20     Q.    Okay.

21         Did you pay a separate amount

22 to Paychex for running your payroll?

23     A.    What do you mean?

24     Q.    You said earlier that -- you

25 said earlier that you used Paychex for

Page 120

1   your payroll to the employees of Traina

2   Delivery -- I'm sorry, Traina Services?

3        A.    Yes.

4        Q.    Do you think this is the amount

5   that was paid to Paychex?

6        A.    I'm not sure what it is.  It's

7   possible.  Like I said, I never really

8   look at my taxes.

9        Q.    Okay.

10            All right.  We are going to go

11  to your 1099 for the next year, okay?  We

12  don't have '2015; is that another record

13  that you looked for and haven't been able

14  to locate?

15       A.    Yeah, '13 and '15 I couldn't

16  find but, you know, I have a file I was

17  looking at, there's nothing I could find

18  in there.  I might have tossed it like I

19  said, off the top of my head, but I'm not

20  sure.

21       Q.    Have you checked with your

22  accountant for records?

23       A.    Yeah, he says he doesn't have

24  it, but I try not to keep a lot of

25  records on files because I don't really

Page 121

1   need them, but I don't have it, I don't

2   know where it is.

3            I'm sure they have a copy.

4   They sent it.

5       Q.    All right.

6            So for 2016 your 1099 is

7   showing amount paid by HDL to Traina

8   Services LLC as $235,618; is that right?

9       A.    I'm trying to look at it.

10   That's what I received from them, yes.

11       Q.    Okay.

12            And this year, 2016, you

13   definitely drove for two companies in

14   addition to HDL?

15       A.    If that was on my -- yes, if

16   that's what I told my attorney, yes.

17            Like I said, the years fly by

18   for me, I don't remember when I did what.

19   So it's a possibility.  I'm trying to

20   look.

21       Q.    All right.

22            So for your Schedule C, which

23   is page Traina Bates number 15, your

24   gross receipts or sales reported to the

25   IRS is 649,466; is that right?

Page 122

1     A.     That's what's on there.

2     Q.     All right.

3            So little bit more than

4     $400,000 would have been paid to Traina

5     Services by a company other than HDL?

6     A.     Possible, 2016.

7     Q.     Sorry?

8     A.     2016, yeah, that's possible.

9     I'm trying to think when I started with

10    other companies, but go ahead.

11    Q.     Do you have the 1099s that you

12    would have received in 2016 from those

13    two other companies?

14    A.     I looked for them.  I don't

15    have a separate little file for HDL, and

16    I thought I had more stuff in there, but

17    the only things I had in there was the

18    1099s I supplied to the attorney.

19    Q.     In 2016 Traina Services reports

20    advertising of about $1,300; do you

21    recall what that advertising was for?

22    A.     I don't.  I'm not sure what it

23    is.

24    Q.     This year you report wages of

25    $180,700; is that right?

Page 123

1      A.    That's what it says on there,

2    yes.

3      Q.    Do you know how many drivers

4    you would have employed under Traina

5    Services LLC in 2016?

6      A.    When you say "drivers," that

7    word should be "employees," and no, I

8    don't.

9      Q.    Okay.

10          Would you have included your

11   compensation under that, wages for Traina

12   Services?

13     A.    I don't do my taxes.  That's a

14   possibility, I'm not sure but I don't

15   know.

16     Q.    And the legal and professional

17   services of 7200, you don't know what

18   that relates to?

19     A.    Legal services, whatever that

20   may be.

21     Q.    Almost $70,000 for insurance;

22   is that right?

23     A.    Yeah, kept going up every year.

24     Q.    Okay.

25          Do you know what the taxes and

Page 124

1   licenses of a little more than 18,000

2   were for the year 2016?

3        A.    I'm not sure what that was for.

4   I'm not sure.

5        Q.    And you don't have any of the

6   underlying documentation for the tax

7   return for 2016; right?

8        A.    I don't, besides what you have.

9        Q.    Okay.

10            The office expenses listed here

11   of 2400, is it your memory that that's

12   the amount that would have been deducted

13   for your home office and not a separate

14   location?

15        A.    Yeah, I don't have a home

16   office -- or I don't have a separate

17   location so it has to be something like

18   that.

19        Q.    Okay.

20            The profit that you reported to

21   the IRS for this year is 19,124?

22        A.    That's what it looks like, yes.

23        Q.    All right.

24            Then the same UGO/MFM payroll

25   expense appears here, and your testimony

Page 125

1  earlier was that you didn't know what

2  that was; right?

3      A.    I'm not sure what that is.

4      Q.    The claims here of 9,155, you

5  don't know if that's claims for work done

6  for HDL or for the other two companies

7  that Traina Services contracted with that

8  year; right?

9      A.    That would 100 percent be HDL;

10  I didn't receive any other claims from

11  any other companies.

12      Q.    Okay.

13            So it is your testimony that's

14  all expenses from the employees of Traina

15  Services providing services to HDL?

16      A.    Claims from HDL that they took,

17  yes.

18      Q.    Okay.

19            For all of the employees?

20      A.    Correct.

21      Q.    Okay.

22            And then a cell phone expense I

23  just want to clarify, that's for your

24  personal cell phone; is that right?

25      A.    Yeah.

Page 126

```
 1        Q.    All right.  All right.
 2              The last year that I think we
 3   have tax returns for is 2017.  We don't
 4   have a 1099 for 2017; is that right?
 5        A.    If he doesn't have it I
 6   couldn't find it, no.
 7        Q.    Okay.
 8              But in 2016 the amounts that
 9   were reported on the Schedule C relate to
10   work that Traina Services performed for
11   both HDL and the other two companies that
12   it contracted with?
13        A.    Correct.
14        Q.    All right.
15        A.    I don't remember whether HDL
16   was removed but I know they did -- they
17   were removed from Sears and a different
18   company took over, but my last days the
19   at Sears were February of '19 and I'm not
20   sure if it was HDL.
21        Q.    Okay.
22              Say that again, what year?
23        A.    February of '19 is when I
24   stopped doing any work for Sears.  I
25   don't remember if it was HDL or not.  I
```

Page 127

1   know they were removed and I think

2   another company took over.  I'm not sure

3   what company that was.

4        Q.    And that would have been 2017?

5        A.    '19, February of '19.

6        Q.    I'm sorry, I thought you were

7   saying February 19th.

8        A.    No, February of 2019 was...

9        Q.    Okay.

10            And how do you recall that date

11   specifically?  Is there anything that

12   cements that in your mind for you?

13        A.    I just have things, certain

14   things written down when I stop certain

15   contracts for my records, just for my

16   own, just something written down in a

17   book.

18        Q.    And you haven't been able to

19   locate any tax records for 2019?

20        A.    Tax return?

21        Q.    Yes, for 2019, either a 1099 or

22   a Schedule C?

23            MR. WEBER:  Sorry, hold on a

24       second.

25            I think either just before or

Page 128

1          after we began the deposition we did

2          produce Mr. Traina's Schedule Cs for

3          2018 and 2019.

4               Just for the sake of making a

5          complete disclosure, we're not sure

6          that he was working for HDL during

7          those years.  I think HDL is aware of

8          whether he was working for them

9          during those years, but if you want

10         to take 10 minutes to look over

11         those, feel free.

12              MS. QUILLEN:  Okay, I see I

13         received an e-mail at 1:23.  I

14         haven't had a chance to review the

15         documents.  It doesn't look like

16         there's any 1099s from HDL for those

17         years.

18         Q.    Is that right, Mr. Traina?

19              MR. WEBER:  That is correct,

20         that is the Schedule Cs for those

21         years.

22         Q.    And you haven't been able to

23    locate any 1099s for 2018 or 2019 issued

24    by HDL; is that right, Mr. Traina?

25         A.    No, I haven't.

                                   Page 129

1      Q.    Did you ever have a

2  conversation with a manager at HDL 0or

3  some other employee for HDL about

4  opportunities to earn more money?

5      A.    Not that I recall.

6      Q.    Do you recall having a

7  conversation about being ready to add

8  trucks or drivers to your business?

9      A.    When requested by them, yes.

10     Q.    Do you recall when that was

11 requested and by whom?

12     A.    No idea.

13     Q.    Okay.

14     A.    Luke was one of the managers,

15 Luke Whitendale, somewhere around there.

16     Q.    Do you think he may have been

17 the one who asked you to add more trucks

18 and drivers to your business?

19     A.    Yeah, he was the operations

20 manager so he was the guy we dealt with

21 there.

22     Q.    Do you recall how many trucks

23 operated at any given time from the

24 Buffalo warehouse?

25     A.    Didn't you ask me that before?

Page 130

1        Q.     I'm not sure if I asked about

2   your specific trucks or other trucks, but

3   now I'm asking about other trucks.

4               Do you know the total number of

5   trucks that might have operated for HDL

6   at Buffalo?

7        A.     Between two and four.

8        Q.     That's your trucks or that's

9   all contractors?

10       A.     You're asking for all

11   contractors?

12       Q.     Yes.  I'm asking just in

13   general at Buffalo, do you recall how

14   many contractors, how many trucks there

15   were on a given day?

16       A.     You didn't say that.  I have no

17   clue.

18       Q.     And what those other

19   contractors may have been doing in

20   operating their businesses, you don't

21   have any information about what they

22   have -- what they may have been doing on

23   any given day?

24       A.     I worry about myself.

25       Q.     How did you go about increasing

Page 131

1   the efficiency of your business so that

2   you had more money at the end of your

3   week for your personalized expenses?

4        A.    I'm not sure that I understand

5   that question.

6        Q.    Did you have any opportunities

7   to increase your profitability on a given

8   week?

9        A.    At HDL or anywhere?

10       Q.    At HDL.

11       A.    It was what they gave me is

12  what they gave me, so no, not that I

13  recall.

14       Q.    Depending on the amount of

15  expenses you had, the more profit you had

16  at the end of the week; right?

17            MR. WEBER:  Objection.  Vague.

18       A.    Yeah, I don't understand the

19  question.

20       Q.    Did you ever attempt to save

21  expenses by fueling up at places that

22  were inexpensive?

23       A.    I fueled wherever fuel was

24  needed.

25       Q.    Didn't matter the cost?

Veritext Legal Solutions
800-336-4000

```
 1              MR. WEBER:  Objection.
 2       A.     I had no choice.
 3       Q.     Why didn't you have a choice?
 4       A.     If I'm running out of fuel and
 5  there is one gas station to my left and
 6  none to my right, I have to use the left
 7  one; right?
 8       Q.     Did you keep any records of
 9  days or hours that you worked?
10       A.     No.
11       Q.     How about for your employee
12  drivers?
13       A.     No, not that I have.
14       Q.     Did you expect your employee
15  drivers to operate seven days a week?
16       A.     I didn't expect them to do
17  anything; HDL was the one that set the
18  time and when they needed us, so whenever
19  they told me to do I did.
20       Q.     And did you tell your drivers
21  that they were expected to drive seven
22  days a week because HDL told you that?
23       A.     Yes, but it wasn't seven days a
24  week.
25       Q.     Okay.
```

Page 133

1             So what did you tell them?

2     A.     Whenever I had trucks they

3 would show up and get the job done.

4     Q.     So were they available on a

5 one-day notice to show up and work?

6     A.     Depended on the time and the

7 day, I mean, yes.

8     Q.     Did you pay your drivers by

9 check or direct deposit?

10     A.     They usually got a pay stub

11 check.

12     Q.     And that was drawn on the

13 business account of Traina Services?

14     A.     Yeah, they would get a pay stub

15 and I would just cash the checks for

16 them.

17     Q.     What was the reason why you

18 terminated the contract when you left

19 HDL?

20     A.     I don't recall the reason.

21             MS. QUILLEN:  Okay, if we can

22     just take a five-minute break, I'm

23     going to review my notes, I may be

24     done or I may just have a few more

25     questions to ask, okay?

Page 134

1              THE WITNESS:  Okay.

2              MR. WEBER:  Can we get a

3      breakout room.

4              THE VIDEOGRAPHER:  Going off

5      the record.  The time is 4:23.

6              (Whereupon, a brief recess was

7      taken.)

8              THE VIDEOGRAPHER:  We are back

9      on the record.  The time is 4:32.

10              MS. QUILLEN:  I'm just going to

11      go on the record and pass the

12      witness.

13              Thank you, Mr. Traina, for

14      answering my questions.

15              THE WITNESS:  No problem.

16              MR. WEBER:  Yes, I have a

17      couple of quick questions.

18      EXAMINATION BY MR. WEBER:

19      Q.    Mr. Traina, I think we looked

20      at your 2012 tax returns and it showed a

21      difference in the amount on your 1099

22      that you received from HDL and it showed

23      a higher amount of business income on

24      your Schedule C; do you remember that?

25      A.    I seen it, yeah.

Page 135

1      Q.      And you also testified that in
2  those years you did not do deliveries for
3  any other companies; do you recall that?
4      A.      Yes.
5      Q.      And that's still your
6  testimony; correct?
7      A.      That I recall, yes.
8      Q.      Was there any other business
9  income you might have had in 2012 that
10  did not relate to deliveries?
11      A.      I used to do carpet install
12  with a separate van, but that's not --
13  that was not deliveries, it was carpet
14  installation.
15      Q.      Did you personally do carpet
16  installations?
17      A.      No, I didn't do it, it wasn't
18  me.
19      Q.      But you would collect the
20  business income from those carpet
21  installations?
22      A.      Yeah, I had a crew, a crew that
23  would do it.
24      Q.      Okay.
25              And do you, I guess, do you

Page 136

1    recall whether the additional income that

2    shows up on your 2012 returns, are you

3    certain whether that's from the carpet

4    installations or not for that year?

5         A.    No, I'm not sure.

6         Q.    But it may have been?

7         A.    Possibly, yeah.

8         Q.    And during that year you -- you

9    were driving a truck for HDL doing

10   deliveries?

11        A.    Yeah, when I started with HDL

12   that's all I did was deliveries, myself.

13        Q.    And that -- and that year, as

14   far as you recall, you did not have a

15   contract with any other delivery company

16   to do deliveries?

17        A.    Correct.

18             MR. WEBER:  That's all I have.

19             MS. QUILLEN:  All right, we're

20        done.

21             THE VIDEOGRAPHER:  Okay.  Going

22        off the record.  The time is 4:35.

23             [Continued on following page to

24        include signature line and jurat

25        clause.]

Page 137

1
2          THE REPORTER:  Before we go,
3      Mr. Weber, do you wish to order a
4      copy of the transcript?
5          MR. WEBER:  Yes, please.
6          THE REPORTER:  All right.
7          Thank you everyone.
8          [TIME NOTED:  4:36 p.m.]
9
10         _____
       DAVID TRAINA
11
12
   _____
13 Subscribed and sworn to
   before me this _____
14 day of _____,
   2021
15
16
   _____
17 Notary Public
18
19
20
21
22
23
24
25

                          Page 138

1

C E R T I F I C A T I O N

2

3

4          I, KATHLEEN PIAZZA LUONGO, a
5     Notary Public for and within the State of
6     New York, do hereby certify that the
7     foregoing witness, DAVID TRAINA, was duly
8     sworn on the date indicated, and that the
9     foregoing is a true and accurate
10    transcription of my stenographic notes.
11          I further certify that I am not
12    employed by nor related to any party to
13    this action.
14    Date:  5/25/2021
15

16                    KATHLEEN PIAZZA LUONGO
                      VERITEXT LEGAL SOLUTIONS
17                    cs-tx@veritext.com
18

19

20

21

22

23

24

25

                              Page 139

```
 1
 2                    I N D E X
 3        WITNESS
 4
                David Traina
 5
 6        EXAMINATION BY                        PAGE
 7
                Ms. Quillen                     4
 8
                Mr. Weber                       135
 9
10
                    E X H I B I T S
11
12        Exhibit 1 Document bearing Bates      53
                    numbers HDLK2274
13
14        Exhibit 2 Document bearing Bates      63
                    numbers HDLK2280
15
16        Exhibit 3 Document bearing Bates      67
                    numbers HDLK2286
17
18        Exhibit 4 Document bearing Bates      71
                    numbers HDLK2291
19
20        Exhibit 5 TNA re the week ending      75
                    January 7, 2012
21
22        Exhibit 6 Document bearing Bates      77
                    number HDLK2018
23
24        Exhibit 7 Document bearing Bates      81
                    number HDLK2023
25
```

Page 140

1
2                    Exhibits (Continued)
3
      Exhibit 8  Document bearing Bates       84
4                 numbers HDLK2029
5
      Exhibit 13 Document bearing Bates       90
6                 numbers HDLK20174
7
      Exhibit 14 Document bearing Bates       91
8                 numbers HDLK2285
9
      Exhibit 19 Document bearing Bates      110
10                numbers TRAINA 1
                  through 18
11
12
13            EXHIBITS RETAINED BY COURT REPORTER
14
15
16
17
18
19
20
21
22
23
24
25

                                    Page 141

```
 1                     LITIGATION SUPPORT INDEX

 2

 3          DIRECTION TO WITNESS NOT TO ANSWER

 4

            Page        Line                Page        Line

 5

 6                          (NONE)

 7

            REQUEST FOR PRODUCTION OF DOCUMENTS

 8

 9          Page        Line

10

                            (NONE)

11

12

            INFORMATION TO BE FURNISHED

13

14          Page        Line

15

16                          (NONE)

17

            QUESTIONS MARKED FOR A RULING

18

            Page        Line                Page        Line

19

20                          (NONE)

21

22

23

24

25

                                            Page 142
```

```
 1                      ERRATA SHEET
              VERITEXT/NEW YORK REPORTING, LLC
 2                    1-800-727-9396
 3       200 OLD COUNTRY ROAD        1250 BROADWAY
         MINEOLA, NEW YORK 11501     NY, NY 10018
 4
 5       NAME OF CASE: Kloppel v. HomeDeliveryLink
         DATE OF DEPOSITION: May 11, 2021
 6       NAME OF DEPONENT: David Traina
 7
         PAGE   LINE(S)       CHANGE            REASON
 8       ____   _____   _____   _____
 9       ____   _____   _____   _____
10       ____   _____   _____   _____
11       ____   _____   _____   _____
12       ____   _____   _____   _____
13       ____   _____   _____   _____
14       ____   _____   _____   _____
15       ____   _____   _____   _____
16       ____   _____   _____   _____
17       ____   _____   _____   _____
18       ____   _____   _____   _____
19                       _____
                         (DAVID TRAINA)
20
21       SUBSCRIBED AND SWORN TO BEFORE ME
         THIS ____DAY OF _____, 2021.
22
         _____    _____
23       (NOTARY PUBLIC)     MY COMMISSION EXPIRES:
24
25

                                        Page 143
```

[& - 3:09]

| & | | | |
|---|---|---|---|

**&**

**&**   2:4,13

**0**

**02116**   2:7
**06296**   1:2
**0or**   130:2

**1**

**1**   53:3,14,25 55:3
  60:14 65:1 110:4
  110:13 114:11
  140:12 141:10
**1,300**   123:20
**1,316**   61:22 62:2
**1,947**   61:4
**1-800-727-9396**
  143:2
**10**   23:7 59:11
  68:22 72:8 129:10
**10,000**   34:4 113:25
**100**   22:11 33:10
  96:2 118:3 126:9
**100.00**   76:14 78:19
**10018**   143:3
**105.00**   117:21
**1099**   16:18,22
  46:10,22 110:22
  111:7,16 112:21
  115:10,15 116:24
  121:11 122:6
  127:4 128:21
  135:21
**1099'd**   16:14
**1099s**   16:16 115:8
  117:8 123:11,18
  129:16,23
**10th**   55:4
**11**   1:10 3:4 116:5
  143:5
**110**   141:9

**11501**   143:3
**12**   23:15 43:1
  68:25
**123**   13:16,20,24
  14:13
**123,000**   116:25
**123,800**   115:16
**1250**   143:3
**13**   43:1 90:10,16
  92:5 115:10
  121:15 141:5
**130**   45:18
**135**   140:8
**138.89**   62:20
**139.88**   62:24
**14**   43:1 78:2 91:16
  91:17 93:19 141:7
**14,431**   114:13
**14206**   4:8
**15**   23:15 121:15
  122:23
**150,000**   45:17
**158.78**   85:1
**17**   58:3 64:22
**170.00**   67:21
**18**   49:24 110:4,13
  141:10
**18,000**   125:1
**180**   78:25 79:5
**180,700**   123:25
**19**   83:8 110:3,11
  110:21 127:19,23
  128:5,5 141:9
**19,000**   114:24
**19,124**   125:21
**19th**   83:13 128:7
**1:23**   129:13

| 2 | | | |
|---|---|---|---|

**2**   63:21,22 64:11
  64:17,21 82:2
  112:20 140:14

**20.00**   79:21
**200**   143:3
**2006**   4:11
**2011**   15:25 24:4
  28:11,18 36:7
  46:4,6,10,20,25
  48:14 55:4 58:3
  64:22 67:14 69:23
  71:19 72:22 75:8
  75:11 101:19
  109:16 110:22
  111:11
**2012**   75:16,18 78:2
  82:16,25 84:13
  90:20 92:5,6,14
  111:16,24 112:18
  113:2,14 135:20
  136:9 137:2
  140:20
**2013**   16:3,19,22,25
  17:3 92:18
**2014**   14:23 16:3,6
  16:12 22:2,16
  24:16 26:1,13
  27:4 28:3,20,24
  29:14 30:11 35:22
  35:25 40:3 62:13
  92:19 115:9,16,25
  116:1,5,12 117:5
  117:17 119:11
  120:4,16
**2015**   29:1 92:19
  121:12
**2016**   19:15,17
  20:23 36:22 51:13
  92:19 108:15
  122:6,12 123:6,8
  123:12,19 124:5
  125:2,7 127:8
**2017**   19:15,17
  20:23 36:23 51:13

**92**:2,6,6,14 93:18
  94:25 95:24
  108:15 127:3,4
  128:4
**2017/2018**   49:23
**2018**   19:3 20:1,6
  48:16 52:8 129:3
  129:23
**2019**   128:8,19,21
  129:3,23
**2021**   1:10 3:4
  138:14 143:5,21
**20th**   2:6
**21**   82:16,25
**23**   92:6
**235,618**   122:8
**24**   67:14 69:23
  90:20 92:5
**2400**   125:11
**26**   101:25
**26,859**   111:20
  112:22
**26.80**   96:6
**273,750**   116:19
**28**   84:13
**28,596**   115:5
**28th**   84:25
**2:04**   1:11 3:5
**2s**   26:24 29:10

| 3 | | | |
|---|---|---|---|

**3**   66:24 67:1 69:22
  140:16
**3.98.**   57:15
**300**   65:17
**300.00**   58:9
**31**   71:19
**33**   83:15
**335.00**   63:4 66:10
**3927**   139:15
**3:09**   68:25 69:14

Veritext Legal Solutions
800-336-4000

**[3:21 - answer]**

**3:21** 69:18

**4**

**4** 71:5,8,17 75:6
  140:7,18
**400** 57:3
**400,000** 123:4
**4:23** 135:5
**4:32** 135:9
**4:35** 137:22
**4:36** 138:8

**5**

**5** 75:14,17 77:9
  140:20
**5,000** 76:18
**5/25/2021** 139:14
**50** 57:7,13,23
**500** 28:14
**500.00** 27:21 28:9
**5000** 76:20,21
**53** 140:12
**57** 4:7

**6**

**6** 77:11,13 78:1
  140:22
**6,000** 119:5
**6,500** 46:11
**6-17** 1:2
**63** 140:14
**630.00** 61:20
**630.89.** 61:19
**649,466** 122:25
**67** 140:16
**6g** 57:19
**6th** 56:7

**7**

**7** 75:16,18 81:3,4
  112:3 140:20,24
**70,000** 124:21

**700** 101:14
**71** 140:18
**7200** 124:17
**729** 2:5
**75** 140:20
**76102** 2:16
**77** 140:22
**777** 2:15
**78,292** 112:18

**8**

**8** 43:1 84:4,5
  141:3
**8,400** 119:17
**80** 83:10
**81** 140:24
**82.00** 62:6
**84** 141:3
**86** 83:7
**87.50** 72:2

**9**

**9,155** 126:4
**90** 102:15 141:5
**91** 12:21 141:7
**92,276** 118:4

**a**

**aaron** 48:9,19
**abbreviation**
  55:20
**able** 5:8 7:12
  16:16 32:17
  121:13 128:18
  129:22
**absorbed** 87:8
  91:5
**accepted** 14:11
**access** 29:9
**account** 35:16,19
  36:2,4,10,13,19,25
  37:9,15 38:4,7,24
  39:4,8,14 40:7,14

40:18 44:17
  101:17 104:7
  134:13
**accountant** 39:16
  39:21 42:3 109:18
  113:3,21 118:11
  121:22
**accounting** 37:21
  39:13,19 40:2
  70:13 96:16
**accounts** 116:23
**accurate** 6:13
  32:22 93:6 95:16
  139:9
**accurately** 7:3,23
**acquired** 43:15
**action** 139:13
**actual** 85:23
**ad** 14:9,10,19
  25:19 45:10,16
**adam** 9:3,7,9
**add** 25:9 60:6
  130:7,17
**added** 24:19 25:8
  60:2 83:17
**addition** 122:14
**additional** 80:7,10
  100:3 137:1
**address** 4:6 22:18
  22:19
**adds** 61:3
**administration**
  31:1 66:12
**administrative**
  96:5
**ads** 117:23
**advance** 89:3
**advertise** 42:10
**advertised** 42:7
**advertisement**
  44:15,21

**advertisements**
  51:21
**advertising** 114:17
  117:20 123:20,21
**agent** 105:8
**ago** 5:19 13:13
  28:25 50:5
**agree** 87:15
**agreement** 47:2,4
  47:12 63:11 98:25
**agreements** 47:17
**ah** 7:2
**ahead** 79:9 87:22
  88:21 99:20
  118:22 123:10
**al** 1:4
**alberto** 96:18
**allow** 7:14
**allowed** 18:13
  31:13
**amount** 39:6
  40:22 46:12 56:1
  57:8 68:1 72:2,12
  76:16,17,19 80:7
  86:25 95:2,20
  100:3 111:11,20
  112:21 114:6
  115:15 120:21
  121:4 122:7
  125:12 132:14
  135:21,23
**amounts** 27:9
  36:23 40:5,12
  77:3 83:22 95:15
  101:15 113:8
  127:8
**annual** 30:24
  37:19
**answer** 6:23 7:5
  85:12 105:3 142:3

[answered - business]

**answered** 8:5
71:23
**answering** 7:16
135:14
**answers** 6:17,17
7:17,22 102:13
**appear** 7:3 42:18
42:21 53:18 60:13
83:4
**appeared** 68:7
**appears** 76:10
116:5 125:25
**appliance** 20:11
20:14
**appliances** 98:15
98:15,18 99:22
**applied** 14:10
30:20
**approximately**
9:16
**arrived** 86:7
**asked** 10:25 19:1
24:11 60:4 90:6
105:13 130:17
131:1
**asking** 80:9 131:3
131:10,12
**assume** 42:1 63:13
117:25
**assuming** 115:1
**ate** 87:2
**attempt** 132:20
**attend** 13:2
**attorney** 3:11,23
10:13,17 11:5
110:2,18 122:16
123:18
**attorneys** 2:8,17
**audio** 7:10,20 69:7
**authority** 30:12
32:17

**authorized** 31:5
**available** 102:20
108:10 134:4
**avenue** 4:7
**average** 28:21
**aware** 8:8 129:7

**b**

**b** 14:24 15:1,6,12
26:1 35:23 36:8
47:9 48:19 50:19
51:2 140:10
**back** 42:13 49:25
53:1 59:22 65:17
68:24 69:3,17
83:12 94:16 96:21
99:23,25 100:10
100:17 114:11
135:8
**backgrounds**
67:24
**bad** 48:21
**bank** 36:2,9,19,25
37:9,15 39:3,8
40:14,18 44:17
101:16 104:7
**banking** 35:16,19
36:13
**base** 27:12,14
**based** 17:12 46:21
**basis** 37:19 38:18
39:7 50:15 53:23
101:4
**bates** 53:4,15
63:23 64:3 66:25
67:2 71:5,9 77:11
77:14 81:5,9 84:6
84:10 90:11,16
91:18 110:4,11
122:23 140:12,14
140:16,18,22,24
141:3,5,7,9

**bearing** 53:3
63:22 67:1 71:8
77:13 81:4 84:5
90:10 91:17 110:3
140:12,14,16,18
140:22,24 141:3,5
141:7,9
**began** 46:3 129:1
**beginning** 15:25
22:20 24:3 28:18
28:20 36:6 81:23
110:12 116:2
118:9
**begins** 3:2
**behalf** 15:5 47:9
**believe** 5:6 11:9,11
12:2 14:5 16:4
19:5 20:7,7 24:15
26:13 30:3 31:21
32:13 33:9,22
36:3,8 39:25 40:4
44:23 45:17 46:8
46:18 54:5,15
55:14 61:17 65:19
68:10 75:7 78:14
78:15 89:18 92:22
95:11 96:18 97:3
97:5,17 120:2
**ben** 5:1
**beneficial** 34:24
**benjamin** 2:9 3:13
**bertine** 51:2
**best** 19:16 69:6
103:15
**better** 103:25
**bills** 37:23 38:23
**bit** 123:3
**bjweber** 2:10
**blattenberger**
51:7

**blowing** 68:18
**bond** 76:10,13,24
**book** 128:17
**boss** 45:3
**boston** 2:7
**bottom** 61:8,17
64:12 110:12
112:3
**box** 68:12 86:10
101:24
**boylston** 2:5
**branched** 19:1,7
**break** 8:1 68:22
69:21 106:13
134:22
**breakout** 135:3
**breaks** 8:6
**brief** 6:2 69:15
135:6
**bring** 94:16
**brings** 65:16
**broad** 104:12
**broadway** 143:3
**broke** 102:21
105:21
**brought** 99:23
**budget** 33:14
101:3,13,20 102:9
102:19 103:1
105:10 108:4,14
**buffalo** 1:19 17:6
17:13 46:2,25
54:23 59:2 97:16
130:24 131:6,13
**build** 65:21
**business** 15:2
17:19 19:9,24
20:4 22:2,15,18
35:16 36:13,18,25
37:9 39:3 40:7,18
42:8,14,15 45:2

Veritext Legal Solutions
800-336-4000

**[business - continued]**

73:9,25 104:7
105:20 109:7,11
112:12 116:8
130:8,18 132:1
134:13 135:23
136:8,20
**businesses** 36:22
131:20
**buy** 73:25 74:5
**buying** 73:21 74:4

**c**

**c** 2:2 48:19 49:1,5
49:10 50:8,19
112:8 113:2,14
114:12 116:4,8,11
117:1 120:5
122:22 127:9
128:22 135:24
139:1,1
**ca** 58:4
**call** 19:10 33:21
88:18 89:4,15
111:4
**called** 3:18 19:11
65:13 96:13 112:8
**camera** 77:22
**capacity** 47:8
**car** 114:23
**cards** 42:15
**care** 26:16 68:18
68:22,24
**carpet** 136:11,13
136:15,20 137:3
**carried** 63:2
**carrier** 17:24
30:12,25 106:13
**carriers** 18:18
**carry** 62:10 72:4
106:6
**case** 1:2 28:1
33:15 88:20 101:9

109:15 143:5
**cases** 104:1,1
**cash** 134:15
**caused** 34:19
86:14,19,23 87:5
91:3,11
**ceisla** 50:8
**cell** 106:18,19,22
126:22,24
**cements** 128:12
**cents** 57:7,14,23
**certain** 76:16 88:3
101:22 102:2
118:17 128:13,14
137:3
**certificates** 13:8
**certifications**
25:12
**certify** 139:6,11
**chance** 129:14
**change** 5:8 24:6
33:5 34:5,10 61:4
143:7
**changed** 68:11
81:25 94:5,21
103:5 104:18
**changes** 104:16
106:1
**charge** 68:6
**charged** 67:23
68:2
**check** 37:6 52:15
54:9,13,16 66:15
134:9,11
**checked** 121:21
**checks** 54:4 82:5
134:15
**cheektowaga** 4:7
**choice** 133:2,3
**chosen** 12:10,11
12:12

**city** 12:25 31:7
**claim** 15:10 77:4
85:1,17,19 86:3,14
86:20 91:1,2,4
**claims** 76:25 77:3
114:2 126:4,5,10
126:16
**clarify** 6:22 7:5
36:6 126:23
**clause** 137:25
**clear** 28:8 35:14
**clearly** 7:4
**click** 82:23
**close** 32:23 33:4
**clothes** 80:22
**clue** 91:13 95:18
131:17
**coded** 56:11 58:4
**coding** 65:13
**collect** 136:19
**college** 13:2
**colon** 50:18 96:18
**column** 58:13
59:17,21,24 60:1
65:10 78:8
**come** 7:10 69:3
**comes** 119:1
**commercial** 21:17
21:18
**commission**
143:23
**communicate** 5:14
**communicated**
8:21 98:3
**comp** 61:15,16
62:5,7,13 95:2,25
119:24
**companies** 18:7,19
18:24 19:19,21
20:17 51:12 108:5
122:13 123:10,13

126:6,11 127:11
136:3
**company** 13:15,23
15:5,16 16:25
17:3 18:2 19:14
20:23 22:1,12,24
26:8,11,15 27:3,7
34:8 44:4 61:19
103:10,13 104:9
115:24 117:17
123:5 127:18
128:2,3 137:15
**compare** 54:18
**compensation**
46:11 60:7 61:4
61:13 80:10 100:4
124:11
**complaint** 11:14
**complete** 88:18
129:5
**completed** 58:13
58:18,20 59:10,11
59:16 60:23 78:24
**completing** 83:6
**complex** 65:24
**computer** 52:23
91:23 94:14
**concluded** 58:22
**condo** 65:23
**conference** 69:11
**confirm** 69:25
**confused** 18:10
**connect** 98:22
**consecutively**
84:19
**considered** 30:6
**continued** 5:13
52:7 53:17 64:15
67:9 69:19 71:13
75:22 78:3 81:12
84:14 90:21 92:1

[continued - deliveries]

110:15 137:23
141:2
**continuously**
15:24
**contract** 13:17
19:25 20:5,12,18
41:5,6 44:20
46:24 65:20 92:12
118:2 134:18
137:15
**contracted** 19:22
24:10 45:21 46:19
47:20 51:13 107:6
108:6 117:16
126:7 127:12
**contracting** 18:1,5
18:8,16,20,23
20:17 36:17,22
46:3 76:23 120:16
**contractor** 36:24
44:2 108:11
**contractor's** 62:19
62:23
**contractors** 11:22
14:9 44:10 97:13
97:16 98:4 131:9
131:11,14,19
**contracts** 44:5
128:15
**conversation**
10:12 130:2,7
**conversations** 6:1
10:16
**convicted** 8:16
**cooperate** 66:20
**cooperating** 77:21
**copy** 53:14 122:3
138:4
**corporation** 29:18
30:7 36:1 119:11

**correct** 4:6 15:23
27:22 43:7 61:17
62:4 63:15 65:3
66:6 70:15 73:19
97:2 126:20
127:13 129:19
136:6 137:17
**correlates** 116:6
**corrupt** 64:7
81:11
**cost** 44:15 87:3
91:4 132:25
**costs** 113:15
**counsel** 3:7
**country** 143:3
**couple** 135:17
**courier** 13:13 14:2
14:14 15:19
**court** 1:1 3:16
6:14 7:12 11:15
141:13
**cover** 62:6
**coverage** 103:15
**covered** 62:21
73:13
**craig's** 25:20
42:11 44:24 51:22
117:23
**creating** 30:7
**crew** 136:22,22
**crime** 8:16
**cs** 129:2,20 139:17
**curbside** 21:1,9
**current** 32:20
**currently** 3:25
11:18 17:15,22
18:15,20 19:22
20:13 22:23 23:5
31:5 33:2 44:3
48:10,12

**cushion** 76:17
**customer** 21:20
60:3,6 66:4 80:2
98:25 99:7
**customer's** 85:24
86:7 99:23 100:6
106:14
**cv** 1:2

**d**

**d** 3:18,18 14:24
15:1,6,12 26:1
35:23 36:8 47:9
67:21 140:2
**damage** 35:3
85:20,23,23 86:23
87:6 90:25 91:4
91:10
**damaged** 73:13
86:5,10
**dan** 49:9,15
**data** 92:3
**database** 105:16
**date** 3:4 46:5 55:1
56:7 92:7 128:10
139:8,14 143:5
**dates** 50:16 70:6
**david** 1:17 3:3 4:4
138:10 139:7
140:4 143:6,19
**day** 17:7,9 31:18
50:14,15 57:4
58:2,9 59:1,11
70:18 78:18 83:9
83:16,21 88:7,14
88:24,25 89:4,14
89:17 90:5 99:16
99:25 100:14
108:8 131:15,23
134:5,7 138:14
143:21

**days** 58:11 65:12
70:2 87:17,18
88:16 127:18
133:9,15,22,23
**dealing** 103:11
**dealt** 130:20
**december** 46:4,16
55:4 56:7 58:3
64:22 67:14 69:23
71:19 75:11 92:6
**decide** 103:12
109:19
**decided** 89:20
90:3 93:8
**decision** 33:17
72:22
**dedicated** 56:18
56:25 65:19 83:15
108:14
**deduct** 109:19
**deducted** 86:24
95:2,21 109:5
117:21 119:18
125:12
**deduction** 67:20
80:19 96:4
**deductions** 119:4
**defendant** 1:8,18
2:17 3:24
**definitely** 122:13
**del** 56:8
**deliver** 98:21
**delivered** 100:15
**deliveries** 13:24
20:11,14 21:12
31:15,19 32:2,4
59:5 70:7,11,16,25
87:18 88:7,17,25
107:24 136:2,10
136:13 137:10,12
137:16

Page 5

**[delivering - employees]**

**delivering** 21:16
21:19 86:5 98:11
**delivery** 13:16,21
13:25 14:14 19:18
20:6,8,9,11 21:1
45:7 52:4,14
53:19 54:11 56:8
58:4,8 59:8 65:11
66:2 78:9,12 79:4
79:20 80:11,11
83:7,15 85:24
86:6 94:9 100:11
107:18 108:19,21
121:2 137:15
**department** 17:23
31:1
**depended** 50:15
134:6
**depending** 40:21
104:8 132:14
**depends** 34:15
104:13
**deponent** 143:6
**deposit** 36:18 37:5
38:2 134:9
**deposited** 36:25
37:8
**deposition** 1:17
3:3 4:16,17,21
5:15 6:16 10:9,23
11:8 18:10,14
22:21 116:2 129:1
143:5
**describe** 21:11
42:23
**determined** 40:24
**devon** 50:8
**difference** 113:1
116:24 135:21
**different** 6:7 16:3
45:5,8 47:15

58:14 71:25 87:17
87:17,18 91:1
92:25 93:20,21
94:20 95:16
102:17 103:17,25
127:17
**difficult** 80:1
**dinged** 86:1
**diploma** 12:18
**direct** 37:5 134:9
**direction** 142:3
**directly** 21:19
101:16
**disclosure** 129:5
**discovery** 11:10
**discretion** 25:10
**discussed** 5:16
**dispose** 99:12
**district** 1:1,2
**divide** 72:11
**division** 72:15
**dock** 97:20
**document** 53:3,24
63:22 67:1 71:8
77:13 81:4 84:5
90:10 91:17 95:15
96:14 110:3
112:16 140:12,14
140:16,18,22,24
141:3,5,7,9
**documentation**
125:6
**documents** 10:15
10:18,21 11:2,4
110:1,17,17 114:5
129:15 142:7
**dog** 29:20
**dogs** 64:5
**doing** 14:2 17:15
20:9,22 103:18
127:24 131:19,22

137:9
**door** 42:22 43:1,3
43:12
**dot** 30:14,17 43:5
43:13,14,15
**downs** 72:4,8 73:2
73:21 74:1
**drawn** 134:12
**drive** 14:13 15:24
16:24 17:5 41:17
41:20 51:12 97:6
133:21
**driven** 57:22
**driver** 14:14 25:5
27:20 34:19 35:2
41:12 55:7,10
68:2 70:2,6,10,23
70:24 71:2 76:1
80:23 82:19 83:1
86:23 87:6 91:11
92:9,18 93:7,15
96:19,24 97:2
**driver's** 55:12
92:25
**drivers** 27:16
28:10 32:21 43:20
43:23 44:3 47:21
47:25 48:3,7 68:5
89:8,10,21 117:24
119:25 124:3,6
130:8,18 133:12
133:15,20 134:8
**drivers's** 93:13
**driving** 9:24 15:18
15:21 43:11 45:7
48:17 51:15 74:11
137:9
**drove** 13:13 19:14
19:18 41:24
122:13

**drug** 67:24
**dryer** 98:16
**dt** 56:12 83:14
**due** 61:9,18
**duly** 3:19 139:7

**e**

**e** 2:2,2 31:11 48:19
49:1,5 50:8,19,21
51:2,2 129:13
139:1 140:2,10
**earlier** 44:19
78:11 79:24 97:5
98:14 101:2
112:20 120:24,25
126:1
**earn** 130:4
**earned** 15:11
16:11
**easier** 33:19,22
**education** 13:8
**efficiency** 132:1
**eight** 32:21 33:1
47:25 48:3 57:22
58:17 59:5,6
**either** 9:5 39:8
86:5 128:21,25
**electronic** 53:14
100:24 107:1
**electronically**
52:17
**emily** 2:18 3:10,22
77:19
**employed** 23:14
48:8,12 50:11,25
89:9 124:4 139:12
**employee** 13:19,20
49:7,18 50:2,7
117:24 130:3
133:11,14
**employees** 11:23
24:9,19 25:1,9,11

| | | | |
|---|---|---|---|
| 25:18,21 26:2,22 26:25 27:10 28:21 29:5,11 41:14 42:5,9 51:11,19 106:19 121:1 124:7 126:14,19 | **exclusively** 108:20 **excuse** 8:3 42:14 111:3 **exhibit** 53:3,13,25 55:3 60:14 63:21 63:22 64:11,17,21 65:1 66:24 67:1 | **f** | **fits** 42:25 **five** 5:24 18:22 25:4 27:15 50:5 68:17,19 70:2 74:15 134:22 **fixed** 33:21 |

| | | | |
|---|---|---|---|
| **ensure** 70:14 | 69:22 71:5,8,17 | **f** 21:4 49:2 139:1 | **flat** 27:21 56:8,24 |
| **entail** 21:13 | 75:6,14,17 77:9,11 | **familiar** 9:5,8 | 57:3 58:4,7 60:22 |
| **entire** 22:15 28:2 | 77:13 78:1 81:3,4 | 21:10 97:12 | 65:11,12 78:9,18 |
| 59:1 | 84:2,4,5 90:10,16 | **far** 35:20 84:18 | 83:14,21 |
| **entirety** 7:19 | 91:16,17 92:5 | 137:14 | **floor** 2:6 72:8 |
| **envelope** 54:5 | 93:19 110:3,11,21 | **feary** 2:14 | 85:25 |
| **equal** 27:18 | 111:15 112:2 | **february** 127:19 | **fluctuated** 23:10 |
| **equillen** 2:19 | 140:12,14,16,18 | 127:23 128:5,7,8 | **fluctuates** 29:3 |
| **equipment** 72:3 | 140:20,22,24 | **federal** 30:25 | **fly** 122:17 |
| 105:19 106:2 | 141:3,5,7,9 | **fee** 66:12 67:21 | **fm** 21:3 |
| 109:1 | **exhibits** 141:2,13 | **feel** 129:11 | **fmcsa** 32:21 |
| **erie** 103:19 | **expect** 133:14,16 | **felt** 72:18 | **following** 82:9 |
| **errata** 143:1 | **expected** 88:2 | **fewest** 23:19 | 137:23 |
| **esq** 2:9,18 | 133:21 | **fictitious** 76:25 | **follows** 3:20 |
| **establish** 114:6 | **expense** 35:4 | **figure** 116:25 | **foot** 101:25 |
| **estes** 18:18 | 37:17 87:7 115:5 | **figures** 45:19 61:9 | **ford** 102:23 |
| **et** 1:4 | 120:5,6 125:25 | **file** 15:5 29:8 | **foregoing** 139:7,9 |
| **everybody** 89:12 | 126:22 | 52:22 53:10 64:7 | **forget** 31:8 |
| **exact** 19:4 46:5 | **expenses** 37:16 | 64:11 66:24 77:25 | **forgive** 48:24 |
| 107:9 | 38:6,12,13,18 39:9 | 81:11 84:11 94:25 | **forgot** 4:24 11:7 |
| **exactly** 9:18 43:18 | 40:7,13,24 63:8 | 121:16 123:15 | 103:20 |
| 47:14 53:22 60:18 | 104:5 105:18,25 | **filed** 11:14 15:7 | **form** 14:21 29:13 |
| 78:15 86:9 119:15 | 113:24 114:17,23 | **files** 91:23 121:25 | 29:25 |
| **examination** 4:1 | 114:25 125:10 | **filing** 31:4 32:20 | **format** 64:25 |
| 5:13 53:17 64:15 | 126:14 132:3,15 | **filings** 30:22,24 | 93:21 94:20 95:17 |
| 67:9 69:19 71:13 | 132:21 | **fill** 50:14 | **formed** 15:4 22:2 |
| 75:22 78:3 81:12 | **experience** 15:20 | **find** 16:20 34:24 | 22:4 36:12 115:24 |
| 84:14 90:21 92:1 | 103:23 | 47:5 70:19 103:16 | **forming** 30:7 |
| 110:15 135:18 | **expires** 143:23 | 103:24 117:8 | **fort** 2:16 |
| 140:6 | **explanation** 6:5 | 121:16,17 127:6 | **four** 24:23,24 33:7 |
| **examined** 3:20 | **explore** 82:14 | **finish** 7:15 | 33:10 75:9,10 |
| **example** 58:16 | **express** 18:18 | **first** 3:19 5:14 | 91:8 131:7 |
| 62:14 76:18 | **extra** 13:7 60:3,18 | 13:11 14:7,19 | **fpg** 1:2 |
| **excel** 53:10,15 | | 15:16 45:22 46:14 | **frank** 21:4 |
| 64:11 77:21 | | 49:2 56:6 63:7 | |
| | | 66:13 69:4 82:15 | |
| | | 83:13 103:18 | |
| | | 110:21 116:12 | |
| | | 120:18 | |

Page 7

[free - helper]

**free** 100:18 129:11
**freight** 20:25 21:8
**freightliner**
 102:23
**freights** 20:19
**frequently** 82:4
 85:5
**friday** 56:2 58:12
 87:25
**friends** 45:4
**front** 73:16
**froze** 85:13
**frozen** 85:7
**fuel** 57:6,9,12
 106:1 132:23
 133:4
**fueled** 132:23
**fueling** 132:21
**full** 4:3
**fun** 64:6
**furnished** 142:12
**furniture** 20:20
**further** 139:11

**g**

**garvin** 2:13
**gas** 133:5
**gate** 101:24
 102:11
**general** 20:19,25
 21:7 131:13
**gentleman** 45:22
**gentlemen** 9:6
**give** 52:21,25
 66:20 71:6,14
 110:13
**given** 4:15,17
 10:23 12:9 16:22
 29:6 40:23 54:25
 63:5 80:2 87:16
 88:7,14 89:3
 105:11 130:23

131:15,23 132:7
**go** 6:6 10:20 31:13
 32:11 48:5 59:22
 60:17 64:10 65:21
 68:18 79:9 83:12
 90:1 96:12 99:20
 100:18 104:17
 111:24 118:22
 121:10 123:10
 131:25 135:11
 138:2
**goes** 109:22
**going** 6:6,10 36:4
 48:5 49:25 53:13
 56:6 64:13 66:19
 66:21 67:7 69:13
 71:22 77:10 81:1
 82:23 83:12 84:3
 88:14 90:15,17
 91:15 95:7 96:12
 109:25 110:24
 111:4,24 114:11
 116:4 121:10
 124:23 134:23
 135:4,10 137:21
**good** 45:3 98:1
**goods** 20:20
**gotten** 96:25
**gps** 106:22
**graduate** 12:20
**gross** 112:17
 116:18 122:24
**guess** 111:3
 136:25
**guy** 46:1 130:20
**guys** 5:4 24:24
 29:20 50:13 68:12
 90:7 97:20

**h**

**h** 49:1,5 50:19
 140:10
**half** 6:3
**hand** 100:20
**handful** 92:7
 119:10
**handle** 33:19 34:1
**handled** 30:21
 91:2
**hang** 99:18
**hanson** 2:13
**happen** 24:13 99:9
**happened** 26:4
 30:16
**happening** 101:10
**happens** 33:20
**happy** 8:2,5
**hat** 80:20
**hats** 44:7,8,12
**hbc** 96:17
**hdl** 9:24 10:4
 14:15,19 16:8,13
 18:25 19:8,15
 20:11 24:10 28:2
 31:20 32:5 33:7
 36:17 37:5 41:7
 41:13,23,25 43:11
 43:21 44:21 45:21
 45:25 46:13 47:12
 47:20 48:2,3,17
 49:21 51:16 52:9
 52:14 53:21 63:5
 63:11 72:23 74:2
 74:6,11 76:23
 77:3 80:15 90:1
 92:13,22 96:16
 98:5 99:11 101:6
 106:4 107:1,7,17
 108:5,9,10,14
 111:5,7,16 113:18

114:3 115:10
 117:6,13 122:7,14
 123:5,15 126:6,9
 126:15,16 127:11
 127:15,20,25
 129:6,7,16,24
 130:2,3 131:5
 132:9,10 133:17
 133:22 134:19
 135:22 137:9,11
**hdl's** 92:3 107:14
 107:23
**hdlk20174** 90:11
 90:17 141:6
**hdlk2018** 77:12,14
 140:22
**hdlk2023** 81:5,10
 140:24
**hdlk2029** 84:6,11
 141:4
**hdlk2274** 53:4,16
 140:12
**hdlk2280** 63:23
 64:3 140:14
**hdlk2285** 91:16,18
 141:8
**hdlk2286** 66:25
 67:2 140:16
**hdlk2291** 71:6,9
 140:18
**head** 6:18 121:19
**health** 119:19
**hear** 7:13,19 77:19
 105:2
**hears** 7:22
**held** 1:18
**help** 63:7,7 69:9
**helper** 24:2,23
 25:6 27:20 41:12
 68:1 74:19 75:1,3
 80:22 86:15,22

[helper - kathleen]

87:6 91:12
**helpers**  27:16
  28:11 43:20 68:5
**high**  12:17 13:9
**higher**  135:23
**hilberto**  50:18
**hino**  102:22
**hire**  25:11
**hired**  25:14 68:6
**hiring**  51:25
**hold**  29:19,21 53:1
  90:18 128:23
**home**  59:13 85:23
  85:24 86:7 90:25
  91:4,10 100:19
  106:14 109:7,9,11
  109:20 125:13,15
**homedeliverlink**
  110:23
**homedelivery**
  110:23
**homedeliveryinc**
  110:24
**homedeliverylink**
  1:7 3:12,23 9:12
  9:25 10:4 12:16
  14:6,8 15:25 24:1
  30:3 61:10 110:25
  143:5
**honest**  81:24
**hopefully**  81:2
**hour**  6:3
**hours**  12:10 111:2
  133:9
**house**  39:2
**hum**  7:1 38:9
**hundred**  27:15

**i**

**ic**  96:13
**idea**  49:13 63:1
  86:16 130:12

**identification**  53:5
  63:24 67:3 71:10
  75:19 77:15 81:6
  84:7 90:12 91:19
  110:6
**identify**  3:7
**important**  7:8
**impossible**  108:7
**in's**  50:14
**inaudible**  85:5,10
**include**  137:24
**included**  124:10
**income**  15:10 16:5
  16:10 37:7 40:9
  45:13,16 135:23
  136:9,20 137:1
**incomplete**  59:17
  65:6,7
**incorporated**
  14:24 25:25 26:12
  119:14
**increase**  24:8
  132:7
**increased**  28:13
  28:14
**increasing**  131:25
**index**  142:1
**indicate**  29:5
  41:20
**indicated**  32:10
  41:24 86:19 139:8
**indication**  65:6,12
  78:10
**indications**  41:4
**individual**  47:8
  87:10
**individuals**  23:5,8
  23:13,20 41:6
  90:4
**industry**  13:12
  14:4

**inexpensive**
  132:22
**information**
  118:18 131:21
  142:12
**initial**  4:4
**innovel**  98:12
**input**  27:9 70:5
**inside**  31:7
**install**  136:11
**installation**  136:14
**installations**
  136:16,21 137:4
**installed**  58:23
**instructed**  29:17
  29:25
**insurance**  31:3
  61:15 62:20,23,25
  95:21,25 103:1,9
  103:10,13,19
  119:17,21,24
  120:2 124:21
**interest**  22:8,24
**interested**  45:1
**internal**  96:15
**international**
  102:16
**internationals**
  102:14
**internet**  85:9,14
**interrogatory**
  102:12
**interruption**  7:20
**interstate**  31:9,11
  32:16
**interview**  52:1
**interviewing**
  51:24
**intrastate**  31:6,10
**intuit**  26:14 28:5

**involved**  8:18 14:5
**involvement**  14:7
  42:4
**irs**  16:11 40:8
  116:13 122:25
  125:21
**issuance**  42:4
**issue**  26:24
**issued**  29:10
  110:22 111:7
  129:23
**item**  78:7 86:4
  98:21 99:10,14,22
  100:8
**items**  21:16 59:6
  61:12 98:10,12
  99:3 100:5,15,16
  100:16

**j**

**j**  2:9 50:21
**jack**  20:25 21:9
**jacket**  80:19
**jackets**  74:15,19
**january**  75:16,18
  78:2 82:16,25
  83:7,13 84:12,25
  140:20
**jay**  39:23
**jeritt**  50:21
**job**  13:11 14:3
  23:2 102:4 134:3
**join**  69:12
**josh**  2:22
**jumps**  92:2
**jurat**  137:24

**k**

**k**  49:10
**kathleen**  1:19
  139:4,16

Page 9

[keep - magnetic]

**keep** 37:2 86:18
105:15 107:11,18
118:8 121:24
133:8
**keeps** 81:10
**kept** 61:25 107:21
124:23
**kicks** 77:23
**kind** 20:21 34:2
39:7 46:1 65:24
76:17 80:10 85:12
89:2 98:15
**kloppel** 1:4 9:1
143:5
**knew** 9:19 35:12
37:6 97:17
**know** 5:16,22 7:21
9:9,13,16,22 10:4
16:19 26:7 30:10
43:1 48:6 54:4,18
62:8,20,24 65:22
68:12 70:5 76:13
77:23 80:21,24
81:10 85:13 88:19
88:21 89:16 91:9
92:19 94:4,15
95:5 102:17 104:4
113:7,17,23 114:9
115:4,12 116:23
117:3,7 118:6,16
118:18,19 119:6
120:6,11 121:16
122:2 124:3,15,17
124:25 126:1,5
127:16 128:1
131:4
**knowledge** 19:16
**known** 88:23

**l**

**l** 49:2,10 50:8,19
50:19,22
**labeled** 64:14
**labor** 41:5 118:3
**large** 98:18
**law** 6:14
**lawsuit** 3:24 8:19
8:23 9:1 11:18
**lawyer** 4:20,23
8:22
**learn** 103:24
**learned** 44:20
**lease** 33:13,14,18
33:23 34:24 101:7
101:22 102:20
114:24
**leased** 34:2,12
101:2 102:13
108:4,13,19
**leasing** 34:7
101:20 104:9
**leave** 69:2
**left** 37:17,22 38:17
38:22,22 98:4
106:13 133:5,6
134:18
**legal** 119:5,8
124:16,19 139:16
**length** 102:8
**licenses** 125:1
**lichten** 2:4
**life** 4:14
**lift** 101:24 102:11
**light** 2:13
**limit** 31:18
**line** 137:24 142:4
142:4,9,14,18,18
143:7
**link** 110:24

**liss** 2:4
**list** 25:20 42:11
44:24 51:22
117:23
**listed** 37:4 71:1
93:14 120:5
125:10
**lists** 32:21 72:7
**litigation** 142:1
**little** 6:6 28:12
60:2,6 80:1
113:24 119:5
123:3,15 125:1
**living** 37:18
**llc** 14:22 15:4,15
16:6,12 17:12,20
18:4 21:24 22:5,9
22:25 29:14 30:1
30:12 35:15 36:1
36:12,14 38:13
115:21 116:7,14
117:4 122:8 124:5
143:1
**llrlaw.com** 2:10
**load** 59:1
**loan** 63:4,5,10,14
63:16 66:10
113:18
**locate** 16:16 25:17
115:10 121:14
128:19 129:23
**located** 12:24
25:13 47:16 51:21
**location** 3:6 17:6
21:17 54:22 65:22
66:3,4 73:22
97:16 99:24 100:6
104:16 107:20,21
125:14,17
**logistics** 18:17,17

**logo** 43:25
**logos** 43:19
**long** 4:9 5:25 8:3
9:13,19 14:13
35:18 45:3 46:19
83:19
**longer** 19:23 52:9
66:22 74:8 86:21
114:8
**look** 54:6 62:16,17
63:21 67:8 79:2
82:8,12 83:13
93:25 94:6 96:21
121:8 122:9,20
129:10,15
**looked** 53:24
55:15 67:18 75:9
82:7 87:14 92:4
109:4 112:20
118:21 121:13
123:14 135:19
**looking** 57:16
64:13,19 66:23
69:21 77:25 86:12
121:17
**looks** 58:10 67:19
70:4 72:11 79:20
83:14,24 116:16
125:22
**lost** 106:6,13
**lot** 18:13 50:13
54:19 93:1 121:24
**lower** 28:13
**luke** 130:14,15
**luongo** 1:20 139:4
139:16

**m**

**m** 21:4,4 39:25
48:19
**magnetic** 43:2,4

[mail - number]

mail 129:13
main 2:15 5:7
maintenance
  33:23 34:2,6
making 31:23 32:4
  72:21 88:7,25
  129:4
man 21:3
manager 130:2,20
managers 130:14
manifest 62:16
  106:23 107:1
march 90:20 92:5
mark 53:13
marked 53:5
  63:24 66:24 67:3
  71:10 75:19 77:15
  81:6 84:7 90:12
  91:19 110:5,10
  142:17
mary 21:4,5
massachusetts 2:7
matter 18:11
  27:19 37:7 87:5
  91:3 132:25
mc 31:14
mcabe 48:19
mean 10:18 11:20
  14:25 17:8 24:7
  29:7 48:10 87:23
  93:9 94:4 106:12
  120:23 134:7
meaning 6:12,22
  31:9
means 21:11 56:12
meant 25:1 32:14
  35:13 78:16
mechanical 34:17
medicare 26:21
medications 8:10

memories 65:17
  94:17
memory 125:11
mentioned 97:24
  97:25
merchandise 85:1
  85:16 86:3,14,20
  91:2
met 9:15,21
mfm 19:23 20:24
  21:5 107:17 108:1
  108:23 120:6,9,14
  120:16 125:24
microwaves 98:20
middle 4:4
mike 1:4 8:25 9:7
mile 57:7,23
mileage 57:4
  78:25 79:2,11
miles 34:4 57:23
  79:5,18 83:7,16
military 13:5
mind 128:12
mineola 143:3
minus 76:25
minute 52:22
  68:22 134:22
minutes 50:5
  68:17,19 129:10
miscellaneous
  63:3 67:20
misclassification
  11:19
misclassified
  11:21,25
mistaken 114:1
mjp 1:2
models 102:2
moment 66:21
  71:7,14 110:2,14

monday 87:24
  88:3
money 40:25
  61:16,25 130:4
  132:2
month 5:18 46:15
  46:17
monthly 37:20
motor 17:24 30:12
  30:25
mouth 25:19
  103:14
move 45:6
moved 65:23
moving 84:18
multiple 47:13
  89:10 105:1,5
multiples 81:18

n

n 2:2 3:18 20:24
  21:2 31:11 49:1
  50:19,22 51:2,3,4
  139:1 140:2
name 3:22 4:3,25
  15:2 27:2 36:2
  42:17 43:22 45:23
  48:20,22 49:1,2
  50:20 51:19 55:12
  68:11 74:22 92:25
  96:21 116:8 143:5
  143:6
named 50:8
names 48:6,7,21
  97:23 98:1
nancy 20:24 21:3
necessarily 59:6
necessary 72:18
need 8:1 68:18,23
  73:15 101:6
  106:15,16,21
  118:19 122:1

needed 29:17 73:8
  73:16 89:16 90:2
  90:7 104:22
  105:19 132:24
  133:18
needs 34:5
negotiated 80:14
negotiating 80:6
  80:17
net 61:21
never 44:11 48:2
  55:15 61:24 93:23
  95:4 106:12
  107:25 108:2
  118:21 121:7
new 1:2,19,21 3:25
  4:8,13 13:1 22:5
  31:7 32:18 65:21
  139:6 143:1,3
nfm 19:18,25
  20:21
night 100:1
non 113:24
normal 34:20
normally 87:1
notary 1:20
  138:17 139:5
  143:23
note 39:2 84:23
noted 138:8
notes 134:23
  139:10
notice 1:18 93:12
  134:5
noticed 93:11
number 17:24
  23:8,12,20 24:9
  28:21 30:14,17
  31:14 33:2 43:5
  43:15 48:1 64:3
  66:25 71:6 73:1

Veritext Legal Solutions
800-336-4000

[number - paperwork]

81:9 87:18 105:10
122:23 131:4
140:22,24
**numbered** 53:16
77:12 90:17
110:11
**numbers** 53:4
58:14 63:23 67:2
71:9 77:14 81:5
84:6,10 87:17
90:11 91:18 110:4
140:12,14,16,18
141:4,6,8,10
**ny** 143:3,3

**o**

**o** 49:10,10 50:19
50:19,19,22 139:1
**oath** 6:12
**objection** 132:17
133:1
**obviously** 46:16
119:21
**occupied** 66:5,6,7
**occurred** 43:17
**office** 109:5,6,8,9
109:13,20 125:10
125:13,16
**oh** 17:11 57:18
79:5 96:2
**oil** 34:5,10 104:15
104:17 106:1
**okay** 5:10 7:6,7,25
8:7,14 10:2,14
11:1,12 15:9 18:9
21:6,22 27:25
35:10,12 37:25
38:25 44:14 48:4
48:15,17,23 49:9
50:17 52:20 54:7
54:17 55:6,18,23
56:5,16,20 57:11

58:1,24 59:14,20
60:9,25 61:7 62:1
63:9 64:24 65:4
65:16 66:16 68:3
69:1 70:20 71:3
71:14 72:6,19,25
73:6 74:9,13,24
75:4,13 77:7
78:17,22 79:7,13
79:19 81:13 82:11
82:22 83:3,11,20
83:25 84:22 85:21
86:11,17 88:5,11
88:22 89:7,19,24
90:8 92:23 93:2
93:17 94:8,12
95:9,19,23 96:3,10
96:22 97:4,11
98:2,7 99:1,8
100:22 101:11
102:6 103:7 104:3
104:14 105:7
106:7,17 107:4,10
109:14,23 110:20
111:3,14 112:6,15
112:24 113:5,12
113:22 114:10,15
114:22 115:3,14
115:23 116:3,17
116:22 117:15,19
118:1,13,20 119:3
119:13,23 120:10
120:13,20 121:9
121:11 122:11
124:9,24 125:9,19
126:12,18,21
127:7,21 128:9
129:12 130:13
133:25 134:21,25
135:1 136:24
137:21

**old** 45:3 99:2,5,9
100:16 143:3
**onboarding** 14:12
25:16
**once** 31:17,23
43:15 68:13 76:20
103:20
**ones** 95:7
**online** 11:7
**open** 52:22 64:9
71:7 77:11 81:1
84:4 90:18 91:15
**opened** 36:1,13
**operate** 17:22 25:2
42:19 73:16
105:20 133:15
**operated** 36:9
90:4 92:11 97:13
105:11 108:20
130:23 131:5
**operating** 24:25
26:1 33:3,7 35:23
36:7 41:25 55:11
89:11,22 92:20
105:25 106:25
107:16 108:9
131:20
**operations** 109:2
130:19
**opportunities**
130:4 132:6
**opportunity** 44:20
45:9
**option** 73:20
**oral** 6:17
**order** 138:3
**outside** 10:16
**outstanding** 77:2
**overlapped** 83:5
**owed** 77:4,5

**owned** 15:16
33:12 109:2
**owner** 21:23 23:4
37:12 38:21
**ownership** 22:8,24

**p**

**p** 2:2,2
**p.c.** 2:4,14
**p.m.** 1:11 138:8
**pa** 31:13,18
**package** 62:20,24
**pads** 72:1,7 73:1,7
73:13,21,25 76:3
106:12
**page** 110:12,21
111:15 112:3,20
113:13 114:11
116:5 120:4
122:23 137:23
140:6 142:4,4,9,14
142:18,18 143:7
**paid** 16:7,13 25:21
26:5,6 27:10,21
28:10 36:23 38:7
38:19 39:13 42:12
44:16 56:1,24
57:6 58:7 60:22
61:21 62:2 63:14
63:16 65:7,13
78:24 79:21 80:14
81:22,24 83:22
99:7 101:16 104:6
113:8 117:6 121:5
122:7 123:4
**painted** 43:3
**pallet** 20:25 21:9
21:14
**paper** 52:18,19
70:18
**paperwork** 100:21
100:25 116:14

[part - questions]

part  98:24
parted  19:8
partners  19:9
party  139:12
pass  135:11
passing  87:9
pay  26:2 37:14,23
    39:3 86:25 102:25
    120:21 134:8,10
    134:14
paychex  27:5,6,11
    28:4 29:7,9
    120:22,25 121:5
paying  101:13
payment  38:20
    40:6 63:4 66:10
    76:5 78:19 118:3
payments  36:16
    36:24 37:2 38:3
    39:8 46:12 54:8
    72:12 74:16 91:8
    117:4
payroll  24:20 26:8
    26:11,14,15,18
    27:3,7 28:6 42:4
    120:6,22 121:1
    125:24
pending  3:25 8:4
    11:18
pennsylvania
    31:16,20,24 32:3
people  59:12
    65:23
percent  22:11
    33:10 96:2 102:15
    126:9
percentage  66:14
performance  76:9
    76:13,24
performed  40:17
    127:10

performing  51:16
period  9:17 23:17
    29:6 47:19,21
    48:13 49:18,23
    50:1,10,24 51:9
    83:4 92:20 108:15
person  6:7 7:9
    15:8 69:9
personal  15:8 36:4
    36:4,9 37:17
    38:24 39:2,9,10
    40:6,9,13 68:23
    126:24
personalized
    132:3
personally  30:21
    32:3 39:14 40:17
    40:25 136:15
phone  33:21 52:1
    68:17 106:18,24
    107:2,5,9 109:1
    126:22,24
phones  106:19,22
piazza  1:20 139:4
    139:16
pick  99:2,4 100:5
picked  58:25
    99:10
piece  70:17
pinned  5:7
placard  42:22,24
    43:2
placards  43:12
place  85:22
placed  117:24
places  37:5 132:21
plaintiffs  1:5 2:8
    3:14
please  3:7,16 4:2
    29:21 105:22
    138:5

plus  57:3
pm  34:5
point  6:20 8:2
    63:13 73:5 74:5
    86:6 97:10 115:19
policy  103:24
portion  112:7
position  13:18
possession  10:22
possibility  96:23
    122:19 124:14
possible  68:20
    113:19 121:7
    123:6,8
possibly  24:17,22
    24:24 31:17 33:10
    92:25 106:6 137:7
potential  45:13,16
power  33:1
preferred  6:18
    102:3
preparation  10:23
prepared  10:8
present  2:21
pretty  12:12 15:3
    25:13 27:12 28:6
prevent  8:9
preventative  34:6
previous  76:12
printout  53:20
    94:14
prior  14:15 82:10
probably  69:5
    79:12 82:9 83:17
    90:6 97:25
problem  29:24
    135:15
problems  34:11
proceedings  6:5
process  14:12

produce  16:18
    110:18 129:2
produced  16:15
    41:4 46:10
product  56:14
production  142:7
professional
    124:16
profit  114:13
    125:20 132:15
profitability  132:7
pronounce  48:25
    49:12
proprietor  112:12
provided  6:4 28:2
    106:3 110:17
    117:13
providing  6:12
    18:24 41:7 54:22
    126:15
public  1:20 138:17
    139:5 143:23
purchase  34:25
purposes  6:16
    33:23
pursuant  1:18
put  21:14 41:9
    45:10 54:9 55:21
    60:20 69:10 73:11
    92:24

q

qualification
    67:21
qualified  68:13
question  7:19,22
    8:4 16:9 18:11
    28:7 56:23 68:16
    77:9 100:13 132:5
    132:19
questions  7:15
    18:14 60:12 71:23

Veritext Legal Solutions
800-336-4000

[questions - repairing]

75:6 118:15
134:25 135:14,17
142:17
**quick** 135:17
**quillen** 2:18 3:10
3:10,21,22 4:1 5:6
5:13 29:22,24
52:21 53:2,8,12,17
56:22 64:2,6,15
66:19 67:6,9
68:21 69:5,19
71:3,13 75:7,14,22
77:10,20,24 78:3
81:1,9,12 84:3,10
84:14 85:11 90:15
90:21 91:15,25
92:1 109:25 110:9
110:15 129:12
134:21 135:10
137:19 140:7
**quillen's** 53:6
63:25 67:4 71:11
75:20 77:16 81:7
84:8 90:13 91:20
110:7
**quit** 9:24 18:24
48:16

**r**

**r** 2:2 3:18 31:11
39:25 49:1,5
50:19,21 51:2
139:1
**r&l** 18:18
**ran** 12:4 68:1
**rate** 27:21 28:10
28:17 56:8,25
57:3,6,13 58:4,7
60:22 65:11,12
78:9,19 80:14,16
80:16 83:22
101:12 103:25

**rates** 103:17
**ready** 90:1 130:7
**really** 9:22 55:15
106:21 121:7,25
**reason** 7:18 66:17
70:9,22 88:8
95:10,14 105:14
134:17,20 143:7
**reasons** 34:23 85:6
**recall** 14:18 19:4
20:2 23:16 24:14
26:4,7 27:2 28:17
28:24 29:2 30:2,6
30:13,15 31:25
32:8 33:6 35:20
41:18,23 45:12,15
45:20 46:5,6,23
47:4,7,11,20 48:7
48:20,21 49:7,15
49:17 50:1,10,20
50:24 51:9,18,23
51:24 52:2,6,11,12
52:13 55:14 56:12
56:21 57:8 58:5
59:21,25 60:15,24
62:12 63:5,10
65:7,9,14,25 67:22
70:8 72:14,20
73:2,23 74:3,18
75:1 78:14 80:6,9
80:13 81:17 85:3
85:17,18 88:15
89:23 90:3 93:16
94:3,22 95:12,24
96:19 97:15,20,22
101:1,10,12 103:4
107:3 112:25
113:10 118:11,20
118:23 119:19
120:15 123:21
128:10 130:5,6,10

130:22 131:13
132:13 134:20
136:3,7 137:1,14
**receipts** 112:17
116:18 122:24
**receive** 95:6
126:10
**received** 11:4 13:9
36:16 40:25 46:13
53:20,24 54:10
82:5 89:5,15 94:2
94:19 96:15 100:4
110:1 113:18
116:25 117:5
122:10 123:12
129:13 135:22
**receiving** 52:13
81:17 116:13
**recess** 69:15 135:6
**recipient** 115:20
**recognize** 110:16
**recognized** 51:20
**recollection** 40:11
82:1 92:10 117:22
**reconnect** 69:8
**record** 3:8 4:3
6:23 7:3 8:4 35:14
64:2 69:14,18
118:16 121:12
135:5,9,11 137:22
**records** 29:4 41:19
41:24 47:24 86:18
92:17 105:9
116:13 121:22,25
128:15,19 133:8
**reduce** 101:7
**refer** 10:3
**referred** 103:19
**referring** 10:5
12:7,15

**refrigerator** 98:17
99:4,5
**refund** 76:24
**regarding** 5:15
8:22
**regardless** 82:4
**regional** 46:1
**regular** 34:2
**reimbursed**
113:24
**reimbursement**
57:10
**relate** 120:14
127:9 136:10
**related** 85:4
105:25 119:6
120:2 139:12
**relates** 75:15 78:1
84:12 90:19 118:7
124:18
**relationship** 76:23
**remainder** 38:20
**remaining** 58:11
**remember** 23:24
26:3,5 30:4 45:23
45:24 47:10 50:4
50:7,16 51:5 54:1
54:2 55:15 59:18
62:15 76:19 81:20
81:21 94:5,22
98:1,8 122:18
127:15,25 135:24
**remote** 1:16
**removed** 127:16
127:17 128:1
**rent** 105:4
**rental** 101:20
**repair** 35:5 104:21
104:24,25
**repairing** 34:21

**[repairs - second]**

| | | | |
|---|---|---|---|
| **repairs** 104:5 105:5 | 112:8 125:7 128:20 | 110:9,25 111:5,8 111:12,13,19,23 | **sancher** 49:1,3 |
| **repeat** 16:9 105:21 | **returned** 61:24 | 112:2,11,18,22 | **satcher** 49:4,25 |
| **repeatedly** 73:15 | **returns** 41:3 109:4 | 113:9 114:7 115:7 | **saturday** 56:2 58:12 88:3 |
| **replace** 106:15 | 118:10,19 127:3 | 115:11,17,18,21 | **save** 132:20 |
| **replaced** 33:21 | 135:20 137:2 | 116:9,15,20 | **saw** 14:9,19 |
| **replacing** 99:3 | **review** 10:15 11:3 | 117:13 119:25 | **saying** 21:2 128:7 |
| **report** 123:24 | 129:14 134:23 | 120:3 121:10 | **says** 59:10,25 |
| **reported** 16:5,10 | **reviewed** 11:13 | 122:5,8,21,25 | 61:19 65:10 67:8 |
| 40:8 113:1 114:17 | 65:1 | 123:2,25 124:22 | 81:16 119:18 |
| 122:24 125:20 | **right** 10:7 15:22 | 125:7,23 126:2,8 | 121:23 124:1 |
| 127:9 | 19:15 25:6,22 | 126:24 127:1,1,4 | **schedule** 87:22 |
| **reporter** 3:16 7:12 | 31:7,12 32:23 | 127:14 129:18,24 | 88:1 89:2 112:8 |
| 138:2,6 141:13 | 33:8 34:14 35:6 | 132:16 133:6,7 | 113:2,14 114:12 |
| **reporting** 143:1 | 36:10 38:4,8,14,16 | 137:19 138:6 | 116:4,8,11 117:1 |
| **reports** 123:19 | 40:9 41:1 43:17 | **riordan** 2:4 | 120:5 122:22 |
| **represent** 3:9 92:3 | 44:17,22 45:8 | **road** 143:3 | 127:9 128:22 |
| **represented** 4:20 | 46:4 48:1 49:14 | **rochester** 17:10 | 129:2,20 135:24 |
| **representing** 3:11 | 50:6 53:1,12,25 | 97:9 | **scheduled** 89:10 |
| **request** 142:7 | 54:12,20,23 55:1,4 | **roof** 34:16 | 89:12 |
| **requested** 72:15 | 55:8,13 56:3,9 | **room** 69:11 | **school** 12:17 13:9 |
| 130:9,11 | 57:1,4,7,24 58:9 | 109:12 135:3 | **scopelitis** 2:13 |
| **required** 26:17 | 58:14 59:2,9 | **route** 32:15 60:3 | 3:11 |
| 30:10 34:1 101:25 | 60:14,15,23 61:5 | **routes** 12:9 | **scopelitis.com** |
| **requirement** | 61:22,23 62:3,17 | **ruling** 142:17 | 2:19 |
| 43:14 | 63:20 64:10 65:2 | **run** 38:23 65:15 | **scott** 4:5 |
| **requirements** | 66:8,23 67:12,16 | 67:24 | **scratched** 85:25 |
| 102:7 | 69:20 70:3 71:17 | **running** 120:22 | **screen** 53:7,9 64:1 |
| **reside** 4:12 | 73:17 75:5,11,23 | 133:4 | 67:5 71:12 75:21 |
| **resided** 4:9 | 76:6,8 77:8,24 | | 77:17 81:8 84:9 |
| **residential** 21:18 | 78:6,13,20 80:3,23 | **s** | 85:7 90:14 91:21 |
| 22:19 66:4 | 83:23 84:1,17,20 | **s** 2:2 4:4 49:1,2,2,5 | 110:8 |
| **response** 11:10 | 86:1,8,15 87:4,10 | 49:10 50:8,22 | **sdo** 32:11 78:10,16 |
| **responsibility** | 87:12,13,19 90:9 | 140:10 143:7 | 79:14 80:11 |
| 34:13 | 90:19,24 91:6,12 | **safety** 30:25 | **searched** 47:3 |
| **responsible** 34:21 | 91:14,25 94:24 | **sake** 129:4 | 117:7 |
| **retail** 66:2 | 95:2,21 96:8,9,12 | **salary** 27:12,14 | **sears** 56:15 98:12 |
| **retained** 141:13 | 96:19,21 97:7 | 37:11,13 | 127:17,19,24 |
| **return** 99:11,15,24 | 98:12 102:14 | **sale** 65:20 | **second** 29:21 53:1 |
| 100:9,10,16,17,20 | 104:7 107:7 | **sales** 112:17 | 76:5 82:24 83:5 |
| 102:24 111:25 | 108:16 109:24 | 116:19 122:24 | 91:7 96:13,25 |

[second - situation]

99:19 111:15
113:13 120:4
128:24
**seconds** 52:25
**see** 5:4,8,10,11
53:9 55:5 57:12
57:15,18,20,20
60:7,10 61:10
64:8,16,17,22,23
65:16 66:11 67:10
67:14 71:20 72:2
72:9 74:16 78:4
78:25 79:22,23
82:17 83:1,8,9,16
84:15 90:22 91:7
94:10,11 95:3,22
96:7 111:1,16,21
112:3,9,13,23
113:15 114:14,19
118:4,5 129:12
**seeing** 94:5,23
95:12,17 97:19
**seen** 6:18 93:23
95:4 135:25
**select** 104:11,22
**sense** 60:21 78:21
**sent** 10:24 11:3
122:4
**separate** 35:19
37:4 54:10 59:5,6
74:2,6 75:9,10
97:1 109:6,10,12
115:4 120:21
123:15 125:13,16
136:12
**separately** 37:3
**serve** 13:5
**service** 42:12 80:2
104:11,12,13
106:5 107:8
112:12

**services** 14:22
15:11,14,15,21
16:6,12 17:12,20
18:4,21,25 20:9,22
21:24 22:8,19,25
23:3,6,9,13,21
25:22,23 26:25
28:2,22 29:6,14
30:1,11 34:13,19
35:3,5,15,25 36:8
36:14,18,21,24
37:12 38:3,13,19
39:15 40:3,14,22
41:7,13,17,21,25
42:5,8,8,15,17
43:6,10,24 44:5,8
44:12 48:8 49:19
50:11,25 51:16
52:3,7 54:23
55:11,20 63:17
68:6 87:8 89:9
91:6 92:12,21
96:9 98:11 104:6
106:4 107:11
108:6 109:2 113:9
115:21 116:7,14
117:4,12,12 119:5
119:7,8 121:2
122:8 123:5,19
124:5,12,17,19
126:7,15,15
127:10 134:13
**services's** 37:15
44:17 101:16
107:19
**set** 12:4,6 37:13
39:6 46:2 87:21
98:22 133:17
**settings** 5:9
**settlement** 32:10
52:14 53:19 54:11

55:13,24 57:13
60:11,14 61:3,8
64:21 66:9 68:7
70:1,15 71:4,18,24
72:16 76:1,10,12
81:18 82:6 84:24
86:13 87:2 92:4,8
93:4,14 94:1,10,18
97:1 106:10
**settlements** 63:19
**seven** 28:25
133:15,21,23
**sh** 65:14 83:6
**shakes** 6:18
**shared** 53:7 64:1
67:5 71:12 75:21
77:17 81:8 84:9
90:14 91:21 110:7
**sharing** 53:9
**sheet** 55:13 57:13
60:19 61:3,9
84:25 86:13 92:4
97:1 143:1
**sheets** 93:14
**shipped** 21:15
**shirts** 43:19,24
44:4 74:15,19
80:19
**shop** 103:16
**shopping** 103:21
103:21
**show** 6:19 12:5
47:24 59:16 90:15
92:8,18 95:1,20
96:16 105:10
109:25 114:12
115:20 116:13
134:3,5
**showed** 93:4,6,13
112:21 135:20,22

**showing** 54:15
106:10 110:10
112:2 116:7 122:7
**shown** 53:5 54:21
55:7,12 63:24
67:3 70:23 71:10
75:20,25 77:15
81:6 82:19 84:7
88:6 90:12 91:19
95:15 110:6
**shows** 46:11 55:3
55:25 56:8,11
62:24 66:10 70:1
74:15 83:5 112:1
112:11,16 113:14
114:23 137:2
**shuttle** 56:13,25
65:15,18 83:6,18
83:18
**sic** 19:18,25 20:21
**side** 42:25 69:11
**sign** 11:6 119:2
**signage** 43:8
**signature** 137:24
139:15
**signatures** 47:13
**signed** 47:8 69:4
**signing** 46:23 47:4
47:11 63:10
118:23
**similar** 53:18 66:1
67:18
**similarly** 108:18
**simultaneously**
107:17
**sir** 12:18 18:14
64:16 67:7
**sit** 70:21 85:3,16
91:9
**situation** 34:15

Veritext Legal Solutions
800-336-4000

[six - taken]

**six** 5:24 24:24 28:22 45:19 72:7 101:14
**size** 42:23 102:8 102:10
**slafias** 48:25 49:2 49:4
**slider** 72:8
**sneaking** 7:11
**solely** 51:15
**solutions** 139:16
**soon** 66:6
**sorry** 4:25 27:23 28:7 29:20,23 35:11 48:11 51:4 56:21 62:22 66:21 68:25 77:21 79:9 85:11 95:13 99:20 105:2 116:6,10 118:3,14 121:2 123:7 128:6,23
**sort** 26:21 31:3 47:1 57:9 85:19 106:1
**sound** 46:12 47:25
**sounds** 9:7
**source** 37:8
**south** 12:23 79:12
**space** 66:5 109:6 109:10
**speak** 7:9
**special** 79:21,25 80:2,7,11
**specials** 59:25 60:12
**specific** 70:6 87:9 104:16 131:2
**specifically** 12:13 72:7,21 128:11
**spell** 39:24

**spelled** 40:1
**spirit** 19:18,23 20:5,9 107:18,23 108:19,20
**spiro** 18:17
**spoke** 45:20
**spoken** 5:21 8:25
**sporting** 20:19
**spots** 60:20
**spreadsheet** 53:15 64:18,20 67:7,17 69:22 81:2,14 93:5,18 94:1,18 95:5
**spreadsheets** 87:15 92:8 106:11
**stand** 56:17
**standards** 109:21
**start** 7:15 17:7,9 63:6,7 104:15
**started** 15:21 28:3 33:16 35:21 46:14 46:24 74:3 87:11 103:18,21,21 120:18 123:9 137:11
**starting** 97:10
**startup** 73:8 113:14
**state** 1:21 3:8 4:2 79:10,11,16 139:5
**statement** 53:19 54:11 55:25 60:11 60:14 64:21 66:9 68:8 70:1,15 71:4 71:18,25 75:8 76:1,11,12 82:6 94:10
**statements** 32:11 52:14 72:16 75:10 81:18

**states** 1:1 32:18,25
**station** 133:5
**stenographic** 139:10
**steve** 51:2
**stivers** 2:22
**stood** 58:5
**stop** 58:20,22 59:15 60:23 65:6 76:21 128:14
**stopped** 127:24
**stops** 27:19 58:13 58:18 59:7,10,12 59:17 65:8 78:24
**store** 56:15 65:18 107:22
**stove** 98:16
**strap** 72:9
**straps** 72:5 106:6 106:13 108:25
**street** 2:5,15
**strict** 25:15
**stub** 134:10,14
**stuff** 26:19 123:16
**subscribed** 138:13 143:21
**success** 40:21
**supplied** 43:21 44:1,4,10 72:4 74:22 123:18
**supplies** 106:5,9
**supply** 106:19
**support** 19:12 142:1
**suppose** 79:6
**supposed** 5:3 104:10
**sure** 6:9 7:21 20:3 29:12,22 35:13 38:1 40:10 41:8 41:10 42:2 43:16

43:18 46:21 47:14 48:25 49:21 52:24 53:2 60:18 67:25 68:9,11,14,21 74:12,23 75:3 78:15 85:8 88:9 92:16 93:9 94:15 98:23 105:15,23 107:8 109:22 113:4,19 114:4,19 114:21 116:11 117:9,14,18 119:8 119:10,15,22 120:9,17,19 121:6 121:20 122:3 123:22 124:14 125:3,4 126:3 127:20 128:2 129:5 131:1 132:4 137:5
**swear** 3:16
**sworn** 3:19 138:13 139:8 143:21
**syosset** 17:10 97:6

**t**

**t** 3:18 31:11 39:25 49:5 50:19,21,21 51:2,3,4 139:1,1 140:10
**tab** 67:8 71:18 75:15 82:15,24 83:5,13 96:13
**tabs** 64:12 81:15
**take** 8:1,6 16:2 26:16 37:11 38:20 56:14 62:17 63:21 66:21 68:18,21,22 68:23 82:12 83:19 129:10 134:22
**taken** 1:17 40:6,12 62:11 69:16 114:2

[taken - transportation]

135:7
**takes**  34:16 35:5
**talk**  95:13
**talked**  5:22 9:23
76:4 104:4 106:9
111:10
**talking**  7:13 99:21
104:13 120:18
**tax**  41:3 109:4
111:25 112:8
118:10,19 125:6
127:3 128:19,20
135:20
**taxes**  15:5,7 26:18
41:9 113:6,21
114:20 118:9,24
121:8 124:13,25
**team**  72:9
**teams**  24:12
**tear**  34:20
**tell**  60:5 80:4
86:13 104:9,17,23
118:22 133:20
134:1
**telling**  81:11 118:8
**tells**  34:7
**ten**  14:17
**terminated**  76:22
134:18
**terms**  93:6
**testified**  3:20
136:1
**testifying**  8:9
**testimony**  6:13
16:13 117:10
125:25 126:13
136:6
**tests**  67:24
**texas**  2:16
**thank**  5:12 135:13
138:7

**thing**  17:17 84:23
89:14 106:2
108:23
**things**  6:9 7:1,2
10:24 19:11 26:22
60:20 68:23 71:24
72:5 73:14 74:1
103:15 105:1,5
118:17 119:10,15
123:17 128:13,14
**think**  7:2 24:19,21
31:10 66:13 70:9
70:22 81:23 82:12
87:1 94:13 95:14
102:12 121:4
123:9 127:2 128:1
128:25 129:7
130:16 135:19
**thought**  123:16
128:6
**three**  24:21,25
25:3 33:9 74:15
89:25,25
**thursday**  56:2
58:12,17 83:7
**tie**  40:16 72:4,8
73:2,10,12,21 74:1
**ties**  72:1 73:7 76:3
**time**  3:5 7:9,12
9:14,17 14:1 16:2
18:2,6 22:15
23:10,14,16,21
24:18 28:2,13
29:6 45:3 47:7,19
47:22 48:13 49:17
49:23 50:1,10,24
51:9 52:15 62:12
66:7 68:25 69:14
69:18 72:22 73:24
74:20 83:4 86:6
88:4,21 89:13

92:21 100:23
102:15 108:15
115:19,25 116:12
130:23 133:18
134:6 135:5,9
137:22 138:8
**times**  5:20,23
31:25 32:8 88:12
93:3,11
**title**  23:2
**tna**  55:19 64:14,14
67:8 71:18 75:15
75:17 81:15,15,16
82:15,15,24
140:20
**tna2**  81:16 82:24
**today**  4:21 6:6,10
8:10 10:9 70:21
85:4,16 91:10
101:19
**today's**  3:4
**told**  30:9 34:5
88:13 122:16
133:19,22
**tony**  51:7
**top**  57:17 94:9
121:19
**tossed**  121:18
**total**  61:3,18,18
131:4
**totalling**  118:3,4
**town**  32:12 78:12
79:3,15
**traina**  1:17 3:3,21
4:5 8:15 14:21
15:11,13,15,21
16:6,11 17:12,20
18:4,20 20:8,22
21:23 22:8,18,25
23:3,6,9,13,21
25:12,22,23 26:25

28:22 29:6,13
30:1,11 34:13,19
35:2,4,15,24 36:8
36:14,17,21 37:12
37:15 38:3,13,19
39:14 40:14,22
41:12,17,21,25
42:5,8,15,17 43:6
43:10,24 44:5,8,12
44:16 48:8 49:18
50:11,25 51:16
52:3,7 53:8 55:11
55:20 63:16 64:17
67:22 68:6 69:10
69:20 85:8 87:8
89:9 91:5 92:12
92:21 98:10
101:16 104:6
106:3 107:11,19
108:6 109:2 110:4
110:13 112:3
113:8 115:20
116:5,7,14 117:4
117:12 119:7
121:1,2 122:7,23
123:4,19 124:4,11
126:7,14 127:10
129:18,24 134:13
135:13,19 138:10
139:7 140:4
141:10 143:6,19
**traina's**  129:2
**transcript**  6:20
138:4
**transcription**
139:10
**transmitted**  52:17
**transportation**
13:12 14:4 15:20
17:19,23 31:2,6

Veritext Legal Solutions
800-336-4000

**[travel - week]**

travel 32:14,17
treat 27:17
truck 25:5,8 33:20
  34:16 55:17 56:18
  56:25 57:1 58:8
  65:13 73:3,4,12,17
  73:19 74:1 76:20
  78:19 83:15 92:11
  92:20 96:25
  100:17 101:8,23
  101:24 102:9,10
  104:22 105:17,24
  105:25 108:9
  114:23 119:23
  137:9
trucking 112:13
  113:9 117:12
trucks 24:12,22
  25:1,3 33:2,7,12
  33:18 34:3 42:18
  43:9 89:11,16,22
  90:1,2,4 96:1
  101:3,6 102:17,21
  103:2,9 105:11
  107:12,19,22
  108:4,13,18 130:8
  130:17,22 131:2,2
  131:3,5,8,14 134:2
true 6:13 22:14
  139:9
truth 118:22
truthfully 8:10
try 7:16 121:24
trying 52:22 94:6
  122:9,19 123:9
tuesday 56:1,7
turn 69:6 100:25
turning 118:24
two 9:6 19:19,21
  25:9 52:12,25
  54:3,4,9,15 59:12

65:12 67:18 72:12
  72:16 74:16 80:19
  81:15,22,25 82:3,8
  83:21 90:2 101:6
  108:5 111:2
  122:13 123:13
  126:6 127:11
  131:7
tx 139:17
type 20:8,10,16
  21:12 56:8 58:4
  65:11 78:9 83:15
  101:23

**u**

ugo 120:6,11
  125:24
um 6:2 7:1,2 14:5
  18:9 38:9 73:11
underlying 125:6
understand 6:9,11
  6:24,25 38:2
  62:11 100:12
  132:4,18
understanding
  11:17,24 16:7,21
  41:11
understood 7:4
unfortunately
  35:7,8
uniform 74:14
  80:18
uniforms 44:10
  76:4
united 1:1
units 33:1
university 13:3
updated 33:4
use 26:9 27:3,6
  103:13 107:5
  108:3 109:5,7,19
  133:6

uses 39:10
usually 105:5
  134:10

**v**

v 1:6 3:18 143:5
vague 132:17
van 13:14 14:2
  15:19 45:7 136:12
varied 88:1
vehicle 34:12 35:4
  39:2
verbal 6:17
veritext 139:16
  143:1
veritext.com
  139:17
version 47:12
video 5:7 6:19
  69:6
videographer 2:22
  3:2,15 69:13,17
  135:4,8 137:21
videotaped 1:16
view 5:9
virtual 1:16

**w**

w 26:24 29:10
  39:25 49:10,10,15
  50:22
wabash 4:7
wages 123:24
  124:11
wall 86:1
wanna 24:22
  49:20 61:1
want 5:16,18,22
  6:8 19:10 78:7
  84:23 88:13
  126:23 129:9

wanted 35:13 45:4
  45:6 60:5 66:22
  69:25
warehouse 17:9
  21:15 56:15 59:2
  89:17 99:16,25
  100:9,10,18
  107:13,14,23
  130:24
washer 98:16
way 12:3,3,6 68:17
  91:3 99:12
ways 19:9,9
we've 67:18 84:18
  111:10
wear 34:20 43:20
  43:24 44:3
weber 2:9 3:13,13
  5:1,15,21 69:9
  128:23 129:19
  132:17 133:1
  135:2,16,18
  137:18 138:3,5
  140:8
website 30:19
wednesday 56:1
  58:3
week 27:15 28:9
  28:15 31:17,23
  37:22,24 38:7
  40:19,23 54:2,12
  55:1 56:23 58:12
  61:22 67:13 69:22
  70:3,14 71:19
  75:15,17 76:15
  78:1 81:19,24
  82:3,6,9,9,13,16
  82:25 84:12,19,19
  87:16 95:1,8 96:5
  101:8,14 105:12
  132:3,8,16 133:15

[week - zoom]

133:22,24 140:20
**weekends** 87:25
**weekly** 37:20
38:18 39:7 53:23
86:25 101:4
**weeks** 41:16,20
54:3,9 75:10
81:22,25 88:1
111:11
**went** 14:11 20:4
30:19 104:19
105:18
**western** 1:2
**whitendale** 130:15
**williamsville**
12:23 13:1
**wilson** 9:3,10
50:21 97:18
**winter** 80:20
**wise** 79:11
**wish** 138:3
**withheld** 61:13,20
61:24 62:5
**withholdings**
26:16
**witmar** 39:23
**witness** 3:17,19
5:3,10 29:19,23
52:24 53:6,11
63:25 64:4 67:4
68:14 69:1 71:11
75:20 77:16,18,22
81:7 84:8 85:7
90:13 91:20,22
99:18 110:7 135:1
135:12,15 139:7
140:3 142:3
**witness's** 3:5
**word** 25:19 61:23
103:14 104:12
124:7

**wording** 45:10,12
**words** 58:23
**work** 6:10 17:2,16
20:12,16,21 23:6
25:15 40:16,22
44:25 46:17 52:3
52:7 80:1 87:24
88:13,19 93:4,13
96:14,17 106:3
126:5 127:10,24
134:5
**worked** 12:3,11
23:9,20,25 60:24
87:17 133:9
**worker** 87:10
**worker's** 61:15
**workers** 14:10
62:5,7,13 95:2,25
119:24
**working** 9:11,12
26:10 41:13 98:23
129:6,8
**works** 81:3
**worried** 55:16
**worry** 131:24
**worth** 2:16
**written** 128:14,16
**wrote** 70:17

| x |
|---|

**x** 1:3,9 140:2,10
**xpo** 18:17

| y |
|---|

**yeah** 16:14 23:11
24:11 26:18,19
31:13 34:4 43:18
46:14 47:1 52:15
57:20 68:9 72:3
73:18 78:21 79:5
79:17 80:4,24
83:9,17 87:11

93:23 95:3 96:7
97:3 98:19 100:1
101:9,18 104:19
106:12 112:19
115:12 120:1
121:15,23 123:8
124:23 125:15
126:25 130:19
132:18 134:14
135:25 136:22
137:7,11
**year** 14:18 16:19
19:4 23:24 24:14
31:4 33:5 39:12
40:13 46:8,13,20
49:21 51:6 92:18
103:6 113:10
114:4,13,18
116:19 117:20
118:25 119:11
121:11 122:12
123:24 124:23
125:2,21 126:8
127:2,22 137:4,8
137:13
**years** 13:13 14:17
19:13 28:25 29:12
92:13 122:17
129:7,9,17,21
136:2
**york** 1:2,19,21
3:25 4:8,13 13:1
22:5 31:7 32:18
139:6 143:1,3
**yup** 48:18 55:2
112:5,10

| z |
|---|

**z** 49:10
**zoom** 6:8 7:10

Page 20

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 27

```
 1              UNITED STATES DISTRICT COURT

 2             WESTERN DISTRICT OF NEW YORK

 3   - - - - - - - - - - - - - - - - - - - - - - - -
     MIKE KLOPPEL and ADAM WILSON, on behalf of
 4   themselves and all other similarly situated

 5   persons,

 6            Plaintiffs,

 7   v.              Civil Action No. 6:17-cv-6296-FPG

 8   HOMEDELIVERYLINK, INC.,

 9            Defendant.

10   - - - - - - - - - - - - - - - - - - - - - - - -

11   Deposition Upon Oral Examination Of:

12                Adam D. Wilson

13   Location:     120 East Avenue, Suite 200

14                 Rochester, New York 14604

15

16   Date:         December 3, 2019

17

18   Time:         10:00 a.m.

19

20

21   Reported By:  CHRISTINE KESTER

22

23

24

25
```

1                ADAM D. WILSON - BY MR. BUTCHER

2    for their certified transcript charge, including any

3    expedite or other related production charges;

4                AND IT IS FURTHER STIPULATED, that the

5    Notary Public, CHRISTINE KESTER, may administer the

6    oath to the witness.

7                    *       *       *

8                (The following exhibits were marked for

9                identification:  Exhibits 1, 2 and 3.)

10   ADAM D. WILSON,

11               called herein as a witness, first being sworn,

12               testified as follows:

13               EXAMINATION BY MR. BUTCHER:

14               Q.   The court reporter has handed you what's

15   been marked as Exhibit 1.  Mr. Wilson, can you take a

16   look at Exhibit 1?  I'll represent for the record that

17   it's a printout from the New York State Department of

18   State Division of Corporations.  It lists ECC Movers,

19   LLC.

20               Mr. Wilson, are you familiar with ECC

21   Movers, LLC?

22               A.   Yes.

23               Q.   Are you the owner of ECC Movers, LLC?

24               A.   Yes.

25               Q.   And have you been the owner of ECC Movers

```
 1                ADAM D. WILSON - BY MR. BUTCHER
 2          Q.   Let's go back to Exhibit 2.  If you look
 3     at part 2, under advertising is a $1,200 expense for
 4     advertising.
 5               MR. ALBA:  Are we still on the 2014
 6     Schedule C?
 7               MR. BUTCHER:  We are.
 8               MR. ALBA:  Thank you.
 9          Q.   Mr. Wilson, do you recall what the
10     advertising that ECC Movers did was for?
11               MR. ALBA:  Right there (indicating).
12          A.   330 -- oh, $1,200.  Offhand, I don't know
13     exactly what that was for.  Probably -- usually we
14     advertise for like baseball teams and stuff like that
15     and just like shirts or whatever, like sponsorships
16     for like, you know, baseball clubs or something like
17     that.  That's probably what that would be for.  I
18     usually do that every year for my nephew's team.  So
19     we usually do something like that for them.
20          Q.   Besides advertisement for your nephew's
21     baseball team, any other advertisements that you
22     recall ECC Movers running?
23          A.   Not at that time.
24          Q.   Was there any advertising that ECC Movers
25     did other than the baseball team at any point?
```

```
 1                ADAM D. WILSON - BY MR. BUTCHER
 2          A.  Not at -- at this Exhibit 2, no.  I don't
 3     remember.
 4          Q.  I'm not limiting it to Exhibit 2.  Is
 5     there any advertising --
 6          A.  So no.
 7          Q.  Is there any advertising that ECC Movers
 8     has done at any point during its existence other than
 9     for your nephew's baseball team?
10          A.  Recently when we purchased our own
11     vehicles, we advertise on our trucks.  So we do have
12     advertisement on those, logos, stuff like that.
13          Q.  At line 15 of the Schedule C -- again,
14     we're still on 2014 -- lists $15,408 in insurance.  Do
15     you see that?
16          A.  Yes.
17          Q.  Do you know what insurance products were
18     purchased with that money?
19          A.  That would be more than likely -- I don't
20     know offhand again.  But that would more than likely
21     be probably insurance to carry whatever HDL's
22     requirements at the time were.
23          Q.  Were there any insurance that you had to
24     have for the Appliance Associates' work?
25          A.  Again, that would probably be something
```

1          ADAM D. WILSON - BY MR. BUTCHER

2          Q.  Do you have documentation that identifies

3     how much Mike Thurston paid for that one and a half

4     percent interest?

5          A.  I don't think he paid anything to be

6     honest with you.

7          Q.  Is this the -- would you have used the

8     zoom legal products to facilitate this transaction?

9          A.  No.  I believe we used our accountant.

10         Q.  How long has William Rager been a member

11    of the company?

12         A.  Same time, a year.

13         Q.  What was the rationale for bringing

14    William Rager in as a co-owner?

15         A.  Same thing.

16         Q.  Same thing as Mike Thurston?

17         A.  And he deserved it, yeah.

18         Q.  So did Jim, Mike and William share in any

19    profits of ECC Movers?

20         A.  Any profits?

21         Q.  Correct?

22         A.  At the end of the year, yeah.

23         Q.  Is Jim Wilson now on a salary basis?

24         A.  Yes.  I believe so.

25         Q.  Do you know what his salary is?

1           ADAM D. WILSON - BY MR. BUTCHER

2           Q.  How are you paid for the work that ECC

3    Movers does?

4           A.  Just get a -- end of the year, K1 at the

5    end of the year.

6           Q.  Do you ever take disbursements during the

7    year?

8           A.  When needed.

9           Q.  And are those withdrawals based on how

10   well the company is doing financially?

11          A.  Yeah.

12          Q.  Other than those withdrawals, there is no

13   pay you receive from ECC Movers?

14          A.  No.

15          Q.  That was a double negative.

16              It's accurate to say that there are no

17   payments other than the withdrawals that you receive

18   from ECC Movers?

19          A.  Correct.

20          Q.  And has that been the case since the

21   formation of ECC Movers in 2011?

22          A.  Correct.

23          Q.  So you do not take separate pay for labor

24   or services provided as a driver on the days you would

25   work as a driver for ECC Movers?

```
 1              ADAM D. WILSON - BY MR. BUTCHER
 2   purchase trucks?
 3         A.  Correct.
 4         Q.  How many trucks does ECC Movers currently
 5   own?
 6         A.  Eight.
 7         Q.  After the contract was terminated in 2016
 8   with HDL, ECC Movers continued to provide services to
 9   Appliance Associates?
10         A.  Correct.
11         Q.  Any other customers that ECC Movers
12   provided services to after terminating the contract
13   with HDL?
14              MR. ALBA:  Object to the form.
15         A.  Orville's.  We started Orville's a little
16   bit after that, I believe.  About two years ago, so
17   roughly right around that time.
18         Q.  So other than Orville, Appliance
19   Associates and the contract with HDL, those are the
20   three contracts that you serviced since forming ECC
21   Movers?
22         A.  Correct.  Well, Spirit too.
23         Q.  Are the trucks that ECC owns used
24   interchangeably now between the Orville account and
25   Appliance Associates' account?
```

1                ADAM D. WILSON - BY MR. BUTCHER

2    insurance, we would just have to carry cargo and it

3    would be cargo in excess of $50,000.  J.B. Hunt you

4    had to be fully liened on everything that you took

5    from them, which was just ridiculous.

6                So we had to go through an insurance

7    company for that.  And there was only one insurance

8    company that would cover that and it was out of

9    California.  And they just -- it was ridiculous.  Just

10   a huge amount.

11        Q.   If at any point there are things that you

12   remember, add them.  This is not a memorization test.

13        A.   Okay.

14        Q.   It's good that you brought up J.B. Hunt.

15   When did ECC Movers contract with J.B. Hunt?

16        A.   2016.  That's -- again, that's why the

17   Schedule Cs are different, they have more money in

18   there.  That's why.  2016, I believe we worked for

19   them for about a year up until maybe the beginning of

20   2018.  I'm not sure the exact end date for them, but

21   it was roughly about a year we worked for them.

22        Q.   Was the contract ECC had with J.B. Hunt

23   overlapping with the contract ECC had with HDL?

24        A.   No.

25        Q.   Do you know approximately when in 2016 ECC

```
 1              ADAM D. WILSON - BY MR. BUTCHER

 2         A.  Not all the time.  I don't know if you

 3   want specifics.  Two to three times a week.  And that

 4   job was just basically Monday through Friday.  They

 5   didn't work weekends.

 6         Q.  During the 2011 to the present period, ECC

 7   has contracted with at some point in time to move

 8   product J.B. Hunt, Appliance Associates, HDL,

 9   Orville's and Spirit?

10         A.  Correct.

11         Q.  And you don't recall any others?

12         A.  There is no others.

13         Q.  Were there uniforms required on the J.B.

14   Hunt account?

15         A.  No.

16         Q.  Were there uniforms required on the

17   Orville account?

18         A.  No.  Let me correct that.  We have our own

19   uniforms.  There aren't no requirements through

20   Orville's, but we require ourselves.  So we have our

21   own.

22         Q.  And what do the uniforms that ECC Movers

23   have say?

24         A.  Just ECC Delivery.

25         Q.  T-shirt?
```

```
1                ADAM D. WILSON - BY MR. BUTCHER
2    And below that on the Friday that you -- on the
3    Saturday that you worked there is a "DT," are the two
4    letters.  Do you know what DT stands for?
5            A.   That's the dedicated truck.
6            Q.   During the week of this May 17, 2014, on
7    the other days of the week, is it possible you would
8    have been servicing the --
9            A.   Appliance Associates.
10           Q.   -- Appliance Associates' account?
11           A.   That's possible.  I wouldn't be able to
12   tell you where I was at that time.  It could have
13   been -- could have been on a different truck.  I could
14   have been doing other stuff for HDL.  Other trucks
15   that we took out that week, I could have been on that
16   truck specifically, not as a driver.  I could have
17   been a helper.
18           Q.   How often were you working as a helper on
19   a truck as opposed to a driver?
20           A.   Whenever needed.  I'm not -- specifically
21   dates or days, I mean -- but whenever it was needed,
22   so...
23           Q.   Do you have an estimate as to how often
24   you were needed as a helper?
25           A.   10 percent of the time.  I don't know.
```

1                ADAM D. WILSON - BY MR. BUTCHER

2    was under contract with HDL in which you did not

3    deliver any product under that contract?

4                MR. ALBA:  Object to form.

5                You can answer.

6          A.  I have no idea to be honest with you.  I

7    don't have any specific dates.

8          Q.  Do you have any reason to doubt that you

9    did not transport any product as a driver, helper on

10   the HDL contract between May 7, 2016, and May 28,

11   2016?

12         A.  Again, I -- that I would not know.  I

13   don't know if maybe I was in Rochester at that time.

14   These specific dates, I don't know.  I don't know how

15   many we ran at that time.  I couldn't tell you.

16         Q.  It's possible?

17         A.  It's possible, but highly unlikely if

18   there was a whole month that goes by.  It's highly

19   unlikely that I didn't work on one of those trucks at

20   some point or in some fashion.  Just because there's

21   names down there for drivers, that doesn't mean that

22   I'm not on a truck.

23         Q.  And how would we find out if you were on

24   one of these trucks or not?

25         A.  That would have to be through their

```
1              ADAM D. WILSON - BY MR. BUTCHER
2    manifests.  I don't know.  I don't log my days.
3         Q.  What is on the manifest that would
4    identify if you were on the truck or not?
5         A.  Again, I don't know.  I don't know how
6    they do their situations as far as drivers, helpers.
7    I don't know if they just list one person or if -- or
8    if they list two.  That I'm not sure.
9         Q.  So it's possible the manifests wouldn't be
10   helpful in identifying what trucks you operated on
11   either?
12        A.  Correct.  I could have worked every day
13   from the start to when we finished with them.  You
14   wouldn't know because I wouldn't know if I was on
15   those trucks.  If I was doing a helper job or if I was
16   working with a driver or two drivers -- two drivers
17   can be on the same truck.  It doesn't matter.  It's
18   not specific to a driver, helper.  We've had plenty of
19   those.
20        Q.  We know you weren't working on the truck
21   every day on the HDL account, correct?
22        A.  I wasn't working every day, correct.  That
23   obviously would be kind of -- I wouldn't be working
24   six days a week for a whole year.  So I probably had
25   some days that I either took off days, I didn't work.
```

```
 1              ADAM D. WILSON - BY MR. BUTCHER
 2         A.   Nothing.   Just seeing how everything was
 3    running, how the routes were, how the -- or the
 4    manifests were, how the scores were.   Scores were
 5    really your lifeline, basically dictated where you
 6    were all the time.   You always want to make sure your
 7    scores were good.
 8         Q.   On the days that you were delivering for
 9    Appliance Associates, what time would you have to
10    arrive at Appliance Associates?
11         A.   Any time I wanted to.
12         Q.   Where was the Appliance Associates'
13    warehouse located?
14         A.   200 Amherst Street in Buffalo 14207.
15         Q.   So would you go from the Innovel location
16    in Buffalo for the stand-up meeting over to Appliance
17    Associates?
18         A.   If it called for that day, I guess, yeah.
19    I don't specifically remember days like that, but...
20              MR. BUTCHER:   Let's go off the record.
21         (There was a discussion off the record.)
22         Q.   Mr. Wilson, after terminating the contract
23    with HDL, did ECC continue to maintain the same
24    insurance policies it had with Erie?
25         A.   No.   I don't believe so.   We weren't
```

```
 1              ADAM D. WILSON - BY MR. BUTCHER
 2   required to carry the umbrella policy that we were
 3   required to carry for HDL.
 4         Q.  Other than the umbrella policy, were there
 5   insurance policies that you continued to maintain
 6   after terminating the contract?
 7         A.  Yeah.  We pretty much had the same
 8   insurances that we worked with.
 9         Q.  Do you have cell phone records of calls
10   that were made while you were contracting with HDL?
11         A.  Maybe.  I'm not 100 percent sure.  I'd
12   have to go back and get records.
13         Q.  Have you performed any search of your
14   records to determine if you have the cell phone
15   records?
16         A.  No.
17         Q.  Do you have a r?sum? that you filled out?
18         A.  Do I have a r?sum? filled out?
19         Q.  Yes.
20         A.  I have a r?sum?.  That I filled out for
21   HDL?
22         Q.  No.  When was the last time you updated
23   your r?sum??
24         A.  Probably ten years.
25         Q.  Do you have a copy of that r?sum??
```

1

2                    C E R T I F I C A T I O N
STATE OF NEW YORK:
3  COUNTY OF MONROE:

4                I, CHRISTINE KESTER, do hereby certify

5  that the foregoing testimony was duly sworn to; that I

6  reported in machine shorthand the foregoing pages of

7  the above-styled cause, and that they were produced by

8  computer-aided transcription (CAT) under my personal

9  supervision and constitute a true and accurate record

10 of the testimony in this proceeding;

11                I further certify that the witness

12 requests to review the transcript;

13                I further certify that I am not an

14 attorney or counsel of any parties, nor a relative or

15 employee of any attorney or counsel connected with the

16 action, nor financially interested in the action;

17                WITNESS my hand in the City of Rochester,

18 County of Monroe, State of New York.

19 Dated: December 13, 2019.

20

21 *Christine Kester*

22 CHRISTINE KESTER

23 Freelance Court Reporter and

24 Notary Public No. 01KE6093245

25 in and for Monroe County, New York

# EXHIBIT 28

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -x

MIKE KLOPPEL AND ADAM WILSON,

on behalf of themselves and all

other similarly situated persons,

                Plaintiffs,

                              Index No.

      vs.                     6:17cv-06296-FPG

SEARS HOLDINGS CORPORATION, SEARS

ROEBUCK & COMPANY,

AND HOMEDELIVERYLINK, INC.,

                Defendants.

- - - - - - - - - - - - - - - - - - -x

           DEPOSITION of ALEX DUNLOP, taken by

Plaintiffs, held at the offices of Jackson Lewis, 58

South Service Road, Melville, New York, on Wednesday,

October 9, 2019, commencing at 10:02 a.m., before Jean

Wilm, a Registered Professional Reporter, Certified

Manager of Reporting Services, Certified LiveNote

Reporter and Notary Public within and for the State of

New York.

HUDSON COURT REPORTING & VIDEO        1-800-310-1769

```
 1                          Dunlop
 2   A L E X    D U N L O P,
 3   ·           called as a witness, having been first
 4               duly sworn/affirmed by Jean Wilm, a
 5               Notary Public within and for the State
 6               of New York, was examined and testified
 7               as follows:
 8   EXAMINATION
 9   BY MR. SATTIRAJU:
10        Q     Please state your name and address for
11   the record.
12        A     Alex Dunlop, 46 Bryces Court,
13   Sicklerville, New Jersey 08081.
14        Q     Good morning, sir.
15        A     Good morning.
16        Q     My name is Ravi Sattiraju.  I am an
17   attorney and I'm representing Mike Kloppel, Adam
18   Wilson and a group of employees in a case against
19   HomeDeliveryLink and some other entities.
20              You are here for a deposition today.
21   Have you ever had your deposition taken before?
22        A     Not for HomeDeliveryLink, no.
23        Q     Have you ever had a deposition taken
24   before at all?
25        A     Yes.
```

1                            Dunlop

2    three New York terminals.   There was Syosset?

3            A      Yes.

4            Q      Buffalo?

5            A      Yes.

6            Q      And --

7            A      Rochester.

8            Q      Those three?

9            A      Yes.

10           Q      There are no others that you are aware

11   of?

12           A      No.

13           Q      How long have you been a regional

14   director?

15           A      Two and a half years.

16           Q      I am going to be asking you some

17   questions about dates.   Again, do your best.

18           A      Okay.

19           Q      So we are in October of 2019.   So is

20   it fair to say you got your regional director role

21   sometime in early 2017?

22           A      It was April -- yes, end of

23   April 2017.

24           Q      And you have had responsibility for

25   New York since that time?

1

2               C E R T I F I C A T E

3    STATE OF NEW YORK    )

                          ) ss.

4    COUNTY OF NEW YORK )

5               I, Jean Wilm, a Registered

6          Professional Reporter and Notary

7          Public of the State of New York, do

8          hereby certify that the witness was

9          duly sworn/affirmed by me.

10              I further certify that the

11         foregoing deposition of ALEX DUNLOP,

12         taken at the time and place

13         aforesaid is a true and correct

14         transcription of said deposition.

15              I further certify that I am

16         neither counsel for nor related to

17         any party to said action, nor in any

18         wise interested in the result or

19         outcome thereof.

20              IN WITNESS WHEREOF, I have

21         hereunto set my hand this 17th day

22         of October 2019.

23

24         _____

25              JEAN WILM, RPR, CMRS, CLR

# EXHIBIT 29

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK


MIKE KLOPPEL and ADAM WILSON,     )
on behalf of themselves and       )
all other similarly situated      )
persons,                          )
                                  )
                Plaintiffs,       )
                                  )
     vs.                          ) Case No. 6:17-
                                  ) cv-06296-FPG-JWF
                                  )
SEARS HOLDINGS CORPORATION,       )
SEARS, ROEBUCK & COMPANY, and     )
HOMEDELIVERLINK, INC.,            )
                                  )
                Defendants.       )
_____)


DEPOSITION OF RICARDO SIERRA

Burbank, California

Thursday, August 29, 2019


Reported by:  Jeannette Correia

CSR No. 10994

HUDSON COURT REPORTING & VIDEO       1-800-310-1769

 1           BURBANK, CALIFORNIA;

 2      THURSDAY, AUGUST 29, 2019; 8:38 A.M.

 3                 ---o0o---

 4

 5           RICARDO SIERRA,

 6      the witness, having been administered an oath in

 7      accordance with CCP Section 2094, testified as follows:

 8

 9                 EXAMINATION

10   BY MR. SATTIRAJU:

11           Q   Sir, can I get your name for the record.

12           A   Ricardo Sierra.

13           Q   Mr. Sierra, have you ever had your

14      deposition taken before?

15           A   Yes.

16           Q   How many times?

17           A   Five to seven.  I don't remember.

18           Q   Have you had your deposition taken in any

19      wage and hour litigation?

20           A   Yes.

21           Q   Okay.  How many times have you had your

22      deposition taken in a wage and hour litigation?

23           A   Actually, specifically, to wage and hourly,

24      no.  I don't remember if that was the specifics.  It's

25      been about 10 years.

1          Q   How much time did you spend at those

2    facilities?  Would you routinely -- would you go visit

3    them during the years?

4          A   No.  Not specifically.

5          Q   Have you ever been there?

6          A   I've -- I've been there, yes, but not

7    routinely.  Not on schedule.

8          Q   How many times do you think you've been

9    there?

10         MR. BUTCHER:  Objection.  Ambiguous.

11         You can answer.

12         THE WITNESS:  I can?

13         MR. BUTCHER:  Yes, you can.

14         MR. SATTIRAJU:  Actually, I'll withdraw.  I'll

15   reword it.

16         Q   How many times do you think you've been to

17   each of the three New York locations?

18         A   I've been to Rochester once.  I've been to

19   Buffalo, in the last the five years, once.  Before that

20   I spent a little more time in Buffalo, but I don't

21   remember the specific days.

22         Q   What about Syosset?

23         A   Syosset I've been to a handful of times, but

24   in the last thee years, I've been -- I haven't been

25   there in the last three years.  So I don't remember the

1   other dates.

2           Q   Is Syosset still in operation?

3           A   Yes.

4           Q   How many -- about how many trucks operated

5   out of -- would operate out of Rochester on a given day?

6           A   I don't -- I don't know.

7           Q   What about Buffalo when it was open?

8           A   Same difference.  I don't know.  It depends

9   on time of year, time of day.  Peak season, slow season.

10          Q   Do you have a range or?

11          A   I really don't.

12          Q   Could you give me a range or an

13  approximation?

14          MR. BUTCHER:  Objection.  Ambiguous.

15          You can answer it.

16          THE WITNESS:  I -- I really can't.

17  BY MR. SATTIRAJU:

18          Q   What about Syosset?

19          A   Same difference.

20          Q   Is Syosset -- do you remember if Syosset was

21  a big -- a bigger or busier facility than Rochester or

22  Buffalo?

23          A   It was, yes.

24          Q   I mean, would you estimate there were more

25  than 20 or 30 trucks there operating daily?

1        A  They keep -- keep performance indicators

2    that they share, at times through us, that they share

3    directly, that they post for each -- each delivery team.

4        Q  Well, I -- I deposed Mr. Rex yesterday, and

5    my understanding was that the performance metrics for

6    the teams were -- that that information came from Sears.

7        Is that correct or does it come from Innovel

8    Solutions?

9        A  It comes from Innovel Solutions.

10       Q  Okay.  Does -- does Innovel provide that

11   information to Sears as well or the retailer?

12       A  Yes.

13       Q  So when you're saying that there are

14   performance metrics, are you talking about the -- after

15   every delivery, the customer is asked to do a rating,

16   correct?

17       A  I couldn't answer that.  I don't know for

18   sure.  It --

19       Q  Okay.

20       A  -- all depends on the survey company that

21   Innovel Solutions and/or Sears, Costco, e-Bay, La-Z-Boy,

22   whoever the retailer is on the truck, Costco, whoever

23   they use will conduct a survey.  But it -- it varies by

24   client.

25       Q  Okay.  So the information could either come

1   STATE OF CALIFORNIA          )

                                 ) ss:

2   COUNTY OF KINGS              )

3

4        I, JEANNETTE CORREIA, do hereby certify:

5        That I am a duly qualified Certified Shorthand

6   Reporter, in and for the State of California, holder of

7   certificate number 10994, which is in full force and

8   effect and that I am authorized to administer oaths and

9   affirmations;

10       That the foregoing deposition testimony of the

11  herein named witness was taken before me at the time and

12  place herein set forth;

13       That prior to being examined, the witness named

14  in the foregoing deposition, was duly sworn or affirmed

15  by me, to testify the truth, the whole truth, and

16  nothing but the truth;

17       That the testimony of the witness and all

18  objections made at the time of the examination were

19  recorded stenographically by me, and were thereafter

20  transcribed under my direction and supervision;

21       That the foregoing pages contain a full, true

22  and accurate record of the proceedings and testimony to

23  the best of my skill and ability;

24       That prior to the completion of the foregoing

25  deposition, review of the transcript was not requested.

1    I further certify that I am not a relative or

2 employee or attorney or counsel of any of the parties,

3 nor am I a relative or employee of such attorney or

4 counsel, nor am I financially interested in the outcome

5 of this action.

6

7    IN WITNESS WHEREOF, I have subscribed my name

8 this _____ day of _____, _____.

9

10

11   _____

12   JEANNETTE CORREIA, CSR No. 10994

13

14

15

16

17

18

19

20

21

22

23

24

25